# In the United States Court of Appeals
## for the Fifth Circuit

### NO. 26-20412

IN RE: QVC GROUP, INC., ET AL.

ADAM GUI, *ET AL.*,
APPELLANTS
v.
QVC GROUP, INC., *ET AL.*,
DEBTORS-APPELLEES,

On Appeal from the United States Bankruptcy Court
for the Southern District of Texas

## EXHIBITS IN SUPPORT OF EMERGENCY MOTION TO DISMISS APPEAL FOR LACK OF APPELLATE JURISDICTION

Joshua A. Sussberg
Aparna Yenamandra*
Laila M. Kassis
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022

Chad J. Husnick*
Gabriela Zamfir Hensley*
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654

Rex W. Manning
*Counsel of Record*
Katherine McMullen*
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 389-5000

*Counsel for Appellees*

July 30, 2026                                                              *Admission Pending*

## TABLE OF CONTENTS

| EXH. NO | DOCUMENT |
|---|---|
| A | Order denying emergency motions to stay pending appeal, dated July 28, 2026 (SDTX Case No 4:26-cv-05680, Dkt. 39) |
| B | Preferred Shareholders' Amended Emergency Motion for Stay Pending Appeal of Confirmation Order, or, in the Alternative, for Limited Stay and Interim Stay Pending Hearing, dated July 23, 2026 (SDTX Case No 4:26-cv-05680, Dkt. 14) |
| C | Appellees' Opposition to Amended Emergency Motion for Stay Pending Appeal, dated July 27, 2026 (SDTX Case No 4:26-cv-05680, Dkt. 38) |
| D | Transcript of Hearing, dated July 22, 2026 (Bankr. SDTX Case No. 26-90447) |
| E | Preferred Shareholders' Emergency Motion for Stay Pending Appeal of Confirmation Order Under Bankruptcy Rule 8007(A), or, in the Alternative, for Limited Stay and Interim Stay Pending Hearing, dated July 16, 2026 (Bankr. SDTX Case No 26-90447, BkDkt. 716) |
| F | Debtors' Objection to Preferred Shareholders' Emergency Motion for Stay Pending Appeal [Docket No. 716], dated July 20, 2026 (Bankr. SDTX Case No 26-90447, BkDkt. 730) |
| G | Declaration of Jason Keyes in Support of Debtors' Objection to Preferred Shareholders' Emergency Motion for Stay Pending Appeal of Confirmation Order Under Bankruptcy Rule 8007(A), or, in the Alternative, for Limited Stay and Interim Stay Pending Hearing, dated July 20, 2026 (Bankr. SDTX Case No 26-90447, BkDkt. 729) |
| H | Order (I) Approving the Debtors' Disclosure Statement for the Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, (II) Confirming the Second Amended Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, and (III) Granting Related Relief, |

| | |
|---|---|
| | dated July 20, 2026 (Bankr. SDTX Case No 26-90447, BkDkt. 722) |
| I | Memorandum Opinion (I) Approving Disclosure Statement, (II) Confirming Second Amended Plan, and (III) Granting Related Relief, dated July 15, 2026 (Bankr. SDTX Case No 26-90447, BkDkt. 710) |
| J | Order Denying Preferred Shareholders' Emergency Motion for Stay Pending Appeal of Confirmation Order Under Bankruptcy Rule 8007(A), or, in the Alternative, for Limited Stay and Interim Stay Pending Hearing [Docket No. 716], dated July 22, 2026 (Bankr. SDTX Case No 26-90447, BkDkt. 750) |

July 30, 2026

Joshua A. Sussberg
Aparna Yenamandra*
Laila M. Kassis
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022

Chad J. Husnick*
Gabriela Zamfir Hensley*
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654

Respectfully submitted,

<u>s/ Rex W. Manning</u>
Rex W. Manning
  *Counsel of Record*
Katherine McMullen*
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 389-5000

*Admission Pending

# Exhibit A

United States District Court
Southern District of Texas
**ENTERED**
July 28, 2026
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re QVC GROUP INC., | § | |
| | § | |
| Debtor. | § | |
| | § | CIVIL ACTION NO. 4:26-CV-5680 |
| | § | |
| ADAM GUI, *et al.*, | § | BANKRUPTCY CASE NO. 26-90447 |
| | § | |
| Appellants. | § | |

## **ORDER**

This is a bankruptcy appeal. Pending before the Court is Appellants' amended motion for a stay pending appeal of the bankruptcy court's confirmation order.

An appeal to a federal district court from the bankruptcy court "shall be taken in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district courts[.]" 28 U.S.C. § 158(c)(2). A stay pending appeal is "an extraordinary remedy[,]" and the burden on the party seeking it "is a substantial one[.]" *Texas v. United States*, 40 F.4th 205, 215 (5th Cir. 2022). Four factors guide the Court's exercise of its discretion in deciding whether to grant a stay pending appeal: "1) whether the applicant has made a strong showing of likelihood to succeed on the merits; 2) whether the movant will be irreparably harmed absent a stay; 3) whether issuance of a stay will substantially injure other interested parties; and 4) where the public interest lies." *Thomas v. Bryant*, 919 F.3d 298, 303 (5th Cir. 2019).

1 / 2

The Court has reviewed the record and the parties' thorough briefing[1] and has concluded that Appellants have failed to carry their burden. Accordingly, Appellants' amended motion for a stay pending appeal (Dkt. 14) is respectfully **DENIED**. Appellants' original motion for a stay pending appeal (Dkt. 3) is **DENIED AS MOOT**.

SIGNED at Houston, Texas on July 28, 2026.

George C. Hanks Jr.

GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE

---

[1] Appellants' motion for leave to exceed the Court's word and page limits (Dkt. 15) is **GRANTED**.

# Exhibit B

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Civil Action No. 26-cv-05680 |
| QVC GROUP, INC., *et al.*,[1] | Bankruptcy Case No. 26-90447 (ARP) |
| Debtors. | (Jointly Administered) |
| Adam Gui, *et al.*, | |
| Appellants. | |

## PREFERRED SHAREHOLDERS' AMENDED EMERGENCY MOTION FOR STAY PENDING APPEAL OF CONFIRMATION ORDER, OR, IN THE ALTERNATIVE, FOR LIMITED STAY AND <ins>INTERIM STAY PENDING HEARING</ins>

---

[1] A complete list of each of the Debtors in these Chapter 11 cases (the "<ins>Chapter 11 Cases</ins>") may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/QVC. The location of Debtor QVC Group, Inc.'s corporate headquarters and the Debtors' service address in these Chapter 11 Cases is 1200 Wilson Drive, West Chester, Pennsylvania 19380.

# **TABLE OF CONTENTS**

TABLE OF CONTENTS................................................................................................ii

TABLE OF AUTHORITIES ........................................................................................iii

PRELIMINARY STATEMENT ..................................................................................... 2

RELEVANT BACKGROUND ....................................................................................... 9

    I.    The Corporate Structure And The QVCG Preferred Equity ................................... 9

    II.    The Intercompany Settlement ............................................................................... 11

    III.  The Prepackaged Plan Process Excluded The Preferred Shareholders.................. 12

    IV.  The Confirmation Trial Record .............................................................................. 12

        A.    The Plan Violates Section 1129(a)(10) of the Bankruptcy Code .................. 12

        B.    The Intercompany Settlement is Neither Fair nor Equitable ........................ 13

    V.    The Confirmation Decision And Need For Emergency Relief ............................ 17

RELIEF REQUESTED ................................................................................................. 19

ARGUMENT................................................................................................................. 19

    I.    Legal Standard ..................................................................................................... 19

    II.    The Preferred Shareholders Have A Substantial Case To Present On Appeal ...... 20

        A.    The Plan Raises Serious Issues Under Section 1129(a)(10) of the
            Bankruptcy Code........................................................................................... 21

        B.    The Appropriate Standard of Review Governing the Bankruptcy Rule
            9019 Settlement Presents a Substantial Question ......................................... 27

        C.    Approval of the Intercompany Settlement Presents a Substantial Question . 28

    III.  The Preferred Shareholders Will Suffer Irreparable Harm Absent A Stay ........... 36

    IV.  A Stay Will Not Substantially Harm Other Parties And Can Be Tailored ............ 38

    V.    The Public Interest Favors A Stay ....................................................................... 41

    VI.  The Court Should Enter An Interim Stay Of The Confirmation Order
        During The Pendency Of This Motion.................................................................. 41

EMERGENCY CONSIDERATION ........................................................................... 42

CONCLUSION ............................................................................................................. 43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arnold v. Garlock, Inc.*,
278 F.3d 426 (5th Cir. 2001)..................................................................................... 9, 20

*Asarco LLC v. Americas Mining Corp.*,
419 B.R. 737 (S.D. Tex. 2009) ...............................................................................21, 39

*Czyzewski v. Jevic Holding Corp.*,
580 U.S. 451 (2017)...................................................................................................... 41

*Detroit Free Press, Inc. v. Ashcroft,*
No. 02-1437, 2002 WL 1332827 (6th Cir. Apr. 10, 2002)............................................ 42

*Foster v. Hallco Mfg. Co.*,
835 F. Supp. 1235 (D. Or. 1993) ................................................................................. 40

*In re Adelphia Commc'ns Corp.*,
361 B.R. 337 (S.D.N.Y. 2007) ................................................................................ 36, 41

*In re Am. Solar King Corp.*,
90 B.R. 808 (Bankr. W.D. Tex. 1988)..................................................................... 22, 26

*In re AWECO, Inc.*,
725 F.2d 293 (5th Cir. 1984)........................................................................................ 28

*In re Beach,*
731 F. App'x 322 (5th Cir. 2018).................................................................................. 28

*In re Bidermann Indus. U.S.A. Inc.*,
203 B.R. 547 (Bankr. S.D.N.Y. 1997) .........................................................................27

*In re Blast Energy Servs., Inc.*,
593 F.3d 418 (5th Cir. 2010)........................................................................................ 37

*In re Container Store Grp., Inc.*,
676 B.R. 356 (S.D. Tex. 2026) ....................................................................................23

*In re Coram Healthcare Corp.*,
271 B.R. 228 (Bankr. D. Del. 2001) ............................................................................ 33

*In re Emerald Oil Co.*,
807 F.2d 1234 (5th Cir. 1987)................................................................................... 6, 31

*In re First S. Sav. Ass'n*,
820 F.2d 700 (5th Cir. 1987)..................................................................................... 8, 20

*In re Jackson Brewing Co.*,
624 F.2d 599 (5th Cir. 1980) ........................................................................ 30

*In re K Lunde, LLC*,
513 B.R. 587 (Bankr. D. Colo. 2014) ........................................................... 23

*In re LATAM Airlines Grp. S.A.*,
620 B.R. 722 (Bankr. S.D.N.Y. 2020) ...........................................................27

*In re Manges*,
29 F.3d 1034 (5th Cir. 1994) ........................................................................ 36

*In re Moore*,
608 F.3d 253 (5th Cir. 2010) ........................................................................ 29

*In re NII Holdings, Inc.*,
536 B.R. 61 (Bankr. S.D.N.Y. 2015) .............................................................35

*In re Ondova Ltd. Co.*,
620 F. App'x 290 (5th Cir. 2015) ............................................................. 9, 42

*In re Pac. Lumber Co.*,
584 F.3d 229 (5th Cir. 2009) ............................................................. 36, 37, 41

*In re RNI Wind Down Corp.*,
348 B.R. 286 (Bankr. D. Del. 2006) ............................................................. 34

*In re Spirit Airlines, Inc.*,
668 B.R. 689 (Bankr. S.D.N.Y. 2025) ...........................................................23

*In re Tex. Equip. Co.*,
283 B.R. 222 (Bankr. N.D. Tex. 2002) ................................................... 20, 28

*In re Ultra Petroleum Corp.*,
943 F.3d 758 (5th Cir. 2019) ................................................................... 22, 26

*In re Village at Camp Bowie I, L.P.*,
710 F.3d 239 (5th Cir. 2013) ........................................................................ 23

*In re Voluntary Purchasing Grps.*, Inc.,
196 F.3d 1258 (5th Cir. 1999) ...................................................................... 37

*In re Voyager Digital Holdings, Inc.*,
2023 WL 2731737 (S.D.N.Y. Apr. 1, 2023) ................................................. 36

*Matter of Foster Mortg. Corp.*,
68 F.3d 914 (5th Cir. 1995) ........................................................... 6, 27, 34, 35

*Millennium Dental Techs., Inc. v. Fotona d.d.*,
407 F. App'x 482 (Fed. Cir. 2011) ............................................................... 42

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
478 F.3d 452 (2d Cir. 2007) ..........................................................................35

*Nat'l Treasury Employees Union v. Von Raab*,
  808 F.2d 1057 (5th Cir. 1987)................................................................ 20, 21

*Nken v. Holder*,
  556 U.S. 418 (2009).............................................................................. 37

*Poplar Grove Planting & Ref. Co. v. Bache Halsey Stuart, Inc.*,
  600 F.2d 1189 (5th Cir. 1979) .............................................................. 39

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
  390 U.S. 414 (1968).............................................................................. 30

*Reading & Bates Petroleum Co. v. Musslewhite*,
  14 F.3d 271 (5th Cir. 1994).................................................................. 20

*Rio Grande Cmty. Health Ctr., Inc. v. Armendariz*,
  792 F.3d 229 (1st Cir. 2015) ................................................................ 42

*Ruiz v. Estelle*,
  650 F.2d 555 (5th Cir. 1981) ................................................................ 20

*Starke v. SquareTrade, Inc.*,
  2017 WL 11504834 (E.D.N.Y. Dec. 15, 2017)........................................ 21

*Trump v. Int'l Refugee Assistance Project*,
  582 U.S. 571 (2017).............................................................................. 38

*Valentine v. Collier*,
  956 F.3d 797 (5th Cir. 2020)................................................................ 20

*Wembley, Ltd. v. Steinberg (In re Pro Air, Inc.)*,
  (W.D. Wash. Apr. 20, 2005)................................................................. 40

**Statutes**

11 U.S.C. § 101(2) ................................................................................. 24
11 U.S.C. § 101(31)(E)............................................................................ 24
11 U.S.C. § 1124.................................................................. 22, 23, 24, 25, 40
11 U.S.C. § 1129(a)(9)(D) ....................................................................... 23
11 U.S.C. § 1129(a)(10)......................................................................... passim
28 U.S.C. § 158(d)(2) ............................................................................ 19

**Rules**

Fed. R. Bankr. P. 8006 ......................................................................... 19
Fed. R. Bankr. P. 8007(a)(1)(A) ............................................................ 17

Fed. R. Bankr. P. 8007(b)..............................................................................................1, 8

Fed. R. Bankr. P. 9019 ...............................................................................................passim

**TO THE HONORABLE GEORGE C. HANKS JR., UNITED STATES DISTRICT
JUDGE:**

Appellants Adam Gui and certain other Preferred Shareholders (the "Preferred
Shareholders")[2] of QVC Group, Inc. ("QVCG" and, together with its subsidiaries and
affiliates in the above-captioned Chapter 11 Cases, the "Debtors"), by and through their
undersigned counsel, Glenn Agre Bergman & Fuentes LLP and Kane Russell Coleman
Logan PC, respectfully submit this emergency motion (this "Motion") under Rule 8007(b)
of the Federal Rules of Bankruptcy Procedure for entry of a stay, pending appeal, of the
United States Bankruptcy Court for the Southern District of Texas's (the "Bankruptcy
Court") *Memorandum Decision (I) Approving Disclosure Statement, (II) Confirming
Second Amended Plan, and (III) Granting Related Relief* [Bankr. Dkt. No. 710] (the
"Confirmation Decision") and order [Bankr. Dkt. No. 722] (the "Confirmation Order")
confirming the Debtors' *Second Amended Joint Prepackaged Plan of Reorganization*
[Bankr. Dkt. No. 389] (the "Plan"), which the Bankruptcy Court entered on July 20, 2026.[3]

The Bankruptcy Court entered the Confirmation Order more than twenty-four hours
before the scheduled hearing on the Preferred Shareholders' emergency stay motion
[Bankr. Dkt. No. 716] (the "Stay Motion") pending in the Bankruptcy Court.[4]  It did so
without ruling on the Stay Motion, without granting an administrative stay to preserve the
status quo pending the hearing it had itself set, and without stating any reasons for declining

---

[2]   The Preferred Shareholders are certain institutional and individual holders of the 8.000% Series A Cumulative
      Redeemable Preferred Stock (the "Preferred Stock") issued by QVCG.

[3]   References herein to "Bankr. Dkt." shall refer to the docket of the Chapter 11 Cases.

[4]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

1

to do so.  The Bankruptcy Court subsequently held the hearing and, on July 22, 2026, denied the Stay Motion by written order [Bankr. Dkt. No. 750] (the "Stay Denial Order"). *See* Ex. 1 (Stay Denial Order).[5]  The Preferred Shareholders accordingly seek relief directly from this Court.

## PRELIMINARY STATEMENT

The Confirmation Order should be stayed because the Preferred Shareholders have a pending appeal involving substantial, unresolved legal questions concerning who is entitled to vote on a plan of reorganization, the standard of review for insider settlements, and what constitutes a fair and equitable settlement under Bankruptcy Rule 9019.  Without a stay, the Debtors will consummate the Plan, transfer every dollar and every asset out of QVCG, cancel $1.4 billion in Preferred Stock, and then argue that the appeal is equitably moot.  That sequence is not speculative.  It is the Debtors' stated objective, and it could render appellate review meaningless.

The Confirmation Order approves an improper intercompany settlement (the "Intercompany Settlement") between QVCG and its subsidiary, QVC, Inc. ("QVC").  The Preferred Shareholders—holders of QVCG's 8% Series A cumulative redeemable preferred stock—challenged a prepackaged Plan built on the Intercompany Settlement that transfers all of QVCG's value to its subsidiary, QVC.  The Preferred Shareholders established that this settlement was the product of a preordained, non-arm's-length process

---

[5]  Unless otherwise noted, all references herein to "Ex. _" are to the exhibits contained in the *Preferred Shareholders' Appendix to Amended Emergency Motion for Stay Pending Appeal of Confirmation Order, or, in the Alternative, for Limited Stay and Interim Stay Pending Hearing* (the "Appendix"), filed contemporaneously herewith.  For the avoidance of doubt, a copy of the Stay Denial Order is Ex. 1.  The Preferred Shareholders will file the transcript of the Bankruptcy Court's July 22, 2026 oral ruling once available.

2

among insiders warranting entire-fairness scrutiny, not business-judgment deference. The intercompany claims being "settled" consisted of unfiled fraudulent-transfer claims based on dividends paid over three years ago and hypothetical tax-indemnification claims that have not been assessed by the IRS and have already been substantially insured. In exchange for releasing these dubious claims, QVCG surrendered approximately $195 million in cash and its 62% equity stake in Cornerstone.

Tellingly, the purported intercompany claims were never disclosed in any SEC filings. Instead, they were first concocted by the Debtors, their advisors, and subsidiary company creditors and then negotiated in a settlement that was disclosed for the first time only when the Debtors filed Chapter 11. No parties were allowed to vote on this settlement, and the only parties adversely affected, QVCG's preferred shareholders, were excluded from the negotiation of the settlement and strenuously oppose it. The Bankruptcy Court overruled all objections and confirmed the Plan.

The Plan and the Intercompany Settlement raise substantial legal issues that warrant serious appellate consideration.

First, the Plan violates Section 1129(a)(10) of the Bankruptcy Code, which requires at least one impaired class of claims to vote to accept a plan where, as here, any class of claims is impaired. No such vote occurred here because the Debtors misclassified the Intercompany Settlement claim as unimpaired. The undisputed evidence proves that the claim is in fact impaired: QVC is receiving materially less than the face amount of its $400 million settlement—at most approximately $278.7 million—and is receiving equity in partial satisfaction. The Confirmation Decision reaffirms this conclusion. *See*

3

Confirmation Decision at 90 (finding that the combined value of the Distributable Cash and equity interests in Cornerstone is substantially less than $400 million). Under Fifth Circuit precedent, that qualifies as impairment as a matter of law. Yet the Bankruptcy Court adopted a novel interpretation allowing any debtor, at its sole option, to deem any settlement class "unimpaired"—thereby eliminating the requirement that an impaired non-insider class accept the Plan. The Fifth Circuit has never considered, let alone endorsed, this proposition. Indeed, creditors at QVC and other affiliated debtors who also compromised their claims in settlements under the Plan were classified as impaired and permitted to vote. Only the QVC-QVCG Settlement Claim was gerrymandered into an "unimpaired" classification—precisely because counting QVC's vote would not satisfy Section 1129(a)(10) of the Bankruptcy Code, since QVC is an insider whose acceptance cannot count. This ruling warrants appellate review.

Second, the settlement itself should not have been approved under Bankruptcy Rule 9019. Under the "settlement," all of the value of the QVCG estate was transferred to QVC based solely on the vote of a special committee that never assessed the probability of success of the underlying claims, never obtained an estimate of litigation costs, and never insisted on any recovery for Preferred Shareholders. The Preferred Shareholders—the only parties adversely affected—were excluded from the process and their objections were disregarded. Normally, such wholesale value transfers occur only through substantive consolidation, veil-piercing, or actual litigation. Here, insiders manufactured an intercompany "claim" and then "settled" it on terms that gave QVCG nothing—an extraordinary outcome that was not the product of arm's-length negotiation.

Bankruptcy Rule 9019 requires a settlement to be fair and equitable. That determination requires the court to assess whether there was arm's-length negotiation that accounted for the probability of success on the merits, the cost of litigation, and the views of affected stakeholders. The settlement here satisfies none of these criteria. QVCG's own director, Roger Meltzer, admitted that, before agreeing to the $400 million settlement claim, he never assessed the probability of success of the intercompany litigation he agreed to settle. Driven solely by a desire to placate QVC's creditors, the settlement recognized no possibility that QVCG might prevail, made no deduction for QVC's litigation costs, and provided no recovery whatsoever for Preferred Shareholders—the only QVCG stakeholders who stood to gain or lose from the underlying litigation. The outcome was preordained. By February 12, 2026—before QVCG's Special Committee even began negotiating with QVC—the Committee had already concluded that the most it could obtain for Preferred Shareholders was a release. The undisputed evidence establishes that the settlement was designed to placate QVC's creditors at the expense of QVCG's equity.

Third, the Bankruptcy Court improperly applied business-judgment deference to this insider transaction. The Fifth Circuit has not addressed whether business judgment or entire fairness applies to an intercompany settlement, which, by definition, involves only insiders. Where, as here, a settlement involves insiders, courts customarily apply the entire-fairness standard. At a minimum, this implicates an important, unresolved legal question. And the record here establishes that the Debtors failed to meet their burden to show that the settlement was fair and equitable under either standard.

5

A bankruptcy court's discretion to approve settlements is not limitless. The Fifth Circuit Court of Appeals has repeatedly vacated settlements approved by bankruptcy courts where, as here, (i) they settled weak claims for substantial value, (ii) parties in interest opposed the settlement, and (iii) the settlement was reached between insiders without the participation of the parties in interest. *See In re Emerald Oil Co.*, 807 F.2d 1234, 1239 (5th Cir. 1987) (reversing approval of a settlement where "the hazards of litigation d[id] not justify the approved compromise whereby the creditors receive less than one-third of their potential recovery after trial"); *Matter of Foster Mortg. Corp.*, 68 F.3d 914, 918 (5th Cir. 1995) (vacating a settlement where the bankruptcy court "gave no consideration to issues we find dispositive: that nearly all creditors in interest opposed this settlement and that the settlement was reached between insiders without the participation of the creditors"). The Preferred Shareholders should have an opportunity to present their substantial case on appeal.

Absent a stay, the Preferred Shareholders will suffer irreparable harm. The Debtors will consummate the Plan and transfer QVCG's distributable cash to QVC, transfer QVCG's interest in Cornerstone to QVC, cancel the Preferred Stock, and grant releases binding against the Preferred Shareholders. Once those transactions close, the Debtors clearly will invoke equitable mootness and ask the Fifth Circuit to decline review.

The loss of appellate rights is itself irreparable harm as a matter of law. While the failure to grant a stay would be catastrophic for the Preferred Shareholders, QVC and other stakeholders will suffer no meaningful harm from a stay. QVCG's cash and its Cornerstone equity will remain intact, and unsecured creditors will have the same recovery whether the

6

appeal succeeds or fails. The Plan itself contemplates that the Effective Date for one Debtor may occur before the Effective Date for another. A narrowly tailored stay would merely preserve the status quo at QVCG while these substantial legal questions are resolved.

This case warrants meaningful appellate review. It raises important questions that warrant review on a full record, not foreclosure through consummation. The public interest is not served by allowing a debtor to rush past appellate review by implementing transactions that moot the very rights the Preferred Shareholders seek to vindicate.

The Confirmation Order should be stayed.

## **PROCEDURAL HISTORY**

On April 16, 2026, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court, Case No. 26-90447 (ARP). The Chapter 11 Cases are jointly administered.

The Bankruptcy Court conducted a confirmation trial over four days in June 2026. On July 15, 2026, the Bankruptcy Court entered its Confirmation Decision, overruling the Preferred Shareholders' objections and confirming the Plan.

On July 16, 2026, the Preferred Shareholders filed a notice of appeal of the Confirmation Decision and the forthcoming Confirmation Order, together with an emergency motion for a stay pending appeal in the Bankruptcy Court [Bankr. Dkt. No. 716]. The Bankruptcy Court set a hearing on the stay motion for July 21, 2026, at 1:00 p.m. (Central Time). The Preferred Shareholders also filed an emergency motion for stay pending appeal in this Court [Dkt. No. 3].

On July 20, 2026, the Bankruptcy Court entered the Confirmation Order [Bankr. Dkt. No. 722], more than twenty-four hours before the scheduled hearing on the Preferred Shareholders' stay motion and without first ruling on that motion or entering an administrative stay.  That same day, the Debtors filed a letter in this Court requesting that it "abstain from ruling on appellants' motion" pending the Bankruptcy Court's decision on the stay request [Dkt. No. 5].

On July 21, 2026, the Bankruptcy Court held the hearing on the stay motion.  On July 22, 2026, the Bankruptcy Court entered the Stay Denial Order.  The Bankruptcy Court found that the Preferred Shareholders had not shown a likelihood of success on the merits, had not demonstrated irreparable harm, that a stay would substantially harm the Debtors and other stakeholders, and that the public interest did not favor a stay.  In the alternative, the Bankruptcy Court ruled that any stay would require a bond of no less than $631 million. *See* Ex. 1 (Stay Denial Order).

On July 22, 2026, the Debtors filed a letter in this Court advising of the Bankruptcy Court's ruling and indicating that they would file a formal opposition to the Stay Motion in this Court no later than July 27, 2026 [Dkt. No. 9].  The Debtors have confirmed, both in their filings and on the record before the Bankruptcy Court, that they will not seek a waiver of the fourteen-day automatic stay under Bankruptcy Rule 3020(e), which expires on August 3, 2026.

## ISSUES PRESENTED AND STANDARD OF REVIEW

This Motion presents the following issues:

8

a.     Whether the Preferred Shareholders are entitled to a stay of the Confirmation Order pending appeal under Bankruptcy Rule 8007(b), considering (a) the likelihood of success on the merits, (b) the risk of irreparable harm absent a stay, (c) whether a stay would substantially harm other parties, and (d) whether the public interest favors a stay.  Standard of Review: Courts in the Fifth Circuit apply the four-factor test set forth in *In re First S. Sav. Ass'n*, 820 F.2d 700, 704 (5th Cir. 1987).  A stay may be granted where the movant presents a "substantial case on the merits when a serious legal question is involved" and the balance of equities weighs heavily in favor of a stay. *Arnold v. Garlock, Inc.*, 278 F.3d 426, 439 (5th Cir. 2001).

b.     Whether the Court should enter an immediate interim stay of the Confirmation Order during the pendency of this Motion to preserve the status quo and prevent consummation of the Plan before this Motion can be fully briefed and decided.  Standard of Review: Courts have inherent authority to enter interim stays to preserve the status quo where consummation or a transaction may occur before a stay motion can be resolved.  *See In re Ondova Ltd. Co.*, 620 F. App'x 290, 291 (5th Cir. 2015) (per curiam).

## RELEVANT BACKGROUND

## I.     THE CORPORATE STRUCTURE AND THE QVCG PREFERRED EQUITY

1.     QVCG is the ultimate parent holding company in the Debtors' corporate structure.  As of April 10, 2026, QVCG had approximately $195 million in cash.

9

Disclosure Statement, Art. IV.D.3. Critically, QVCG has zero funded indebtedness. First Day Decl. ¶ 36. In SEC filings submitted shortly before the Petition Date (and in the years preceding it), QVCG did not disclose the existence of any indebtedness, contingent-but-unliquidated claims, or known litigation claims against it and in favor of any of its affiliates, nor did QVC in its own separate SEC filings. *See* Ex. 2, QVC Group, Inc., Annual Report (Form 10-K) (Apr. 15, 2026).

2.    QVCG issued approximately $1.272 billion in face amount of the Preferred Stock. Disclosure Statement, Art. IV.D.2(e). The Preferred Stock consisted of 12,723,158 shares issued and outstanding as of December 31, 2025. Ex. 2, QVC Group, Inc., Annual Report (Form 10-K) (Apr. 15, 2026) at II-57. It is publicly traded under the ticker symbol "QVCPQ" and was listed on the NASDAQ until April 24, 2026. *See* Ex. 3, QVC Group, Inc., Current Report (Form 8-K) (Apr. 20, 2026). The Preferred Stock is subject to a mandatory redemption on March 15, 2031, and holders were entitled to receive quarterly cash dividends at a fixed rate of 8% of face amount per year (which rate increased by contract to 9.5% due to dividend arrearages). Disclosure Statement, Art. IV.D.2(e). In June 2025, QVCG suspended paying cash dividends. *Id.* On the day before the bankruptcy filing, the Preferred Stock trading closed at approximately $2.55 per share.

3.    QVCG also holds a 62% equity interest in QRI Cornerstone, Inc. ("Cornerstone"). Cornerstone is a solvent, operating company with approximately $74 million in cash, no funded debt, and positive Adjusted OIBDA. Cornerstone generated approximately $937 million in revenue and $16 million in Adjusted OIBDA in 2025 (*see* Ex. 2, QVC Group, Inc., Annual Report (Form 10-K) (Apr. 15, 2026) at II-62), and is

10

projected annually to generate $30 million to $42 million of OIBDA through 2029. *See* Ex. 4, QVC Group, Inc., Current Report (Form 8-K), Ex. 99.3 (Apr. 16, 2026). The Debtors' financial advisor estimated Cornerstone's value to be $35 million to $135 million, with a midpoint of $85 million. *See* June 5 Trial Tr. (Griffin) at 425:8-12. Cornerstone and QVCG's $195 million cash provide substantial value to Preferred Shareholders that is being entirely wiped out pursuant to the Intercompany Settlement.

## II.    THE INTERCOMPANY SETTLEMENT

4.    The Intercompany Settlement would transfer almost 100% of QVCG's value to QVC. It allows QVC a $400 million claim against QVCG (the "QVC-QVCG Settlement Claim") to settle (i) alleged, unfiled fraudulent conveyance claims seeking to avoid and recover approximately $800 million distributed from QVC to QVCG in connection with the 2022 Cash Management Plan, and (ii) contractual claims under the Tax Liability Allocation and Indemnification Agreement, dated April 26, 2004 (the "TSA"), for alleged overpayments of approximately $500 million in alleged tax overpayments from QVC to QVCG from 2018 through 2024 and a potential tax indemnification claim of up to approximately $2 billion relating to LINTA's deferred tax liabilities (the "Alleged Intercompany Claims"), which has already been substantially, if not fully, mitigated through insurance. *See Statement of Disinterested Directors of QVC, Inc. in Support of Joint Prepackaged Chapter 11 Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates* ("QVC Board Statement") [Bankr. Dkt. No. 147] ¶ 16; Disclosure Statement, Art. VII.B.3(c)-(e).

11

5. Pursuant to the settlement, QVC will receive 100% of QVCG's distributable cash in satisfaction of the Alleged Intercompany Claims. *See* Plan, Art. III.B.4(b)-(c). QVC will also receive QVCG's 62% equity stake in Cornerstone in satisfaction of the Alleged Intercompany Claims. The trial record confirmed that QVCG transferred that interest to QVC as part of the overall settlement, even though the Plan's treatment of the QVC-QVCG Settlement Claim refers only to QVCG distributable cash and contains no distribution mechanic for the Cornerstone equity. *See* June 8 Trial Tr. (Meltzer) 193:16-23 ("We made a decision that, in the context of the overall settlement and the other items that were being negotiated with Inc., that we would transfer our 62 percent interest in Cornerstone to Inc.").

## III.   THE PREPACKAGED PLAN PROCESS EXCLUDED THE PREFERRED SHAREHOLDERS

6. The Preferred Shareholders were excluded from the process that produced the Intercompany Settlement. Before the Petition Date, the Debtors and their advisors negotiated the restructuring with holders of QVC Notes, RCF Lenders, and LINTA Noteholders—none of whom held claims against QVCG—while leaving out the only stakeholders with a meaningful economic interest in QVCG.

7. In February 2026, counsel for certain Preferred Shareholders asked QVCG to include the Preferred Shareholders in restructuring negotiations. QVCG ignored this overture. The Debtors instead proceeded with a prepackaged Plan under which no class of claims or interests against QVCG voted to accept.

## IV.    THE CONFIRMATION TRIAL RECORD

8.    The evidence at trial established both that the Plan is not confirmable and the Intercompany Settlement is neither fair nor equitable.

### A.    The Plan Violates Section 1129(a)(10) of the Bankruptcy Code

9.    Under QVCG's Plan, the QVC-QVCG Settlement Claim is deemed "Unimpaired," as is every other class of claims under the Plan.  But the evidence at trial confirmed that this $400 million claim is ***impaired*** because claimants are receiving (i) less than 100% of the value of the claim, and (ii) QVCG's equity stake in Cornerstone in partial satisfaction of the claim.

10.    By the Debtors' own valuation of Cornerstone, QVCG's equity stake in that business is worth, at most, $83.7 million.  *See supra* ¶ 3.  Combined with $195 million of cash on QVCG's balance sheet, the QVC-QVCG Settlement Claim is receiving, at most, $278.7 million, substantially less than the $400 million allowed claim.

11.    As explained above, the trial record confirmed that the QVC-QVCG Settlement Claim is also receiving QVCG's equity stake in Cornerstone as a distribution. *See supra* ¶ 5, *citing* June 8 Trial Tr. (Meltzer) 193:16-23 ("We made a decision that, in the context of the overall settlement and the other items that were being negotiated with Inc., that we would transfer our 62 percent interest in Cornerstone to Inc.").

12.    The trial record thus unequivocally established that the Plan violates Section 1129(a)(10) of the Bankruptcy Code, which requires that at least one class of claims that is impaired under the plan has accepted the plan.  *See* 11 U.S.C. § 1129(a)(10).

**B.    The Intercompany Settlement is Neither Fair nor Equitable**

13.    The evidence at trial also established that the Intercompany Settlement is neither fair nor equitable.

14.    First, the evidence established that the Alleged Intercompany Claims were weak at best.  The claims to claw back the dividends require proof of insolvency, but QVC was unlikely to establish that it was insolvent at the time of transfer because:

    i.    Kroll provided a solvency opinion concluding that QVC was solvent at the time it made the $800 million dividend to QVCG (*see* PX-153; PX-173);

    ii.    Kroll provided multiple additional, contemporaneous solvency opinions concluding that QVCG was solvent at all relevant times (*see* PX-48, PX-50, PX-59, PX-52, PX-53, PX-60, PX-51, PX-46, PX-192);

    iii.    QVC's director testified that, if QVCG was solvent, it was reasonable to assume that QVC was also solvent (*see* June 8 Trial Tr. (Keglevic) at 66:6-15);

    iv.    QVC's CFO testified that the solvency opinions were issued in good faith (*see* June 5 Trial Tr. (Wafford) at 401:19-23); and

    v.    The *only* alleged evidence of insolvency was a deck prepared by Evercore relying solely on bond prices, which, critically and without explanation, excluded bonds trading at 80 to 90 cents (*see* PX-150; PX-374)

15.    When scrutinized, the tax claims fared no better.  The record shows that QVC never overpaid its tax obligations.  Both QVC's Vice President of Tax and its CFO testified that QVC's tax payments complied with the TSA.  *See* June 4 Trial Tr. (Kearns) at 204:10-205:11; June 5 Trial Tr. (Wafford) at 404:12-18.

16.    The record also shows that QVC's hypothetical tax indemnity claims were weak.  Among other things, (i) QVC obtained a "should" opinion from PwC with a high

14

degree of certainty that QVC's tax obligation would never become payable (*see* June 4 Trial Tr. (Kearns) at 227:19-228:8, 229:17-230:9); (ii) QVC's CFO testified that both the Debtors' position and his own personal view were that the tax liability "will not" materialize (*see* June 5 Trial Tr. (Wafford) at 405:2-7); and (iii) QVC obtained insurance coverage for the potential tax claims with a 3.8% premium (*see* June 8 Trial Tr. (Meltzer) at 293:7-17), implying a low likelihood that the claims will ever have to be paid.

17.     <u>Second</u>, the evidence established that QVCG failed to assess the probability of success of the Alleged Intercompany Claims.  Incredibly, QVCG's director conceded at trial that he never came to a view regarding QVC's probability of success on the Alleged Intercompany Claims.  *See* June 8 Trial Tr. (Meltzer) at 316:18-317:1 ("Q: [B]efore you agreed to the $400 million claim amount, you did not come to a view [on] the probability that QVC, Inc. would prevail on the intercompany litigation, did you? A: I did not come to a view any more than I came to a view as to whether we would succeed in defending it.").

18.     <u>Third</u>, the evidence established that QVCG failed to negotiate at arm's length.  Among other things:

    i.    QVCG's director conceded that the settlement recognized no possibility that QVCG might prevail (*see* June 8 Trial Tr. (Meltzer) at 320:13-18);

    ii.    QVCG's director conceded that he never insisted on a recovery for Preferred Shareholders (*see id.* at 310:11-24; 311:13-22);

    iii.    By February 12, 2026, before any direct negotiations QVC's representatives, QVCG's directors had already limited Preferred Shareholder recovery to releases only (*see* PX-368; *see also* June 8 Trial Tr. (Meltzer) at 278:13-280:25)

    iv.    QVCG obtained no estimate of litigation costs (*see id.* at 320:19-24);

> v.    QVCG did not use those costs, QVC's litigation risk, or QVC's desire for a "fast and final" resolution as leverage (*see id.* at 321:8-24; June 8 Trial Tr. (Keglevic) at 101:18-22); and
>
> vi.    QVCG funded at least $75 million in professional fees to date to consummate a restructuring of other QVC debtor entities (*see id.* at 274:23-275:11).

19.    Fourth, the evidence established that QVCG had only approximately $220,000 of third-party trade claims.  *See* DX-439.  While the QVCG directors extolled the virtue of paying general unsecured claims in full, the record is now clear that there are only $220,000 of third-party trade claims.  The vast majority of purported general unsecured claims—more than $9.5 million—are tax priority claims that are entirely unaffected by the Intercompany Settlement because they have priority status over general unsecured claims.  *See id.*

20.    Fifth, the evidence established that the QVCG directors never analyzed whether existing Preferred Shareholders would benefit from the releases included in the Intercompany Settlement.  The QVCG directors also extolled the importance of obtaining releases for the Preferred Shareholders in connection with the settlement, but QVCG's director conceded at trial that he never determined whether existing Preferred Shareholders would benefit from the releases.  *See* June 8 Trial Tr. (Meltzer) at 333:25-334:11.

21.    Sixth, no Preferred Shareholder has expressed support for the settlement.  The Debtors have argued that only the Preferred Shareholders who retained counsel to formally object to the Plan oppose the settlement.  That is false.  Since the trial ended, other Preferred Shareholders have written to the Bankruptcy Court expressing their dissatisfaction with the settlement.  *See* June 16, 2026 Wampanoag Capital LLC Letter

[Bankr. Dkt. No. 547]; June 22, 2026 A. Ariker Letter [Bankr. Dkt. No. 598].  The views of Preferred Shareholders must be taken into account because they are the only stakeholders that stand to gain or lose from the settlement.  Yet QVCG simply ignored the views of the Preferred Shareholders because the decision had already been made to sacrifice their recovery for the benefit of QVC creditors.  The Confirmation Decision validated the Debtors' disregard for Preferred Shareholder interests by adopting a legal standard for settlement approval that only considers whether the settlement is in the "best interests of creditors" and ignores all consideration of the interests of equity holders.

22.    Seventh, the Preferred Shareholders have offered to fund the intercompany litigation at no cost to the estates.  *See* PX-301.

23.    On this record, the Debtors did not (and cannot) establish that the Intercompany Settlement is fair and equitable.

## V.    THE CONFIRMATION DECISION AND NEED FOR EMERGENCY RELIEF

24.    Bankruptcy Rule 8007(a)(1)(A) required the Preferred Shareholders to seek a stay pending appeal from the Bankruptcy Court in the first instance.  On July 15, 2026, the Bankruptcy Court entered the Confirmation Decision overruling the Preferred Shareholders' objections and confirming the Plan.  On July 16, 2026, in compliance with that requirement, the Preferred Shareholders filed a notice of appeal of the Confirmation Decision and the forthcoming Confirmation Order, together with the Stay Motion seeking a stay of the Confirmation Order pending that appeal.  The Bankruptcy Court set a hearing

17

on the Stay Motion for July 21, 2026, at 1:00 p.m. (Central Time)—the first opportunity the Bankruptcy Court gave itself to rule on the requested stay.

25.     Notwithstanding that schedule, on July 20, 2026, more than twenty-four hours before the scheduled hearing, the Bankruptcy Court entered the Confirmation Order. It did so without ruling on the Stay Motion, without granting an administrative stay to preserve the status quo pending the hearing it had itself set, and without stating any reasons for declining to do so.  The Confirmation Order expressly provides that "[i]n the absence of any party obtaining a stay pending appeal, the Debtors are authorized to consummate the Plan."  Confirmation Order ¶ 156.  By entering the Confirmation Order on this basis before the Stay Motion could be heard, the Bankruptcy Court cleared the way for the Debtors to consummate the Plan, and potentially moot this appeal, before the Stay Motion could be resolved.

26.     The Bankruptcy Court then held the hearing on the Stay Motion and, on July 22, 2026, denied the Stay Motion by written order [Bankr. Dkt. No. 750].  The Bankruptcy Court found, among other things, that the Preferred Shareholders had not shown a likelihood of success on the merits, had not demonstrated irreparable harm, that a stay would substantially harm the Debtors and other stakeholders, and that the public interest did not favor a stay, and directed the Debtors to submit a proposed order denying the Stay Motion for those reasons.  In the alternative, the Bankruptcy Court ruled that any stay would require a bond of no less than $631 million, based largely on purported harm to QVC's creditors, employees, and vendors rather than to QVCG or QVC itself.  Under these circumstances, the Preferred Shareholders seek relief directly from this Court.

27.     On the Effective Date, the Plan deems substantial consummation to occur, authorizes the Debtors and Reorganized Debtors to consummate restructuring transactions, and binds all holders of claims and interests.  *See* Plan, Arts. IX.C, XII.A, IV.C, IV.G.

28.     Emergency relief is therefore necessary.  Without a stay, the Debtors can cause the Effective Date to occur and implement the QVCG-related transactions before the Preferred Shareholders obtain meaningful appellate review, including direct review by the Fifth Circuit if authorized.  The Preferred Shareholders will separately file a request for certification of a direct appeal to the Fifth Circuit under 28 U.S.C. § 158(d)(2) and Bankruptcy Rule 8006.  *See* Fed. R. Bankr. P. 8006; 28 U.S.C. § 158(d)(2); Plan, Arts. IX.A-C, XII.A.

## **RELIEF REQUESTED**

29.     By this Motion, the Preferred Shareholders respectfully request that the Court: (i) enter an order, substantially in the form attached hereto as **Exhibit A**, granting an immediate interim stay pending a hearing and ruling on this Motion and, if necessary, pending the Fifth Circuit's consideration of direct appeal authorization and any further stay relief, and (ii) enter an order, substantially in the form attached hereto as **Exhibit B**, staying the Confirmation Order pending appeal and prohibiting the Debtors from causing the Effective Date to occur while any stay remains in effect; or alternatively, staying the QVCG-specific provisions of the Plan, including implementation of the Intercompany Settlement, transfer or distribution of QVCG distributable cash, transfer of QVCG's 62% Cornerstone interest, cancellation of Preferred Stock, and enforcement of releases against the Preferred Shareholders; and (iii) grant such other and further relief as is just and proper.

19

**ARGUMENT**

## I.   LEGAL STANDARD

30.     Courts in the Fifth Circuit consider four factors in deciding a motion to stay pending appeal: "(1) whether the movant has made a showing of likelihood of success on the merits; (2) whether the movant has made a showing of irreparable injury if the stay is not granted; (3) whether the granting of the stay would substantially harm the other parties; and (4) whether the granting of the stay would serve the public interest." *In re First S. Sav. Ass'n*, 820 F.2d 700, 704, 709 (5th Cir. 1987); *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981) (same); *In re Tex. Equip. Co.*, 283 B.R. 222, 226-27 (Bankr. N.D. Tex. 2002) (same).

31.     "The first two factors are the most critical." *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020).  Moreover, the Fifth Circuit "has refused to apply these factors in a rigid mechanical fashion." *Reading & Bates Petroleum Co. v. Musslewhite*, 14 F.3d 271, 272 (5th Cir. 1994); *see, e.g., In re First S. Sav. Ass'n*, 820 F.2d at 709 n.10 (finding that the absence of one factor was not fatal).

32.     Here, all four factors weigh in favor of a stay.

## II.   THE PREFERRED SHAREHOLDERS HAVE A SUBSTANTIAL CASE TO PRESENT ON APPEAL

33.     To show likelihood of success for a stay pending appeal, an appellant need only (i) present a "substantial case on the merits when a serious legal question is involved," and (ii) show that the "balance of the equities [*i.e.*, factors 2-4] weighs heavily in favor of granting the stay." *Arnold v. Garlock, Inc.*, 278 F.3d 426, 439 (5th Cir. 2001); *In re Tex. Equip. Co., Inc.*, 283 B.R. at  227 ("With respect to questions of law . . . especially questions

20

involving the application of law, or when the law has not been definitively addressed by a higher court, the movant more easily satisfies the first element."). A "serious legal question" is one "of substantial import to others" (*Asarco LLC v. Americas Mining Corp.*, 419 B.R. 737, 741 (S.D. Tex. 2009) (quoting *Nat'l Treasury Employees Union v. Von Raab*, 808 F.2d 1057, 1059 (5th Cir. 1987)); or one involving a "fact-intensive question in an evolving area of the law, which the court views as presenting a serious question going to the merits." *Starke v. SquareTrade, Inc.*, 2017 WL 11504834, at *2 (E.D.N.Y. Dec. 15, 2017).

34. Here, the Preferred Shareholders have a substantial case to present on appeal involving serious legal questions, including (i) whether, at the sole option of the debtors, any settlement claim can be deemed "unimpaired" and disenfranchised under Section 1129(a)(10), (ii) whether a debtor seeking approval of an insider intercompany settlement is entitled to deference under the business judgment rule or whether the entire fairness standard of review applies, (iii) whether a settlement that wipes 100% of the value of one debtor for the benefit of its debtor subsidiaries can be fair and equitable when the record is rife with evidence that the negotiation was not at arm's length and the purportedly independent directors simply capitulated, and (iv) whether it is appropriate to only consider the best interests of creditors, without regard to any equity holder interests, when determining whether to approve a settlement in a Chapter 11 plan .

### A. The Plan Raises Serious Issues Under Section 1129(a)(10) of the Bankruptcy Code

35. Section 1129(a)(10) of the Bankruptcy Code requires that "at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). As explained above, the record is clear that the QVC-QVCG Settlement Claim is impaired because claimants are receiving (i) less than 100% of the value of the claim, and (ii) equity in Cornerstone in partial satisfaction of that claim. *See supra* ¶ 9. In the Confirmation Decision, the Bankruptcy Court acknowledges that the QVC-QVCG Settlement claim is receiving less than $400 million of value, but mistakenly concludes that claim is unimpaired.

36. The Bankruptcy Court adopted the Debtors' argument that the QVC-QVCG Settlement Claim is unimpaired because QVC agreed, through the RSA and the Intercompany Settlement, to accept QVCG's Distributable Cash and the equity in Cornerstone in full satisfaction of its $400 million allowed settlement claim. *See* Confirmation Decision at 95. In the Bankruptcy Court's view, Section 1124 exempts this treatment from the impairment analysis because QVC, as holder of the claim, agreed under Section 1123(a)(4) to accept less than the full value to which it would otherwise be entitled. *Id.* at 95. There is no Fifth Circuit authority allowing this. Accordingly, the Preferred Shareholders have a strong case that the Bankruptcy Court erred on this serious legal question.

22

37.    Section 1124 provides that a class is impaired unless the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder."  11 U.S.C. § 1124; *see also In re Ultra Petroleum Corp.*, 943 F.3d 758, 763-64 (5th Cir. 2019) ("Impairment results from what the *plan* does.") (emphasis in original) (citing *In re Am. Solar King Corp.*, 90 B.R. 808, 819 (Bankr. W.D. Tex. 1988)).  The Plan does not leave QVC's rights unaltered.  It limits QVC's cash recovery to QVCG's Distributable Cash, and transfers QVCG's 62% Cornerstone interest to QVC as part of the overall settlement.  *See* Plan, Art. III.B.4; Plan Supplement [Bankr. Dkt. No. 212], Ex. C; Preferred Shareholders' Plan Objection ¶¶ 65-69.  As explained above, as reflected in the Debtor's own valuation, QVC's maximum recovery on account of the QVC-QVCG Settlement Claim is roughly $278.7 million, materially below the $400 million allowed claim.  *See supra* ¶ 10.  If even a slight, artificial alteration constitutes impairment, *see In re Village at Camp Bowie I, L.P.*, 710 F.3d 239, 245 (5th Cir. 2013) (rejecting a motive inquiry and materiality requirement under Section 1129(a)(10) because "any alteration of a creditor's rights, no matter how minor," constitutes impairment under Section 1124), then so too does receipt of approximately 70% of an allowed claim and receiving equity instead of cash in satisfaction of that claim.

38.    The three cases on which the Bankruptcy Court relied do not compel a different result.  *See* Confirmation Decision ¶ 94-95.  Both *In re Container Store Grp., Inc.*, 676 B.R. 356, 377-88 (S.D. Tex. 2026), and *In re Spirit Airlines*, *Inc.*, 668 B.R. 689, 702 (Bankr. S.D.N.Y. 2025), addressed opt-out mechanics for third-party releases, not whether an insider settlement claim can be deemed unimpaired to avoid Section 1129(a)(10).  *In re*

23

*K Lunde*, *LLC*, 513 B.R. 587, 595 n.4 (Bankr. D. Colo. 2014), involved statutory tax treatment under Section 1129(a)(9)(D), not a plan-created settlement that transfers a debtor's remaining assets.   None of these cases permits a debtor to manufacture unimpairment of an insider's discounted settlement claim so that no impaired non-insider class of claims exists at that debtor.

39.    The contemporaneous plan documents confirm why Class A4's impairment matters.   The April 12, April 14, April 15, and April 16 drafts treated Class A4 as "Impaired" and stated that QVC was entitled to vote, while the filed Plan treated Class A4 as "Unimpaired," deemed QVC to accept under Section 1126(f), and asserted that Section 1129(a)(10) was satisfied or inapplicable because QVCG had no impaired class of claims. *See* JX 0043, QVC_0031711-QVC_0031873 (4/12/26 Draft Plan) at 32; JX 0044, QVC_0046581-QVC_0046836 (4/14/26 Draft Plan) at 31; JX 0045, QVC_0044406-QVC_0044615 (4/15/26 Draft Plan) at 116; JX 0046, QVC_0037415-QVC_0037597 (4/16/26 Draft Plan) at 127; Plan, Art. III.B.4(d), III.G.  That change is not a bookkeeping point.   It is the mechanism by which the Plan attempts to avoid the only thing Section 1129(a)(10) would otherwise require at QVCG: acceptance by an impaired non-insider class of claims.   If Class A4 is impaired, QVC would be the only impaired accepting claim class at QVCG, and QVC is an insider whose vote could not be counted to satisfy Section 1129(a)(10).[6]

---

[6]    QVC is an insider of QVCG because QVCG directly or indirectly owns 100% of QVC.   *See* 11 U.S.C. § 101(31)(E) (defining "insider" to include, inter alia, an "affiliate" of the debtor); *id.* § 101(2) (defining "affiliate" to include an entity that "directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor"); *see also* First Day Decl., Ex. B1 (Simplified Corporate Structure Chart).

40. The Bankruptcy Court's acceptance of the Debtors' impaired classification of the RSA parties, alongside its acceptance of the unimpaired classification of the QVC-QVCG claim, confirms that its ruling on Section 1124 was outcome-driven rather than neutral. The RCF Lenders, QVC Noteholders, and LINTA Noteholders also "settled" disputed recoveries as part of the RSA and the broader restructuring. Indeed, the LINTA Noteholders accepted an approximately 92.5% haircut on their claims. *See* Confirmation Decision at 72. Yet unlike the QVC-QVCG Settlement Claim, the Debtors classified those RSA parties' claims as impaired, solicited their votes, and relied on their acceptance to satisfy Section 1129(a)(10) at the QVC and LINTA Debtor levels. *See* Confirmation Decision at 92-93. The Debtors cannot have it both ways: if a negotiated settlement in which a creditor accepts less than the full value of its claim renders that creditor "unimpaired" under Section 1124, the RSA parties' claims should likewise have been unimpaired, and no Debtor would have had an impaired accepting class. That the Debtors instead deemed the RSA parties impaired and entitled to vote—while deeming the QVC-QVCG Settlement Claim unimpaired and therefore not entitled to vote—reveals that the Debtors classified economically similar settlements differently depending on which classification was needed to satisfy Section 1129(a)(10) at each Debtor. That kind of classification gerrymandering, in a case of this size and visibility, presents exactly the sort of policy-laden question the Fifth Circuit should be given the opportunity to address.

41. For the first time, in their objection to the Stay Motion, the Debtors offered a rationale for this differential treatment: because Class A4 (the QVC-QVCG Settlement Claim) has a single member that accepted its treatment, "the entire class is definitionally

unimpaired," whereas the multi-member RSA classes were impaired because each contained non-settling creditors. Debtors' Objection to Stay Motion [Bankr. Dkt. No. 730] at 23-24. This reasoning misapplies Section 1123(a)(4), which provides that a plan shall "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to less favorable treatment of such particular claim or interest." By its terms, this provision addresses only whether a member of a class receives less favorable treatment than *other members of that same class*. This provision cannot logically apply to a single-member class. And the Debtors have never explained why the RCF Lender class, 100% of whose members consented to the RSA, was nonetheless classified as impaired.

42.     In denying the Stay Motion, the Bankruptcy Court adopted the Debtors' rationale, holding that a single-member class that consents to less favorable treatment is unimpaired while a multi-member class containing both consenting and non-consenting members remains impaired. The Preferred Shareholders respectfully submit that this ruling does not resolve, but rather confirms, the substantial and previously unaddressed legal question presented on appeal regarding the proper application of Section 1129(a)(10) to a single-member insider settlement class.

43.     Independently, the Plan also impairs the QVC-QVCG Settlement Claim by converting the Alleged Intercompany Claims, which the Disinterested Directors estimated could aggregate $1 to $3 billion in liability (*see* Disclosure Statement, Art. V.D; QVC Board Statement ¶ 22), from contingent, disputed, and unliquidated claims into a liquidated claim allowed in the amount of $400 million. *See* Plan, Art. III.B.4(b). That conversion

26

alters QVC's rights: it eliminates QVC's right to litigate potential intercompany claims and fixes their value at $400 million (a 60-87% discount according to the QVC's Board's own estimation). *See generally In re Ultra Petroleum Corp.*, 943 F.3d 758, 763 (5th Cir. 2019) ("[i]mpairment results from what *the plan* does") (emphasis in original) (citing *In re Am. Solar King Corp.*, 90 B.R. 808, 819 (Bankr. W.D. Tex. 1988)).

44.     The Plan therefore violates Section 1129(a)(10) of the Bankruptcy Code, and a stay is warranted to preserve appellate review of that error.

### B.     The Appropriate Standard of Review Governing the Bankruptcy Rule 9019 Settlement Presents a Substantial Question

45.     In response to the Preferred Shareholders' position that entire fairness should govern review of the Intercompany Settlement, counsel for the Debtors conceded in the Debtors' opening statement that "our response to that is, go ahead.  Apply the entire fairness standard." *See* June 4 Trial Tr. (Sussberg) at 17:24-18:4.  The Bankruptcy Court— without addressing the Debtors' admission concerning the proper standard of review— nevertheless held that QVCG's decision to approve the Intercompany Settlement is entitled to deference under the business judgment rule.  *See* Confirmation Decision at 61.  The Bankruptcy Court's holding was based on its finding that the settlement process here was not conflicted.  *See* Confirmation Decision at 62-67.  At least some courts have disagreed that the relevant inquiry is whether the settlement process was conflicted, holding instead that "[b]y definition, the business judgment rule is not applicable to transactions among a debtor and an insider of the debtor.  Those kinds of transactions are inherently suspect because 'they are rife with the possibility of abuse.'" *In re LATAM Airlines Grp. S.A.*, 620

B.R. 722, 769 (Bankr. S.D.N.Y. 2020) (citing *In re Bidermann Indus. U.S.A. Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997)).  While the Fifth Circuit has not determined the proper standard of review for a settlement between a debtor and an insider of the debtor, it has recognized that "a court's scrutiny must be great when the settlement is between insider and an overwhelming majority of creditors in interest oppose such settlement of claims." *Matter of Foster Mortg. Corp.*, 68 F.3d 914, 919 (5th Cir. 1995).

46.     The absence of definitive Fifth Circuit authority on the precise standard applicable to an insider intercompany settlement only reinforces that the Preferred Shareholders have presented a substantial case on appeal.  *See In re Tex. Equip. Co., Inc.*, 283 B.R. at 227 ("With respect to questions of law . . . especially questions involving the application of law, or when the law has not been definitively addressed by a higher court, the movant more easily satisfies the first element.").  Whether the proper criterion for selecting the standard of review is the presence of a conflict in the negotiation process, rather than the insider nature of the transaction, is precisely the kind of question the Fifth Circuit has not resolved.

## C.     Approval of the Intercompany Settlement Presents a Substantial Question

47.     The Preferred Shareholders have at least a substantial case that the Bankruptcy Court erred by approving the Intercompany Settlement under Bankruptcy Rule 9019.  *See* Confirmation Decision at 67-74.  The core problem is straightforward: the Bankruptcy Court treated uncertainty, cost, process labels, and the rhetoric of a global settlement as substitutes for the estate-specific analysis required.

28

48.     Bankruptcy Rule 9019 does not require a mini-trial, but it does require an informed, independent judgment on a sufficient factual record.  *See In re AWECO, Inc.*, 725 F.2d 293, 299 (5th Cir. 1984) ("approval of a compromise, absent a sufficient factual foundation, inherently constitutes an abuse of discretion").  A settlement must be "*fair and equitable* and in the best interest of the estate." *In re Beach*, 731 F. App'x 322, 325 (5th Cir. 2018) (emphasis added).  In evaluating whether a settlement is fair and equitable, the Bankruptcy Court must consider: "(1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay, including the difficulties, if any, to be encountered in the matter of collection; (3) the paramount interest of the creditors and a proper deference to their respective views; (4) the extent to which the settlement is truly the product of arm's-length bargaining and not fraud or collusion; and (5) all other factors bearing on the wisdom of the compromise." *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010).  The Bankruptcy Court erred in applying these factors to the undisputed facts in the record.

49.     First, the Bankruptcy Court reasoned that the probability of success factor favored approval because the outcome of the litigation was uncertain and the Disinterested Directors believed that settling, rather than litigating, would be more beneficial to estate creditors because litigating could diminish potential recovery out of the estate assets. *See* Confirmation Decision at 69-70.  Critically, the Bankruptcy Court "d[id] not make any conclusive findings as to the merits" of the underlying claims.  Confirmation Decision at 26.  "Rather, the Court f[ound] that the Disinterested Directors each conducted and

29

analyzed their due diligence of the company, and each separately and independently formulated an understanding as to the potential existence of such claims, their potential magnitude, potential defenses, and the factual and legal issues underpinning such potential claims which may need to be addressed by a court through litigation." *Id.* at 26. Indeed, the Bankruptcy Court elsewhere confirmed that it deferred entirely to the Disinterested Directors' judgment rather than independently assessing the merits, stating that it "will not second guess the Disinterested Directors' business judgment that releases with no distribution for the Preferred Shareholders was appropriate . . ." *Id.* at 85. But the law is clear that the Bankruptcy Court must do more than that. The Bankruptcy Court cannot simply defer to the business judgment of the debtors. The court must reach its own "intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980) (applying *TMT Trailer Ferry* factors). The Bankruptcy Court's failure to do so here constitutes clear error.

50. The Bankruptcy Court's reasoning also elided a central point: the record did not merely show uncertainty; it showed specific defenses that QVCG never weighed. QVCG's own materials stated that QVC was not likely to make the required showing of insolvency for clawback claims (*see* PX-153), and QVC's CFO testified that the contemporaneous solvency opinions were issued in good faith. *See* June 5 Trial Tr. (Wafford) at 401:19-23. QVC's tax witness testified that the alleged tax overpayments were not overpayments under the TSA (*see* June 4 Trial Tr. (Kearns) at 204:10-205:11,

222:4-20), and QVC's CFO likewise testified that QVC's payments to QVCG complied with the TSA. *See* June 5 Trial Tr. (Wafford) at 404:12-18. The asserted tax-indemnity exposure was similarly contested: QVC obtained a "should" opinion that the tax liability would not materialize (*see* June 8 Trial Tr. (Meltzer) at 182:19-183:14), QVC's own position was that the tax liability "will not" materialize and QVC's CFO agreed with that position (*see* June 5 Trial Tr. (Wafford) at 405:2-8), and QVC obtained $925 million of tax insurance for a premium of approximately $36 million. *See* June 8 Trial Tr. (Meltzer) at 293:7-17. Yet Mr. Meltzer admitted that, before agreeing to the $400 million claim, he did not come to a view on QVC's probability of success, and that the settlement recognized ***no*** possibility that QVCG might prevail. *See* June 8 Trial Tr. (Meltzer) at 316:18-317:1, 320:13-18. Bankruptcy Rule 9019 does not let a debtor convert uncertainty into proof. On this record, the probability factor supports reversal, not approval.

51. The Fifth Circuit's decision in *In re Emerald Oil Co.*, 807 F.2d 1234 (5th Cir. 1987) is instructive. There, the bankruptcy court approved a settlement of a fraudulent conveyance claim finding that the compromise was reasonable and in the estate's best interests in light of its conclusion that the trustee "might not succeed" in setting aside the transfer. *Id.* at 1239. The Fifth Circuit disagreed with the bankruptcy court's assessment of the strength of the claim, finding that the trustee likely could set aside the transfer as a matter of law. *See id.* The Fifth Circuit therefore reversed the Bankruptcy Court's approval of the settlement, emphasizing that the "hazards of litigation do not justify the approved compromise whereby the creditors receive less than one-third of their potential recovery after trial." *Id.*

31

52.     Second, the Bankruptcy Court reasoned that the complexity and cost factor favored approval because the potential intercompany claims would "implicate manifold legal issues" as well as "complicated factual issues" that would be time-consuming and expensive to litigate.  *See* Confirmation Decision at 70-71.  This could be said of any settlement of significant bankruptcy litigation claims and would render this factor meaningless.  But even so, litigation would have given QVCG *some chance of a recovery*, whereas this settlement eliminated any chance of one.  Moreover, QVCG never undertook the work needed to rely on litigation cost as a settlement justification.  Mr. Meltzer admitted that QVCG never obtained an estimate of litigation costs for either QVCG or QVC, and never used the cost of litigation for either side as leverage.  *See* June 8 Trial Tr. (Meltzer) at 320:19-24; 321:8-11.  QVC, by contrast, had every reason to pay for speed and finality: its director testified that litigation would reduce QVC's recovery by fees (*see* June 8 Trial Tr. (Keglevic) at 99:1-8), delaying the "fast and final" resolution was his "objective" (*see id.* at 99:12-100:4; 102:20-103:5; 126:17-21), create risk that QVC could lose and recover nothing (*see id.* at 101:18-22), and be "ugly" and harmful to the estate.  *Id.* at 100:5-12.  QVCG did not use that leverage, did not deduct litigation costs from QVC's asserted recovery, and accepted a settlement that gave QVCG no upside from winning.  The Preferred Shareholders also offered to fund litigation costs so the estates would not bear them.  *See* PX-301.  Complexity may justify compromise; it cannot justify total capitulation, surrendering all of QVCG's value without first testing whether the cost problem was real, avoidable, or useful as leverage against QVC.

32

53.     Third, the Bankruptcy Court reasoned that the settlement was the product of arm's length bargaining because each key debtor had disinterested directors and separate counsel. *See* Confirmation Decision at 73. But titles and process labels are not talismans. Before negotiations even began, the QVCG Special Committee limited Preferred Shareholder recovery to releases (*see* PX-368). One day later, QVCG's opening position was that QVC's clawback claims were not likely viable and QVCG should pay nothing for them. *See* PX-153. QVC then proposed an at least $400 million unsecured claim with no recovery for Preferred Shareholders (*see* June 8 Trial Tr. (Keglevic) at 106:10-107:9), and QVCG ultimately accepted a $400 million claim with no Preferred Shareholder recovery. *See id.* at 113:15-114:3.

54.     The Bankruptcy Court found that "Kobre and the QVCG Disinterested Directors negotiated as best they could for a better result both for QVCG and the Preferred Shareholders." Confirmation Decision at 73. But that finding is not supported by the facts established at trial. Indeed, Mr. Meltzer admitted that he never insisted on any Preferred Shareholder recovery (*see* June 8 Trial Tr. (Meltzer) at 310:11-24; 311:13-22), did not hire an independent financial advisor, investment banker, or solvency expert, did not bring QVCG's tax advisor to the settlement meeting (*see id.* at 178:25-179:6, 221:17-222:4, 222:10-21; 303:24-304:1; 304:11-14), and ignored Preferred Shareholder outreach before the settlement was finalized. *See id.* at 325:11-14; 326:4-8; 327:3-8. That is not arm's length bargaining. As the court explained in *In re Coram Healthcare Corp.*, a debtor cannot hire a purportedly independent fiduciary to simply "sprinkle holy water" to cleanse an

33

otherwise conflicted transaction. *In re Coram Healthcare Corp.*, 271 B.R. 228, 240 (Bankr. D. Del. 2001).

55.    Fourth, the Bankruptcy Court reasoned that the stakeholder interest factor favored approval because the settlement "functions as the keystone to the RSA and the Plan." Confirmation Decision at 72. That argument cannot support approval. Bankruptcy Rule 9019 required a QVCG-specific inquiry: was it fair and equitable for QVCG to give QVC its distributable cash and QVCG's 62% Cornerstone interest while leaving Preferred Shareholders with no recovery? The fact that the settlement was part of a broader restructuring did not answer that question. To the contrary, because the settlement was embedded in the Plan and eliminated Preferred Shareholder recovery, the Bankruptcy Court must ensure that the settlement did not bypass the voting and confirmation protections that ordinarily apply when a plan transfers estate value away from junior stakeholders. If the desire for "global peace" were sufficient, a debtor could transfer value from one estate to another debtor's creditors whenever doing so made a multi-debtor restructuring easier to confirm. Bankruptcy Rule 9019 does not permit that result.

56.    The Bankruptcy Court also emphasized that "no creditor has lobbied an objection" to the settlement—the only objectors are equity and the U.S. Trustee. Confirmation Decision at 72. That emphasis was misplaced. Where, as here, "there is a likelihood of a recovery for equity, the Court can and should consider the interest of equity holders in applying" the stakeholder interest factor. *In re RNI Wind Down Corp.*, 348 B.R. 286, 298 (Bankr. D. Del. 2006), *subsequently aff'd*, 359 F. App'x 352 (3d Cir. 2010). No Preferred Shareholder before the Bankruptcy Court supported the settlement, even though

34

the Preferred Stock had approximately $1.4 billion of liquidation preference and was the only constituency with an economic incentive to test QVC's claims.  Since the trial ended, multiple Preferred Shareholders have written to the Bankruptcy Court expressing their dissatisfaction with the settlement.  *See supra* ¶ 21.  The stakeholder interest factor therefore weighs against approval.

57.     The Fifth Circuit's decision in *Matter of Foster Mortg. Corp.*, 68 F.3d 914 (5th Cir. 1995) is instructive.  There, the Fifth Circuit vacated a settlement approved by the bankruptcy court because the bankruptcy court "gave no consideration to issues we find dispositive: that nearly all creditors in interest opposed this settlement and that the settlement was reached between insiders without the participation of the creditors.  In our estimation, the court abused its discretion by not showing proper deference to the views of the creditors."  *Id.* at 918; *see also Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (identifying, among the factors bearing on whether a settlement is fair and equitable, "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement"); *In re NII Holdings, Inc.*, 536 B.R. 61, 120 (Bankr. S.D.N.Y. 2015) (finding that parties in interest supported the settlement where "the Plan received overwhelming approval from every impaired class of creditors, all of whom will be affected by the Settlement").  The same reasoning applies here:  the relevant parties in interest—the preferred shareholders of a solvent debtor—all oppose the settlement and were excluded from the negotiation.

58.     Each of the relevant factors therefore weighed against approval of the QVC-QVCG Settlement.  The Preferred Shareholders have, at minimum, a substantial case that approval of the settlement should be reversed.

## III.    THE PREFERRED SHAREHOLDERS WILL SUFFER IRREPARABLE HARM ABSENT A STAY

59.     Absent a stay, the Preferred Shareholders will suffer irreparable harm because the Debtors may consummate the Plan and then argue that appellate review is equitably moot.  That risk matters here because the appeal concerns assets, releases, cancellations, and waivers that the Debtors intend to implement on or around the Effective Date.  Courts recognize that the loss of appellate rights is irreparable harm as a matter of law.  *See In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 348 (S.D.N.Y. 2007) (holding that "loss of appellate rights" is "a quintessential form of prejudice"); *In re Voyager Digital Holdings, Inc.*, 2023 WL 2731737, at *10 (S.D.N.Y. Apr. 1, 2023) (holding that risk of mootness absent a stay satisfies the irreparable-harm prong); *see also In re Pac. Lumber Co.*, 584 F.3d 229, 242-43 (5th Cir. 2009) (noting that plan consummation may often be dispositive of equitable mootness and that substantial legal issues can and should be preserved for review).

60.     The Preferred Shareholders do not concede that their appeal would be equitably moot.  But courts grant stays precisely because consummation of a Chapter 11 plan may create a serious risk that appellate courts will be asked to decline review, and the Debtors have indicated that they believe the appeal would be equitably moot.  *See In re Manges*, 29 F.3d 1034, 1039 (5th Cir. 1994) (recognizing that equitable mootness is

prudential and permits a court to decline review); *In re Blast Energy Servs., Inc.*, 593 F.3d 418, 424 (5th Cir. 2010) (stating that equitable mootness applies only when reorganization has progressed too far for practical relief); *In re Pac. Lumber Co.*, 584 F.3d at 242-43 (describing risks created by plan consummation absent a stay); *In re Voluntary Purchasing Grps.*, Inc., 196 F.3d 1258 (5th Cir. 1999) (per curiam) (reversing denial of stay where, absent a stay, appellants' right to contest confirmation could be thwarted).

61.     The harm is especially concrete here because, on or around the Effective Date, the Plan authorizes the Debtors to transfer assets, issue and distribute new equity, enter exit financing, issue takeback debt, adopt new organizational documents, and make the Plan binding on all holders of claims and interests. *See* Plan, Arts. IV.A, IV.C.3-5, IV.E, IV.G, IV.I, XII.A. Those steps would not merely advance the broader restructuring; they would implement the very QVCG-specific transactions that the Preferred Shareholders seek to challenge on appeal. *See* Plan, Arts. VIII.C-D, VIII.F.

62.     The Plan makes that risk acute. It provides that substantial consummation occurs on the Effective Date; authorizes transfers, new debt and equity issuances, exit financing, and other restructuring transactions; and provides that, on the Effective Date, holders are deemed to have waived arguments concerning their claims or interests if not disclosed before confirmation. *See* Plan, Arts. IV.A, IV.C.3-5, IV.E.2-5, IV.I, IV.J, IX.C, XII.A, XII.N. If QVCG distributable cash and the 62% Cornerstone interest are transferred, releases become operative, and the Preferred Stock is canceled, the Preferred Shareholders cannot be restored fully after the fact. *See* Plan, Arts. III.B.6, VIII.C–D, VIII.F.

## IV.   A STAY WILL NOT SUBSTANTIALLY HARM OTHER PARTIES AND CAN BE TAILORED

63.     A stay will not substantially harm other parties because the Court can tailor relief to the QVCG-specific provisions that threaten appellate rights.  Courts may tailor a stay to operate only with respect to a portion of the proceeding.  *See Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (recognizing courts' ability to tailor stay relief); *Nken v. Holder*, 556 U.S. 418, 428 (2009) (describing a stay as a means of suspending judicial alteration of the status quo).  The Plan itself supports tailored relief because it states that conditions precedent apply to each Debtor individually and that the Effective Date for one Debtor may occur before the Effective Date for another.  *See* Plan, Art. IX.B.

64.     The Debtors have argued that the Plan preserves QVC and Cornerstone as going concerns, saves jobs, eliminates funded debt, provides exit financing, pays general unsecured claims in full, and resolves inter-debtor litigation.  *See* Debtors' Confirmation Brief at 10-11.  But the Preferred Shareholders do not ask the Court to unwind the enterprise; they ask the Court to preserve QVCG's disputed assets and their appellate rights while the QVCG-specific issues are reviewed.

65.     At a minimum, the Court should stay the transfer or distribution of QVCG distributable cash, the transfer of QVCG's 62% Cornerstone interest, the cancellation of Preferred Stock, and enforcement of releases against the Preferred Shareholders. Practically speaking, this will result only in lowering the amount of distribution certain of QVC's creditors will take at emergence.  There will be no impact to the business,

38

employees, supplies, or customers. That relief would preserve the appellate remedy without necessarily preventing the Debtors from seeking to implement non-QVCG transactions that can lawfully proceed without impairing the Preferred Shareholders' appeal. *See* Plan, Art. IX.B-C.

66. No bond should be required here, where the assets at issue, cash and stock in a subsidiary, will remain intact for distribution in the event that Appellees prevail on this appeal. A bond under Bankruptcy Rule 8007 is intended solely to protect the debtor whose assets are the subject of the stay (here, QVCG) and its creditors against harm during the pendency of the appeal; it is not a vehicle for securing the rights and claims of third parties, including QVC and the other Debtors, which are not part of, and should not factor into, any bond calculation. The assets at issue during the pendency of the stay (*i.e.*, QVCG's distributable cash and its 62% Cornerstone equity interest) will remain intact and available to be transferred to the Debtors or other parties later should the Preferred Shareholders not prevail on appeal, and the Debtors will continue to control and operate Cornerstone throughout the appeal regardless of the stay. Accordingly, there is no cognizable risk of harm to QVCG or its creditors that a bond would need to secure. And because those assets need only remain in a bank account pending appeal, any bond—let alone the $631 million bond calculated by the Bankruptcy Court based on harm to the other Debtors and their stakeholders—is unnecessary, dramatically excessive and punitive.

67. Indeed, the Fifth Circuit permits a court to accept alternate security in place of a bond. *See Poplar Grove Planting & Ref. Co. v. Bache Halsey Stuart, Inc.*, 600 F.2d 1189, 1191 (5th Cir. 1979); *see also Asarco LLC v. Ams. Mining Corp.*, 419 B.R. 737, 741-

42, 745 (S.D. Tex. 2009) (explaining that *Poplar Grove* "instructs [that] courts possess considerable discretion to devise an alternative to posting a supersedeas bond"). Where, as here, the funds at issue—presently held by QVCG—can be deposited in an interest-bearing bank account by QVCG with no threat of diminution, the requirements for "alternate security" have been met. *See, e.g., Wembley, Ltd. v. Steinberg (In re Pro Air, Inc.)*, No. AP 02-1571, 2005 WL 81600, at *2-3 (W.D. Wash. Apr. 20, 2005) (holding that an interest-bearing escrow account is an adequate alternate guarantee in lieu of a supersedeas bond); *Foster v. Hallco Mfg. Co.*, 835 F. Supp. 1235, s (D. Or. 1993) (holding that funds held in an interest-bearing account served as an adequate substitute for a bond). QVCG's distributable cash, which will remain intact in a bank account earning interest pending appeal, constitutes adequate alternate security. Indeed, requiring a bond here is no different than requiring security for a disputed claim being withheld pending final allowance. No such bond is typically required.

68.     The Bankruptcy Court's suggestion that it would impose a $650 million bond on the Preferred Shareholders stems from its underlying holding that QVCG's interests are subordinate to those of its subsidiary, QVC, based on intercompany claims that were weak but nonetheless "settled" under Bankruptcy Rule 9019, and that QVCG should therefore transfer all of its value to QVC. But QVCG is not the guarantor of the success of QVC *and its plan of reorganization.* QVCG is a separate legal entity that is not being reorganized in any scenario; thus, there is nothing stopping the QVC from reorganizing on its own pending this appeal. Instead, QVC and its stakeholders have unilaterally decided to make their plan contingent on QVCG transferring $278 million to

them.  Even if the Court credits the speculative damages asserted by QVC and its stakeholders from any stay (and it should not), these are consequential damages of their own making, and not the basis for a bond.

## V.    THE PUBLIC INTEREST FAVORS A STAY

69.    Finally, the public interest compels staying the Confirmation Order pending resolution of the Preferred Shareholders' appeal because meaningful appellate review is a substantial and important right, particularly where confirmation of a complex Chapter 11 plan may otherwise become practically unreviewable.  *See In re Adelphia Commc'ns Corp.*, 361 B.R. at 342, 348 (explaining the importance of meaningful appellate review and holding that loss of appellate rights is irreparable prejudice); *In re Pac. Lumber Co.*, 584 F.3d at 243 ("substantial legal issues can and ought to be preserved for review").

70.    The public interest also favors correct application of the Bankruptcy Code's confirmation requirements.  This appeal will raise important issues concerning impairment, Bankruptcy Rule 9019 settlements, good faith, best interests, and the ability to transfer value through an insider intercompany settlement in a multi-debtor plan.  *See* 11 U.S.C. §§ 1124, 1129(a)(3), 1129(a)(7), 1129(a)(10), 1129(b); Fed. R. Bankr. P. 9019; *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) (the priority system is a "basic underpinning" of business bankruptcy law).

## VI.    THE COURT SHOULD ENTER AN INTERIM STAY OF THE CONFIRMATION ORDER DURING THE PENDENCY OF THIS MOTION

71.    The Court should enter an immediate interim stay pending a hearing and ruling on this Motion.  Without interim relief, the Debtors may consummate the Plan before

this Motion can be fully briefed and decided, thereby threatening to moot the relief requested here. Courts have entered interim stays to preserve the status quo where consummation or a transaction may occur before a stay motion can be resolved. *See In re Ondova Ltd. Co.*, 620 F. App'x 290, 291 (5th Cir. 2015) (per curiam) (temporarily staying sale order until further order of the court); *see also Rio Grande Cmty. Health Ctr., Inc. v. Armendariz,* 792 F.3d 229, 231 (1st Cir. 2015) (per curiam) (issuing a temporary stay of certain district court orders while considering a stay of the same); *Millennium Dental Techs., Inc. v. Fotona d.d.*, 407 F. App'x 482, 483 (Fed. Cir. 2011) (per curiam) (issuing a temporary stay of a district court order directing appellant to draft and sign a settlement agreement pending the circuit court's ruling on a stay motion and entry into a settlement); *Detroit Free Press, Inc. v. Ashcroft*, No. 02-1437, 2002 WL 1332827, at \*1 (6th Cir. Apr. 10, 2002) (per curiam) (granting a temporary stay pending appeal of a district court injunction).

## <u>EMERGENCY CONSIDERATION</u>

72.    Emergency consideration is warranted because the Confirmation Order already authorizes the Debtors to consummate the Plan in the absence of a stay, and the Bankruptcy Court entered that order less than twenty-four hours before the very hearing it had scheduled on the Stay Motion, without ruling on the Stay Motion and without explanation. That sequencing leaves the Preferred Shareholders exposed to the risk that the Debtors will cause the Effective Date to occur and implement the QVCG-related transactions before this Motion can be fully briefed and decided, and before this Court has ruled on the merits of the requested stay. An immediate administrative stay is necessary to

preserve the status quo while this Motion is considered, so that the Plan is not consummated in the meantime and the requested relief is not rendered ineffective.

## CONCLUSION

For the foregoing reasons, the Preferred Shareholders respectfully request that this Court: (i) enter an order, substantially in the form attached hereto as **Exhibit A**, granting an immediate interim stay pending a hearing and ruling on this Motion and, if necessary, pending the Fifth Circuit's consideration of direct appeal authorization and any further stay relief, and (ii) enter an order, substantially in the form attached hereto as **Exhibit B**, staying the Confirmation Order pending appeal and prohibiting the Debtors from causing the Effective Date to occur while any stay remains in effect; or alternatively, staying the QVCG-specific provisions of the Plan, including implementation of the Intercompany Settlement, transfer or distribution of QVCG distributable cash, transfer of QVCG's 62% Cornerstone interest, cancellation of Preferred Stock, and enforcement of releases against the Preferred Shareholders; and (iii) grant such other and further relief as is just and proper.

[*Remainder of Page Intentionally Left Blank*]

Dated: July 23, 2026

**KANE RUSSELL COLEMAN LOGAN PC**

By: /s/ *Mark C. Taylor*_____
Mark C. Taylor
Texas Bar No. 19713225
401 Congress Ave., Suite 2100
Austin, Texas 78701
Telephone: (512) 487-6650
Email: mtaylor@krcl.com

-and-

**GLENN AGRE BERGMAN & FUENTES LLP**

Andrew K. Glenn (admitted *pro hac vice*)
Kurt A. Mayr (admitted *pro hac vice*)
Agustina G. Berro (admitted *pro hac vice*)
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 970-1601
Email: aglenn@glennagre.com
        kmayr@glennagre.com
        aberro@glennagre.com

*Counsel to the Preferred Shareholders*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Motion complies with the type-volume limit of

Fed. R. Bankr. P. 8015(a)(7)(B)(i) because, excluding the parts of the document exempted

by Fed. R. Bankr. P. 8015(g), this document contains 11,681 words.

/s/ Mark C. Taylor
Mark C. Taylor

## CERTIFICATE OF CONFERENCE

Counsel for the Preferred Shareholders certify that they have conferred with counsel for the Debtors regarding the substance of the relief requested in the foregoing Motion. The Debtors oppose the relief requested in the Motion.

/s/ Mark C. Taylor
Mark C. Taylor

# CERTIFICATE OF SERVICE

I hereby certify that, on July 23, 2026, I served the foregoing Motion upon all parties and/or counsel of record, via CM/ECF to all counsel of record and on the counsel listed below by e-mail in accordance with the Federal Rules of Civil Procedure.

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: joshua.sussberg@kirkland.com
       aparna.yenamandra@kirkland.com

Chad J. Husnick, P.C. (admitted *pro hac vice*)
Gabriela Zamfir Hensley (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: chad.husnick@kirkland.com
       gabriela.hensley@kirkland.com

- and-

**GRAY REED**

Jason S. Brookner (TX Bar No. 24033684)
Lydia R. Webb (TX Bar No. 24083758)
Emily F. Shanks (TX Bar No. 24110350)
1300 Post Oak Blvd.
Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100
Email: jbrookner@grayreed.com
       lwebb@grayreed.com
       eshanks@grayreed.com

*/s/ Mark C. Taylor*
Mark C. Taylor

# Exhibit C

# In the United States District Court
## for the Southern District of Texas

IN RE: QVC GROUP, INC., ET AL.

ADAM GUI, *ET AL.*,
APPELLANTS
V.
QVC GROUP, INC., *ET AL.*,
DEBTORS-APPELLEES,

CIVIL ACTION NO.: 26-CV-05680

On Appeal from the United States Bankruptcy Court
for the Southern District of Texas
Case No.: 26-90447

## APPELLEES' OPPOSITION TO AMENDED EMERGENCY MOTION FOR STAY PENDING APPEAL

Joshua A. Sussberg*
Aparna Yenamandra†
Laila M. Kassis
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022

Chad J. Husnick*
Gabriela Zamfir Hensley*
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654

Rex W. Manning
*Attorney-in-Charge*
Texas Bar No. 24118452
SDTX Bar No. 622333
KIRKLAND & ELLIS LLP
609 Main Street
Houston, TX 77002
Telephone: (713) 836-3474

Mark McKane†
Michael P. Esser*
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104

*Counsel for Appellees*
(Additional Counsel Listed on Inside Cover)

July 27, 2026

Jason S. Brookner  McClain Thompson*
Lydia R. Webb  Katherine McMullen†
Emily F. Shanks  KIRKLAND & ELLIS LLP
GRAY REED  1301 Pennsylvania Avenue, N.W.
1300 Post Oak Blvd.  Washington, DC 20004
Houston, TX 77056

*Admitted Pro Hac Vice
†Pro Hac Vice Pending

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................... i

TABLE OF AUTHORITIES ................................................................. iii

CITATION KEY ................................................................................... vi

INTRODUCTION ................................................................................. 1

BACKGROUND .................................................................................... 4

    A.    The Debtors ....................................................................... 4

    B.    The Investigation and Settlement ..................................... 4

    C.    The Bankruptcy ................................................................ 5

    D.    Appellants Enter the Fray ................................................. 7

    E.    Proceedings Below ............................................................ 7

STANDARD OF REVIEW .................................................................. 10

ARGUMENT ....................................................................................... 10

I.    Judge Perez Did Not Abuse His Discretion By Denying A Stay Pending Appeal ................................................................. 10

    A.    Appellants have not shown a likelihood of success .............. 11

        1.    This Appeal presents no serious legal questions .............. 11

        2.    Appellants are unlikely to succeed ................................... 13

    B.    Appellants have not shown irreparable harm. ....................... 20

    C.    A stay would substantially and irreparably harm Debtors, their creditors, other stakeholders, and numerous other parties. ......................................................... 21

    D.    The public interest disfavors a stay. ....................................... 23

II.    A Stay Pending Appeal Would Require A $631 Million Bond............ 24

III.   An Interim Stay Is Inappropriate And, If Ordered, Should Be Conditioned On A Bond Of $1,152,511.42 Per Day ...............................26

CONCLUSION ...............................................................................................27

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
    361 B.R. 337 (S.D.N.Y. 2007) ........................................................24

*In re Allied Props., LLC*,
    2007 WL 1849017 (Bankr. S.D. Tex. June 25, 2007) ........................18

*American Solar King*,
    90 B.R. 808 (Bankr. W.D. Tex. 1988) ...............................................14

*Matter of Cajun Elec. Power Co-op., Inc.*,
    119 F.3d 349 (5th Cir. 1997)............................................................18

*In re Container Store Grp., Inc.*,
    2025 WL 4226766 (Bankr. S.D. Tex. Apr. 7, 2025)...........................20

*In re Container Store Grp., Inc.*,
    676 B.R. 356 (S.D. Tex. 2026)..................................................... 14, 15

*Cook v. Waldron*,
    2006 WL 1007489 (S.D. Tex. Apr. 18, 2006) ....................................18

*In re Dewey & LeBoeuf LLP*,
    478 B.R. 627 (Bankr. S.D.N.Y. 2012) ...............................................17

*In re Foster Mortgage Corp.*,
    68 F.3d 914 (5th Cir. 1995)..............................................................16

*Harvey Gulf Int'l Marine, Inc. v. Bennu Oil & Gas, LLC*,
    559 B.R. 152 (S.D. Tex. 2016)..........................................................10

*Hernandez v. Erazo*,
    2023 WL 3175471 (5th Cir. May 1, 2023) .........................................12

*Hilton v. Braunskill*,
    481 U.S. 770 (1987)..........................................................................11

iii

*In re Jackson Brewing Co.,*
624 F.2d 599 (5th Cir. 1980)........................................................15, 18

*In re Nat'l CineMedia, LLC,*
2023 WL 5030098 (S.D. Tex. Aug. 4, 2023)........................................10

*In re Permian Producers Drilling, Inc.,*
263 B.R. 510 (W.D. Tex. 2000)............................................................17

*Plaquemines Parish v. Chevron USA, Inc.,*
84 F.4th 362 (5th Cir. 2023) ...............................................................23

*Poplar Grove Planting & Refin. Co. v. Bache Halsey Stuart Inc.,*
600 F.2d 1189 (5th Cir. 1979).............................................................26

*In re Raborn,*
2017 WL 4536090 (Bankr. M.D. La. 2017).........................................23

*In re RNI Wind Down Corporation,*
348 B.R. 286 (Bankr. D. Del. 2006) ....................................................19

*In re Robertshaw US Holding Corp.,*
662 B.R. 300 (Bankr. S.D. Tex. 2024)..................................................16

*Ruiz v. Estelle,*
650 F.2d 555 (5th Cir. 1981)........................................................11, 12

*In re Spirit Airlines, Inc.,*
668 B.R. 689 (Bankr. S.D.N.Y. 2025) ..................................................14

*Texas v. United States,*
40 F.4th 205 (5th Cir. 2022) ...............................................................10

*Thomas v. Bryant,*
919 F.3d 298 (5th Cir. 2019)...............................................................11

*Trend Intermodal Chassis Leasing LLC v. Zariz Transp. Inc.,*
711 F. Supp. 3d 627 (N.D. Tex. 2024)..................................................12

*In re Ultra Petroleum Corp.,*
943 F.3d 758 (5th Cir. 2019)...............................................................14

iv

*In re Village at Camp Bowie I, L.P.*,
   710 F.3d 239 (5th Cir. 2013).................................................................. 14

*Weinberger v. UOP, Inc.*,
   457 A.2d 701 (Del. 1983)..................................................................... 16

*Yucaipa Corp. Initiatives Fund, ILP v. Piccadilly Restaurants, LLC*,
   2014 WL 1871889 (W.D. La. May 6, 2014)........................................ 23

*Zehr v. Osherow*,
   2019 WL 266973 (W.D. Tex. Jan. 17, 2019) ..................................... 11

**Statutes**

11 U.S.C. § 1123(a)(4)..................................................................... 13, 14, 15

11 U.S.C. § 1124 .................................................................................. 13, 14

11 U.S.C. § 1129(a)(10)............................................................................. 7, 13

28 U.S.C. § 158(a) ..................................................................................... 10

**Rules**

Fed. R. Bankr. P. 8007(c) .......................................................................... 24

Fed. R. Bankr. P. 9019 ....................................................... 7, 15, 17, 18

# CITATION KEY

"Bk.Dkt." refers to the docket in the underlying bankruptcy proceeding.

"Dkt." refers to the docket in this case.

## INTRODUCTION

After an overhaul in corporate governance, months of investigations, and negotiations between disinterested directors around complex intercompany issues, 74 entities in the QVC family ("Debtors") sought chapter 11 relief. They did so to alleviate financial distress; position the business for future success; and resolve billions of dollars of potential intercompany claims involving deferred-tax indemnities and alleged fraudulent transfers up the corporate chain. To stay in business rather than liquidate, Debtors proposed a chapter 11 plan of reorganization ("Plan") that pays general unsecured creditors in full and saves 15,000 jobs. The Plan earned the support of virtually every stakeholder, including the official committee of unsecured creditors and multiple groups of lenders who stood behind the Plan even though they received much less than they were owed.

But shortly after QVC declared bankruptcy, several hedge funds bought preferred equity in the ultimate parent, QVC Group, Inc. ("QVCG"), for pennies on the dollar. Then they banded together a subset of other preferred-equity holders (together, "Appellants") and tried to create hold-up leverage by objecting to the Plan.

Judge Perez held a four-day evidentiary hearing, heard from eight witnesses, and admitted hundreds of exhibits. He ultimately overruled Appellants' objections and confirmed Debtors' Plan.

The Plan represents an excellent outcome. In addition to preserving the QVC business and saving 15,000 jobs, it eliminates $5 billion in funded debt, pays general unsecured creditors in full, and resolves complex intercompany claims.

Now, Appellants seek to stop the Plan from going into effect. They ask this Court to stay the Confirmation Order pending their appeal. Judge Perez held an evidentiary hearing on that request, too. Appellants chose not to present evidence. The Debtors presented evidence, which went unrebutted and unchallenged. Judge Perez determined that none of the stay factors weighed in Appellants' favor. Dkt.25-1 (July 22, 2026 Hr'g Tr.). To fully develop the record, he also calculated the bond amount that would need to accompany a stay, if one were to be granted: $631 million—the amount necessary to remedy the harm if Debtors could not consummate the Plan.

Judge Perez did not abuse his discretion when denying a stay. Appellants do not even argue they are likely to succeed on appeal, opting instead to seek refuge in a narrow exception: When the other stay factors tilt

2

*heavily* toward a stay, a movant need only raise a serious legal question. But, here, the factors lean the other way—as Judge Perez found. And Appellants challenge fact-specific determinations, not serious legal questions (which must extend beyond this case). So the narrow exception Appellants invoke does not apply. Nor are Appellants likely to win on their merits; their challenges fail because of fact findings in Judge Perez's 103-page confirmation ruling with which they never grapple.

The other factors likewise disfavor a stay. Appellants argue they will suffer irreparable harm because consummating the chapter 11 plan could equitably moot their appeal. Yet the risk of equitable mootness is not a form of irreparable harm in the Fifth Circuit. By contrast, a stay would substantially harm Debtors, creditors, and other stakeholders in multiple ways. As Judge Perez found, a stay would risk unwinding the Restructuring Support Agreement, which locks in the creditor votes necessary for the QVC enterprise to restructure. And courts repeatedly find that the public interest lies in promoting a successful reorganization, which the Debtors are on the cusp of achieving.

The Court should deny the Motion.

## BACKGROUND

### A.    The Debtors

The QVC business sells products through media and specializes in home shopping. QVCG sits atop the hierarchy. Below it are Liberty Interactive, LLC ("LINTA"); QVC, Inc. ("QVC"); and Cornerstone Brands, Inc. ("Cornerstone"). The full family picture is larger, but QVCG, LINTA, QVC, and Cornerstone are the relevant entities.

Since 2022, QVC has transferred around $2.3 billion to QVCG and LINTA. Bk.Dkt.710 at 15-22. QVCG then paid its preferred and common shareholders approximately $2.1 billion in dividends. *Id*. at 25.

More recently, financial distress caused the QVC enterprise to explore restructuring. During that process, the companies refreshed governance. QVCG, LINTA, and QVC each appointed Disinterested Directors empowered to investigate potential intercompany claims. *Id*. at 7-8.

### B.    The Investigation and Settlement

With the help of independent outside counsel, the Disinterested Directors collected, reviewed, and analyzed tens of thousands of documents. Bk.Dkt.14 at 51. They interviewed executives. *Id*. at 52. They hired forensic accountants to track the money. *Id*. And they brought in tax experts to assess

deferred-tax risks. Bk.Dkt.710 at 11. They concluded that QVC had potential claims against QVCG and LINTA totaling over $3 billion. *Id*. at 40.

QVC's potential claims against QVCG took at least three forms. QVC could pursue QVCG for fraudulently transferring significant portions of the billions QVC had sent QVCG. *Id*. at 26-32. QVC could also look to QVCG to indemnify it for possible deferred-tax liabilities, which could have exceeded $1 billion. *Id*. at 32-34. And QVC could pursue QVC's preferred shareholders to claw back the dividends QVCG paid. *Id*. at 32.

QVCG, LINTA, QVC, and others eventually reached a compromise (the "Settlement"). Relevant here, QVCG agreed to a $400 million general unsecured claim to be held by QVC. *Id*. at 49, 50; Bk.Dkt.14 at 50. In return, QVC released QVCG from all liability and released QVCG's shareholders from claw-back liability from the dividends they received. Bk.Dkt.710 at 49-51; Bk.Dkt.14 at 50. QVC also agreed to pay QVCG's general unsecured creditors in full. Bk.Dkt.710 at 51.

## C.   The Bankruptcy

During settlement negotiations, Debtors also worked with their lenders on a comprehensive financial restructuring. Those discussions culminated in a Restructuring Support Agreement ("RSA"), which secured

5

creditor support for a chapter 11 plan that preserved the business (rather than liquidating it) and paid general unsecured claims in full. The Plan also implements the Settlement. Debtors and lenders negotiated and signed two credit agreements as well: (1) a letter-of-credit facility to provide liquidity during the chapter 11 process and (2) a revolving line of credit for once they emerge from bankruptcy. Because retailers struggle in bankruptcy, the RSA required the process to move forward and set deadlines (that expire soon). Bk.Dkt.14 at 252.

QVCG does not have $400 million in cash to pay QVC the full amount of the settlement claim. The Plan also transfers to QVC a 62% interest in Cornerstone that QVCG holds. Bk.Dkt.710 at 49, 50. That interest still does not make QVC whole, but QVC has agreed to accept less than the full settlement amount. Bk.Dkt.14 at 50.

The Plan garnered widespread creditor support. Unsecured creditors recover in full. Bk.Dkt.710 at 51. The official committee of unsecured creditors supported the Plan, as did various groups of lenders who took substantial discounts on the face amount of their debt. Bk.Dkt.710 at 84.

As is almost always the case in a financial restructuring, equity holders did not fare as well. QVCG was able to obtain full releases for them, which

eliminated the risk that QVC would claw back dividends. Bk.Dkt.710 at 44, 45, 49, 51. After paying the Settlement and its other creditors, though, QVCG will be out of money, so equity holders will recover nothing. Bk.Dkt.14 at 9. And QVCG, which will be left with no assets, will extinguish all equity interests, wind down, and dissolve. Bk.Dkt.14 at 80.

### D.    Appellants Enter the Fray

Shortly after Debtors entered bankruptcy and announced their plans, several hedge funds purchased preferred shares for pennies on the dollar. Bk.Dkt.341-109. They eventually gathered support from a few individuals who also held preferred shares. In total, the coalition behind this appeal holds roughly 22.5% of QVCG's preferred stock. Bk.Dkt.315.

### E.    Proceedings Below

Appellants objected to confirmation of the Plan and challenged the Settlement. Bk.Dkt.318. Among other things, Appellants argued that the Plan did not comply with 11 U.S.C. §1129(a)(10), which triggers if any class of claims is impaired and requires that at least one non-insider impaired class votes for a plan. Bk.Dkt.318 at 4, 33-37. They also argued the Settlement did not meet the requirements for approval under Bankruptcy Rule 9019. *Id*. at 4, 12-33.

The bankruptcy court conducted a four-day evidentiary hearing. Judge Perez heard testimony from "eight highly credible Debtor-witnesses." Bk.Dkt.710 at 2. He admitted "hundreds of exhibits." *Id.*

Judge Perez then issued a 103-page opinion overruling the objections and confirming the Plan. Bk.Dkt.710. He found that no side "capitulated during the negotiations" and that the settlement terms "were not preordained, but rather were reached as part of a thorough, complete, and arm's-length process." Bk.Dkt.710 at 34-35. He further found that "the settlement was achieved through a fair, arm's-length process devoid of fraud and collusion" and that it "is fair and equitable and in the best interest of the estates and their creditors." *Id.* at 73-74. He entered an order confirming the Plan ("Confirmation Order") on July 20, 2026. Bk.Dkt.722.

This appeal followed. Bk.Dkt.714; Bk.Dkt.726. Appellants also moved for an emergency stay pending appeal. Bk.Dkt.716. Debtors opposed. Bk.Dkt.730.

Judge Perez held an evidentiary hearing on the stay motion. Bk.Dkt.745. Debtors presented the testimony of Jason Keyes, a restructuring advisor who established the harm Debtors and others would suffer from a stay. Bk.Dkt.729; *see also* Dkt.6 at 55-62. Appellants presented no competing

8

evidence and chose not to question Mr. Keyes; his testimony went unrebutted and unchallenged.

The next day, in a 25-minute oral ruling, Judge Perez denied the motion. He found that Appellants "failed to carry their burden on the four elements" of the stay standard. Dkt.25-1 at 18:17-20. He concluded that they "do not have a likelihood of success on the merits"; that "the possibility of the application of equitable mootness does not demonstrate irreparable harm"; and that "significant damage" would result to "the Debtors, its 15,000 employees, its creditors, and vendors" if confirmation were stayed. *Id.* at 14:18-19:4. He also held that Appellants had not established that the public interest favored a stay because their arguments conflated success on the merits and irreparable harm with the public interest. *Id.* at 17:13-18:16. To fully develop the record for this Court, Judge Perez calculated the bond amount that would be required were a stay later granted: $631 million. Bk.Dkt.749. The $631 million quantifies the harm that the estate would suffer if the Plan could not go into effect until after the appellate process runs its course.

9

Before the stay hearing, Appellants had filed a separate stay motion with this Court. Dkt.3. After Judge Perez ruled, Appellants amended their motion, Dkt.14, to which Debtors now respond in opposition.

## STANDARD OF REVIEW

This Court has jurisdiction to hear appeals of bankruptcy courts' final orders and judgments. *See* 28 U.S.C. §158(a). When doing so, this Court "functions as an appellate court, applying the standards of review generally applied in federal appeals courts." *Harvey Gulf Int'l Marine, Inc. v. Bennu Oil & Gas, LLC*, 559 B.R. 152, 154 (S.D. Tex. 2016). A bankruptcy court's denial of a stay pending appeal receives "abuse of discretion" review. *In re Nat'l CineMedia, LLC*, 2023 WL 5030098, at *2 (S.D. Tex. Aug. 4, 2023). Legal conclusions are reviewed de novo; fact findings are reviewed for clear error. *CineMedia*, 2023 WL 5030098, at *2.

## ARGUMENT

### I. Judge Perez Did Not Abuse His Discretion By Denying A Stay Pending Appeal

A stay pending appeal is "an extraordinary remedy," not a matter of right. *Texas v. United States*, 40 F.4th 205, 215 (5th Cir. 2022). The movant's burden "is a substantial one." *Id.* Four factors govern: (1) likelihood of success on the merits; (2) irreparable harm to the movant absent a stay;

10

(3) substantial injury to other interested parties with a stay; and (4) the public interest. *Thomas v. Bryant*, 919 F.3d 298, 303 (5th Cir. 2019). Here, all four factors weigh against a stay.

### A. Appellants have not shown a likelihood of success

Judge Perez did not abuse his discretion in holding that Appellants failed to satisfy the first stay factor. Appellants did not make a "strong showing that [they are] likely to succeed on the merits," *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987), which requires demonstrating that "success on appeal is probable," *Zehr v. Osherow*, 2019 WL 266973, at *2 (W.D. Tex. Jan. 17, 2019). Indeed, they have never argued that they are likely to win. Instead, they say they have a "substantial case to present on appeal." Dkt.14 at 26-27 (title case omitted). That lesser standard applies only "when a serious legal question is involved" and "the balance of the equities weighs *heavily* in favor of granting the stay," *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981) (emphasis added), neither of which is true here.

### 1. This Appeal presents no serious legal questions

The substantial-question standard requires a "serious legal question," *Ruiz*, 650 F.2d at 565, which must have "far-reaching effects" or be a "matter[] of public concern that go[es] well beyond the interests of the

parties." *Hernandez v. Erazo*, 2023 WL 3175471, at *5 (5th Cir. May 1, 2023) (cleaned up); *see also Ruiz*, 650 F.2d at 567 (finding serious legal question over whether Constitution requires prisons to provide inmates with individual cells). Conversely, "when a case concerns whether the court below correctly applied established legal standards to the facts of this case, it is not a serious legal question." *Trend Intermodal Chassis Leasing LLC v. Zariz Transp. Inc.*, 711 F. Supp. 3d 627, 640 (N.D. Tex. 2024) (citing *Hernandez*).

Appellants challenge fact-specific determinations. They dispute the impairment status of a single-creditor-single-claim class, which turns on the Bankruptcy Code's application to the Settlement. *See infra* Part I.A.2.a. They ask for "entire fairness" review of the Settlement, which is not applicable and, even if it were, would trigger only if the Disinterested Directors stood on both sides of the Settlement. *See infra* Part I.A.2.b. And they attack how Judge Perez applied well-established settlement-approval factors to the unique facts here. *See infra* Part I.A.2.c. The resolution of these issues will have no implications beyond these proceedings. For that reason alone, factor one weighs against a stay. *See Trend Intermodal*, 711 F. Supp. 3d at 640.

### 2. Appellants are unlikely to succeed

#### a. The Plan complies with 11 U.S.C. §1129(a)(10)

Appellants first contend their appeal raises a substantial question over whether the Plan complies with 11 U.S.C. §1129(a)(10). Dkt.14 at 28-33. *If a chapter 11 plan impairs any class of claims—meaning creditors recover less than full value—section 1129(a)(10) requires at least one impaired class to accept the plan. Judge Perez held that section 1129(a)(10) does not apply because no classes of claims against QVCG are impaired. Bk.Dkt.710 at 95.

Appellants contest that ruling. They argue that the class containing QVC's claim against QVCG was impaired. Dkt.14 at 28. QVC agreed to settle that claim for $400 million and accept less than a full recovery. *Id.* at 29. Because QVC will recover less than $400 million, Appellants argue that QVC's claim is impaired. *Id.*

Appellants misunderstand the law. Section 1124 of the Bankruptcy Code defines impairment but carves out the circumstances listed in section 1123(a)(4). *See* 11 U.S.C. §1124 ("except as provided in section 1123(a)(4)"). Section 1123(a)(4), in turn, permits a claim holder to "agree[] to a less favorable treatment." 11 U.S.C. §1123(a)(4). In other words, when a creditor "consent[s] to specific treatment that is less than the creditor's full legal and

13

equitable rights," its claim is no longer considered impaired. *In re Spirit Airlines, Inc.*, 668 B.R. 689, 702 (Bankr. S.D.N.Y. 2025); *see also In re Container Store Grp., Inc.*, 676 B.R. 356, 377 (S.D. Tex. 2026).

That is what happened here. By agreeing to accept what QVCG could pay, QVC consented to less favorable treatment. Under section 1123(a)(4), QVC's consent makes its claim unimpaired. *See* Bk.Dkt.730 at 22-23 (collecting cases). QVC's claim is the only claim in Class A4, so the class is also unimpaired, and section 1129(a)(10)'s requirements do not trigger.

Appellants' contrary arguments miss the mark. For starters, the cases they cite do not examine consent under section 1123(a)(4). *See In re Ultra Petroleum Corp.*, 943 F.3d 758, 763 (5th Cir. 2019); *American Solar King*, 90 B.R. 808, 819 (Bankr. W.D. Tex. 1988); *In re Village at Camp Bowie I, L.P.*, 710 F.3d 239, 245 (5th Cir. 2013).

Appellants also accuse the Debtors of "gerrymander[ing]" impairment. Dkt.14 at 31. They emphasize that other creditors settled claims against other Debtors and accepted less than the settled amount—yet are still classified as impaired. Dkt.14 at 31. But that's because impairment is determined at the class level, *see* 11 U.S.C. §§1124, 1129(a)(10), and those creditors reside in classes with non-settling creditors whose claims were

14

impaired, Bk.Dkt.710 at 54-55. The presence of both types of creditors in a single class renders the entire class impaired.

Finally, Appellants argue that the Plan impairs QVC's claim because it alters QVC's rights. They say the alteration takes two forms: (1) liquidating (determining the exact amount of) a claim that had a range of potential values and (2) allowing (approving payment of) a contingent, disputed claim. Dkt.14 at 32-33. But they again overlook section 1123(a)(4) and rely on the same inapposite caselaw discussed above. *See supra* Part I.A.2.a. Appellants identify no decision holding that a plan treating a creditor the way that creditor agreed to be treated still impairs the creditor. For good reason: consent *removes* impairment. *See In re Container Store Grp.*, 676 B.R. at 377.

### b.   Settlement approval under Bankruptcy Rule 9019 does not encompass entire-fairness review

Appellants also argue that their appeal raises a substantial question over which standard governed review of the Settlement. Dkt.14 at 33-34. Bankruptcy Rule 9019 authorizes a bankruptcy court to approve settlements that are "fair and equitable and in the best interest of the estate." *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980). More than 30 years ago, the

Fifth Circuit outlined the factors a bankruptcy court must consider when making that determination. *In re Foster Mortgage Corp.*, 68 F.3d 914 (5th Cir. 1995). Since then, those factors have remained unchanged. When applying them, courts give "[g]reat judicial deference" to a debtor's "business judgment." *In re Robertshaw US Holding Corp.*, 662 B.R. 300, 314 (Bankr. S.D. Tex. 2024).

Appellants nevertheless say the Settlement should have been reviewed for "entire fairness." Dkt.14 at 33. That concept originated in Delaware merger law. *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983). It applies to transactions in which the same fiduciary "stands on both sides." *Id.*

Judge Perez declined to apply entire-fairness review. Bk.Dkt.710 at 61-67. That decision was correct, and Appellants have not shown that they are likely to succeed on appeal.

As an initial matter, during the confirmation hearing, Debtors did not concede that entire fairness was the correct standard, as Appellants now contend. Dkt.14 at 33. Instead, Debtors argued that *if* entire fairness applied, the Settlement would still warrant approval: "We satisfied [the entire-fairness standard] in spades over and over and over again because we did this right." Bk.Dkt.730 at 27.

16

In any case, the Rule 9019 standard does *not* encompass entire-fairness review. Litigants frequently advocate for its inclusion, but courts have rejected the invitation time and again. *See, e.g.*, *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 641 (Bankr. S.D.N.Y. 2012); *see also* Bk.Dkt.730 at 26 (collecting cases). Although Appellants suggest a substantial question looms because the Fifth Circuit has not yet weighed in, Dkt.14 at 34, there can be no substantial question when courts uniformly reject a position, *In re Permian Producers Drilling, Inc.*, 263 B.R. 510, 516 (W.D. Tex. 2000).

Nobody stood on both sides of the Settlement, either. As Judge Perez correctly found, the Disinterested Directors who negotiated the Settlement "each made their own independent determinations, through the advice of counsel…." Bk.Dkt.710 at 63; *see also id.* at 9-12, 26-34. Those findings led Judge Perez to conclude that "the investigation and negotiation" of the Settlement "was not subject to a conflict." *Id.* at 66. And nowhere do Appellants argue that Judge Perez clearly erred when making those findings. *See generally* Dkt.14.

### c.    Judge Perez correctly applied Rule 9019

The last "substantial" question Appellants posit is really four meager questions bundled together. They challenge Judge Perez's Rule 9019

17

analysis, which examined the likelihood that QVCG could prevail in litigation against QVC, the cost and complexity of litigating, whether the negotiations were arm's length, and what was best for creditors. In their view, Judge Perez weighed every one of those factors incorrectly. Dkt.14 at 42.

Appellants have not shown a likelihood of success. To surpass the Rule 9019 threshold, a settlement need only be "fair, equitable, and in the best interest of the estate," *Jackson Brewing Co.*, 624 F.2d at 602, and fall "within the range of reasonable litigation alternatives," *In re Allied Props., LLC*, 2007 WL 1849017, at *4 (Bankr. S.D. Tex. June 25, 2007). To make that call, a bankruptcy court need not conduct a "mini-trial." *Matter of Cajun Elec. Power Co-op., Inc.*, 119 F.3d 349, 356 (5th Cir. 1997). All that is required is that the bankruptcy judge "be informed of all the relevant facts and information" and "make an independent judgment as to whether settlement is fair and reasonable under the circumstances." *Cook v. Waldron*, 2006 WL 1007489, at *4 (S.D. Tex. Apr. 18, 2006).

Here, Judge Perez outlined his independent judgment at great length. He issued a 103-page opinion, with 57 pages of fact findings and another 14 pages of Rule-9019 analysis. Bk.Dkt.710 at 2-59 (findings of fact), 60-74 (Rule

18

9019). Although Appellants disagree with his findings and conclusions seemingly from start to finish, they have never suggested that he was uninformed of the relevant facts—and they could not credibly do so.

Nor can Appellants show that the Settlement fell outside the range of reasonable litigation alternatives. QVCG had billions of dollars of exposure and no way to make money. *See* Bk.Dkt.710 at 41-43, 49-51. It faced multiple, independent claims that, if successful, would wipe it out. The company could not resolve everything through litigation. *Id.* at 33-34. And shareholders faced claw-back suits from QVC. *Id.* at 31-32. Judge Perez correctly recognized all this and concluded that the settlement was "fair and equitable and in the best interest of the estates and their creditors." *Id.* at 74.

Appellants accuse Judge Perez of "defer[ing] entirely" to the Debtors' business judgment, Dkt.14 at 36, but as Judge Perez noted in his oral ruling denying the stay, they overlook his exhaustively cataloged independent assessment, Bk.Dkt.710 at 2-59, 60-74. They never contest that resolving the claims in court would be expensive and elaborate. Instead, they say that complexity "cannot justify total capitulation," Dkt.14 at 38, which assumes QVCG gave up value for nothing—a premise Judge Perez rejected, Bk.Dkt.710 at 63-64. They list ways the Disinterested Directors could have

19

been more thorough, Dkt.14 at 39, but they never explain why what the Disinterested Directors did fell short of the arm's-length bargaining Judge Perez found to have occurred. And rather than acknowledge the overwhelming creditor support for QVCG's Plan, they try to expand the inquiry to their equity interests. But the case they cite, *In re RNI Wind Down Corporation*, involved equity interests that were realistically in the money, 348 B.R. 286, 298 (Bankr. D. Del. 2006), whereas here, Judge Perez found that under any alternative, "equity would still receive no recovery." Bk.Dkt.710 at 90.

## B.    Appellants have not shown irreparable harm.

Judge Perez did not abuse his discretion in concluding Appellants will suffer no irreparable harm absent a stay. Dkt.25-1 at 14:18-15:16. Appellants argue that once the Plan goes into effect, their appeal could become equitably moot. Dkt.14 at 42. But that is not enough. The mere possibility that an appeal could become equitably moot is *not* irreparable harm. *In re Container Store Grp., Inc.*, 2025 WL 4226766, at *9 (Bankr. S.D. Tex. Apr. 7, 2025); *see also* Bk.Dkt.730 at 36-37 (collecting cases).

## C. A stay would substantially and irreparably harm Debtors, their creditors, other stakeholders, and numerous other parties.

Judge Perez did not abuse his discretion when finding that the harm a stay would cause others weighs against granting one. Dkt.25-1 at 15:17-17:12. On "very credible and uncontradicted evidence," Judge Perez found that a stay would "wreak havoc" on Debtors' restructuring and pose "real risk as well as unrecoverable harm" to Debtors, their employees, lenders, creditors, and vendors. *Id.* at 18:23-19:4, 15:17-16:9, 16:10-24. Appellants presented no contrary evidence, did not object to the admission of Debtors' evidence, and did not cross-examine Debtors' witness.

Judge Perez's findings lay bare what a stay would put at risk. "The Plan, the RSA, [and] the []Settlement represent an intricate balance of concessions at every stakeholder level, as well as gives and takes." Dkt.25-1 at 15:24-16:6. "Staying the Confirmation Order would potentially unwind the terms of the RSA contained within the Plan." *Id.* at 16:10-11. "It would also make it more difficult for the Debtors to maintain their going-concern operations" during a "potentially years-long protracted chapter 11 case." *Id.* at 16:11-14. "These results pose real risk as well as unrecoverable harm to

21

both the Debtors, their employees, lenders, creditors, vendors, and others unsecured parties." *Id.* at 16:15-17.

Appellants do not contest those findings. Even though they ask this Court to declare that Debtors "shall not consummate the effectiveness of the Plan unless and until the appeal is finally disposed on the merits," Dkt.14-2 at 3, they argue that Debtors and others will suffer no harm because "the Court can tailor relief to the QVCG-specific provisions…." Dkt.14 at 44. Their refusal to address the harm emanating from a full stay reflects their tacit admission that such harm would occur.

A "tailored" stay would not prevent that harm. As Judge Perez found, QVCG cannot be isolated from the rest of the enterprise. The Settlement and RSA are interlocking, part of a holistic resolution. A QVCG-specific stay would "hold up" the Settlement, which "functions as the keystone to the RSA and the Plan." Dkt.25-1 at 16:25-17:4. The delay would "necessarily have irreparable downstream effects on the terms of the RSA" and those parties have "no…obligation to recommit to…after August 17." *Id.* at 17:5-11. Without the RSA to keep the parties aligned, Debtors' chapter 11 cases could unravel. And if that came to pass, Debtors' "employees, lenders,

22

creditors, vendors, and others unsecured parties" would all suffer "unrecoverable harm." Dkt.25-1 at 16:15-17.

Whether full or tailored, a stay pending appeal would impose orders of magnitude more harm than allowing the Confirmation Order to take effect. A stay "is not a matter of right," and courts must "balance [] the equities." *Plaquemines Parish v. Chevron USA, Inc.*, 84 F.4th 362, 373 (5th Cir. 2023). Courts in this District often deny stay motions when the harm from a stay would greatly outweigh the harm absent one. *See* Bk.Dkt.730 ¶87 (collecting cases).

### D.    The public interest disfavors a stay.

Judge Perez did not abuse his discretion when concluding that the public interest disfavors a stay. Dkt.25-1 at 17:13-18:16. The public interest favors successful reorganizations and finality in bankruptcy. *In re Raborn*, 2017 WL 4536090, at *4 (Bankr. M.D. La. 2017); Bk.Dkt.730 ¶88 (collecting cases); *Yucaipa Corp. Initiatives Fund, ILP v. Piccadilly Restaurants, LLC*, 2014 WL 1871889, at *5 (W.D. La. May 6, 2014). Here, the Confirmation Order allows Reorganized QVC to emerge from bankruptcy better positioned for long-term growth, benefiting employees, vendors, commercial

23

counterparties, and creditors relying on the Confirmation Order's finality. Bk.Dkt.729 ¶¶7-8; Dkt.6 at 57-58; Bk.Dkt.730 ¶7.

Appellants respond that the public interest favors correct application of the Bankruptcy Code and preservation of their appellate rights. Dkt.14 at 47. But as Judge Perez correctly recognized, their framing "conflate[s] factors 1…and 2…with the public interest." Dkt.25-1 at 17:18-20.

## II.    A Stay Pending Appeal Would Require A $631 Million Bond.

Under Bankruptcy Rule 8007(c), a court "may condition relief on filing a bond or other security." Fed.R.Bankr.P. 8007(c). The amount is typically set "at or near the full amount of the potential harm" to the parties who do not seek a stay. *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 368 (S.D.N.Y. 2007). In large bankruptcies, courts have set bond amounts in the hundreds-of-millions or billions of dollars. *See, e.g., id.* ($1.3 billion); *id.* at n.166 (collecting cases); *see also* Bk.Dkt.730 at 46.

Here, because Judge Perez found that a stay pending appeal was unwarranted, he did not order Appellants to post a bond. But he did "provide a bond calculation for a fully developed record." Dkt.25-1 at 18:20-22; Bk.Dkt.749 at 2. After considering the "very credible and uncontradicted evidence" that Debtors presented at the stay hearing, Judge Perez

24

determined "the minimum bond requirement would be no less than $631 million." *Id.* at 18:23-19:2, 19:20-21.

Appellants take issue with his ruling, but they have not shown an abuse of discretion. They first argue that a bond would be inappropriate because "the assets at issue…will remain intact for distribution in the event that Appellees prevail on this appeal." Dkt.14 at 45. That argument makes little sense. For one thing, Appellants are wrong: Professional fees—which so far have averaged $17 million per month—will continue to drain the bankruptcy estate. Bk.Dkt.729 ¶9; Dkt.6 at 58-61. For another, the risk to those assets is not the only harm a stay will cause. Even the short period Debtors have been in bankruptcy has been associated with decreased revenue, lost business opportunities, and added supplier and employee expenses. *Id.*

Appellants also argue that a bond "is not a vehicle for securing the rights and claims of third parties, including QVC and the other Debtors." Dkt.14 at 45. They similarly contend that "there is nothing stopping the QVC [sic] from reorganizing on its own pending this appeal." *Id.* at 46. But QVC and the other Debtors are *not* third parties, and Appellants themselves seek to stop QVC from reorganizing during their appeal. Appellants' proposed

order tells it as it is: "The Debtors"—plural—"shall not consummate the effectiveness of the Plan unless and until the appeal is finally disposed on the merits." Dkt.14-2 at 3.

Appellants suggest that "alternate security" could take the place of a bond. Dkt.14 at 45-46. But the alternate they propose is no security at all. They say QVCG could deposit its money "in an interest-bearing bank account." *Id.* That would solve nothing. QVCG *won* below; it does not need to secure itself (and others) from the harm that would flow from a stay pending *Appellants'* appeal. If Appellants want the stay, they must post the bond. *Poplar Grove Planting & Refin. Co. v. Bache Halsey Stuart Inc.*, 600 F.2d 1189, 1191 (5th Cir. 1979).

### III. An Interim Stay Is Inappropriate And, If Ordered, Should Be Conditioned On A Bond Of $1,152,511.42 Per Day

Appellants also request an "interim" stay. As Debtors explained in their July 23, 2026 letter, the Confirmation Order is already stayed through August 3, 2026. Dkt.24. Should the Court order a stay for any time after August 3, it should require Appellants to post a bond of $1,152,511.42 per day. *Id.* That is consistent with Judge Perez's bond calculation, which has not been appealed or stayed—let alone reversed.

26

## CONCLUSION

The Court should deny the Motion.

July 27, 2026

Respectfully submitted,

s/ Rex W. Manning

Joshua A. Sussberg*
Aparna Yenamandra*
Laila M. Kassis
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022

Chad J. Husnick*
Gabriela Zamfir Hensley*
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654

Jason S. Brookner
Lydia R. Webb
Emily F. Shanks
GRAY REED
1300 Post Oak Blvd.
Houston, TX 77056

Rex W. Manning
*Attorney-in-Charge*
Texas Bar No. 24118452
SDTX Bar No. 622333
KIRKLAND & ELLIS LLP
609 Main Street
Houston, TX 77002
Telephone: (713) 836-3474

Mark McKane*
Michael P. Esser*
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104

McClain Thompson*
Katherine McMullen†
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004

*Admitted Pro Hac Vice*
†*Pro Hac Vice Pending*

27

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above response brief was filed electronically on July 27, 2026, and will therefore be served electronically upon all counsel.

*s/ Rex W. Manning*

Rex W. Manning

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this response complies with the word limit of Federal Rule of Bankruptcy Procedure 8013(f)(3)(A) because, excluding the parts of the document exempted by Federal Rule of Bankruptcy Procedure 8015(g), it contains 5,195 words. This response also complies with the typeface requirements of Federal Rule of Bankruptcy Procedure 8015(a)(5) and the type-style requirements of Federal Rule of Bankruptcy Procedure 8015(a)(6) because it has been prepared in a proportionally spaced, roman-style typeface of 14 points or more.

*s/ Rex W. Manning*

Rex W. Manning

# Exhibit D

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| QVC Group, Inc. and | ) | CASE NO: 26-90447 |
| Official Committee of | ) | Houston, Texas |
| Unsecured Creditors | ) | |
|       Debtor. | ) | |
| | ) | |
| | ) | Wednesday, |
| | ) | July 22, 2026 |
| ----------------------------) | | 10:30 AM to 8:53 AM |

RULING ON MOTION TO STAY PENDING APPEAL

BEFORE THE HONORABLE ALFREDO R. PEREZ

UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For QVC Group, Inc.:
                    MARK MCKANE
                    Kirkland & Ellis LLP
                    609 Main Street
                    Houston, TX 77002

For the Preferred Equityholders:
                    AGUSTINA G. BERRO
                    Glenn Agre Bergman & Fuentes LLP
                    1185 Avenue of the Americas, 22nd
                    Floor
                    New York, NY 10036

Court Reporter:

Courtroom Deputy:      GARRETT COLE

Transcribed by:        Veritext Legal Solutions
                    330 Old Country Road, Suite 300
                    Mineola, NY 11501
                    Tel: 800-727-6396

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

HOUSTON, TEXAS; WEDNESDAY, JULY 22, 2026; 10:30 AM

(Call to Order)

THE COURT:  All right.  Good morning.  It is 10:30 a.m., on Wednesday, July 22nd, 2026.  We're here in case number 26-90447, QVC Group.  I'm going to activate the hand-raising feature because there's a lot of background noise.

So Ms. Berro and Mr. McKane, why don't you hit 5*, or anyone else who wishes to speak?

All right.  Thank you.  All right.  So before me is the preferred shareholders' motion for stay pending appeal of my memorandum decision and the order approving the intercompany settlement and confirming the Debtors' joint prepackaged plan.  After reviewing the evidence and the arguments of the parties, I'm going to deny the motion.

Here are my reasons for denying the motion.  A stay pending appeal is an extraordinary remedy based in equity and committed to the Court's discretion.  Thomas v. Bryant, 919 F.3d 298, Fifth Circuit 2019, citing Nken v. Holder, 556 U.S. 418, 2009.  The movement bears the burden of proving that a state pending appeal should be granted by a preponderance of the evidence.  In re TMT Procurement, 2014, West Law 1577457, Southern District of Texas, 2004.

The following 4 factors guide the Court's discretion.  One, whether the movement has made a showing of likelihood of success on the merits.  Two, whether the

movement has made a showing of irreparable injury if the stay is not granted.  Three, whether the granting of the stay would substantially harm the other parties.  And four, whether the granting of the stay would serve the public interest.  In re South Savings, 820 F.2d 700, Fifth Circuit, 1987.

The United States Supreme Court has stated the first two factors of the traditional standard are the most critical, Nken 556 U.S. at 434.  The Fifth Circuit has stated that although four factors are relevant in determining entitlement to a stay.  The first, likelihood of success on the merit, is arguably the most important, Tesfamichael v. Gonzales, 411 F.3d 169, Fifth Circuit at 2005.

Turning to the first factor, the movements must demonstrate a strong showing that they would likely succeed on the merit, Hilton v. Braunskill, 481 U.S. 770, 1987.  The preferred shareholders argue the alternative serious question analysis applies to the motion for stay pending appeal.  The Fifth Circuit has stated in cases involving serious legal questions, the first factor is more nuanced, Reese v. Estelle, 650 F.2d 555, Fifth Circuit, 1981.  When a serious legal question is involved, the movement need not always show probability of success on the merits.

Instead, the movement need only present a

substantial case on the merit and show that the balance of the equities weighs heavily in favor of granting the stay. In such cases, the balance of the equities refers to the consideration of the other three factors, In re First South Savings, 820 F.2d at 709 n.10.

A serious legal question exists when legal issues have far-reaching effects, involve significant public concerns, or have broad impact on federal and state relations, In re Diedrich, 2019 Westlaw 23699, citing Wildman v. Berwick Universal Pictures, 983 F.2d, Fifth Circuit, 1992, and U.S. v. Baylor University Medical Center, 511 F.2d 38, Fifth Circuit, 1983.

In Ruiz, the Court found there was a serious legal question when the issue on appeal was whether the single-celling inmates at corrections facility was constitutionally required under the District Court's finding of fact.  The Court did not entirely explain its reasoning for deeming this a serious legal question, but the nature of overcrowding and constitutional implication of one's condition of incarceration speak for themselves as to the seriousness of the legal issue.  In re Baylor Medical Center, the Fifth Circuit found there to be a serious legal question where the issue of whether Medicare and Medicaid payments constituted federal financial assistance within the meaning of the Rehabilitation Act because the answer could

have broad impact on federal and state relations, which could open the doors of private institutions to the probing tools of HHS investigation.  Conversely, the Fifth Circuit in Wildman distinguished Baylor, declining to extend the serious legal question doctrine to a private contract matter between two parties which would, by definition, only affect themselves and would not have far-reaching effects or public concerns to anyone, 983 F.2d at 23 and 24.

Moreover, the district court for the Southern District of Texas has stated, "A serious legal question is one of substantial import to others, the resolution of which would have far-reaching effects," Asarco v. Americas Mining Corporation, 419 B.R. 737, citing National Treasury Employees Union v. Von Raab, 808 F.2d 1057, Fifth Circuit 1987.  In Von Raab, the Fifth Circuit found the issue of whether the United States Customs Service employees can be mandated to participate in urine testing to screen for illegal drugs as a condition of obtaining promotions and advancing their careers to be of substantial import to the Customs Service, its employees, and the citizens of this country as to constitute a serious legal question within the meaning of the state pending appeal elements.  In Asarco, the district court also found certain issues on appeal to constitute serious legal questions because they had substantial import to others, the resolution of which would

have far-reaching effects within the meaning of Von Raab, Wildman, and Baylor.

The District Court reasoned that the merits of the appeal involved serious legal questions because each of the causes of action on appeal turned on matters of law heretofore undecided by the Fifth Circuit, matters that implicate a wide range of important corporate governance, fiduciary, and bankruptcy issues.  The instant case does not fit within this precedent.  The preferred shareholders have presented four issues on appeal.  I'm going to list them as the preferred shareholders have framed them.

One, whether the Debtor seeking approval of an insider company settlement is entitled to deference under the business judgment rule, or whether the entire fairness standard of review applies.  Two, whether the settlement that wipes out 100% of the value of one Debtor for the benefit of another Debtor subsidiary can be fair and equitable when the record is rife with evidence of negotiation was not at arm's length and purportedly independent directors simply capitulated.  Three, whether it was appropriate to only consider the best interest of Creditors without regard to any equity holder interest when determining whether to approve the settlement in a Chapter 11 plan.  And four, whether the sole option of -- whether at the sole option of the Debtors, any settlement can be deemed

unimpaired and disenfranchised and under Section 1129(a)(10).

Each of these issues implicate bankruptcy issues, as well as corporate governance and fiduciary issues, both in terms of the 9019 standard and the interpretation of impairment under 1129(a)(10).  But the Court's ruling on 9019 and the 1129(a) issues are couched in bankruptcy-specific jurisprudence rather than the broader corporate governance fiduciary issues presented in this ARCO.  More specifically, this Court applied the 9019 standard in line with how it has been interpreted in the Fifth Circuit for the last 30 years since Foster Mortgage.

If Congress intended on providing an express standard for Rule 9019, they would have done so.  They did not.  The Fifth Circuit standard for 9019 does not necessarily include entire fairness.  As this Court explained in the memorandum decision, entire fairness is a state-level, corporate law concept that is implicated when the Court makes a finding that the party -- that the same party exists on both sides of the transaction.

Here, the Court made extensive factual findings and ultimately concluded that the intercompany settlement was not conflicted.  And even if there was a rule requiring heightened scrutiny to a 9019 settlement between insiders, this Court factual findings would obviate the need for

entire fairness review because the transaction at issue was

at arm's length between disinterested fiduciaries.

The preferred shareholders base their appeal on the premise that a blanket rule should be established of applying entire fairness anytime insiders are present in a 9019 settlement.  This is not the law in this Circuit.  The strongest case the preferred shareholders cite to support this argument is In re LATAM, expressly recognizes that business -- expressly recognizes that business judgment deference is appropriate in instances where parties to a business decisions were disinterested.

In LATAM, disinterested fiduciaries were appointed to evaluate the Tranche A and the Tranche C DIP facilities. The LATAM court concluded that because the transaction was between Debtor insiders, the business judgment deference by definitions did not apply.  The LATAM court did not bridge the analytical or factual gap as to why the existence of disinterested directors in that case would otherwise cure the inherent conflict present in a transaction among insiders.

This case is fundamentally different than LATAM because here the Court made extensive factual findings regarding the disinterested directors at each key entity, their investigation, the negotiations, and ultimate agreement, which undergirded its final conclusion that the

intercompany settlement was not conflicted.  Therefore, a different standard was applicable to 9019 business judgment deference, not entire fairness.  This issue does not rise to the level of a serious legal question because this Court's holding is based on longstanding, Fifth Circuit, and Corporate Law jurisprudence.  Nor have the preferred shareholders demonstrated a likelihood of succeeding on this argument on appeal.  Nor can the preferred shareholders credibly argue that this court solely deferred to the Debtor's business judgment in evaluating the intercompany settlement.

The Court used its own judgment after extensively reviewing the evidence before concluding that the intercompany settlement was fair and equitable in the best interest of Creditors.  The memorandum decision documents this evaluation.  The Court considered the 9019 in the context of all the gives and gets with due consideration for the uncertainty of the result, the negative and value-destructive consequences of litigation would cause, and the complexity of the legal and factual issues implicated in the potential intercompany claims.  This misplaced argument does not transform the question on appeal into a serious legal question, nor does this demonstrate that the preferred shareholders stand a likelihood of success on appeal.

Regarding consideration of equity stakeholders as

part of Foster Mortgage analysis for a 9019, this area of law is similarly clear.  The Court applied the test accordingly.  The test is whether the settlement was fair and equal in the best interest of Creditors.  The court addressed Foster Mortgage upfront in its ruling, explaining that the Fifth Circuit overturned the bankruptcy court's approval of the 9019, where the majority of Creditors disapproved of the transaction.

There is no case law in the Fifth Circuit nor a statutory basis to support the preferred shareholders' positions that objections from out of the money equity should be a hold up to a settlement.  The cases the preferred shareholders cite involve plans that contemplated distributions to equity.  This Court made various factual findings explaining that even if the intercompany settlement was not approved, recovery for equity was still unlikely given the significant uphill battle QVCG would face in litigating or defending the potential intercompany claims.

This was exacerbated by QVCG's limited cash on hand to fund such litigation.  This issue was neither serious nor likely to succeed on appeal.  With respect to this preferred shareholders' argument that this Court incorrectly interpreted the facts regarding the disinterested directors' negotiation of the intercompany settlement, the Court based its factual findings on the

extensive record before it, including the testimony of eight credible witnesses and hundreds of exhibits admitted into evidence.  It was on this basis that the Court concluded that the transaction was at arm's length, the result was not preordained, and the disinterested directors did not capitulate.  These factual findings will be reviewed, but do not rise to the level of a serious legal question.  The preferred shareholders did not demonstrate that they were likely to succeed on this challenge merely by disagreeing with the Court's factual findings.

Regarding 1129(a)(10) issue, this Court's holding is based on the clear text of the Bankruptcy Code.  1129(a) provides that if a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has to accept the plan determined without any acceptance of a plan by an insider.  1124 provides, except as provided in Section 1123(a)(4) of this title, a class of claims or interest is impaired under a plan unless, with respect to each claim or interest of such class, the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest.

1123(a)(4) provides, "A plan shall provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest

agrees to a less favorable treatment of such particular claim or interest."  The Court's interpretation of this unless clause is that a party can agree to a less favorable treatment through settlement, stipulation, or agreement, and its consent would remove impairment.

The preferred shareholders mischaracterized the Court's ruling by saying that the Debtor, at its sole discretion, could deem any settlement class unimpaired, but that would never be the case, be at the Debtor's sole option because a settling party has to agree to a less favorable treatment.  The preferred shareholders attempt to distinguish the Court-cited cases because they were in the context of third-party release opt-outs and statutory tax claim treatment.  However, the cases cited still stand for the proposition that a Creditor can consent to a less favorable treatment under 1123(a)(4), which removes impairment.  As the Debtor stated in the opposition, that proposition holds regardless of the factual vehicle in which the consent arrives.

Regarding the argument that the Court did not apply the same logic when evaluating the impairment of certain RSA parties, the QVCG settlement class only had one member which agreed to a less favorable treatment.  The RSA classes contain multiple non-settling Creditors.  Section 1124 defines impairment as a claim on a claim-by-claim basis

or interest-by-interest basis within each respective class. The preferred shareholders argue the language of the statute forecloses the possibility of deeming the QVCG settlement class as unimpaired because it is a single-member class. But that interpretation is not reflected in the text of 1124. It is entirely consistent to conclude that a single-member consenting class can be deemed unimpaired, while a multi-member class of consenting and non-consenting members can be deemed impaired.

At the hearing on the stay pending appeal, the preferred shareholders argued this logic would not extend to the RFC lenders as one of the three impaired classes with voting rights because the class voted 100% to accept the preferred shareholders conflate acceptance with the consent to less favorable treatment. The two are not the same. Parties in the RFC class voting class could have been impaired, but nonetheless, voted to accept. Having voted 100% in acceptance does not mean their entire class is not impaired. Acceptance does not alleviate their impairment.

Accordingly, this Court's approval of the QVCG settlement claim as properly being considered unimpaired -- as properly being considered unimpaired, while also accepting certain RSA classes as being impaired, is entirely consistent, both with the terms of the plan, the text of the code, and case law. These bankruptcy nuanced issues are not

similar to the serious legal questions present in Ruiz,

Wildman, and Von Raab.  Moreover, courts only grant a stay

pending appeal when Factor 1 demonstrate a substantial case

on the merits rather than the high burden of likelihood of

success on the merits if the question on appeal are serious

and the balance of the equity heavily weigh in favor of the

movement.

Based on the reasons discussed further on, the Court has concluded that the preferred shareholders have failed to demonstrate a balance of the equity weighs heavily in their favor, Factors 2 through 4 of the stay pending appeal standard.  Accordingly, regardless of the outcome of the serious legal question inquiry, the preferred shareholders' alternative avenue for succeeding under stay pending appeal motion is effectively foreclosed by failing to demonstrate that the balance of the equities weighs heavily in their favor.

But let me be clear, based on the extensive factual record, the Court finds that the preferred shareholders do not have a likelihood of success on the merits.  Regarding Factor 2, whether the movement has made a showing of irreparable harm, as the Fifth Circuit explained regarding the second factor, the key word is irreparable, and an injury is irreparable only if it cannot be undone. The preferred shareholders argue that a loss of appellate

rights is the quintessential form of prejudice, but the question presented is more nuanced than how the preferred shareholders frame it.

The confirmation order does not extinguish the preferred shareholders' appellate right, but rather confirms a plan, which slates the extinguishment of their equity. Accordingly, the alleged harm after the stay is more appropriately framed as the possibility of application of equitable mootness, not equitable mootness per se.  As the Court has previously stated, however, the possibility of the application of equitable mootness does not demonstrate irreparable harm, and that approach is uniform among courts in this circuit.  The reason for this is simple.  The threat of equitable mootness does not guarantee a loss on appeal. The Court concludes that Factor 2 does not weigh in favor of granting a stay.

Regarding Factor 3, whether the granting of the stay would substantially harm other parties, the Court is required to determine whether there is an absence of substantial harm to the other parties for granting the stay. As the Fifth Circuit stated in Alliance for Hippocratic Medicine v. the FDA, "To succeed on this prong, the movement must show that the requested stay will not harm the opposing appellate or interested party."  Here, ample evidence presented at the combined hearing and at the hearing on the

stay motion demonstrates that the stay of confirmation order during the pendency of the appellate process would wreak havoc on the Debtors' proposed restructuring, the plan, the RSA, the intercompany's element, represent an intricate balance of concessions at every stakeholder level, as well as gives and takes.  The Debtors, their Counsel and management engaged in extensive pre-petition negotiations to maintain the business as a going concern as the company contemplated an imminent Chapter 11 reorganization.

Staying the confirmation order would potentially unwind the terms of the RSA contained within the plan.  It would also make it more difficult for the Debtors to maintain their going concern operations during the pendency of a potentially years-long protracted Chapter 11 case. These results pose real risk as well as unrecoverable harm to both the Debtors, their employees, lenders, Creditors, vendors and others unsecured parties.  The preferred shareholders propose alleviating this harm by tailoring the stay pending appeal.  But the contemplated tailoring, which would stop the transfer or distribution of QVC distributable cash, transfer of QVCG's 62% cornerstone interest, the cancellation of the preferred stock, and the enforcement of releases against QVCG would not eliminate all potential harm to the interested parties.

As the Debtors rightly argue, staying those

specific terms of the confirmation hold up the terms of the

intercompany settlement, which the Court has recognized

based on the evidence presented at the combined hearing

functions as the keystone to the RSA and the plan.

Restricting the terms of the intercompany settlement will

necessarily have irreparable downstream effects on the terms

of the RSA.  Interested parties may not have agreed to the

RSA absent the current terms of the intercompany settlement,

and those parties have no obligation to recommit to the RSA

after August 17th, regardless of the approval of the

settlement.  Accordingly, the Court concludes that Factor 3

does not weigh in favor of granting a stay.

Regarding Factor 4, whether the public interest

favors granting a stay, this factor asks where the public

interest lies.  The preferred shareholders have posited that

the public interest lies in preventing the potential loss of

their appellate rights through equitable mootness doctrine.

The preferred shareholders seem to conflate Factors 1,

likelihood of success on the merit, and 2, irreparable harm

with the public interest.  They argue that the nature of the

questions on appeal justify a conclusion that the public

interest favors staying the confirmation order, but the

analysis is relevant to Factor 1, not 4.

The potential loss of appellate rights speaks to

irreparable harm they suffer as a result of denying the stay

rather than that the public interest favors generally.  The public interest in bankruptcy cases is promoting a successful reorganization, In re Rayburn 217 Westlaw 4453606, 90.  It's difficult to draw a comparison between appellate rights and a successful reorganization of a large corporate entity.

In the Court's view, Factor 4 is not about choosing between those two interests.  The public interest may favor a stay to the extent it would preserve appellate rights, but the preferred shareholders are only presented with the possibility of the application of equitable mootness at a future date.  Staying the confirmation order threatens to derail the Debtor's reorganizations entirely.  Bottom line, the preferred shareholders have not demonstrated that this factor weighs heavily in their favor, nor the other two equity factor.

Based on these four going reasons, because the movement had failed to carry their burden on the four elements of the stay, I'm going to deny the stay -- deny the motion.  Even though the Court has denied the motion based on the evidence and the arguments of the parties, it will provide a bond calculation for a fully developed record.

There was very credible and uncontradicted evidence presented by Mr. Keys at the stay hearing as to the significant damage the Debtors, its 15,000 employees, its

Creditors and vendors would suffer if the confirmation of the plan were stayed, CECF 729 and 725-2.  The Court took this evidence very seriously and finds that significant damage would result if confirmation were stayed.

The Creditors of QVC are scheduled to receive $930 million on emergence.  With respect to this alone, there would be a significant cost to the Creditors if they were delay in deploying money for a long period of time.  Because of the importance of this issue, and based on the Court uncontroverted evidence presented, the Court will calculate the minimum bond that would be needed if a stay were issued, and I do mean minimum bond.  Mr. Keys identified several items that were difficult to calculate.

The Court will conservatively assume that appeal will take 18 months.  The Debtors calculate that the amount required would be $603 million plus at least $100 million for loss of liquidity from the letters of credit.  The Court will reduce the professional fee spend by 50% because the level of activity in this case may be reduced during the pendency of the appeal.  Making this assumption, the minimum bond requirement would be no less than $631 million.

So Mr. McKane, can you feel -- can you please file a proposed form of order denying the motion for the reasons stated?

MR. MCKANE:  We will, Your Honor, and we will

submit it today.

THE COURT:  All right.  Thank you.

Unless anyone has anything, we'll be in recess till my 11 o'clock hearings.

MR. MCKANE:  All right.  Thank you, Your Honor.

THE COURT:  All right.  Thank you.

MS. BERRO:  Thank you, Your Honor.

THE COURT:  Thank you.

(Proceedings adjourned at 10:58 AM)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Nikole Nolan

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  July 27, 2026

Case: 26-20412 Document: 15 Page: 121 Date Filed: 07/30/2026

# Exhibit E

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| QVC GROUP, INC., *et al.*,[1] | Case No. 26-90447 (ARP) |
| Debtors. | (Jointly Administered) |

## PREFERRED SHAREHOLDERS' EMERGENCY MOTION FOR STAY PENDING APPEAL OF CONFIRMATION ORDER UNDER BANKRUPTCY RULE 8007(A), OR, IN THE ALTERNATIVE, FOR LIMITED STAY AND INTERIM STAY PENDING HEARING

**Emergency relief has been requested. Relief is requested not later than July 17, 2026 at 5:00 p.m. (Central Time).**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

---

[1] A complete list of each of the Debtors in these Chapter 11 cases (the "Chapter 11 Cases") may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/QVC. The location of Debtor QVC Group, Inc.'s corporate headquarters and the Debtors' service address in these Chapter 11 Cases is 1200 Wilson Drive, West Chester, Pennsylvania 19380.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES........................................................................................................ 3

PRELIMINARY STATEMENT................................................................................................ 6

JURISDICTION AND VENUE ...............................................................................................11

RELEVANT BACKGROUND................................................................................................11

    I.     The Corporate Structure And The QVCG Preferred Equity ...........................................11

    II.    The Intercompany Settlement ........................................................................................ 12

    III.  The Prepackaged Plan Process Excluded The Preferred Shareholders ........................... 13

    IV.  The Confirmation Trial Record....................................................................................... 14

         A.    The Plan Violates Section 1129(a)(10) of the Bankruptcy Code ........................... 14

         B.    The Intercompany Settlement is Neither Fair nor Equitable ................................. 15

    V.    The Confirmation Decision And Need For Emergency Relief ..................................... 18

RELIEF REQUESTED.............................................................................................................. 18

ARGUMENT ............................................................................................................................ 19

    I.     Legal Standard................................................................................................................ 19

    II.    The Preferred Shareholders Have A Substantial Case To Present On Appeal ................ 20

         A.    The Plan Raises Serious Issues Under Section 1129(a)(10) of the
             Bankruptcy Code ................................................................................................... 21

         B.    The Appropriate Standard of Review Governing the Bankruptcy Rule
             9019 Settlement Presents a Substantial Question ...................................................... 24

         C.    Approval of the Intercompany Settlement Presents a Substantial Question............ 26

    III.  The Preferred Shareholders Will Suffer Irreparable Harm Absent A Stay ...................... 32

    IV.  A Stay Will Not Substantially Harm Other Parties And Can Be Tailored...................... 34

    V.    The Public Interest Favors A Stay ................................................................................. 35

    VI.  The Court Should Enter An Interim Stay Of The Confirmation Order
        During The Pendency Of This Motion .......................................................................... 36

EMERGENCY CONSIDERATION........................................................................................ 36

NOTICE.................................................................................................................................... 37

CONCLUSION......................................................................................................................... 37

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arnold v. Garlock, Inc.*,
278 F.3d 426 (5th Cir. 2001) ........................................................................................... 19

*Asarco LLC v. Americas Mining Corp.*,
419 B.R. 737 (S.D. Tex. 2009) ........................................................................................ 20

*Czyzewski v. Jevic Holding Corp.*,
580 U.S. 451 (2017) ......................................................................................................... 35

*Detroit Free Press, Inc. v. Ashcroft*,
No. 02-1437, 2002 WL 1332827 (6th Cir. Apr. 10, 2002) ............................................... 35

*In re Adelphia Commc'ns Corp.*,
361 B.R. 337 (S.D.N.Y. 2007) .................................................................................... 32, 35

*In re Am. Solar King Corp.*,
90 B.R. 808 (Bankr. W.D. Tex. 1988) ........................................................................ 21, 24

*In re AWECO, Inc.*,
725 F.2d 293 (5th Cir. 1984) ........................................................................................... 26

*In re Beach,*
731 F. App'x 322 (5th Cir. 2018) ..................................................................................... 26

*In re Bidermann Indus. U.S.A. Inc.*,
203 B.R. 547 (Bankr. S.D.N.Y. 1997) .............................................................................. 25

*In re Blast Energy Servs., Inc.*,
593 F.3d 418 (5th Cir. 2010) ........................................................................................... 32

*In re Container Store Grp., Inc.*,
676 B.R. 356 (S.D. Tex. 2026) ......................................................................................... 22

*In re Coram Healthcare Corp.*,
271 B.R. 228 (Bankr. D. Del. 2001) ................................................................................. 30

*In re Emerald Oil Co.*,
807 F.2d 1234 (5th Cir. 1987) ................................................................................. 9, 10, 28

*In re First S. Sav. Ass'n*,
820 F.2d 700 (5th Cir. 1987) ........................................................................................... 19

*In re Jackson Brewing Co.*,
624 F.2d 599 (5th Cir. 1980) ........................................................................................... 27

*In re K Lunde, LLC*,
513 B.R. 587 (Bankr. D. Colo. 2014) ............................................................................... 22

*In re LATAM Airlines Grp. S.A.*,
620 B.R. 722 (Bankr. S.D.N.Y. 2020) .............................................................................. 25

*In re Manges*,
29 F.3d 1034 (5th Cir. 1994) ........................................................................................ 32

*In re Moore*,
608 F.3d 253 (5th Cir. 2010) ........................................................................................ 26

*In re NII Holdings, Inc.*,
536 B.R. 61 (Bankr. S.D.N.Y. 2015) ........................................................................... 31

*In re Ondova Ltd. Co.*,
620 F. App'x 290 (5th Cir. 2015) ................................................................................. 35

*In re Pac. Lumber Co.*,
584 F.3d 229 (5th Cir. 2009) ................................................................................ 32, 35

*In re RNI Wind Down Corp.*,
348 B.R. 286 (Bankr. D. Del. 2006) ............................................................................ 30

*In re Spirit Airlines*, *Inc.*,
668 B.R. 689 (Bankr. S.D.N.Y. 2025) ......................................................................... 22

*In re Tex. Equip. Co.*,
283 B.R. 222 (Bankr. N.D. Tex. 2002) .................................................................. 19, 25

*In re Ultra Petroleum Corp.*,
943 F.3d 758 (5th Cir. 2019) ................................................................................ 21, 24

*In re Village at Camp Bowie I, L.P.*,
710 F.3d 239 (5th Cir. 2013) ........................................................................................ 21

*In re Voluntary Purchasing Grps.*, Inc.,
196 F.3d 1258 (5th Cir. 1999) ...................................................................................... 32

*In re Voyager Digital Holdings, Inc.*,
2023 WL 2731737 (S.D.N.Y. Apr. 1, 2023) ................................................................ 32

*Matter of Foster Mortg. Corp.*,
68 F.3d 914 (5th Cir. 1995) ........................................................................ 9, 10, 25, 31

*Millennium Dental Techs., Inc. v. Fotona d.d.*,
407 F. App'x 482 (Fed. Cir. 2011) ............................................................................... 35

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
478 F.3d 452 (2d Cir. 2007) ......................................................................................... 31

*Nat'l Treasury Employees Union v. Von Raab*,
808 F.2d 1057 (5th Cir. 1987) ...................................................................................... 20

*Nken v. Holder*,
556 U.S. 418 (2009) ...................................................................................................... 33

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
390 U.S. 414 (1968) ...................................................................................................... 27

*Reading & Bates Petroleum Co. v. Musslewhite*,
14 F.3d 271 (5th Cir. 1994) .......................................................................................... 19

*Rio Grande Cmty. Health Ctr., Inc. v. Armendariz,*
    792 F.3d 229 (1st Cir. 2015) ................................................................................. 35

*Ruiz v. Estelle,*
    650 F.2d 555 (5th Cir. 1981) ................................................................................. 19

*Starke v. SquareTrade, Inc.,*
    2017 WL 11504834 (E.D.N.Y. Dec. 15, 2017) ........................................................ 20

*Trump v. Int'l Refugee Assistance Project,*
    582 U.S. 571 (2017) ............................................................................................ 33

*Valentine v. Collier,*
    956 F.3d 797 (5th Cir. 2020) ................................................................................. 19

**Statutes**

11 U.S.C. § 101(31)(E) ............................................................................................ 23
11 U.S.C. § 1124 ........................................................................................ 21, 22, 23, 35
11 U.S.C. § 1129(a)(9)(D) ....................................................................................... 22
11 U.S.C. § 1129(a)(10) ....................................................................................... passim
28 U.S.C. § 157(b) ................................................................................................ 10
28 U.S.C. § 158(d)(2) ......................................................................................... 11, 18
28 U.S.C. §§ 157 and 1334 ...................................................................................... 10
28 U.S.C. §§ 1408 and 1409 .................................................................................... 10

**Rules**

Fed. R. Bankr. P. 8007 ....................................................................................... passim
Fed. R. Bankr. P. 9019 ....................................................................................... passim

Certain Preferred Shareholders (the "Preferred Shareholders")[2] of QVC Group, Inc. ("QVCG" and, together with its subsidiaries and affiliates in the above-captioned Chapter 11 Cases, the "Debtors"), by and through their undersigned counsel, Glenn Agre Bergman & Fuentes LLP and Kane Russell Coleman Logan PC, respectfully submit this emergency motion (this "Motion") under Rule 8007 of the Federal Rules of Bankruptcy Procedure for entry of an order staying, pending appeal, the Court's *Memorandum Decision (I) Approving Disclosure Statement, (II) Confirming Second Amended Plan, and (III) Granting Related Relief* [Dkt. No. 710] (the "Confirmation Decision") and forthcoming order (the "Confirmation Order") confirming the Debtors' *Second Amended Joint Prepackaged Plan of Reorganization* [Dkt. No. 389] (the "Plan").[3]

## PRELIMINARY STATEMENT

The Confirmation Order should be stayed because the Preferred Shareholders have a pending appeal involving substantial, unresolved legal questions concerning who is entitled to vote on a plan of reorganization, the standard of review for insider settlements, and what constitutes a fair and equitable settlement under Bankruptcy Rule 9019. Without a stay, the Debtors will consummate the Plan, transfer every dollar and every asset out of QVCG, cancel $1.4 billion in Preferred Stock, and then argue that the appeal is equitably moot. That sequence is not speculative. It is the Debtors' stated objective, and it could render appellate review meaningless.

The Confirmation Order approves an improper intercompany settlement (the "Intercompany Settlement") between QVCG and its subsidiary, QVC, Inc. ("QVC"). The Preferred Shareholders—holders of QVCG's 8% Series A cumulative redeemable preferred stock—challenged a prepackaged Plan built on the Intercompany Settlement that transfers all of

---

[2]    The Preferred Shareholders are certain institutional and individual holders of the 8.000% Series A Cumulative Redeemable Preferred Stock (the "Preferred Stock") issued by QVCG as identified in the Notice of Appeal filed concurrently herewith.

[3]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

QVCG's value to its subsidiary, QVC. The Preferred Shareholders established that this settlement was the product of a preordained, non-arm's-length process among insiders warranting entire-fairness scrutiny, not business-judgment deference. The intercompany claims being "settled" consisted of unfiled fraudulent-transfer claims based on dividends paid over three years ago and hypothetical tax-indemnification claims that have not been assessed by the IRS and have already been substantially insured. In exchange for releasing these dubious claims, QVCG surrendered approximately $195 million in cash and its 62% equity stake in Cornerstone.

Tellingly, the purported intercompany claims were never disclosed in any SEC filings. Instead, they were first concocted by the Debtors, their advisors, and subsidiary company creditors and then negotiated in a settlement that was disclosed for the first time only when the Debtors filed Chapter 11. No parties were allowed to vote on this settlement, and the only parties adversely affected, QVCG's preferred shareholders, were excluded from the negotiation of the settlement and strenuously oppose it. The Court overruled all objections and confirmed the Plan.

The Plan and the Intercompany Settlement raise substantial legal issues that warrant serious appellate consideration.

First, the Plan violates Section 1129(a)(10) of the Bankruptcy Code, which requires at least one impaired class of claims to vote to accept a plan where, as here, any class of claims is impaired. No such vote occurred here because the Debtors misclassified the Intercompany Settlement claim as unimpaired. The undisputed evidence proves that the claim is in fact impaired: QVC is receiving materially less than the face amount of its $400 million settlement—at most approximately $278.7 million—and is receiving equity in partial satisfaction. The Confirmation Decision reaffirms this conclusion. *See* Confirmation Decision at 90 (finding that the combined value of the Distributable Cash and equity interests in Cornerstone is substantially less than $400

7

million).  Under Fifth Circuit precedent, that qualifies as impairment as a matter of law.  Yet the Court adopted a novel interpretation allowing any debtor, at its sole option, to deem any settlement class "unimpaired"—thereby eliminating the requirement that an impaired non-insider class accept the Plan.  The Fifth Circuit has never considered, let alone endorsed, this proposition.  Indeed, creditors at QVC and other affiliated debtors who also compromised their claims in settlements under the Plan were classified as impaired and permitted to vote.  Only the QVC-QVCG Settlement Claim was gerrymandered into an "unimpaired" classification—precisely because counting QVC's vote would not satisfy Section 1129(a)(10) of the Bankruptcy Code, since QVC is an insider whose acceptance cannot count.  This ruling warrants appellate review.

Second, the settlement itself should not have been approved under Bankruptcy Rule 9019.  Under the "settlement," all of the value of the QVCG estate was transferred to QVC based solely on the vote of a special committee that never assessed the probability of success of the underlying claims, never obtained an estimate of litigation costs, and never insisted on any recovery for Preferred Shareholders.  The Preferred Shareholders—the only parties adversely affected—were excluded from the process and their objections were disregarded.  Normally, such wholesale value transfers occur only through substantive consolidation, veil-piercing, or actual litigation.  Here, insiders manufactured an intercompany "claim" and then "settled" it on terms that gave QVCG nothing—an extraordinary outcome that was not the product of arm's-length negotiation.

Bankruptcy Rule 9019 requires a settlement to be fair and equitable.  That determination requires the court to assess whether there was arm's-length negotiation that accounted for the probability of success on the merits, the cost of litigation, and the views of affected stakeholders.  The settlement here satisfies none of these criteria.  QVCG's own director, Roger Meltzer, admitted that, before agreeing to the $400 million settlement claim, he never assessed the

8

probability of success of the intercompany litigation he agreed to settle. Driven solely by a desire to placate QVC's creditors, the settlement recognized no possibility that QVCG might prevail, made no deduction for QVC's litigation costs, and provided no recovery whatsoever for Preferred Shareholders—the only QVCG stakeholders who stood to gain or lose from the underlying litigation. The outcome was preordained. By February 12, 2026—before QVCG's Special Committee even began negotiating with QVC—the Committee had already concluded that the most it could obtain for Preferred Shareholders was a release. The undisputed evidence establishes that the settlement was designed to placate QVC's creditors at the expense of QVCG's equity.

Third, the Bankruptcy Court improperly applied business-judgment deference to this insider transaction. The Fifth Circuit has not addressed whether business judgment or entire fairness applies to an intercompany settlement, which, by definition, involves only insiders. Where, as here, a settlement involves insiders, courts customarily apply the entire-fairness standard. At a minimum, this implicates an important, unresolved legal question. And the record here establishes that the Debtors failed to meet their burden to show that the settlement was fair and equitable under either standard.

A bankruptcy court's discretion to approve settlements is not limitless. The Fifth Circuit Court of Appeals has repeatedly vacated settlements approved by bankruptcy courts where, as here, they (i) settled weak claims for substantial value, (ii) parties in interest opposed the settlement, and (iii) the settlement was reached between insiders without the participation of the parties in interest. *See In re Emerald Oil Co*., 807 F.2d 1234, 1239 (5th Cir. 1987) (reversing approval of a settlement where "the hazards of litigation d[id] not justify the approved compromise whereby the creditors receive less than one-third of their potential recovery after trial"); *Matter of Foster Mortg. Corp*., 68 F.3d 914, 918 (5th Cir. 1995) (vacating a settlement where the bankruptcy

9

court "gave no consideration to issues we find dispositive: that nearly all creditors in interest opposed this settlement and that the settlement was reached between insiders without the participation of the creditors"). The Preferred Shareholders should have an opportunity to present their substantial case on appeal.

Absent a stay, the Preferred Shareholders will suffer irreparable harm. The Debtors will consummate the Plan and transfer QVCG's distributable cash to QVC, transfer QVCG's interest in Cornerstone to QVC, cancel the Preferred Stock, and grant releases binding against the Preferred Shareholders. Once those transactions close, the Debtors clearly will invoke equitable mootness and ask the Fifth Circuit to decline review.

The loss of appellate rights is itself irreparable harm as a matter of law. While the failure to grant a stay would be catastrophic for the Preferred Shareholders, QVC and other stakeholders will suffer no meaningful harm from a stay. QVCG's cash and its Cornerstone equity will remain intact, and unsecured creditors will have the same recovery whether the appeal succeeds or fails. The Plan itself contemplates that the Effective Date for one Debtor may occur before the Effective Date for another. A narrowly tailored stay would merely preserve the status quo at QVCG while these substantial legal questions are resolved.

This case warrants meaningful appellate review. It raises important questions that warrant review on a full record, not foreclosure through consummation. The public interest is not served by allowing a debtor to rush past appellate review by implementing transactions that moot the very rights the Preferred Shareholders seek to vindicate.

The Confirmation Order should be stayed.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      This matter is a core proceeding under 28 U.S.C. § 157(b).  The Preferred Shareholders seek relief under Bankruptcy Rule 8007(a)(1), which provides the procedural mechanism for a stay of a bankruptcy court order pending appeal.

3.      The Preferred Shareholders are filing concurrently herewith a notice of appeal of the Confirmation Decision, together with the anticipated Confirmation Order, and will file a request for certification of a direct appeal to the Fifth Circuit under 28 U.S.C. § 158(d)(2) and Bankruptcy Rule 8006.  Bankruptcy Rule 8007(a)(1)(A) requires a party to seek a stay pending appeal from the bankruptcy court in the first instance, and the Preferred Shareholders do so here. *See* Fed. R. Bankr. P. 8007(a)(1)(A).

## RELEVANT BACKGROUND

### I.      THE CORPORATE STRUCTURE AND THE QVCG PREFERRED EQUITY

4.      QVCG is the ultimate parent holding company in the Debtors' corporate structure. As of April 10, 2026, QVCG had approximately $195 million in cash.  Disclosure Statement, Art. IV.D.3.  Critically, QVCG has zero funded indebtedness.  First Day Decl. ¶ 36.  In SEC filings submitted shortly before the Petition Date (and in the years preceding it), QVCG did not disclose the existence of any indebtedness, contingent-but-unliquidated claims, or known litigation claims against it and in favor of any of its affiliates, nor did QVC in its own separate SEC filings. *See* Ex.[4] 1, QVC Group, Inc., Annual Report (Form 10-K) (Apr. 15, 2026).

---

[4]      Unless otherwise noted, all references herein to "Ex. _" are to the exhibits attached to this hereto.

5.      QVCG issued approximately $1.272 billion in face amount of the Preferred Stock. Disclosure Statement, Art. IV.D.2(e).  The Preferred Stock consisted of 12,723,158 shares issued and outstanding as of December 31, 2025.  Ex. 1, QVC Group, Inc., Annual Report (Form 10-K) (Apr. 15, 2026) at II-57.  It is publicly traded under the ticker symbol "QVCPQ" and was listed on the NASDAQ until April 24, 2026.  *See* Ex. 2, QVC Group, Inc., Current Report (Form 8-K) (Apr. 20, 2026).  The Preferred Stock is subject to a mandatory redemption on March 15, 2031, and holders were entitled to receive quarterly cash dividends at a fixed rate of 8% of face amount per year (which rate increased by contract to 9.5% due to dividend arrearages).  Disclosure Statement, Art. IV.D.2(e).  In June 2025, QVCG suspended paying cash dividends.  *Id.*  On the day before the bankruptcy filing, the Preferred Stock trading closed at approximately $2.55 per share.

6.      QVCG also holds a 62% equity interest in QRI Cornerstone, Inc. ("Cornerstone"). Cornerstone is a solvent, operating company with approximately $74 million in cash, no funded debt, and positive Adjusted OIBDA.  Cornerstone generated approximately $937 million in revenue and $16 million in Adjusted OIBDA in 2025 (*see* Ex. 1, QVC Group, Inc., Annual Report (Form 10-K) (Apr. 15, 2026) at II-62), and is projected annually to generate $30 million to $42 million of OIBDA through 2029.  *See* Ex. 3, QVC Group, Inc., Current Report (Form 8-K), Ex. 99.3 (Apr. 16, 2026).  The Debtors' financial advisor estimated Cornerstone's value to be $35 million to $135 million, with a midpoint of $85 million.  *See* June 5 Trial Tr. (Griffin) at 425:8-12. Cornerstone and QVCG's $195 million cash provide substantial value to Preferred Shareholders that is being entirely wiped out pursuant to the Intercompany Settlement.

## II.      THE INTERCOMPANY SETTLEMENT

7.      The Intercompany Settlement would transfer almost 100% of QVCG's value to QVC.  It allows QVC a $400 million claim against QVCG (the "QVC-QVCG Settlement Claim") to settle (i) alleged, unfiled fraudulent conveyance claims seeking to avoid and recover

approximately $800 million distributed from QVC to QVCG in connection with the 2022 Cash Management Plan, and (ii) contractual claims under the Tax Liability Allocation and Indemnification Agreement, dated April 26, 2004 (the "TSA"), for alleged overpayments of approximately $500 million in alleged tax overpayments from QVC to QVCG from 2018 through 2024 and a potential tax indemnification claim of up to approximately $2 billion relating to LINTA's deferred tax liabilities (the "Alleged Intercompany Claims"), which has already been substantially, if not fully, mitigated through insurance. *See Statement of Disinterested Directors of QVC, Inc. in Support of Joint Prepackaged Chapter 11 Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates* ("QVC Board Statement") [Dkt. No. 147] ¶ 16; Disclosure Statement, Art. VII.B.3(c)-(e).

8.  Pursuant to the settlement, QVC will receive 100% of QVCG's distributable cash in satisfaction of the Alleged Intercompany Claims. *See* Plan, Art. III.B.4(b)-(c). QVC will also receive QVCG's 62% equity stake in Cornerstone in satisfaction of the Alleged Intercompany Claims. The trial record confirmed that QVCG transferred that interest to QVC as part of the overall settlement, even though the Plan's treatment of the QVC-QVCG Settlement Claim refers only to QVCG distributable cash and contains no distribution mechanic for the Cornerstone equity. *See* June 8 Trial Tr. (Meltzer) 193:16-23 ("We made a decision that, in the context of the overall settlement and the other items that were being negotiated with Inc., that we would transfer our 62 percent interest in Cornerstone to Inc.").

## III.    THE PREPACKAGED PLAN PROCESS EXCLUDED THE PREFERRED SHAREHOLDERS

9.  The Preferred Shareholders were excluded from the process that produced the Intercompany Settlement. Before the Petition Date, the Debtors and their advisors negotiated the restructuring with holders of QVC Notes, RCF Lenders, and LINTA Noteholders—none of whom

13

held claims against QVCG—while leaving out the only stakeholders with a meaningful economic interest in QVCG.

10. In February 2026, counsel for certain Preferred Shareholders asked QVCG to include the Preferred Shareholders in restructuring negotiations. QVCG ignored this overture. The Debtors instead proceeded with a prepackaged Plan under which no class of claims or interests against QVCG voted to accept.

## IV. THE CONFIRMATION TRIAL RECORD

11. The evidence at trial established both that the Plan is not confirmable and the Intercompany Settlement is neither fair nor equitable.

### A. The Plan Violates Section 1129(a)(10) of the Bankruptcy Code

12. Under QVCG's Plan, the QVC-QVCG Settlement Claim is deemed "Unimpaired," as is every other class of claims under the Plan. But the evidence at trial confirmed that this $400 million claim is ***impaired*** because claimants are receiving (i) less than 100% of the value of the claim, and (ii) QVCG's equity stake in Cornerstone in partial satisfaction of the claim.

13. By the Debtors' own valuation of Cornerstone, QVCG's equity stake in that business is worth, at most, $83.7 million. *See supra* ¶ 6. Combined with $195 million of cash on QVCG's balance sheet, the QVC-QVCG Settlement Claim is receiving, at most, $278.7 million, substantially less than the $400 million allowed claim.

14. As explained above, the trial record confirmed that the QVC-QVCG Settlement Claim is also receiving QVCG's equity stake in Cornerstone as a distribution. *See supra* ¶ 8, *citing* June 8 Trial Tr. (Meltzer) 193:16-23 ("We made a decision that, in the context of the overall settlement and the other items that were being negotiated with Inc., that we would transfer our 62 percent interest in Cornerstone to Inc.").

14

15. The trial record thus unequivocally established that the Plan violates Section 1129(a)(10) of the Bankruptcy Code, which requires that at least one class of claims that is impaired under the plan has accepted the plan. *See* 11 U.S.C. § 1129(a)(10).

### B. The Intercompany Settlement is Neither Fair nor Equitable

16. The evidence at trial also established that the Intercompany Settlement is neither fair nor equitable.

17. <u>First</u>, the evidence established that the Alleged Intercompany Claims were weak at best. The claims to claw back the dividends require proof of insolvency, but QVC was unlikely to establish that it was insolvent at the time of transfer because:

i. Kroll provided a solvency opinion concluding that QVC was solvent at the time it made the $800 million dividend to QVCG (*see* PX-153; PX-173);

ii. Kroll provided multiple additional, contemporaneous solvency opinions concluding that QVCG was solvent at all relevant times (*see* PX-48, PX-50, PX-59, PX-52, PX-53, PX-60, PX-51, PX-46, PX-192);

iii. QVC's director testified that, if QVCG was solvent, it was reasonable to assume that QVC was also solvent (*see* June 8 Trial Tr. (Keglevic) at 66:6-15);

iv. QVC's CFO testified that the solvency opinions were issued in good faith (*see* June 5 Trial Tr. (Wafford) at 401:19-23); and

v. The *only* alleged evidence of insolvency was a deck prepared by Evercore relying solely on bond prices, which, critically and without explanation, excluded bonds trading at 80 to 90 cents (*see* PX-150; PX-374)

18. When scrutinized, the tax claims fared no better. The record shows that QVC never overpaid its tax obligations. Both QVC's Vice President of Tax and its CFO testified that QVC's tax payments complied with the TSA. *See* June 4 Trial Tr. (Kearns) at 204:10-205:11; June 5 Trial Tr. (Wafford) at 404:12-18.

19. The record also shows that QVC's hypothetical tax indemnity claims were weak. Among other things, (i) QVC obtained a "should" opinion from PwC with a high degree of

certainty that QVC's tax obligation would never become payable (*see* June 4 Trial Tr. (Kearns) at 227:19-228:8, 229:17-230:9); (ii) QVC's CFO testified that both the Debtors' position and his own personal view were that the tax liability "will not" materialize (*see* June 5 Trial Tr. (Wafford) at 405:2-7); and (iii) QVC obtained insurance coverage for the potential tax claims with a 3.8% premium (*see* June 8 Trial Tr. (Meltzer) at 293:7-17), implying a low likelihood that the claims will ever have to be paid.

20.     Second, the evidence established that QVCG failed to assess the probability of success of the Alleged Intercompany Claims.  Incredibly, QVCG's director conceded at trial that he never came to a view regarding QVC's probability of success on the Alleged Intercompany Claims.  *See* June 8 Trial Tr. (Meltzer) at 316:18-317:1 ("Q: [B]efore you agreed to the $400 million claim amount, you did not come to a view [on] the probability that QVC, Inc. would prevail on the intercompany litigation, did you? A: I did not come to a view any more than I came to a view as to whether we would succeed in defending it.").

21.     Third, the evidence established that QVCG failed to negotiate at arm's length.  Among other things:

i.      QVCG's director conceded that the settlement recognized no possibility that QVCG might prevail (*see* June 8 Trial Tr. (Meltzer) at 320:13-18);

ii.     QVCG's director conceded that he never insisted on a recovery for Preferred Shareholders (*see id.* at 310:11-24; 311:13-22);

iii.    By February 12, 2026, before any direct negotiations QVC's representatives, QVCG's directors had already limited Preferred Shareholder recovery to releases only (*see* PX-368; *see also* June 8 Trial Tr. (Meltzer) at 278:13-280:25)

iv.     QVCG obtained no estimate of litigation costs (*see id.* at 320:19-24);

v.      QVCG did not use those costs, QVC's litigation risk, or QVC's desire for a "fast and final" resolution as leverage (*see id.* at 321:8-24; June 8 Trial Tr. (Keglevic) at 101:18-22); and

16

vi.    QVCG funded at least $75 million in professional fees to date to consummate a restructuring of other QVC debtor entities (*see id.* at 274:23-275:11).

22.    <u>Fourth</u>, the evidence established that QVCG had only approximately $220,000 of third-party trade claims. *See* DX-439. While the QVCG directors extolled the virtue of paying general unsecured claims in full, the record is now clear that there are only $220,000 of third-party trade claims. The vast majority of purported general unsecured claims—more than $9.5 million—are tax priority claims that are entirely unaffected by the Intercompany Settlement because they have priority status over general unsecured claims. *See id.*

23.    <u>Fifth</u>, the evidence established that the QVCG directors never analyzed whether existing Preferred Shareholders would benefit from the releases included in the Intercompany Settlement. The QVCG directors also extolled the importance of obtaining releases for the Preferred Shareholders in connection with the settlement, but QVCG's director conceded at trial that he never determined whether existing Preferred Shareholders would benefit from the releases. *See* June 8 Trial Tr. (Meltzer) at 333:25-334:11.

24.    <u>Sixth</u>, no Preferred Shareholder has expressed support for the settlement. The Debtors have argued that only the Preferred Shareholders who retained counsel to formally object to the Plan oppose the settlement. That is false. Since the trial ended, other Preferred Shareholders have written to the Court expressing their dissatisfaction with the settlement. *See* June 16, 2026 Wampanoag Capital LLC Letter [Dkt. No. 547]; June 22, 2026 A. Ariker Letter [Dkt. No. 598]. The views of Preferred Shareholders must be taken into account because they are the only stakeholders that stand to gain or lose from the settlement. Yet QVCG simply ignored the views of the Preferred Shareholders because the decision had already been made to sacrifice their recovery for the benefit of QVC creditors. The Confirmation Decision validated the Debtors' disregard for Preferred Shareholder interests by adopting a legal standard for settlement approval

17

that only considers whether the settlement is in the "best interests of creditors" and ignores all consideration of the interests of equity holders.

25.     <u>Seventh</u>, the Preferred Shareholders have offered to fund the intercompany litigation at no cost to the estates. *See* PX-301.

26.     On this record, the Debtors did not (and cannot) establish that the Intercompany Settlement is fair and equitable.

## V.     THE CONFIRMATION DECISION AND NEED FOR EMERGENCY RELIEF

27.     On July 15, 2026, the Court entered the Confirmation Decision overruling the Preferred Shareholders' objections and confirming the Plan. The Court indicated that it will be entering an order confirming the Plan in the Confirmation Decision. On July 16, 2026, the Debtors filed a proposed Confirmation Order [Dkt. No. 713], which the Court has not yet entered. This Motion is being filed to ensure that it is considered alongside entry of the order confirming the Plan.

28.     On the Effective Date, the Plan deems substantial consummation to occur, authorizes the Debtors and Reorganized Debtors to consummate restructuring transactions, and binds all holders of claims and interests. *See* Plan, Arts. IX.C, XII.A, IV.C, IV.G.

29.     Emergency relief is therefore necessary. Without a stay, the Debtors can cause the Effective Date to occur and implement the QVCG-related transactions before the Preferred Shareholders obtain meaningful appellate review, including direct review by the Fifth Circuit if authorized. *See* Fed. R. Bankr. P. 8007(a)(1)(A); 28 U.S.C. § 158(d)(2); Plan, Arts. IX.A-C, XII.A.

## RELIEF REQUESTED

30.     By this Motion, the Preferred Shareholders respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit 4**, (i) staying the Confirmation Order pending appeal and prohibiting the Debtors from causing the Effective Date to occur while any

stay remains in effect; (ii) alternatively, staying the QVCG-specific provisions of the Plan, including implementation of the Intercompany Settlement, transfer or distribution of QVCG distributable cash, transfer of QVCG's 62% Cornerstone interest, cancellation of Preferred Stock, and enforcement of releases against the Preferred Shareholders; (iii) granting an immediate interim stay pending a hearing and ruling on this Motion and, if necessary, pending the Fifth Circuit's consideration of direct appeal authorization and any further stay relief; and (iv) granting such other and further relief as is just and proper.

## ARGUMENT

### I.    LEGAL STANDARD

31.     Bankruptcy Rule 8007 permits a party to seek "a stay of a judgment, order, or decree of the bankruptcy court pending appeal."  Fed. R. Bankr. P. 8007(a)(1)(A).

32.     Courts in the Fifth Circuit consider four factors: "(1) whether the movant has made a showing of likelihood of success on the merits; (2) whether the movant has made a showing of irreparable injury if the stay is not granted; (3) whether the granting of the stay would substantially harm the other parties; and (4) whether the granting of the stay would serve the public interest." *In re First S. Sav. Ass'n*, 820 F.2d 700, 704, 709 (5th Cir. 1987); *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981) (same); *In re Tex. Equip. Co.*, 283 B.R. 222, 226-27 (Bankr. N.D. Tex. 2002) (same).

33.     "The first two factors are the most critical." *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020).   Moreover, the Fifth Circuit "has refused to apply these factors in a rigid mechanical fashion." *Reading & Bates Petroleum Co. v. Musslewhite,* 14 F.3d 271, 272 (5th Cir. 1994); *see, e.g., In re First S. Sav. Ass'n*, 820 F.2d at 709 n.10 (finding that the absence of one factor was not fatal).

34.     Here, all four factors weigh in favor of a stay.

19

## II.    THE PREFERRED SHAREHOLDERS HAVE A SUBSTANTIAL CASE TO PRESENT ON APPEAL

35.    To show likelihood of success for a stay pending appeal, an appellant need only (i) present a "substantial case on the merits when a serious legal question is involved," and (ii) show that the "balance of the equities [*i.e.*, factors 2-4] weighs heavily in favor of granting the stay." *Arnold v. Garlock, Inc.*, 278 F.3d 426, 439 (5th Cir. 2001); *In re Tex. Equip. Co., Inc.*, 283 B.R. at 227 ("With respect to questions of law . . . especially questions involving the application of law, or when the law has not been definitively addressed by a higher court, the movant more easily satisfies the first element."). A "serious legal question" is one "of substantial import to others" (*Asarco LLC v. Americas Mining Corp.*, 419 B.R. 737, 741 (S.D. Tex. 2009) (quoting *Nat'l Treasury Employees Union v. Von Raab,* 808 F.2d 1057, 1059 (5th Cir. 1987)); or one involving a "fact-intensive question in an evolving area of the law, which the court views as presenting a serious question going to the merits." *Starke v. SquareTrade, Inc.*, 2017 WL 11504834, at \*2 (E.D.N.Y. Dec. 15, 2017).

36.    Here, the Preferred Shareholders have a substantial case to present on appeal involving serious legal questions, including (i) whether, at the sole option of the debtors, any settlement claim can be deemed "unimpaired" and disenfranchised under Section 1129(a)(10), (ii) whether a debtor seeking approval of an insider intercompany settlement is entitled to deference under the business judgment rule or whether the entire fairness standard of review applies, (iii) whether a settlement that wipes 100% of the value of one debtor for the benefit of its debtor subsidiaries can be fair and equitable when the record is rife with evidence that the negotiation was not at arm's length and the purportedly independent directors simply capitulated, and (iv) whether it is appropriate to only consider the best interests of creditors, without regard to any equity holder interests, when determining whether to approve a settlement in a Chapter 11 plan .

20

### A. The Plan Raises Serious Issues Under Section 1129(a)(10) of the Bankruptcy Code

37. Section 1129(a)(10) of the Bankruptcy Code requires that "at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). As explained above, the record is clear that the QVC-QVCG Settlement Claim is impaired because claimants are receiving (i) less than 100% of the value of the claim, and (ii) equity in Cornerstone in partial satisfaction of that claim. *See supra* ¶ 8. In the Confirmation Decision, the Court acknowledges that the QVC-QVCG Settlement claim is receiving less than $400 million of value, but mistakenly concludes that claim is unimpaired.

38. The Court adopted the Debtors' argument that the QVC-QVCG Settlement Claim is unimpaired because QVC agreed, through the RSA and the Intercompany Settlement, to accept QVCG's Distributable Cash and the equity in Cornerstone in full satisfaction of its $400 million allowed settlement claim. *See* Confirmation Decision at 95. In the Court's view, Section 1124 exempts this treatment from the impairment analysis because QVC, as holder of the claim, agreed under Section 1123(a)(4) to accept less than the full value to which it would otherwise be entitled. *Id.* at 95. There is no Fifth Circuit authority allowing this. Accordingly, the Preferred Shareholders have a strong case that the Court erred on this serious legal question.

39. Section 1124 provides that a class is impaired unless the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder." 11 U.S.C. § 1124; *see also In re Ultra Petroleum Corp.*, 943 F.3d 758, 763-64 (5th Cir. 2019) ("Impairment results from what the *plan* does.") (emphasis in original) (citing *In re Am. Solar King Corp.*, 90 B.R. 808, 819 (Bankr. W.D. Tex. 1988)). The Plan does not leave QVC's rights unaltered. It limits QVC's cash recovery to QVCG's Distributable Cash, and transfers QVCG's

21

62% Cornerstone interest to QVC as part of the overall settlement. *See* Plan, Art. III.B.4; Plan Supplement [Dkt. No. 212], Ex. C; Preferred Shareholders' Plan Objection ¶¶ 65-69. As explained above, as reflected in the Debtor's own valuation, QVC's maximum recovery on account of the QVC-QVCG Settlement Claim is roughly $278.7 million, materially below the $400 million allowed claim. *See supra* ¶ 13. If even a slight, artificial alteration constitutes impairment, *see In re Village at Camp Bowie I, L.P.*, 710 F.3d 239, 245 (5th Cir. 2013) (rejecting a motive inquiry and materiality requirement under Section 1129(a)(10) because "any alteration of a creditor's rights, no matter how minor," constitutes impairment under Section 1124), then so too does receipt of approximately 70% of an allowed claim and receiving equity instead of cash in satisfaction of that claim.

40. The three cases on which the Court relied do not compel a different result. *See* Confirmation Decision ¶ 94-95. Both *In re Container Store Grp., Inc.*, 676 B.R. 356, 377-88 (S.D. Tex. 2026), and *In re Spirit Airlines, Inc.*, 668 B.R. 689, 702 (Bankr. S.D.N.Y. 2025), addressed opt-out mechanics for third-party releases, not whether an insider settlement claim can be deemed unimpaired to avoid Section 1129(a)(10). *In re K Lunde, LLC*, 513 B.R. 587, 595 n.4 (Bankr. D. Colo. 2014), involved statutory tax treatment under Section 1129(a)(9)(D), not a plan-created settlement that transfers a debtor's remaining assets. None of these cases permits a debtor to manufacture unimpairment of an insider's discounted settlement claim so that no impaired non-insider class of claims exists at that debtor.

41. The contemporaneous plan documents confirm why Class A4's impairment matters. The April 12, April 14, April 15, and April 16 drafts treated Class A4 as "Impaired" and stated that QVC was entitled to vote, while the filed Plan treated Class A4 as "Unimpaired," deemed QVC to accept under Section 1126(f), and asserted that Section 1129(a)(10) was satisfied

22

or inapplicable because QVCG had no impaired class of claims. *See* JX 0043, QVC_0031711-QVC_0031873 (4/12/26 Draft Plan) at 32; JX 0044, QVC_0046581-QVC_0046836 (4/14/26 Draft Plan) at 31; JX 0045, QVC_0044406-QVC_0044615 (4/15/26 Draft Plan) at 116; JX 0046, QVC_0037415-QVC_0037597 (4/16/26 Draft Plan) at 127; Plan, Art. III.B.4(d), III.G. That change is not a bookkeeping point. It is the mechanism by which the Plan attempts to avoid the only thing Section 1129(a)(10) would otherwise require at QVCG: acceptance by an impaired non-insider class of claims. If Class A4 is impaired, QVC would be the only impaired accepting claim class at QVCG, and QVC is an insider whose vote could not be counted to satisfy Section 1129(a)(10). [5]

42. The Court's acceptance of the Debtors' impaired classification of the RSA parties, alongside its acceptance of the unimpaired classification of the QVC-QVCG claim, confirms that its ruling on Section 1124 was outcome-driven rather than neutral. The RCF Lenders, QVC Noteholders, and LINTA Noteholders also "settled" disputed recoveries as part of the RSA and the broader restructuring. Indeed, the LINTA Noteholders accepted an approximately 92.5% haircut on their claims. *See* Confirmation Decision at 72. Yet unlike the QVC-QVCG Settlement Claim, the Debtors classified those RSA parties' claims as impaired, solicited their votes, and relied on their acceptance to satisfy Section 1129(a)(10) at the QVC and LINTA Debtor levels. *See* Confirmation Decision at 92-93. The Debtors cannot have it both ways: if a negotiated settlement in which a creditor accepts less than the full value of its claim renders that creditor "unimpaired" under Section 1124, the RSA parties' claims should likewise have been unimpaired, and no Debtor

---

[5] QVC is an insider of QVCG because QVCG directly or indirectly owns 100% of QVC. *See* 11 U.S.C. § 101(31)(E) (defining "insider" to include, inter alia, an "affiliate" of the debtor); *id.* § 101(2) (defining "affiliate" to include an entity that "directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor"); *see also* First Day Decl., Ex. B1 (Simplified Corporate Structure Chart).

would have had an impaired accepting class. That the Debtors instead deemed the RSA parties impaired and entitled to vote—while deeming the QVC-QVCG Settlement Claim unimpaired and therefore not entitled to vote—reveals that the Debtors classified economically similar settlements differently depending on which classification was needed to satisfy Section 1129(a)(10) at each Debtor. That kind of classification gerrymandering, in a case of this size and visibility, presents exactly the sort of policy-laden question the Fifth Circuit should be given the opportunity to address.

43. Independently, the Plan also impairs the QVC-QVCG Settlement Claim by converting the Alleged Intercompany Claims, which the Disinterested Directors estimated could aggregate $1 to $3 billion in liability (*see* Disclosure Statement, Art. V.D; QVC Board Statement ¶ 22), from contingent, disputed, and unliquidated claims into a liquidated claim allowed in the amount of $400 million. *See* Plan, Art. III.B.4(b). That conversion alters QVC's rights: it eliminates QVC's right to litigate potential intercompany claims and fixes their value at $400 million (a 60-87% discount according to the QVC's Board's own estimation). *See generally In re Ultra Petroleum Corp.*, 943 F.3d 758, 763 (5th Cir. 2019) ("[i]mpairment results from what *the plan* does") (emphasis in original) (citing *In re Am. Solar King Corp.*, 90 B.R. 808, 819 (Bankr. W.D. Tex. 1988)).

44. The Plan therefore violates Section 1129(a)(10) of the Bankruptcy Code, and a stay is warranted to preserve appellate review of that error.

### B. The Appropriate Standard of Review Governing the Bankruptcy Rule 9019 Settlement Presents a Substantial Question

45. In response to the Preferred Shareholders' position that entire fairness should govern review of the Intercompany Settlement, counsel for the Debtors conceded in the Debtors' opening statement that "our response to that is, go ahead. Apply the entire fairness standard." *See*

24

June 4 Trial Tr. (Sussberg) at 17:24-18:4. The Court—without addressing the Debtors' admission concerning the proper standard of review—nevertheless held that QVCG's decision to approve the Intercompany Settlement is entitled to deference under the business judgment rule. *See* Confirmation Decision at 61. The Court's holding was based on its finding that the settlement process here was not conflicted. *See* Confirmation Decision at 62-67. At least some courts have disagreed that the relevant inquiry is whether the settlement process was conflicted, holding instead that "[b]y definition, the business judgment rule is not applicable to transactions among a debtor and an insider of the debtor. Those kinds of transactions are inherently suspect because 'they are rife with the possibility of abuse.'" *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 769 (Bankr. S.D.N.Y. 2020) (citing *In re Bidermann Indus. U.S.A. Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997)). While the Fifth Circuit has not determined the proper standard of review for a settlement between a debtor and an insider of the debtor, it has recognized that "a court's scrutiny must be great when the settlement is between insider and an overwhelming majority of creditors in interest oppose such settlement of claims." *Matter of Foster Mortg. Corp.*, 68 F.3d 914, 919 (5th Cir. 1995).

46.     The absence of definitive Fifth Circuit authority on the precise standard applicable to an insider intercompany settlement only reinforces that the Preferred Shareholders have presented a substantial case on appeal. *See In re Tex. Equip. Co., Inc.*, 283 B.R. at 227 ("With respect to questions of law . . . especially questions involving the application of law, or when the law has not been definitively addressed by a higher court, the movant more easily satisfies the first element."). Whether the proper criterion for selecting the standard of review is the presence of a conflict in the negotiation process, rather than the insider nature of the transaction, is precisely the kind of question the Fifth Circuit has not resolved.

### C. Approval of the Intercompany Settlement Presents a Substantial Question

47.     The Preferred Shareholders have at least a substantial case that the Court erred by approving the Intercompany Settlement under Bankruptcy Rule 9019.  *See* Confirmation Decision at 67-74.  The core problem is straightforward: the Court treated uncertainty, cost, process labels, and the rhetoric of a global settlement as substitutes for the estate-specific analysis required.

48.     Bankruptcy Rule 9019 does not require a mini-trial, but it does require an informed, independent judgment on a sufficient factual record.  *See In re AWECO, Inc.*, 725 F.2d 293, 299 (5th Cir. 1984) ("approval of a compromise, absent a sufficient factual foundation, inherently constitutes an abuse of discretion").  A settlement must be "*fair and equitable* and in the best interest of the estate." *In re Beach,* 731 F. App'x 322, 325 (5th Cir. 2018) (emphasis added).  In evaluating whether a settlement is fair and equitable, the Court must consider: "(1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay, including the difficulties, if any, to be encountered in the matter of collection; (3) the paramount interest of the creditors and a proper deference to their respective views; (4) the extent to which the settlement is truly the product of arm's-length bargaining and not fraud or collusion; and (5) all other factors bearing on the wisdom of the compromise." *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010).  The Court erred in applying these factors to the undisputed facts in the record.

49.     First, the Court reasoned that the probability of success factor favored approval because the outcome of the litigation was uncertain and the Disinterested Directors believed that settling, rather than litigating, would be more beneficial to estate creditors because litigating could diminish potential recovery out of the estate assets.  *See* Confirmation Decision at 69-70.  Critically, the Court "d[id] not make any conclusive findings as to the merits" of the underlying claims.  Confirmation Decision at 26.  "Rather, the Court f[ound] that the Disinterested Directors

26

each conducted and analyzed their due diligence of the company, and each separately and independently formulated an understanding as to the potential existence of such claims, their potential magnitude, potential defenses, and the factual and legal issues underpinning such potential claims which may need to be addressed by a court through litigation." *Id.* at 26. Indeed, the Court elsewhere confirmed that it deferred entirely to the Disinterested Directors' judgment rather than independently assessing the merits, stating that it "will not second guess the Disinterested Directors' business judgment that releases with no distribution for the Preferred Shareholders was appropriate . . ." *Id.* at 85. But the law is clear that the Court must do more than that. The Court cannot simply defer to the business judgment of the debtors. The court must reach its own "intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980) (applying *TMT Trailer Ferry* factors). The Court's failure to do so here constitutes clear error.

50. The Court's reasoning also elided a central point: the record did not merely show uncertainty; it showed specific defenses that QVCG never weighed. QVCG's own materials stated that QVC was not likely to make the required showing of insolvency for clawback claims (*see* PX-153), and QVC's CFO testified that the contemporaneous solvency opinions were issued in good faith. *See* June 5 Trial Tr. (Wafford) at 401:19-23. QVC's tax witness testified that the alleged tax overpayments were not overpayments under the TSA (*see* June 4 Trial Tr. (Kearns) at 204:10-205:11, 222:4-20), and QVC's CFO likewise testified that QVC's payments to QVCG complied with the TSA. *See* June 5 Trial Tr. (Wafford) at 404:12-18. The asserted tax-indemnity exposure was similarly contested: QVC obtained a "should" opinion that the tax liability would not materialize (*see* June 8 Trial Tr. (Meltzer) at 182:19-183:14), QVC's own position was that the

tax liability "will not" materialize and QVC's CFO agreed with that position (*see* June 5 Trial Tr. (Wafford) at 405:2-8), and QVC obtained $925 million of tax insurance for a premium of approximately $36 million. *See* June 8 Trial Tr. (Meltzer) at 293:7-17. Yet Mr. Meltzer admitted that, before agreeing to the $400 million claim, he did not come to a view on QVC's probability of success, and that the settlement recognized *no* possibility that QVCG might prevail. *See* June 8 Trial Tr. (Meltzer) at 316:18-317:1, 320:13-18. Bankruptcy Rule 9019 does not let a debtor convert uncertainty into proof. On this record, the probability factor supports reversal, not approval.

51.     The Fifth Circuit's decision in *In re Emerald Oil Co.*, 807 F.2d 1234 (5th Cir. 1987) is instructive. There, the bankruptcy court approved a settlement of a fraudulent conveyance claim finding that the compromise was reasonable and in the estate's best interests in light of its conclusion that the trustee "might not succeed" in setting aside the transfer. *Id.* at 1239. The Fifth Circuit disagreed with the bankruptcy court's assessment of the strength of the claim, finding that the trustee likely could set aside the transfer as a matter of law. *See id.* The Fifth Circuit therefore reversed the Bankruptcy Court's approval of the settlement, emphasizing that the "hazards of litigation do not justify the approved compromise whereby the creditors receive less than one-third of their potential recovery after trial." *Id.*

52.     Second, the Court reasoned that the complexity and cost factor favored approval because the potential intercompany claims would "implicate manifold legal issues" as well as "complicated factual issues" that would be time-consuming and expensive to litigate. *See* Confirmation Decision at 70-71. This could be said of any settlement of significant bankruptcy litigation claims and would render this factor meaningless. But even so, litigation would have given QVCG *some chance of a recovery*, whereas this settlement eliminated any chance of one.

28

Moreover, QVCG never undertook the work needed to rely on litigation cost as a settlement justification. Mr. Meltzer admitted that QVCG never obtained an estimate of litigation costs for either QVCG or QVC, and never used the cost of litigation for either side as leverage. *See* June 8 Trial Tr. (Meltzer) at 320:19-24; 321:8-11. QVC, by contrast, had every reason to pay for speed and finality: its director testified that litigation would reduce QVC's recovery by fees (*see* June 8 Trial Tr. (Keglevic) at 99:1-8), delaying the "fast and final" resolution was his "objective" (*see id.* at 99:12-100:4; 102:20-103:5; 126:17-21), create risk that QVC could lose and recover nothing (*see id.* at 101:18-22), and be "ugly" and harmful to the estate. *Id.* at 100:5-12. QVCG did not use that leverage, did not deduct litigation costs from QVC's asserted recovery, and accepted a settlement that gave QVCG no upside from winning. The Preferred Shareholders also offered to fund litigation costs so the estates would not bear them. *See* PX-301. Complexity may justify compromise; it cannot justify total capitulation, surrendering all of QVCG's value without first testing whether the cost problem was real, avoidable, or useful as leverage against QVC.

53. Third, the Court reasoned that the settlement was the product of arm's length bargaining because each key debtor had disinterested directors and separate counsel. *See* Confirmation Decision at 73. But titles and process labels are not talismans. Before negotiations even began, the QVCG Special Committee limited Preferred Shareholder recovery to releases (*see* PX-368). One day later, QVCG's opening position was that QVC's clawback claims were not likely viable and QVCG should pay nothing for them. *See* PX-153. QVC then proposed an at least $400 million unsecured claim with no recovery for Preferred Shareholders (*see* June 8 Trial Tr. (Keglevic) at 106:10-107:9), and QVCG ultimately accepted a $400 million claim with no Preferred Shareholder recovery. *See id.* at 113:15-114:3.

29

54. The Court found that "Kobre and the QVCG Disinterested Directors negotiated as best they could for a better result both for QVCG and the Preferred Shareholders." Confirmation Decision at 73. But that finding is not supported by the facts established at trial. Indeed, Mr. Meltzer admitted that he never insisted on any Preferred Shareholder recovery (*see* June 8 Trial Tr. (Meltzer) at 310:11-24; 311:13-22), did not hire an independent financial advisor, investment banker, or solvency expert, did not bring QVCG's tax advisor to the settlement meeting (*see id.* at 178:25-179:6, 221:17-222:4, 222:10-21; 303:24-304:1; 304:11-14), and ignored Preferred Shareholder outreach before the settlement was finalized. *See id.* at 325:11-14; 326:4-8; 327:3-8. That is not arm's length bargaining. As the court explained in *In re Coram Healthcare Corp.*, a debtor cannot hire a purportedly independent fiduciary to simply "sprinkle holy water" to cleanse an otherwise conflicted transaction. *In re Coram Healthcare Corp.*, 271 B.R. 228, 240 (Bankr. D. Del. 2001).

55. <u>Fourth</u>, the Court reasoned that the stakeholder interest factor favored approval because the settlement "functions as the keystone to the RSA and the Plan." Confirmation Decision at 72. That argument cannot support approval. Bankruptcy Rule 9019 required a QVCG-specific inquiry: was it fair and equitable for QVCG to give QVC its distributable cash and QVCG's 62% Cornerstone interest while leaving Preferred Shareholders with no recovery? The fact that the settlement was part of a broader restructuring did not answer that question. To the contrary, because the settlement was embedded in the Plan and eliminated Preferred Shareholder recovery, the Court must ensure that the settlement did not bypass the voting and confirmation protections that ordinarily apply when a plan transfers estate value away from junior stakeholders. If the desire for "global peace" were sufficient, a debtor could transfer value from one estate to

another debtor's creditors whenever doing so made a multi-debtor restructuring easier to confirm. Bankruptcy Rule 9019 does not permit that result.

56.     The Court also emphasized that "no creditor has lobbied an objection" to the settlement—the only objectors are equity and the U.S. Trustee. Confirmation Decision at 72. That emphasis was misplaced. Where, as here, "there is a likelihood of a recovery for equity, the Court can and should consider the interest of equity holders in applying" the stakeholder interest factor. *In re RNI Wind Down Corp.*, 348 B.R. 286, 298 (Bankr. D. Del. 2006), *subsequently aff'd*, 359 F. App'x 352 (3d Cir. 2010). No Preferred Shareholder before the Court supported the settlement, even though the Preferred Stock had approximately $1.4 billion of liquidation preference and was the only constituency with an economic incentive to test QVC's claims. Since the trial ended, multiple Preferred Shareholders have written to the Court expressing their dissatisfaction with the settlement. *See supra* ¶ 24. The stakeholder interest factor therefore weighs against approval.

57.     The Fifth Circuit's decision in *Matter of Foster Mortg. Corp.*, 68 F.3d 914 (5th Cir. 1995) is instructive. There, the Fifth Circuit vacated a settlement approved by the bankruptcy court because the bankruptcy court "gave no consideration to issues we find dispositive: that nearly all creditors in interest opposed this settlement and that the settlement was reached between insiders without the participation of the creditors. In our estimation, the court abused its discretion by not showing proper deference to the views of the creditors." *Id.* at 918; *see also Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (identifying, among the factors bearing on whether a settlement is fair and equitable, "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement"); *In re NII Holdings, Inc.*, 536 B.R. 61, 120 (Bankr. S.D.N.Y. 2015) (finding that parties in interest

31

supported the settlement where "the Plan received overwhelming approval from every impaired class of creditors, all of whom will be affected by the Settlement"). The same reasoning applies here: the relevant parties in interest—the preferred shareholders of a solvent debtor—all oppose the settlement and were excluded from the negotiation.

58.     Each of the relevant factors therefore weighed against approval of the QVC-QVCG Settlement. The Preferred Shareholders have, at minimum, a substantial case that approval of the settlement should be reversed.

## III. THE PREFERRED SHAREHOLDERS WILL SUFFER IRREPARABLE HARM ABSENT A STAY

59.     Absent a stay, the Preferred Shareholders will suffer irreparable harm because the Debtors may consummate the Plan and then argue that appellate review is equitably moot. That risk matters here because the appeal concerns assets, releases, cancellations, and waivers that the Debtors intend to implement on or around the Effective Date. Courts recognize that the loss of appellate rights is irreparable harm as a matter of law. *See In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 348 (S.D.N.Y. 2007) (holding that "loss of appellate rights" is "a quintessential form of prejudice"); *In re Voyager Digital Holdings, Inc.*, 2023 WL 2731737, at *10 (S.D.N.Y. Apr. 1, 2023) (holding that risk of mootness absent a stay satisfies the irreparable-harm prong); *see also In re Pac. Lumber Co.*, 584 F.3d 229, 242-43 (5th Cir. 2009) (noting that plan consummation may often be dispositive of equitable mootness and that substantial legal issues can and should be preserved for review).

60.     The Preferred Shareholders do not concede that their appeal would be equitably moot. But courts grant stays precisely because consummation of a Chapter 11 plan may create a serious risk that appellate courts will be asked to decline review, and the Debtors have indicated that they believe the appeal would be equitably moot. *See In re Manges*, 29 F.3d 1034, 1039 (5th

Cir. 1994) (recognizing that equitable mootness is prudential and permits a court to decline review); *In re Blast Energy Servs., Inc.*, 593 F.3d 418, 424 (5th Cir. 2010) (stating that equitable mootness applies only when reorganization has progressed too far for practical relief); *In re Pac. Lumber Co.*, 584 F.3d at 242-43 (describing risks created by plan consummation absent a stay); *In re Voluntary Purchasing Grps.*, Inc., 196 F.3d 1258 (5th Cir. 1999) (per curiam) (reversing denial of stay where, absent a stay, appellants' right to contest confirmation could be thwarted).

61.     The harm is especially concrete here because, on or around the Effective Date, the Plan authorizes the Debtors to transfer assets, issue and distribute new equity, enter exit financing, issue takeback debt, adopt new organizational documents, and make the Plan binding on all holders of claims and interests. *See* Plan, Arts. IV.A, IV.C.3-5, IV. E, IV.G, IV.I, XII.A. Those steps would not merely advance the broader restructuring; they would implement the very QVCG-specific transactions that the Preferred Shareholders seek to challenge on appeal. *See* Plan, Arts. VIII.C-D, VIII.F.

62.     The Plan makes that risk acute. It provides that substantial consummation occurs on the Effective Date; authorizes transfers, new debt and equity issuances, exit financing, and other restructuring transactions; and provides that, on the Effective Date, holders are deemed to have waived arguments concerning their claims or interests if not disclosed before confirmation. *See* Plan, Arts. IV.A, IV.C.3-5, IV.E.2-5, IV.I, IV.J, IX.C, XII.A, XII.N. If QVCG distributable cash and the 62% Cornerstone interest are transferred, releases become operative, and the Preferred Stock is canceled, the Preferred Shareholders cannot be restored fully after the fact. *See* Plan, Arts. III.B.6, VIII.C–D, VIII.F.

## IV.    A STAY WILL NOT SUBSTANTIALLY HARM OTHER PARTIES AND CAN BE TAILORED

63.    A stay will not substantially harm other parties because the Court can tailor relief to the QVCG-specific provisions that threaten appellate rights.  Courts may tailor a stay to operate only with respect to a portion of the proceeding.  *See Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (recognizing courts' ability to tailor stay relief); *Nken v. Holder*, 556 U.S. 418, 428 (2009) (describing a stay as a means of suspending judicial alteration of the status quo).  The Plan itself supports tailored relief because it states that conditions precedent apply to each Debtor individually and that the Effective Date for one Debtor may occur before the Effective Date for another.  *See* Plan, Art. IX.B.

64.    The Debtors have argued that the Plan preserves QVC and Cornerstone as going concerns, saves jobs, eliminates funded debt, provides exit financing, pays general unsecured claims in full, and resolves inter-debtor litigation.  *See* Debtors' Confirmation Brief at 10-11.  But the Preferred Shareholders do not ask the Court to unwind the enterprise; they ask the Court to preserve QVCG's disputed assets and their appellate rights while the QVCG-specific issues are reviewed.

65.    At a minimum, the Court should stay the transfer or distribution of QVCG distributable cash, the transfer of QVCG's 62% Cornerstone interest, the cancellation of Preferred Stock, and enforcement of releases against the Preferred Shareholders.  Practically speaking, this will result only in lowering the amount of distribution certain of QVC's creditors will take at emergence.  There will be no impact to the business, employees, supplies, or customers.  That relief would preserve the appellate remedy without necessarily preventing the Debtors from seeking to implement non-QVCG transactions that can lawfully proceed without impairing the Preferred Shareholders' appeal.  *See* Plan, Art. IX.B-C.

34

66.     No bond should be required.  The assets at issue during the pendency of the stay (*i.e.,* QVCG's distributable cash and its 62% Cornerstone equity interest) will remain intact and available to be transferred to the Debtors or other parties later should the Preferred Shareholders not prevail on appeal.  Accordingly, there is no cognizable risk of harm to the Debtors or other parties that a bond would need to secure.  To the extent the Court nonetheless determines that a bond is necessary, the Debtors are already holding approximately $75 million in professional fees that QVCG funded to consummate the restructuring of other Debtor entities and for which QVCG is entitled to reimbursement, as set forth herein.  *See* June 8 Trial Tr. (Meltzer) at 274:23-275:11.  Because the Debtors already control those funds, that $75 million can serve as adequate security for a stay, and the Debtors can simply hold onto it pending the outcome of the appeal without requiring the Preferred Shareholders to post any additional collateral.  *See* Fed. R. Bankr. P. 8007.

## V.      THE PUBLIC INTEREST FAVORS A STAY

67.     Finally, the public interest compels staying the Confirmation Order pending resolution of the Preferred Shareholders' appeal because meaningful appellate review is a substantial and important right, particularly where confirmation of a complex Chapter 11 plan may otherwise become practically unreviewable.  *See In re Adelphia Commc'ns Corp.*, 361 B.R. at 342, 348 (explaining the importance of meaningful appellate review and holding that loss of appellate rights is irreparable prejudice); *In re Pac. Lumber Co.*, 584 F.3d at 243 ("substantial legal issues can and ought to be preserved for review").

68.     The public interest also favors correct application of the Bankruptcy Code's confirmation requirements.  This appeal will raise important issues concerning impairment, Bankruptcy Rule 9019 settlements, good faith, best interests, and the ability to transfer value through an insider intercompany settlement in a multi-debtor plan.  *See* 11 U.S.C. §§ 1124, 1129(a)(3), 1129(a)(7), 1129(a)(10), 1129(b); Fed. R. Bankr. P. 9019; *Czyzewski v. Jevic Holding*

*Corp.*, 580 U.S. 451, 464 (2017) (the priority system is a "basic underpinning" of business bankruptcy law).

## VI. THE COURT SHOULD ENTER AN INTERIM STAY OF THE CONFIRMATION ORDER DURING THE PENDENCY OF THIS MOTION

69. The Court should enter an immediate interim stay pending a hearing and ruling on this Motion. Without interim relief, the Debtors may consummate the Plan before this Motion can be fully briefed and decided, thereby threatening to moot the relief requested here. Courts have entered interim stays to preserve the status quo where consummation or a transaction may occur before a stay motion can be resolved. *See In re Ondova Ltd. Co.*, 620 F. App'x 290, 291 (5th Cir. 2015) (per curiam) (temporarily staying sale order until further order of the court); *see also Rio Grande Cmty. Health Ctr., Inc. v. Armendariz,* 792 F.3d 229, 231 (1st Cir. 2015) (per curiam) (issuing a temporary stay of certain district court orders while considering a stay of the same); *Millennium Dental Techs., Inc. v. Fotona d.d.,* 407 F. App'x 482, 483 (Fed. Cir. 2011) (per curiam) (issuing a temporary stay of a district court order directing appellant to draft and sign a settlement agreement pending the circuit court's ruling on a stay motion and entry into a settlement); *Detroit Free Press, Inc. v. Ashcroft,* No. 02-1437, 2002 WL 1332827, at *1 (6th Cir. Apr. 10, 2002) (per curiam) (granting a temporary stay pending appeal of a district court injunction).

## EMERGENCY CONSIDERATION

70. Emergency consideration is warranted because, absent immediate relief, the Debtors may cause the Effective Date to occur and implement the QVCG-related transactions before this Motion can be fully briefed and decided. An immediate stay is necessary to allow the Preferred Shareholders to proceed expeditiously with appellate review without fear that the Plan will be consummated in the meantime and the requested relief rendered ineffective.

36

## NOTICE

71.     Notice of this Motion will be provided to counsel to the Debtors, the Office of the United States Trustee for the Southern District of Texas, any statutory committee appointed in these Chapter 11 Cases, all parties that have requested notice, and all parties required to receive notice under the Bankruptcy Rules and the Bankruptcy Local Rules.  The Preferred Shareholders submit that, under the circumstances, no other or further notice is required.

## CONCLUSION

For the foregoing reasons, the Preferred Shareholders respectfully request entry of an order: (i) staying the Confirmation Order pending appeal and prohibiting the Debtors from causing the Effective Date to occur while any stay remains in effect; (ii) alternatively, staying the QVCG-specific provisions of the Plan, including implementation of the Intercompany Settlement, transfer or distribution of QVCG distributable cash, transfer of QVCG's 62% Cornerstone interest, cancellation of Preferred Stock, and enforcement of releases against the Preferred Shareholders; (iii) granting an immediate interim stay pending a hearing and ruling on this Motion and, if necessary, pending the Fifth Circuit's consideration of direct appeal authorization and any further stay relief; and (iv) granting such other and further relief as is just and proper.

[*Remainder of Page Intentionally Left Blank*]

Dated: July 16, 2026

**KANE RUSSELL COLEMAN LOGAN PC**

By: /s/ *Mark C. Taylor*_____
Mark C. Taylor
Texas Bar No. 19713225
401 Congress Ave., Suite 2100
Austin, Texas 78701
Telephone: (512) 487-6650
Email: mtaylor@krcl.com

-and-

**GLENN AGRE BERGMAN & FUENTES LLP**

Andrew K. Glenn (admitted *pro hac vice*)
Kurt A. Mayr (admitted *pro hac vice*)
Agustina G. Berro (admitted *pro hac vice*)
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 970-1601
Email:  aglenn@glennagre.com
        kmayr@glennagre.com
        aberro@glennagre.com

*Counsel to the Preferred Shareholders*

**CERTIFICATE OF ACCURACY**

I hereby certify that the facts set forth in the foregoing document are true and correct to the best of my knowledge, information, and belief, based on the record in these Chapter 11 Cases.

By: */s/ Mark C. Taylor*_____

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 16, 2026, I caused a true and correct copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas to all parties registered to receive electronic notice in this case.

By: */s/ Mark C. Taylor*_____

# **EXHIBIT 1**

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D. C. 20549**
**FORM 10-K**
x **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2025**
**OR**
o **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from to**
**Commission File Number 001-33982**

# QVC GROUP, INC.
(Exact name of Registrant as specified in its charter)

| **State of Delaware** | **84-1288730** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **1200 Wilson Dr**<br>**West Chester, Pennsylvania** | **19380** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(484) 701-1000**
Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of exchange on which registered |
|---|---|---|
| Series A Common Stock | QVC GA | The Nasdaq Stock Market LLC |
| Series B Common Stock | QVC GB | OTCQB Venture Market |
| 8.0% Series A Cumulative Redeemable Preferred Stock | QVC GP | The Nasdaq Stock Market LLC |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes o No x

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes o No x

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes x No o

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes x No o

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act .

| Large Accelerated Filer o | Accelerated Filer o | Non-accelerated Filer x | Smaller Reporting Company o | Emerging Growth Company o |
|---|---|---|---|---|

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act . o

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S .C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. o

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. o

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). o

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act ). Yes o No x

The aggregate market value of the voting stock held by nonaffiliates of QVC Group , Inc. computed by reference to the last sales price of QVC Group , Inc. common stock, as of the closing of trading on June 30, 2025, was approximately $22 million.

The number of outstanding shares of QVC Group , Inc.'s common stock as of March 31, 2026 was:

| Series A common stock | 7,911,869 |
|---|---|
| Series B common stock | 182,233 |

Documents Incorporated by Reference

The Registrant's definitive proxy statement for its 2026 Annual Meeting of Stockholders is hereby incorporated by reference into Part III of this Annual Report on Form 10-K.

**QVC GROUP, INC.**
**2025 ANNUAL REPORT ON FORM 10K**

**Table of Contents**

| | **Part I** | **Page** |
|---|---|---|
| Item 1. | Business | I-4 |
| Item 1A. | Risk Factors | I-18 |
| Item 1B. | Unresolved Staff Comments | I-43 |
| Item 1C. | Cybersecurity | I-43 |
| Item 2. | Properties | I-45 |
| Item 3. | Legal Proceedings | I-45 |
| Item 4. | Mine Safety Disclosures | I-45 |
| | **Part II** | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | II-1 |
| Item 6. | [Reserved] | II-2 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | II-2 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | II-19 |
| Item 8. | Financial Statements and Supplementary Data | II-20 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | II-20 |
| Item 9A. | Controls and Procedures | II-20 |
| Item 9B. | Other Information | II-20 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | II-21 |
| | **Part III** | |
| Item 10. | Directors, Executive Officers and Corporate Governance | III1 |
| Item 11. | Executive Compensation | III1 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | III1 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | III1 |
| Item 14. | Principal Accountant Fees and Services | III1 |
| | **Part IV** | |
| Item 15. | Exhibits and Financial Statement Schedules | IV1 |
| Item 16. | Form 10-K Summary | IV8 |

# PART I.

## Cautionary Note Regarding Forward-Looking Statements

Certain statements in this Annual Report on Form 10-K constitute forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, including statements regarding business, product and marketing strategies, including the outcome and effects of the Chapter 11 Cases (as defined below) (including our ability to successfully emerge from the process and the timing thereof); QVC 's WIN strategy; revenue growth at QVC ; synergies; economic and macroeconomic trends (including impact of tariffs); statements regarding the carrying value of intangible assets; our ability to continue as a going concern; projected sources and uses of cash; repayment of debt; fluctuations in interest rates and foreign currency exchange rates; and the anticipated impact of certain contingent liabilities related to legal and tax proceedings and other matters arising in the ordinary course of business. You can identify some of the forward-looking statements by the use of forward-looking words such as "anticipate," "believe," "plan," "estimate," "expect," "intend," "should," "may" and other similar expressions, although not all forward-looking statements contain these identifying words. In particular, statements under Item 1. "Business," Item 1A. "Risk-Factors," Item 2. "Properties," Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations" and Item 7A. "Quantitative and Qualitative Disclosures About Market Risk " contain forward-looking statements. Where, in any forward-looking statement, we express an expectation or belief as to future results or events, such expectation or belief is expressed in good faith and believed to have a reasonable basis, but there can be no assurance that the expectation or belief will result or be achieved or accomplished. You should not place undue reliance on these forward-looking statements made in this Annual Report on Form 10-K. The following include some but not all of the factors that could cause actual results or events to differ materially from those anticipated:

- our ability to obtain court approval from the Bank ruptcy Court with respect to motions or other requests made to the Bank ruptcy Court throughout the course of the Chapter 11 Cases ;
- potential adverse effects of the Chapter 11 Cases on our liquidity and results of operations, including increased legal and other professional costs necessary to execute our restructuring process, on our liquidity and results of operations (including the availability of operating capital during the pendency of the Chapter 11 Cases );
- objections to the confirmation of our Plan (as defined below) or other pleadings we file that could protract the Chapter 11 Cases ;
- the Bank ruptcy Court 's rulings in the Chapter 11 Cases , and the outcome of the Chapter 11 Cases generally;
- the length of time that we will operate under Chapter 11 protection and the continued availability of operating capital during the pendency of the proceedings;
- the impact of the expected delisting and downgrade of our capital stock from the Nasdaq Capital Market and OTCQB Venture Market, as applicable;
- our ability to comply with the restrictions imposed by the terms and conditions of certain financing arrangements;
- the effects of the Chapter 11 Cases on the interests of various constituents and financial stakeholders;
- customer demand for our products and services and our ability to attract new customers and retain existing customers by anticipating customer demand and adapting to changes in demand;
- our competitive industry and competitor responses to our products and services;
- increased digital TV penetration and the impact on channel positioning of our programs;
- the levels of online traffic on our businesses' websites and our ability to convert visitors into customers or contributors;
- uncertainties inherent in the development and integration of new business lines and business strategies;
- our future financial performance and condition, including availability, terms, deployment of capital and our level of indebtedness;
- our ability to continue as a going concern;
- our ability to effectively manage our installment sales plans and revolving credit card programs;
- the cost and ability of shipping companies, manufacturers, suppliers, digital marketing channels, and vendors to deliver products, equipment, software and services;
- the outcome of any pending or threatened litigation;
- the impact of the seasonality of our businesses;
- changes in, or failure or inability to comply with, government regulations, including, regulations of the Federal Communications Commission ("FCC " ) and commitments and adverse outcomes from regulatory proceedings;
- new regulations and varied governmental and non-governmental perspectives on corporate sustainability;
- changes in the nature of key strategic relationships with partners, distributors, suppliers and vendors, including our increased reliance on social media platforms as a marketing tool;
- domestic and international economic and business conditions and industry trends, including the impact of Brexit (as defined below) and the impact of inflation and increased labor costs;
- increases in market interest rates;

I-3

- changes and uncertainty surrounding tariffs, trade policy and trade relations with China, the United Kingdom ("U.K .") and other countries;
- consumer spending levels, including the availability and amount of individual consumer debt and customer credit losses;
- matters relating to our debt and other financial obligations and ability to meet those obligations, including covenants in our debt agreements;
- downgrades to QVC 's credit ratings;
- the impairment of our goodwill and intangible assets;
- system interruption and the lack of integration and redundancy in the systems and infrastructures of our businesses;
- advertising spending levels;
- changes in distribution and viewing of television programming, including the expanded deployment of video on demand technologies and internet protocol television and their impact on home shopping programming;
- rapid technological changes, including the increased use of artificial intelligence by us and our competitors;
- failure to protect the security of personal information, including as a result of cybersecurity threats and cybersecurity incidents, subjecting us to potentially costly government enforcement actions and/or private litigation and reputational damage;
- the regulatory and competitive environment of the industries in which we operate;
- natural disasters, public health crises, political crises, and other catastrophic events or other events outside of our control, including climate change;
- threatened terrorist attacks, political and economic unrest in international markets and ongoing military action around the world;
- failure to successfully implement business improvement initiatives and growth strategies;
- fluctuations in foreign currency exchange rates;
- the reaction of our customers, prospective customers, suppliers and service providers to the Chapter 11 Cases and the related increased performance and credit risks associated with our constrained liquidity position and capital structure; and
- our ability to attract and retain skilled personnel on commercially reasonable terms, whether due to labor regulations, unionization or otherwise, or to retain employees as a result of our financial condition generally or as a result of the Chapter 11 Cases .

These forward-looking statements and such risks, uncertainties and other factors speak only as of the date of this Annual Report on Form 10-K, and we expressly disclaim any obligation or undertaking to disseminate any updates or revisions to any forward-looking statement contained herein, to reflect any change in our expectations with regard thereto, or any other change in events, conditions or circumstances on which any such statement is based. When considering such forward-looking statements, you should keep in mind the factors described in Item 1A, "Risk Factors " and other cautionary statements contained in this Annual Report on Form 10-K. Such risk factors and statements describe circumstances that could cause actual results to differ materially from those contained in any forward-looking statement.

\* \* \* \* \*

## Item 1. Business.

*General Development of Business*

QVC Group , Inc. ("QVC Group ", the "Company " , "we", "us" and "our"), formerly known as Qurate Retail, Inc., owns interests in subsidiaries and other companies which are primarily engaged in the video and online commerce industries. Through our subsidiaries and affiliates, we operate in North America, Europe and Asia. Our principal businesses and assets include our consolidated subsidiaries QVC , Inc. ("QVC "), Cornerstone Brands, Inc. ("CBI " ), and other equity investments. Our largest businesses and reportable segments are QxH (QVC U.S . and HSN , Inc. ("HSN " )), QVC International and CBI .

During the year-ended December 31, 2025, our Company 's Board of Directors (the "Board of Directors " or the "Board ") approved an amendment to the Company 's restated certificate of incorporation and an amendment and restatement of the Company 's bylaws to change the Company 's name from Qurate Retail, Inc. to QVC Group , Inc. The Board believes that the name change builds on the brand equity of the Company 's largest brand and supports its growth strategy to expand into a live social shopping company. The name change went into effect on February 21, 2025.

On September 23, 2011, QVC Group completed the split-off (the "LMC Split-Off ") of a wholly owned subsidiary, Liberty Media Corporation ("LMC "). Following the LMC Split-Off , QVC Group and LMC operate as separately publicly traded companies and neither has any stock ownership, beneficial or otherwise, in the other.

QVC Group has entered into certain agreements with LMC . These agreements include a reorganization agreement, services agreement and facilities sharing agreement. As a result of certain corporate transactions, LMC and QVC Group may have obligations to each other for certain tax related matters. The reorganization agreement with LMC provides for, among other things, provisions governing the relationship between QVC Group and LMC , including certain cross-indemnities. Pursuant to the services agreement, LMC provided QVC Group with general and administrative services including legal, tax, accounting, treasury, information technology, cybersecurity, and investor relations support. In December 2019, the Company entered into an amended services agreement. Under the amended services agreement, components of the compensation paid to LMC 's former Chief Executive Office (who also served as Chairman of the Board ) were either paid directly to him or reimbursed to LMC , in each case, based on allocations set forth in the amended services agreement. LMC 's former Chief Executive Officer's employment arrangement with LMC ended on December 31, 2024, but he continues to serve as Chairman of QVC Group pursuant to a new employment arrangement with our Company . For the years ended December 31, 2024 and 2023, the allocation percentage for the Company was 10% and 11%, respectively.

QVC Group reimburses LMC for direct, out-of-pocket expenses incurred by LMC in providing these services and for QVC Group 's allocable portion of costs associated with any shared services or personnel based on an estimated percentage of time spent providing services to QVC Group . As part of its ongoing strategy to expand into a live social shopping company, QVC Group has undertaken various organizational and strategic changes. As part of that transition, all then current officers of QVC Group (with limited exceptions) stepped down from their officer positions, during the first half of 2025, and these positions were assumed by members of the QVC management team, effective as of April 1, 2025. LMC continued to support QVC Group throughout the transition period, which was substantially completed during the third quarter of 2025. During the third quarter of 2025, the management of QVC Group and QVC began to perform certain general and administrative services previously provided to QVC Group by LMC , and as a result LMC substantially reduced their provided services. Under these various agreements approximately $5 million, $8 million and $7 million of these allocated expenses were reimbursable from QVC Group to LMC for the years ended December 31, 2025, 2024 and 2023, respectively.

In connection with a split-off transaction that occurred in the first quarter of 2018 (the "GCI Liberty Split-Off " ), QVC Group and an entity formerly known as GCI Liberty, Inc. ("prior GCI Liberty") entered into a tax sharing agreement. Pursuant to the tax sharing agreement, prior GCI Liberty agreed to indemnify QVC Group for taxes and tax-related losses resulting from the GCI Liberty Split-Off to the extent such taxes or tax-related losses (i) result primarily from, individually or in the aggregate, the breach of certain restrictive covenants made by prior GCI Liberty (applicable to actions or failures to act by prior GCI Liberty and its subsidiaries following the completion of the GCI Liberty Split-Off ), or (ii) result from Section 355(e) of the Internal Revenue Code applying to the GCI Liberty Split-Off as a result of the GCI Liberty Split-Off being part of a plan (or series of related transactions) pursuant to which one or more persons acquire, directly or indirectly, a 50-percent or greater interest (measured by vote or value) in the stock of prior GCI Liberty (or any successor corporation). Following a merger between Liberty Broadband Corporation ("Liberty Broadband " ) and prior GCI Liberty, Liberty Broadband has assumed the tax sharing agreement. QVC Group has recorded a payable to Liberty Broadband under the tax sharing agreement in the amount of approximately $10 million and $20 million as of December 31, 2025 and December 31, 2024, respectively, included in other liabilities in the consolidated balance sheets.

*Reverse Stock Split*

On May 22, 2025, the Company filed an amendment to its Restated Certificate of Incorporation (the "Charter Amendment " ) with the Secretary of State of the State of Delaware to effect a reverse stock split of the Company 's Series A common stock, par value $0.01 per share ("QVC GA " ), and Series B common stock, par value $0.01 per share ("QVC GB " and, together with QVC GA , the "Common Stock " ), at a ratio of 1-for-50 (the "Reverse Stock Split " ). There was no change to the number of QVC GA and QVC GB shares currently authorized. The Charter Amendment was authorized by the stockholders of the Company at the Company 's Annual Meeting of Stockholders held on May 12, 2025.

Pursuant to the Charter Amendment on May 22, 2025, every 50 shares of QVC GA and QVC GB were automatically converted into one share of QVC GA and QVC GB , respectively, without any change in par value per share. The number of shares of Common Stock reserved for issuance, the number of shares subject to the then-outstanding awards, and the purchase or exercise price or payout value based on a number of shares of the then-outstanding awards were proportionately adjusted. The Company did not issue fractional shares of Common Stock in connection with the Reverse Stock Split . Instead, stockholders who were otherwise entitled to receive a fractional share of Common Stock following the Reverse Stock Split received a cash payment (without interest) in lieu of such fractional shares.

The Company 's Common Stock began trading on the Nasdaq Capital Market on a split-adjusted basis at the opening of trading on May 23, 2025. On May 27, 2025, the Company elected to have QVC GB suspended from trading on the Nasdaq Capital Market and QVC GB began quotation on the OTCQB Venture Market on May 28, 2025.

Unless noted, all shares of Common Stock , including Common Stock underlying stock options and restricted stock units, as well as all conversion ratios, exercise prices, conversion prices and per share information in the consolidated financial statements have been retroactively adjusted to reflect the 1-for-50 Reverse Stock Split , as if the split occurred at the beginning of the earliest period presented in this Annual Report on Form 10-K.

*Chapter 11 Proceedings*

*Voluntary Filing under Chapter 11*

On or about April 15, 2026 (the "Petition Date " ), QVC Group and certain of our direct and indirect subsidiaries (excluding subsidiaries outside of the U.S . with the exception of one non-operating subsidiary in Luxembourg), including QVC , Inc. (collectively, the "Company Parties " ), intend to commence voluntary cases (the "Chapter 11 Cases " ) under Chapter 11 of Title 11 of the United States Code (the "Bank ruptcy Code " ) in the United States Bank ruptcy Court for the Southern District of Texas (the "Bank ruptcy Court " ). As of the Petition Date , we intend to operate our businesses as a debtor-in-possession under the jurisdiction of the Bank ruptcy Court in accordance with the applicable provisions of the Bank ruptcy Code and orders of the Bank ruptcy Court . QVC Group and QVC , Inc. intend to request approval from the Bank ruptcy Court for a variety of "first day" motions to continue our ordinary course operations during the Chapter 11 Cases . Although no assurance can be made as to a potential emergence date, QVC Group is targeting emergence from the Chapter 11 Cases within approximately 90 days.

Commencing the Chapter 11 Cases will constitute an event of default that accelerates the Company Parties ' respective obligations under (i) the 4.750% Senior Secured Notes due 2027, 4.375% Senior Secured Notes due 2028, 6.875% Senior Secured Notes due 2029, 5.450% Senior Secured Notes due 2034, 5.950% Senior Secured Notes due 2043, 6.375% Senior Secured Notes due 2067, and 6.250% Senior Secured Notes due 2068 (collectively, the "QVC Notes " ), issued by QVC , (ii) the 3.75% senior unsecured exchangeable debentures due 2030, 4.00% senior unsecured exchangeable debentures due 2029, 8.25% senior unsecured debentures due 2030, and 8.50% senior unsecured debentures due 2029 (collectively, the "LINTA Notes " ), issued by Liberty Interactive LLC ("LI LLC " ) and (iii) that certain Fifth Amendment and Restatement Agreement dated as of October 27, 2021, by and among QVC and QVC Global Corporate Holdings, LLC, the lenders from time to time party thereto, and JPMorgan Chase Bank , N.A., as administrative and collateral agent (the "Credit Agreement ," and the credit facility thereunder, the "Credit Facility " ). The Credit Facility , together with the QVC Notes and LINTA Notes , are herein referred to as the "Debt Instruments " . The Credit Facility and the QVC Notes provide that, as a result of the Chapter 11 Cases , the principal and interest due thereunder shall be immediately due and payable. The exchangeable senior debentures provide that the amount accelerated is the greater of (x) the current principal amount of the exchangeable senior debentures or (y) the market value of the reference shares, plus all accrued and unpaid interest and all pass-through distributions due with respect to the reference shares shall be immediately due and payable. Any efforts to enforce such payment obligations under the Debt Instruments will be automatically stayed as a result of the Chapter 11 Cases , and the stakeholders' rights of enforcement in respect of the Debt Instruments will be subject to the applicable provisions of the Bank ruptcy Code , including the Automatic Stay . Before the commencement of the Chapter 11 Cases , on or about April 15, 2026, QVC Group intends to enter into a Restructuring Support Agreement with certain holders of our Debt Instruments .

*Automatic Stay and Other Protections*

Subject to certain exceptions under the Bank ruptcy Code , pursuant to Section 362 of the Bank ruptcy Code , the filing of our Chapter 11 Cases will automatically stay the continuation of most legal proceedings or the filing of other actions against or on behalf of QVC Group or our property to recover on, collect or secure a claim arising prior to the Petition Date or to exercise control over property of our bankruptcy estate, unless and until the Bank ruptcy Court modifies or lifts the automatic stay as to any such claim (the "Automatic Stay "). Notwithstanding the general application of the Automatic Stay described above and other protections afforded by the Bank ruptcy Code , governmental authorities may determine to continue actions brought under their police and regulatory powers.

*Nasdaq Delisting*

I-6

We expect to receive a delisting notice (the "Delisting Notice ") from the Nasdaq Stock Market LLC notifying us that, in connection with the Chapter 11 Cases and in accordance with Nasdaq Listing Rule 5550(a)(2), the Nasdaq Stock Market LLC has determined that our shares of capital stock would be delisted from the Nasdaq Capital Market and that trading of our shares of capital stock on the Nasdaq Capital Market will be suspended immediately. Following the suspension of trading on the Nasdaq Capital Market, we expect our shares of capital stock to be quoted on the OTCID Basic Market or another over-the-counter market. The over-the-counter markets are significantly more limited than the Nasdaq Capital Market. Quotation on the OTCID Basic Market or another over-the-counter market could result in a less liquid market for existing and potential holders of our capital stock and could further depress the trading price of our capital stock. We can provide no assurance as to whether broker-dealers will continue to provide public quotes of our capital stock on the over-the-counter markets, or whether the trading volume of our capital stock will be sufficient to provide for an efficient trading market.

We also expect Nasdaq Stock Market LLC to file a Form 25 for us in connection with the delisting of our shares of capital stock from the Nasdaq Capital Market. The delisting will become effective ten days after the Form 25 is filed. In accordance with Rule 12d2-2 of the Exchange Act , the deregistration of our shares of capital stock under Section 12(b) of the Exchange Act will become effective 90 days after the date the Form 25 is filed.

*Description of Business*

The following table identifies our subsidiaries:

**Consolidated Subsidiaries**
QVC , Inc.
Cornerstone Brands, Inc.

*QVC*

On December 29, 2017, QVC Group completed the acquisition of the remaining 62% ownership interest of HSN , Inc. ("HSN ") in an all-stock transaction. On December 31, 2018, QVC Group transferred our 100% ownership interest in HSN to QVC , Inc. through a transaction among entities under common control. References throughout this Annual Report on Form 10-K to "QVC " refer to QVC , Inc. and its consolidated subsidiaries.

QVC is a live social shopping company that curates and sells a wide variety of consumer products through video-driven commerce on most every screen, from smartphones and tablets to laptops and TVs. QVC is distributed to over 200 million worldwide households each day through its broadcast networks and also reaches audiences through its websites (including QVC .com, HSN .com and others); its social platforms (including TikTok, Instagram and others); virtual multichannel video programming distributors (including Hulu + Live TV, DirecTV Stream and YouTube TV); its applications via streaming video (including Facebook Live, Roku, Apple TV, Amazon Fire, Xfinity Flex, Alphabet and Samsung TV Plus); mobile applications; and over-the-air broadcasters. QVC believes it is a global leader in video retailing, e-commerce, mobile commerce and social commerce, with operations based in the United States ("U.S ."), Japan, Germany, the U.K ., and Italy.

The goal of QVC is to extend its leadership in video commerce, e-commerce, streaming commerce and social commerce by continuing to create the world's most engaging shopping experiences, combining the best of retail, media and social, highly differentiated from traditional brick-and-mortar stores or transactional e-commerce. QVC provides customers with curated collections of unique products, made personal and relevant by the power of storytelling. QVC curates experiences, conversations and communities for millions of highly discerning shoppers, and also reaches large audiences, across its many platforms, for its thousands of brand partners.

QVC offers a wide assortment of high-quality merchandise and classifies its products into six groups: home, apparel, beauty, accessories, electronics and jewelry. It is QVC 's product sourcing team's mission to research and curate compelling and differentiated products from vendors who have sufficient scale to meet anticipated demand. QVC offers many exclusive and proprietary products, leading national and international brands and limited distribution brands offering unique items. Many of QVC 's products are endorsed by celebrities, designers and other well-known personalities who often join its presenters on its live programming and provide lead-in publicity on their own social media pages, websites and other customer touchpoints. QVC believes that its ability to demonstrate product features and present "faces and

I-7

Table of Contents

Case 26-20412 Document 115 Filed in TXSB on 07/30/2026
Case 26-20412 Document 746-1 File Page: 169 Date Filed: 07/30/2026

places" differentiates and defines the QVC shopping experience. QVC closely monitors customer demand and its product mix to remain well-positioned and relevant in popular and growing retail segments, which it believes is a significant competitive advantage relative to competitors who operate brick-and-mortar stores.

For the year ended December 31, 2025, approximately 97% of QVC 's worldwide shipped sales were from repeat and reactivated customers (i.e., customers who made a purchase from QVC during the prior twelve months and customers who previously made a purchase from QVC but not during the prior twelve months, respectively). In the same period, QVC attracted 2 million new customers and the global e-commerce operation comprised $5.2 billion, or approximately 63%, of QVC 's consolidated net revenue for the year ended December 31, 2025.

QVC operates nine distribution centers worldwide. In 2025, QVC 's work force consisted of approximately 15,300 employees who handled approximately 70 million customer calls, shipped approximately 182 million units globally and served approximately 10.3 million unique customers. QVC believes its long-term relationships with major U.S . television distributors, including cable operators (e.g., Comcast, Charter Communications and Cox), satellite television providers (e.g., DIRECTV and DISH) and telecommunications companies (e.g., Verizon and AT&T), provide it with broad distribution, favorable channel positioning and significant competitive advantages. QVC believes that its significant market share, brand awareness, outstanding customer service, repeat customer base, flexible payment options, international reach and scalable infrastructure distinguish QVC from its competitors.

On June 27, 2022, QVC Group announced a turnaround plan designed to stabilize and differentiate its core QVC -U.S and HSN . businesses and expand the Company 's leadership in video streaming commerce ("Project Athens " ). During 2022, QVC commenced the first phase of Project Athens , including actions to reduce inventory and a planned workforce reduction that was completed in February 2023. QVC recorded restructuring charges of $13 million during the year ended December 31, 2023 in restructuring, penalties and fire related costs, net of (recoveries) in the consolidated statement of operations. These initiatives were consistent with QVC 's strategy to operate more efficiently as it implemented its turnaround plan.

During the second quarter of 2024, QVC entered into an agreement and announced a plan to shift its global operating model for information technology services to a managed services model. As a result, during the year ended December 31, 2024, QVC recorded restructuring charges of $18 million in restructuring, penalties and fire related costs, net of (recoveries) in the consolidated statement of operations. The cash payments associated with this restructuring were substantially complete as of December 31, 2025.

On November 14, 2024, QVC announced the WIN strategy, targeting top-line growth through three central priorities: (i) 'Wherever She Shops' - aims to enhance customer interactions across diverse platforms; (ii) 'Inspiring People & Products' - fosters rich, engaging content experiences; and (iii) 'New Ways of Working' - emphasizes leveraging technology and process enhancements to streamline operations and fuel innovation. With the WIN strategy, QVC plans to broaden content outreach by creating dynamic, purpose-built experiences that resonate across social media and digital streaming channels. By optimizing QVC 's production studios and fostering continuous improvement, QVC envisages content creation as an integrated, efficient process that adapts to various platforms without losing the essence of its brand. QVC aims to grow audiences and redefine shopping experiences, ensuring that it meets its customers wherever they are while building on its heritage for sustained success.

On January 29, 2025, the Company announced the consolidation of its QVC and HSN operations at QVC 's Studio Park location in West Chester, PA, and the closing of the St. Petersburg, FL campus. The consolidation is part of QVC 's organizational and strategic changes intended to support its WIN strategy. As a result, QVC accelerated depreciation related to the closure of the St. Petersburg, FL campus, which was completed as of September 30, 2025 (the "Completion Date "), and recorded $45 million of incremental depreciation in 2025 through the Completion date. On March 27, 2025, QVC announced a plan to reorganize teams across the Company as part of the WIN strategy, which is intended to increase revenue through growth initiatives while maintaining Adjusted OIBDA margin. As a result of the reorganization, QVC recorded $34 million and $19 million of restructuring charges at QxH and QVC International, respectively, during the year ended December 31, 2025 in restructuring, penalties and fire related costs, net of (recoveries) in the consolidated statement of operations.

In September 2025, QVC entered into agreements to sell the St. Petersburg properties to independent third parties. Two of the St. Petersburg property sales closed in December 2025. The sale of the remaining property is expected to be completed within the next twelve months. As of December 31, 2025, the remaining long-lived assets of $17 million, all within QxH, were included in assets held for sale noncurrent in the consolidated balance sheet.

### QxH

QxH's programming is distributed in the U.S ., 20 hours per day of live programming, 364 days per year, to approximately 82 million television households and is distributed to approximately 99% of households subscribing to services offered by television distributors. QxH's televised shopping programs, including live and recorded content, are broadcast across multiple channels nationally on a full time basis, including the main QVC and HSN channels as well as the additional channels of QVC 2, QVC 3 and HSN 2. These additional channels offer viewers access to a broader range of QxH programming options as well as more relevant programming for viewers in different time zones. QxH also has over-the-air broadcasting in designated U.S . markets that can be accessed by any household with a digital antenna in such markets, regardless of whether it subscribes to a paid television service. This allows QxH to reach customers who previously did not have access to the program through other television platforms.

QxH's programming is also available through QVC .com and HSN .com (our "Websites "); social platforms (including TikTok, Instagram and others); virtual multichannel video programming distributors (including Hulu + Live TV, DirecTV Stream and YouTube TV); applications via streaming video (including Facebook Live, Roku, Apple TV, Amazon Fire, Xfinity Flex and Samsung TV Plus); and mobile applications (collectively, our "Digital Platforms "). Our Digital Platforms enable consumers to purchase goods offered on our broadcast programming along with a wide assortment of products that are available only on our Websites . Our Websites and other Digital Platforms are natural extensions of our business model, allowing customers to engage in our shopping experience wherever they are, with live or on-demand content customized to the device they are using. In addition, our Websites , social platforms and mobile applications allow shoppers to browse, research, compare and perform targeted searches for products, read customer reviews, control the order-entry process and conveniently access their account. For the year ended December 31, 2025, approximately 90% of our new QxH customers made their first purchase through our Digital Platforms . QxH, including our Digital Platforms , contributed $5.9 billion, or 72%, of consolidated QVC , Inc. net revenue and $517 million of Adjusted OIBDA (defined in note 15 of the accompanying notes to our consolidated financial statements) for the year ended December 31, 2025.

The table below sets forth QxH's revenue through Digital Platforms since 2023:

| (in millions) | Years ended December 31, | | |
| --- | --- | --- | --- |
| | 2025 | 2024 | 2023 |
| QxH Digital Platform revenue | $ 3,969 | 4,219 | 4,321 |
| Total QxH net revenue | 5,936 | 6,598 | 6,995 |
| QxH Digital Platform % of total QxH net revenue | 66.9 % | 63.9 % | 61.8 % |

### QVC International

QVC International's business brings the QVC shopping experience to approximately 126 million households outside the U.S ., primarily in Japan, Germany, the U.K ., and Italy. Similar to QxH, QVC International's business engages customers via multiple platforms, including broadcast networks, websites, mobile applications and social media pages. QVC International product sourcing teams select products tailored to the interests of each local market. For the year ended December 31, 2025, QVC International operations, including its Digital Platforms , generated $2.4 billion, or 28%, of consolidated QVC net revenue and $293 million of Adjusted OIBDA (defined in note 15 of the accompanying notes to our consolidated financial statements) for the year ended December 31, 2025.

The table below sets forth QVC -International's revenue through Digital Platforms since 2023:

| (in millions) | Years ended December 31, | | |
| --- | --- | --- | --- |
| | 2025 | 2024 | 2023 |
| QVC International Digital Platform revenue | $ 1,272 | 1,257 | 1,218 |
| Total QVC - International net revenue | 2,357 | 2,399 | 2,454 |
| QVC International Digital Platform % of total QVC - International net revenue | 54.0 % | 52.4 % | 49.6 % |

I-9

*Merchandise*

QVC 's global merchandise mix features: home, apparel, beauty, accessories, electronics and jewelry. Many of its brands are exclusive, while others are created by well-known designers. QVC 's global sales mix is provided in the table below:

| Product category | Years ended December 31, | | |
| --- | --- | --- | --- |
| | 2025 | 2024 | 2023 |
| Home | 41% | 41% | 41% |
| Apparel | 19 % | 18% | 18% |
| Beauty | 18 % | 18% | 18% |
| Accessories | 11% | 11% | 11% |
| Electronics | 6% | 7% | 7% |
| Jewelry | 5% | 5% | 5% |
| Total | 100% | 100% | 100% |

Unlike traditional brick-and-mortar retailers with inventories across a network of stores, QVC is able to quickly adapt its offerings in direct response to changes in its customers purchasing patterns. QVC utilizes a test and re-order model to determine initial customer demand. Through constant monitoring, QVC aims to manage its product offerings to maximize net revenue. QVC 's merchandising team is dedicated to continually researching, pursuing and launching new products and brands. With a mandate to deliver hard-to-find value, its merchants find and curate collections of high quality goods from vendors with the scale to offer sufficient supply to QVC 's existing and future customers. QVC maintains strong relationships with its vendors, which are attracted by the showcasing and story-telling elements of its programming, and the volume of sales during featured presentations.

QVC purchases, or obtains on consignment, products from U.S . and foreign manufacturers and wholesalers, often on favorable terms based upon the volume of the transactions. QVC has attracted some of the world's most respected consumer brands as well as celebrities, entrepreneurs, and designers to promote these brands. Brand leaders such as HP, SKECHERS, Barefoot Dreams®, Dyson, Philosophy and Apple® reach a broad audience while product representatives share the stories behind these brands. QVC has agreements with celebrities, entrepreneurs and designers such as Kim Gravel, Curtis Stone and Giuliana Rancic enabling it to provide entertaining and engaging programming that develops a lifestyle bond with its customers. These celebrity personalities and product representatives often provide pre-appearance publicity for their QVC products on their own social media pages and broadcast shows, enhancing demand during their QVC appearances. QVC presents and promotes across its networks, websites, mobile applications, and social media platforms, allowing shoppers to engage with QVC on multiple platforms and devices.

QVC does not depend on any single supplier or designer for a significant portion of its inventory purchases.

*Distribution*

QVC distributes its programming via satellite and optical fiber, to cable television and direct-to-home satellite system operators for retransmission to its subscribers in the U.S ., Japan, Germany, the U.K ., Italy and neighboring countries. QVC also transmits its programming over digital terrestrial broadcast television to viewers throughout Germany, the U.K . and Italy and to viewers in certain geographic regions in the U.S . QVC uplinks its digital programming transmissions in the U.S . using a third-party service or internal resources. The transmissions are uplinked to protected, non-preemptible transponders on U.S . satellites. "Protected " status means that, in the event of a transponder failure, QVC 's signal will be transferred to a spare transponder or, if none is available, to a preemptible transponder located on the same satellite or, in certain cases, to a transponder on another satellite owned by the same service provider if one is available at the time of the failure. "Non-preemptible " status means that, in the event of a transponder failure, QVC 's transponders cannot be preempted in favor of a user of a failed transponder, even another user with "protected" status. The international business units each obtain uplinking services from third parties and transmit their programming to non-preemptible transponders on international satellites and terrestrial transmitters. The transponder service agreements for the U.S . transponders expire at the earlier of the end of the lives of the satellites or the service agreements. The service agreements for QxH and QVC International expire between 2026 and 2030. We intend to renegotiate or extend expiring agreements as applicable.

I-10

QVC continually seeks to expand and enhance its broadcast and e-commerce platforms, as well as to further its international operations and multimedia capabilities. In addition to its websites and mobile applications, QVC continues to adapt to emerging technologies to offer elements of its programming via new technologies. To reach consumers who use online sources for viewing content, QVC programming is being offered through virtual multichannel video providers (including Hulu + Live TV, DirecTV Stream and YouTube TV), online video distributors and programming networks that provide its content directly to consumers over the internet rather than through traditional television services (including Facebook Live, Roku, Apple TV, Amazon Fire, Xfinity Flex, Alphabet and Samsung TV Plus).

### *Affiliation Agreements*

QVC enters into long-term affiliation agreements with certain of its television distributors who downlink its programming and distribute the programming to customers. The majority of QVC 's affiliation agreements with distributors have termination dates ranging from 2026 to 2029. We intend to renegotiate or extend expiring agreements as applicable. QVC 's ability to continue to sell products to its customers is dependent on its ability to maintain and renew these affiliation agreements in the future. Although QVC is typically successful in obtaining and renewing these agreements, it does not have distribution agreements with some of the distributors that carry its programming. QVC provides programming without affiliation agreements to distributors representing approximately 4% of its QVC channel distribution and 0.5% of its HSN channel distribution. Some of its programming may continue to be carried by distributors after the expiration dates on its affiliation agreements with such distributors have passed.

In return for carrying QVC 's signals, most programming distributors for its U.S . distribution receive an allocated portion, based upon market share, of up to 5% of the net sales of merchandise sold via the television programs and from certain internet sales to customers located in the programming distributor's service areas. QVC International programming distributors predominantly receive an agreed-upon annual fee, or a monthly or yearly fee per subscriber regardless of the net sales, a variable percentage of net sales or some combination of the above arrangements.

In addition to sales-based commissions or per-subscriber fees, QVC also makes payments to distributors primarily in the U.S . for carriage and to secure channel positioning within a broadcast area or within the general entertainment area on the distributor's channel line-up. QVC believes that a portion of its sales are attributable to purchases resulting from channel "surfing" and that a channel position near broadcast networks and more popular cable networks increases the likelihood of such purchases. As technology evolves, QVC will continue to monitor optimal channel placement and attempt to negotiate agreements with its distributors to maximize the viewership of its television programming.

### *Demographics of customers*

We enjoy a very loyal customer base, as demonstrated by the fact that for the twelve months ended December 31, 2025, approximately 92% of our shipped sales came from repeat customers (i.e., customers who made a purchase from us during the prior twelve months), who spent an average of $1,428 each during this period. An additional 3% of shipped sales in that period came from new customers and the remaining 5% of shipped sales came from reactivated customers (i.e., customers who previously made a purchase from us, but not during the prior twelve months).

On a trailing twelve month basis, total consolidated customers were approximately 10.3 million, which includes 6.6 million QxH customers and 3.7 million QVC International customers. QVC believes its core customer base represents an attractive demographic target market. Based on internal customer data for QxH, approximately 73% of its customers for the twelve months ended December 31, 2025 were women over the age of 50.

QVC does not depend on any single customer for a significant portion of its revenue.

### *Order taking and fulfillment*

QVC takes a majority of its orders via mobile applications on iPhone, iPad, Apple Watch, Android and other devices and via its websites. QxH and QVC International customers placed approximately 47% and 44%, respectively, of all orders directly through their mobile devices in 2025.

QVC primarily utilizes home based customer service agents to handle calls, e-mail contacts and social contacts, allowing staffing flexibility for peak volume hours. In addition, QVC utilizes computerized interactive voice response order systems, which handle approximately 58% of all telephonic orders taken on a worldwide basis. QxH has five

distribution centers and QVC International has four distribution centers. QVC 's distribution centers and drop ship partners shipped, on average, 328,000 units per day at QxH and 172,000 units per day at QVC International during 2025.

QVC has built a scalable operating infrastructure focused on sustaining efficient, flexible and cost-effective sale and distribution of its products. Since its physical store locations are minimal, QVC requires lower inventory levels and capital expenditures compared to traditional brick-and-mortar retailers. Further, since QVC has no set "floor plan" and can closely manage inventory levels at its centralized warehouses, QVC believes it has the flexibility to analyze and react quickly to changing trends and demand by shifting programming time and product mix. QVC 's cost structure is variable, which QVC believes allows it to consistently achieve attractive margins relative to brick-and-mortar retailers.

Third party carriers transport QVC 's packages from its distribution centers to its customers. In each market where QVC operates, it has negotiated long-term contracts with shipping companies, which in certain circumstances provides for favorable shipping rates.

### Competition

QVC operates in a rapidly evolving and highly competitive retail business environment. QVC has numerous and varied competitors at the national and local levels, ranging from large department stores to specialty shops, e-commerce retailers, direct marketing retailers, wholesale clubs, discount retailers, infomercial retailers, and mail-order and catalog companies. Some of QVC 's competitors, such as Amazon and Walmart, have a significantly greater web-presence. QVC believes that the principal competitive factors for its web-commerce operations are high-quality products, brand recognition, selection, value, convenience, price, website performance, customer service and accuracy of order shipment.

QVC believes that QxH is a leader in video shopping, e-commerce, mobile commerce and social commerce. QxH curates quality products at outstanding values, provides exceptional customer service, establishes favorable channel positioning and multiple touchpoints across Digital Platforms and generates repeat business from its core customer base. QxH's closest video shopping competitors are ShopHQ and JTV (Jewelry Television) and QVC International operations face similar competition in their respective markets, such as Jupiter Shop Channel in Japan, HSE in Germany, and TJC, Ideal World, Gems TV, Must Have Ideas TV, and JML Direct in the U.K .

QVC also competes for access to customers and audience share with other providers of broadcast, digital and hard copy entertainment and content. The price and availability of other programming and the conversion to digital programming platforms may unfavorably affect the placement of its programming in the channel line-ups of its distributors, and may affect its ability to obtain distribution agreements with small cable distributors. Competition from other programming also affects the compensation that must be paid to distributors for carriage. Principal competitive factors for QVC include (i) value, quality and selection of merchandise; (ii) customer experience, including customer service and speed, cost and reliability of fulfillment and delivery services; and (iii) convenience and accessibility of sales channels.

### Government regulation

The manner in which we sell and promote merchandise and related claims and representations made in connection with these efforts is regulated by federal and state law. Some examples of regulatory agencies and regulations that affect the manner in which we sell and promote merchandise include the following:

- The Federal Trade Commission ("FTC ") and the state attorneys general regulate the advertising of retail products and services offered for sale in the U.S ., including, for example, the FTC 's Rule Concerning the Use of Consumer Reviews and Testimonials and Guides for the Use of Environmental Marketing Claims;
- The Food and Drug Administration has specific regulations regarding claims that can be made about food products and regulates marketing claims that can be made for cosmetic beauty products, medical devices and over-the-counter drugs;
- The Environmental Protection Agency ("EPA ") requires products that make certain types of claims, such as "anti-bacterial," to be registered with the EPA prior to making such claims;
- Each of the FTC 's Telemarketing Sales Rules, the Federal Communication Commission's ("FCC ") rules implementing the Telephone Consumer Protection Act and similar state laws, establish procedures that must be followed when telemarketing or placing particular types of calls to consumers;
- The Consumer Product Safety Commission ("CPSC " ) has specific regulations regarding products that present unreasonable risks of injuries to consumers;

- Import and export laws, including U.S . economic sanction and embargo regulations and tariffs, U.S . homeland security laws and regulations and other laws such as the U.S . anti-boycott law and U.S . export controls regulations may limit foreign sales;
- Comparable regulatory agencies and regulations in countries in which we have our non-U.S . operations may be applicable;

In addition, the FCC regulates the television stations, cable television systems, direct broadcast satellite ("DBS ") distributors and other multichannel video programming distributors ("MVPDs ") that distribute the Company 's services. The FCC has adopted various requirements related to the Company 's programming, and also licenses radio transmission facilities that the Company uses in connection with its business, such as television stations, satellite uplink/downlink facilities and internal private radio systems.

As a result of an interest in various cable operators attributed to QVC Group , QVC may be deemed to be a satellite cable programming vendor in which a cable operator has an attributable interest for purposes of various FCC rules regarding the distribution of video programming to MVPDs . These include, for example, the FCC 's program access rules, which, in general, prohibit various unfair practices involving the distribution of video programming to MVPDs ; and its program carriage rules, which, among other things, prohibit cable operators from favoring affiliated programmers so as to restrain unreasonably the ability of unaffiliated programmers to compete. The FCC program access and program carriage rules also make provision for enforcement of alleged violations through complaint proceedings initiated by aggrieved entities. QVC may be subject to program access rules as a result of an FCC condition adopted in connection with its 2008 approval of a transaction involving a predecessor of QVC Group and News Corp.

In 2000, QVC became subject to a consent decree issued by the FTC barring it from making certain deceptive claims for dietary supplements and specified products related to the common cold, pneumonia, hay fever and allergies. QVC also became subject to an expanded consent decree issued by the FTC in 2009 that terminates on the later of May 26, 2029, or 20 years from the most recent date that the U.S . or the FTC files a complaint in federal court alleging any violation thereunder.

Pursuant to this expanded consent decree, QVC is prohibited from making certain claims about specified weight-loss, dietary supplement and anti-cellulite products unless it has competent and reliable scientific evidence to substantiate such claims. Violation of the QVC consent decree may result in the imposition of significant civil penalties for non-compliance and related redress to consumers and/or the issuance of an injunction enjoining QVC from engaging in prohibited activities.

In October 2023, HSN entered into a settlement agreement with the CPSC in which HSN agreed to pay a civil penalty of $16 million to settle the CPSC 's claim that HSN allegedly failed to timely submit a report under the Consumer Product Safety Act ("CPSA ") in relation to handheld clothing steamers sold by HSN under the Joy Mangano brand names My Little Steamer® and My Little Steamer® Go Mini that were subject to a voluntary recall previously announced on May 26, 2021. The settlement agreement also requires HSN to implement and maintain a compliance program to ensure compliance with the CPSA . In January 2024, HSN received a grand jury subpoena from the U.S . Attorney for the Central District of California that was issued in connection with an official criminal investigation into the clothing steamer matter. QVC and HSN have cooperated (and intend to continue cooperating) fully with this investigation.

Congress enacted the Commercial Advertisement Loudness Mitigation ("CALM ") Act in 2010. The CALM Act directs the FCC to incorporate into its rules and make mandatory a technical standard that is designed to prevent digital television commercial advertisements from being transmitted at louder volumes than the program material they accompany. Although the FCC 's CALM Act regulations place direct compliance responsibility on broadcasters and MVPDs , the FCC adopted a "safe harbor" compliance approach applicable to commercials embedded in programming provided by programmers, such as the Company . Under the FCC 's safe harbor approach, broadcasters and MVPDs may meet their CALM Act compliance obligations through reliance on programmer-provided CALM Act compliance certifications that are made "widely available" to broadcasters and MVPDs through a website or other means. The Company has determined that its programming is CALM Act compliant, and in response to requests from its distributors, and in order to allow its distributors to meet the FCC 's safe harbor, the Company has posted a CALM Act compliance certification to a website that is available to its distributors.

FCC rules adopted pursuant to the Telecommunications Act of 1996 generally require closed captioning of the Company 's televised programming distributed on broadcast television stations, cable television systems, DBS and other MVPDs , with only limited exemptions. Regulations adopted by the FCC pursuant to the Twenty-First Century

I-13

Communications and Video Accessibility Act of 2010 imposed captioning requirements on various types of programming distributed via internet protocol ("IP") that was previously televised with captions. The Company also is subject to the IP-captioning rules as a Video Programming Owner and as a Video Programming Distributor that distributes covered programming on its website and via mobile and video streaming platforms.

The FCC 's closed captioning rules applicable to televised programming and programming distributed by IP initially placed closed captioning compliance obligations directly on the Company 's distributors. Amendments to those rules adopted by the FCC in 2016 extend direct compliance responsibility, jointly with distributors, to video programmers such as the Company , impose certain registration and certification requirements on the Company , and subject the Company to captioning complaint procedures. The registration and certification requirements of these amended rules have not yet become effective. On July 18, 2024, the FCC released a further notice of proposed rulemaking that would exempt from the captioning and certification requirements video programmers that provide or license video programming exclusively to a non-broadcast network for distribution by an MVPD, if such network has filed registration information and a certification with the FCC indicating that the network itself is exempt, or all programming comprising its linear lineup is compliant with, or exempt from, captioning obligations. The FCC proposal remains pending. As a result of the foregoing changes and rules involving captioning of IP-delivered programming and captioning quality standards, QVC may incur additional costs and compliance obligations related to closed captioning of its programming.

We market and provide a broad range of merchandise through our broadcast networks, websites, mobile applications and social media pages. As a result, we are subject to a wide variety of statutes, rules, regulations, policies and procedures in various jurisdictions that are subject to change at any time, including laws regarding consumer protection, privacy, the regulation of retailers generally, the importation, sale and promotion of merchandise and the operation of retail stores and warehouse facilities, as well as laws and regulations applicable to the internet and businesses engaged in e-commerce, such as those regulating the sending of unsolicited, commercial electronic mail and texts.

For example, the Children's Online Privacy Protection Act ("COPPA ") prohibits web sites from collecting personal information online from children under age 13 without parental consent and imposes a number of operational requirements. In 2025, the FTC amended COPPA regulations to, among other things, further regulate the use and disclosure of children's personal information. Certain email activities are subject to the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003, commonly known as the CAN-SPAM Act. The CAN-SPAM Act regulates the sending of unsolicited commercial email by requiring the email sender, among other things, to comply with specific disclosure requirements and to provide an "opt-out" mechanism for recipients. Both of these laws include statutory penalties for non-compliance. The Digital Millennium Copyright Act limits, but does not eliminate, liability for listing or linking to third party websites that may include content that infringes on copyrights or other rights so long as our internet businesses comply with the statutory requirements. Various states also have adopted laws regulating certain aspects of internet communications. Federal legislation enacted in 2016 permanently extended the moratorium on state and local taxes on internet access.

Our e-commerce businesses are subject to domestic and foreign laws governing the collection, use, retention, security and transfer of personally-identifiable information about their users. The enactment, interpretation and application of user data protection laws are in a state of flux, and the interpretation and application of such laws may vary from country to country. For example, the European Union's ("E.U .") General Data Protection Regulation ("GDPR "), which established new data laws that give customers additional rights and impose additional restrictions and penalties on companies for illegal collection and misuse of personal information, took effect in May 2018. Further, in 2015, the Court of Justice of the E.U . invalidated the "Safe Harbor Framework ," which had allowed companies to collect and process personal data in E.U . nations for use in the U.S .

The E.U .-U.S . Privacy Shield, which replaced the Safe Harbor Framework , and became fully operational in 2016, provided a mechanism to comply with data protection requirements when transferring personal data from the E.U . to the U.S . On July 16, 2020, the Court of Justice of the E.U . invalidated the E.U .-U.S . Privacy Shield, and imposed new obligations on the use of Standard Contractual Clauses ("SCCs ") - another key mechanism to allow data transfers between the U.S . and the E.U .

The European Commission adopted revised SCCs on June 4, 2021. In March 2022, the U.S . and the European Commission announced a new Transatlantic Data Privacy Framework ("DPF ") to replace the E.U .-U.S . Privacy Shield. On December 13, 2022, the European Commission issued an adequacy decision initiating the formal adoption process for the DPF , and the E.U . formally adopted the adequacy decision on July 10, 2023. The U.S . and the E.U . implemented the DPF in July 2023. The E.U .'s proposed ePrivacy Regulation, which, among other things, would have adopted additional

I-14

regulation of "cookies" and other internet tracking tools was withdrawn in 2025. The E.U . has proposed the E.U . Digital Simplification Package, referred to as the "Digital Omnibus ," to consolidate and streamline the E.U .'s digital regulations. Following the "Brexit " withdrawal of the U.K . from the E.U ., on June 28, 2021, the European Commission determined that the U.K .'s data protection laws essentially are equivalent to data protection laws in the European Economic Area. Finally, countries in other regions, most notably Asia, Eastern Europe and Latin America, are increasingly implementing new privacy regulations, resulting in additional compliance burdens and uncertainty as to how some of these laws will be enforced.

In the U.S ., Congress may consider a range of legislation that would impose federal privacy obligations on organizations including obligations that could require organizations that suffer a breach of security related to personal information to notify owners of such information. Such federal legislation may not preempt similar state laws with the effect that organizations may be obligated to comply with separate federal and state laws that regulate the same activity in different, and possibly inconsistent, ways. Federal agencies, including the FTC , are seeking to regulate the use of personal data through rule-making efforts and through enforcement activities targeted at organizations. Many states have adopted laws requiring notification to users when there is a security breach affecting personal data, such as California's Information Practices Act.

California also has enacted the California Consumer Privacy Act of 2018 ("CCPA " ), which, among other things, allows California consumers to request that certain companies disclose the types of personal information collected by such companies. The CCPA took effect on January 1, 2020. The California Attorney General has issued implementation regulations and guidance regarding the CCPA , and undertook enforcement actions in 2024 regarding violations of the law. In November 2020, California voters approved the California Privacy Rights Act of 2020 ("CPRA " ), which amends and extends the CCPA and establishes the California Privacy Protection Agency to implement and enforce consumer privacy laws. The CPPA issued regulations in 2025 implementing certain CCPA requirements.

Since the enactment of the CCPA , a substantial minority of additional states have enacted comprehensive privacy legislation, and other states continue to consider adopting such comprehensive privacy legislation. In addition to broad consumer privacy laws, states are enacting and may continue to enact sectoral-specific privacy laws focused on health data, data about people under the age of 18, biometric data, the use of algorithms by organizations, and other matters. In some areas, the broad consumer privacy laws and sectoral-specific privacy laws may differ across states in ways that require complicated or expensive customer-facing solutions. For example, states that create opt-out or opt-in rights that differ from approaches generally taken by other states can result in a significant effort to implement and maintain solutions that comply with these more unique requirements. Private litigants are also using federal and state laws to pursue litigation related to the use of personal data, video content, chat tools and other communication tools, and trackers commonly used by organizations in the operation of consumer-facing websites and applications. Complying with these different national and state privacy requirements may cause us to incur substantial costs. In addition, we generally have and post on our websites privacy policies and practices regarding the collection, use and disclosure of user data. A failure to comply with such posted privacy policies or with the regulatory requirements of federal, state, or foreign privacy laws could result in proceedings or actions by governmental agencies or others (such as class action litigation) which could adversely affect our business.

Our business is also dependent upon our continued ability to transmit our programming to television distributors from our third party FCC -licensed satellite uplink and downlink facilities, which are subject to FCC compliance in the U.S . and foreign regulatory requirements in our international operations.

Our business also utilizes emerging technology, including artificial intelligence ("AI"), which may be subject to increasing regulation. For information regarding the potential regulatory and other risks associated with our use of AI, see the risk factor "Our integration and use, or the use by our competitors, of artificial intelligence and similar technology may pose risks and present challenges to our business, reputation, and results of operations" in Item 1A., "Risk Factors ."

For information regarding regulations related to U.S . trade policy with China, see the risk factor "Significant developments stemming from U.S . and international trade policy with China, including in response to forced labor and human rights abuses in China may adversely impact our business and operating results" in Item 1A., "Risk Factors ."

### Intellectual property

We regard our trademarks, service marks, patents, copyrights, domain names, trade dress, trade secrets, proprietary technologies and similar intellectual property as important to our business. We rely on a combination of

trademark, patent, and copyright laws, trade secret protections, and contractual restrictions, including confidentiality and/or license agreements with our employees, customers, suppliers, affiliates and others to protect our proprietary rights. We have registered, or applied for the registration of, certain of our trademarks, service marks, patents, copyrights and domain names in U.S . and in select foreign jurisdictions, and we seek to vigorously protect our intellectual property against both unauthorized use and infringement.

In the U.S ., we own registrations for a number of our trademarks and service marks including, but not limited to our primary brand names and logo, namely, "QVC ," "Quality Value Convenience," the "Q Logo ," and "Q" and certain proprietary brands such as "Cook's Essentials ," "Denim & Co.," "Diamonique," "Today's Special Value," and "TSV." We also maintain trademark and service mark registrations in select foreign jurisdictions for the same, including, but not limited to, "QVC ," the "Q Logo ," "Cook's Essentials ," "Denim & Co.," and "Diamonique." We believe these registrations, together with our common law rights, are important to the protection of our brands and reputation.

HSN owns numerous trademark registrations or pending applications in the U.S ., relating to its brand and offerings. These include registrations for the "HSN " brand name and the "HSN logo " as well as registrations for certain propriety products and services, including, but not limited to, "HSN Shop By Remote," "Tech Impressions," and "Concierge Collection ."

We consider the "QVC " and "HSN " brands to be among our most significant trademarks and service marks, reflecting their longstanding market presence, extensive consumer recognition, and their association with our core retail and media platforms. These brands play a central role in our customer relationships and in the promotion of our products and services across our geographic markets. Our trademark and service mark registrations in the U.S . for "QVC " and "HSN " are issued for ten year terms and may be renewed for successive ten year periods prior to their respective expirations, provided that the trademarks or service marks are used continuously and comply with the applicable legal requirements.

### *Seasonality*

QVC 's business is seasonal due to a higher volume of sales in the fourth calendar quarter related to year-end holiday shopping. In recent years, QVC has earned, on average, between 23% and 24% of its revenue in each of the first three quarters of the year and between 29% and 30% of its revenue in the fourth quarter of the year.

### *CBI*

CBI consists of a portfolio of aspirational home and apparel brands. Although there is some overlap in the product offerings, the home brands are comprised of Ballard Designs, Frontgate, and Grandin Road. Garnet Hill focuses primarily on apparel and accessories and is categorized as an apparel brand. There are 35 retail and outlet stores located throughout the U.S .

Frontgate features premium, high quality indoor (including bed, bath, kitchen, dining and living room) and outdoor (including patio, garden and pool) furnishings and accessories. Ballard Designs features European-inspired bed, bath, dining, outdoor and office furnishings and accessories, as well as rugs, shelving and architectural accents for the home. Grandin Road offers an affordable style assortment of products ranging from occasional furniture, accessories, holiday decor and outdoor furniture.

New editions of full-color catalogs are mailed to customers several times each year, with a total annual circulation in 2025 of approximately 75 million catalogs. The timing and frequency of catalog circulation varies by brand and depends upon a number of factors, including the timing of the introduction of new products, marketing campaigns and promotions and inventory levels, among other factors. Branded catalogs are designed in-house, which enables each individual brand to control the process.

CBI also operates websites for each of its featured brands, such as BallardDesigns.com, Frontgate.com, GrandinRoad.com, and GarnetHill.com. These websites serve as additional storefronts for products featured in related print catalogs, as well as provide customers with additional content and product assortments to support and enhance their shopping experience. Additional content provided by these websites, which differs across the various websites, includes decorating tips, measuring information, online design centers, and gift registries, as well as a feature that allows customers to browse the related catalog online.

The CBI brands differentiate themselves by offering customers an assortment of innovative proprietary and branded home and apparel products. In many cases, CBI seeks to secure exclusive distribution rights for certain products. CBI employs in-house designers and partners with leading manufacturers and designers to aid in the development of its unique, exclusive product assortment. The CBI brands use their respective websites and e-mail marketing to promote special offers, including cross-promotions for other CBI brands. CBI believes that these affiliations enhance the awareness of the CBI brands among consumers as well as strengthen its various brands overall. CBI has also been extending its distributed commerce platform through both its experiential and more traditional retail and outlet stores, as a marketing tool to increase demand in the overall regions where the stores reside.

### *Human Capital*

*Headcount*. QVC Group employed approximately 16,900 full-time and part-time employees as of December 31, 2025, which includes 9,200 employees at QxH, 6,100 employees at QVC -International, and 1,600 employees at CBI . Employment levels fluctuate due to seasonal factors affecting our business. Additionally, we utilize independent contractors and temporary staffing personnel to supplement our workforce, particularly on a seasonal basis. We consider our employee relations to be a key factor in our workforce strategy. In addition, as described above, our Company is a party to a services agreement with LMC , however, during 2025 the Company substantially reduced certain general and administrative services provided by LMC .

*Inclusion and Belonging*. We remain committed to fostering an inclusive culture that ensures a sense of belonging for every team member, business partner and customer experience they offer by leveraging the backgrounds, perspectives and experiences of their team members to continuously exceed expectations and innovate for growth. We serve a broad range of customers around the world and strive to understand the lives they lead in order to deliver authentic customer experiences with meaningful curated products and broad representation across our platforms.

*Team Member Engagement and Enablement*. To improve and monitor team member engagement, enablement, and commitment, we have a robust continuous listening strategy that includes periodic census surveys, topical pulse surveys, and "always on" surveys throughout the year to measure team member sentiment on a wide range of topics including the Company 's direction, leadership, culture, performance and rewards, and change management. The results of these surveys are used by management to improve the overall team member experience and retention, as well as to inform our approach to the Company 's programs and practices. For example, based in part on feedback from team members, we have established workstreams focused on leadership competencies and development, organizational goal setting, and process rewiring for organizational effectiveness.

*Health and Safety*. We are committed to maintaining a safe and secure work environment and have specific safety programs and protocols in place to protect our team members. This includes administering a comprehensive occupational injury- and illness-prevention program and training for team members. In addition to offering a variety of comprehensive health benefits plans, we also offer our team members a variety of mental, emotional, and physical wellness resources through our Employee Assistance Program (EAP), among a number of other initiatives, such as greater access to telemedicine, home care help and paid time off. Where applicable, we continue to comply with country, state and local restrictions related to addressing specific health risks.

#### *Available Information*

All of our filings with the SEC, including our Form 10-Ks, Form 10-Qs and Form 8-Ks, as well as amendments to such filings are available on our website free of charge generally within 24 hours after we file such material with, or furnish it to, the SEC. Our website address is https://investors.qvcgrp.com.

Our corporate governance guidelines, code of business conduct and ethics, compensation committee charter, nominating and corporate governance committee charter, and audit committee charter are available on our website. In addition, we will provide a copy of any of these documents, free of charge, to any shareholder who calls or submits a request in writing to Investor Relations, QVC Group , Inc., 1200 Wilson Drive, West Chester, PA, 19380. Tel. No. (484) 701-1000.

The information contained on our website and the websites of our subsidiaries and affiliated businesses mentioned throughout this report are not incorporated by reference herein.

I-17

**Item 1A. Risk Factors .**

*The risks described below and elsewhere in this Annual Report are not the only ones that relate to our businesses or our capitalization. The risks described below are considered to be the most material. However, there may be other unknown or unpredictable economic, business, competitive, regulatory or other factors that also could have material adverse effects on our businesses. Past financial performance may not be a reliable indicator of future performance and historical trends should not be used to anticipate results or trends in future periods. If any of the events described below were to occur, our businesses, prospects, financial condition, results of operations and/or cash flows could be materially adversely affected.*

### Risk Factor Summary

**The following is a summary of the material risk factors that could adversely affect our business, financial condition, and results of operations**

**Risks Related to Chapter 11 Bank ruptcy**
- We intend to commence Chapter 11 reorganization proceedings under the Bank ruptcy Code , which will cause our capital stock to decrease in value and will eventually render our capital stock worthless.
- We are subject to other risks and uncertainties associated with our Chapter 11 Cases .
- Delays in our Chapter 11 Cases increase the risks of us being unable to reorganize our business and emerge from bankruptcy and increase our costs associated with the bankruptcy process.
- Operating under the Bank ruptcy Court protection for a long period of time may harm our business.
- The Plan is based in large part upon assumptions and analyses developed by us. If these assumptions and analyses prove to be incorrect, our Plan may be unsuccessful in its execution.
- Even if the Plan is consummated, we may not be able to achieve our stated goals and continue as a going concern.
- Changes to our capital structure may have a material adverse effect on existing and future debt and security holders, and will adversely impact holders of our capital stock.
- The negotiations regarding the Restructuring have consumed and will continue to consume a substantial portion of the time and attention of our management, which may have an adverse effect on our business and results of operations, and we may face increased levels of employee attrition.
- Our long-term liquidity requirements and the adequacy of our capital resources are difficult to predict at this time.
- Upon emergence from Chapter 11 bankruptcy, Reorganized QVC will be subject to risks related to its substantial indebtedness.
- Our actual financial results after emergence from bankruptcy may not be comparable to our projections filed with the Bank ruptcy Court in the course of the Chapter 11 Cases .
- As a result of the Chapter 11 Cases , our historical financial information may not be indicative of our future financial performance, which may be volatile.
- In connection with the Chapter 11 Cases , we expect that our Series A common stock and Preferred Stock (as defined below) will be delisted from Nasdaq and there is no guarantee that such stock will be regularly traded on the over-the-counter markets.
- Trading in our securities during the pendency of the Chapter 11 Cases is highly speculative and poses substantial risks. It is possible that our common stock will be cancelled pursuant to the Plan and holders of any such common stock will receive only such distributions as set forth in the Plan, which may result in such holders being unable to recover their investments.
- Our ability to use certain tax attributes and tax basis in assets may be reduced or eliminated in connection with the implementation of the Plan, which may increase our future cash tax liabilities.
- Taxing authorities may challenge tax positions we will take with respect to the consequences of the Chapter 11 Cases and the transactions contemplated thereby and, in the event such a challenge were successful, it could result in a material current tax liability for Reorganized QVC .
- We may be subject to claims that will not be discharged in the Chapter 11 Cases .
- In certain instances, a Chapter 11 case may be converted to a case under Chapter 7 of the Bank ruptcy Code .

**Risks Related to Our Financial Condition and Business**
- There are questions about our ability to continue operating as a going concern.
- Business improvement initiatives focused on promoting business growth strategies and generating cost savings may not be successful in generating operating results in the anticipated amounts, it may take longer than expected to realize such results, or they could produce such results only for a limited period.
- The retail business environment is subject to intense competition, and we may not be able to effectively compete for customers.
- Our net revenue and operating results depend on our ability to predict or respond to consumer preferences.

- Our long-term success depends in large part on our continued ability to attract new customers and retain existing customers and we may not be able to do that in a cost-effective manner.
- Our subsidiary QVC depends on the television distributors that carry its programming, and no assurance can be given that QVC will be able to maintain and renew its affiliation agreements on favorable terms or at all.
- The failure to maintain suitable placement for our programming or to adapt to changes in consumer behavior driven by online video distribution platforms for viewing content could adversely affect our ability to attract and retain television viewers and could result in a decrease in revenue.
- We are subject to risks of adverse government regulation, and we may be subject to claims for representations made in connection with the sale and promotion of merchandise or for harm experienced by customers who purchase merchandise from us.
- New legislation or regulations related to corporate sustainability and varied perspectives of governmental and non-governmental organizations, stockholders and customers on sustainability issues may have a material adverse effect on our business and results of operations.
- Use of social media and influencers may materially and adversely affect our reputation or subject us to fines or other penalties.
- We may fail to adequately protect our intellectual property rights or may be accused of infringing intellectual property rights of third parties.
- QVC and HSN offer installment payment options on most of their respective merchandise. Failure to effectively manage such installment payment options could negatively impact our results of operations.
- Natural disasters, political crises, and other catastrophic events or other events outside of our control, including climate risk, may damage our facilities or the facilities of third parties on which we depend, adversely affect our ability to operate our businesses and have broader effects.
- Increases in labor costs could adversely affect our business, financial condition and results of operations.
- Impairment of our goodwill or other intangible assets could have a material adverse effect on our business, results of operations and financial condition.

**Risks Related to Technology and Information Security**
- Any continued or permanent inability to transmit our programming via satellite would result in lost revenue and could result in lost customers.
- Our e-commerce business could be negatively affected by changes in third-party digital platform algorithms and dynamics as well as our inability to monetize the resulting web traffic.
- Our businesses and information systems are subject to cybersecurity risks, including cybersecurity threats and cybersecurity incidents.
- System interruption and the lack of integration and redundancy in the systems and infrastructures of our subsidiary QVC and our other online commerce and catalog businesses may adversely affect our ability to, as applicable, operate our businesses, transmit our television programs, operate websites, process and fulfill transactions, respond to customer inquiries and generally maintain cost-efficient operations.
- The processing, storage, sharing, use, disclosure and protection of personal data could give rise to liabilities as a result of governmental regulation, conflicting legal requirements and policies or differing views of personal privacy rights.
- Our integration and use, or the use by our competitors, of artificial intelligence and similar technology may pose risks and present challenges to our business, reputation, and results of operations.

**Risks Related to our Facilities and Third-Party Suppliers and Vendors**
- We rely on distribution facilities to operate our businesses, and any damage to one of these facilities, or any disruptions caused by incorporating new facilities into our operations, could have a material adverse impact on our businesses.
- We rely on independent shipping companies to deliver the products we sell.
- We depend on relationships with third party suppliers and any adverse changes in these relationships could result in a failure to meet customer expectations which could result in lost revenue.
- The unanticipated loss of certain larger vendors or the consolidation of our vendors could negatively impact our sales and profitability on a short term basis.

**Risks Related to the Seasonality of Our Business and Key Personnel**
- We face significant inventory risk as a result of seasonality, new product launches, rapid changes in product cycles and pricing, defective merchandise, changes in consumer demand, consumer spending patterns, changes in consumer tastes with respect to our products, spoilage and other factors.
- The seasonality of certain of our businesses places increased strain on our operations.
- The success of our home television and online commerce businesses depends in large part on our ability to recruit and retain key personnel capable of executing our unique business models.

**Risks Related to Economic Conditions**

I-19

- Our businesses may be materially adversely affected by the imposition of duties and tariffs and other trade barriers and retaliatory countermeasures implemented by the United States and other countries.
- Significant developments stemming from United States and international trade policy with China, including in response to forced labor and human rights abuses in China, may adversely impact our businesses and operating results.
- Certain of our subsidiaries and business affiliates have operations outside of the United States that are subject to numerous operational and financial risks.
- Fluctuations in currency exchange rates may lead to lower revenues and earnings.
- Weak and uncertain economic conditions worldwide may reduce consumer demand for our businesses' products and services.
- Uncertainty and increases in market interest rates could increase our operating costs and decrease consumer demand, which may adversely affect our businesses.

**Risks Related to Our Indebtedness and Common Stock**

- Our subsidiary QVC has significant indebtedness and other financial obligations, which could limit its flexibility in responding to current market conditions, restrict its business activity and adversely affect our financial condition.
- QVC may not be able to generate sufficient cash to service its debt obligations.
- Credit ratings downgrades or being put on negative watch could adversely affect our liquidity, capital position, borrowing cost and access to capital markets.

**Risks Related to Chapter 11 Bank ruptcy**

*We intend to commence Chapter 11 reorganization proceedings under the Bank ruptcy Code , which will cause our capital stock to decrease in value and will eventually render our capital stock worthless.* The Company Parties intend to commence Chapter 11 Cases under Chapter 11 of Title 11 of the Bank ruptcy Code in the United States Bank ruptcy Court for the Southern District of Texas. Any trading in our capital stock during the pendency of our Chapter 11 Cases is highly speculative and poses substantial risks to purchasers of our capital stock, as the price of our capital stock has and will continue to decrease in value and become worthless.

*We are subject to other risks and uncertainties associated with our Chapter 11 Cases .* Our operations and ability to develop and execute our business plan, our financial condition, our liquidity and our continuation as a going concern are subject to the risks and uncertainties associated with our Chapter 11 Cases . These risks include the following:

- our ability to consummate the Plan with respect to the Chapter 11 Cases ;
- the high costs of bankruptcy cases and related fees;
- the imposition of restrictions or obligations on the Company by regulators related to the bankruptcy and emergence from Chapter 11;
- Bank ruptcy Court rulings in the Chapter 11 Cases , as well as the outcome of all other pending litigation and the outcome of the Chapter 11 Cases generally;
- our ability to maintain our relationships with our general unsecured creditors, suppliers, service providers, customers, employees and other third parties;
- our ability to maintain contracts that are critical to our operations;
- our ability to execute competitive contracts with third parties;
- our ability to attract, motivate and retain key employees;
- the ability of third parties to seek and obtain court approval to terminate contracts and other agreements with us;
- our ability to retain our current management team; and
- the actions and decisions of our stockholders, creditors and other third parties who have interests in our Chapter 11 Cases that may be inconsistent with our plans.

*Delays in our Chapter 11 Cases increase the risks of us being unable to reorganize our business and emerge from bankruptcy and increase our costs associated with the bankruptcy process.* These risks and uncertainties could affect our business and operations in various ways. For example, negative events or publicity associated with our Chapter 11 Cases could adversely affect our relationships with our general unsecured creditors, employees, customers, vendors, suppliers, service providers and other third parties, which, in turn, could adversely affect our operations and financial condition. Also, pursuant to the Bank ruptcy Code , we need the prior approval of the Bank ruptcy Court for transactions outside the ordinary course of business, which may limit our ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with our Chapter 11 Cases , we cannot accurately

I-20

predict or quantify the ultimate impact or timing of events that occur during our Chapter 11 Cases and the impact that those events will have on our business, financial condition and results of operations. Further, there is no certainty as to our ability to continue as a going concern.

*Operating under the Bank ruptcy Court protection for a long period of time may harm our business.* A long period of operations under the protection of the Bank ruptcy Court could have a material adverse effect on our business, financial condition, results of operations and liquidity. A prolonged period of operating under Bank ruptcy Court protection may also make it more difficult to retain management and other key personnel necessary to the success and growth of our business. In addition, the longer the Chapter 11 Cases continue, the more likely it is that our customers and suppliers will lose confidence in our ability to reorganize our business successfully and will seek to establish alternative commercial relationships. So long as the Chapter 11 Cases continue, we will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases .

Furthermore, we cannot predict the ultimate terms of settlement of the liabilities that will be subject to the Plan. Even once the Plan is approved and implemented, our operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from Chapter 11 bankruptcy.

*The Plan is based in large part upon assumptions and analyses developed by us. If these assumptions and analyses prove to be incorrect, our Plan may be unsuccessful in its execution.* The Plan will affect both our capital structure and the ownership, structure, and operation of our business and reflects assumptions and analyses based on our experience and perception of historical trends, current conditions, and expected future developments, as well as other factors that we consider appropriate under the circumstances. In addition, the Plan relies upon financial projections developed by us with the assistance of our advisors, including with respect to fees, revenues, debt service, and cash flow. Financial forecasts are necessarily speculative, and it is likely that one or more of the assumptions and estimates that are the basis of these financial forecasts will not be accurate. Whether actual future results and developments will be consistent with our expectations and assumptions depends on a number of factors, including, but not limited to, (i) our ability to maintain customers', vendors', suppliers', and other third parties' confidence in our viability as a continuing enterprise and to attract and retain sufficient business from them, (ii) our ability to retain key employees, and (iii) the overall strength and stability of general economic conditions. The failure of any of these factors could materially adversely affect the successful reorganization of our business and the value of the Company . Consequently, at this time, there can be no assurance that the results or developments that are contemplated in the Plan will occur or, even if they do occur, that they will have the anticipated effects on us or our businesses or operations. The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful execution of the Plan.

*Even if the Plan is consummated, we may not be able to achieve our stated goals and continue as a going concern.* Even if the Plan is consummated, we will continue to face a number of risks that are beyond our control, such as changes in economic conditions, changes in the financial markets, changes in investment values or the industry in general, changes in demand for our products and increasing expenses. Some of these risks typically become more acute when a case under the Bank ruptcy Code continues for a protracted period of time without indication of how or when the transactions under a Chapter 11 plan of reorganization will close.

Further, our corporate business strategy is subject to continued development, evaluation and implementation by our management and Board . Upon the Effective Date of the Plan, the Board is expected to be reconstituted. The new directors may have different backgrounds, experiences and perspectives from those individuals who serve on the Board at the time of the commencement of the Chapter 11 Cases and, thus, may have different views on the issues that will determine our future, including our strategic plans and priorities. The Board , as reconstituted, may determine, from time to time, to implement changes in our business strategy that may affect our operations. There is, however, no guarantee that the strategic initiatives and plans, whether current or future, of the Board will be implemented in a timely manner or at all and, consequently, there is no guarantee that the operational and financial objectives of the reconstituted Board will be achieved in a timely manner or at all.

In addition, even after we emerge from bankruptcy, our having recently filed for bankruptcy could adversely affect our business and relationships with our general unsecured creditors, employees, customers, vendors, suppliers, service providers and other third parties. Due to uncertainties, many risks exist even after emergence from bankruptcy, including the following:

- the ability to attract, motivate and/or retain key executives and employees may be adversely affected;
- employees may be more easily attracted to other employment opportunities; and
- competitors may take business away from us, and our ability to retain customers may be negatively impacted.

The occurrence of one or more of these events could have a material and adverse effect on our operations, financial condition and reputation, and we cannot assure you that having been subject to bankruptcy proceedings will not adversely affect our operations in the future. As a result of these and other risks, we cannot guarantee that the Plan will achieve our stated goals.

Finally, even if our current debts are reduced or discharged through the Plan, we expect to have substantial indebtedness following consummation of the Plan, which may limit our operating flexibility going forward. Our indebtedness following consummation of the Plan will also subject us to certain restrictive covenants. Failure by us to comply with these covenants could result in an event of default that, if not cured or waived, could have a material adverse effect on us and result in amounts outstanding thereunder to be immediately due and payable. If we are unable to pay amounts due under our indebtedness or to fund other liquidity needs, such as future capital expenditures or contingent liabilities as a result of adverse business developments, including expenses related to future legal proceedings and governmental investigations or decreased revenues, as well as increased pricing pressures or otherwise, we may need to raise additional funds through one or more public or private debt or equity financings or other means to fund our business after the completion of the Chapter 11 Cases . Our access to additional capital may be limited, if it is available at all, particularly in light of the recent bankruptcy proceedings. Therefore, adequate funds may not be available when needed or may not be available on favorable terms. As a result of these and other risks, we cannot guarantee that the Plan will achieve our stated goals, and, thus, we cannot assure you of our ability to continue as a going concern after our expected emergence from bankruptcy.

*Changes to our capital structure may have a material adverse effect on existing and future debt and security holders, and will adversely impact holders of our capital stock.* Pursuant to the Plan, our post-bankruptcy capital structure will change significantly. The reorganization of our capital structure pursuant to the Plan includes exchanges of new debt or equity securities for our existing debt and claims against us. Such new debt will be issued at different interest rates, payment schedules and maturities than our existing debt securities. There can be no guarantees regarding the success of changes to our capital structure. Holders of our debt or of claims against us may find their holdings no longer have any value or are materially reduced in value, or they may be converted to equity and be diluted or may be modified or replaced by debt with a principal amount that is less than the outstanding principal amount, longer maturities and reduced interest rates. Our existing equity securities are not expected to receive any recovery under the Plan. There can be no assurance that any new debt or equity securities will maintain their value at the time of issuance. If existing debt or equity holders are adversely affected by a reorganization, it may adversely affect our ability to issue new debt or equity in the future.

*The negotiations regarding the Restructuring have consumed and will continue to consume a substantial portion of the time and attention of our management, which may have an adverse effect on our business and results of operations, and we may face increased levels of employee attrition.* Our management has spent, and continues to be required to spend, a significant amount of time and effort focusing on the Restructuring. This diversion of attention may have a material adverse effect on the conduct of our business, and, as a result, on our financial condition and results of operations, particularly if the Restructuring and the Chapter 11 Cases are protracted. During the pendency of the Restructuring, our employees will face considerable distraction and uncertainty, and we may experience increased levels of employee attrition. A loss of key personnel or material erosion of employee morale could have a materially adverse effect on our ability to meet customer expectations, thereby adversely affecting our business and results of operations. The failure to retain or attract members of our management team and other key personnel could impair our ability to execute our strategy and implement operational initiatives, thereby having a material adverse effect on our financial condition and results of operations. Likewise, we could experience losses of customers, vendors and suppliers who may be concerned about our ongoing long-term viability.

*Our long-term liquidity requirements and the adequacy of our capital resources are difficult to predict at this time.* We face uncertainty regarding the adequacy of our liquidity and capital resources. In addition to the cash requirements necessary to fund ongoing operations, we have incurred significant professional fees and other costs in connection with preparation for the Chapter 11 Cases and expect that we will continue to incur significant professional fees and costs throughout our Chapter 11 Cases . We cannot assure that cash on hand, cash flow from operations will be sufficient to continue to fund our operations and allow us to satisfy our obligations related to the Chapter 11 Cases until we are able to emerge from the Chapter 11 Cases .

Our liquidity, including our ability to meet our ongoing operational obligations, is dependent upon, among other things: (i) our ability to maintain adequate cash on hand; (ii) our ability to generate cash flow from operations; (iii) our ability to develop, confirm and consummate a Chapter 11 plan or other alternative restructuring transaction; and (iv) the cost, duration and outcome of the Chapter 11 Cases .

*Upon emergence from Chapter 11 bankruptcy, Reorganized QVC will be subject to risks related to its substantial indebtedness.* On the effective date of the Plan (the "Effective Date " ), it is expected that Reorganized QVC will have secured indebtedness outstanding. This level of expected indebtedness and the funds required to service such debt could, among other things, make it difficult for Reorganized QVC to satisfy its obligations under such indebtedness, increasing the risk that it may default on such debt obligations. A range of economic, competitive, business, and industry factors will affect Reorganized QVC 's future financial performance and, as a result, its ability to generate cash flow from operations and to pay its debt. Many of these factors are beyond its control. If Reorganized QVC does not generate enough cash flow from operations to satisfy its debt obligations, it may have to undertake alternative financing plans, such as refinancing or restructuring debt, selling assets, reducing or delaying capital investments, or seeking to raise additional capital. It cannot be assured, however, that undertaking alternative financing plans, if necessary, would be possible on commercially reasonable terms, or at all, and allow Reorganized QVC to meet its debt obligations.

If we are unable to generate sufficient cash flow and are otherwise unable to obtain funds necessary to meet required payments of principal, premium, if any, and interest on our indebtedness, we could be in default under the terms of the agreements governing such indebtedness. An event of default, if not waived, could result in acceleration of the indebtedness outstanding under the applicable agreement and an event of default with respect to, and an acceleration of, the indebtedness outstanding under any other debt agreements to which we are a party. Any such accelerated indebtedness would become immediately due and payable. If that occurs, we may not be able to make all of the required payments. In addition, any failure to make payments on outstanding indebtedness on a timely basis would likely result in a reduction of our credit rating, which could harm our ability to incur additional indebtedness.

*Our actual financial results after emergence from bankruptcy may not be comparable to our projections filed with the Bank ruptcy Court in the course of the Chapter 11 Cases .* In connection with the disclosure statement we intend to file with the Bank ruptcy Court and the hearing to consider confirmation of the Plan, we prepared projected financial information to demonstrate to the Bank ruptcy Court the feasibility of the Plan and our ability to continue operations upon our emergence from the Chapter 11 Cases . Those projections were prepared solely for the purpose of the Chapter 11 Cases and have not been and will not be updated and should not be relied upon by investors. At the time of their preparation, the projections reflected numerous assumptions concerning our anticipated future performance with respect to then prevailing and anticipated market and economic conditions that were and remain beyond our control and that may not materialize. We will not update the projections prepared solely for the purpose of the Chapter 11 Cases or the assumptions on which they were based after our emergence. Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic and competitive risks, and the assumptions underlying the projections or valuation estimates may prove to be wrong in material respects. Actual results may vary significantly from those contemplated by the projections. As a result, investors should not rely on these projections.

*As a result of the Chapter 11 Cases , our historical financial information may not be indicative of our future financial performance, which may be volatile.* During the Chapter 11 Cases , we expect our financial results to be volatile as restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact our consolidated financial statements. As a result, our historical financial performance is likely not indicative of our financial performance after the date of the filing of the Chapter 11 Cases .

*In connection with the Chapter 11 Cases , we expect that our Series A common stock and Preferred Stock (as defined below) will be delisted from Nasdaq and there is no guarantee that such stock will be regularly traded on the over-the-counter markets.* In connection with the Chapter 11 Cases and in accordance with the Nasdaq Listing Rule 5550(a)(2), we expect to receive a Delisting Notice from the Nasdaq Stock Market LLC notifying us that Nasdaq Stock Market LLC has determined that our Series A common stock and our 8.0% Series A Cumulative Redeemable Preferred Stock (our "Preferred Stock " ) will be delisted from the Nasdaq Capital Market and that trading of our Series A common stock and our Preferred Stock on the Nasdaq Capital Market will be suspended immediately. We also expect Nasdaq Stock Market LLC to file a Form 25 for us in connection with the delisting of our shares of our Series A common stock and our Preferred Stock from the Nasdaq Capital Market, and that our delisting will become effective ten days after the Form 25 is filed. Delisting will have an adverse effect on the liquidity of these stocks and, as a result, it is more difficult for you to sell

I-23

or otherwise transact in these stocks. Delisting also reduces the number of investors willing to hold or acquire these stocks and negatively impacts our ability to access equity markets and obtain financing. In accordance with Rule 12d2-2 of the Exchange Act , the deregistration of our shares of capital stock under Section 12(b) of the Exchange Act will become effective 90 days after the date the Form 25 is filed. Following the suspension of trading on the Nasdaq Capital Market, we expect our Series A common stock and Preferred Stock to be quoted on the OTCID Basic Market or another over-the-counter market. We also expect that our Series B common stock, which is currently quoted on the OTCQB Market will be moved to the OTCID Basic Market or another over-the-counter market. The over-the-counter markets are significantly more limited than the Nasdaq Capital Market, and quotation on such markets could result in a less liquid market for existing and potential holders of our stock to trade our stock and could further depress the trading price of our capital stock. There is no guarantee that our capital stock will continue to be traded on the over-the-counter markets, and accordingly, our capital stock may become illiquid. We can provide no assurance as to whether broker-dealers will continue to provide public quotes of the common stock on this market, or whether the trading volume of the common stock will be sufficient to provide for an efficient trading market.

*Trading in our securities during the pendency of the Chapter 11 Cases is highly speculative and poses substantial risks. Pursuant to the Plan, our capital stock is expected to be cancelled without recovery, which may result in such holders being unable to recover their investments.* A significant amount of our indebtedness is senior to the capital stock in our capital structure. The Plan provides that these equity interests will be cancelled and extinguished on the Effective Date upon the approval of the Bank ruptcy Court and the holders thereof would not be entitled to receive, and would not receive or retain, any property or interest in property on account of such equity interests. In the event of a cancellation of these equity interests, amounts invested by such holders in our outstanding equity securities will not be recoverable. Under the current Plan, holders of our common stock will not receive a recovery. However, even if our Plan is not approved, or the Effective Date does not occur, our currently outstanding common stock may have no value. Trading prices for our common stock are very volatile and may bear little or no relationship to the actual recovery, if any, by the holders of such securities in the Chapter 11 Cases . Accordingly, we urge that extreme caution be exercised with respect to existing and future investments in our equity securities and any of our other securities.

*Our ability to use certain tax attributes and tax basis in assets may be reduced or eliminated in connection with the implementation of the Plan, which may increase our future cash tax liabilities.* Our ability to utilize existing tax attributes and tax basis in assets to offset future taxable income and to reduce our income tax liability may be subject to certain requirements and restrictions, including because our existing tax attributes and tax basis in assets may be subject to limitation on use in connection with the implementation of the Plan or reduction as a result of any cancellation of indebtedness income arising in connection with the implementation of the Plan. Furthermore, the implementation of the Plan may itself generate cash tax obligations independent of the loss of certain tax attributes and tax basis in assets. As such, at this time, there can be no assurance that we will have tax attributes to offset future taxable income.

*Taxing authorities may challenge tax positions we will take with respect to the consequences of the Chapter 11 Cases and the transactions contemplated thereby and, in the event such a challenge were successful, it could result in a material current tax liability for Reorganized QVC .* It is our position that certain deferred tax liabilities recorded on our financial statements as of December 31, 2025 will not materialize into a current tax liability because of the application of certain tax rules applicable to companies under the protection of a Bank ruptcy court. While the Company believes its tax position is the correct interpretation of applicable law, there can be no guarantees, and there are no cases or other guidance beyond the applicable Treasury Regulations that directly address similar situations. Taxing authorities (including the Internal Revenue Service) therefore may disagree with this tax position. If a taxing authority were to successfully challenge this tax position, Reorganized QVC could incur a material current tax liability and significant costs in contesting or resolving any such challenge, which could adversely affect our liquidity and results from operations.

*We may be subject to claims that will not be discharged in the Chapter 11 Cases .* The Bank ruptcy Code provides that the confirmation of a plan of reorganization may discharge a debtor from substantially all debts arising prior to the Petition Date . Although QVC Group intends to pay pre-petition unsecured claims in full, with few exceptions, all claims that arose before the Petition Date (1) are subject to compromise and/or treatment under the Plan and/or (2) could be discharged in accordance with the terms of the Plan. The Bank ruptcy Code excepts certain pre-petition claims from discharge for corporate debtors, including certain debts owed to governmental entities obtained by, among other things, false representations or actual fraud. Any claims not ultimately discharged through the Plan could be asserted against the reorganized entities and may have an adverse effect on their financial condition and results of operations on a post-reorganization basis.

I-24

*In certain instances, a Chapter 11 case may be converted to a case under Chapter 7 of the Bank ruptcy Code .* Although our intention is to reorganize under Chapter 11 of the Bank ruptcy Code and emerge as a going concern, under certain limited circumstances, and upon a showing of cause, the Bank ruptcy Court could convert the Chapter 11 Cases to cases under Chapter 7 of the Bank ruptcy Code . We do not believe that any such cause exists or is likely to arise, and we remain committed to pursuing our reorganization through the Chapter 11 process. However, in the unlikely event that such a conversion were to occur, a Chapter 7 trustee would be appointed or elected to liquidate our assets and the assets of our subsidiaries for distribution in accordance with the priorities established by the Bank ruptcy Code . We believe that liquidation under Chapter 7 would result in significantly smaller distributions being made to our creditors than those provided for in the Plan because of (i) the likelihood that the assets would have to be sold or otherwise disposed of in a distressed fashion over a short period of time rather than in a controlled manner and as a going concern, (ii) additional administrative expenses involved in the appointment of a Chapter 7 trustee, and (iii) additional expenses and claims, some of which would be entitled to priority, that would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of operations.

## Risks Related to Our Financial Condition and Business

*There are questions about our ability to continue operating as a going concern.* As a result of the upcoming scheduled maturity of the Credit Facility on October 27, 2026 and the Chapter 11 Cases , there is substantial doubt about our ability to continue as a going concern. Absent the restructuring contemplated by the Chapter 11 Cases and the Plan, as of December 31, 2025, QVC 's net leverage ratio, as calculated under the Credit Facility , was greater than 4.5 to 1.0, which constitutes a breach of the financial covenant under the Credit Facility . Without a waiver under the Fifth Amended and Restated Credit Agreement , the lenders would have (absent the Automatic Stay ) the right, but not the obligation, to accelerate the loans and demand repayment from QVC for noncompliance with the net leverage ratio debt covenant; however such acceleration cannot occur until certain conditions are satisfied, including the expiration of a cure period during which QVC may take remedial action to cure the breach. Additionally, under the indentures governing the senior secured notes, a default under the Credit Facility would constitute an event of default under the indentures, and would trigger the right, but not the obligation, of the noteholders to accelerate the senior secured notes and demand repayment if (i) the Credit Facility has been accelerated, (ii) there is a payment default under the Credit Facility or (iii) there is a foreclosure on collateral securing the Credit Facility . As of December 31, 2025, the Borrowers ' outstanding debt balance under the Credit Facility and senior secured notes of $5,046 million was classified as a current liability. Therefore, our ability to continue as a going concern will depend on a successful restructuring of our debt in the Chapter 11 Cases pursuant to the Plan. We are also focused on operational improvements. However, there can be no assurance that we will be able to successfully emerge from the Chapter 11 Cases , in which case we would be forced to cease operations, which would be detrimental to our stockholders' investment in us.

*Business improvement initiatives focused on promoting business growth strategies and generating cost savings may not be successful in generating operating results in the anticipated amounts, it may take longer than expected to realize such results, or they could produce such results for only for a limited period.* QVC Group has implemented, and in the future will continue to implement, business improvement initiatives focused on promoting business growth strategies and generating cost savings. However, these initiatives require us to incur additional expenses, which could adversely impact our financial results prior to the realization of the expected benefits associated with these initiatives. For example, in 2025, the Company consolidated its QVC and HSN operations at QVC 's Studio Park location in West Chester, PA, and the closing of the St. Petersburg, FL campus and reorganized teams across the Company as part of the WIN strategy, which could adversely impact our financial results prior to the realization of the expected benefits associated with these initiatives. These initiatives could also divert the attention of management and cause disruptions in the Company 's business, which could have an adverse impact on the business and financial results. Due to numerous factors or future developments, we may not achieve cost reductions or other business improvements consistent with our expectations or the benefits may be delayed or achieved for only a limited period. These factors or future developments could include the incurrence of higher than expected costs or delays in workforce reduction measures, actual savings differing from anticipated cost savings, anticipated benefits from business improvement initiatives not materializing and disruptions to normal operations or other unintended adverse impacts resulting from the initiatives.

*The retail business environment is subject to intense competition, and we may not be able to effectively compete for customers*. We operate in a rapidly evolving and highly competitive retail business environment. Although QVC is one of the nation's largest home shopping networks, it has numerous and varied competitors at the national and local levels, ranging from large department stores to specialty shops, e-commerce retailers, direct marketing retailers, wholesale clubs, discount retailers and infomercial retailers. In addition, QVC competes with other televised shopping retailers, such as ShopHQ and JTV (Jewelry Television) in the U.S ., Jupiter Shop Channel in Japan, HSE in Germany, TJC, Ideal World,

I-25

Gems TV, Must Have Ideas TV, and JML Direct in the U.K , livestream shopping retailers and platforms, and mail-order and catalog companies. QVC also competes for access to customers and audience share with other providers of televised, online and hard copy entertainment and content. Similarly, CBI competes with e-commerce businesses such as Amazon.com, Inc. and Alibaba Group, the e-commerce platforms of traditional retailers such as Target Corporation and Wal-Mart Stores, Inc., and online marketplaces such as eBay Inc. CBI also competes with other mail-order and catalog companies. Competition is characterized by many factors, including assortment, advertising, price, quality, services, accessibility, the attractiveness and ease of use of digital platforms, cost and speed of options for delivery, reputation and credit availability, as well as the financial, technical and marketing expertise of competitors. For example, many of our businesses' competitors have greater resources, longer histories, more customers and greater brand recognition than our businesses do, and competitors may secure better terms from vendors, adopt more aggressive pricing, offer free or subsidized shipping and devote more resources to technology, fulfillment and marketing. Other companies also may enter into business combinations or alliances that strengthen their competitive positions. Such business combinations or alliances may result in competitors with greatly improved financial resources, improved access to merchandise, greater market penetration than they previously enjoyed and other improvements in their competitive positions. This may cause QVC 's customers to elect to purchase products from a competitor that they would have historically purchased from QVC , resulting in less revenue to QVC . If we do not compete effectively with regard to these factors, our results of operations could be materially and adversely affected.

Although we sell a variety of exclusive products, one of the most significant challenges our subsidiaries and business affiliates face is competition on the basis of price. Price is of great importance to most customers, and price transparency and comparability continues to increase, particularly as a result of digital technology. The ability of consumers to compare prices on a real-time basis puts additional pressure on our subsidiaries and business affiliates to maintain competitive prices. Additionally, as a result of inflationary pressures currently being experienced in many markets, our cost to obtain, import and deliver the products we sell has increased, which has required us to charge consumers more for those products, or reduce our margin on those products, or both. These price increases may result in us being unable to maintain competitive prices with other retailers.

In addition, many retailers, especially online retailers with whom we compete, are currently offering customers more competitive shipping and returns terms, including faster delivery and free or discounted shipping and returns. As a result of these practices, our subsidiaries and business affiliates may experience further competitive pressures to attract customers and/or to change their shipping and returns programs in order to retain existing customers. Our ability to be competitive on delivery times and shipping costs depends on many factors, and our failure to successfully manage these factors and offer competitive shipping terms could negatively impact the demand for our products and our profit margins. Our inability to compete effectively with regard to the assortment, product price, shipping terms, shipping pricing or free shipping and quality of the merchandise we offer for sale or to keep pace with competitors in our marketing, service, location, reputation, credit availability and technologies, could have a material adverse effect.

*Our net revenue and operating results depend on our ability to predict or respond to consumer preferences.* Our net revenue and operating results depend, in part, on our ability to predict or respond to changes in consumer preferences and fashion trends in a timely manner. We develop new retail concepts and continuously adjust our product mix in an effort to satisfy customer demands. Consumer preferences may be affected by many factors outside of our control, including responses of competitors and general economic conditions. Any sustained failure by us to identify and respond to emerging trends in lifestyle and consumer preferences could have a material adverse effect on our relationship with our customers and the demand for the products we sell.

*Our long-term success depends in large part on our continued ability to attract new customers and retain existing customers and we may not be able to do that in a cost-effective manner.* In an effort to attract and retain customers, we engage in various merchandising and marketing initiatives, which involve the expenditure of money and resources, particularly in the case of the production and distribution of our television programming, digital content (including through streaming and social media), and digital marketing. We have spent, and expect to continue to spend, increasing amounts of money on, and devote greater resources to, certain of these initiatives, particularly in our continuing efforts to increasingly engage customers through online digital marketing and to personalizing our customers' shopping experience. These initiatives, however, may not resonate with existing customers or consumers generally or may not be as cost-effective as traditional television advertising. In addition, costs associated with the production and distribution of our television programming and digital content and costs associated with digital marketing, including marketing on third-party platforms such as TikTok, Alphabet, Meta, Roku and Amazon Fire, have increased and are likely to continue to increase in the foreseeable future and, if significant, could have a material adverse effect to the extent that they do not result in corresponding increases in net revenue.

I-26

***We depend on the television distributors that carry our programming, and no assurance can be given that we will be able to maintain and renew our affiliation agreements on favorable terms or at all.*** In the U.S ., we currently distribute our programming through affiliation or transmission agreements with many television service providers, including, but not limited to, Comcast, DIRECTV, Charter, DISH, Verizon and Cox. Internationally, we currently distribute our programming through providers such as Vodafone TV Connect and Vodafone GigaTV, Freenet TV, SES ASTRAS.A., Telekom Magtenta TV, PYUR, kabel plus, A1 Xplore TV, Jupiter Telecommunications, JCOM Co., Ltd., BS Nippon Corporation, The Sky Perfect JSAT Group, World Hi-Vision Channel, Inc., CS-TBS, Inc., Sky UK, Freesat, Freeview Virgin Media, Elettronica Industriale S.p.A., Tivu Ttivusat and Sky Italia. The majority of our affiliation agreements with our distributors are scheduled to expire between 2026 and 2029 unless renewed prior to the applicable expiration.

As part of normal course renewal discussions, occasionally we have disagreements with our distributors over the terms of carriage, such as channel placement or other contract terms. If not resolved through business negotiation, such disagreements could result in litigation or termination of an existing agreement. Term ination of an existing agreement resulting in the loss of distribution of our programming to a material portion of our television households may adversely affect our growth, net revenue and earnings.

The renewal negotiation process for affiliation agreements is typically lengthy. In some cases, renewals are not agreed upon prior to the expiration of a given agreement while the programming continues to be carried by the relevant distributor without an effective agreement in place. We do not have distribution agreements with some of the cable operators that carry our programming. In total, QVC currently provides programming without affiliation agreements to distributors representing approximately 4% of our QVC U.S . distribution, and approximately 0.5% of our HSN cable television distribution. Some of our international programming may continue to be carried by distributors after the expiration dates on our affiliation agreements with such distributors have passed.

We may be unable to obtain renewals with our current distributors on acceptable terms, if at all. We may also be unable to successfully negotiate affiliation agreements with new or existing distributors to carry our programming and no assurance can be given that we will be successful in negotiating renewals with these distributors or that the financial and other terms of these renewals will be acceptable. Although we consider our current levels of distribution without written agreement to be ordinary course, the failure to successfully renew or negotiate new affiliation agreements covering a material portion of television households could result in a discontinuation of carriage that may adversely affect our viewership, growth, net revenue and earnings.

***The failure to maintain suitable placement for our programming, to adapt to changes in consumer behavior driven by online video distribution platforms for viewing content or achieve success in our social media and digital streaming efforts could adversely affect our ability to attract and retain television viewers and could result in a decrease in revenue.*** We are dependent upon the continued ability of our programming to compete for viewers. Effectively competing for television viewers is dependent, in substantial part, on our ability to negotiate and maintain placement of our programming in a favorable channel position, such as in a basic tier or within a general entertainment or general broadcasting tier. Less favorable channel position for our programming, such as placement adjacent to programming that does not complement our programming, a position next to our televised home shopping competitors or isolation in a "shopping" tier or lack of high-definition formatted presentation could adversely affect our ability to attract television viewers to our programming. Viewership of our programming is also dependent on consumer behavior.

Changes in consumer behavior driven by online video distribution platforms for viewing content may have an adverse impact on our business. Distribution platforms for viewing content over the internet have been, and will likely continue to be, developed that further increase the competition for viewers of programming. These distribution platforms are driving changes in consumer behavior as consumers seek more control over when, where and how they consume content.

Consumers are increasingly turning to online sources, including social media and digital streaming, for viewing content, which has and likely will continue to reduce the number of viewers of our television programming. Although we have attempted to adapt our offerings to changing consumer behaviors, virtual multichannel video providers, online video distributors and programming networks providing their content directly to consumers over the internet rather than through traditional television services continue to emerge, gain consumer acceptance and disrupt traditional television distribution services, which we rely on for the distribution of our television programming.

I-27

The increasing number of companies offering streaming services, including some with exclusive high-quality original video programming, as well as programming networks offering content directly to consumers over the internet, has increased the number of entertainment choices available to consumers, which has intensified audience fragmentation. The increase in entertainment choices adversely affects the viewership of our programming. Although we have secured the placement of our streaming service and primary channels on major streaming platforms (such as Samsung, Roku, Amazon, Vizio and LG), we face the risk that we may be unable to maintain our current placements, obtain new placements as new platforms develop or optimize consumer discovery.

Our future success will depend, in part, on the success of our efforts in social media and digital streaming and our ability to anticipate and adapt to technological changes and to offer elements of our programming via new technologies in a cost-effective manner that meet customer demands and evolving industry standards. Our failure to effectively anticipate or adapt to emerging technologies or competitors or changes in consumer behavior, including among younger consumers, could have an adverse effect on our competitive position, businesses and results of operations.

***We are subject to risks of adverse government regulation, and we may be subject to claims for representations made in connection with the sale and promotion of merchandise or for harm experienced by customers who purchase merchandise from us.*** We market and provide a broad range of merchandise through television shopping programs, digital content (including through streaming and social media), and, to an increasing extent, digital marketing. As a result, our businesses are subject to a wide variety of laws, rules, regulations, policies and procedures in various jurisdictions, including foreign jurisdictions, which are subject to change at any time, including laws regarding consumer protection, privacy, the regulation of retailers generally, the license requirements for television retailers in foreign jurisdictions, the importation, sale and promotion of merchandise and the operation of warehouse facilities, as well as laws and regulations applicable to the internet and businesses engaged in e-commerce, such as those regulating the sending of unsolicited, commercial electronic mail and texts and data privacy laws related to customer information and shopping habits. See Item 1. "Business - Government regulation" for further discussions of regulations to which we are subject. Additionally, we accept payments for our products using a variety of methods. For existing and future payment options we offer to our customers, we currently are subject to, and may become subject to additional, regulations and compliance requirements (including obligations to implement enhanced authentication processes that could result in significant costs and reduce the ease of use of our payment products). The failure by our businesses to comply with these laws and regulations could result in a revocation of required licenses, fines and/or proceedings by governmental agencies and/or consumers, which could adversely affect our businesses, financial condition and results of operations. Moreover, unfavorable changes in the laws, rules and regulations applicable to our businesses could decrease demand for our businesses' products and services, increase costs and/or subject our businesses to additional liabilities. Similarly, new disclosure and reporting requirements, established under existing or new state or federal laws, such as requirements to disclose efforts to identify the origin and existence of certain "conflict minerals" or abusive labor practices in portions of our supply chains, could increase the cost of doing business, adversely affecting our results of operations. In addition, certain of these regulations impact the marketing efforts of our businesses and their brands.

As mentioned above, the manner in which certain of our subsidiaries and business affiliates sell and promote merchandise and related claims and representations made in connection with these efforts is regulated by federal, state and local law, as well as the laws of the foreign countries in which they operate. Certain of our subsidiaries and business affiliates may be exposed to potential liability from claims by purchasers or by regulators and law enforcement agencies, including, but not limited to, claims for personal injury, wrongful death and damage to personal property relating to merchandise sold and misrepresentation of merchandise features and benefits. In certain instances, these subsidiaries and business affiliates have the right to seek indemnification for related liabilities from their respective vendors and may require such vendors to carry minimum levels of product liability and errors and omissions insurance. These vendors, however, may be unable to satisfy indemnification claims, obtain suitable coverage or maintain this coverage on acceptable terms, or insurance may provide inadequate coverage or be unavailable with respect to a particular claim.

In addition, programming services, cable television systems, the internet, telephony services and satellite service providers are subject to varying degrees of regulation in the U.S . by the FCC and other entities and in foreign countries by similar regulators. Such regulation and legislation are subject to the political process and have been in constant flux over the past decade. The application of various sales and use tax provisions under state, local and foreign law to the products and services of our subsidiaries and certain of our business affiliates sold via the internet, television and telephone is subject to interpretation by the applicable taxing authorities, and no assurance can be given that such authorities will not take a contrary position to that taken by our subsidiaries and certain of our business affiliates, which could have a material adverse effect on our businesses. In addition, there have been numerous attempts at the federal, state and local levels to impose additional taxes on online commerce transactions. Moreover, most foreign countries in which our subsidiaries or

I-28

business affiliates have, or may in the future make, an investment, regulate, in varying degrees, the distribution, content and ownership of programming services and foreign investment in programming companies and the internet.

In 2000, QVC became subject to a consent decree issued by the FTC barring it from making certain deceptive claims for dietary supplements and specified products related to the common cold, pneumonia, hay fever and allergies. QVC also became subject to an expanded consent decree issued by the FTC in 2009 that terminates on the later of May 26, 2029, or 20 years from the most recent date that the U.S . or the FTC files a complaint in federal court alleging any violation thereunder. Pursuant to this expanded consent decree, QVC is prohibited from making certain claims about specified weight-loss, dietary supplement and anti-cellulite products unless it has competent and reliable scientific evidence to substantiate such claims. Violation of the QVC consent decree may result in the imposition of significant civil penalties for non-compliance and related redress to consumers and/or the issuance of an injunction enjoining us from engaging in prohibited activities.

In October 2023, HSN entered into a settlement agreement with the CPSC in which HSN agreed to pay a civil penalty of $16 million to settle the CPSC 's claims that HSN allegedly failed to timely submit a report under the CPSA in relation to handheld clothing steamers sold by HSN under the Joy Mangano brand names My Little Steamer and My Little Steamer® Go Mini that were subject to a voluntary recall previously announced on May 26, 2021. The settlement agreement also requires HSN to implement and maintain a compliance program to ensure compliance with the CPSA . As part of that program, during September and October 2025, HSN conducted the second of three annual internal audits of the effectiveness of our policies, procedures, systems and training related to CPSA compliance. HSN also submitted the second of three annual reports to the CPSC 's Office of Compliance, Division of Enforcement and Litigation, on December 19, 2025. HSN continues to institute annual training for all QVC G team members in the U.S . to ensure comprehensive understanding of CPSA compliance. In January 2024, HSN received a grand jury subpoena from the U.S . Attorney for the Central District of California that was issued in connection with an official criminal investigation into the clothing steamer matter. QVC and HSN have cooperated (and intend to continue cooperating) fully with this investigation, and at this time, we are unable to predict the eventual scope, duration or outcome of this investigation, nor are we able to reasonably estimate any range of probable loss.

Violation of these consent decrees and settlement agreements may result in the imposition of significant civil penalties for non-compliance and related redress to consumers and/or the issuance of an injunction enjoining these businesses from engaging in prohibited activities. Further material changes in the law and increased regulatory requirements must be anticipated, and there can be no assurance that our businesses and/or any of our assets will not become subject to increased expenses or more stringent restrictions as a result of any future legislation, new regulation or deregulation.

***Use of social media and influencers may materially and adversely affect our reputation or subject us to fines or other penalties.*** We use third-party social media platforms as, among other things, selling and marketing tools. Many of our businesses' products are endorsed by celebrities, designers and other well-known personalities and influencers, and in the case of QVC , often join QVC 's presenters on its live programming and provide lead-in publicity on their own social media pages, websites and other customer touchpoints. As existing e-commerce and social media platforms continue to rapidly evolve and new platforms develop, our businesses must continue to maintain a presence on these platforms and establish presences on new or emerging popular social media platforms. If our businesses are unable to cost-effectively use social media platforms as marketing tools or if the social media platforms we use change their policies or algorithms, we may not be able to fully optimize such platforms, and our ability to maintain and acquire customers and our financial condition may suffer.

Furthermore, as laws and regulations and public opinion rapidly evolve to govern the use of these platforms and devices, they can be subject to disruptions or bans for reasons beyond our control. For example, lawmakers in the U.S ., Europe and Canada have recently escalated efforts to restrict access to TikTok. On April 24, 2024, a bill was signed to either force a sale of TikTok by its Chinese owner, ByteDance, or institute a ban on the app in the U.S . The original deadline for a sale or a shutdown of operations was January 19, 2025, and although the deadline was extended, TikTok experienced a temporary shutdown of its operations. Although a deal for the sale of TikTok's U.S . operations has now been announced, there can be no guarantee that lawmakers may not enact further legislation in respect of this or other platforms in the future. Individual states, governmental bodies and institutions have also voiced concerns that TikTok poses a national security threat and have pursued similar prohibitions. The failure by us, our employees, or our network of celebrities, designers and other well-known personalities and influencers to abide by applicable laws and regulations in the use of these platforms and devices or otherwise could subject us to regulatory investigations, litigation, liability, fines or other penalties and have a material adverse effect on our business, financial condition and operating results.

In addition, an increase in the use of social media for product promotion and marketing may cause an increase in the burden on us to monitor compliance of such materials, and increase the risk that such materials could contain problematic product or marketing claims in violation of applicable regulations. For example, in some cases, the FTC has sought enforcement action where an endorsement has failed to clearly and conspicuously disclose a financial relationship or material connection between an influencer and an advertiser.

Although we require the influencers we retain to agree to comply with their terms and conditions, as well as applicable laws, regulations, guidelines, and other requirements applicable to the activities of our influencers, we do not specifically prescribe what our influencers post. Other influencers who make claims or statements about their products may be subject to terms and conditions of social media platforms instead of our terms and conditions, even if such influencers receive commissions from us. In some cases, we may ask an influencer to edit or remove unsubstantiated claims or statements that could be misleading to our consumers. However, if we were held responsible for the content of their posts or their actions or for the content or actions of other influencers, we could be fined or forced to alter our practices, which could have an adverse impact on our business.

Negative commentary regarding us, their products or influencers and other third parties who are affiliated with us may also be posted on social media platforms and may be adverse to our reputation or business. Influencers with whom we maintain relationships, or who otherwise promote our products through a separate relationship with a social media platform, could engage in behavior or use their platforms to communicate directly with customers in a manner that reflects poorly on our brands and may be attributed to us or otherwise adversely affect us and our businesses. It is not possible to prevent such behavior, and the precautions we take to detect this activity may not be effective in all cases. Certain brands and retailers have become subject to boycott and faced negative media attention for marketing campaigns or actions of influencers that are amplified by social media and there is no guarantee that we will not face such retail boycotts or negative media attention in the future. Our target consumers often value readily available information and often act on such information without further investigation and without regard to its accuracy. The harm may be immediate, without affording us an opportunity for redress or correction.

***Legislation or regulations related to corporate sustainability and varied perspectives of governmental and non-governmental organizations, stockholders and customers on sustainability issues may have a material adverse effect on our business and results of operations.*** Supranational, national, state and local governments, as well as some of our customers, investors, employees, business affiliates and other stakeholders continue to focus on non-financial performance measures and policies relating to sustainability as they pertain to our business, such as climate risks, environmental stewardship, water use, social responsibility, responsible sourcing, sustainable packaging and product stewardship, supply chain practices, animal health and welfare, human rights in our supply chain and human capital management in our operations. Global interest on sustainability matters has resulted in new domestic and international legislation or regulations and growing customer expectations relating to reporting on greenhouse gas emissions, supply chain due diligence, sustainable packaging and product stewardship, including the regulation of plastics and packaging, responsible sourcing and other sustainability matters. Such regulatory developments and stakeholders' expectations could negatively affect us as we have incurred, and will likely continue to incur additional costs or be required to make changes to our operations in order to comply with these new regulations or result in loss of business if our reporting does not satisfy customer expectations. The domestic and international jurisdictions in which we operate are following different approaches to the regulation of climate change and other sustainability matters, including corporate sustainability reporting, packaging, responsible sourcing and supply chain practices, which approaches increase the complexity of, and potential cost related to complying with, such regulations.

Legislation or regulations that impose, or could potentially impose restrictions, caps, taxes or other controls on energy use, packaging and waste, sustainable value chain and sourcing practices, animal health and welfare and water use may have a material adverse effect on our results of operations. Such restrictions may also increase the operating costs of our various vendors, which in turn could increase our cost of doing business or impact our revenues, and if we fail to comply with such regulations, we could be subject to fines, enforcement actions or litigation and experience reputational damage.

Additionally, if our various vendors are unable or unwilling to comply with providing us the necessary greenhouse gas, social or other information or packaging, responsible sourcing and waste data required by legislative or regulatory actions, we could be subject to regulatory actions if we are found to not have satisfied such regulatory requirements, and our associated cost of disclosure, our overall financial results as a result of strained relationships with our customers and vendors, or our reputation may be materially adversely affected. In addition, our revenues could decrease if we are unable to meet customer sustainability requirements or competitive pressures to source products that are, or are perceived as,

I-30

sustainable. These additional costs, changes in operations or loss of revenues may have a material adverse effect on our business and results of operations.

Additionally, our failure or perceived failure to meet our sustainability goals and targets, or our failure or perceived failure to meet regulatory requirements or the expectations of non-governmental organizations, investors, employees, business affiliates, customers or other stakeholders could lead to fines, litigation, loss of business relationships, decreased customer loyalty, reputational damage, reduced demand for our products and other negative impacts on our business and operations.

***We may fail to adequately protect our intellectual property rights or may be accused of infringing intellectual property rights of third parties.*** We regard our intellectual property rights, including service marks, trademarks, patents and domain names, copyrights (including our programming and our websites), trade secrets and similar intellectual property, as important to our success. Our businesses also rely heavily upon software codes, informational databases and other components that make up our products and services. From time to time, we are subject to legal proceedings and claims in the ordinary course of business, including claims of alleged infringement of the tradenames, patents, copyrights and other intellectual property rights of third parties. In addition, litigation may be necessary to enforce the intellectual property rights of these businesses, protect trade secrets or to determine the validity and scope of proprietary rights claimed by others. Any litigation of this nature, regardless of outcome or merit, could result in substantial costs and diversion of management and technical resources, any of which could adversely affect our business, financial condition and results of operations. Our failure to protect our intellectual property rights, particularly our proprietary brands, in a meaningful manner or third party challenges to related contractual rights could result in erosion of brand names and limit the our ability to control marketing on or through the internet using our various domain names, which could adversely affect our business, financial condition and results of operations.

***QVC and HSN offer their installment payment option on most of their merchandise and, in certain circumstances offer it as the default payment option. Failure to effectively manage our installment sales plans and revolving credit card programs as applicable, could negatively impact our results of operations.*** QVC offers an installment payment option in all of its markets other than Japan, which is available on certain merchandise we sell. This installment payment option is called "Easy-Pay" at QVC U.S . and in the U.K ., "Q-Pay " in Germany and Italy, and "Flex-Pay" at HSN . QVC 's installment payment option is currently offered on most of its merchandise and for QVC U.S . website and mobile sales, is set as the default payment option on all products on which it is offered. Full payment for merchandise at the time of sale would require the customer to affirmatively change to that option. QVC 's installment payment option, when offered, allows customers to pay for certain merchandise in multiple interest-free monthly installments. When the installment payment option is offered by QVC U.S . and QVC International and elected by the customer (or if the customer inadvertently purchases merchandise using the installment payment option because it was the default payment option), the first installment is typically billed to the customer's credit or debit card upon shipment. Generally, the customer's credit or debit card is subsequently billed in additional monthly installments until the total purchase price of the products has been billed. We cannot predict whether customers will pay their installments when due or at all, regardless of whether the customer would have preferred to pay in one lump-sum but did not opt out of the installment payment option. Accordingly, we maintain an allowance for customer credit losses arising from these late and unpaid installments. This provision for customer credit loss is provided as a percentage of accounts receivable based on QVC 's historical experience in the period of sale and is included within selling, general and administrative expense ("SG&A " ). To the extent that customers elect installment payment options at greater rates, or to the extent the number of customers failing to opt out of the default installment payment option increases, we would be required to maintain a greater allowance for customer credit loss and to the extent that installment payment option losses exceed historical levels, our results of operations may be negatively impacted.

Most major retailers either directly or through third parties offer some form of Buy Now Pay Later ("BNPL " ) financing arrangements, typically through a digital user account, which allow the customer to access credit on a repeated basis. Previously, in the U.S ., the Consumer Financial Protection Bureau (the "CFPB " ) indicated that these BNPL financing arrangements meet the criteria for credit card providers under the Truth in Lending Act ("TILA " ). However, QVC and HSN do not utilize digital user accounts for either Easy Pay or FlexPay, and therefore have taken the position that CFPB 's interpretive rule does not apply to our practices. In addition, in 2025, the CFPB announced that it would not prioritize enforcement actions taken on the basis of these BNPL financing arrangements, and is contemplating appropriate actions to rescind this interpretive rule. Easy Pay and FlexPay are available to any qualified consumer who is purchasing from QVC and HSN , with or without a QVC or HSN customer account, and offered on a one-time basis that does not enable a consumer to access future credit. Although we believe this most recent guidance, so long as it remains in effect, does not impact our practices in the U.S ., we cannot predict future scrutiny by the CFPB or by regulators in non-U.S .

jurisdictions or changes to existing laws and regulations or their interpretation, or the adoption of new laws or regulations, which could require mandatory changes to our installment payment options in any of the markets in which we operate. Implementing these changes may increase our costs to maintain our installment payment options and may make our installment payment options less desirable to our customers which could lead to a decline in sales; additionally, failure to comply with these laws and regulations could result in the imposition of fines and penalties, any of which could have an adverse effect on our results of operations.

In addition, QxH has agreements with a large consumer financial institution (the "Bank") pursuant to which the Bank provides revolving credit directly to U.S. customers for the sole purpose of purchasing merchandise from QVC with a private label credit card (for QVC U.S. the "Q Card" and for HSN the "HSN Credit Card"). We cannot predict the extent to which QVC's customers will use the Q Card or the HSN Credit Card, nor the extent that they will make payments on their outstanding balances, especially during periods of high economic uncertainty or in response to inflationary pressures. As QxH receives a portion of the net economics from the credit card program, the ability of customers to make payments on their outstanding balances due to circumstances related to economic uncertainty or inflationary pressures could result in reduced private label credit card income to QxH from the Bank. Additionally, future legislation, executive orders or regulatory actions by the CFPB, FTC or other federal or state regulators may limit credit card interest rates or penalty fees, which could also result in reduced private label credit card income to QxH from the Bank.

*Increases in labor costs could adversely affect our business, financial condition and results of operations* Labor is a significant portion of our cost structure and is subject to many external factors, including unemployment levels, prevailing wage rates, minimum wage laws, exempt status salary statutory thresholds, potential collective bargaining arrangements, general inflationary pressures, health and other insurance costs and changes in employment and labor legislation or other workplace regulation. From time to time, legislative proposals are made to increase federal, state and local minimum wage rates, to limit exemptions from federal and state minimum wage laws for white collar jobs, and to create or extend benefit programs, such as health insurance and paid sick and other leave programs. As minimum wage rates increase or related laws and regulations change, or as labor market demand increases, we may need to increase the wages paid to our hourly or salaried employees. Any increase in the cost of our labor could have an adverse effect on our business, financial condition and results of operations or, if we fail to pay such higher wages we could suffer increased employee turnover. In addition, increases in labor costs could force us to increase prices, which could adversely impact our sales. If competitive pressures or other factors prevent us from offsetting increased labor costs by increases in prices, our profits may decline and could have a material adverse effect on our business.

Additionally, any increase in the cost of labor for our third party carriers and suppliers could increase our cost of shipping and materials, which may adversely affect our ability to increase or maintain our revenue.

*Natural disasters, political crises, and other catastrophic events or other events outside of our control, including climate risk, may damage our facilities or the facilities of third parties on which we depend, adversely affect our ability to operate our businesses and have broader effects*. Our corporate headquarters and operations center are located in West Chester, Pennsylvania, and we also operate country headquarters and administrative offices, distribution centers and contact centers worldwide. If any of these facilities or the facilities of our businesses' vendors or third-party service providers are affected by natural disasters (such as fires, earthquakes, hurricanes, tsunamis, power shortages or outages, floods or monsoons), public health crises, political crises (such as terrorism, war, geopolitical tension, political instability, insurrections or other conflict), or other events outside of our businesses' control, including climate risk, our businesses, financial condition and results of operations could be materially adversely affected. Although our businesses maintain property, general liability and business interruption insurance coverage, it may not be applicable to, or sufficient to cover, all claims, costs, and damages. In December 2021, QVC experienced a fire at its Rocky Mount fulfillment center in North Carolina, during which one contractor lost his life. Rocky Mount was QVC's second-largest fulfillment center processing 25% to 30% of volume for QVC U.S. and also served as QVC U.S.'s primary returns center for hard goods. Inbound deliveries and customer returns that were previously sent to the Rocky Mount facility are now routed through other distribution facilities within QVC's distribution network and to third-party logistic service providers.

Climate risk may also have indirect effects on our businesses by increasing the cost of, or making unavailable, property insurance on terms we find acceptable. To the extent that significant changes in the climate occur in areas where our properties are located, we may experience more frequent extreme weather events, which may result in physical damage to our or our third parties' facilities and may adversely affect our businesses, results of operations and financial condition.

The COVID-19 pandemic resulted in significant disruption to the global economy, including to our capital and liquidity, decreases in the disposable income of existing and potential new customers, heightened inflation, increased

I-32

currency volatility resulting in adverse currency rate fluctuations and higher interest rates, and negatively impacted us and our operations, including as a result of a range of negative effects on our supply chain due to factory closures, shipping and trucking delays and labor shortages, as well as product shortages, which resulted in material negative impacts to our financial results.

In addition, any of these events occurring at our or our businesses' vendors' facilities also could impact its businesses' reputations and their customers' perception of the products they sell, and adversely affect our business, financial condition and results of operations. Moreover, these types of events could have broader effects causing macro-level issues in the areas where its businesses operate. For example these types of events could negatively impact consumer spending in the impacted regions or depending upon the severity, globally, which could adversely impact its business, financial condition and results of operations.

*Impairment of our goodwill or other intangible assets could have a material adverse effect on our business, results of operations and financial condition.* From time to time we review the recoverability of goodwill and other certain identifiable intangible assets, including whenever events or circumstances indicate that the carrying value of a reporting unit, including goodwill or an identifiable intangible asset, may not be recoverable. We may incur impairment charges on goodwill or identifiable intangible assets if we determine that the fair values of a reporting unit, including goodwill or identifiable intangible assets, are less than their current carrying values. We evaluate, on a regular basis, whether events or circumstances have occurred that indicate all, or a portion, of the carrying amount of goodwill may no longer be recoverable, in which case an impairment charge to earnings would become necessary.

For example, for the year ended December 31, 2025, the Company identified impairments for the QxH reporting unit, including goodwill and the QVC and HSN tradenames, and the CBI reporting unit's goodwill. As previously reported in the year ended December 31, 2024, we recorded an impairment for the QxH reporting unit including goodwill and the QVC and HSN tradenames. As previously reported during the year ended December 31, 2023, we recorded an impairment for the QxH reporting unit related to goodwill.

Additionally, recent business trends and global economic conditions may continue to make it a challenge for our reporting units to be able to realize their current long-term forecast. The Company will continue to monitor its reporting units' current business performance versus the current and updated long-term forecasts, among other relevant considerations, to determine if the carrying value of its assets (including goodwill and tradenames) is appropriate. Future outlook declines in revenue, cash flows, or other factors could result in a sustained decrease in fair value that may result in a determination that carrying value adjustments are required, which could be material, and we could be required to record additional impairment charges on our goodwill or other identifiable intangible assets in the future, which could result in reductions to stockholders' equity and material non-cash charges to our earnings and may negatively impact our stock price and financial condition.

**Risks Related to Technology and Information Security**

*Any continued or permanent inability to transmit our programming via satellite would result in lost revenue and could result in lost customers.* We continue to utilize geo-stationary orbital satellites for the transmission of our television programming signals to our video programming distributors which rely upon satellite earth stations for their operations. Our success is dependent upon our continued ability to transmit our television programming signals to video programming service providers from our satellite uplink facilities, and for our distributors to continue to receive our programming at their satellite earth station downlink facilities. These transmissions are subject to FCC regulation and compliance with U.S . and foreign regulatory requirements in our international operations. In most cases, QVC has entered into long-term satellite transponder leases to provide for continued carriage of its programming on replacement transponders and/or replacement satellites, as applicable, in the event of a failure of either the transponders and/or satellites currently carrying its programming. Although we believe that we take reasonable and customary measures to ensure continued satellite transmission capability and that these international transponder service agreements can be renewed (or replaced, if necessary) in the ordinary course of business, termination or interruption of satellite transmissions may occur, particularly if we are not able to successfully negotiate renewals or replacements of any of our expiring transponder service agreements in the future.

In order to free up additional spectrum for the provision of next generation commercial wireless broadband services, commonly referred to as 5G and 6G, and other new and emerging terrestrial purposes, the FCC has commenced and is in the process of completing, a rulemaking proceeding that is expected to reallocate for 5G and 6G and other terrestrial purposes 100 MHz (and up to 180 MHz) in the 3.98 to 4.2 GHz ("Upper C-Band " ) spectrum, which is currently

I-33

used for the delivery of our programming to the satellite earth stations of certain of our distributors. Our commercial agreements with satellite operators to host satellite operations and deliver programing provide for full C-Band coverage during the term of the agreement. However, depending on the reallocation parameters adopted by the FCC , there could be an impact on our ability to deliver programming to our distributors without interruption and in a cost-effective manner.

**Our e-commerce businesses could be negatively affected by changes in third-party digital platform algorithms and dynamics as well as their inability to monetize the resulting web traffic.** The success of our e-commerce business and our online marketing efforts depends on a high degree of website traffic, which is dependent on many factors, including the availability of appealing website content, user loyalty and new user generation from various digital marketing channels that charge a fee. Third-party digital platforms, such as Google and Facebook, frequently update and change the logic that determines the placement and display of results of a user's search, or advertiser content, such that the purchased or algorithmic placement of advertisements or links to the websites of our e-commerce business can be negatively affected. If a major search engine or third-party digital platform changes its algorithms in a manner that negatively affects our paid advertisement distribution or unpaid search ranking, the business and financial performance of our e-commerce business would be adversely affected, potentially to a material extent. Additionally, mobile application distribution platforms, such as Apple's App Store and the Amazon Appstore for Android, may require that third party digital platforms and e-commerce companies present users with an option where the user chooses to opt-in or opt-out of tracking technology used by these third party digital platforms or included in mobile applications. To the extent that users opt-out of tracking technology used by third party digital platforms on which we advertise or users of our applications opt-out of tracking technology included in our applications, our ability to monitor and improve customer experience and track the effectiveness of our digital marketing strategies would be adversely impacted. Furthermore, our failure to successfully manage our digital marketing strategies could result in a substantial decrease in traffic to our website, as well as increase costs if we were to replace free traffic with paid traffic. Even if our e-commerce business is successful in generating a high level of website traffic, no assurance can be given that our e-commerce business will be successful in achieving repeat user loyalty or that new visitors will explore the offerings on our site. Monetizing this traffic by converting users to consumers is dependent on many factors, including availability of inventory, consumer preferences, price, ease of use and website quality. Globally, the cost of digital marketing has increased significantly and no assurance can be given that the fees we pay to third-party digital platforms will not exceed the revenue generated by our visitors. The increasing costs of digital marketing may require that we find more cost-effective ways of reaching and retaining consumers, such as through the use of social media and influencers, which may not be as effective as the current methods of digital marketing. Any failure to sustain user traffic or to monetize such traffic could materially adversely affect the financial performance of our e-commerce business and, as a result, adversely affect our financial results.

**Our e-commerce business may experience difficulty in the ongoing development, implementation and customer acceptance of applications for personal electronic devices, which could harm our business.** Although our e-commerce business has developed services and applications to address user and consumer interaction with website content on personal electronic devices, such as smartphones and tablets, the ways in which consumers use or rely on these personal electronic devices is continually changing. If the services or applications we develop in response to changes in consumer behavior are defective, unstable or viewed as ineffective by consumers, our e-commerce business may experience difficulty attracting and retaining traffic on these platforms. Any failure to attract and retain traffic on these personal electronic devices could materially adversely affect the financial performance of our e-commerce business and, as a result, adversely affect our financial results. Additionally, as new devices and new platforms are continually being released, it is difficult to predict the challenges that may be encountered in developing versions of our e-commerce business offering for use on these alternative devices, and our e-commerce business may need to devote significant resources to the creation, support, and maintenance of their services on such devices.

**Our businesses and information systems are subject to cybersecurity risks, including cybersecurity threats and cybersecurity incidents.** Through our operations, sales, marketing activities, and use of third-party information, we collect and store certain non-public personal information that customers provide to purchase products, enroll in promotional programs, register on websites, or otherwise communicate with us. This may include demographic information, phone numbers, driver license numbers, contact preferences, personal information stored on electronic devices, and payment information, including credit and debit card data. We also gather and retain information about employees and job applications in the normal course of business. We may share information about such persons with vendors, contractors and other third-parties that assist with certain aspects of our business. In addition, our online operations depend upon the transmission of confidential information over the internet, such as information permitting cashless payments. Like many e-commerce companies, we frequently encounter unauthorized parties attempting to gain access to our or our vendors' information systems by, among other things, hacking those systems, through fraud or other means of deceiving our employees or vendors, or burglaries. We also face cybersecurity risks from errors by our or our vendors' employees,

I-34

misappropriation of data by employees, vendors or unaffiliated third-parties, or other irregularities that may result in disruption of services or persons obtaining unauthorized access to our company's data. For example, third party service providers, such as telecommunications and cloud services providers, have been subject to increasing cyberattacks from state-sponsored threat actors that could materially impact our information systems and operations. Additionally, as a result of the increased number of employees working on a hybrid schedule, we and our partners may be more vulnerable to cybersecurity incidents and attacks and other security threats, including attempts by certain persons to obtain employment using falsified identities with our company or with third parties who provide goods and services to our company. The techniques used to gain access to our or our vendors' computer systems, data or customer information, disable or degrade service, or sabotage systems are constantly evolving and continue to become more sophisticated and targeted, may be difficult to detect quickly, and often are not recognized until launched against a target. Further, the use of AI and machine learning by cybercriminals may increase the frequency and severity of cybersecurity attacks against us or our suppliers, vendors and other service providers.

Increasingly, unauthorized parties are exploiting access they gain to third party vendors to target companies that do business with these vendors, which may include third party vendors with whom we do business. We have implemented measures and processes intended to secure our computer systems and prevent disruptions in services or unauthorized access to or loss of sensitive data, but as with all companies, these security measures may not be sufficient for all eventualities and there is no guarantee that they will be adequate to safeguard against all cybersecurity threats or cybersecurity incidents, information system compromises or misuses of data. Although we have not detected a material security breach or other cybersecurity incident to date, we have been the target of events of this nature and expect to be subject to similar attacks in the future. Any disruptions of our information systems or misappropriation or misuse of customer, employee or other personal information, whether at our company or any of our vendors, could cause interruptions in the operations of our business and subject us to increased costs, fines, litigation, regulatory actions and other liabilities. Security breaches and other cybersecurity incidents could also significantly damage our reputation with consumers and third parties with whom we do business, which could result in lost sales and customer and vendor attrition. We continue to invest in new and emerging technology and other solutions to protect our retail commerce websites, mobile commerce applications and information systems, but there can be no assurance that these investments and solutions will prevent any of the risks described above. If we are unable to maintain the security of our retail commerce websites and mobile commerce applications, we could suffer loss of sales, reductions in traffic, damage to our reputation, loss of consumer confidence, diversion of management attention, and deterioration of our competitive position and incur liability for any damage to customers whose personal information is accessed without authorization or claims, investigation, penalties and fines imposed by governmental regulators. We may be required to expend significant additional capital and other resources to protect against and remedy any potential or existing security breaches and their consequences, such as additional infrastructure capacity spending to mitigate any system degradation and the reallocation of resources from development activities. We also face similar risks associated with security breaches and other cybersecurity incidents affecting third parties with which we are affiliated or otherwise conduct business.

***System interruption and the lack of integration and redundancy in the systems and infrastructures of our subsidiary QVC and our other online commerce and catalog businesses may adversely affect our ability to, as applicable, operate our businesses, transmit our television programs, operate websites, process and fulfill transactions, respond to customer inquiries and generally maintain cost-efficient operations.*** Our success depends, in part, on our ability to maintain the integrity of our transmissions, systems and infrastructures, including the transmission of our television programs, as well as our websites, information and related systems, contact centers and fulfillment facilities. We may experience occasional system interruptions that make some or all transmissions, systems or data unavailable or prevent us from transmitting our signal or efficiently providing services or fulfilling orders. We rely on legacy systems that are often difficult to update and maintain. As a result, we maintain an ongoing process of implementing new technology systems and upgrading others. Our failure to properly implement new systems or delays in implementing new systems or failing to integrate new systems with our legacy systems could impair our ability to provide services, fulfill orders and/or process transactions. We also rely on affiliate and third-party computer systems, broadband, transmission and other communications systems and service providers in connection with the transmission of our signals, as well as to facilitate, process and fulfill transactions. Such service providers, including telecommunications and cloud services providers, have been subject to increasing cyberattacks from state-sponsored threat actors that could materially impact our information systems and operations. Any interruptions, outages or delays in our signal transmissions, systems and infrastructures, our business, our affiliates and/or third parties, or deterioration in the performance of these transmissions, systems and infrastructures, could impair our ability to provide services, fulfill orders and/or process transactions. Fire, flood, power loss, telecommunications failure, hurricanes, tornadoes, earthquakes, public health crises (such as pandemics and epidemics), acts of war or terrorism, geopolitical tension, acts of God and similar events or disruptions may damage or interrupt television transmissions, computer, broadband or other communications systems and infrastructures at any time.

I-35

Any of these events could cause transmission or system interruption, delays and loss of critical data, and could prevent us from providing services, fulfilling orders and/or processing transactions. While we have backup systems for many aspects of our operations, our systems are not fully redundant and disaster recovery planning is not sufficient for all possible scenarios. In addition, we may not have adequate insurance coverage to compensate for losses from a major interruption.

*The processing, storage, sharing, use, disclosure and protection of personal data could give rise to liabilities as a result of governmental regulation, conflicting legal requirements and policies or differing views of personal privacy rights.* In the processing of consumer transactions and managing our employees, our business receives, transmits and stores a large volume of personal identifiable information and other user data. The processing, storage, sharing, use, disclosure and protection of this information are governed by the privacy and data security policies maintained by us. Moreover, there are federal, state and international laws regarding privacy and the processing, storage, sharing, use, disclosure and protection of personal identifiable information and user data. Specifically, personal identifiable information is increasingly subject to changing legislation and regulations, in numerous jurisdictions around the world, which are intended to protect the privacy of personal information that is collected, processed and transmitted in or from the governing jurisdiction. Compliance with these laws and regulations may be onerous and expensive and may be inconsistent from jurisdiction to jurisdiction, further increasing the cost of compliance. For example, the European Court of Justice in 2015 invalidated the U.S.-EU Safe Harbor Framework, which facilitated personal data transfers to the U.S. in compliance with applicable European data protection laws. The E.U.-U.S. Privacy Shield, which replaced the U.S.-EU Safe Harbor Framework, and became fully operational in 2016, provided a mechanism to comply with data protection requirements when transferring personal data from the E.U. to the U.S. On July 16, 2020, the Court of Justice of the European Union invalidated the E.U.-U.S. Privacy Shield, and imposed new obligations on the use of SCCs - another key mechanism to allow data transfers between the U.S. and the E.U.

The European Commission adopted revised SCCs on June 4, 2021. In March 2022, the U.S. and the European Commission announced a new DPF to replace the E.U.-U.S. Privacy Shield. On December 13, 2022, the European Commission issued an adequacy decision initiating the formal adoption process for the DPF and the E.U. formally adopted the adequacy decision on July 10, 2023. The U.S. and the E.U. implemented the DPF in July 2023. Further, the GDPR, which became effective in 2018, gives consumers in the E.U. additional rights and imposes additional restrictions and penalties on companies for illegal collection and misuse of personal information. The E.U.'s proposed ePrivacy Regulation, which, among other things, would have adopted additional regulation of "cookies" and other internet tracking tools, was withdrawn in 2025. The E.U. has proposed the E.U. Digital Simplification Package, referred to as the "Digital Omnibus," to consolidate and streamline the E.U.'s digital regulations. Following the U.K.'s withdrawal from the E.U. ("Brexit"), on June 28, 2021, the European Commission determined that the U.K.'s data protection laws essentially are equivalent to data protection laws in the European Economic Area. As a result, personal data transfers from the E.U. to the U.K. may continue without a new data transfer framework.

California has enacted the CCPA, which, among other things, allows California consumers to request that certain companies disclose the types of personal information collected by such companies. The CCPA became effective on January 1, 2020. The California Attorney General has issued draft implementing regulations and guidance regarding the CCPA and undertook enforcement actions in 2024 regarding violations of the law. In November 2020, California voters approved the CPRA, which amends and expands the CCPA and establishes the California Privacy Protection Agency ("CPPA") to implement and enforce consumer privacy laws. Regulations under the CPRA became effective in February 2024. The CPPA also finalized new regulations in September 2025 that will require certain companies to conduct annual cybersecurity audits; these audits are due starting April 1, 2028, April 1, 2029 and April 1, 2030 depending on the revenues and amount of personal information collected by the business. In addition, starting January 1, 2026, covered businesses must conduct risk assessments involving certain kinds of processing that pose a significant risk to consumers and set up notice and opt-out and access procedures for the use of automated decision-making technology in connection with certain kinds of significant decisions involving consumers. In 2025, the FTC amended regulations promulgated under COPPA to further regulate the use and disclosure of children's personal information from websites. These proposed new requirements could increase our costs of compliance and impact our operations and the products and services we offer.

Since the enactment of the CCPA, a substantial minority of additional states have enacted comprehensive privacy legislation, and other states continue to consider adopting such comprehensive privacy legislation. In addition to broad consumer privacy laws, states are enacting and may continue to enact sectoral-specific privacy laws focused on health data, data about people under the age of 18, biometric data, the use of algorithms by organizations, and other matters. In addition to the increasing adoption of privacy laws by governments, other platforms where we operate (including social media platforms) may have separate policies that limit our use of personal information that we collect through our operations on

I-36

such platforms, either now or in the future. Private litigants are also using federal and state laws to pursue litigation related to the use of personal data, video content, chat tools and other communication tools, and trackers commonly used by organizations in the operation of consumer-facing websites and applications. Our failure, and/or the failure by the various third party vendors and service providers with which we do business, to comply with applicable privacy policies or federal, state or similar international laws and regulations, or changes in applicable laws and regulations, or changes in the policies of third party platforms where we conduct business, or any compromise of security that results in the unauthorized release of personal identifiable information or other user data could damage our reputation and the reputation of our third party vendors and service providers, discourage potential users from trying our products and services and/or result in fines and/or proceedings by governmental agencies and/or consumers and/or result in limits on our use of personal information we use in the operation of our business, any one or all of which could adversely affect our business, financial condition and results of operations. In addition, we may not have adequate insurance coverage to compensate for losses.

*Our integration and use, or the use by our competitors, of artificial intelligence and similar technology may pose risks and present challenges to our business, reputation, and results of operations.* We are beginning to integrate and use AI and similar technology in our business, including to collect and analyze data and in customer-facing interactions, and we may use other AI tools in additional aspects of our business in the future. Our use of AI technology may present challenges and risks to our business. Such risks may include new data privacy and security risks related to how AI tools collect and use customer data; new compliance burdens as a result of developing AI-related regulation; additional costs of implementation and employee training; financial risks due to errors by AI tools; legal liability and reputational risks related to ethical concerns and biases of AI tools. As competitors increasingly use AI to operate faster, more efficiently, or more creatively, we may find it difficult to keep pace, which would put us at a disadvantage compared to our competitors. Given the complex nature of AI, the evolving regulatory landscape regarding such technology, and the various ethical concerns surrounding AI tools, our use of AI may pose unforeseen challenges and unintended consequences, which could threaten our financial outcomes, reputation, and business.

## Risks Related to Economic Conditions

*Our businesses may be materially adversely affected by the imposition of duties and tariffs and other trade barriers and retaliatory countermeasures implemented by the U.S. and other countries.* There have been significant changes to U.S. trade policies, treaties and tariffs, including, but not limited to, trade policies, treaties and tariffs affecting products from outside of the U.S. since early 2025 and continuing into 2026. For example, in early 2025, the U.S. government announced a baseline tariff of 10% on products from all countries and placed additional significant tariffs on certain goods imported from China. In May 2025, the U.S. government imposed incremental tariffs of 30% on most goods imported from China, from which we source a significant portion of our products, subject to certain exceptions. Since August 2025, higher reciprocal tariff rates for many U.S. trading partners, including countries such as Japan, Turkey, Indonesia and India, have been imposed pursuant to additional executive orders modifying the reciprocal tariff rates for certain countries. In February 2026, the U.S. Supreme Court struck down the sweeping tariffs that the U.S. government had imposed through the executive orders issued pursuant to the International Emergency Economic Powers Act ("IEEPA"). Shortly thereafter, the U.S. government issued a series of orders to comply with the ruling, while also announcing new temporary tariffs for a 150 day period beginning February 24, 2026. Tariffs and international trade arrangements will continue to change, potentially without warning and to an extent or duration that is difficult to predict. The full impact of recent and future governmental actions on macroeconomic conditions makes our business difficult to predict and depends on a number of factors, including the extent and duration of tariffs, any reversal or temporary suspension of announced tariffs (including the recent invalidation of the previously implemented IEEPA tariffs and any related refunds which may become available), the availability of exemptions, changes in the amount and scope of tariffs, the imposition of new tariffs and other measures that target countries may take in response to U.S. trade policies, the result of legal and other challenges on the tariffs, and possible resulting general inflationary pressures in the global economy, as well as the availability and cost of alternative sources of supply for merchandise. As a result of existing and any new or additional tariffs, the cost of merchandise is expected to increase, including as a result of finding new sources of supply for merchandise, which may be at less favorable pricing than our current sources of supply. We have begun to implement price adjustments in certain circumstances and we may seek in the future to increase prices at which other products are offered to our customers in order to maintain our margins, which may diminish demand for the products sold by our businesses. Our businesses' ability to satisfy customer demand for products may be negatively impacted if we decide to hold shipments of inventory while we determine the impacts of the tariffs on our businesses, if we choose to cease carrying merchandise or if we need to source merchandise from alternative suppliers who may not be of comparable quality as our existing suppliers, or if we need to change the timing of planned promotions or the roll-out of new products. Although we have developed and implemented strategies to mitigate previously implemented and, in some cases, proposed tariff increases, there is no assurance we will be able to continue to mitigate prolonged tariffs.

I-37

The imposition of tariffs has resulted in increased market volatility, and exacerbated existing inflationary cost pressures and recessionary fears, which could further negatively impact discretionary spending by our customers. As a result of these dynamics, any future changes to the U.S .'s or other countries' trade relationships or the impact of new tariffs, laws or regulations adopted by the U.S . or other countries could have a material adverse effect on our sales and results of operations.

***Significant developments stemming from U.S . and international trade policy with China, including in response to tariffs, as well as forced labor and human rights abuses in China, may adversely impact our businesses and operating results.*** There is currently significant uncertainty about the future relationship between the U.S . and China with respect to tariffs and trade policies. The U.S . government has placed significant tariffs on certain goods imported from China and may impose new tariffs on goods imported from China. In retaliation, China has responded by imposing tariffs on a wide range of products imported from the U.S . Although the U.S . and China have agreed to reduce tariffs on most Chinese goods from the peak tariffs of April 2025, negotiations remain ongoing and we cannot predict what actions may ultimately be taken with respect to tariffs or trade relations between the U.S . and China, what products may ultimately be subject to tariffs or what additional actions may be taken by either country if trade relations worsen. The imposition of any new or additional U.S . tariffs on Chinese imports or the taking of other actions against China in the future, and any responses by China, could impair our businesses' ability to meet customer demand, resulting in lost sales, cause delays in producing merchandise as our business explore alternative manufacturing sources or suppliers or increase our businesses' cost of merchandise, which would have a material adverse impact on our business and results of operations. The imposition of new or additional tariffs or increases in tariffs could also adversely affect our business and results of operations because we sell imported products, and the cost of our businesses' merchandise would likely increase.

There have been heightened tensions in relations between Western nations and China. For example, on December 23, 2021, the Uyghur Forced Labor Prevention Act (the "UFLPA " ) was signed into law, which is intended to address the use of forced labor in China's Xinjiang Uyghur Autonomous Region ("XUAR " ). Among other things, the UFLPA imposes a presumptive ban on the import of goods to the U.S . that are made, wholly or in part, in the XUAR or by persons that participate in certain programs in the XUAR that entail the use of forced labor. The Forced Labor Enforcement Task Force ("FLETF " ) maintains a UFLPA Entity List to identify entities subject to the UFLPA 's rebuttable presumptive ban as well. As of January 15, 2025, the total number of listed entities is 144. The UFLPA took effect on June 21, 2022, and may increase the risk of delay of goods, inventory shortages and lost sales. Before enactment of the UFLPA , the U.S . Customs and Border Protection ("CBP " ) issued a region-wide withhold release order ("WRO " ), effective January 13, 2021, pursuant to which the CBP will detain cotton products produced in the XUAR . The WRO applies to, among other things, cotton grown in the XUAR and to all products made in whole or in part using such cotton, regardless of where the downstream products are produced, and importers are responsible for ensuring the products they are attempting to import do not exploit forced labor at any point in their supply chain, including the production or harvesting of the raw material. Enforcement of the WRO has been superseded by the UFLPA rebuttable presumption. Additionally, the U.S . Treasury Department placed sanctions on China's Xinjiang Production and Construction Corporation ("XPCC " ) for serious human rights abuses against ethnic minorities in the XUAR . The XUAR is the source of large amounts of cotton and textiles for the global apparel supply chain and XPCC controls many of the cotton farms and much of the textile industry in the region. Although our businesses do not knowingly do business with XPCC , our businesses could be subject to penalties, fines or sanctions if any of the vendors from which they purchase goods is found to have dealings, directly or indirectly with XPCC or entities it controls. Even if our businesses were not subject to penalties, fines or sanctions, if products we source are linked in any way to XPCC , our businesses' reputations could be damaged.

Other countries and jurisdictions have issued or may be considering similar measures. For example, on January 12, 2021, the Foreign Secretary of the U.K . announced a package of measures to help ensure that British organizations, whether public or private sector, are not complicit in, nor profiting from, the human rights violations in XUAR . On September 14, 2022, the European Commission issued its legislative proposal to ban the marketing of goods made with forced labor and the Council of the E.U . formally approved the proposal on November 19, 2024. The new rules, which take effect in December 2027, will apply to both imported goods and goods made in the E.U .

The full potential impact to us of the UFLPA and similar potential legislations in other countries and jurisdictions remains uncertain and could have an adverse effect on our business and results of operations. Our businesses may incur expenses for the review pertaining to these matters and the cost of remediation and other changes to products, processes or sources of supply as a consequence of such verification activities. In the event of a significant disruption or unavailability in the supply of the fabrics or raw materials used by our vendors in the manufacture of our products, our businesses' vendors might not be able to locate alternative suppliers of materials of comparable quality at an acceptable price. In

I-38

addition, prices of purchased finished products also depend on wage rates in the regions where our businesses' vendors' contract manufacturers are located, as well as freight costs from those regions. Fluctuations in wage rates required by legal or industry standards could increase our businesses' costs. Increases in raw material costs or wage rates, unless sufficiently offset by our pricing actions, may cause a decrease in our businesses' profitability and negatively impact our businesses' sales volume.

**We have operations outside of the U.S . that are subject to numerous operational and financial risks.** We have operations in countries other than the U.S . that are subject to the following risks inherent in international operations:

- fluctuations in currency exchange rates;
- longer payment cycles for sales in foreign countries that may increase the uncertainty associated with recoverable accounts;
- recessionary conditions and economic instability may affect overseas markets;
- inflationary pressures, such as those the market is currently experiencing, which have increased, and may in the future increase the costs of the products our businesses sell, as well as the shipping and delivery of these products;
- limited ability to repatriate funds to the U.S . at favorable tax rates;
- potentially adverse tax consequences;
- export and import restrictions, changes in tariffs, trade policies and trade relations;
- disruptions to international shipping and supply chains;
- increases in taxes and governmental royalties and fees;
- the ability to obtain and maintain required licenses or certifications, such as for web services and electronic devices, that enable us to operate our businesses in foreign jurisdictions;
- changes in foreign and U.S . laws, regulations and policies that govern operations of foreign-based companies;
- changes to general consumer protection laws and regulations;
- difficulties in staffing and managing international operations as a result of distance, language and cultural differences; and
- threatened and actual terrorist attacks, political unrest in international markets and ongoing military action around the world that may result in disruptions of service that are critical to QVC 's international businesses.

Additionally, in many foreign countries, particularly in certain developing economies, it is not uncommon to encounter business practices that are prohibited by certain regulations, such as the Foreign Corrupt Practices Act and similar laws. Although we have undertaken compliance efforts with respect to these laws, their respective employees, contractors and agents, as well as those companies to which they outsource certain of their business operations, may take actions in violation of their policies and procedures. Any such violation, even if prohibited by our policies and procedures or the law, could have certain adverse effects. Any failure by us to effectively manage the challenges associated with the international operation of our business could have a material adverse effect.

**Fluctuations in currency exchange rates may lead to lower revenues and earnings.** Sales made by QVC outside the U.S . are denominated in the currency of the country in which its operations are located, and changes in currency exchange rates affect the translation of the sales and earnings of these businesses into U.S . dollars for financial reporting purposes. Because of this, movements in currency exchange rates have had, and are expected to continue to have, a significant impact on QVC 's results from time to time.

Changes in currency exchange rates can also increase the cost of inventory purchases that are denominated in a currency other than the local currency of the business buying the merchandise. When exchange rates change significantly in a short period or move unfavorably over an extended period, it can be difficult for QVC to adjust accordingly, and gross margin can be adversely affected. For example, a significant amount of merchandise QVC offers for sale is made in China and accordingly, a revaluation of Chinese currency, or increased market flexibility in the exchange rate for that currency, increasing its value relative to the U.S . dollar or currencies in which QVC 's operations are located, could be significant.

Fluctuations in currency exchange rates have resulted and may continue to result from a variety of factors, including, but not limited to, market volatility as a result of the current political landscape and, in particular, U.S . policy changes and uncertainty resulting from such changes. We expect that currency exchange rate fluctuations could have a material adverse effect on QVC 's sales and results of operations from time to time.

***Weak and uncertain economic conditions worldwide may reduce consumer demand for our businesses' products and services.*** Prolonged economic weakness and uncertainty in various regions of the world in which we and our subsidiaries and affiliates operate has adversely affected, and could in the future affect, demand for our products and services since a substantial portion of our revenue is derived from discretionary spending by individuals, which typically falls during times of inflation, recession and economic instability. Global financial markets may experience disruptions, including increased volatility and diminished liquidity and credit availability. Economic tensions and changes in international trade policies, including, for example, the recent widespread tariffs announced by the U.S . on its major trading partners, higher tariffs on imported goods and materials, and actions taken in response (such as retaliatory tariffs or other trade protectionist measures or the renegotiation of free trade agreements), have increased inflationary cost pressures and recessionary fears. If economic and financial market conditions in the U.S . or other key markets, including China, Japan and Europe deteriorate, customers of our subsidiaries and business affiliates may respond by suspending, delaying, or reducing their discretionary spending. Any further suspension, delay or reduction in discretionary spending could adversely affect our revenue. Accordingly, our ability to increase or maintain revenue and earnings could be adversely affected to the extent that relevant economic environments decline. We currently are unable to predict the extent of any of these potential adverse effects.

***Uncertainty and increases in market interest rates could increase our operating costs and decrease consumer demand, which may adversely affect our businesses.*** In recent years interest rates have been volatile, rising substantially from 2023 to 2024, then remaining generally stable with slight decreases through 2024 and 2025. Interest rates may rise in the future, and an increase in interest rates could increase our operating costs by increasing the cost of shipping, materials for our products, and/or labor. If competitive pressures or other economic factors prevent us from offsetting such increased costs by raising prices, our ability to increase or maintain revenue may be negatively impacted. In addition, uncertainty or increases in interest rates could reduce consumer confidence, discretionary spending by individuals and adversely affect market demand for our products, which could materially adversely affect our business, financial condition and results of operations.

## Risks Related to Our Businesses' Facilities and Third Party Suppliers and Vendors

***Our programming and online commerce businesses rely on distribution facilities to operate their business, and any damage to one of these facilities, or any disruptions caused by incorporating new facilities into their operations, could have a material adverse impact on our businesses.*** We operate a limited number of distribution facilities worldwide. Our ability to meet the needs of our customers depends on the proper operation of these distribution facilities. If any of these distribution facilities were to shut down or otherwise become inoperable or inaccessible for any reason, we could suffer a substantial loss of inventory and disruptions of deliveries to our customers. For example, a future pandemic or epidemic, in the areas where our distribution facilities are located, or if we are unable to adequately staff our distribution facilities to meet demand in the future, or if the cost of such staffing is higher than historical or projected costs due to wage increases, labor shortages, regulatory changes, or other factors, could harm our operating results. In addition, we could incur significantly higher costs and longer lead times associated with the distribution of our products during the time it takes to reopen or replace the impacted facility. Any of the foregoing factors could result in decreased sales and have a material adverse effect on our business, financial condition and operating results. In addition, we have been implementing new warehouse management systems to further support our efforts to operate with increased efficiency and flexibility. There are risks inherent in operating in new distribution environments and implementing new warehouse management systems, including operational difficulties that may arise with such transitions. We may experience shipping delays should there be any disruptions in our new warehouse management systems or warehouses themselves.

In December 2021, our then-second largest distribution facility located in Rocky Mount, North Carolina suffered significant fire damage, which caused us to route inbound deliveries and customer returns through other distribution facilities within the Company 's distribution network and, to a lesser extent, third party logistic service providers. If a similar event were to occur at another distribution facility, future disruptions or delays as a result of shifting capacity or failing to maintain arrangements with our third party logistic service providers could cause disruptions to our order fulfillment process, causing delays in delivering product to customers which would result in lost sales, strain our relationships with customers, and cause harm to our reputation, any of which could have a material adverse impact on our business, financial condition and operating results.

***We rely on independent shipping companies to deliver the products we sell. We rely on third party carriers to deliver merchandise from vendors and manufacturers to them and to ship merchandise to their customers.*** As a result, we are subject to carrier disruptions and delays due to factors that are beyond our control, including employee strikes, labor shortages, inclement weather and regulation and enforcement actions by customs agencies. For example, as a result of

COVID-19 many consumers significantly increased their use of e-commerce which resulted in a significant increase in the volume of packages handled by third-party carriers, including those we rely on, which result in delayed merchandise and cause our customers to experience delays in their order delivery. Any failure to deliver products to our customers in a timely and accurate manner may damage our reputation and brand and could cause us to lose customers. Enforcement actions by customs agencies can also cause the costs of imported goods to increase, negatively affecting profits.

We are also impacted by increases in shipping rates charged by third party carriers, which over the past few years have increased significantly in comparison to historical levels. We currently expect that shipping and postal rates will continue to increase. In the case of deliveries to customers, in each market where we operate, we have negotiated agreements with one or more independent, third party shipping companies, which in certain circumstances provide for favorable shipping rates. If any of these relationships were to terminate or if a shipping company is unable to fulfill its obligations under its contract for any reason, we would have to work with other shipping companies to deliver merchandise to customers, which would most likely be at less favorable rates. Other potential adverse consequences of changing carriers include delays in order processing and product delivery, and reduced shipment quality, which may result in damaged products and customer dissatisfaction. Additionally, as a result of recent acts of violence against commercial container ships in the Red Sea, our carriers have experienced longer shipping times and increased freight costs. Although these disruptions have not yet had a material impact on our business, our carriers may experience further delays or rescheduled deliveries or further increases in freight costs, which would adversely impact our business. Any increase in shipping rates and related fuel and other surcharges passed on to us by our current carriers or any other shipping company would adversely impact profits, given that we may not be able to pass these increased costs directly to customers or offset them by increasing prices without a detrimental effect on customer demand.

*We depend on relationships with third party suppliers and any adverse changes in these relationships could result in a failure to meet customer expectations which could result in lost revenue.* We purchase merchandise from a wide variety of third party vendors, manufacturers and other sources pursuant to short- and long-term contracts and purchase orders. Our ability to identify and establish relationships with these parties, as well as to access quality merchandise in a timely and efficient manner on acceptable terms and cost, can be challenging. In particular, we purchase a significant amount of merchandise from vendors and manufacturers abroad and cannot predict whether the costs for goods sourced in these markets will remain stable. We depend on the ability of vendors and manufacturers in the U.S . and abroad to produce and deliver goods that meet applicable quality standards, which is impacted by a number of factors, some of which are not within the control of these parties, such as political or financial instability, trade restrictions, tariffs, currency exchange rates and transport capacity and costs, among others.

Our failure to identify new vendors and manufacturers, maintain relationships with a significant number of existing vendors and manufacturers and/or access quality merchandise in a timely and efficient manner could cause us to miss customer delivery dates or delay scheduled promotions, which would result in lost sales or the failure to meet customer expectations and could cause customers to cancel orders or cause us to be unable to source merchandise in sufficient quantities, which could result in lost revenue.

*The unanticipated loss of certain larger vendors or the consolidation of our vendors could negatively impact our sales and profitability on a short term basis.* It is possible that one or more of our larger vendors could experience financial difficulties, including bankruptcy, or otherwise could elect to cease doing business with our businesses. While we have periodically experienced the loss of a major vendor, if multiple major vendors ceased doing business with us, or did not perform consistently with past practice, this could have a material adverse impact on our business, financial condition and operating results. Further, there has been a trend among our vendors towards consolidation in recent years that may continue. This consolidation could exacerbate the foregoing risks and increase these vendors' bargaining power and their ability to demand terms that are less favorable to us.

## Risks Related to the Seasonality of Our Business

*We face significant inventory risk as a result of seasonality, new product launches, rapid changes in product cycles and pricing, defective merchandise, changes in consumer demand, consumer spending patterns, changes in consumer tastes with respect to our products, spoilage and other factors*. We are exposed to significant inventory risks that may adversely affect our operating results as a result of seasonality, new product launches, rapid changes in product cycles and pricing, defective merchandise, changes in consumer demand, consumer spending patterns, changes in consumer tastes with respect to our products, spoilage, and other factors. We endeavor to accurately predict these trends and avoid overstocking or understocking products we sell. Demand for products, however, can change significantly between the time inventory or components are ordered and the date of sale. In addition, when we begin selling a new

I-41

Table of Contents

Case 26-24041 Document 715-1 Filed in TXSB on 07/16/26 Page 203 of 679
Case 26-24041 Document 15 Filed Page EX203 on Date Filed: 07/30/2026 129

product, it may be difficult to establish vendor relationships, determine appropriate product or component selection, and accurately forecast demand. The acquisition of certain types of inventory or components may require significant lead-time and prepayment and they may not be returnable. We carry a broad selection and significant inventory levels of certain products, such as consumer electronics, and at times we may be unable to sell products in sufficient quantities or to meet demand during the relevant selling seasons. Any one of the inventory risk factors set forth above may adversely affect our operating results.

*The seasonality of certain of our businesses places increased strain on our operations.* The net revenue of our home television and online commerce businesses in recent years indicates that these businesses are seasonal due to a higher volume of sales in certain months or calendar quarters or related to particular holiday shopping. For example, in recent years, QVC has earned, on average, between 23% and 24% of its revenue in each of the first three quarters of the year and between 29% and 30% of its revenue in the fourth quarter of the year. Similarly, our subsidiary CBI experiences higher sales volume during the second and fourth quarters of the year. If the vendors for these businesses are not able to provide popular products in sufficient amounts (for example, due to the loss of inventory, illness or absenteeism of our businesses' or our businesses' vendors' workforces, impaired financial conditions, public health crises (such as pandemics and epidemics) or other reasons) such that these businesses fail to meet customer demand, it could significantly affect our revenue and future growth. If too many customers access the websites of these businesses within a short period of time due to increased demand, our businesses may experience system interruptions that make our websites unavailable or prevent them from efficiently fulfilling orders, which may reduce the volume of goods they offer or sell and the attractiveness of our products and services. In addition, we may be unable to adequately staff our fulfillment networks and customer service centers during these peak periods and delivery and other third party shipping (or carrier) companies may be unable to meet the seasonal demand. Risks described elsewhere in this Item 1A relating to fulfillment network optimization and inventory are magnified during periods of high demand.

To the extent these businesses pay for holiday merchandise in advance of certain holidays (e.g., in the case of QVC , in August through November of each year), our available cash may decrease, resulting in less liquidity. As a result of noncompliance with the net leverage ratio, no additional borrowings are available under QVC 's Fifth Amended and Restated Credit Agreement and QVC may not be able to access financing to the extent its cash balance is impaired. QVC may be unable to maintain a level of cash sufficient to permit it to pay the principal, premium, if any, and interest on its indebtedness.

*The success of our home television and online commerce businesses depends in large part on our ability to recruit and retain key personnel capable of executing our unique business models.* Our home television and online commerce subsidiaries and business affiliates have business models that require them to recruit and retain key employees, including management, with the skills necessary for a unique business that demands knowledge of the general retail industry, television production, direct to consumer marketing and fulfillment and the internet. We cannot assure you that if these subsidiaries and business affiliates experience turnover of these key employees they will be able to recruit and retain acceptable replacements because the market for such employees is very competitive and limited. Additionally, although our home television and online commerce subsidiaries are working to provide an effective and engaging workplace, with more employees working a hybrid schedule, it is increasingly challenging to keep employee engagement and productivity high and has led to competition for talent with companies with whom we have not historically competed. Although we have a robust continuous listening strategy to improve and monitor team member engagement and help us improve retention, we cannot guarantee that this strategy will be effective or that we will be able to implement all the programs and policies our employees request. Our failure or inability to respond to the results of this listening strategy could adversely impact our employee engagement and overall retention.

**Risks Related to Our Indebtedness and Common Stock**

*Our subsidiary QVC has significant indebtedness and other financial obligations, which could limit its flexibility to respond to current market conditions, restrict its business activities and adversely affect our financial condition.* QVC has a significant amount of debt, including secured debt under its senior secured notes which are due starting in 2027 and under the Credit Facility which currently matures in October 2026, in each case, secured by a first priority lien on all shares of its capital stock. The Plan provides for the deleveraging of this indebtedness, but if the Plan is not approved on its terms or the Effective Date does not occur, there can be no assurance that QVC will be able to repay this indebtedness when due. QVC may incur significant indebtedness in the future. If indebtedness is incurred, the related risks that it faces could intensify.

If QVC experiences adverse effects on its financial condition as a result of its indebtedness and the Plan is not approved or consummated, our financial performance could be adversely affected as well.

***QVC may not be able to generate sufficient cash to service its debt obligations*** If the Plan is not approved on its terms, or the Effective Date does not occur, QVC 's ability to make payments on its indebtedness will depend on its financial and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business and other factors beyond its control. QVC may be unable to maintain a level of cash flows from operating activities sufficient to permit it to pay the principal, premium, if any, and interest on its indebtedness during the pendency of the Chapter 11 Cases .

***Credit ratings downgrades or being put on negative watch could adversely affect our liquidity, capital position, borrowing cost and access to capital markets.*** We and our subsidiaries are routinely evaluated by credit rating agencies whose ratings are based on several factors, including generally, the ability to generate cash flows; terms and levels of indebtedness, including the credit rating agencies' treatment of certain types of indebtedness, such as subordinated indebtedness which is given partial equity credit but carries a higher interest rate than comparable senior indebtedness; overall financial strength; specific transactions or events and general economic and industry conditions. These credit ratings could be downgraded or subject to other negative rating actions at any time.

A downgrade of any of our businesses' credit ratings or ratings outlooks, as well as the reasons for such downgrades, has and will likely continue to adversely affect the market prices of our securities, our access to capital, increase the cost of funds, or trigger additional collateral or funding requirements or the imposition of financial or other burdensome covenants. This could make it more costly to borrow money, issue securities and/or raise other types of capital, any of which could adversely affect our liquidity and financial condition.

## Item 1B. Unresolved Staff Comments

None.

## Item 1C. Cybersecurity

### *Risk Management and Strategy*

We are committed to protecting the security and integrity of our systems, networks, databases, and applications. To this end, we have implemented a comprehensive cybersecurity program designed to prevent, assess, identify, and manage material risks associated with cybersecurity threats.

Our cybersecurity risk management program is aligned with the National Institute of Standards and Technology (NIST) Cybersecurity Framework, and we are fully compliant with PCI-DSS V4 (Payment Card Industry Data Security Standard) across all markets in which we operate. Cybersecurity risks are assessed as part of our broader enterprise risk management program, ensuring that cyber risk is integrated into our overall risk posture.

We employ a global and multidisciplinary approach to cybersecurity risk management, engaging our information security, legal, and management teams, as well as third-party experts. Our processes for identifying and assessing cybersecurity threats include continuous network monitoring, intrusion detection, vulnerability assessments, penetration testing, threat intelligence, employee awareness training, phishing simulations, endpoint detection and response, and third-party security reviews.

To mitigate material risks, we maintain a comprehensive suite of technical, physical, and organizational controls. These encompass managed endpoint detection and response, incident detection and response, vulnerability management, disaster recovery and business continuity planning, internal controls, data encryption, network and access controls, physical security, asset management, system monitoring, and vendor risk management. Cybersecurity awareness training is provided to all employees and our Board of Directors annually.

We have established a formal incident response framework to ensure the timely identification, resolution, and reporting of cybersecurity incidents in accordance with applicable requirements. We rehearse our incident response plan at least annually via tabletop exercises devised and facilitated by outside experts.

We utilize third-party service providers for certain operational functions and have implemented a third-party risk management program to evaluate and monitor the cybersecurity practices of vendors with access to our systems or data. We also consult with external advisors to stay informed of emerging risks, defense strategies, and governance best practices.

As of the date of this Annual Report on Form 10-K, we are not aware of any risks from cybersecurity threats that have materially affected or are reasonably likely to materially affect our business strategy, results of operations or financial condition.

For additional information on our cybersecurity risks, see "Risks Related to Technology and Information Security." in Item 1A. of this Annual Report on Form 10-K.

*Governance*

### *Role of the Board of Directors*

Our Board of Directors has overall responsibility for risk oversight and has delegated to the audit committee primary enterprise risk oversight responsibility, including privacy and cybersecurity risk exposures, policies and practices, the steps management takes to detect, monitor and mitigate such risks and the potential impact of those exposures on our business, financial results, operations and reputation. The audit committee receives quarterly updates on the enterprise risk management program, including cybersecurity risks and the initiatives undertaken to identify, assess and mitigate such risks. This cybersecurity reporting may include threat and incident reporting, vulnerability detection reporting, risk mitigation metrics, systems and security operations updates, employee education initiatives, and internal audit observations, if applicable.

In addition to the efforts undertaken by the audit committee, the full Board of Directors regularly reviews matters relating to cybersecurity risk and cybersecurity risk management. Any material cybersecurity events would be brought to the attention of the full Board of Directors once the event is deemed material. Our incident response framework provides a formal mechanism for informing management and the Board of Directors , and for monitoring the prevention, detection, mitigation, and remediation of cybersecurity incidents

### *Role of Management*

QVC 's VP Information Security (reporting into the Chief Information Officer) is responsible for day-to-day management and oversight of QVC G's cybersecurity program, including assessing, monitoring and mitigating cybersecurity risk.

Our Executive Leadership Team which includes executives representing our Legal, Accounting, Internal Audit and Risk Management, IT and Facilities departments receive at least quarterly cybersecurity updates from the VP Information Security and provides management oversight for the cybersecurity program at QVC Group .

In addition to real time notification of privacy and security incidents, we hold a bi-monthly meeting to discuss incidents, incident trends, developments in laws and regulations, and other privacy and cybersecurity hot topics, as applicable. QVC 's incident response team (including representatives from cybersecurity, legal/privacy, communications, and operations/physical security) meets on a bi-monthly basis to discuss incidents, incident trends, developments in laws and regulations, and other privacy and cybersecurity hot topics, as applicable. In addition, QVC 's cybersecurity team and legal/privacy teams meet on a monthly basis to discuss and review existing threats to QVC 's systems and data and to review past events.

Our management team's experience includes a diverse background in telecom, retail and other industries, with decades of experience in various aspects of technology and cybersecurity. Our VP Information Security has more than 30 years of IT experience and holds multiple certifications, including Certified Information Security System Professional and Certified Information Security Manager. Our management team has worked at a variety of companies, including large publicly traded companies, implementing and managing IT and cybersecurity programs and teams, developing tools and processes to protect internal networks, business applications, customer facing applications and customer payment systems.

I-44

## Item 2. Properties

We lease our corporate headquarters and operations center in West Chester, Pennsylvania, which includes executive offices, video broadcast studios, showrooms, broadcast facilities and administrative offices for QVC . Our corporate headquarters and the remainder of our material properties are summarized as follows:

| Location | Properties Type | Own or Lease | Operating Segment |
|---|---|---|---|
| West Chester, Pennsylvania | Corporate Headquarters | Lease | QxH |
| Bethlehem, Pennsylvania | Distribution Center | Lease | QxH |
| Suffolk, Virginia | Distribution Center | Lease | QxH |
| Florence, South Carolina | Distribution Center | Lease | QxH |
| Ontario, California | Distribution Center | Lease | QxH |
| Piney Flats, Tennessee | Distribution Center | Lease | QxH |
| Chiba, Japan | Distribution Center | Own | QVC -International |
| Huckelhoven, Germany | Distribution Center | Lease | QVC -International |
| Knowsley, U.K . | Multi-functional | Lease | QVC -International |
| Chiba, Japan | Multi-functional | Own | QVC -International |
| Brugherio, Italy | Multi-functional | Own | QVC -International |
| Dusseldorf, Germany | Multi-functional | Own | QVC -International |
| London, U.K . | Multi-functional | Lease | QVC -International |
| Franconia, New Hampshire | Multi-functional | Own | CBI |
| West Chester, Ohio | Multi-functional | Lease | CBI |
| Phoenix, Arizona | Distribution Center | Lease | CBI |
| West Chester, Ohio | Distribution Center | Lease | CBI |
| Monroe, Ohio | Distribution Center | Lease | CBI |

We supplement the facilities listed above by leasing various facilities worldwide, including 35 retail and outlet stores for CBI (located throughout the U.S .).

In September 2025, QVC entered into agreements to sell the St. Petersburg properties to independent third parties and two of the St. Petersburg property sales closed in December 2025. The sale of the remaining property is expected to be completed within the next twelve months. Refer to note 14 of the accompanying consolidated financial statements for additional details.

## Item 3. Legal Proceedings

In October 2023, HSN entered into a settlement agreement with the Consumer Product Safety Commission ("CPSC " ) in which HSN agreed to pay a civil penalty of $16 million to settle the CPSC 's claims that HSN allegedly failed to timely submit a report under the Consumer Product Safety Act ("CPSA ") in relation to handheld clothing steamers sold by HSN under the Joy Mangano brand names My Little Steamer and My Little Steamer® Go Mini that were subject to a voluntary recall previously announced on May 26, 2021. The settlement agreement also requires HSN to implement and maintain a compliance program to ensure compliance with the CPSA . In January 2024, HSN received a grand jury subpoena from the U.S . Attorney for the Central District of California that was issued in connection with an official criminal investigation into the clothing steamer matter. We have cooperated (and intend to continue cooperating) fully with this investigation, and at this time, we are unable to predict the eventual scope, duration or outcome of this investigation, nor are we able to reasonably estimate any range of loss or possible loss.

## Item 4. Mine Safety Disclosures

Not applicable.

**PART II**

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.**

*Market Information*

Each series of the common stock of QVC Group , Inc. (formerly named Qurate Retail, Inc., "QVC Group ," the "Company ," "we," "us" and "our") traded on the Nasdaq Global Select Market until December 2, 2024, when it began trading on the Nasdaq Capital Market. Our Series A common stock trade on the Nasdaq Capital Market, under the symbol "QVC GA " (formerly "QRTEA " ). Our Series B common trade on the OTCQB Venture Market, under the symbol "QVC GB " (formerly "QRTEB " ). Stock price information for securities traded on the Nasdaq Capital Market can be found on the Nasdaq's website at www.nasdaq.com. Stock price information for securities traded on the OTCQB Venture Market can be found on the OTC Market's website at www.otcmarkets.com. The following table sets forth the range of high and low sales prices of shares of our Series B common stock for the years ended December 31, 2025 and 2024. Although our Series B common stock is traded on the OTCQB Venture Market, an established public trading market does not exist for the stock, as it is not actively traded.

| | QVC Group Series B (QVC GB ) | |
| --- | --- | --- |
| | High | Low |
| **2024** | | |
| First quarter | $ 384.50 | 193.50 |
| Second quarter | $ 249.50 | 180.00 |
| Third quarter | $ 245.00 | 165.00 |
| Fourth quarter | $ 214.00 | 129.00 |
| **2025** | | |
| First quarter | $ 937.00 | 100.00 |
| Second quarter | $ 454.50 | 14.10 |
| Third quarter | $ 32.00 | 26.09 |
| Fourth quarter | $ 26.09 | 25.00 |

*Holders*

As of March 31, 2026, there were 537 and 24 record holders of our Series A and Series B common stock, respectively. The foregoing numbers of record holders do not include the number of stockholders whose shares are held nominally by banks, brokerage houses or other institutions, but include each such institution as one shareholder.

*Securities Authorized for Issuance Under Equity Compensation Plans*

Information required by this item is incorporated by reference to our definitive proxy statement for our 2026 Annual Meeting of Stockholders.

*Purchases of Equity Securities by the Issuer*

*Share Repurchase Programs*

In May 2019, the Board authorized the repurchase of $500 million of Series A or Series B common stock. In August 2021, the Board authorized the repurchase of $500 million of Series A or Series B common stock. As of December 31, 2025, $492 million was available to be used for share repurchases of Series A or Series B common stock under the Company 's share repurchase programs.

There were no repurchases of Series A common stock, Series B common stock or the Company 's 8.0% Series A Cumulative Redeemable Preferred Stock , par value $0.01 per share ("Preferred Stock " ) during the three months ended December 31, 2025.

No shares of Series A common stock or Preferred Stock were surrendered by certain of our officers and employees to pay withholding taxes and other deductions in connection with the vesting of their restricted stock during the three months ended December 31, 2025.

### *Stock Performance*

The following graph compares the percentage change in the cumulative total stockholder return on an investment in QVC Group Series A and Series B common stock from December 31, 2020 through December 31, 2025 to the percentage change in the cumulative total return on the S&P 500 Index and the S&P Retail Select Industry Index. This chart includes the impact of (i) the May 22, 2025 1-for-50 Reverse Stock Split and (ii) the distribution of special cash dividends, assuming reinvestment of the cash proceeds into our common stock.



**Item 6.** [Reserved]

### Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

The following discussion and analysis provides information concerning our results of operations and financial condition. This discussion should be read in conjunction with our accompanying consolidated financial statements and the notes thereto. Additionally, see note 2 of the accompanying consolidated financial statements for an overview of new accounting standards that we have adopted or that we plan to adopt that have had or may have an impact on our financial statements.

*Chapter 11 Proceedings*

*Voluntary Filing under Chapter 11*

On the Petition Date , the Company Parties intend to commence the Chapter 11 Cases under the Bank ruptcy Code in the Bank ruptcy Court . As of the Petition Date , we intend to operate our businesses as a debtor-in-possession under the jurisdiction of the Bank ruptcy Court in accordance with the applicable provisions of the Bank ruptcy Code and orders of the

Bank ruptcy Court . QVC Group and QVC , Inc. intend to request approval from the Bank ruptcy Court for a variety of "first day" motions to continue our ordinary course operations during the Chapter 11 Case.

Commencing the Chapter 11 Cases will constitute an event of default that accelerates the Company Parties ' respective obligations under the Debt Instruments . The Credit Facility and the QVC Notes provide that, as a result of the Chapter 11 Cases , the principal and interest due thereunder shall be immediately due and payable. The exchangeable senior debentures provide that the amount accelerated is the greater of (x) the current principal amount of the exchangeable senior debentures or (y) the market value of the reference shares, plus all accrued and unpaid interest and all pass-through distributions due with respect to the reference shares shall be immediately due and payable. Any efforts to enforce such payment obligations under the Debt Instruments will be automatically stayed as a result of the Chapter 11 Cases , and the stakeholders' rights of enforcement in respect of the Debt Instruments will be subject to the applicable provisions of the Bank ruptcy Code , including the Automatic Stay . For additional information, including information on the Automatic Stay and Other Protections and the Nasdaq Delisting, Refer to Item 1.

*Overview*

We own controlling and non-controlling interests in a broad range of video and online commerce companies. Our largest businesses and reportable segments are QxH (QVC U.S . and HSN , Inc. ("HSN " )) and QVC International. QVC , Inc. ("QVC " ), which includes QxH and QVC International, markets and sells a wide variety of consumer products in the United States ("U.S ." ) and several foreign countries via highly engaging video-rich, interactive shopping experiences primarily by means of its televised shopping programs and the internet through its domestic and international websites and mobile applications. Cornerstone Brands, Inc. ("CBI " ) consists of a portfolio of aspirational home and apparel brands, and is a reportable segment. Our "Corporate and other " category includes corporate activity along with various equity investments.

Zulily , LLC ("Zulily " ) was a wholly owned subsidiary of QVC Group until its divestiture on May 24, 2023. QVC Group recognized a loss on the divestiture of $64 million in the second quarter of 2023. Zulily is included in Corporate and other through May 23, 2023 and is not presented as a discontinued operation as the disposition did not represent a strategic shift that had a major effect on QVC Group 's operations and financial results.

Included in revenue in the accompanying consolidated statements of operations is $301 million for the year ended December 31, 2023, related to Zulily . Included in net earnings (loss) in the accompanying consolidated statement of operations are losses of $44 million for the year ended December 31, 2023, related to Zulily .

*Reverse Stock Split*

On May 22, 2025, the Company filed an amendment to its Restated Certificate of Incorporation (the "Charter Amendment " ) with the Secretary of State of the State of Delaware to effect a reverse stock split of the Company 's Series A common stock, par value $0.01 per share ("QVC GA " ), and Series B common stock, par value $0.01 per share ("QVC GB " and, together with QVC GA , the "Common Stock " ), at a ratio of 1-for-50 (the "Reverse Stock Split " ). There was no change to the number of QVC GA and QVC GB shares currently authorized. The Charter Amendment was authorized by the stockholders of the Company at the Company 's Annual Meeting of Stockholders held on May 12, 2025.

Pursuant to the Charter Amendment on May 22, 2025, every 50 shares of QVC GA and QVC GB were automatically converted into one share of QVC GA and QVC GB , respectively, without any change in par value per share. The number of shares of Common Stock reserved for issuance, the number of shares subject to the then-outstanding awards, and the purchase or exercise price or payout value based on a number of shares of the then-outstanding awards were proportionately adjusted. The Company did not issue fractional shares of Common Stock in connection with the Reverse Stock Split . Instead, stockholders who were otherwise entitled to receive a fractional share of Common Stock following the Reverse Stock Split received a cash payment (without interest) in lieu of such fractional shares.

The Company 's Common Stock began trading on the Nasdaq Capital Market on a split-adjusted basis at the opening of trading on May 23, 2025. On May 27, 2025, the Company elected to have QVC GB suspended from trading on the Nasdaq Capital Market and QVC GB began quotation on the OTCQB Venture Market on May 28, 2025.

Unless noted, all shares of Common Stock , including Common Stock underlying stock options and restricted stock units, as well as all conversion ratios, exercise prices, conversion prices and per share information in the consolidated

II-3

financial statements have been retroactively adjusted to reflect the 1-for-50 Reverse Stock Split , as if the split occurred at the beginning of the earliest period presented in this Annual Report on Form 10-K.

*Strategies and Challenges*

As of December 31, 2025, QVC 's net leverage ratio, as calculated under the Credit Facility , was greater than 4.5 to 1.0. Under the terms of the Fifth Amended and Restated Credit Agreement , this constitutes a breach of the financial covenant. Without a waiver under the Fifth Amended and Restated Credit Agreement , the lenders have the right, but not the obligation, to accelerate the loans and demand repayment from QVC for noncompliance with the net leverage ratio debt covenant; however such acceleration cannot occur until certain conditions are satisfied, including the expiration of a cure period during which QVC may take remedial action to cure the breach.

Under the indentures governing the senior secured notes, a default under the Credit Facility will only constitute an event of default under the indentures, and thus trigger the right, but not the obligation, of the noteholders to accelerate the senior secured notes and demand repayment if (i) the Credit Facility has been accelerated, (ii) there is a payment default under the Credit Facility or (iii) there is a foreclosure on collateral securing the Credit Facility . Accordingly, acceleration of the senior secured notes is not automatic upon a breach of the Credit Facility covenant; it is contingent upon the occurrence of one of these specified events under the Credit Facility .

The outstanding principal associated with the Credit Facility and senior secured notes is $5,046 million. As a result of the above-noted net leverage ratio and the maturity date of the Credit Facility , outstanding balances have been classified as a current liability in the consolidated balance sheet, as of December 31, 2025.

Additionally, as noted above in Item 1, on the Petition Date , commencing the Chapter 11 Cases will constitute an event of default that accelerates the Company Parties ' respective obligations under the Debt Instruments . The Credit Facility and the QVC Notes provide that, as a result of the Chapter 11 Cases , the principal and interest due thereunder shall be immediately due and payable. The exchangeable senior debentures provide that the amount accelerated is the greater of (x) the current principal amount of the exchangeable senior debentures or (y) the market value of the reference shares, plus all accrued and unpaid interest and all pass-through distributions due with respect to the reference shares shall be immediately due and payable. Any efforts to enforce such payment obligations under the Debt Instruments will be automatically stayed as a result of the Chapter 11 Cases , and the stakeholders' rights of enforcement in respect of the Debt Instruments will be subject to the applicable provisions of the Bankruptcy Code , including the Automatic Stay .

As a result of the risks and uncertainties associated with our Chapter 11 Cases , we cannot accurately predict or quantify the ultimate impact or timing of events that occur during our Chapter 11 Cases and the impact that those events will have on our business, financial condition and results of operations. Therefore, there remains substantial doubt about the Company 's ability to continue as a going concern.

*QVC*

On June 27, 2022, QVC Group announced a turnaround plan designed to stabilize and differentiate its core QVC -U.S and HSN . businesses and expand the Company 's leadership in video streaming commerce ("Project Athens " ). During 2022, QVC commenced the first phase of Project Athens , including actions to reduce inventory and a planned workforce reduction that was completed in February 2023. QVC recorded restructuring charges of $13 million during the year ended December 31, 2023 in restructuring, penalties and fire related costs, net of (recoveries) in the consolidated statement of operations. These initiatives were consistent with QVC 's strategy to operate more efficiently as it implements its turnaround plan.

During the second quarter of 2024, QVC entered into an agreement and announced a plan to shift its global operating model for IT services to a managed services model. As a result, during the year ended December 31, 2024 QVC recorded restructuring charges of $18 million in restructuring, penalties and fire related costs, net of (recoveries) in the consolidated statement of operations. The cash payments associated with this restructuring were substantially complete as of December 31, 2025.

On November 14, 2024, QVC announced a transition to the WIN strategy, targeting top-line growth through three central priorities: (i) 'Wherever She Shops' - aims to enhance customer interactions across diverse platforms; (ii) 'Inspiring People & Products' - fosters rich, engaging content experiences; and (iii) 'New Ways of Working' - emphasizes leveraging technology and process enhancements to streamline operations and fuel innovation. With the WIN strategy, QVC plans to broaden content outreach by creating dynamic, purpose-built experiences that resonate across social media and digital

II-4

streaming channels. By optimizing its production studios and fostering continuous improvement, QVC envisage content creation as an integrated, efficient process that adapts to various platforms without losing the essence of its brand. QVC aims to grow audiences and redefine shopping experiences, ensuring that it meets its customers wherever they are while building on its heritage for sustained success.

On January 29, 2025, the Company announced the consolidation of its QVC and HSN operations at QVC 's Studio Park location in West Chester, PA, and the closing of the St. Petersburg, FL campus. The consolidation is part of QVC 's organizational and strategic changes intended to support its WIN strategy. As a result, QVC accelerated depreciation related to the closure of the St. Petersburg, FL campus, which was completed as of September 30, 2025 (the "Completion Date "), and recorded $45 million of incremental depreciation in 2025 through the Completion date. On March 27, 2025, QVC announced a plan to reorganize teams across the Company as part of the WIN strategy, which is intended to increase revenue through growth initiatives while maintaining Adjusted OIBDA margin. As a result of the reorganization, QVC recorded $34 million and $19 million of restructuring charges at QxH and QVC International, respectively, during the year ended December 31, 2025 in restructuring, penalties and fire related costs, net of (recoveries) in the consolidated statement of operations. During the year ended December 31, 2025, the Company paid $37 million related to these charges.

In September 2025, QVC entered into agreements to sell the St. Petersburg properties to independent third parties. Two of the St. Petersburg property sales closed in December 2025. The sale of the remaining property is expected to be completed within the next twelve months. As of December 31, 2025, the remaining long-lived assets of $17 million, all within QxH, were included in assets held for sale noncurrent in the consolidated balance sheet.

In August 2025, the Board of Directors (the "Board ") of QVC Group implemented a revised compensation structure for QVC Group 's senior executives (collectively, the "Senior Executives ") and a large number of existing participants in QVC Group 's incentive compensation programs (together the "Eligible Employees ").

- QVC Group determined to guarantee to each Eligible Employee who remains employed through the end of 2026 cash payments generally equal to the following: (i) for certain senior executives, 50% of their target variable compensation for 2025 and 100% of their target variable compensation for 2026, and (ii) for all other Eligible Employees (except the Senior Executives ), 50% of their target variable compensation for 2025 and 2026 (the payments described in (i) and (ii), the "Guaranteed Compensation "). With the exception of the Senior Executives as described below, 25% of the 2025 Guaranteed Compensation related to all other Eligible Employees was earned and paid as of September 30, 2025, with the remainder earned and paid as of January 2026. Additionally, the 2026 Guaranteed Compensation for all other Eligible Employees , with the exception of the Senior Executives as described below, will be earned and paid on a quarterly basis through the end of 2026.

    - To ensure that the Senior Executives are motivated to achieve important operational goals of the Company , a portion of their Guaranteed Compensation is subject to meeting certain performance conditions.

    - All other Eligible Employees (except the Senior Executives ) remain eligible to earn the portion of their annual bonus that is not part of the Guaranteed Compensation .

- To provide a stronger retention benefit to certain employees, the Company has agreed to prepay (i) the Guaranteed Compensation for the Senior Executives and (ii) existing retention benefits for other specified employees (including the Senior Executives ). Prepaid compensation to Senior Executives will be subject to repayment on an after-tax basis if certain employment and, as applicable, performance conditions are not satisfied.

As a result of this compensation change the 2025 restricted stock grants and a portion of a 2025 performance award grant were canceled. Additionally, the expense associated with the impacted awards (the 2025 restricted stock grants and a portion of a 2025 performance award grant) will no longer qualify as stock-based compensation expense, beginning in the fourth quarter of 2025.

*CBI*

CBI 's goal is to continue to provide customers with home furnishings and apparel products that delight and inspire. As customers shop CBI 's breadth of products through its websites, retail stores or through its catalog mailings, they will find products that allow them to outfit their lives and homes to their unique style. CBI 's brands, including Ballard Designs, Frontgate, Grandin Road and Garnet Hill, provide a selection of fresh, unique and aspirational merchandise curated every season. CBI intends to employ the following strategies to achieve these goals and objectives: (i) acquire new customers through effective direct-to-consumer marketing; (ii) expand brick-and-mortar retail in attractive markets; (iii) further develop proprietary product that is unique to its brand positioning; (iv) invest in cross brand loyalty programs and a

redesigned mobile platform; and (v) build out a successful low cost supply chain network to support the growth of the business. CBI is nearing completing of its business transformation initiative, which is focused on delivering a customer experience that meets or exceeds expectations for premium home furnishings, textiles and apparel. Core elements of the transformation include building incremental capabilities across digital performance marketing, pricing optimization, sourcing and retail store operations.

As part of this strategy, CBI aims to further leverage its global sourcing network by deepening collaboration with its merchandising team to drive proprietary product development. As the business scales, maintaining a stable and reliable supplier base capable of partnering with brand merchants on future collections will be critical to sustaining long-term growth and brand health. Failure to identify manufacturing markets that support the desired logistics cost structure for proprietary products could result in customer attrition to lower-cost competitors that rely more heavily on trading houses.

Additionally, even if CBI successfully onboards new vendors, there can be no assurance that it will be able to secure sufficient product quantities or acceptable commercial terms. Merchandise sourced from alternative suppliers may be of lower quality or higher cost than products from existing vendors. Any inability to source suitable merchandise on favorable terms or to establish new vendor relationships could materially and adversely impact CBI 's business, financial condition, and operating results.

As a direct-to-consumer company, CBI seeks to efficiently target consumers to drive customer acquisition, repeat purchases, and reactivation of lapsed buyers. CBI employs a balanced approach across physical retail stores and digital marketing channels to attract customers to its product assortment.

CBI incurs ongoing marketing related expenses, including, but not limited to, photography, digital analytics, paper procurement, catalog printing partnerships, and retail real estate development. As the business scales, CBI may face challenges in executing marketing strategies that support continued customer growth while maintaining an efficient cost structure and delivering attractive returns on investment.

*Trends*

QVC 's future net revenue will depend on its ability to grow through Digital Platforms (defined in the "Results of Operation - Businesses " section below), retain and grow revenue from existing customers and attract new customers. QVC 's future net revenue may also be affected by (i) the willingness of cable television and direct-to-home satellite system operators to continue carrying QVC 's programming service; (ii) QVC 's ability to maintain favorable channel positioning, which may become more difficult due to governmental action or from distributors converting analog customers to digital; (iii) changes in television viewing habits because of video-on-demand technologies and internet video services; (iv) QVC 's ability to source new and compelling products; and (v) general economic conditions.

The current economic uncertainty in various regions of the world in which our subsidiaries and affiliates operate, has impacted and could continue to adversely affect demand for our products and services since a substantial portion of our revenue is derived from discretionary spending by individuals, which typically falls, to varying degrees, during times of economic instability and inflationary pressures. Economic tensions and changes and uncertainty relating to international trade policies, including, for example, the recent widespread tariffs announced by the U.S . on its major trading partners, higher tariffs on imported goods and materials, actions taken in response (such as retaliatory tariffs or other trade protectionist measures or the renegotiation of free trade agreements), have increased inflationary cost pressures and recessionary fears. In February 2026, the U.S . Supreme Court struck down the sweeping tariffs that the U.S . government had imposed through the executive orders issued pursuant to the International Emergency Economic Powers Act. Shortly thereafter, the U.S . government issued a series of orders to comply with the ruling, while also announcing new temporary tariffs for a 150 day period beginning February 24, 2026. Tariffs and international trade arrangements will continue to change, potentially without warning and to an extent or duration that is difficult to predict. Global financial markets have experienced and may continue to experience disruptions, including increased volatility and diminished liquidity and credit availability. If economic and financial market conditions in the U.S . or other key markets, including Europe and Japan, continue to be uncertain or deteriorate, QVC 's customers may respond by further suspending, delaying or reducing their discretionary spending. Any further suspension, delay or reduction in discretionary spending could adversely affect revenue. Accordingly, our ability to increase or maintain revenue and earnings could be adversely affected to the extent that relevant economic environments decline. Such weak economic conditions may also inhibit QVC 's expansion into new European and other markets. We currently are unable to predict the extent of any of these potential adverse effects.

II-6

The Company has continued to see inflationary pressures during the period including higher wages and merchandise costs consistent with inflation and tariff impacts experienced by the global economy. As a result of existing and any new or additional tariffs, the cost of merchandise has and is expected to continue to increase; as a result QVC has in certain circumstances implemented price adjustments and undertaken an inventory review process and QVC may seek alternative sources of supply for merchandise. Further, the full impact of recent governmental actions on macroeconomic conditions and on QVC 's business is uncertain, difficult to predict and depends on a number of factors, including the extent and duration of tariffs, any reversal or temporary suspension of announced tariffs, the availability of exemptions, changes in the amount and scope of tariffs, the imposition of new tariffs and other measures that target countries may take in response to U.S . trade policies, the result of legal and other challenges on the tariffs, and possible resulting general inflationary pressures in the global economy, as well as the availability and cost of alternative sources of supply for merchandise. If these pressures persist, inflated costs may result in certain increased costs outpacing our pricing power in the near term.

*Fire at Rocky Mount Distribution Center*

In December 2021, QVC experienced a fire at its Rocky Mount fulfillment center in North Carolina. Rocky Mount was QVC 's second-largest fulfillment center, processing approximately 25% to 30% of volume for QVC U.S ., and also served as QVC U.S .'s primary returns center for hard goods. The building was significantly damaged as a result of the fire and related smoke and did not reopen. QVC took steps to mitigate disruption to operations including diverting inbound orders, leveraging its existing fulfillment centers and supplementing these facilities with short-term leased space as needed. QVC sold the property in February 2023 and received net cash proceeds of $19 million. QVC assessed its network footprint and is making investments to increase throughput as a result of the loss of the Rocky Mount fulfillment center.

Based on the provisions of QVC 's insurance policies certain fire related costs were recoverable. In June 2023, QVC agreed to a final insurance settlement with its insurance company and received all remaining proceeds related to the Rocky Mount claim. During the year ended December 31, 2023, QVC received $280 million of insurance proceeds, of which $210 million represented recoveries for business interruption losses. During the year ended December 31, 2023, the Company recorded $32 million of fire related costs and recognized net gains of $208 million representing proceeds received in excess of recoverable losses in restructuring, penalties and fire related costs, net of (recoveries) in the consolidated statements of operations.

*Sale-leaseback Transactions*

In November 2022, QVC entered into agreements to sell two properties located in Germany and the U.K . to an independent third party. Under the terms of the agreements, QVC received net cash proceeds of $182 million related to its German and U.K . facilities when the sales closed in January 2023. Concurrent with the sale, QVC entered into agreements to lease each of the properties back from the purchaser over an initial term of 20 years with the option to extend the terms of the property leases for up to four consecutive terms of five years. QVC recognized a $113 million gain related to the successful sale leaseback of the German and U.K . properties during the first quarter of 2023 calculated as the difference between the aggregate consideration received and the carrying value of the properties.

*Impairment Risk*

As a result of recent financial performance, macroeconomic conditions, declines in stock price and credit rating downgrades, it was determined, during the second quarter of 2025, that an indication of impairment existed for the QxH reporting unit related to the QVC and HSN tradenames and goodwill. The Company recorded an impairment related to the QxH reporting unit, in which the goodwill was determined to be fully impaired. Additionally, an impairment was recorded related to the QVC and HSN tradenames and the carrying value was written down to fair value. As a result, the fair values of intangible assets within the QxH reporting unit do not significantly exceed their carrying values (refer to note 5 of the accompanying consolidated financial statements). The Company will continue to monitor current business performance versus the current and updated long-term forecasts, among other relevant considerations, to determine if the carrying value of its assets (including intangible assets) at each reporting unit is appropriate. Future outlook declines in revenue, cash flows, macroeconomic factors, business conditions, or other factors could result in a sustained decrease in fair value that may result in a determination that carrying value adjustments are required, which could be material.

## Results of Operations—Consolidated

**General.** We provide in the tables below information regarding our Consolidated Operating Results and Other Income and Expense, as well as information regarding the contribution to those items from our principal reportable segments. The "Corporate and other " category consists of corporate activity and various cost method investments. For a more detailed discussion and analysis of the financial results of the principal reporting segments, see "Results of Operations-Businesses" below.

A discussion regarding our financial condition and results of operations for fiscal year 2025 compared to fiscal year 2024 is presented below. A discussion regarding our financial condition and results of operations for fiscal year 2024 compared to fiscal year 2023 can be found in Part II, Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations" of our Annual Report on Form 10-K for the year ended December 31, 2024, filed with the SEC on February 27, 2025 (the "2024 Form 10-K ").

### Operating Results

|  | | Years ended December 31, | | |
|---|---|---|---|---|
|  | | 2025 | | 2024 |
|  | | amounts in millions | | |
| *Total revenue, net* | | | | |
| QxH | $ | 5,936 | $ | 6,598 |
| QVC International | | 2,357 | | 2,399 |
| CBI | | 937 | | 1,040 |
| Corporate and other | | — | | — |
| Consolidated QVC Group | $ | 9,230 | $ | 10,037 |
|  | | | | |
| *Operating Income (Loss)* | | | | |
| QxH | $ | (2,235) | $ | (1,045) |
| QVC International | | 218 | | 275 |
| CBI | | (26) | | 2 |
| Corporate and other | | (55) | | (41) |
| Consolidated QVC Group | $ | (2,098) | $ | (809) |
|  | | | | |
| *Adjusted OIBDA* | | | | |
| QxH | $ | 517 | $ | 765 |
| QVC International | | 293 | | 333 |
| CBI | | 16 | | 36 |
| Corporate and other | | (55) | | (31) |
| Consolidated QVC Group | $ | 771 | $ | 1,103 |

**Total revenue, net.** Consolidated QVC Group revenue decreased 8.0% or $807 million for the year ended December 31, 2025, declining in all segments, as compared to the corresponding prior year period. See "Results of Operations-Businesses" below for a more complete discussion of the results of operations of QVC and CBI .

**Operating income (loss).** Our consolidated operating loss increased $1,289 million for the year ended December 31, 2025 as compared to the corresponding prior year period, primarily due to greater impairments of goodwill and intangible assets. Operating loss increased $1,190 million at QxH, and operating income decreased $57 million at QVC International, and decreased $28 million to a loss of $26 million at CBI . Additionally, operating loss within Corporate and other increased $14 million, primarily due to higher professional services (including consulting and legal expense). See "Results of Operations-Businesses" below for a more complete discussion of the results of operations of QVC and CBI .

*Adjusted Operating Income Before Depreciation and Amortization ("OIBDA ").* To provide investors with additional information regarding our financial results, we also disclose Adjusted OIBDA , which is a non-GAAP financial measure. We define Adjusted OIBDA as operating income (loss) excluding depreciation and amortization, stock-based compensation, and where applicable, separately identified impairments, litigation settlements, restructuring, penalties, fire related costs and (recoveries), and (gains) losses on sales of assets and sale-leaseback transactions. Our chief operating decision maker and management team use this measure of performance in conjunction with other measures to evaluate our businesses and make decisions about allocating resources among our businesses. We believe this is an important indicator of the operational strength and performance of our businesses by identifying those items that are not directly a reflection of each business' performance or indicative of ongoing business trends. In addition, this measure allows us to view operating results, perform analytical comparisons and benchmarking between businesses and identify strategies to improve performance. Accordingly, Adjusted OIBDA should be considered in addition to, but not as a substitute for, operating income (loss), net earnings (loss), cash flows provided by operating activities and other measures of financial performance prepared in accordance with U.S . generally accepted accounting principles ("GAAP ").

The following table provides a reconciliation of Operating income (loss) to Adjusted OIBDA .

| | Years ended December 31, | |
| --- | --- | --- |
| | 2025 | 2024 |
| | amounts in millions | |
| Operating income (loss) - GAAP | $ (2,098) | (809) |
| Depreciation and amortization | 398 | 383 |
| Impairment of intangible assets | 930 | 578 |
| Impairment of goodwill | 1,477 | 902 |
| Gains on sales of assets and sale leaseback transactions | (5) | (1) |
| Restructuring, penalties and fire related costs, net of (recoveries) (note 14) | 53 | 18 |
| Stock-based compensation | 16 | 32 |
| Adjusted OIBDA - non-GAAP | $ 771 | 1,103 |

Consolidated Adjusted OIBDA decreased $332 million for the year ended December 31, 2025, as compared to the corresponding prior year period, with decreases in Adjusted OIBDA across all segments. The increase in Adjusted OIBDA losses of $24 million at Corporate and other is primarily due to higher professional services (including consulting and legal expense). See "Results of Operations-Businesses" below for a more complete discussion of the results of operations of QVC and CBI .

**Other income and expense**

Components of Other income (expense) are presented in the table below.

| | Years ended December 31, | |
| --- | --- | --- |
| | 2025 | 2024 |
| | amounts in millions | |
| Interest expense | $ (496) | (468) |
| Interest and dividend income | 50 | 50 |
| Realized and unrealized gains (losses) on financial instruments, net | (40) | (60) |
| Tax sharing income (expense) with Liberty Broadband | 10 | (4) |
| Other, net | (9) | — |
| Other income (expense) | $ (485) | (482) |

*Interest expense.* Interest expense increased $28 million for the year ended December 31, 2025, as compared to the corresponding prior year period, primarily due to higher outstanding debt during 2025 and additional interest expense related to the non-payment of the Series A Cumulative Redeemable Preferred Stock ("Preferred Stock " ) dividend (see note 9 to the accompanying consolidated financial statements).

*Interest and dividend income.* Interest and dividend income was $50 million for each of the years ended December 31, 2025 and 2024.

*Realized and unrealized gains (losses) on financial instruments.* Realized and unrealized gains (losses) on financial instruments are comprised of changes in the fair value of the following:

| | Years ended December 31, | |
| --- | --- | --- |
| | 2025 | 2024 |
| | amounts in millions | |
| Equity securities | $ (5) | (22) |
| Exchange able senior debentures | (35) | (38) |
| | $ (40) | (60) |

The changes in these accounts are primarily due to changes in market factors largely driven by changes in the fair value of the underlying stocks or financial instruments to which these related (see note 6 to the accompanying consolidated financial statements for additional discussion related to debt). These unrealized losses during the year ended December 31, 2025 were partially offset by a gain on extinguishment of debt of $10 million related to redemptions of the 4% Exchange able Senior Debentures (see note 4 to the accompanying consolidated financial statements).

*Tax sharing income (expense) with Liberty Broadband .* The Company has a tax sharing agreement with Liberty Broadband . As a result, the Company recognized tax sharing gains of $10 million and tax sharing losses of $4 million for the years ended December 31, 2025 and 2024, respectively.

*Other, net.* Other, net decreased $9 million for the year ended December 31, 2025, compared to the corresponding prior year period, primarily due to foreign exchange losses of $11 million in the current year.

*Income taxes.* Earnings (loss) before income taxes, income tax (expense) benefit, and the effective tax rates for the years ended December 31, 2025 and 2024 are summarized below.

| | Years ended December 31, | |
| --- | --- | --- |
| | 2025 | 2024 |
| Earnings (loss) before income taxes | $ (2,583) | (1,291) |
| Income tax (expense) benefit | 185 | 41 |
| Effective income tax rate | 7 % | 3 % |

For the years ended December 31, 2025 and 2024 income tax benefit differs from the U.S . statutory rate of 21% due to impairments of goodwill and intangible assets that are not deductible for tax purposes (see note 5 of the accompanying consolidated financial statements).

*Net earnings (loss).* We had net losses of $2,398 million and $1,250 million for the years ended December 31, 2025 and 2024, respectively. The change in net earnings (loss) was the result of the above-described fluctuations in our revenue, expenses and other gains and losses.

**Liquidity and Capital Resources**

As of December 31, 2025 substantially all of our cash and cash equivalents are invested in U.S . Treasury securities, securities of other government agencies, AAA rated money market funds and other highly rated financial and corporate debt instruments.

The following are potential sources of liquidity: available cash balances, equity issuances, dividend and interest receipts, proceeds from asset sales, and cash generated by the operating activities of our wholly-owned subsidiaries. Cash generated by the operating activities of our subsidiaries is only a source of liquidity to the extent such cash exceeds the working capital needs of the subsidiaries and is not otherwise restricted.

Under both the Fifth Amended and Restated Credit Agreement and the indentures governing the senior secured notes, QVC is permitted to make unlimited dividends to service the debt of its parent entities so long as it is not in default under those agreements and to make certain restricted payments to QVG Group under an intercompany tax sharing agreement in respect of certain tax obligations of QVC and its subsidiaries. As a result of the breach of financial covenant under the Fifth Amended and Restated Credit Agreement , QVC is no longer permitted to make unlimited dividends to service the debt of its parent entities to QVC Group . QVC can continue to make certain restricted payments to QVC Group under an intercompany tax sharing agreement in respect of certain tax obligations of QVC and its subsidiaries.

During the year ended December 31, 2025, QVC Group and certain of its subsidiaries experienced multiple credit rating downgrades by Fitch Ratings, Moody's Ratings and S&P Global Ratings. These downgrades included reductions in QVC 's long-term issuer and senior secured ratings, as well as similar downgrades for LI LLC and QVC Group . A downgrade of QVC 's credit ratings and rating outlooks has adversely affected, and will likely continue to adversely affect, the market prices of its debt securities and QVC Group 's equity securities and its access to capital, and may trigger additional collateral or funding requirements or the imposition of financial or other burdensome covenants. See Part I, Item 1A. "Risk Factors " in this Annual Report on Form 10-K for additional information.

As of December 31, 2025, QVC Group 's liquidity position consisted of the following:

| | Cash and cash equivalents |
|---|---|
| | amounts in millions |
| QVC | $ 1,496 |
| CBI | 101 |
| Corporate and other | 375 |
| Total QVC Group | $ 1,972 |

To the extent that the Company recognizes any taxable gains from the sale of assets we may incur tax expense and be required to make tax payments, thereby reducing any cash proceeds.

As a result of noncompliance with the net leverage ratio, no additional borrowings are available under the Fifth Amended and Restated Credit Agreement .

As of December 31, 2025, QVC had approximately $329 million of cash and cash equivalents and restricted cash held in foreign subsidiaries that is available for domestic purposes with no significant tax consequences upon repatriation to the U.S . QVC accrues foreign taxes on the unremitted earnings of its international subsidiaries. Approximately 35% of this foreign cash balance was that of QVC Japan. QVC owns 60% of QVC Japan and shares all profits and losses with the 40% minority interest holder, Mitsui & Co, LTD.

| | Years ended December 31, | |
|---|---|---|
| | 2025 | 2024 |
| Cash Flow Information | amounts in millions | |
| Net cash provided (used) by operating activities | $ 274 | $ 525 |
| Net cash provided (used) by investing activities | (245) | (225) |
| Net cash provided (used) by financing activities | 1,064 | (498) |

During the year ended December 31, 2025, QVC Group 's primary sources of cash were $1,986 million debt borrowings and $274 million net cash provided by operating activities. During the year ended December 31, 2025, QVC Group 's primary uses of cash were debt repayments of $870 million, capital expenditures of $156 million, expenditures for television distribution rights of $93 million, and dividends paid to noncontrolling interest of $44 million.

Pursuant to the Plan, and following the approval of the Plan and the occurrence of the Effective Date , the projected uses of QVC 's cash in the next year, outside of normal operating expenses (inclusive of tax payments), are the costs to service outstanding debt, payments to taxing authorities, potential capital improvement spending, payments related to television distribution rights, and potentially additional investments in existing or new businesses. The Company expects

that cash on hand and cash provided by operating activities in future periods will be sufficient to fund projected uses of cash, except for any principal amounts that may become due and payable as a result of noncompliance with the net leverage ratio and the Chapter 11 Cases , as described above.

On May 23, 2025, the Board of Directors announced its decision to suspend payment of the quarterly cash dividend on the Preferred Stock , beginning with the quarterly cash dividend payable on June 16, 2025. As a result of the non-payment of the quarterly cash dividend, the dividend rate increased from 8.0% to 9.5%.

Subject to Bank ruptcy Court approval and the Plan, the Company may from time to time repurchase any level of its outstanding debt through open market purchases, privately negotiated transactions, redemptions, tender offers or otherwise. Repurchases or retirement of debt, if any, will depend on prevailing market conditions, liquidity requirements, contractual restrictions and other factors. The amounts involved may be material.

**Off-Balance Sheet Arrangements and Aggregate Material Cash Requirements**

In connection with agreements for the sale of assets by our Company , we may retain liabilities that relate to events occurring prior to the sale, such as tax, environmental, litigation and employment matters. We generally indemnify the purchaser in the event that a third party asserts a claim against the purchaser that relates to a liability retained by us. These types of indemnification obligations may extend for a number of years. We are unable to estimate the maximum potential liability for these types of indemnification obligations as the sale agreements may not specify a maximum amount and the amounts are dependent upon the outcome of future contingent events, the nature and likelihood of which cannot be determined at this time. Historically, we have not made any significant indemnification payments under such agreements and no amount has been accrued in the accompanying consolidated financial statements with respect to these indemnification obligations.

We have contingent liabilities related to legal and tax proceedings and other matters arising in the ordinary course of business. Although it is reasonably possible we may incur losses upon conclusion of such matters, an estimate of any loss or range of loss cannot be made. In the opinion of management, it is expected that amounts, if any, which may be required to satisfy such contingencies will not be material in relation to the accompanying consolidated financial statements.

The Company has outstanding multiple tranches of exchangeable debentures as of December 31, 2025. Under the terms of these exchangeable debentures, prior to the Chapter 11 Cases , the holders had the option to elect to require the Company to exchange the debentures for the value of a specified number of the underlying reference shares, which we had the ability to honor through delivery of reference shares, cash or a combination thereof. As a result of the Chapter 11 Cases and the Automatic Stay , such holders will no longer have the option to require the Company to exchange such debentures, and such debentures are to be treated as set forth in the Plan.

Information concerning the amount and timing of required payments, both accrued and off-balance sheet, under our material cash requirements, excluding uncertain tax positions as it is undeterminable when payments will be made, is summarized below.

| | Payments due by period | | | | | | |
| | 2026 | 2027 | 2028 | 2029 | 2030 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| | amounts in millions | | | | | | |
| *Consolidated material cash requirements* | | | | | | | |
| Debt (1) (2) | $ 2,900 | 44 | 72 | 1,231 | 932 | 1,425 $ | 6,604 |
| Interest payments (3) | 331 | 197 | 196 | 172 | 106 | 2,024 | 3,027 |
| Operating lease obligations | 119 | 116 | 114 | 111 | 113 | 759 | 1,332 |
| Preferred Stock (4) | — | — | — | — | — | 2,227 | 2,227 |
| Purchase orders and other obligations (5) | 2,136 | 124 | 124 | 101 | — | — | 2,485 |

_____

(1) As discussed above, the senior secured notes have been classified as a current liability in the consolidated balance sheet, as of December 31, 2025. The table above reflects the contractual maturities of the senior secured notes.

II-12

(2)  Amounts are reflected in the table at the outstanding principal amount, assuming the debt instruments will remain outstanding until the stated maturity date, and may differ from the amounts stated in our consolidated balance sheet to the extent debt instruments (i) were issued at a discount or premium or (ii) have elements which are reported at fair value in our consolidated balance sheets. Amounts do not assume additional borrowings or refinancings of existing debt.

(3)  Amounts (i) are based on our outstanding debt at December 31, 2025, (ii) assume the interest rates on our variable rate debt remain constant at the December 31, 2025 rates and (iii) assume that our existing debt is repaid at maturity.

(4)  This amount reflects the current 9.5% dividend on shares of Preferred Stock outstanding as of December 31, 2025 and redemption of the Preferred Stock plus all unpaid dividends on the mandatory redemption date, March 15, 2031.

(5)  Amounts include open purchase orders for inventory and non-inventory purchases along with other material cash requirements.

## Critical Accounting Estimates

The preparation of our financial statements in conformity with GAAP requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period. Listed below are the accounting estimates that we believe are critical to our financial statements due to the degree of uncertainty regarding the estimates or assumptions involved and the magnitude of the asset, liability, revenue or expense being reported. All of these accounting estimates and assumptions, as well as the resulting impact to our financial statements, have been discussed with the Audit Committee of the Board of Directors .

*Fair Value Measurements of Non-Financial Instruments*. Our non-financial instrument valuations are primarily comprised of our annual assessment of the recoverability of our goodwill and other nonamortizable intangible assets, such as tradenames, our evaluation of the recoverability of our other long-lived assets upon certain triggering events, and our determination of the estimated fair value allocation of net tangible and identifiable intangible assets acquired in business combinations. If the carrying value of our long-lived assets exceeds their undiscounted cash flows, we are required to write the carrying value down to fair value. Any such write down is included in impairment loss in our consolidated statements of operations. A high degree of judgment is required to estimate the fair value of our long-lived assets. We may use quoted market prices, prices for similar assets, present value techniques and other valuation techniques to prepare these estimates. We may need to make estimates of future cash flows and discount rates as well as other assumptions in order to implement these valuation techniques. Due to the high degree of judgment involved in our estimation techniques, any value ultimately derived from our long-lived assets may differ from our estimate of fair value. As each of our operating segments has long-lived assets, this critical accounting policy affects the financial position and results of operations of each segment.

As of December 31, 2025, the intangible assets not subject to amortization for each of our significant reportable segments were as follows:

| | Goodwill | Tradenames | Total |
|---|---|---|---|
| | amounts in millions | | |
| QxH | $    — | 1,190 | 1,190 |
| QVC International | 800 | — | 800 |
| | $    800 | 1,190 | 1,990 |

We perform our annual assessment of the recoverability of our goodwill and other non-amortizable intangible assets during the fourth quarter of each year, or more frequently, if events or circumstances indicate impairment may have occurred. We perform goodwill impairment testing at the reporting unit level, which is defined in accounting guidance in accordance with GAAP as an operating segment or one level below an operating segment (also known as a component). A component of an operating segment is a reporting unit if the component constitutes a business for which discrete financial information is available and segment management regularly reviews the operating results of that component. The Company considers its reporting units to align with its operating segments.

II-13

We may utilize a qualitative assessment for determining whether a quantitative goodwill and other non-amortizable intangible asset impairment analysis is necessary. The accounting guidance permits entities to first assess qualitative factors to determine whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount as a basis for determining whether it is necessary to perform the quantitative goodwill impairment test. In evaluating goodwill on a qualitative basis the Company reviews the business performance of each reporting unit and evaluates other relevant factors as identified in the relevant accounting guidance to determine whether it is more likely than not that an indicated impairment exists for any of our reporting units. The Company considers whether there are any negative macroeconomic conditions, industry specific conditions, market changes, increased competition, increased costs in doing business, management challenges, the legal environments and how these factors might impact company specific performance in future periods. As part of the analysis the Company also considers fair value determinations for certain reporting units that have been made at various points throughout the current and prior years for other purposes. For the years ended December 31, 2025, 2024, and 2023, impairments of $1,465 million, $902 million, and $326 million, respectively, were recorded to QxH's goodwill. For the year ended December 31, 2025, an impairment charge of $12 million was recorded to CBI 's goodwill.

The Company recorded impairments of $930 million and $578 million for the years ended December 31, 2025 and 2024 related to the tradenames associated with QVC and HSN in the QxH reporting unit.

The quantitative goodwill impairment test compares the estimated fair value of a reporting unit to its carrying value. The Company determines fair values for each of the reporting units using a discounted cash flow model (a form of the income approach). Developing estimates of fair value requires significant judgments, including making assumptions about appropriate discount rates, perpetual growth rates, relevant comparable market multiples, public trading prices and the amount and timing of expected future cash flows. The cash flows employed in QVC Group 's valuation analyses are based on management's best estimates considering current marketplace factors and risks as well as assumptions of growth rates in future years. There is no assurance that actual results in the future will approximate these forecasts.

Following our annual impairment assessment performed during the fourth quarter of 2025, it was determined that the fair values of non-amortizable intangible assets at the QxH reporting unit do not significantly exceed their carrying values. The Company will continue to monitor current business performance versus the current and updated long-term forecasts, among other relevant considerations, to determine if the carrying value of its assets (including intangible assets) at each reporting unit is appropriate. Future outlook declines in revenue, cash flows, macroeconomic factors, business conditions, or other factors could result in a sustained decrease in fair value that may result in a determination that carrying value adjustments are required, which could be material.

*Retail Related Adjustments and Allowances.* The Company records adjustments and allowances for sales returns, inventory net realizable value and uncollectible receivables. Each of these adjustments is estimated based on historical experience. Sales returns are calculated as a percent of sales and are netted against revenue in the consolidated statements of operations. Sales returns represented 15.0%, 15.6% and 16.0% of gross product revenue for the years ended December 31, 2025, 2024 and 2023, respectively. Inventory is stated at the lower of cost or market. Assessments about the realizability of inventory require the Company to make judgments based on the aging of its inventory balance, the likely method of disposition, and the estimated recoverable values based on historical experience of inventory markdowns and liquidation. Any change in estimate of net realizable value is included in cost of goods sold in the consolidated statements of operations. Inventories were $972 million and $1,061 million as of December 31, 2025 and 2024, respectively. Allowance for credit losses is calculated as a percent of accounts receivable at the end of a reporting period, and is based on historical experience, with the change in such allowance recorded as a provision for credit losses in selling, general and administrative expenses in the consolidated statements of operations. Trade accounts receivable (including installment payment, credit card and customer receivables) were $995 million and $1,151 million, as of December 31, 2025 and 2024, respectively. Allowance for credit losses related to uncollectible trade accounts receivable was $67 million and $77 million as of December 31, 2025 and 2024, respectively. Each of these estimates requires management judgment and may not reflect actual results.

## Results of Operations—Businesses

*QVC .* QVC is a retailer of a wide range of consumer products, which are marketed and sold primarily by merchandise-focused televised shopping programs, the internet and mobile applications.

In the U.S ., QVC 's televised shopping programs, including live and recorded content, are distributed across multiple channels nationally on a full-time basis, including QVC , QVC 2, QVC 3, HSN , and HSN 2. The Company 's U.S . programming is also available on QVC .com and HSN .com, which we refer to as QVC 's "U.S . Websites "; its social

II-14

platforms (including TikTok, Instagram and others), virtual multichannel video programming distributors (including Hulu + Live TV, DirectTV Stream and YouTube TV); applications via streaming video (including Facebook Live, Roku, Apple TV, Amazon Fire, Xfinity Flex, Alphabet and Samsung TV Plus); and mobile applications (collectively, the "Digital Platforms ").

QVC 's Digital Platforms enable consumers to purchase goods offered on its televised programming, along with a wide assortment of products that are available only on its U.S . Websites . QVC U.S . Websites and its other Digital Platforms (including its mobile applications, social platforms and others) are natural extensions of its business model, allowing customers to engage in its shopping experience wherever they are, with live or on-demand content customized to the device they are using. In addition to offering video content, QVC 's U.S . websites allow shoppers to browse, research, compare and perform targeted searches for products, read customer reviews, control the order-entry process and conveniently access their account.

Internationally, QVC 's televised shopping programs, including live and recorded content, are distributed to households outside the U.S ., primarily in Japan, Germany, the United Kingdom ("U.K ."), and Italy. In some of the countries where QVC operates, QVC 's televised shopping programs are distributed across multiple QVC channels: QVC Style and QVC 2 in Germany and QVC Beauty, QVC Extra and QVC Style in the U.K . Similar to the U.S ., QVC 's international businesses also engage customers via websites, mobile applications and social platforms. QVC 's international business employs product sourcing teams who select products tailored to the interests of each local market.

QVC 's operating results were as follows:

| | | Years ended December 31, | |
| --- | --- | --- | --- |
| | | 2025 | 2024 |
| | | amounts in millions | |
| Total revenue, net - GAAP | $ | 8,293 | 8,997 |
| Cost of goods sold (exclusive of depreciation and amortization shown separately below) | | (5,505) | (5,905) |
| Operating expenses | | (637) | (693) |
| Advertising expenses | | (369) | (312) |
| Selling, general and administrative expenses (excluding stock-based compensation and advertising) | | (972) | (989) |
| Adjusted OIBDA - non-GAAP | | 810 | 1,098 |
| Depreciation and amortization | | (369) | (351) |
| Impairment of intangible assets | | (930) | (578) |
| Impairment of goodwill | | (1,465) | (902) |
| Gains on sales of assets and sale leaseback transactions | | 5 | 1 |
| Restructuring, penalties and fire related costs, net of (recoveries) (note 14) | | (53) | (18) |
| Stock-based compensation | | (15) | (20) |
| Operating income (loss) - GAAP | $ | (2,017) | (770) |

Total revenue, net was generated from the following geographical areas:

| | | Years ended December 31, | |
| --- | --- | --- | --- |
| | | 2025 | 2024 |
| | | amounts in millions | |
| QxH | $ | 5,936 | 6,598 |
| QVC International | | 2,357 | 2,399 |
| | $ | 8,293 | 8,997 |

**Total revenue, net.** QVC 's consolidated net revenue decreased $704 million or 7.8% for the year ended December 31, 2025, as compared to the corresponding prior year. The $704 million decrease in 2025 net revenue was primarily due to an 8% decrease in units shipped primarily attributable to QxH. The decrease was also driven by a 1.2% decrease in average selling price per unit ("ASP " ) primarily driven by QVC -International and to a lesser extent QxH and a

II-15

$57 million decrease in shipping and handling revenue attributable to QxH. These decreases to net revenue were partially offset by a $198 million decrease in estimated product returns primarily attributable to QxH and $66 million in favorable foreign exchange rates.

During the year ended December 31, 2025, the change in revenue and expenses was affected by the change in the exchange rates for the Euro, the U.K . Pound Sterling and the Japanese Yen. In the event the U.S . Dollar strengthens against these foreign currencies in the future, QVC 's revenue and operating cash flow is likely to be negatively affected.

In discussing QVC 's operating results, the term "currency exchange rates" refers to the currency exchange rates QVC uses to convert the operating results for all countries where the functional currency is not the U.S . Dollar. QVC calculates the effect of changes in currency exchange rates as the difference between current period activity translated using the prior period's currency exchange rates. We refer to the results of this calculation as the impact of currency exchange rate fluctuations. Constant currency operating results refers to operating results without the impact of the currency exchange rate fluctuations. The disclosure of constant currency amounts or results permits investors to better understand QVC 's underlying performance without the effects of currency exchange rate fluctuations.

The percentage change in net revenue for QVC in U.S . Dollars and in constant currency was as follows:

| | Year ended December 31, 2025 | | |
| --- | --- | --- | --- |
| | U.S . dollars | Foreign Currency Exchange Impact | Constant currency |
| QxH | (10.0)% | — % | (10.0)% |
| QVC International | (1.7)% | 2.8 % | (4.5)% |

In 2025, QxH's net revenue decline of $662 million, or 10.0% was attributable to a 10.6% decrease in units shipped and a $53 million decrease in shipping and handling revenue. These declines were partially offset by a $156 million decrease in estimated product returns. For the year ended December 31, 2025, QxH experienced shipped sales declines across all product categories. QVC -International's net revenue declined $108 million, or 4.5% in constant currency primarily due to a 2.7% decrease in units shipped across all markets except the U.K . and a 2.5% decrease in ASP across all markets except Italy. These declines were primarily offset by a $42 million decrease in estimated product returns. For the year ended December 31, 2025, QVC -International experienced shipped sales declines in constant currency across all product categories.

***Cost of goods sold (exclusive of depreciation and amortization).*** QVC 's cost of goods sold as a percentage of net revenue was 66.4%, and 65.6% for the years ended December 31, 2025 and 2024, respectively. The increase in cost of goods sold as a percentage of revenue in 2025 was primarily due to higher fulfillment costs across both segments driven by increased freight rates and warehousing costs, and higher product costs driven by tariffs at QxH. These increases were partially offset by improved margins on returns at QxH.

***Operating expenses.*** QVC 's operating expenses are principally comprised of commissions, order processing and customer service expenses, credit card processing fees, and telecommunications expenses. Operating expenses were 7.7% of net revenue for each of the years ended December 31, 2025 and 2024.

***Advertising expenses.*** QVC recorded advertising expenses of $369 million and $312 million for the years ended December 31, 2025 and 2024, respectively. QVC 's advertising expenses increased $57 million, or 18.3% for the year ended December 31, 2025 compared to the corresponding prior year period, primarily due to a $53 million increase in advertising investments at QxH driven by increased focus on social and streaming platforms in the current year.

***Selling, general and administrative expenses (excluding stock-based compensation and advertising).*** QVC 's selling, general and administrative expenses excluding stock-based compensation and advertising include personnel, information technology, credit losses and production costs. Such expenses decreased $17 million and 1.7% for the year ended December 31, 2025 as compared to the prior year and increased as a percentage of net revenue to 11.7% from 11.0%.

The decrease in expense in 2025 resulted from a $54 million decrease in personnel costs attributable to QxH resulting from lower wages due to the reorganization of teams across the Company as part of the WIN strategy announced at the end of the first quarter of 2025 as well as a workforce reduction associated with the shift in the IT operating model that occurred in the second quarter of the prior year. The decrease was partially offset by a $25 million increase in

II-16

management bonus expense primarily attributable to the cancellation of all QVC GA stock-settled and cash-settled RSU awards granted during 2025 and replacing with a cash award (see note 11 of the accompanying consolidated financial statements) and a $16 million increase in professional services expense.

*Depreciation and amortization.* Depreciation and amortization increased $18 million for the year ended December 31, 2025, as compared to the corresponding prior year. The increase in depreciation expense for the twelve months ended December 31, 2025 was primarily due to $45 million of accelerated depreciation of the St. Petersburg, FL campus and associated assets as a result of the closure completed in the third quarter of 2025. This increase was partially offset by a $23 million decrease in amortization expense driven by lower software amortization as a result of assets that fully amortized during 2024 and a decrease in television distribution right amortization and related expenses due to lower subscriber counts.

*Impairment of intangible assets.* QVC recorded intangible asset impairment losses of $930 million and $578 million for the years ended December 31, 2025 and 2024, respectively, related to decreases in the fair value of the QVC and HSN tradenames as a result of quantitative assessments performed by the Company (refer to note 5 to the accompanying consolidated financial statements).

*Impairment of goodwill.* QVC recorded goodwill impairment losses of $1,465 million and $902 million for the years ended December 31, 2025 and 2024, respectively, related to decreases in the fair value of the QxH reporting unit as a result of quantitative assessments performed by the Company (refer to note 5 to the accompanying consolidated financial statements).

*Gains on sales of assets and sale-leaseback transactions.* QVC recorded $5 million gains on sales of assets and sale-leaseback transactions for the year ended December 31, 2025 primarily related to the closing of two of the St. Petersburg property sales. QVC recorded $1 million of gain on sale of assets and sale leaseback transactions for the year ended December 31, 2024 related to the sale-leaseback of a property in Germany.

*Restructuring, penalties and fire related costs, net of (recoveries).* QVC recorded costs of $53 million and $18 million for the years ended December 31, 2025 and 2024, respectively, in restructuring, penalties and fire related costs, net of recoveries. For the year ended December 31, 2025, QVC recorded restructuring charges of $34 million and $19 million at QxH and QVC International, respectively, to reorganize teams across the Company as part of the WIN strategy (refer to note 14 to the accompanying consolidated financial statements). For the year ended December 31, 2024, QVC recorded restructuring charges of $18 million related to the shift in QVC 's IT operating model with a resulting workforce reduction.

*Stock-based compensation.* Stock-based compensation includes compensation related to options and restricted stock granted to certain officers and employees. QVC recorded $15 million and $20 million of stock-based compensation expense for the years ended December 31, 2025 and 2024, respectively. The decrease in 2025 was primarily related to the cancellation of all QVC GA stock-settled and cash-settled RSU awards granted during 2025 (refer to note 11 to the accompany consolidated financial statements).

*CBI*

CBI consists of a portfolio of aspirational home and apparel brands. The home brands are comprised of Ballard Designs, Frontgate, and Grandin Road, while Garnet Hill focuses primarily on apparel and accessories and is categorized as an apparel brand. There are also 35 retail and outlet stores located throughout the U.S ., primarily comprised of Ballard Designs and Frontgate stores in the U.S . that sell merchandise through brick-and-mortar retail locations as well as via the internet through their websites.

CBI 's operating results for the last two years were as follows:

| | Years ended December 31, | |
| --- | --- | --- |
| | 2025 | 2024 |
| | amounts in millions | |
| Total revenue, net - GAAP | $ 937 | 1,040 |
| Cost of goods sold (exclusive of depreciation and amortization shown separately below) | (559) | (619) |
| Operating expenses | (38) | (41) |
| Advertising expenses | (163) | (172) |
| Selling, general and administrative expenses (excluding stock-based compensation and advertising) | (161) | (172) |
| Adjusted OIBDA - Non-GAAP | 16 | 36 |
| Depreciation and amortization | (29) | (32) |
| Impairment of goodwill | (12) | — |
| Stock-based compensation | (1) | (2) |
| Operating income (loss) - GAAP | $ (26) | 2 |

**Total revenue, net.** CBI 's consolidated net revenue decreased 9.9% for the year ended December 31, 2025, as compared to the corresponding prior year, primarily attributable to a decrease in units shipped of 14.0%, partially offset by a 4.0% increase in ASP compared to the prior year. The increase in ASP was primarily the result of price increases to mitigate the impact of tariffs. The decrease in units shipped was due to lower demand across all categories.

**Cost of goods sold (exclusive of depreciation and amortization).** CBI 's cost of goods sold as a percentage of net revenue was 59.7% and 59.5% for the years ended December 31, 2025 and 2024, respectively. The increase in cost of goods sold as a percentage of revenue was primarily due to higher supply chain costs partially offset by higher product margins.

**Operating expenses.** Operating expenses are principally comprised of credit card processing fees and customer service expenses which are variable expenses that support sales activity. CBI 's operating expenses as a percentage of net revenue were 4.1% and 3.9% for the years ended December 31, 2025 and 2024, respectively. Operating expenses decreased $3 million for the year ended December 31, 2025, compared to the prior year, driven by decreased credit card fees and customer service charges due to lower sales volume.

**Advertising expenses.** CBI 's recorded advertising expenses of $163 million and $172 million for the years ended December 31, 2025 and 2024, respectively. CBI 's advertising expenses decreased $9 million primarily due to strategic reductions in catalog circulation and lower digital marketing spend.

**Selling, general and administrative expenses (excluding stock-based compensation and advertising).** CBI 's selling, general and administrative expenses include personnel costs, retail store operating expenses and miscellaneous operating expenses. Such expenses decreased $11 million and 6.4% for the year ended December 31, 2025 as compared to the prior year and increased as a percentage of net revenue to 17.2% from 16.5%. The decrease in selling, general and administrative expenses is primarily due to lower network infrastructure costs and lower legal costs.

**Depreciation and amortization.** CBI 's depreciation and amortization expense decreased $3 million for the year ended December 31, 2025, as compared to the corresponding period in the prior year, primarily due to fully amortizing technology investments during 2024.

**Impairment of goodwill.** CBI recorded goodwill impairment expense of $12 million during the year ended December 31, 2025 related to decreases in the fair value of the CBI reporting unit as a result of quantitative assessments performed by the Company (refer to note 5 to the accompanying consolidated financial statements).

**Stock-based compensation.** CBI 's stock-based compensation expense decreased $1 million for the year ended December 31, 2025, compared to the corresponding period in the prior year.

II-18

**Item 7A. Quantitative and Qualitative Disclosures about Market Risk.**

We are exposed to market risk in the normal course of business due to our ongoing investing and financial activities and the conduct of operations by our subsidiaries in different foreign countries. Market risk refers to the risk of loss arising from adverse changes in stock prices, interest rates and foreign currency exchange rates. The risk of loss can be assessed from the perspective of adverse changes in fair values, cash flows and future earnings. We have established policies, procedures and internal processes governing our management of market risks and the use of financial instruments to manage our exposure to such risks.

We are exposed to changes in interest rates primarily as a result of our borrowing and investment activities, which include investments in fixed and floating rate debt instruments and borrowings used to maintain liquidity and to fund business operations. The nature and amount of our long-term and short-term debt are expected to vary as a result of future requirements, market conditions and other factors. We manage our exposure to interest rates by maintaining what we believe is an appropriate mix of fixed and variable rate debt. We believe this best protects us from interest rate risk. We have achieved this mix by (i) issuing fixed rate debt that we believe has a low stated interest rate and significant term to maturity, (ii) issuing variable rate debt with appropriate maturities and interest rates and (iii) entering into interest rate swap arrangements when we deem appropriate.

As discussed above, the senior secured notes have been classified as a current liability in the consolidated balance sheet, as of December 31, 2025. The table below reflects the contractual maturities of the senior secured notes.

As of December 31, 2025, our debt is comprised of the following amounts:

| | 2026 | 2027 | 2028 | 2029 | 2030 | Thereafter | Total | Fair Value |
|---|---|---|---|---|---|---|---|---|
| | | | | dollar amounts in millions | | | | |
| Fixed rate debt (1) | $ — | 44 | 72 | 1,231 | 932 | 1,425 | 3,704 | 942 |
| Weighted average interest rate on fixed rate debt | — % | 4.8 % | 4.4 % | 6.5 % | 6.2 % | 6.0 % | 6.1 % | N/A |
| Variable rate debt (1) | $ 2,900 | — | — | — | — | — | 2,900 | 2,900 |
| Weighted average interest rate on variable rate debt | 5.5 % | — % | — % | — % | — % | — % | 5.5 % | N/A |

(1) Amounts are reflected in the table at the outstanding principal amount, assuming the debt instruments will remain outstanding until the stated maturity date, and may differ from the amounts stated in our consolidated balance sheet to the extent debt instruments (i) were issued at a discount or premium or (ii) have elements which are reported at fair value in our consolidated balance sheets. Amounts do not assume additional borrowings or refinancings of existing debt.

N/A - Not applicable

*Foreign currency exchange rate risk*

QVC Group is exposed to foreign exchange rate fluctuations related primarily to the monetary assets and liabilities and the financial results of QVC 's foreign subsidiaries. Assets and liabilities of foreign subsidiaries for which the functional currency is the local currency are translated into U.S . Dollars at period-end exchange rates, and the statements of operations are generally translated at the average exchange rate for the period. Exchange rate fluctuations on translating foreign currency financial statements into U.S . Dollars that result in unrealized gains or losses are referred to as translation adjustments. Cumulative translation adjustments are recorded in accumulated other comprehensive earnings (loss) as a separate component of stockholders' equity. Transactions denominated in currencies other than the functional currency are recorded based on exchange rates at the time such transactions arise. Subsequent changes in exchange rates result in transaction gains and losses, which are reflected in income as unrealized (based on period-end translations) or realized upon settlement of the transactions. Cash flows from our operations in foreign countries are translated at the average rate for the period. Accordingly, QVC Group may experience economic loss and a negative impact on earnings and equity with respect to our holdings solely as a result of foreign currency exchange rate fluctuations. QVC 's reported Adjusted OIBDA for each of the years ended December 31, 2025, 2024 and 2023, would have been impacted by approximately $3 million for every 1% change in foreign currency exchange rates relative to the U.S . Dollar.

## Item 8. Financial Statements and Supplementary Data.

The consolidated financial statements of QVC Group are filed under this Item, beginning on page II-25. The financial statement schedules required by Regulation S-X are filed under Item 15 of this Annual Report on Form 10K.

## Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.

None.

## Item 9A. Controls and Procedures.

### Disclosure Controls and Procedures

In accordance with Rules 13a-15 and 15d-15 of the Securities Exchange Act of 1934, as amended (the "Exchange Act " ), the Company carried out an evaluation, under the supervision and with the participation of management, including its chief executive officer and its principal accounting and financial officer and under the supervision of its Board of Directors , of the effectiveness of the design and operation of its disclosure controls and procedures as of December 31, 2025. Based on that evaluation, the chief executive officer, principal accounting and financial officer concluded that the Company 's disclosure controls and procedures were effective as of December 31, 2025 to provide reasonable assurance that information required to be disclosed in its reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms.

### Management's Report on Internal Control Over Financial Reporting

See page II-22 for Management's Report on Internal Control Over Financial Reporting.

### Changes in Internal Control Over Financial Reporting

There has been no change in the Company 's internal control over financial reporting that occurred during the Company 's quarter ended December 31, 2025, that has materially affected, or is reasonably likely to materially affect, the Company 's internal control over financial reporting.

## Item 9B. Other Information.

On April 10, 2026, QVC Group , Inc. (the "Company " ) amended and restated the employment agreements (as amended and restated, the "Employment Agreement s " ) with each of our executive officers (the "Executives " ) and adopted an executive severance plan (as described below), in each case, to provide for market standard severance provisions, including enhanced change in control severance benefits, in accordance with recommendations and materials previously reviewed and approved by the Board of Directors ("Board " ) and the Compensation Committee of the Board . As amended and restated, the material terms of the Employment Agreement s are unchanged from the prior employment agreements, except as described herein.

In connection with the amendment and restatement of the Employment Agreement s , and based on the Compensation Committee's review of updated market compensation data, the target annual bonus percentage for Bill Wafford was increased from 60% to 110% of base salary to bring total target cash compensation for Mr. Wafford closer to competitive market levels.

The Employment Agreement s now also provide that all Executives , in addition to terminations of employment without "cause", will be eligible for severance benefits upon a resignation with "good reason" (as each such term is defined in the applicable Employment Agreement , and each such termination, an "Involuntary Term ination " ), to the extent their original agreement did not already provide for severance benefits upon a resignation with "good reason." Upon an Involuntary Term ination outside of a Change in Control Period (as defined below) and subject to such Executive's execution and non-revocation of a general release of claims and ongoing compliance with certain restrictive covenant obligations, all Executives (other than David Rawlinson) will be eligible for the following severance benefits: (i) a severance payment equal to 1.5x the sum of the Executive's base salary and target annual bonus; (ii) a pro-rata target annual bonus for the termination year ("Pro-Rata Bonus " ); and (iii) continued participation for the Executive and their eligible dependents in the Company 's group health plan at the Company 's expense for up to 18 months (the "COBRA

II-20

Benefit"). In addition to the foregoing, Mr. Rawlinson, in addition to his existing severance entitlements and subject to the same terms and conditions thereof, will be entitled to receive a Pro-Rata Bonus and the COBRA Benefit. In addition, the Employment Agreement with Mr. Rawlinson was amended to provide that his term of employment, previously set to expire in December 2027 without automatic renewal, will now automatically renew for successive one-year periods unless either Mr. Rawlinson or the Company provides notice of non-renewal prior to the applicable renewal date. If the Company elects not to renew Mr. Rawlinson's Employment Agreement , he will be entitled to receive the severance benefits described above and below in connection with an Involuntary Term ination . If Mr. Rawlinson elects not to renew his employment term, he will not be entitled to such severance benefits.

The Employment Agreement s also provide that, upon an Involuntary Term ination occurring during the period that is three months prior to or 18 months following a Change in Control (as defined in the Employment Agreement s ) ("Change in Control Period " ), in lieu of the foregoing, the Executives will be eligible to receive the following severance benefits: (i) a severance payment equal to 2.0x (or 2.5x for Mr. Rawlinson) the sum of the Executive's base salary and target annual bonus; (ii) a Pro-Rata Bonus ; (iii) the COBRA Benefit and (iv) for Mr. Rawlinson only, payment of any earned but unpaid bonus for the prior year.

The foregoing description of the Employment Agreement s with the Executives is not complete and is subject to, and qualified in its entirety by reference to the Employment Agreement s , copies of which are attached to this report as Exhibits 10.53 and 10.54 and are incorporated by reference herein.

In addition to amending and restating employment agreements with the Executives , the Company adopted an executive severance plan, which provides employees with a title of vice president or higher with certain severance benefits based on such employee's tenure with the Company at the time of termination and/or whether such termination occurs during a Change in Control Period .

**Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections.**

Not Applicable.

II-21

**MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING**

Management of the Company is responsible for establishing and maintaining adequate internal control over the Company 's financial reporting, as such term is defined in Rules 13a-15(f) of the Exchange Act . The Company 's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP . Because of inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate.

The Company 's management, with participation of its chief executive officer and principal accounting and financial officer, under the oversight of the Company 's Board of Directors , evaluated the effectiveness of internal control over financial reporting as of December 31, 2025, using the criteria in Internal Control-Integrated Framework (2013), issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on that evaluation, management concluded that, as of December 31, 2025, the Company 's internal control over financial reporting is effective.

This Annual Report on Form 10-K does not include an audit report of the Company 's independent registered public accounting firm regarding internal control over financial reporting. Management's Report On Internal Control Over Financial Reporting was not subject to audit by the Company 's independent registered public accounting firm pursuant to the rules of the Securities and Exchange Commission.

II-22

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and Board of Directors
QVC Group , Inc.:

*Opinion on the Consolidated Financial Statements*

We have audited the accompanying consolidated balance sheets of QVC Group , Inc. and subsidiaries (the Company ) as of December 31, 2025 and 2024, the related consolidated statements of operations, comprehensive earnings (loss), cash flows and equity for each of the years in the three-year period ended December 31, 2025, and the related notes (collectively, the consolidated financial statements). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2025 and 2024, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2025, in conformity with U.S . generally accepted accounting principles.

*Going Concern*

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in note 1 to the consolidated financial statements, the Company 's Credit Facility matures on October 27, 2026. In addition, the Company has exceeded their net leverage ratio as of December 31, 2025, which constitutes a breach of the financial covenant. These circumstances raise substantial doubt about the Company 's ability to continue as a going concern. Management's plans in regard to these matters are also described in note 1. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

*Basis for Opinion*

These consolidated financial statements are the responsibility of the Company 's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S . federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company 's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

*Critical Audit Matters*

The critical audit matters communicated below are matters arising from the current period audit of the consolidated financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the consolidated financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

II-23

*Sufficiency of audit evidence over revenue*

As discussed in note 2 to the consolidated financial statements, and disclosed in the consolidated statements of operations, the Company generated $9,230 million of revenue for the year ended December 31, 2025. Substantially all of the Company 's customer orders, fulfillment and delivery services are dependent upon the use of information technology (IT) systems.

We identified the evaluation of the sufficiency of audit evidence over revenue as a critical audit matter. Evaluating the sufficiency of audit evidence required subjective auditor judgment due to the highly automated nature of certain processes to record revenue that involve interfacing significant volumes of data across multiple IT systems. The complexity of the IT environment required the involvement of IT professionals with specialized skills and knowledge.

The following are the primary procedures we performed to address this critical audit matter. We applied auditor judgment to determine the nature and extent of procedures to be performed over the processing and recording of revenue, including the IT systems tested. We involved IT professionals with specialized skills and knowledge, who assisted in testing certain general IT and automated internal controls over the IT systems used for the processing and recording of revenue, as well as certain internal controls to reconcile information produced by the various systems to the Company 's general ledger. We assessed the revenue recorded by comparing cash receipts, adjusted for reconciling items, to the revenue recorded in the general ledger. We evaluated the sufficiency of audit evidence obtained over revenue by assessing the results of procedures performed, including the appropriateness of such evidence.

*Fair values of the QxH reporting unit and tradenames with indefinite lives*

As discussed in notes 2 and 5 to the consolidated financial statements, the Company 's reporting units align with its operating segments and the QxH operating segment goodwill balance was $0 as of December 31, 2025. Tradenames with indefinite lives were $1,190 million as of December 31, 2025. The Company performs goodwill and indefinite-lived intangible asset impairment testing on an annual basis and more frequently if events and circumstances indicated that the asset might be impaired. The fair value of the QxH reporting unit was determined using a discounted cash flow method, and a goodwill impairment of $1,465 million was recorded. The fair value of tradenames with indefinite lives was determined using the relief from royalty method and a tradename impairment of $930 million was recorded. The impairment losses were recorded in the second quarter of 2025.

We identified the evaluation of the fair values of the QxH reporting unit and tradenames with indefinite lives as a critical audit matter. Subjective auditor judgment was required to evaluate the discount rates used to estimate the fair value of the QxH reporting unit and tradenames with indefinite lives. Minor changes in these assumptions could have had a significant impact on the fair values. Additionally, the evaluation of the discount rates required the involvement of professionals with specialized skills and knowledge.

The following are the primary procedures we performed to address this critical audit matter. We involved valuation professionals with specialized skills and knowledge, who assisted in evaluating the discount rates used by management by comparing them to a range of independently developed discount rates using publicly available market data for comparable companies.

/s/ KPMG LLP

We have served as the Company 's auditor since 1995.

Philadelphia, Pennsylvania
April 15, 2026

II-24

Case: 26-2041   Document: 15   Page: 231   Date Filed: 07/30/2026

**QVC GROUP, INC. AND SUBSIDIARIES**

**Consolidated Balance Sheets**

**December 31, 2025 and 2024**

| | | 2025 | 2024 |
|---|---|---:|---:|
| | | amounts in millions | |
| **Assets** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ | 1,972 | 905 |
| Trade and other receivables, net of allowance for credit losses of $79 million and $91 million, respectively | | 1,040 | 1,143 |
| Inventories | | 972 | 1,061 |
| Other current assets | | 239 | 190 |
| Total current assets | | 4,223 | 3,299 |
| Property and equipment, net of accumulated depreciation of $974 million and $958 million respectively | | 401 | 502 |
| Intangible assets not subject to amortization (note 5): | | | |
| Goodwill | | 800 | 2,217 |
| Tradenames | | 1,190 | 2,120 |
| | | 1,990 | 4,337 |
| Intangible assets subject to amortization, net (note 5) | | 336 | 402 |
| Operating lease right-of-use assets | | 570 | 600 |
| Other assets | | 106 | 103 |
| Assets held for sale noncurrent (note 14) | | 17 | — |
| Total assets | $ | 7,643 | 9,243 |

(continued)

II-25

Case: 26-2041   Document: 15   Page: 231   Date Filed: 07/30/2026

**QVC GROUP, INC. AND SUBSIDIARIES**

**Consolidated Balance Sheets**

**December 31, 2025 and 2024**

**QVC GROUP, INC. AND SUBSIDIARIES**

**Consolidated Balance Sheets (Continued)**

**December 31, 2025 and 2024**

| | December 31, 2025 | December 31, 2024 |
|---|---|---|
| | amounts in millions, except share amounts | |
| *Liabilities and Equity* | | |
| Current liabilities: | | |
| Accounts payable | $ 701 | 776 |
| Accrued liabilities | 801 | 953 |
| Current portion of debt, including $52 million and $282 million measured at fair value (note 6) | 5,075 | 867 |
| Other current liabilities | 97 | 128 |
| Total current liabilities | 6,674 | 2,724 |
| Long-term debt (note 6) | 790 | 4,101 |
| Deferred income tax liabilities (note 8) | 1,144 | 1,313 |
| Preferred stock (note 9) | 1,366 | 1,272 |
| Operating lease liabilities (note 7) | 580 | 598 |
| Other liabilities | 106 | 120 |
| Total liabilities | 10,660 | 10,128 |
| *Equity* | | |
| Stockholders' equity (note 9): | | |
| Series A common stock, $.01 par value. Authorized 4,000,000,000 shares; issued and outstanding 7,903,233 shares at December 31, 2025 and 7,793,090 shares at December 31, 2024 | — | — |
| Series B common stock, $.01 par value. Authorized 150,000,000 shares; issued and outstanding 182,233 shares at December 31, 2025 and 178,557 shares at December 31, 2024 | — | — |
| Series C common stock, $.01 par value. Authorized 4,000,000,000 shares; no shares issued | — | — |
| Additional paid-in capital | 142 | 138 |
| Accumulated other comprehensive earnings (loss), net of taxes | 291 | (15) |
| Retained earnings (accumulated deficit) | (3,533) | (1,094) |
| Total stockholders' equity (deficit) | (3,100) | (971) |
| Noncontrolling interests in equity of subsidiaries | 83 | 86 |
| Total equity | (3,017) | (885) |
| Commitments and contingencies (note 14) | | |
| Total liabilities and equity | $ 7,643 | 9,243 |

See accompanying notes to consolidated financial statements.

II-26

**QVC GROUP, INC. AND SUBSIDIARIES**

**Consolidated Statements Of Operations**

**Years ended December 31, 2025, 2024 and 2023**

| | | 2025 | 2024 | 2023 |
|---|---|---:|---:|---:|
| | | | amounts in millions, except per share amounts | |
| Total revenue, net | $ | 9,230 | 10,037 | 10,915 |
| Operating costs and expenses: | | | | |
| Cost of goods sold (exclusive of depreciation and amortization shown separately below) | | 6,064 | 6,524 | 7,230 |
| Operating expense | | 675 | 734 | 795 |
| Selling, general and administrative, including stock-based compensation | | 1,736 | 1,708 | 1,869 |
| Depreciation and amortization | | 398 | 383 | 407 |
| Impairment of intangible assets (note 5) | | 930 | 578 | — |
| Impairment of goodwill (note 5) | | 1,477 | 902 | 326 |
| Gains on sales of assets and sale leaseback transactions | | (5) | (1) | (113) |
| Restructuring, penalties and fire related costs, net of (recoveries) (note 14) | | 53 | 18 | (189) |
| | | 11,328 | 10,846 | 10,325 |
| Operating income (loss) | | (2,098) | (809) | 590 |
| Other income (expense): | | | | |
| Interest expense | | (496) | (468) | (451) |
| Interest and dividend income | | 50 | 50 | 52 |
| Realized and unrealized gains (losses) on financial instruments, net (note 4) | | (40) | (60) | (61) |
| Loss on disposition of Zulily , net (note 1) | | — | — | (64) |
| Tax sharing income (expense) with Liberty Broadband | | 10 | (4) | (11) |
| Other, net | | (9) | — | 11 |
| | | (485) | (482) | (524) |
| Earnings (loss) before income taxes | | (2,583) | (1,291) | 66 |
| Income tax (expense) benefit (note 8) | | 185 | 41 | (160) |
| Net earnings (loss) | | (2,398) | (1,250) | (94) |
| Less net earnings (loss) attributable to the noncontrolling interests | | 41 | 40 | 51 |
| Net earnings (loss) attributable to QVC Group , Inc. shareholders | $ | (2,439) | (1,290) | (145) |
| | | | | |
| Basic and diluted net earnings (loss) attributable to Series A and Series B QVC Group , Inc. shareholders per common share (note 2): | $ | (302.97) | (163.00) | (18.50) |

See accompanying notes to consolidated financial statements.

II-27

**QVC GROUP, INC. AND SUBSIDIARIES**

**Consolidated Statements Of Comprehensive Earnings (Loss)**

**Years ended December 31, 2025, 2024 and 2023**

|  | 2025 | 2024 | 2023 |
|---|---|---|---|
|  | amounts in millions | | |
| Net earnings (loss) | $ (2,398) | (1,250) | (94) |
| Other comprehensive earnings (loss), net of taxes: | | | |
| Foreign currency translation adjustments | 108 | (87) | 15 |
| Recognition of previously unrealized losses (gains) on debt, net | (8) | — | (43) |
| Credit risk on fair value debt instruments gains (loss) (note 13) | 206 | (21) | 84 |
| Other | — | — | 5 |
| Other comprehensive earnings (loss) | 306 | (108) | 61 |
| Comprehensive earnings (loss) | (2,092) | (1,358) | (33) |
| Less comprehensive earnings (loss) attributable to the noncontrolling interests | 41 | 33 | 44 |
| Comprehensive earnings (loss) attributable to QVC Group , Inc. shareholders | $ (2,133) | (1,391) | (77) |

See accompanying notes to consolidated financial statements.

II-28

**QVC GROUP, INC. AND SUBSIDIARIES**

**Consolidated Statements Of Cash Flows**

**Years ended December 31, 2025, 2024 and 2023**

| | 2025 | 2024 | 2023 |
|---|---|---|---|
| | | amounts in millions (See note 3) | |
| Cash flows from operating activities: | | | |
| Net earnings (loss) | $ (2,398) | (1,250) | (94) |
| Adjustments to reconcile net earnings to net cash provided by operating activities: | | | |
| Depreciation and amortization | 398 | 383 | 407 |
| Impairment of intangible assets | 930 | 578 | — |
| Impairment of goodwill | 1,477 | 902 | 326 |
| Stock-based compensation | 16 | 32 | 53 |
| Noncash interest expense | 101 | 7 | 9 |
| Realized and unrealized (gains) losses on financial instruments, net | 40 | 60 | 61 |
| Gains on sales of assets and sale leaseback transactions | (5) | (1) | (113) |
| Deferred income tax expense (benefit) | (230) | (211) | 80 |
| Gain on insurance proceeds, net of fire related costs | — | — | (225) |
| Insurance proceeds received for inventory, operating expenses and business interruption losses | — | — | 226 |
| Loss on disposition of Zulily , net | — | — | 64 |
| Other, net | 3 | (6) | 15 |
| Changes in operating assets and liabilities | | | |
| Decrease (increase) in trade and other receivables | 104 | 144 | 36 |
| Decrease (increase) in inventories | 112 | (28) | 257 |
| Decrease (increase) in prepaid expenses and other assets | 121 | 67 | 68 |
| (Decrease) increase in trade accounts payable | (89) | (104) | (34) |
| (Decrease) increase in accrued and other liabilities | (306) | (48) | (217) |
| Net cash provided (used) by operating activities | 274 | 525 | 919 |
| Cash flows from investing activities: | | | |
| Capital expenditures | (156) | (199) | (230) |
| Expenditures for television distribution rights | (93) | (37) | (113) |
| Proceeds from sale of fixed assets | 12 | 6 | 208 |
| Cash proceeds from dispositions of investments | — | 7 | 71 |
| Cash paid for disposal of Zulily | — | — | (41) |
| Insurance proceeds received for fixed asset loss | — | — | 54 |
| Payments for settlements of financial instruments | — | — | (179) |
| Payments from settlements of financial instruments | — | — | 167 |
| Other investing activities, net | (8) | (2) | 9 |
| Net cash provided (used) by investing activities | (245) | (225) | (54) |
| Cash flows from financing activities: | | | |
| Borrowings of debt | 1,986 | 2,014 | 1,267 |
| Repayments of debt | (870) | (2,454) | (2,258) |
| Dividends paid to noncontrolling interest | (44) | (51) | (53) |
| Dividends paid to common shareholders | (1) | (4) | (8) |
| Indemnification agreement settlement | — | — | 45 |
| Other financing activities, net | (7) | (3) | (3) |
| Net cash provided (used) by financing activities | 1,064 | (498) | (1,010) |
| Effect of foreign currency exchange rates on cash, cash equivalents and restricted cash | 17 | (15) | (4) |
| Net increase (decrease) in cash, cash equivalents and restricted cash | 1,110 | (213) | (149) |
| Cash, cash equivalents and restricted cash at beginning of year | 923 | 1,136 | 1,285 |
| Cash, cash equivalents and restricted cash at end of year | $ 2,033 | 923 | 1,136 |

See accompanying notes to consolidated financial statements.

II-29

**QVC GROUP, INC. AND SUBSIDIARIES**

**Consolidated Statements Of Equity**

**Years ended December 31, 2025, 2024 and 2023**

| | Stockholders' Equity (Deficit) | | | | | | |
| | Common stock | | Additional paid-in capital | Accumulated other comprehensive earnings (loss) | Retained earnings (accumulated deficit) | Noncontrolling interest in equity of subsidiaries | Total equity |
| | Series A | Series B | | | | | |
| | | | | amounts in millions | | | |
| Balance at December 31, 2022 | $ — | — | 57 | 18 | 337 | 113 | 525 |
| Net earnings (loss) | — | — | — | — | (145) | 51 | (94) |
| Other comprehensive earnings (loss) | — | — | — | 68 | — | (7) | 61 |
| Stock-based compensation | — | — | 46 | — | — | — | 46 |
| Distribution to noncontrolling interest | — | — | — | — | — | (53) | (53) |
| Withholding taxes on net share settlements of stock-based compensation | — | — | (1) | — | — | — | (1) |
| Distribution of dividends to common and preferred shareholders | — | — | — | — | 4 | — | 4 |
| Other | — | — | 1 | — | — | — | 1 |
| Balance at December 31, 2023 | — | — | 103 | 86 | 196 | 104 | 489 |
| Net earnings (loss) | — | — | — | — | (1,290) | 40 | (1,250) |
| Other comprehensive earnings (loss) | — | — | — | (101) | — | (7) | (108) |
| Stock-based compensation | — | — | 35 | — | — | — | 35 |
| Distribution to noncontrolling interest | — | — | — | — | — | (51) | (51) |
| Withholding taxes on net share settlements of stock-based compensation | — | — | (2) | — | — | — | (2) |
| Other | — | — | 2 | — | — | — | 2 |
| Balance at December 31, 2024 | — | — | 138 | (15) | (1,094) | 86 | (885) |
| Net earnings (loss) | — | — | — | — | (2,439) | 41 | (2,398) |
| Other comprehensive earnings (loss) | — | — | — | 306 | — | — | 306 |
| Stock-based compensation | — | — | 5 | — | — | — | 5 |
| Distribution to noncontrolling interest | — | — | — | — | — | (44) | (44) |
| Other | — | — | (1) | — | — | — | (1) |
| Balance at December 31, 2025 | $ — | — | 142 | 291 | (3,533) | 83 | (3,017) |

See accompanying notes to consolidated financial statements.

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements**

**December 31, 2025, 2024 and 2023**

**(1) Basis of Presentation**

The accompanying consolidated financial statements include the accounts of QVC Group , Inc. (formerly named Qurate Retail, Inc.) and its controlled subsidiaries (collectively, "QVC Group ," the "Company ," "we," "us," and "our") unless the context otherwise requires). All significant intercompany accounts and transactions have been eliminated in consolidation. QVC Group is made up of wholly-owned subsidiaries QVC , Inc. ("QVC " ), which includes HSN , Inc. ("HSN " ), Cornerstone Brands, Inc. ("CBI " ), and other equity investments, and is primarily engaged in the video and online commerce industries in North America, Europe and Asia.

The consolidated financial statements in this Annual Report on Form 10-K have been prepared in accordance with U.S . Generally Accepted Accounting Principles ("GAAP ") assuming the Company will continue as a going concern. The going concern assumption contemplates the realization of assets and satisfaction of liabilities and commitments in the normal course of business. As of December 31, 2025, QVC 's net leverage ratio, as calculated under the Fifth Amended and Restated Credit Agreement (the "Credit Agreement " and the credit facility thereunder, the "Credit Facility " ), was greater than 4.5 to 1.0. Under the terms of the Credit Agreement , this constitutes a breach of the financial covenant. Without a waiver under the Credit Agreement , the lenders have the right, but not the obligation, to accelerate the loans and demand repayment from QVC for noncompliance with the net leverage ratio debt covenant; however such acceleration cannot occur until certain conditions are satisfied, including the expiration of a cure period during which QVC may take remedial action to cure the breach.

Additionally, under the indentures governing the senior secured notes, a default under the Credit Agreement will only constitute an event of default under the indentures, and thus trigger the right, but not the obligation, of the noteholders to accelerate the senior secured notes and demand repayment if (i) the Credit Agreement has been accelerated, (ii) there is a payment default under the Credit Agreement or (iii) there is a foreclosure on collateral securing the Credit Agreement . Accordingly, acceleration of the senior secured notes is not automatic upon a breach of the Credit Agreement covenant; it is contingent upon the occurrence of one of these specified events under the Credit Agreement .

The outstanding principal associated with the Credit Facility and senior secured notes is $5,046 million. As a result of the above-noted net leverage ratio and the maturity date of the Credit Facility , outstanding balances have been classified as a current liability in the consolidated balance sheet, as of December 31, 2025.

QVC Group and certain of our direct and indirect subsidiaries, including QVC , Inc. (collectively, the "Company Parties " ), intend to commence voluntary cases (the "Chapter 11 Cases " ) under Chapter 11 of Title 11 of the United States Code (the "Bank ruptcy Code " ) in the United States Bank ruptcy Court for the Southern District of Texas (the "Bank ruptcy Court " ). We intend to operate our businesses as a debtor-in-possession under the jurisdiction of the Bank ruptcy Court in accordance with the applicable provisions of the Bank ruptcy Code and orders of the Bank ruptcy Court . QVC Group and QVC , Inc. intend to request approval from the Bank ruptcy Court for a variety of "first day" motions to continue our ordinary course operations during the Chapter 11 Cases .

Subsequent to the filing of our Chapter 11 Cases , we will adopt Financial Accounting Standards Board ASC Topic 852 - Reorganizations, which specifies the accounting and financial reporting requirements for entities reorganizing through Chapter 11 bankruptcy proceedings. These requirements include distinguishing transactions associated with the reorganization separate from activities related to the ongoing operations of the business.

Commencing the Chapter 11 Cases will constitute an event of default that accelerates the Company Parties ' respective obligations under (i) the 4.750% Senior Secured Notes due 2027, 4.375% Senior Secured Notes due 2028, 6.875% Senior Secured Notes due 2029, 5.450% Senior Secured Notes due 2034, 5.950% Senior Secured Notes due 2043, 6.375% Senior Secured Notes due 2067, and 6.250% Senior Secured Notes due 2068 (collectively, the "QVC Notes " ), issued by QVC , (ii) the 3.75% senior unsecured exchangeable debentures due 2030, 4.00% senior unsecured exchangeable debentures due 2029, 8.25% senior unsecured debentures due 2030, and 8.50% senior unsecured debentures due 2029 (collectively, the "LINTA Notes " ), issued by Liberty Interactive LLC ("LI LLC " ) and (iii) the Credit Facility . The Credit Facility , together with the QVC Notes and LINTA Notes , are herein referred to as the "Debt Instruments " . The Credit Facility and the QVC Notes provide that, as a result of the Chapter 11 Cases , the principal and interest due thereunder shall be immediately due and payable. The exchangeable senior debentures provide that the amount accelerated is the greater of

II-31

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements**

**December 31, 2025, 2024 and 2023**

(x) the current principal amount of the exchangeable senior debentures or (y) the market value of the reference shares, plus all accrued and unpaid interest and all pass-through distributions due with respect to the reference shares shall be immediately due and payable. Any efforts to enforce such payment obligations under the Debt Instruments will be automatically stayed as a result of the Chapter 11 Cases , and the stakeholders' rights of enforcement in respect of the Debt Instruments will be subject to the applicable provisions of the Bank ruptcy Code , including the Automatic Stay .

As a result of the risks and uncertainties associated with our Chapter 11 Cases , we cannot accurately predict or quantify the ultimate impact or timing of events that occur during our Chapter 11 Cases and the impact that those events will have on our business, financial condition and results of operations. Therefore, there is substantial doubt about the Company 's ability to continue as a going concern.

*Automatic Stay and Other Protections*

Subject to certain exceptions under the Bank ruptcy Code , pursuant to Section 362 of the Bank ruptcy Code , the filing of our Chapter 11 Cases will automatically stay the continuation of most legal proceedings or the filing of other actions against or on behalf of QVC Group or our property to recover on, collect or secure a claim arising prior to the filing of our Chapter 11 Cases or to exercise control over property of our bankruptcy estate, unless and until the Bank ruptcy Court modifies or lifts the automatic stay as to any such claim (the "Automatic Stay "). Notwithstanding the general application of the Automatic Stay described above and other protections afforded by the Bank ruptcy Code , governmental authorities may determine to continue actions brought under their police and regulatory powers.

*Nasdaq Delisting*

We expect to receive a delisting notice (the "Delisting Notice ") from the Nasdaq Stock Market LLC notifying us that, in connection with the Chapter 11 Cases and in accordance with Nasdaq Listing Rule 5550(a)(2), the Nasdaq Stock Market LLC has determined that our shares of capital stock would be delisted from the Nasdaq Capital Market and that trading of our shares of capital stock on the Nasdaq Capital Market will be suspended immediately. Following the suspension of trading on the Nasdaq Capital Market, we expect our shares of capital stock to be quoted on the OTCID Basic Market or another over-the-counter market. The over-the-counter markets are significantly more limited than the Nasdaq Capital Market. Quotation on the OTCID Basic Market or another over-the-counter market could result in a less liquid market for existing and potential holders of our capital stock and could further depress the trading price of our capital stock. We can provide no assurance as to whether broker-dealers will continue to provide public quotes of our capital stock on the over-the-counter markets, or whether the trading volume of our capital stock will be sufficient to provide for an efficient trading market.

We also expect Nasdaq Stock Market LLC to file a Form 25 for us in connection with the delisting of our shares of capital stock from the Nasdaq Capital Market. The delisting will become effective ten days after the Form 25 is filed. In accordance with Rule 12d2-2 of the Exchange Act , the deregistration of our shares of capital stock under Section 12(b) of the Exchange Act will become effective 90 days after the date the Form 25 is filed.

*LMC Agreements*

QVC Group has entered into certain agreements with Liberty Media Corporation ("LMC "), a separate publicly traded company. These agreements include a reorganization agreement, services agreement and facilities sharing agreement. As a result of certain corporate transactions, LMC and QVC Group may have obligations to each other for certain tax related matters. Neither QVC Group nor LMC has any stock ownership, beneficial or otherwise, in the other. In connection with a split-off transaction that occurred in the first quarter of 2018 (the "GCI Liberty Split-Off "), QVC Group and an entity formerly known as GCI Liberty, Inc. ("prior GCI Liberty") entered into a tax sharing agreement. Pursuant to the tax sharing agreement, prior GCI Liberty agreed to indemnify QVC Group for taxes and tax-related losses resulting from the GCI Liberty Split-Off to the extent such taxes or tax-related losses (i) result primarily from, individually or in the aggregate, the breach of certain restrictive covenants made by prior GCI Liberty (applicable to actions or failures to act by prior GCI Liberty and its subsidiaries following the completion of the GCI Liberty Split-Off ), or (ii) result from Section 355(e) of the Internal Revenue Code applying to the GCI Liberty Split-Off as a result of the GCI Liberty Split-Off being

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements**

**December 31, 2025, 2024 and 2023**

part of a plan (or series of related transactions) pursuant to which one or more persons acquire, directly or indirectly, a 50-percent or greater interest (measured by vote or value) in the stock of prior GCI Liberty (or any successor corporation). Following a merger between Liberty Broadband Corporation ("Liberty Broadband ") and prior GCI Liberty, Liberty Broadband has assumed the tax sharing agreement. QVC Group has recorded a payable to Liberty Broadband under the tax sharing agreement in the amount of approximately $10 million and $20 million as of December 31, 2025 and December 31, 2024, respectively, included in other liabilities in the consolidated balance sheets.

The reorganization agreement with LMC provides for, among other things, provisions governing the relationship between QVC Group and LMC , including certain cross-indemnities. Pursuant to the services agreement, LMC provided QVC Group with general and administrative services including legal, tax, accounting, treasury, information technology, cybersecurity, and investor relations support. In December 2019, the Company entered into an amended services agreement. Under the amended services agreement, components of the compensation paid to LMC 's former Chief Executive's Officer ("CEO ") (who also served as our Chairman of the Board ) were either paid directly to him or reimbursed to LMC , in each case, based on allocations set forth in the amended services agreement. LMC 's former CEO 's employment arrangement with LMC ended on December 31, 2024, but he continues to serve as Chairman of QVC Group pursuant to a new employment agreement with our Company . See note 10 for additional information.

QVC Group reimburses LMC for direct, out-of-pocket expenses incurred by LMC in providing these services and for QVC Group 's allocable portion of costs associated with any shared services or personnel based on an estimated percentage of time spent providing services to QVC Group . As part of its ongoing strategy to expand into a live social shopping company, QVC Group has undertaken various organizational and strategic changes. As part of that transition, all then current officers of QVC Group (with limited exceptions) stepped down from their officer positions, during the first half of 2025, and these positions were assumed by members of the QVC management team, effective as of April 1, 2025. LMC continued to support QVC Group throughout the transition period, which was substantially completed during the third quarter of 2025. During the third quarter of 2025, the management of QVC Group and QVC began to perform certain general and administrative services previously provided to QVC Group by LMC , and as a result LMC substantially reduced their provided services. Under these various agreements approximately $5 million, $8 million and $7 million of these allocated expenses were reimbursable from QVC Group to LMC for the years ended December 31, 2025, 2024 and 2023, respectively.

*Reverse Stock Split*

On May 22, 2025, the Company filed an amendment to its Restated Certificate of Incorporation (the "Charter Amendment " ) with the Secretary of State of the State of Delaware to effect a reverse stock split of the Company 's Series A common stock, par value 0.01 per share ("QVC GA " ), and Series B common stock, par value 0.01 per share ("QVC GB " and, together with QVC GA , the "Common Stock " ), at a ratio of 1-for-50 (the "Reverse Stock Split " ). There was no change to the number of QVC GA and QVC GB shares currently authorized. The Charter Amendment was authorized by the stockholders of the Company at the Company 's Annual Meeting of Stockholders held on May 12, 2025.

Pursuant to the Charter Amendment on May 22, 2025, every 50 shares of QVC GA and QVC GB were automatically converted into one share of QVC GA and QVC GB , respectively, without any change in par value per share. The number of shares of Common Stock reserved for issuance, the number of shares subject to the then-outstanding awards, and the purchase or exercise price or payout value based on a number of shares of the then-outstanding awards were proportionately adjusted. The Company did not issue fractional shares of Common Stock in connection with the Reverse Stock Split . Instead, stockholders who were otherwise entitled to receive a fractional share of Common Stock following the Reverse Stock Split received a cash payment (without interest) in lieu of such fractional shares. .

The Company 's Common Stock began trading on the Nasdaq Capital Market on a split-adjusted basis at the opening of trading on May 23, 2025. On May 27, 2025, the Company elected to have QVC GB suspended from trading on the Nasdaq Capital Market and QVC GB began quotation on the OTCQB Venture Market on May 28, 2025.

Unless noted, all shares of Common Stock , including Common Stock underlying stock options and restricted stock units, as well as all conversion ratios, exercise prices, conversion prices and per share information in the consolidated

II-33

Case 26-242041 Document 715-1 15 Filed Page TX40 on Date Filed: 07/30/2026 129

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements**

**December 31, 2025, 2024 and 2023**

financial statements have been retroactively adjusted to reflect the 1-for-50 Reverse Stock Split , as if the split occurred at the beginning of the earliest period presented in this Annual Report on Form 10-K.

*Zulily Divestiture*

Zulily , LLC ("Zulily " ) was a wholly owned subsidiary of QVC Group until its divestiture on May 24, 2023. QVC Group recognized a loss on the divestiture of $64 million in the second quarter of 2023. Zulily is included in Corporate and other through May 23, 2023 and is not presented as a discontinued operation as the disposition did not represent a strategic shift that had a major effect on QVC Group 's operations and financial results.

Included in revenue in the accompanying consolidated statements of operations is $301 million for the year ended December 31, 2023, related to Zulily . Included in net earnings (loss) in the accompanying consolidated statement of operations are losses of $44 million for the year ended December 31, 2023, related to Zulily .

## (2) Summary of Significant Accounting Policies

### Cash and Cash Equivalents

Cash equivalents consist of investments which are readily convertible into cash and have maturities of three months or less at the time of acquisition.

### Restricted Cash

Restricted cash as of December 31, 2025 primarily includes cash deposits to cover potential disputes or other financial obligations with certain counterparties and a cash deposit with a third party trustee that provides financial assurance that the Company will fulfill its obligations in relation to claims under its workers' compensation policy.

Restricted cash as of December 31, 2024 primarily includes the above noted cash deposit with a third party trustee.

### Trade Receivables

Trade and Other Receivables from major credit cards represents amounts owed to QVC Group from the credit card clearing houses for amounts billed but not yet collected. Trade and Other Receivables consisted of the following:

| (in millions) | December 31, 2025 | 2024 |
|---|---|---|
| Installment payment option | $ 816 | 946 |
| Major credit cards and customers | 179 | 205 |
| Trade accounts receivable | 995 | 1,151 |
| Other receivables | 124 | 83 |
| Trade and other receivables | 1,119 | 1,234 |
| Less: allowance for credit losses | (79) | (91) |
| Trade and other receivables, net | $ 1,040 | 1,143 |

Trade receivables are reflected net of sales returns. A provision for credit losses is provided as a percentage of accounts receivable based on historical experience in the period of sale and included in selling, general and administrative expense ("SG&A " ). A provision for vendor receivables are determined based on an estimate of probable expected losses and included in cost of goods sold.

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

A summary of activity in the allowance for credit losses is as follows:

| | Balance beginning of year | Additions | | Deductions-write-offs | Balance end of year |
| | | Charged to expense | Other | | |
|---|---|---|---|---|---|
| | | amounts in millions | | | |
| 2025 | $ 91 | 50 | — | (62) | 79 |
| 2024 | $ 102 | 57 | (1) | (67) | 91 |
| 2023 | $ 111 | 59 | (6) | (62) | 102 |

### *Inventories*

Inventories, consisting primarily of products held for sale, is stated at the lower of cost or market. Cost is determined by the average cost method, which approximates the first-in, first-out method. Assessments about the realizability of inventory require the Company to make judgments based on currently available information about the likely method of disposition including sales to individual customers, returns to product vendors, liquidations and the estimated recoverable values of each disposition category.

### *Derivative Instruments and Hedging Activities*

All of the Company 's derivatives, whether designated in hedging relationships or not, are recorded on the balance sheet at fair value. If the derivative is designated as a fair value hedge, the changes in the fair value of the derivative and of the hedged item attributable to the hedged risk are recognized in earnings. If the derivative is designated as a cash flow hedge, the effective portions of changes in the fair value of the derivative are recorded in other comprehensive earnings (loss) and are recognized in the statements of operations when the hedged item affects earnings (loss). Ineffective portions of changes in the fair value of cash flow hedges are recognized in earnings. If the derivative is not designated as a hedge, changes in the fair value of the derivative are recognized in earnings.

The Company generally enters into derivative contracts that it intends to designate as a hedge of a forecasted transaction or the variability of cash flows to be received or paid related to a recognized asset or liability (cash flow hedge). For all hedging relationships, the Company formally documents the hedging relationship and its risk management objective and strategy for undertaking the hedge, the hedging instrument, the hedged item, the nature of the risk being hedged, how the hedging instrument's effectiveness in offsetting the hedged risk will be assessed prospectively and retrospectively, and a description of the method of measuring ineffectiveness. The Company also formally assesses, both at the hedge's inception and on an ongoing basis, whether the derivatives that are used in hedging transactions are highly effective in offsetting cash flows of hedged items.

II-35

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

### Property and Equipment

Property and equipment consisted of the following:

| ($ in millions) | December 31, 2025 | December 31, 2024 | Estimated useful life |
|---|---|---|---|
| Land | $ 45 | 63 | N/A |
| Buildings and improvements | 416 | 452 | 2 - 40 years |
| Furniture and other equipment | 623 | 614 | 2 - 15 years |
| Broadcast equipment | 120 | 133 | 2 - 7 years |
| Computer equipment | 129 | 147 | 2 - 5 years |
| Projects in progress | 42 | 51 | N/A |
| Total property and equipment | 1,375 | 1,460 | |
| Less: accumulated depreciation | (974) | (958) | |
| Property and equipment, net | $ 401 | 502 | |

N/A - Not applicable.

Property and equipment, including significant improvements, is stated at amortized cost, less impairment losses, if any. Depreciation is computed using the straight-line method.

### Internally developed software

Internal software development costs are capitalized in accordance with guidance on accounting for the costs of computer software developed or obtained for internal use, and are classified within other intangible assets in the consolidated balance sheets. The Company amortizes computer software and internal software development costs over an estimated useful life of approximately three years using the straight-line method.

### Intangible Assets

Intangible assets with estimable useful lives are amortized over their respective estimated useful lives to their estimated residual values, and reviewed for impairment upon certain triggering events. Goodwill and other intangible assets with indefinite useful lives ( "indefinite lived intangible assets") are not amortized, but instead are tested for impairment at least annually. Our annual impairment assessment of our indefinite-lived intangible assets is performed during the fourth quarter of each year.

When evaluating goodwill for impairment, we may utilize a qualitative assessment for determining whether a quantitative goodwill impairment analysis is necessary for any of our reporting units. The accounting guidance permits entities to first assess qualitative factors to determine whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount as a basis for determining whether it is necessary to perform the quantitative goodwill impairment test. A reporting unit is defined in accounting guidance in accordance with GAAP as an operating segment or one level below an operating segment (also known as a component). A component of an operating segment is a reporting unit if the component constitutes a business for which discrete financial information is available and segment management regularly reviews the operating results of that component. The Company considers its reporting units to align with its operating segments. The Company considers whether there are any negative macroeconomic conditions, industry specific conditions, market changes, increased competition, increased costs in doing business, management challenges, the legal environments and how these factors might impact company specific performance in future periods. As part of the analysis the Company also considers fair value determinations for certain reporting units that have been made at various points throughout the current year and prior year for other purposes. If based on the qualitative analysis it is more likely than not that an impairment exists, the Company performs the quantitative impairment test.

II-36

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

The quantitative goodwill impairment test compares the estimated fair value of a reporting unit to its carrying value. Developing estimates of fair value requires significant judgments, including making assumptions about appropriate discount rates, perpetual growth rates, relevant comparable market multiples, public trading prices and the amount and timing of expected future cash flows. The cash flows employed in QVC Group 's valuation analyses are based on management's best estimates considering current marketplace factors and risks as well as assumptions of growth rates in future years. There is no assurance that actual results in the future will approximate these forecasts.

The accounting guidance also permits entities to first perform a qualitative assessment to determine whether it is more likely than not that an indefinite-lived intangible asset is impaired. The accounting guidance also allows entities the option to bypass the qualitative assessment for any indefinite-lived intangible asset in any period and proceed directly to the quantitative impairment test. The entity may resume performing the qualitative assessment in any subsequent period. If the qualitative assessment supports that it is more likely than not that the carrying value of the Company 's indefinite-lived intangible assets exceeds its fair value, then a quantitative assessment is performed. If the carrying value of an indefinite-lived intangible asset exceeds its fair value, an impairment loss is recognized in an amount equal to that excess.

### Television Distribution Rights

The Company enters into affiliation agreements with television providers for carriage of the Company 's shopping service, as well as for certain channel placement. If these television providers were to change the number of subscribers to the agreement through acquisition, it may change the amount paid by the Company .

The Company 's ability to continue to sell products to its customers is significantly dependent on its ability to maintain and renew these affiliation agreements. In some cases, renewals are not agreed upon prior to the expiration of a given agreement while the programming continues to be carried by the relevant distributor without an effective agreement in place. The Company does not have distribution agreements with some of the cable operators that carry its programming.

Television distribution rights are amortized using the straight-line method over the lives of the individual agreements.

### Self-Insurance Reserves

The Company is self-insured for workers compensation and general liability claims up to certain maximum liability amounts and for medical claims up to the stop-loss deductible. Although the amounts accrued are actuarially determined based on analysis of historical trends of losses, settlements, litigation costs and other factors, the amounts the Company will ultimately disburse could differ from such accrued amounts.

### Impairment of Long-lived Assets

The Company periodically reviews the carrying amounts of its property and equipment and its intangible assets (other than goodwill and indefinite-lived intangible assets) upon a triggering event to determine whether current events or circumstances indicate that such carrying amounts may not be recoverable. If a triggering event occurs and the carrying amount of the asset group is greater than the expected undiscounted cash flows to be generated by such asset group, including its ultimate disposition, an impairment adjustment is to be recognized. Such adjustment is measured by the amount that the carrying value of such asset groups exceeds their fair value. The Company generally measures fair value by considering sale prices for similar asset groups or by discounting estimated future cash flows using an appropriate discount rate. Considerable management judgment is necessary to estimate the fair value of asset groups. Accordingly, actual results could vary significantly from such estimates. Asset groups to be disposed of are carried at the lower of their financial statement carrying amount or fair value less costs to sell.

### Noncontrolling Interests

The Company reports noncontrolling interests of subsidiaries within equity in the balance sheet and the amount of consolidated net income attributable to the parent and to the noncontrolling interest is presented in the statements of

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

operations. Also, changes in ownership interests in subsidiaries in which the Company maintains a controlling interest are recorded in equity.

*Foreign Currency Translation*

The functional currency of the Company is the U.S . Dollar. The functional currency of the Company 's foreign operations generally is the applicable local currency for each foreign subsidiary. Assets and liabilities of foreign subsidiaries are translated at the spot rate in effect at the applicable reporting date, and the consolidated statements of operations are translated at the average exchange rates in effect during the applicable period. The resulting unrealized cumulative translation adjustment, net of applicable income taxes, is recorded as a component of accumulated other comprehensive earnings (loss) in stockholders' equity.

Transactions denominated in currencies other than the functional currency are recorded based on exchange rates at the time such transactions arise. Subsequent changes in exchange rates result in transaction gains and losses which are reflected in the accompanying consolidated statements of operations and comprehensive earnings (loss) as unrealized (based on the applicable period-end exchange rate) or realized upon settlement of the transactions. These realized and unrealized gains and losses are reported in the Other, net line item in the consolidated statements of operations.

*Revenue Recognition*

Disaggregated revenue by segment and product category consisted of the following:

| | Year ended December 31, 2025 | | | | |
|---|---|---|---|---|---|
| | QxH | QVC Int'l | CBI | Corp and other | Total |
| | | | amounts in millions | | |
| Home | $ 2,389 | 956 | 770 | — | 4,115 |
| Apparel | 1,094 | 422 | 167 | — | 1,683 |
| Beauty | 883 | 545 | — | — | 1,428 |
| Accessories | 708 | 206 | — | — | 914 |
| Electronics | 441 | 66 | — | — | 507 |
| Jewelry | 273 | 161 | — | — | 434 |
| Other revenue | 148 | 1 | — | — | 149 |
| Total Revenue | $ 5,936 | 2,357 | 937 | — | 9,230 |

II-38

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

| | | Year ended December 31, 2024 | | | |
|---|---|---|---|---|---|
| | QxH | QVC Int'l | CBI | Corp and other | Total |
| | | | amounts in millions | | |
| Home | $ 2,626 | 975 | 864 | — | 4,465 |
| Apparel | 1,177 | 418 | 176 | — | 1,771 |
| Beauty | 1,010 | 566 | — | — | 1,576 |
| Accessories | 799 | 208 | — | — | 1,007 |
| Electronics | 539 | 69 | — | — | 608 |
| Jewelry | 293 | 161 | — | — | 454 |
| Other revenue | 154 | 2 | — | — | 156 |
| Total Revenue | $ 6,598 | 2,399 | 1,040 | — | 10,037 |

| | | Year ended December 31, 2023 | | | |
|---|---|---|---|---|---|
| | QxH | QVC Int'l | CBI | Corp and other | Total |
| | | | amounts in millions | | |
| Home | $ 2,768 | 982 | 984 | 76 | 4,810 |
| Apparel | 1,207 | 436 | 181 | 113 | 1,937 |
| Beauty | 1,083 | 588 | — | 14 | 1,685 |
| Accessories | 846 | 208 | — | 79 | 1,133 |
| Electronics | 617 | 68 | — | 2 | 687 |
| Jewelry | 304 | 165 | — | 11 | 480 |
| Other revenue | 170 | 7 | — | 6 | 183 |
| Total Revenue | $ 6,995 | 2,454 | 1,165 | 301 | 10,915 |

*Consumer Product Revenue and Other Revenue.* QVC Group 's revenue includes sales of consumer products in the following categories: home, apparel, beauty, accessories, electronics and jewelry, which are primarily sold through live merchandise-focused televised shopping programs and via our websites and other interactive media, including catalogs.

Other revenue consists primarily of income generated from our company branded credit cards in which a large consumer financial services company provides revolving credit directly to the Company 's customers for the sole purpose of purchasing merchandise or services with these cards. In return, the Company receives a portion of the net economics of the credit card program.

*Revenue Recognition.* Revenue is recognized when obligations with our customers are satisfied; generally this occurs at the time of shipment to our customers consistent with when control of the shipped product passes. The recognized revenue reflects the consideration we expect to receive in exchange for transferring goods, net of allowances for returns.

The Company recognizes revenue related to its company branded credit cards over time as the credit cards are used by QVC Group 's customers.

Sales, value add, use and other taxes we collect concurrent with revenue-producing activities are excluded from revenue.

II-39

Case 26-04041 Document 15 Filed EX246 on Date Filed 07/30/2026

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

The Company has elected to treat shipping and handling activities that occur after the customer obtains control of the goods as a fulfillment cost and not as a promised good or service. Accordingly, the Company accrues the related shipping costs and recognizes revenue upon delivery of goods to the shipping carrier. In electing this accounting policy, all shipping and handling activities are treated as fulfillment costs.

The Company generally has payment terms with its customers of one year or less and has elected the practical expedient applicable to such contracts not to consider the time value of money.

*Significant Judgments.* QVC Group 's products are generally sold with a right of return and we may provide other credits or incentives, which are accounted for as variable consideration when estimating the amount of revenue to recognize. Returns and credits are estimated at contract inception and updated at the end of each reporting period as additional information becomes available. The Company has determined that it is the principal in vendor arrangements as the Company can establish control over the goods prior to shipment. Accordingly, the Company records revenue for these arrangements on a gross basis.

An allowance for sales returns is provided as a percentage of sales based on historical experience. A summary of activity in the allowance for sales returns, is as follows:

| | Balance beginning of year | Additions - charged to earnings | Deductions | Balance end of year |
|---|---|---|---|---|
| | | amounts in millions | | |
| 2025 | $190 | 1,540 | (1,572) | 158 |
| 2024 | $219 | 1,734 | (1,763) | 190 |
| 2023 | $215 | 1,898 | (1,894) | 219 |

### Cost of Goods Sold

Cost of goods sold primarily includes actual product cost, provision for excess and obsolete inventory, buying allowances received from suppliers, shipping and handling costs and warehouse costs.

### Advertising Costs

Advertising costs generally are expensed as incurred. Advertising expense aggregated $532 million, $484 million and $497 million for the years ended December 31, 2025, 2024 and 2023, respectively. Advertising costs are reflected in SG&A , including stock-based compensation line item in our consolidated statements of operations and are shown separately in note 15.

### Stock-Based Compensation

As more fully described in note 11, the Company has granted to its directors, employees and employees of its subsidiaries options, restricted stock and stock appreciation rights relating to shares of QVC Group common stock ("QVC Group common stock ") (collectively, "Awards "). The Company measures the cost of employee services received in exchange for an Award of equity instruments (such as stock options and restricted stock) based on the grant-date fair value ("GDFV ") of the Award, and recognizes that cost over the period during which the employee is required to provide service (usually the vesting period of the Award). The Company measures the cost of employee services received in exchange for an Award of liability instruments (such as stock appreciation rights that will be settled in cash) based on the current fair value of the Award, and remeasures the fair value of the Award at each reporting date.

During 2025, the Board of Directors of QVC Group and the Compensation Committee of the Board implemented a revised compensation structure for the Company . As a part of this revised compensation structure, certain officers, employees and directors of the Company were paid approximately $55 million in exchange primarily for (1) cancellation of

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

their 2025 RSU grants, as well as cancellation of one half of David Rawlinson II, our President and Chief Executive Officer's 2025 performance cash award, (2) advance payments of the 2025 management bonus plan and (3) for certain officers, advance payments of long term incentive awards and management bonus plans that would have been granted in 2026. As a result of this compensation change, all of the 2025 restricted stock grants and a portion of a 2025 performance award grant were canceled. Additionally, the expense associated with the impacted awards (the 2025 restricted stock grants and a portion of a 2025 performance award grant) will no longer qualify as stock-based compensation expense, beginning in the fourth quarter of 2025.

*Income Taxes*

The Company accounts for income taxes using the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying value amounts and income tax bases of assets and liabilities and the expected benefits of utilizing net operating loss and tax credit carryforwards. The deferred tax assets and liabilities are calculated using enacted tax rates in effect for each taxing jurisdiction in which the Company operates for the year in which those temporary differences are expected to be recovered or settled. Net deferred tax assets are then reduced by a valuation allowance if the Company believes it more likely than not such net deferred tax assets will not be realized. The effect on deferred tax assets and liabilities of an enacted change in tax rates is recognized in income in the period that includes the enactment date.

When the tax law requires interest to be paid on an underpayment of income taxes, the Company recognizes interest expense from the first period the interest would begin accruing according to the relevant tax law. Such interest expense is included in interest expense in the accompanying consolidated statements of operations. Any accrual of penalties related to underpayment of income taxes on uncertain tax positions is included in other income (expense) in the accompanying consolidated statements of operations.

*Leases*

The Company has operating leases, finance leases, and has entered into sale leaseback transactions. Refer to note 7 for a discussion on accounting for leases and other financial disclosures.

*Earnings (Loss) Attributable to QVC Group Stockholders and Earnings (Loss) Per Common Share*

Basic earnings (loss) per common share ("EPS ") is computed by dividing net earnings (loss) by the weighted average number of common shares outstanding ("WASO ") for the period. Diluted EPS presents the dilutive effect on a per share basis of potential common shares as if they had been converted at the beginning of the periods presented. On May 22, 2025, the Company effected a reverse stock split. Refer to note 1 Basis of Presentation, for additional discussion regarding the Company 's reverse stock split.

*Series A and Series B Common Stock*

EPS for all periods through December 31, 2025, is based on the following WASO . Excluded from diluted EPS for each of the years ended December 31, 2025, 2024 and 2023, are less than one million potentially dilutive common shares because their inclusion would be antidilutive.

II-41

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

| | Years ended December 31, | | |
|---|---|---|---|
| | **2025** | **2024** | **2023** |
| | **number of shares in thousands** | | |
| Basic WASO | 8,051 | 7,920 | 7,735 |
| Dilutive shares (1) | — | — | — |
| Diluted WASO | 8,051 | 7,920 | 7,735 |

(1) Diluted earnings (loss) per share considers the impact of potentially dilutive securities except in periods in which there is a loss because the inclusion of the potential common shares would have an antidilutive effect.

### Reclasses and adjustments

Certain prior period amounts have been reclassified for comparability with the current year presentation.

### Estimates

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates. QVC Group considers (i) fair value measurements of non-financial instruments and (ii) estimates of retail-related adjustments and allowances to be its most significant estimates.

### New Accounting Pronouncements Not Yet Adopted

In November 2024, the Financial Accounting Standards Board ("FASB " ) issued Accounting Standards Update ("ASU " ) 2024-03, *Income Statement - Reporting Comprehensive Income - Expense Disaggregation Disclosures (Subtopic 220-40): Disaggregation of Income Statement Expenses*, which expands disclosures about specific expense categories at interim and annual reporting periods. The standard is effective for fiscal years beginning after December 15, 2026, and interim periods within fiscal years beginning after December 15, 2027, with early adoption permitted. The Company is in the process of evaluating the impact of the new standard on the related disclosures.

In July 2025, the FASB issued ASU 2025-05, *Financial Instruments-Credit Losses (Topic 326): Measurement of Credit Losses for Accounts Receivable and Contract Assets*, which simplifies the estimation of expected credit losses for certain current receivables and contract assets under the CECL model, particularly those arising from revenue contracts under ASC 606. The standard is effective for fiscal years beginning after December 15, 2025, and interim reporting periods within those fiscal years. Prospective application of the new guidance is required. The Company will adopt this new standard as of January 1, 2026 and does not expect it to have a material impact on its consolidated financial statements.

In September 2025 the FASB issued ASU 2025-06, *Intangibles—Goodwill and Other—Internal-Use Software (Subtopic 350-40): Targeted Improvements to the Accounting for Internal-Use Software*. ASU 2025-06 clarifies and modernizes the accounting for costs related to internal-use software by removing all references to project stages throughout ASC 350-40 and clarifying the threshold entities apply to begin capitalizing costs. The standard is effective for fiscal years beginning after December 15, 2027, and interim periods within those years, with early adoption permitted. The new guidance may be applied using a prospective, retrospective or modified transition approach. The Company is in the process of evaluating the impacts related to the new standard.

### Recently Adopted Accounting Pronouncements

In December 2023, the FASB issued ASU 2023-09, *Improvements to Income Tax Disclosures*, which requires more detailed income tax disclosures. The guidance requires entities to disclose disaggregated information about their effective tax rate reconciliation as well as expanded information on income taxes paid by jurisdiction. The effective date for the standard is for fiscal years beginning after December 15, 2024. The Company adopted this guidance for the year

II-42

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

ended December 31, 2025 and has applied it prospectively in the financial statements. See note 8 for income tax disclosures.

**(3) Supplemental Disclosures to Consolidated Statements of Cash Flows**

| | Years ended December 31, | | |
|---|---|---|---|
| | 2025 | 2024 | 2023 |
| | amounts in millions | | |
| Cash paid for interest | $ 414 | 458 | 471 |
| Cash paid for income taxes, net | $ 106 | 153 | 107 |

The following table reconciles cash, cash equivalents and restricted cash reported in our consolidated balance sheets to the total amount presented in our consolidated statements of cash flows:

| | December 31, | |
|---|---|---|
| | 2025 | 2024 |
| | amounts in millions | |
| Cash and cash equivalents | $ 1,972 | 905 |
| Restricted cash included in other current assets | 61 | 18 |
| Total cash, cash equivalents and restricted cash in the consolidated statement of cash flows | $ 2,033 | 923 |

**(4) Assets and Liabilities Measured at Fair Value**

For assets and liabilities required to be reported at fair value, GAAP provides a hierarchy that prioritizes inputs to valuation techniques used to measure fair value into three broad levels. Level 1 inputs are quoted market prices in "active markets" for identical assets or liabilities that the reporting entity has the ability to access at the measurement date. Level 2 inputs, other than quoted market prices included within Level 1, that are observable for the asset or liability, either directly or indirectly. Level 3 inputs are unobservable inputs for the asset or liability.

II-43

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

The Company measures the fair value of money market funds based on quoted prices in active markets for identical assets. Money market funds are included as cash equivalents Level 1 fair value instruments in the table below. The Company 's Level 2 financial liabilities are debt instruments with quoted market prices that are not considered to be traded on "active markets," as defined in GAAP . The fair values for such instruments are derived from a typical model using observable market data as the significant inputs. Accordingly, these financial instruments are reported in the below table as Level 2 fair value instruments.

The Company 's assets and liabilities measured at fair value on a recurring basis were as follows:

| Description | | Total | Quoted prices in active markets for identical assets (Level 1) | Significant other observable inputs (Level 2) | Total | Quoted prices in active markets for identical assets (Level 1) | Significant other observable inputs (Level 2) |
|---|---|---|---|---|---|---|---|
| | | | December 31, 2025 | | | December 31, 2024 | |
| | | | amounts in millions | | | | |
| Cash equivalents | $ | 816 | 816 | — | 652 | 652 | — |
| Debt | $ | 52 | — | 52 | 282 | — | 282 |

***Realized and Unrealized Gains (Losses) on Financial Instruments***

Realized and unrealized gains (losses) on financial instruments are comprised of changes in the fair value of the following:

| | | 2025 | 2024 | 2023 |
|---|---|---|---|---|
| | | | Years ended December 31, | |
| | | | amounts in millions | |
| Equity securities | $ | (5) | (22) | (22) |
| Exchange able senior debentures | | (35) | (38) | (33) |
| Indemnification asset (1) | | — | — | (5) |
| Other financial instruments | | — | — | (1) |
| | $ | (40) | (60) | (61) |

_____

(1) Pursuant to an indemnification agreement Liberty Broadband agreed to indemnify Liberty Interactive LLC ("LI LLC " ) for certain payments made to holders of LI LLC 's 1.75% exchangeable senior debentures due 2046 (the "1.75% Exchange able Senior Debentures "). As of December 31, 2023, all remaining 1.75% Exchange able Senior Debentures were either retired or exchanged.

The Company has elected to account for its exchangeable debt using the fair value option. Changes in the fair value of the exchangeable senior debentures recognized in the consolidated statement of operations are primarily due to market factors largely driven by changes in the fair value of the underlying shares into which the debt is exchangeable.

The Company isolates the portion of the unrealized gain (loss) attributable to the change in the instrument specific credit risk and recognizes such amount in other comprehensive earnings (loss). The change in the fair value of the exchangeable senior debentures attributable to changes in the instrument specific credit risk were gains of $270 million, losses of $27 million and gains of $50 million, net of the recognition of previously unrecognized gains and losses, for the years ended December 31, 2025, 2024, and 2023, respectively.

Table of Contents

Case 26-04041 Document 15 FiledPageEX251 on Date Filed: 07/30/2026
Case 26-04041 Document 718-1 Filed Page EX251 on 07/16/26 Page 929 of 0129

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

During the fourth quarter of 2025, certain holders of the 4% Exchange able Senior Debentures, exchanged their debentures for cash in an amount equal to the current market price of the shares underlying their debentures. As a result of the exchange, the Company settled a total of $10 million and $1 million in principal and carrying value, respectively. During the year ended December 31, 2025, the Company recognized $10 million of previously unrecognized gains related to the retirement of a portion of the 4% Exchange able Senior Debentures, which was recognized through realized and unrealized gains (losses) on financial instruments, net on the consolidated statement of operations. During the year ended December 31, 2023, the Company recognized $60 million of previously unrecognized gains related to the retirement of a portion of the 1.75% Exchange able Senior Debentures, which was recognized through realized and unrealized gains (losses) on financial instruments, net on the consolidated statement of operations. The cumulative change was a gain of $772 million and $512 million as of December 31, 2025 and December 31, 2024, net of the recognition of previously unrecognized gains and losses, respectively.

**(5) Intangible Assets**

*Goodwill*

Changes in the carrying amount of goodwill are as follows:

| | QxH | QVC International | CBI | Corporate and Other |
|---|---|---|---|---|
| | | amounts in millions | | |
| Balance at January 1, 2024 | $ 2,367 | 785 | 12 | 3,164 |
| Impairment | (902) | — | — | (902) |
| Exchange rate fluctuations | — | (45) | — | (45) |
| Balance at December 31, 2024 | 1,465 | 740 | 12 | 2,217 |
| Impairment | (1,465) | | (12) | (1,477) |
| Exchange rate fluctuations | — | 60 | — | 60 |
| Balance at December 31, 2025 | $ — | 800 | — | 800 |

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

*Intangible Assets*

Other intangible assets consist of the following:

| | December 31, 2025 | | | December 31, 2024 | | | |
|---|---|---|---|---|---|---|---|
| | Gross carrying amount | Accumulated amortization | Intangible assets, net | Gross carrying amount | Accumulated amortization | Intangible assets, net | Weighted average remaining life (years) |
| | amounts in millions | | | | | | |
| Purchased and internally developed software | $ 1,230 | (1,015) | 215 | 1,195 | (943) | 252 | 2 |
| Affiliate and customer relationships | 2,835 | (2,788) | 47 | 2,816 | (2,722) | 94 | 1 |
| Television distribution rights | 161 | (93) | 68 | 535 | (489) | 46 | 1 |
| Other | 54 | (48) | 6 | 46 | (36) | 10 | 2 |
| Intangible assets subject to amortization | $ 4,280 | (3,944) | 336 | 4,592 | (4,190) | 402 | |
| Tradenames (indefinite life) | $ 1,190 | — | 1,190 | 2,120 | — | 2,120 | N/A |

As of December 31, 2025, QVC Group expects that amortization expense will be as follows for the next five years (amounts in millions):

| | | |
|---|---|---|
| 2026 | $ | 225 |
| 2027 | | 76 |
| 2028 | | 33 |
| 2029 | | 2 |
| 2030 | | — |

*Impairment of goodwill and intangible assets*

As a result of recent financial performance, macroeconomic conditions, declines in stock price and credit rating downgrades, it was determined during the second quarter of 2025 that an indication of impairment existed for the QxH reporting unit including goodwill and the QVC and HSN tradenames. The fair value of the tradenames was determined using the relief from royalty method, primarily using a discounted cash flow model using projections of future operating performance (income approach) and applying a royalty rate (market approach) (Level 3), and an impairment in the amount of $930 million for the QVC and HSN tradenames was recorded during the second quarter of 2025, in impairment of intangible assets in the consolidated statements of operations. The fair value of the QxH reporting unit was determined using a discounted cash flow method (Level 3), and a goodwill impairment in the amount of $1,465 million was recorded during the second quarter of 2025 in impairment of goodwill in the consolidated statements of operations. During the Company 's annual impairment test it was determined that it was more likely than not that an impairment existed for the CBI reporting unit's goodwill, as a result of recent financial performance and macroeconomic trends. The Company performed a quantitative analysis using a discounted cash flow method (Level 3), and a goodwill impairment in the amount of $12 million was recorded during the fourth quarter of 2025 in impairment of goodwill in the consolidated statements of operations. The Company utilized the assistance of a third party specialist when determining the above noted fair values for all years.

During prior years, indications of impairment existed for the QxH reporting unit including goodwill and the QVC and HSN tradenames. The fair value of the tradenames was determined using the relief from royalty method, primarily using a discounted cash flow model using projections of future operating performance (income approach) and applying a

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

royalty rate (market approach) (Level 3), and an impairment in the amount of $578 million for the QVC and HSN tradenames, was recorded during the fourth quarter of 2024, in impairment of intangible assets in the consolidated statements of operations. The fair value of the QxH reporting unit was determined using a discounted cash flow method (Level 3), and goodwill impairments in the amounts of $902 million and $326 million for QxH were recorded in 2024 and 2023, respectively, in impairment of goodwill in the consolidated statements of operations. The Company utilized the assistance of a third party specialist when determining the above noted fair values.

As of December 31, 2025 the Company had accumulated goodwill impairment losses of $5,228 million and $12 million attributed to the QxH reporting unit and CBI , respectively.

**(6) Debt**

Debt is summarized as follows:

| | Outstanding principal December 31, 2025 | Carrying value | |
| --- | --- | --- | --- |
| | | December 31, 2025 | December 31, 2024 |
| | | amounts in millions | |
| Corporate level debentures | | | |
| 8.5% Senior Debentures due 2029 | $ 287 | 286 | 286 |
| 8.25% Senior Debentures due 2030 | 505 | 503 | 503 |
| 4% Exchange able Senior Debentures due 2029 [1][2][3] | 339 | 24 | 128 |
| 3.75% Exchange able Senior Debentures due 2030 [1][2][3] | 427 | 28 | 154 |
| Subsidiary level notes and facilities | | | |
| QVC 4.45% Senior Secured Notes due 2025[3] | — | — | 585 |
| QVC 4.75% Senior Secured Notes due 2027[2] | 44 | 44 | 44 |
| QVC 4.375% Senior Secured Notes due 2028[2] | 72 | 72 | 72 |
| QVC 6.875% Senior Secured Notes due 2029[2] | 605 | 605 | 605 |
| QVC 5.45% Senior Secured Notes due 2034[2] | 400 | 400 | 400 |
| QVC 5.95% Senior Secured Notes due 2043[2] | 300 | 300 | 300 |
| QVC 6.375% Senior Secured Notes due 2067[2] | 225 | 225 | 225 |
| QVC 6.25% Senior Secured Notes due 2068[2] | 500 | 500 | 500 |
| QVC Senior Secured Credit Facility [2] | 2,900 | 2,900 | 1,195 |
| Finance lease obligations | 2 | 2 | — |
| Deferred loan costs[2] | — | (24) | (29) |
| Total consolidated QVC Group debt | $ 6,606 | 5,865 | 4,968 |
| Less current classification | | (5,075) | (867) |
| Total long-term debt | | $ 790 | 4,101 |

_____

(1)  Measured at fair value
(2)  Classified as current as of December 31, 2025
(3)  Classified as current as of December 31, 2024

II-47

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

### *Covenant Compliance*

As noted in note 1, as of December 31, 2025 QVC is not in compliance with the net leverage ratio, as calculated under the Credit Facility . Under the terms of the Fifth Amended and Restated Credit Agreement , this constitutes a breach of the financial covenant.

Under both the Fifth Amended and Restated Credit Agreement and the indentures governing the senior secured notes, QVC is permitted to make unlimited dividends to service the debt of its parent entities so long as it is not in default under those agreements and to make certain restricted payments to QVG Group under an intercompany tax sharing agreement in respect of certain tax obligations of QVC and its subsidiaries. As a result of the breach of financial covenant under the Fifth Amended and Restated Credit Agreement , QVC is no longer permitted to make unlimited dividends to service the debt of its parent entities to QVC Group . QVC can continue to make certain restricted payments to QVC Group under an intercompany tax sharing agreement in respect of certain tax obligations of QVC and its subsidiaries.

The outstanding principal associated with the Credit Facility and senior secured notes is $5,046 million. As a result of the above-noted net leverage ratio and the maturity date of the Credit Facility , outstanding balances have been classified as a current liability in the consolidated balance sheet, as of December 31, 2025.

### *Exchange able Senior Debentures*

Each $1,000 debenture of LI LLC 's 4% exchangeable senior debentures due 2029 ("4% Exchange able Senior Debentures ") was exchangeable at the holder's option for the value of 3.2265 shares of Sprint Corporation ("Sprint " ) common stock and 0.7860 shares of Lumen Technologies , Inc. ("Lumen Technologies " ) (formerly known as CenturyLink, Inc.) common stock. On April 1, 2020, T-Mobile US, Inc. ("T-Mobile " ) completed its acquisition of Sprint Corporation ("TMUS/S Acquisition " ) for 0.10256 shares of T-Mobile for every share of Sprint Corporation. Following the TMUS/S Acquisition , the reference shares attributable to each $1,000 original principal amount of the 4% Exchange able Senior Debentures consist of 0.3309 shares of common stock of T-Mobile , and 0.7860 shares of common stock of Lumen Technologies . LI LLC may, at its election, pay the exchange value in cash, T-Mobile and Lumen Technologies common stock or a combination thereof. LI LLC , at its option, may redeem the debentures, in whole or in part, for cash generally equal to the principal amount of the debentures plus accrued interest. As a result of various principal payments made to holders of the 4% Exchange able Senior Debentures, the adjusted principal amount of each $1,000 debenture is $899 as of December 31, 2025.

Each $1,000 debenture of LI LLC 's 3.75% exchangeable senior debentures due 2030 ("3.75% Exchange able Senior Debentures ") was exchangeable at the holder's option for the value of 2.3578 shares of Sprint common stock and 0.5746 shares of Lumen Technologies common stock. Following the TMUS/S Acquisition , each $1,000 debenture of LI LLC 's 3.75% Exchange able Senior Debentures is exchangeable at the holder's option for the value of 0.2419 shares of T-Mobile common stock and 0.5746 shares of Lumen Technologies common stock. LI LLC may, at its election, pay the exchange value in cash, T-Mobile and Lumen Technologies common stock or a combination thereof. LI LLC , at its option, may redeem the debentures, in whole or in part, for cash generally equal to the principal amount of the debentures plus accrued interest. As a result of various principal payments made to holders of the 3.75% Exchange able Senior Debentures, the adjusted principal amount of each $1,000 debenture is $928 as of December 31, 2025. On February 17, 2026, the Company completed the semiannual interest payment of $18.75 per $1,000 debenture and made an additional distribution of $0.4596 per debenture, resulting in an ending principal amount for each $1,000 debenture of $927 as of February 15, 2026.

Interest on the Company 's exchangeable debentures is payable semi-annually based on the date of issuance. At maturity, all of the Company 's exchangeable debentures are payable in cash.

As of December 31, 2025 and 2024 the Company 's 3.75% and 4.0% Exchange able Debentures have been classified as current because the Company does not own shares to exchange the debentures and they are currently exchangeable. The Company reviews the terms of the debentures on a quarterly basis to determine whether a triggering event has occurred to require current classification of the exchangeables upon a call event.

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

The Company has elected to account for its exchangeable senior debentures using the fair value option. Accordingly, changes in the fair value of these instruments are recognized as unrealized gains (losses) in the statements of operations. See note 4 for information related to unrealized gains (losses) on debt measured at fair value.

### QVC Senior Secured Notes

On February 18, 2025, QVC repaid the remaining 4.45% Senior Secured Notes due 2025, at maturity, using availability on the Credit Facility (as defined below) and cash on hand.

During prior years, QVC issued $400 million principal amount 5.45% senior secured notes due 2034 at an issue price of 99.784%, $300 million principal amount of 5.95% senior secured notes due 2043 at an issue price of 99.973%, $225 million of 6.375% senior notes due 2067 (the "2067 Notes ") at par, and $500 million of the 6.25% senior secured notes due 2068 ("2068 Notes ") at par.

On September 11, 2024, QVC commenced a private offer to existing bondholders to exchange any and all of QVC 's outstanding 4.75% Senior Secured Notes due 2027 (the "2027 Notes") for $350 principal amount of QVC 's newly-issued 6.875% Senior Secured Notes due April 2029 (the "2029 Notes") and $650 in cash per $1,000 principal amount of 2027 Notes exchanged, and any and all of QVC 's outstanding 4.375% Senior Secured Notes due 2028 (the "2028 Notes ") for $1,000 principal amount of the 2029 Notes per $1,000 principal amount of 2028 Notes exchanged (the "Exchange "), and a private offer to purchase 2027 Notes and 2028 Notes for cash from holders who were not eligible to participate in the private exchange offer. On September 25, 2024, QVC issued an aggregate principal amount of $605 million in 2029 Notes and paid $352 million in cash consideration (including $277 million contributed by QVC Group ) in exchange for $531 million of the 2027 Notes and $428 million of the 2028 Notes . The Exchange was accounted for as a debt modification in accordance with U.S . GAAP and fees paid to third parties were expensed during the year ended December 31, 2024 in other expense in the consolidated statement of operations.

### QVC Senior Secured Credit Facility

On October 27, 2021, QVC amended and restated its latest credit agreement (as amended and restated, the "Fifth Amended and Restated Credit Agreement ") and refinanced QVC 's existing bank credit facility by entering into the Fifth Amended and Restated Credit Agreement with CBI and QVC Global Corporate Holdings, LLC ("QVC Global ") , each a direct or indirect wholly owned subsidiary of QVC Group , as borrowers (QVC , CBI and QVC Global , collectively, the "Borrowers ") , JPMorgan Chase Bank , N.A., as administrative agent, and the other parties named therein.

The Fifth Amended and Restated Credit Agreement is a multi-currency facility providing for a $3.25 billion revolving credit facility (the "Credit Facility ") , with a $450 million sub-limit for letters of credit and an alternative currency revolving sub-limit equal to 50% of the revolving commitments thereunder. The Credit Facility may be borrowed by any Borrower, with each Borrower jointly and severally liable for the outstanding borrowings. Borrowings under the Fifth Amended and Restated Credit Agreement bear interest at either the alternate base rate (such rate, the "ABR Rate ") or a London Inter-bank Offered Rate ("LIBOR ") -based rate (or the applicable non-U.S . Dollar equivalent rate) (such rate, the "Term Benchmark/RFR Rate ") at the applicable Borrower's election in each case plus a margin. Borrowings that are ABR Rate loans will bear interest at a per annum rate equal to the base rate plus a margin that varies between 0.25% and 0.625% depending on the Borrowers ' combined ratio of consolidated total debt to consolidated EBITDA (the "consolidated net leverage ratio"). Borrowings that are Term Benchmark/RFR Rate loans will bear interest at a per annum rate equal to the applicable rate plus a margin that varies between 1.25% and 1.625% depending on the Borrowers ' consolidated net leverage ratio. Each loan may be prepaid at any time and from time to time without penalty, other than customary breakage costs. No mandatory prepayments will be required other than when borrowings and letter of credit usage exceed availability; provided that, if QVC Global or any other borrower under the Credit Facility (other than QVC ) is removed, at the election of QVC , as a borrower thereunder, all of its loans must be repaid and its letters of credit are terminated or cash collateralized. Any amounts prepaid on the Credit Facility may be reborrowed.

On June 20, 2023, QVC and QVC Global as borrowers, JPMorgan Chase Bank , N.A., as administrative agent, and the other parties thereto entered into an agreement whereby, in accordance with the Fifth Amended and Restated Credit Agreement , LIBOR -based rate loans denominated in U.S . dollars made on or after September 30, 2023 would be replaced

II-49

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

with SOFR -based rate loans. Borrowings that are Secured Overnight Financing Rate ("SOFR ") based loans will bear interest at a per annum rate equal to the applicable SOFR rate, plus a credit spread adjustment, plus a margin that varies between 1.25% and 1.625% depending on the Borrowers ' consolidated net leverage ratio.

On April 1, 2025, CBI was removed as a borrower under the Fifth Amended and Restated Credit Agreement . CBI had no outstanding borrowings under the Fifth Amended and Restated Credit Agreement at the time of its removal from the Fifth Amended and Restated Credit Agreement .

The loans under the Credit Facility are scheduled to mature on October 27, 2026. Payment of the loans may be accelerated following certain customary events of default. Refer to note 1 Basis of Presentation, for additional discussion regarding the Company 's ability to continue as a going concern.

The payment and performance of the Borrowers ' obligations under the Fifth Amended and Restated Credit Agreement are guaranteed by each of QVC 's and QVC Global 's Material Domestic Subsidiaries (as defined in the Fifth Amended and Restated Credit Agreement ), if any, and certain other subsidiaries of any Borrower that such Borrower has chosen to provide guarantees. Further, the borrowings under the Fifth Amended and Restated Credit Agreement are secured, pari passu with QVC 's existing notes, by a pledge of all of QVC 's equity interests.

The Fifth Amended and Restated Credit Agreement contains certain affirmative and negative covenants, including certain restrictions on the Borrowers and each of their respective restricted subsidiaries (subject to certain exceptions) with respect to, among other things: incurring additional indebtedness; creating liens on property or assets; making certain loans or investments; selling or disposing of assets; paying certain dividends and other restricted payments; dissolving, consolidating or merging; entering into certain transactions with affiliates; entering into sale or leaseback transactions; restricting subsidiary distributions; and limiting the Borrowers ' consolidated leverage ratio.

Borrowings under the Fifth Amended and Restated Credit Agreement may be used to repay outstanding indebtedness, pay certain fees and expenses, finance working capital needs and general purposes of the Borrowers and their respective subsidiaries and make certain restricted payments and loans to the Borrowers ' respective parents and affiliates.

As a result of noncompliance with the net leverage ratio, no additional borrowings are available under the Fifth Amended and Restated Credit Agreement . The interest rate on the Credit Facility was 5.45% and 6.06% at December 31, 2025 and 2024, respectively.

**Five Year Maturities**

The annual principal maturities of QVC Group 's debt, based on stated maturity dates, for each of the next five years are as follows:

| (in millions) | | Debt (1) |
|---|---|---|
| 2026 | $ | 2,900 |
| 2027 | $ | 44 |
| 2028 | $ | 72 |
| 2029 | $ | 1,231 |
| 2030 | $ | 932 |

(1) Amounts exclude the issue discounts on the 5.45% Senior Secured Notes due 2034 and 5.95% Senior Secured Notes due 2043.

*Fair Value of Debt*

QVC Group estimates the fair value of its debt based on the quoted market prices for the same or similar issues or on the current rate offered to QVC Group for debt of the same remaining maturities (Level 2). The 2067 Notes and the 2068 Notes are traded on the New York Stock Exchange , which the Company considers to be an "active market," as

Case 26-90412 Document 15 Filed in TXSB on 07/30/2026 Page 257 of 679

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

defined by U.S . GAAP . As such, the 2067 Notes and 2068 Notes are valued based on their trading price (Level 1). The fair value of QVC Group 's publicly traded debt securities that are not reported at fair value in the accompanying condensed consolidated balance sheet at December 31, 2025 are as follows (amounts in millions):

|  | December 31, | |
| --- | --- | --- |
|  | 2025 | 2024 |
| Senior debentures | $ 44 | 374 |
| QVC senior secured notes | $ 846 | 1,942 |

Due to the variable rate nature, QVC Group believes that the carrying amount of its other debt, not discussed above, approximated fair value at December 31, 2025.

## (7) Leases

Right-of-use assets and lease liabilities are initially recognized based on the present value of the future lease payments over the expected lease term. As for most leases the implicit rate is not readily determinable, the Company uses a discount rate in determining the present value of future payments based on the Company 's incremental borrowing rate on a collateralized basis aligning with the term of the lease. Our lease agreements include both lease and non-lease components, which the Company accounts for as a single lease component. The Company 's leases have base rent periods and some with optional renewal periods. Leases with base rent periods of less than 12 months are not recorded on the balance sheet. For purposes of measurement of lease liabilities, the expected lease terms may include renewal options when it is reasonably certain that the Company will exercise such options.

Leases with an initial term greater than twelve months are classified as either finance or operating. Finance leases are generally those that we substantially use or pay for the entire asset over its estimated useful life and are recorded in property and equipment. All other leases are categorized as operating leases and recorded in operating lease right-of-use assets.

We have entered into sale leaseback transactions. To determine whether the transaction should be accounted for as a sale, we evaluate whether control of the asset has transferred to a third party. If the transfer of the asset is determined to be a sale, we recognize the transaction price for the sale based on cash proceeds received, derecognize the carrying amount of the asset sold, and recognize a gain or loss in the consolidated statement of operations for any difference between the carrying value of the asset and the transaction price. The leaseback is accounted for according to our lease policy discussed above. If the transfer of the asset is not determined to be a sale, we account for the transaction as a financing arrangement.

The Company has lease agreements with transponder and transmitter network suppliers for the right to transmit its signals. The Company also leases data processing equipment, facilities, office space, retail space and land, which are classified as operating leases. Operating lease ROU assets and operating lease liabilities are recognized based on the present value of the future lease payments using our incremental borrowing rate.

Our leases have remaining lease terms of less than one year to 17 years, some of which include options to extend or terminate the leases.

The components of lease cost during the years ended December 31, 2025, 2024 and 2023, were as follows:

|  | Years ended December 31, | | |
| --- | --- | --- | --- |
|  | 2025 | 2024 | 2023 |
|  | amounts in millions | | |
| Operating lease cost (1) | $ 161 | 160 | 168 |

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

(1) Included within operating lease costs were short-term lease costs and variable lease costs, which were not material to the financial statements.

The remaining weighted-average lease term and the weighted-average discount rate were as follows:

| | December 31, | | |
|---|---|---|---|
| | 2025 | 2024 | 2023 |
| Weighted-average remaining lease term (years): | | | |
| Operating leases | 11.6 | 12.2 | 12.6 |
| Weighted-average discount rate: | | | |
| Operating leases | 18.3 % | 14.4 % | 13.4 % |

Supplemental balance sheet information related to leases was as follows:

| | December 31, | |
|---|---|---|
| | 2025 | 2024 |
| | amounts in millions | |
| Operating leases: | | |
| Operating lease ROU assets | $ 570 | 600 |
| | | |
| Current operating lease liabilities (1) | $ 38 | 41 |
| Operating lease liabilities | 580 | 598 |
| Total operating lease liabilities | $ 618 | 639 |

_____

(1) Included within the Other current liabilities line item on the consolidated balance sheets.

Supplemental cash flow information related to leases was as follows:

| | December 31, | | |
|---|---|---|---|
| | 2025 | 2024 | 2023 |
| | amounts in millions | | |
| Cash paid for amounts included in the measurement of lease liabilities: | | | |
| Operating cash outflows from operating leases | $ 123 | 116 | 126 |
| | | | |
| ROU assets obtained in exchange for lease obligations: | | | |
| Operating leases | $ 10 | 25 | 163 |

II-52

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

Future lease payments under operating leases with initial terms of one year or more at December 31, 2025 consisted of the following:

| | Operating Leases |
|---|---|
| | amounts in millions |
| 2026 | $ 119 |
| 2027 | 116 |
| 2028 | 114 |
| 2029 | 111 |
| 2030 | 113 |
| Thereafter | 759 |
| Total lease payments | $ 1,332 |
| Less: imputed interest | (714) |
| Total lease liabilities | $ 618 |

In November 2022, QVC entered into agreements to sell two properties located in Germany and the U.K . to an independent third party. Under the terms of the agreements, QVC received net cash proceeds of $182 million related to its German and U.K . facilities when the sale closed in January 2023. Concurrent with the sale, the Company entered into agreements to lease each of the properties back from the purchaser over an initial term of 20 years, with the option to extend the terms of the property leases for up to four consecutive terms of five years. QVC recorded a gain of $113 million related to the successful sale leaseback of the German and U.K . properties during the first quarter of 2023 calculated as the difference between the aggregate consideration received and the carrying value of the properties. QVC accounted for the leases as operating at the close of the sale leaseback transaction and recorded $74 million of right-of-use assets and operating lease liabilities for the German and U.K . properties.

On October 31, 2022, the Company entered into foreign currency forward contracts with an aggregate notional amount of $167 million to mitigate the foreign currency risk associated with the sale and leaseback of Germany and U.K . properties. The forward did not qualify as a cash flow hedge under U.S . GAAP . Changes in the fair value of the forward are reflected in realized and unrealized gains (losses) on financial instruments, net in the consolidated statements of operations. The forward expired in January 2023 which resulted in a net cash settlement of $12 million.

In December 2023, QVC modified the lease for its distribution center in Ontario, California pursuant to which QVC extended the term of the lease through December 31, 2030 with an option to renew the lease for an additional 3-year term ending December 31, 2033.

II-53

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

**(8) Income Taxes**

Income tax benefit (expense) consists of:

| | | Years ended December 31, | |
|---|---|---|---|
| | 2025 | 2024 | 2023 |
| | amounts in millions | | |
| Current: | | | |
| Federal | $ 8 | (86) | (8) |
| State and local | 19 | (6) | 12 |
| Foreign | (72) | (78) | (84) |
| | (45) | (170) | (80) |
| Deferred: | | | |
| Federal | 210 | 172 | (50) |
| State and local | 23 | 42 | (3) |
| Foreign | (3) | (3) | (27) |
| | 230 | 211 | (80) |
| Income tax benefit (expense) | $ 185 | 41 | (160) |

The following table presents a summary of our domestic and foreign earnings (losses) from continuing operations before income taxes:

| | | Years ended December 31, | |
|---|---|---|---|
| | 2025 | 2024 | 2023 |
| | amounts in millions | | |
| Domestic | $ (2,757) | (1,525) | (236) |
| Foreign | 174 | 234 | 302 |
| Total | $ (2,583) | (1,291) | 66 |

II-54

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

Total Income tax benefit (expense) differs from the amounts computed by applying the U.S . federal income tax rate of 21% in 2025 as a result of the following:

| | Year ended December 31, 2025 | |
| --- | --- | --- |
| | amounts in millions | percent |
| US Federal statutory income tax rate | $ 542 | 21.0 % |
| Domestic federal | | |
| Tax credits | 5 | 0.2% |
| Nontaxable and non-deductible items, net | | |
|    Goodwill impairment | (310) | (12)% |
|    Other non-deductible items | (36) | (1.4)% |
|   Cross-border tax laws | (23) | (0.9)% |
|   Valuation Allowance - FTC C/F | (11) | (0.4)% |
|   Other | 6 | 0.2% |
| Domestic state and local income taxes, net of federal tax effect (1) | 25 | 1.0 % |
| Foreign tax effects | (13) | (0.5)% |
| Worldwide changes in unrecognized tax benefits | — | — % |
| Total tax benefit (expense) | $ 185 | 7.2 % |

(1) The following jurisdictions make up greater than 50% of the state income tax expense for 2025: California and New York.

For the year ended December 31, 2025, income tax benefit differs from the U.S . statutory rate of 21% due to an impairment of goodwill that is not deductible for tax purposes (see note 5).

Total Income tax benefit (expense) for 2024 and 2023 differs from the amounts computed by applying the U.S . federal income tax rate of 21% as a result of the following:

| | Years ended December 31, | |
| --- | --- | --- |
| | 2024 | 2023 |
| | amounts in millions | |
| Computed expected tax benefit (expense) | $ 271 | (14) |
| State and local income taxes, net of federal income taxes | 24 | (21) |
| Tax on foreign earnings, net of federal tax benefits | 210 | (24) |
| Change in valuation allowance affecting tax expense | (236) | — |
| Impairment of non-deductible goodwill | (189) | (68) |
| Non-deductible interest on Preferred Stock | (21) | (21) |
| Stock compensation | (6) | (17) |
| Executive compensation | (6) | (4) |
| Change in tax rate | (2) | 16 |
| Non-deductible equity distribution | (1) | — |
| Other, net | (3) | (7) |
| Income tax benefit (expense) | $ 41 | (160) |

For the year ended December 31, 2024, income tax benefit differs from the U.S . statutory rate of 21% due to an impairment of goodwill that is not deductible for tax purposes (see note 5).

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

For the year ended December 31, 2023, income tax expense was greater than the U.S . statutory rate of 21% due to state income tax expense, foreign income tax expense, the impairment of goodwill that is not deductible for tax purposes, non-deductible interest expense related to Preferred Stock , and stock compensation, partially offset by tax benefits from a decrease in effective tax rate used to measure deferred taxes.

The tax effects of temporary differences that give rise to significant portions of the deferred income tax assets and deferred income tax liabilities are presented below:

| | December 31, | |
| --- | --- | --- |
| | **2025** | **2024** |
| | amounts in millions | |
| Deferred tax assets: | | |
| Tax losses and credit carryforwards | $ 772 | 594 |
| Foreign tax credit carryforwards | 102 | 101 |
| | | |
| Operating lease liability | 152 | 123 |
| Other accrued liabilities | 25 | 35 |
| Prepaid royalty | 23 | 43 |
| Other | — | 15 |
| Deferred tax assets | 1,074 | 911 |
| Valuation allowance | (535) | (500) |
| Net deferred tax assets | 539 | 411 |
| | | |
| Deferred tax liabilities: | | |
| Intangible assets | 304 | 540 |
| Fixed assets | 36 | 22 |
| Discount on exchangeable debentures | 1,275 | 1,136 |
| Other | 46 | — |
| Deferred tax liabilities | 1,661 | 1,698 |
| Net deferred tax liabilities | $ 1,122 | 1,287 |

As of December 31, 2025, the Company had a deferred tax asset of $772 million for net operating losses and interest expense carryforwards. If not utilized to reduce income tax liabilities in future periods, $378 million of these loss carryforwards will expire at various times between 2026 and 2044. The remaining $394 million of losses and interest expense carryforwards may be carried forward indefinitely. These carryforwards are expected to be utilized by the Company , except for $441 million which, based on current projections, will not be utilized in the future and are subject to a valuation allowance.

As of December 31, 2025, the Company had a deferred tax asset of $102 million for foreign tax credit carryforwards. If not utilized to reduce income tax liabilities in future periods, these foreign tax credit carryforwards will expire at various times between 2026 and 2034. The Company estimates that $94 million of its foreign tax credit carryforward will expire without utilization and are subject to a valuation allowance.

II-56

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

A reconciliation of unrecognized tax benefits is as follows:

| | | Years ended December 31, | |
| --- | --- | --- | --- |
| | 2025 | 2024 | 2023 |
| | | amounts in millions | |
| Balance at beginning of year | $ 61 | 67 | 97 |
| Additions based on tax positions related to the current year | 3 | 3 | 5 |
| Additions for tax positions of prior years | 8 | — | 1 |
| Reductions for tax positions of prior years | (10) | (3) | (3) |
| Lapse of statute and settlements | (3) | (6) | (33) |
| Balance at end of year | $ 59 | 61 | 67 |

Income taxes paid during 2025 by taxing jurisdiction are as follows:

| | Year ended December 31, 2025 |
| --- | --- |
| | amounts in millions |
| US Federal | $ 27 |
| US state and local | 9 |
| Foreign | |
| Japan | 51 |
| Other | 19 |
| Total | $ 106 |

As of December 31, 2025, the Company 's tax years prior to 2022 are closed for federal income tax purposes, and the Internal Revenue Service ("IRS " ) has completed its examination of the Company 's 2022 and 2023 tax years. However, 2022 and 2023 remain open until the statute of limitations lapses on October 15 of 2026 and 2027, respectively. The Company 's 2024 and 2025 tax years are being examined currently as part of the IRS 's Compliance Assurance Process ("CAP ") program. As of December 31, 2025, the Company was under examination in Arizona, Massachusetts, Minnesota, Pennsylvania, Texas, Utah, Wisconsin, New York City, and Germany.

The Company recorded $8 million of accrued interest and penalties related to uncertain tax positions for each of the years ended December 31, 2025 and 2024, and $6 million for the year ended December 31, 2023.

**(9) Preferred and Common Stock**

On September 14, 2020, QVC Group issued its Preferred Stock . There were 13,500,000 shares of Preferred Stock authorized and 12,723,158 shares and 12,723,258 shares issued and outstanding at December 31, 2025 and 2024, respectively.

*Priority*. The Preferred Stock ranks senior to the shares of QVC Group common stock , with respect to dividend rights, rights of redemption and rights on the distribution of assets on any voluntary or involuntary liquidation, dissolution or winding up of QVC Group 's affairs. Shares of Preferred Stock are not convertible into shares of QVC Group common stock .

*Dividends*. Holders of the Preferred Stock are entitled to receive quarterly cash dividends at a rate of 8.0% per annum of the liquidation price (as described below) on a cumulative basis, during the term. If declared, accrued dividends will be payable quarterly on each dividend payment date, beginning December 15, 2020 and thereafter on each March 15,

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

June 15, September 15, and December 15 during the term (or, if such date is not a business day, the next business day after such date). If QVC Group fails to pay dividends or the applicable redemption price with respect to any redemption within 30 days after the applicable dividend payment or redemption date, the dividend rate will increase as provided by the Certificate of Designations for the Preferred Stock (the "Certificate of Designations " ). Accrued dividends that are not paid within 30 days after the applicable dividend payment date will be added to the liquidation price until paid together with all dividends accrued thereon.

The ability of QVC Group to declare or pay any dividend on, or purchase, redeem, or otherwise acquire, any of its common stock or any other stock ranking on parity with the Preferred Stock will be subject to restrictions if QVC Group does not pay all dividends and all redemption payments on the Preferred Stock , subject to certain exceptions as set forth in the Certificate of Designations .

On February 14, 2025, the Company declared a quarterly cash dividend of $2.00 per share, which was paid in cash on March 17, 2025 to stockholders of record of the Preferred Stock at the close of business on February 28, 2025. On May 23, 2025, the Board of Directors announced its decision to suspend payment of the quarterly cash dividend on the Preferred Stock , beginning with the quarterly cash dividend payable on June 16, 2025. As of December 31, 2025, the amount of preferred dividends in arrears was approximately $88 million in aggregate, which is included in preferred stock in the consolidated balance sheet as of December 31, 2025, and $6.90 on a per share basis. As a result of the non-payment of the quarterly cash dividend, the dividend rate increased from 8.0% to 9.5%. During the years ended December 31, 2023 and 2024, the Company declared and paid four quarterly cash dividends, each for $2.00 per share to stockholders of record of the Preferred Stock .

*Distributions upon Liquidation, Dissolution or Winding Up.* Subject to the applicable law, upon QVC Group 's liquidation, winding-up or dissolution, each holder of shares of the Preferred Stock will be entitled to receive, before any distribution is made to the holders of QVC Group common stock , an amount equal to the liquidation price plus all unpaid dividends (whether or not declared) accrued from the immediately preceding dividend payment date, subject to the prior payment of liabilities owed to QVC Group 's creditors and the preferential amounts to which any stock senior to the Preferred Stock is entitled. The Preferred Stock has a liquidation price equal to the sum of (i) $100, plus (ii) all accrued and unpaid dividends (whether or not declared) that have been added to the liquidation price.

*Mandatory and Optional Redemption.* The Preferred Stock is subject to mandatory redemption on March 15, 2031 at the liquidation price plus all unpaid dividends (whether or not declared) accrued from the most recent dividend payment date. On or after the fifth anniversary of September 14, 2020 (the "Original Issue Date " ), QVC Group may redeem all or a portion of the outstanding shares of Preferred Stock , at the liquidation price plus all unpaid dividends (whether or not declared) accrued from the most recent dividend payment date plus, if the redemption is (i) on or after the fifth anniversary of the Original Issue Date but prior to its sixth anniversary, 4.00% of the liquidation price, (ii) on or after the sixth anniversary of the Original Issue Date but prior to its seventh anniversary, 2.00% of the liquidation price and (iii) on or after the seventh anniversary of the Original Issue Date , zero. Both mandatory and optional redemptions must be paid in cash.

*Voting Power*. Holders of the Preferred Stock will not have any voting rights or powers, except as specified in the Certificate of Designations or as required by Delaware law.

*Preferred Stock Directors*. So long as the aggregate liquidation price of the outstanding shares of Preferred Stock exceeds 25% of the aggregate liquidation price of the shares of Preferred Stock issued on the Original Issue Date , holders of Preferred Stock will have certain director election rights as described in the Certificate of Designations whenever dividends on shares of Preferred Stock have not been declared and paid for two consecutive dividend periods and whenever QVC Group fails to pay the applicable redemption price in full with respect to any redemption of the Preferred Stock or fails to make a payment with respect to the Preferred Stock in connection with a liquidation or Extraordinary Transactions (as defined in the Certificate of Designations ).

*Recognition*. As the Preferred Stock is subject to unconditional mandatory redemption in cash and was issued in the form of a share, the Company concluded the Preferred Stock was a mandatorily redeemable financial instrument and

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

should be classified as a liability in the consolidated balance sheets. The Preferred Stock was initially recorded at its fair value, which was determined to be the liquidation preference of $100 per share. Given the liability classification of the Preferred Stock , all dividends accrued are classified as interest expense in the consolidated statements of operations. The fair value of the Preferred Stock (level 1) was $46 million and $439 million as of December 31, 2025 and 2024, respectively.

***Common Stock***

Series A common stock has one vote per share, and Series B common stock has ten votes per share. Each share of the Series B common stock is exchangeable at the option of the holder for one share of Series A common stock. The Series A and Series B common stock participate on an equal basis with respect to dividends and distributions.

At an annual meeting of stockholders held on May 23, 2018, the Company 's stockholders approved an amendment to the Restated Certificate of Incorporation, which (i) eliminated the tracking stock capitalization structure of the Company and (ii) reclassified each outstanding share of Series A and Series B QVC Group common stock into one share of our Series A and Series B common stock, respectively. In addition, the amendment to the Restated Certificate of Incorporation changed (i) the total number of shares of the Company 's capital stock which the Company will have the authority to issue to 8,200 million shares, (ii) the number of shares of the Company 's capital stock designated as "Common Stock " to 8,150 million shares, (iii) the number of shares of Common Stock designated as "Series A Common Stock ," "Series B Common Stock " and "Series C Common Stock " to 4,000 million shares, 150 million shares and 4,000 million shares, respectively, and (iv) the number of shares of the Company 's capital stock designated as "Preferred Stock " to 50 million shares.

As of December 31, 2025, QVC Group reserved for issuance upon exercise of outstanding stock options approximately 0.3 million shares of Series A common stock and approximately 0.1 million shares of Series B common stock.

***Purchases of Common Stock***

There were no shares of Series A or Series B common stock repurchased during the years ended December 31, 2025, 2024 and 2023.

**(10) Related Party Transactions with Officers and Directors**

***Chairman Compensation Arrangement***

In December 2019, LMC entered into a new employment arrangement with Gregory B. Maffei, our Chairman. The arrangement provided for a five year employment term which began on January 1, 2020 and ended December 31, 2024, with an annual base salary of $3 million (with no contracted increase), a one-time cash commitment bonus of $5 million (paid in December 2019), an annual target cash performance bonus of $17 million (with payment subject to the achievement of one or more performance metrics as determined by the applicable company's Compensation Committee), upfront equity awards and annual equity awards (as described below).

The Chairman was entitled to receive term equity awards with an aggregate GDFV of $90 million (the "Upfront Awards " ) which were granted in two equal tranches. The first tranche consisted of time-vested stock options from each of QVC Group , LMC , Liberty Broadband and GCI Liberty and time-vested restricted stock units ("RSUs " ) from Liberty TripAdvisor Holdings, Inc. ("Liberty TripAdvisor " ) (collectively, the "2019 term awards " ) that vested, in each case, on December 31, 2023 (except Liberty TripAdvisor 's award of time-vested RSUs , which vested on December 15, 2023). The second tranche of the Upfront Awards consisted of time-vested stock options from each of LMC , QVC Group , Liberty Broadband and GCI Liberty and time-vested RSUs from Liberty TripAdvisor (collectively, the "2020 term awards " ) that vested, in each case, on December 31, 2024 (except Liberty TripAdvisor 's award of time-vested RSUs , which vested on December 7, 2024).

II-59

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

The Chairman was also entitled to receive annual equity award grants with an annual aggregate GDFV of $17.5 million, consisting of time-vested options, performance-based RSUs or a combination of both, at the election of the Chairman. The annual equity awards were granted directly by QVC Group , LMC , Liberty Broadband , Atlanta Braves Holdings, Inc. and Liberty TripAdvisor according to their applicable allocation percentage. The allocation percentage was determined based on a combination of (1) relative market capitalizations, weighted 50%, and (2) a blended average of historical time allocation on an LMC -wide and Chairman basis, weighted 50%, in each case, absent agreement to the contrary by QVC Group , LMC , Liberty Broadband , Atlanta Braves Holdings, Inc. and Liberty TripAdvisor in consultation with the Chairman. The allocation percentage was then adjusted annually and following certain events. For the years ended December 31, 2024 and 2023 the allocation percentage for QVC Group was 10%, and 11%, respectively. Vesting of any annual performance-based RSUs was subject to the achievement of one or more performance metrics as approved by the Compensation Committee of the applicable company with respect to its respective allocable portion of the annual performance-based RSUs .

Our Chairman's employment arrangement with LMC ended on December 31, 2024, but he continues to serve as Chairman of QVC Group .

*CEO Employment Agreement*

On February 27, 2025, QVC Group and Mr. Rawlinson executed a new employment arrangement (the "Employment Agreement " ) through December 31, 2027 (the "Initial Term " ), which may be extended through December 31, 2028, if mutually agreed (the "Extension Term " and, together with the Initial Term , the "Term " ). Pursuant to the Employment Agreement , Mr. Rawlinson would receive an annual base salary of $1.75 million, retroactive to January 1, 2025. Mr. Rawlinson would be eligible to receive an annual target cash bonus during each year of the Term equal to 200% of his annual base salary, with an annual maximum cash bonus equal to 300% of his annual base salary. Mr. Rawlinson received a retention bonus of $2.25 million, subject to repayment on a pro-rated, after tax, basis in the event Mr. Rawlinson is terminated for cause or terminates his employment without good reason (each as defined in the Employment Agreement ), in either case, prior to the end of the Initial Term . In addition, Mr. Rawlinson received a grant of RSUs with respect to QVC GA with a GDFV equal to $6 million (see additional information in note 11). Mr. Rawlinson also received a long-term performance cash award with a target grant date value equal to $15 million, which can be earned between 50% and 200% of the target value of $5 million each year (referred to as "tranche") for three years, based on the QVC GA stock price as measured after earnings are released each year relative to the stock price as measured after the prior year's earnings are released.

In August 2025, the Board of Directors (the "Board " ) of QVC Group implemented a revised compensation structure for QVC Group 's senior executives, including Mr. Rawlinson. The Company has determined to guarantee Mr. Rawlinson, so long as he remains employed through the end of 2026, cash payments generally equal to 50% of Mr. Rawlinson's target variable compensation for 2025 and 100% of Mr. Rawlinson's target variable compensation for 2026, which was prepaid during the third quarter of 2025. A portion of Mr. Rawlinson's prepayment is subject to meeting certain performance conditions. In connection with this prepayment, Mr. Rawlinson's RSU Grant with respect to QVC GA with a GDFV equal to $6 million was canceled during the year ended December 31, 2025. Additionally, 50% of Mr. Rawlinson's long-term performance cash award was also canceled during the year ended December 31, 2025 (see additional information in note 11). In April 2026, the Company amended and restated Mr. Rawlinson's employment agreement to provide for a market standard severance provision and to provide that his term of employment, previously set to expire in December 2027 without automatic renewal, will now automatically renew for successive one-year periods unless either Mr. Rawlinson or the Company provides notice of non-renewal prior to the applicable renewal date.

*Maffei Arrangements*

On June 3, 2021, the Company and Mr. Maffei entered into a Stock Exchange Agreement (the "Maffei Stock Exchange Agreement " ) pursuant to which, among other things, QVC Group agreed that on the terms and subject to the conditions of the Maffei Stock Exchange Agreement , Mr. Maffei, at his option (during the six-month period following the vesting of the performance-based restricted stock unit award granted to Mr. Maffei on March 10, 2021), may transfer to the

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

Company the number of shares of QVC GA actually received by Mr. Maffei upon vesting of such performance-based restricted stock unit award in exchange for an equivalent number of newly-issued shares of QVC GB .

Pursuant to the terms of the Maffei Stock Exchange Agreement , on March 25, 2022, Mr. Maffei transferred to the Company an aggregate of 4,580 shares of QVC GA received by Mr. Maffei upon vesting of the performance-based RSU award granted to Mr. Maffei on March 10, 2021 and in exchange, the Company issued to Mr. Maffei an equivalent number of shares of QVC GB . Each share of QVC GB stock is convertible, at the option of the holder, into one share of QVC GA .

On September 25, 2024, the Company entered into a call agreement (the "Call Agreement " ) with Mr. Maffei, pursuant to which Mr. Maffei granted to the Company the right to purchase all shares of High Vote Stock (as defined below) owned by Mr. Maffei and certain successors and permitted transferees (collectively, the "Maffei Group " ) upon Mr. Maffei's death. If that right is exercised, the Company may acquire the High Vote Stock at a price equal to the market price of the Low Vote Stock (as defined below) into which such High Vote Stock is convertible, plus a 10% premium. The Company also has a right of first refusal to purchase High Vote Stock that a member of the Maffei Group may propose to sell to a third party, at a purchase price equal to the lesser of (i) the price offered by the third party and (ii) the market price of the Low Vote Stock into which such High Vote Stock is convertible, plus a 10% premium. In either case, if the Company exercises its right to purchase the High Vote Stock of the applicable member of the Maffei Group , such member of the Maffei Group can elect to receive from the Company the purchase price for such High Vote Stock in cash, shares of Low Vote Stock or a combination thereof. The Call Agreement also prohibits any member of the Maffei Group from disposing of High Vote Stock , except for certain exempt transfers (such as transfers to specified related parties, the conversion of any High Vote Stock to Low Vote Stock on a one-for-one basis or certain dispositions to satisfy withholding obligations in connection with the exercise of stock options) and except if the Company fails to exercise its right of first refusal in connection with a proposed sale of High Vote Stock to a third party.

For purposes of the Call Agreement , "High Vote Stock " is common stock of the Company of any series that has voting rights greater than one vote per share, while "Low Vote Stock" is common stock of the Company of any series that has not more than one vote per share. The High Vote Stock currently consists of the QVC GB , while the Low Vote Stock currently consists of the QVC GA .

**(11) Stock-Based Compensation**

The Company has granted to certain of its directors, employees and employees of its subsidiaries, restricted stock ("RSAs "), restricted stock units ("RSUs " ), performance restricted stock units ("PSUs " ), performance cash awards and options to purchase shares of the Company 's common stock (collectively, "Awards "). The Company measures the cost of employee services received in exchange for an equity classified Award (such as stock options and RSAs ) based on the grant-date fair value ("GDFV ") of the Award, and recognizes that cost over the period during which the employee is required to provide service (usually the vesting period of the Award). The Company measures the cost of employee services received in exchange for a liability classified Award based on the current fair value of the Award, and remeasures the fair value of the Award at each reporting date.

In connection with the Reverse Stock Split , each QVC GA RSU, PSU and deferred stock unit ("DSU " ) outstanding immediately prior to the effective time:
  i.  was divided by the ratio of 1-for-50 and rounded down to the nearest whole RSU, PSU or DSU , and
  ii.  cash was issued in lieu of fractional RSUs , PSUs or DSU s.

Also in connection with the Reverse Stock Split , each QVC GA and QVC GB stock option and stock appreciation right ("SAR " ) outstanding immediately prior to the effective time:
  i.  was divided by the ratio of 1-for-50 and rounded down to the nearest whole stock option or SAR , and
  ii.  the corresponding exercise price was multiplied by the ratio of 1-for-50 and rounded up to the nearest cent.

All other terms and restrictions of the RSUs , PSUs , DSU s, stock option and SAR s, including, for example, the

II-61

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

vesting terms, and for stock options and SAR s, the expiration date, are the same as those applicable to the corresponding original RSUs , PSUs , DSU s, stock option and SAR s.

Included in SG&A in the accompanying consolidated statements of operations are $16 million, $32 million and $53 million of stock-based compensation during the year-ended December 31, 2025, 2024, and 2023, respectively.

***QVC Group - Grants of Awards***

During the three months ended March 31, 2025, and in connection with his employment agreement, QVC Group granted a $15 million performance cash award to Mr. Rawlinson. Prior to the subsequent modification of the award during the third quarter of 2025, such performance cash award vested annually over three years, subject to the satisfaction of certain performance objectives. See discussion below for modification during 2025 to the performance cash award granted to Mr. Rawlinson.

The following table presents the number of QVC GA stock-settled RSUs and weighted average GDFV of Awards granted by the Company during the years ended December 31, 2025, 2024 and 2023:

| | For the Years ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2025 | | 2024 | | 2023 | |
| | Awards Granted (000's) | Weighted Average GDFV | Awards Granted (000's) | Weighted Average GDFV | Awards Granted (000's) | Weighted Average GDFV |
| QVC GA stock-settled RSUs , DSU s (1) | 324 | $ 14.00 | 75 | $ 61.47 | 121 | $ 57.94 |
| QVC GB stock-settled RSUs | — | $ — | 6 | $ 250.50 | 7 | $ 275.50 |

(1) All of the QVC GA stock-settled RSUs granted during 2025 were modified and canceled during the twelve months ended December 31, 2025. See discussion below.

Also during the year ended December 31, 2025, QVC Group granted 2.6 million performance-based, cash-settled RSUs of QVC GA to subsidiary employees and QVC Group employees. During the year ended December 31, 2024, QVC Group granted 427 thousand performance-based, cash-settled RSUs of QVC GA to subsidiary employees and QVC Group employees, and 423 thousand time-based, cash-settled RSUs of QVC GA to subsidiary employees. During the year ended December 31, 2023, QVC Group granted 407 thousand performance-based, cash settled RSUs of QVC GA to subsidiary employees. These cash-settled RSUs mainly vest over three years, subject to the satisfaction of certain performance objectives, as applicable.The liability and compensation expense related to such awards is adjusted at the end of each reporting period based on the closing market price of QVC GA on the last trading day of the quarter combined with the probability of satisfying the performance objectives, as applicable.

For awards that are performance-based, performance objectives, which are subjective, are considered in determining the timing and amount of compensation expense recognized. When the satisfaction of the performance objectives becomes probable, the Company records compensation expense. The probability of satisfying the performance objectives is assessed at the end of each reporting period.

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

### *QVC Group - Outstanding Awards*

The following table presents the number and weighted average exercise price ("WAEP ") of options to purchase QVC Group common stock granted to certain officers, employees and directors of the Company , as well as the weighted average remaining life and aggregate intrinsic value of the options.

| | QVC Group | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Series A | | | | Series B | | | |
| | Options (000's) | WAEP | Weighted average remaining life | Aggregate intrinsic value (in millions) | Options (000's) | WAEP | Weighted average remaining life | Aggregate intrinsic value (in millions) |
| Options outstanding at January 1, 2025 | 384 | $ 354.42 | | | 8 | $ 647.50 | | |
| Forfeited/Cancelled (1) | (99) | $ 557.44 | | | (7) | $ 674.50 | | |
| Options outstanding and exercisable at December 31, 2025 | 285 | $ 283.66 | 1.3 years | $ — | 1 | $ 438.00 | 0.2 years | $ — |

(1) There were no options exercised during the years ended 2025 and 2024.

The following table presents the number and weighted average GDFV of QVC Group stock-settled RSUs and DSU s granted to certain officers, employees and directors of the Company .

| | Series A (000's) | Weighted Average GDFV | Series B (000's) | Weighted Average GDFV |
|---|---|---|---|---|
| RSUs outstanding at January 1, 2025 | 175 | $ 116.85 | 6 | $ 250.50 |
| Granted | 324 | $ 14.00 | — | $ — |
| Vested | (142) | $ 139.65 | (6) | $ 250.50 |
| Forfeited/Cancelled | (343) | $ 17.14 | — | $ — |
| RSUs outstanding at December 31, 2025 | 14 | $ 64.15 | — | $ — |

The following table presents the number of QVC Group cash-settled RSUs and PSUs granted to certain officers and employees of the Company .

| | QVC GA RSUs (000's) | QVC GA PSUs (000's) | Total QVC GA RSUs & PSUs (000's) |
|---|---|---|---|
| RSUs outstanding at January 1, 2025 | 388 | 717 | 1,105 |
| Granted | 2,557 | — | 2,557 |
| Vested | (130) | (19) | (149) |
| Forfeited/Cancelled | (2,603) | (432) | (3,035) |
| RSUs outstanding at December 31, 2025 | 212 | 266 | 478 |

### *Revised compensation structure*

During 2025, the Board of Directors of QVC Group and the Compensation Committee of the Board implemented a revised compensation structure for the Company . As a part of this revised compensation structure, certain officers, employees and directors of the Company were paid approximately $55 million in exchange primarily for (1) cancellation of their 2025 RSU grants, as well as cancellation of one half of Mr. Rawlinson's 2025 performance cash award, (2) advance

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

payments of the 2025 management bonus plan and (3) for certain officers, advance payments of long term incentive awards and management bonus plans that would have been granted in 2026. These advance payments, with respect to certain officers of the Company , will be subject to repayment on an after-tax basis, if certain employment and, as applicable, performance conditions are not satisfied. Those awards subject to repayment have been recorded in other current assets and other noncurrent assets and will be expensed over the relevant service period.

*QVC Group - Restricted Stock and Restricted Stock Units*

The Company has approximately 14 thousand unvested RSUs of QVC GA and 269 unvested RSUs of Preferred Stock held by certain directors, officers and employees of the Company as of December 31, 2025. The QVC GA unvested RSUs have a weighted average GDFV of $64.15 per share and there is no incremental cost associated with the unvested Preferred Stock RSUs .

The aggregate fair value of all QVC GA , QVC GB and Preferred Stock RSAs and RSUs that vested during the years ended December 31, 2025, 2024 and 2023, was $5 million, $11 million and $13 million, respectively.

*QVC Group - Exercises*

As of December 31, 2025, the total unrecognized compensation cost related to unvested QVC Group Awards was approximately $6 million. Such amount will be recognized in the Company 's consolidated statements of operations over a weighted average period of approximately 0.7 years.

**(12) Employee Benefit Plans**

Subsidiaries of QVC Group sponsor 401(k) plans, which provide their employees an opportunity to make contributions to a trust for investment in QVC Group common stock , as well as other mutual funds. The Company 's subsidiaries make matching contributions to their plans based on a percentage of the amount contributed by employees. Employer cash contributions to all plans aggregated $24 million, $27 million and $26 million for the years ended December 31, 2025, 2024 and 2023, respectively.

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

**(13) Other Comprehensive Earnings (Loss)**

Accumulated other comprehensive earnings (loss) included in the Company 's consolidated balance sheets and consolidated statements of equity reflect the aggregate of foreign currency translation adjustments, comprehensive earnings (loss) attributable to debt credit risk adjustments and the Company 's share of accumulated other comprehensive earnings of affiliates.

The change in the components of accumulated other comprehensive earnings (loss), net of taxes ("AOCI "), is summarized as follows:

| | Foreign currency translation adjustments | Share of AOCI of equity affiliates | Comprehensive Earnings (loss) Attributable to Credit Risk Adjustments | Other[1] | AOCI |
|---|---|---|---|---|---|
| | | | amounts in millions | | |
| Balance at December 31, 2022 | $ (349) | (5) | 298 | 74 | 18 |
| Other comprehensive earnings (loss) attributable to QVC Group , Inc. stockholders | 23 | 5 | 84 | (44) | 68 |
| Balance at December 31, 2023 | $ (326) | — | 382 | 30 | 86 |
| Other comprehensive earnings (loss) attributable to QVC Group , Inc. stockholders | (80) | — | (21) | — | (101) |
| Balance at December 31, 2024 | $ (406) | — | 361 | 30 | (15) |
| Other comprehensive earnings (loss) attributable to QVC Group , Inc. stockholders | 108 | — | 206 | (8) | 306 |
| Balance at December 31, 2025 | $ (298) | — | 567 | 22 | 291 |

(1) Recognition of previously unrealized losses (gains) on debt, net of taxes

II-65

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

The components of other comprehensive earnings (loss) are reflected in QVC Group 's consolidated statements of comprehensive earnings (loss) net of taxes. The following table summarizes the tax effects related to each component of other comprehensive earnings (loss).

| | Before-tax amount | Tax (expense) benefit | Net-of-tax amount |
|---|---|---|---|
| | | amounts in millions | |
| *Year ended December 31, 2025:* | | | |
| Foreign currency translation adjustments | $ 113 | (5) | 108 |
| Recognition of previously unrealized losses (gains) on debt, net[1] | (10) | 2 | (8) |
| Comprehensive earnings (loss) attributable to credit risk adjustments | 270 | (64) | 206 |
| Other comprehensive earnings (loss) | $ 373 | (67) | 306 |
| *Year ended December 31, 2024:* | | | |
| Foreign currency translation adjustments | $ (82) | (5) | (87) |
| Comprehensive earnings (loss) attributable to credit risk adjustments | (27) | 6 | (21) |
| Other comprehensive earnings (loss) | $ (109) | 1 | (108) |
| *Year ended December 31, 2023:* | | | |
| Foreign currency translation adjustments | $ 17 | (2) | 15 |
| Recognition of previously unrealized losses (gains) on debt, net[1] | (60) | 17 | (43) |
| Comprehensive earnings (loss) attributable to credit risk adjustments | 111 | (27) | 84 |
| Other | 5 | — | 5 |
| Other comprehensive earnings (loss) | $ 73 | (12) | 61 |

(1) Previously unrealized losses (gains) on debt are recognized before-tax in realized and unrealized gains (losses) on financial instruments and the related tax (expense) benefit is recognized in income tax (expense) benefit in the consolidated statement of operations.

II-66

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

**(14) Commitments and Contingencies**

*Litigation*

QVC Group has contingent liabilities related to legal and tax proceedings and other matters arising in the ordinary course of business. Although it is reasonably possible QVC Group may incur losses upon conclusion of such matters, an estimate of any loss or range of loss cannot be made. In the opinion of management, it is expected that amounts, if any, which may be required to satisfy such contingencies will not be material in relation to the accompanying consolidated financial statements.

*HSN Settlement Agreement*

In October 2023, HSN entered into a settlement agreement with the Consumer Product Safety Commission ("CPSC " ) in which HSN agreed to pay a civil penalty to settle the CPSC 's claims in relation to certain handheld clothing steamers sold by HSN that were subject to a voluntary recall previously announced in 2021. In January 2024, HSN received a grand jury subpoena from the U.S . Attorney for the Central District of California that was issued in connection with an official criminal investigation into the clothing steamer matter. QVC has cooperated (and intends to continue cooperating) fully with this investigation, and at this time, QVC is unable to predict the eventual scope, duration or outcome of this investigation, nor is it able to reasonably estimate any range of loss or possible loss.

*Fire at Rocky Mount Fulfillment Center*

On December 18, 2021, QVC experienced a fire at its Rocky Mount fulfillment center in North Carolina. In June 2023, the Company agreed to a final insurance settlement with its insurance company and received all remaining proceeds related to the Rocky Mount claim. During the year ended December 31, 2023, the Company received $280 million of insurance proceeds, of which $210 million represented recoveries for business interruption losses. During the year ended December 31, 2023, the Company recorded $32 million of fire related costs and recognized net gains of $208 million representing proceeds received in excess of recoverable losses in restructuring, penalties and fire related costs, net of (recoveries) in the consolidated statements of operations.

In February 2023, QVC sold the Rocky Mount fulfillment center to an independent third party and as of December 31, 2023 received net cash proceeds of $19 million. QVC recognized gains on the sale of $17 million during the year ended December 31, 2023, calculated as the difference between the aggregate consideration received and the carrying value of the property. The gain is included in restructuring, penalties and fire related costs, net of (recoveries) in the consolidated statement of operations.

*QVC Restructuring*

On June 27, 2022, QVC Group announced a turnaround plan designed to stabilize and differentiate its core HSN and QVC -U.S . businesses and expand the Company 's leadership in video streaming commerce ("Project Athens " ). During 2022, QVC commenced the first phase of Project Athens , including actions to reduce inventory and a planned workforce reduction that was completed in February 2023. QVC recorded restructuring charges of $13 million during the year ended December 31, 2023 in restructuring, penalties and fire related costs, net of (recoveries) in the consolidated statement of operations. These initiatives were consistent with QVC 's strategy to operate more efficiently as it implements its turnaround plan.

During the second quarter of 2024, QVC entered into an agreement and announced a plan to shift its global operating model for IT services to a managed services model. As a result, during the year ended December 31, 2024 QVC recorded restructuring charges of $18 million in restructuring, penalties and fire related costs, net of (recoveries) in the consolidated statement of operations. The cash payments associated with this restructuring were substantially complete as of December 31, 2025.

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

Project Athens laid the foundation for sustained growth by enhancing operational efficiency and financial margins and embedding a culture of continuous improvement. Following the completion of Project Athens and building on these successes, on November 14, 2024, QVC announced a transition to the WIN strategy, targeting top-line growth through three central priorities: (i) 'Wherever She Shops' - aims to enhance customer interactions across diverse platforms; (ii) 'Inspiring People & Products' - fosters rich, engaging content experiences; and (iii) 'New Ways of Working' - emphasizes leveraging technology and process enhancements to streamline operations and fuel innovation. With the WIN strategy, QVC plans to broaden content outreach by creating dynamic, purpose-built experiences that resonate across social media and digital streaming channels. By optimizing its production studios and fostering continuous improvement, QVC envisage content creation as an integrated, efficient process that adapts to various platforms without losing the essence of its brand. QVC aims to grow audiences and redefine shopping experiences, ensuring that it meets its customers wherever they are while building on its heritage for sustained success.

On January 29, 2025, the Company announced the consolidation of its QVC and HSN operations at QVC 's Studio Park location in West Chester, PA, and the closing of the St. Petersburg, FL campus. The consolidation is part of QVC 's organizational and strategic changes intended to support its WIN strategy. As a result, QVC accelerated depreciation related to the closure of the St. Petersburg, FL campus, which was completed as of September 30, 2025 (the "Completion Date "), and recorded $45 million of incremental depreciation through the Completion date. On March 27, 2025, QVC announced a plan to reorganize teams across the Company as part of the WIN strategy, which is intended to increase revenue through growth initiatives while maintaining Adjusted OIBDA margin. As a result of the reorganization, QVC recorded restructuring charges of $34 million and $19 million at QxH and QVC International, respectively, in restructuring, penalties and fire related costs, net of (recoveries) in the consolidated statement of operations during the year ended December 31, 2025. During the year ended December 31, 2025, the Company paid $37 million related to these charges.

In September 2025, QVC entered into agreements to sell the St. Petersburg properties to independent third parties. Two of the St. Petersburg property sales closed in December 2025. The sale of the remaining property is expected to be completed within the next twelve months. As of December 31, 2025, the remaining long-lived assets, all within QxH, were included in assets held for sale noncurrent in the consolidated balance sheet.

*Zulily Restructuring*

Zulily was a wholly owned subsidiary of QVC Group until its divestiture on May 24, 2023 (see note 1). Zulily recorded $5 million of restructuring charges during the year ended December 31, 2023, related to its reduction in corporate workforce.

**(15) Information About QVC Group 's Operating Segments**

QVC Group , through its ownership interests in subsidiaries and other companies, is primarily engaged in the video and on-line commerce industries. QVC Group identifies its reportable segments as (A) those operating segments that represent 10% or more of its consolidated annual revenue, annual Adjusted OIBDA or total assets and (B) those equity method affiliates whose share of earnings represent 10% or more of QVC Group 's annual pre-tax earnings. The segment presentation for prior periods has been conformed to the current period segment presentation.

QVC Group 's chief operating decision maker, the chief executive officer, evaluates performance and makes decisions about allocating resources to its operating segments based on financial measures such as revenue, cost of goods sold, gross profit, operating expense, advertising expense, SG&A and Adjusted OIBDA , in addition to average sales price per unit, number of units shipped and revenue or sales per customer equivalent. In addition, QVC Group reviews nonfinancial measures such as unique website visitors, conversion rates and active customers, as appropriate.

For segment reporting purposes, QVC Group defines Adjusted OIBDA as revenue less cost of goods sold, operating expenses, and SG&A excluding stock-based compensation and, where applicable, separately identified items impacting comparability. QVC Group believes this measure is an important indicator of the operational strength and performance of its businesses by identifying those items that are not directly a reflection of each business' performance or indicative of ongoing business trends. In addition, this measure allows management to view operating results and perform

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

analytical comparisons and benchmarking between businesses and identify strategies to improve performance. This measure of performance excludes depreciation and amortization, stock-based compensation, and where applicable, separately identified impairments, litigation settlements, restructuring, penalties, fire related costs, net of recoveries (including Rocky Mount inventory losses) and gains on sales of assets and sale leaseback transactions, that are included in the measurement of operating income (loss) pursuant to GAAP . Accordingly, Adjusted OIBDA should be considered in addition to, but not as a substitute for, operating income, net income, cash flow provided by operating activities and other measures of financial performance prepared in accordance with GAAP . QVC Group generally accounts for intersegment sales and transfers as if the sales or transfers were to third parties, that is, at current prices.

For the year ended December 31, 2025, QVC Group has identified the following operating segments as its reportable segments, which are also operating segments:

- QxH - QxH markets and sells a wide variety of consumer products in the U.S ., primarily by means of its televised shopping programs and via the internet through their websites and mobile applications;

- QVC International - QVC International markets and sells a wide variety of consumer products in several foreign countries, primarily by means of its televised shopping programs and via the internet through its international websites and mobile applications; and

- CBI - CBI consists of a portfolio of aspirational home and apparel brands in the U.S . that sell merchandise through brick-and-mortar retail locations as well as via the internet through their websites.

QVC Group 's operating segments are strategic business units that offer different products and services. They are managed separately because each segment requires different technologies, distribution channels and marketing strategies. The accounting policies of the segments are the same as those described in the Company 's summary of significant accounting policies.

**Performance Measures**

| | | Year ended December 31, 2025 | | | |
|---|---|---|---|---|---|
| | QxH | QVC Int'l | CBI | Corporate and other | Total |
| | | | amounts in millions | | |
| Total revenue, net | $ 5,936 | 2,357 | 937 | — | 9,230 |
| Cost of goods sold (excluding depreciation and amortization) | 3,979 | 1,526 | 559 | — | 6,064 |
| Gross profit | 1,957 | 831 | 378 | — | 3,166 |
| Operating expense | 454 | 183 | 38 | — | 675 |
| Advertising expense | 330 | 39 | 163 | — | 532 |
| SG&A (excluding stock based compensation and advertising) | 656 | 316 | 161 | 55 | 1,188 |
| Adjusted OIBDA | $ 517 | 293 | 16 | (55) | 771 |

II-69

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

| | Year ended December 31, 2024 | | | | |
|---|---|---|---|---|---|
| | QxH | QVC Int'l | CBI | Corporate and other | Total |
| | amounts in millions | | | | |
| Total revenue, net | $ 6,598 | 2,399 | 1,040 | — | 10,037 |
| Cost of goods sold (excluding depreciation and amortization) | 4,373 | 1,532 | 619 | — | 6,524 |
| Gross profit | 2,225 | 867 | 421 | — | 3,513 |
| Operating expense | 512 | 181 | 41 | — | 734 |
| Advertising expense | 277 | 35 | 172 | — | 484 |
| SG&A (excluding stock based compensation and advertising) | 671 | 318 | 172 | 31 | 1,192 |
| Adjusted OIBDA | $ 765 | 333 | 36 | (31) | 1,103 |

| | Year ended December 31, 2023 | | | | |
|---|---|---|---|---|---|
| | QxH | QVC Int'l | CBI | Corporate and other | Total |
| | amounts in millions | | | | |
| Total revenue, net | $ 6,995 | 2,454 | 1,165 | 301 | 10,915 |
| Cost of goods sold (excluding depreciation, amortization, and Rocky Mount inventory losses) | 4,711 | 1,562 | 717 | 240 | 7,230 |
| Gross profit | 2,284 | 892 | 448 | 61 | 3,685 |
| Operating expense | 549 | 190 | 45 | 11 | 795 |
| Advertising expense | 251 | 38 | 178 | 30 | 497 |
| SG&A (excluding stock based compensation and advertising) | 738 | 339 | 158 | 84 | 1,319 |
| Adjusted OIBDA | $ 746 | 325 | 67 | (64) | 1,074 |

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

**Other Information**

| | December 31, 2025 | | December 31, 2024 | | December 31, 2023 | |
|---|---|---|---|---|---|---|
| | Depreciation | Amortization | Depreciation | Amortization | Depreciation | Amortization |
| | amounts in millions | | | | | |
| QxH | $ 91 | 224 | 51 | 252 | 59 | 265 |
| QVC International | 27 | 27 | 26 | 22 | 31 | 17 |
| CBI | 16 | 13 | 13 | 19 | 9 | 17 |
| Corporate and other | — | — | — | — | 5 | 4 |
| Consolidated QVC Group | $ 134 | 264 | 90 | 293 | 104 | 303 |

| | December 31, 2025 | | December 31, 2024 | |
|---|---|---|---|---|
| | Total assets | Capital expenditures | Total assets | Capital expenditures |
| | amounts in millions | | | |
| QxH | $ 4,780 | 97 | 6,388 | 122 |
| QVC International | 1,927 | 37 | 1,761 | 51 |
| CBI | 495 | 23 | 567 | 26 |
| Corporate and other | 441 | — | 527 | — |
| Consolidated QVC Group | $ 7,643 | 157 | 9,243 | 199 |

Property and equipment, net of accumulated depreciation, by segment was as follows:

| | Years ended December 31, | |
|---|---|---|
| | 2025 | 2024 |
| | amounts in millions | |
| QxH | $ 166 | 259 |
| QVC International | 150 | 151 |
| CBI | 85 | 92 |
| Consolidated QVC Group | $ 401 | 502 |

II-71

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

The following table provides a reconciliation of consolidated segment Adjusted OIBDA to operating income and earnings (loss) from continuing operations before income taxes:

| | | Years ended December 31, | | |
|---|---|---|---|---|
| | | 2025 | 2024 | 2023 |
| | | amounts in millions | | |
| Consolidated segment Adjusted OIBDA | $ | 771 | 1,103 | 1,074 |
| Depreciation and amortization | | (398) | (383) | (407) |
| Impairment of intangible assets | | (930) | (578) | — |
| Impairment of goodwill | | (1,477) | (902) | (326) |
| Gains on sale of assets and sale leaseback transactions | | 5 | 1 | 113 |
| Restructuring, penalties and fire related (costs), net of recoveries | | (53) | (18) | 189 |
| Stock-based compensation | | (16) | (32) | (53) |
| Operating income | | (2,098) | (809) | 590 |
| Interest expense | | (496) | (468) | (451) |
| Interest and dividend income | | 50 | 50 | 52 |
| Realized and unrealized gains (losses) on financial instruments, net | | (40) | (60) | (61) |
| Loss on disposition of Zulily , net | | — | — | (64) |
| Tax sharing income (expense) with Liberty Broadband | | 10 | (4) | (11) |
| Other, net | | (9) | — | 11 |
| Earnings (loss) from continuing operations before income taxes | $ | (2,583) | (1,291) | 66 |

**Revenue by Geographic Area**

The following table summarizes net revenue generated by subsidiaries located within the identified geographic areas:

| | | Years ended December 31, | | |
|---|---|---|---|---|
| | | 2025 | 2024 | 2023 |
| | | amounts in millions | | |
| United States | $ | 6,873 | 7,638 | 8,442 |
| Japan | | 825 | 870 | 945 |
| Germany | | 784 | 785 | 788 |
| Other foreign countries | | 748 | 744 | 740 |
| Consolidated QVC Group | $ | 9,230 | 10,037 | 10,915 |

II-72

**QVC GROUP, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**December 31, 2025, 2024 and 2023**

**Property and Equipment by Geographic Area**

The following table summarizes property and equipment, net of accumulated depreciation, based on physical location:

| | Years ended December 31, | |
| --- | --- | --- |
| | 2025 | 2024 |
| | amounts in millions | |
| U.S . | $ 251 | 351 |
| Japan | 79 | 81 |
| Other foreign countries | 71 | 70 |
| Consolidated QVC Group | $ 401 | 502 |

II-73

**PART III**

The following required information is incorporated by reference to our definitive proxy statement for our 2026 Annual Meeting of Stockholders presently scheduled to be held in the second quarter of 2026:

Item 10.    Directors, Executive Officers and Corporate Governance

Item 11.    Executive Compensation

Item 12.    Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

Item 13.    Certain Relationships and Related Transactions, and Director Independence

Item 14.    Principal Accountant Fees and Services

We expect to file our definitive proxy statement for our 2026 Annual Meeting of Shareholders with the Securities and Exchange Commission on or before April 30, 2026.

**PART IV.**

**Item 15. Exhibits and Financial Statement Schedules.**

(a)(1) *Financial Statements*

Included in Part II of this report:

| | Page No. |
|---|---|
| QVC Group , Inc.: | |
| Report of Independent Registered Public Accounting Firm (KPMG LLP, Philadelphia, PA, Auditor Firm ID: 185) | II-23 |
| Consolidated Balance Sheets, December 31, 2025 and 2024 | II-25 |
| Consolidated Statements of Operations, Years ended December 31, 2025, 2024 and 2023 | II-27 |
| Consolidated Statements of Comprehensive Earnings (loss), Years ended December 31, 2025, 2024 and 2023 | II-28 |
| Consolidated Statements of Cash Flows, Years ended December 31, 2025, 2024 and 2023 | II-29 |
| Consolidated Statements of Equity, Years ended December 31, 2025, 2024 and 2023 | II-30 |
| Notes to Consolidated Financial Statements, December 31, 2025, 2024 and 2023 | II-31 |

(a)(2) *Financial Statement Schedules*

(i)    All schedules have been omitted because they are not applicable, not material or the required information is set forth in the financial statements or notes thereto.

(a)(3) *Exhibits*

Listed below are the exhibits which are filed as a part of this report (according to the number assigned to them in Item 601 of Regulation S-K):

3 - Articles of Incorporation and Bylaws:

3.1    https://www.sec.gov/Archives/edgar/data/1355096/000110465918035505/a18-14183_1ex3d1.htm">Restated Certificate of Incorporation of the Registrant (incorporated by reference to Exhibit 3.1 to Amendment No. 5 to the Registrant's Registration Statement on Form 8-A filed on May 24, 2018 (File No. 001-33982) (the "2018 Form 8-A " )).

3.2    https://www.sec.gov/Archives/edgar/data/1355096/000155837025001837/qvcga-20241231xex3d2.htm">Amendment to Restated Certificate of Incorporation of the Registrant (incorporated by reference to Exhibit 3.2 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 2024 filed on February 27,2025 (File No. 001-33982))*

3.3    https://www.sec.gov/Archives/edgar/data/1355096/000110465925016368/tm257272d1_ex3-2.htm">Amended and Restated Bylaws of the Registrant, as amended effective February 21, 2025 (incorporated by reference to Exhibit 3.2 to the Registrant's Current Report on Form 8-K on February 24, 2025 (File No. 001-33982)).

3.4    https://www.sec.gov/Archives/edgar/data/1355096/000110465925052042/tm2515939d1_ex3-1.htm">Certificate of Amendment of Restated Certificate of Incorporation of the Company (incorporated by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed on May 22, 2025 (File No. 001-33982))

3.5    https://www.sec.gov/Archives/edgar/data/1355096/000135509620000023/qrte-20200821ex310a24cdf.htm">Certificate of Designations of 8.0% Series A Cumulative Redeemable Preferred Stock (incorporated by reference Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed on August 26, 2020 (File No. 001-33982)).

4 - Instruments Defining the Rights of Securities Holders, including Indentures:

4.1   https://www.sec.gov/Archives/edgar/data/1355096/000110465915043483/a15-13495_1ex4d1.htm">Form of Specimen certificate for shares of the Registrant's Series A common stock, par value $.01 per share (incorporated by reference to Exhibit 4.1 to the Registrant's Registration Statement on Form 8-A filed on May 24, 2018 (File No. 001-33982 (the "2018 Form 8-A " ).

4.2   https://www.sec.gov/Archives/edgar/data/1355096/000110465915043483/a15-13495_1ex4d2.htm">Form of Specimen certificate for shares of the Registrant's Series B common stock, par value $.01 per share (incorporated by reference to Exhibit 4.2 to the 2018 Form 8-A ).

4.3   https://www.sec.gov/Archives/edgar/data/1355096/000110465920099685/tm2029501d1_ex4-2.htm">Specimen Certificate for shares of 8.0% Series A Cumulative Redeemable Preferred Stock (incorporated by reference to Exhibit 4.2 to the Registrant's Registration Statement on Form 8-A filed on August 27, 2020 (File No. 001-33982)).

4.4   https://www.sec.gov/Archives/edgar/data/1355096/000155837021001983/qrtea-20201231xex4d4.htm">Description of the Registrant's Securities Registered Pursuant to Section 12 of the Securities Exchange Act of 1934 (incorporated by reference to Exhibit 4.4 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 2020 filed on February 26, 2021 https://www.sec.gov/Archives/edgar/data/1355096/000155837021001983/qrtea-20201231xex4d4.htm">(File No. 001-33982)(the "2020 Form 10-K " )).

4.5   The Registrant undertakes to furnish to the Securities and Exchange Commission, upon request, a copy of all instruments with respect to long-term debt not filed herewith.

10 - Material Contracts:

10.1   https://www.sec.gov/Archives/edgar/data/1355096/000135509611000007/linta_exhibit107x9302011.htm">Liberty Interactive Corporation 2010 Incentive Plan (As Amended and Restated Effective November 7, 2011) (the "2010 Incentive Plan " ) (incorporated by reference to Exhibit 10.7 to the Registrant's Quarterly Report on Form 10-Q for the quarterly period ended on September 30, 2011 filed on November 8, 2011 (File No. 001-33982)). +

10.2   https://www.sec.gov/Archives/edgar/data/1355096/000135509613000063/linta_exhibit10593013.htm">Amendment to the 2010 Incentive Plan (effective August 5, 2013) (incorporated by reference to Exhibit 10.5 to the Registrant's Quarterly Report on From 10-Q for the quarterly period ended on September 30, 2013 filed on November 5, 2013 (File No. 001-33982)). +

10.3   https://www.sec.gov/Archives/edgar/data/1355096/000155837015000837/lint-20150331ex103a31325.htm">Liberty Interactive Corporation 2012 Incentive Plan (Amended and Restated as of March 31, 2015) (incorporated by reference to Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q for the quarterly period ended on March 31, 2015 filed on May 8, 2015 (File No. 001-33982). +

10.4   https://www.sec.gov/Archives/edgar/data/1355096/000104746916014238/a2229131zdef14a.htm">Liberty Interactive Corporation 2016 Omnibus Incentive Plan (incorporated by reference to Annex A to the Registrant's Proxy Statement on Schedule 14A filed on July 8, 2016 (File No. 001-33982)). +

10.5   https://www.sec.gov/Archives/edgar/data/1355096/000135509614000015/linta_exhibit10-13x12312013.htm">Form of Non-Qualified Stock Option Agreement (incorporated by reference to Exhibit 10.13 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 2013 filed on February 28, 2014 (File No. 001-33982) (the "Liberty 2013 Form 10-K " )). +

10.6   https://www.sec.gov/Archives/edgar/data/1355096/000135509614000015/linta_exhibit10-14x12312013.htm">Form of Restricted Stock Award Agreement (incorporated by reference to Exhibit 10.14 to the Liberty 2013 Form 10-K ). +

10.7   https://www.sec.gov/Archives/edgar/data/1355096/000104746910001362/a2196058zex-10_19.htm">Form of Restricted Stock Award Agreement under the 2007 Incentive Plan and the 2010 Incentive Plan for certain designated award recipients (incorporated by reference to Exhibit 10.19 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 2009 filed on February 25, 2010 (File No. 001-33982)). +

10.8 https://www.sec.gov/Archives/edgar/data/1355096/000135509612000005/linta_exhibit1029.htm">Form of Indemnification Agreement between the Registrant and its executive officers/directors (incorporated by reference to Exhibit 10.29 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 2011 filed on February 23, 2012 (File No. 001-33982)).

10.9 https://www.sec.gov/Archives/edgar/data/1507934/000104746911008199/a2205694zex-10_5.htm">Services Agreement , dated as of September 23, 2011, by and between Liberty Interactive Corporation and Liberty Media Corporation (as assignee of Starz (f/k/a Liberty Media Corporation)) (the "Services Agreement " ) (incorporated by reference to Exhibit 10.5 to Post-Effective Amendment No. 1 to Starz's Registration Statement on Form S-4 filed on September 23, 2011 (File No. 333-171201)).

10.10 https://www.sec.gov/Archives/edgar/data/1254699/000125469913000011/qvc2013-indenture_exhibit1.htm">Indenture dated as of March 18, 2013 among QVC , Inc., the guarantors party thereto and U.S . Bank National Association (incorporated by reference to Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2013 filed on May 9, 2013 (File No. 333-184501)).

10.11 https://www.sec.gov/Archives/edgar/data/1254699/000104746914004404/a2219810zex-4_1.htm">Form of the Indenture dated as of March 18, 2014 among QVC , Inc., the guarantors party thereto and U.S . Bank National Association (incorporated by reference to Exhibit 4.1 to QVC , Inc.'s Registration Statement on Form S-4 filed on April 30, 2014 (File No. 333-195586)).

10.12 https://www.sec.gov/Archives/edgar/data/1254699/000104746914008242/a2221689zex-4_1.htm">Indenture dated as of August 21, 2014 among QVC , Inc., the guarantors party thereto and U.S . Bank National Association (incorporated by reference to Exhibit 4.1 to QVC , Inc.'s Registration Statement on Form S-4 filed on October 10, 2014 (File No. 333-199254)).

10.13 https://www.sec.gov/Archives/edgar/data/1254699/000125469919000001/exhibit41.htm">Fourth Amended and Restated Credit Agreement , dated as of December 31, 2018, among QVC , Inc. and zulily, llc, as Borrowers , JPMorgan Chase Bank , N.A., as Lead Arranger, Lead Bookrunner and Administrative Agent and the parties named therein as Lenders, Co-Bookrunners, Co-Syndication Agents and Co-Documentation Agents (incorporated by reference to Exhibit 4.1 to QVC , Inc.'s Current Report on Form 8-K filed on January 4, 2019 (File No. 001-38654)).

10.14 https://www.sec.gov/Archives/edgar/data/1355096/000155837015000837/lint-20150331ex104d27c5f.htm">Liberty Interactive Corporation Nonemployee Director Deferred Compensation Plan (incorporated by reference to Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q for the quarterly period ended on March 31, 2015 filed on May 8, 2015 (File No. 001-33982)).+

10.15 https://www.sec.gov/Archives/edgar/data/1355096/000155837016003621/lint-20151231ex10480aae1.htm">Form of Non-Qualified Stock Option Agreement (incorporated by reference to Exhibit 10.48 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 2015 filed on February 26, 2016 (File No. 001-33982) (the "Liberty 2015 Form 10-K " )). +

10.16 https://www.sec.gov/Archives/edgar/data/1355096/000155837016003621/lint-20151231ex10493e6d7.htm">Form of Restricted Stock Award Agreement (incorporated by reference to Exhibit 10.49 to the Liberty 2015 Form 10-K ). +

10.17 https://www.sec.gov/Archives/edgar/data/1355096/000155837017008702/lint-20170930ex10555a02f.htm">Form of Nonqualified Stock Option Agreement under the 2016 Incentive Plan for Nonemployee Directors (incorporated by reference to Exhibit 10.5 to the 2017 Q3 Form 10-Q). +

10.18 https://www.sec.gov/Archives/edgar/data/1434729/000143472914000003/exhibit1013hsnincsecondame.htm">HSN , Inc. Second Amended and Restated 2008 Stock and Annual Incentive Plan (incorporated by reference to Exhibit 10.13 to HSN , Inc.'s Annual Report on Form 10-K for the year ended December 31, 2013 filed on February 20, 2014 (File No. 01-34061)). +

10.19 https://www.sec.gov/Archives/edgar/data/1434729/000143472917000007/hsn2017proxy.htm">HSN , Inc. 2017 Omnibus Incentive Plan (incorporated by reference to Annex A of HSN , Inc.'s 2017 Proxy Statement on Schedule 14A filed on April 10, 2017 (File No. 01-34061)). +

10.20 https://www.sec.gov/Archives/edgar/data/1560385/000155837018001342/lmc-20171231ex10606be27.htm">Letter Agreement between Liberty Interactive Corporation and Liberty Media Corporation relating to the Services Agreement (incorporated by reference to Exhibit 10.60 to Liberty Media Corporation's Annual Report on Form 10-K for the year ended December 31, 2017 filed on February 28, 2018 (File No. 001-35707)).

10.21 https://www.sec.gov/Archives/edgar/data/1355096/000155837018004617/qrte-20180331ex104fbdd81.htm">Amendment, dated March 13, 2018, of certain Liberty Interactive Corporation incentive plans (incorporated by reference to Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 2018 file on May 10, 2018 (File No. 001-33982)).+

10.22 https://www.sec.gov/Archives/edgar/data/808461/000110465918017479/a18-8247_1ex10d1.htm">Tax Sharing Agreement, dated as of March 9, 2018, by and between Liberty Interactive Corporation and GCI Liberty, Inc. (incorporated by reference to Exhibit 10.1 to GCI Liberty, Inc's Current Report on Form 8-K filed on March 14, 2018 (File No. 001-38385) (the "GCI March Form 8-K " )).

10.23 https://www.sec.gov/Archives/edgar/data/808461/000110465918017479/a18-8247_1ex10d2.htm">Indemnification Agreement, dated as of March 9, 2018, by and among Liberty Interactive Corporation, GCI Liberty, Inc., Liberty Interactive LLC and LV Bridge, LLC (incorporated by reference to Exhibit 10.2 to the GCI March Form 8-K ).

10.24 https://www.sec.gov/Archives/edgar/data/1254699/000110465918056551/a18-26027_7ex4d1.htm">Indenture, dated September 13, 2018, by and among QVC , Inc., Affiliate Investment, Inc., Affiliate Relations Holdings, Inc., AMI 2, Inc., ER Marks, Inc., QVC Global Holdings I, Inc., QVC Global Holdings II, Inc., QVC Rocky Mount, Inc., QVC San Antonio, LLC and U.S . Bank National Association, as trustee (incorporated by reference to Exhibit 4.1 to QVC , Inc.'s Form 8-A filed on September 13, 2018 (File No. 001-38654) (the "2018 QVC Form 8-A " )).

10.25 https://www.sec.gov/Archives/edgar/data/1254699/000110465918056551/a18-26027_7ex4d2.htm">First Supplemental Indenture, dated September 13, 2018, by and among QVC , Inc., Affiliate Investment, Inc., Affiliate Relations Holdings, Inc., AMI 2, Inc., ER Marks, Inc., QVC Global Holdings I, Inc., QVC Global Holdings II, Inc., QVC Rocky Mount, Inc., QVC San Antonio, LLC and U.S . Bank National Association, as trustee (incorporated by reference to Exhibit 4.2 to the 2018 QVC Form 8-A ).

10.26 https://www.sec.gov/Archives/edgar/data/1254699/000110465918056551/a18-26027_7ex4d3.htm">Form of QVC , Inc. 6.375% Senior Secured Notes due 2067 (incorporated by reference to Exhibit 4.3 to the 2018 QVC Form 8-A ).

10.27 https://www.sec.gov/Archives/edgar/data/1254699/000110465919067280/a19-18286_8ex4d2.htm">Second Supplemental Indenture, dated November 26, 2019, by and among QVC , Inc., Affiliate Investment, Inc., Affiliate Relations Holdings, Inc., AMI 2, Inc., ER Marks, Inc., QVC Global Holdings I, Inc., QVC Global Holdings II, Inc., QVC Rocky Mount, Inc., QVC San Antonio, LLC, QVC Deutschland GP, Inc., HSN , Inc., HSN i, LLC, HSN Holding LLC, AST Sub, Inc., Home Shopping Network En Espanol, L.L.C., Home Shopping Network En Espanol, L.P., H.O.T. Networks Holdings (Delaware) LLC, HSN of Nevada LLC, Ingenious Designs LLC, NLG Merger Corp., Ventana Television, Inc., and Ventana Television Holdings, Inc., as guarantors, and U.S . Bank National Association, as trustee (incorporated by reference to Exhibit 4.2 to QVC , Inc.'s Form 8-A filed on November 26, 2019 (File No. 001-38654) (the "2019 QVC Form 8-A " )).

10.28 https://www.sec.gov/Archives/edgar/data/1254699/000110465919067280/a19-18286_8ex4d3.htm">Form of 6.250% Senior Secured Notes due 2068 (incorporated by reference to Exhibit 4.3 to the 2019 QVC Form 8-A ).

10.29 https://www.sec.gov/Archives/edgar/data/1355096/000155837019004827/qrte-20190331ex101fe0ee1.htm">Form of Amended and Restated Indemnification Agreement between the Registrant and its executive officers/directors (incorporated by reference to Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2019 filed on May 10, 2019 (File No. 001-33982)).

| 10.30 | https://www.sec.gov/Archives/edgar/data/1355096/000155837020001490/ex-10d62.htm">Form of First Amendment to Services Agreement , effective as of December 13, 2019, between Liberty Media Corporation and the Registrant, Liberty Broadband Corporation, GCI Liberty, Inc. and Liberty TripAdvisor Holdings, Inc. (incorporated by reference to Exhibit 10.62 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 2019 filed on February 26, 2020 (File No. 001-33982)).+ |
|---|---|
| 10.31 | https://www.sec.gov/Archives/edgar/data/1355096/000110465919074432/tm1926614d1_ex10-3.htm">Form of Annual Option Award Agreement between the Registrant and Gregory B. Maffei (incorporated by reference to Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed on December 19, 2019 (File No. 001-33982) (the "December 2019 Form 8-K " )). + |
| 10.32 | https://www.sec.gov/Archives/edgar/data/1355096/000110465919074432/tm1926614d1_ex10-5.htm">Form of Upfront Award Agreement between the Registrant and Gregory B. Maffei under the QVC Group , Inc. 2016 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.5 to the December 2019 Form 8-K ). + |
| 10.33 | https://www.sec.gov/Archives/edgar/data/1355096/000110465925054916/tm2516525d2_ex10-1.htm">Employment Agreement , effective as of May 27, 2025, by and between ER Development International, Inc., QVC , Inc., and Gregory B Maffei (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on May 30, 2025 (File No.001-33982))+ |
| 10.34 | https://www.sec.gov/Archives/edgar/data/1254699/000110465920010360/a20-5531_4ex4d2.htm">Third Supplemental Indenture, dated February 4, 2020, by and among QVC , Inc., Affiliate Investment, Inc., Affiliate Relations Holdings, Inc., AMI 2, Inc., ER Marks, Inc., QVC Global Holdings I, Inc., QVC Global Holdings II, Inc., QVC Rocky Mount, Inc., QVC San Antonio, LLC, QVC Deutschland GP, Inc., HSN , Inc., HSN i, LLC, HSN Holding LLC, AST Sub, Inc., Home Shopping Network En Espanol, L.L.C., Home Shopping Network En Espanol, L.P., H.O.T. Networks Holdings (Delaware) LLC, HSN of Nevada LLC, Ingenious Designs LLC, NLG Merger Corp., Ventana Television, Inc., and Ventana Television Holdings, Inc., as guarantors, and U.S . Bank National Association, as trustee (incorporated by reference to Exhibit 4.2 to QVC , Inc.'s Current Report on Form 8-K (File No. 001-38654) filed on February 4, 2020 (the "February 2020 Form 8-K " )). |
| 10.35 | https://www.sec.gov/Archives/edgar/data/1254699/000110465920010360/a20-5531_4ex4d3.htm">Form of 4.75% Senior Secured Notes due 2027 (incorporated by reference to Exhibit 4.3 to the February 2020 Form 8-K ). |
| 10.36 | https://www.sec.gov/Archives/edgar/data/1355096/000110465920046065/tm201671-1_def14a.htm">QVC Group , Inc. 2020 Omnibus Incentive Plan (incorporated by reference to Annex A to the Registrant's Proxy Statement on Schedule 14A filed on April 14, 2020 (File No. 001-33982)). + |
| 10.37 | https://www.sec.gov/Archives/edgar/data/1254699/000110465920097117/tm2027214d8_ex4-2.htm">Fourth Supplemental Indenture, dated August 20, 2020, by and among QVC , Inc., Affiliate Investment, Inc., Affiliate Relations Holdings, Inc., AMI 2, Inc., ER Marks, Inc., QVC Global Holdings I, Inc., QVC Global Holdings II, Inc., QVC Rocky Mount, Inc., QVC San Antonio, LLC, QVC Deutschland GP, Inc., HSN , Inc., HSN i, LLC, HSN Holding LLC, AST Sub, Inc., Home Shopping Network En Espanol, L.L.C., Home Shopping Network En Espanol, L.P., H.O.T. Networks Holdings (Delaware) LLC, HSN of Nevada LLC, Ingenious Designs LLC, NLG Merger Corp., Ventana Television, Inc., and Ventana Television Holdings, Inc., as guarantors, and U.S . Bank National Association, as trustee (incorporated by reference to Exhibit 4.2 to the Registrant's Current Report on Form 8-K filed on August 20, 2020 (File No. 001-38654) (the "August 2020 Form 8-K " )). |
| 10.38 | https://www.sec.gov/Archives/edgar/data/1254699/000110465920097117/tm2027214d8_ex4-3.htm">Form of 4.375% Senior Secured Notes due 2028 (incorporated by reference to Exhibit 4.3 to the August 2020 Form 8-K ). |
| 10.39 | https://www.sec.gov/Archives/edgar/data/1355096/000155837021001983/qrtea-20201231xex10d67.htm">Form of Nonqualified Stock Option Agreement under the QVC Group , Inc. 2020 Omnibus Incentive Plan, as amended from time to time, for Nonemployee Directors (incorporated by reference to Exhibit 10.67 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 2020 filed on February 26, 2021 (File No. 001-33982)(the "2020 Form 10-K " )).+ |

| 10.40 | https://www.sec.gov/Archives/edgar/data/1355096/000155837021001983/qrtea-20201231xex10d68.htm">Form of Restricted Stock Units Agreement under the QVC Group , Inc. 2020 Omnibus Incentive Plan, as amended from time to time, for Nonemployee Directors (incorporated by reference to Exhibit 10.68 to the 2020 Form 10-K ).+ |
| --- | --- |
| 10.41 | https://www.sec.gov/Archives/edgar/data/1355096/000155837021001983/qrtea-20201231xex10d69.htm">Form of Nonqualified Stock Option Agreement under the QVC Group , Inc. 2020 Omnibus Incentive Plan, as amended from time to time, for certain officers (incorporated by reference to Exhibit 10.69 to the 2020 Form 10-K ).+ |
| 10.42 | https://www.sec.gov/Archives/edgar/data/1355096/000155837021006419/qrtea-20210331xex10d1.htm">Form of Performance-Based Restricted Stock Units Agreement under the QVC Group , Inc. 2020 Omnibus Incentive Plan, as amended from time to time, for certain officers (incorporated by reference to Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 2021 filed on May 7, 2021 (File No. 001-33982) (the "March 2021 Form 10-Q " )).+ |
| 10.43 | https://www.sec.gov/Archives/edgar/data/0001355096/000110465921076619/tm2118509d1_ex10-1.htm">Stock Exchange Agreement, dated June 3, 2021, among John C. Malone, Leslie A. Malone, The John C. Malone 1995 Revocable Trust, The Leslie A. Malone 1995 Revocable Trust, The Tracy M. Neal Trust A, The Evan D. Malone Trust A and the Registrant (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on June 4, 2021 (File No. 001-33982) (the "June 2021 Form 8-K " )). |
| 10.44 | https://www.sec.gov/Archives/edgar/data/0001355096/000110465921076619/tm2118509d1_ex10-2.htm">Stock Exchange Agreement, dated June 3, 2021, between Gregory B. Maffei and the Registrant (incorporated by reference to Exhibit 10.2 to the June 2021 8-K). |
| 10.45 | https://www.sec.gov/Archives/edgar/data/0001355096/000110465921076619/tm2118509d1_ex10-3.htm">Waiver Letter and Amendment of Employment Agreement , dated June 3, 2021, among Gregory B. Maffei, Liberty Media Corporation and the Registrant (incorporated by reference to Exhibit 10.3 to the June 2021 Form 8-K ).https://www.sec.gov/Archives/edgar/data/0001355096/000110465921076619/tm2118509d1_ex10-3.htm">+ |
| 10.46 | https://www.sec.gov/Archives/edgar/data/1355096/000110465925019250/tm257914d1_ex10-1.htm">Employment Agreement , effective as of February 27, 2025, by and between David Rawlinson and the Company (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on February 27, 2025 (File No. 001-33982)+ |
| 10.47 | https://www.sec.gov/Archives/edgar/data/0001254699/000110465921131049/tm2131224d1_ex4-1.htm">Fifth Amended and Restated Credit Agreement , dated as of October 27, 2021, among QVC , Inc., Zulily , LLC, QVC Global Corporate Holdings, LLC and Cornerstone Brands, Inc., as Borrowers , JPMorgan Chase Bank , N.A., as Lead Arranger, Lead Bookrunner and Administrative Agent and the parties named therein as Lenders, Co-Bookrunners, Co-Syndication Agents and Co-Documentation Agents (incorporated by reference to Exhibit 4.1 to QVC , Inc.'s Current Report on Form 8-K filed on October 28, 2021 (File No. 001-38654)). |
| 10.48 | https://www.sec.gov/Archives/edgar/data/1355096/000155837023013362/qrtea-20230630xex10d1.htm">SOFR Transition and Other Agreements, dated as of June 20, 2023, by and among QVC , Inc., QVC Global Corporate Holdings, LLC, and Cornerstone Brands, Inc., as Borrowers , and the other parties thereto, related to the Fifth Amended and Restated Credit Agreement (incorporated by reference to Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2023 filed on August 4, 2023 (File No. 001-33982)). |
| 10.49 | https://www.sec.gov/Archives/edgar/data/1254699/000110465924102997/tm2424512d2_ex4-1.htm">Indenture, dated September 25, 2024, by and among QVC , Inc., Affiliate Investment, Inc., Affiliate Relations Holdings, Inc., Ami 2, Inc., ER Marks, Inc., QVC Global Holdings I, Inc., QVC Rocky Mount, Inc., QVC San Antonio, LLC, HSN , Inc., HSN i, LLC, HSN Holding LLC, as guarantors, and U.S . Bank Trust Company , National Association, as trustee (incorporated by reference to Exhibit 4.1 to QVC , Inc.'s Current Report on Form 8-K (File No. 001-38654) as filed on September 26, 2024 (the "September 2024 Form 8-K " ). |
| 10.50 | https://www.sec.gov/Archives/edgar/data/1254699/000110465924102997/tm2424512d2_ex4-1.htm">Form of 6.875% Senior Secured Notes due 2029 (incorporated by reference to Exhibit 4.1 to the September 2024 Form 8-K ). |

| 10.51 | https://www.sec.gov/Archives/edgar/data/1355096/000110465924102843/tm2424615d2_ex10-1.htm">Call Agreement , dated as of September 25, 2024, by and between Qurate Retail, Inc. and Gregory B. Maffei (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K (File No. 001-33982) as filed on September 25, 2024). |
|---|---|
| 10.52 | Amended and Restated Employment Agreement , dated as of April 10, 2026, by and between David Rawlinson and QVC Group , Inc.*+ |
| 10.53 | Letter Agreement, dated April 10, 2026, by and between Bill Wafford and ER Development International, Inc., a subsidiary of the Registrant.*+ |
| 10.54 | Form of Performance-Based Restricted Stock Awards under the QVC Group , Inc. 2020 Omnibus Incentive Plan, as amended from time to time, for certain officers.*+ |
| 19 | QVC Group , Inc. Insider Trading Policies and Procedures.* |
| 21 | Subsidiaries of QVC Group , Inc.* |
| 23.1 | Consent of KPMG LLP.* |
| 31.1 | Rule 13a-14(a)/15d - 14(a) Certification.* |
| 31.2 | Rule 13a-14(a)/15d - 14(a) Certification.* |
| 32 | Section 1350 Certification.** |
| 97 | https://www.sec.gov/Archives/edgar/data/1355096/000155837024002032/qrtea-20231231xex97.htm">QVC Group , Inc. Policy for the Recovery of Erroneously Awarded Compensation (incorporated by reference to Exhibit 97 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 2023 (File No. 001-33982) as filed on February 28, 2024). |
| 99.1 | Reconciliation of QVC Group , Inc. Net Assets and Net Earnings to Liberty Interactive LLC Net Assets and Net Earnings. ** |
| 101.INS | Inline XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document.* |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document.* |
| 101.CAL | Inline XBRL Taxonomy Calculation Linkbase Document.* |
| 101.LAB | Inline XBRL Taxonomy Label Linkbase Document.* |
| 101.PRE | Inline XBRL Taxonomy Presentation Linkbase Document.* |
| 101.DEF | Inline XBRL Taxonomy Definition Document.* |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101).* |

_____

* Filed herewith.
** Furnished herewith.

+ This document has been identified as a management contract or compensatory plan or arrangement.

**Item 16. Form 10-K Summary.**

Not applicable.

IV-8

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

QVC GROUP, INC.

Date: April 15, 2026

By /s/ DAVID RAWLINSON II

David Rawlinson II
*Chief Executive Officer and President*

Date: April 15, 2026

By /s/ BILL WAFFORD

Bill Wafford
*Chief Financial Officer and Chief Administrative Officer*

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the date indicated.

| Signature | Title | Date |
|---|---|---|
| /s/Gregory B. Maffei<br>Gregory B. Maffei | Chairman of the Board and Director | April 15, 2026 |
| /s/David Rawlinson II<br>David Rawlinson II | Chief Executive Officer, President and Director | April 15, 2026 |
| /s/Bill Wafford<br>Bill Wafford | Chief Financial Officer and Chief Administrative Officer | April 15, 2026 |
| /s/Richard N. Barton<br>Richard N. Barton | Director | April 15, 2026 |
| /s/M. Ian G. Gilchrist<br>M. Ian G. Gilchrist | Director | April 15, 2026 |
| /s/Evan D. Malone<br>Evan D. Malone | Director | April 15, 2026 |
| /s/Roger Meltzer<br>Roger Meltzer | Director | April 15, 2026 |
| /s/ Carol Flaton<br>Carol Flaton | Director | April 15, 2026 |
| /s/Fiona P. Dias<br>Fiona P. Dias | Director | April 15, 2026 |

IV-9

# EXHIBIT 2

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

FORM **8-K**

### CURRENT REPORT

Pursuant to Section 13 or 15(d)
of the Securities Exchange Act of 1934

Date of Report (date of earliest event reported): **April 17, 2026**

## QVC GROUP, INC.
(Exact name of registrant as specified in its charter)

| **Delaware** | **001-33982** | **84-1288730** |
|:---:|:---:|:---:|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**1200 Wilson Dr.**
**West Chester, Pennsylvania 19380**
(Address of principal executive offices and zip code)

Registrant's telephone number, including area code: **(484) 701-1000**

Former name or former address, if changed since last report:**N/A**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|:---:|:---:|:---:|
| Series A common stock | QVCGA | The Nasdaq Stock Market LLC |
| Series B common stock | QVCGB | OTCID Basic Market |
| 8.0% Series A Cumulative Redeemable Preferred Stock | QVCGP | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter). Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 3.01 Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing.**

*Nasdaq Delisting Determination — QVC Group, Inc.*

As previously disclosed in the Current Report on Form 8-K filed by QVC Group, Inc. (the "Company") on April 16, 2026, the Company and certain of its affiliates, including QVC, Inc. (collectively, the "Company Parties"), filed voluntary petitions for relief (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").

On April 17, 2026, the Company received a written notice (the "Nasdaq Notice") from the Listing Qualifications Staff of The Nasdaq Stock Market LLC ("Nasdaq") notifying the Company that, pursuant to Nasdaq Listing Rules 5101, 5110(b) and IM-5101-1, Nasdaq has determined to delist the Company's Series A common stock (Nasdaq: QVCGA) and 8.0% Series A Cumulative Redeemable Preferred Stock (Nasdaq: QVCGP) (collectively, the "QVC Group Listed Securities") from Nasdaq. Pursuant to the Nasdaq Notice, Nasdaq's determination was based on (i) the filing of the Chapter 11 Cases and associated public interest concerns raised thereby, (ii) concerns regarding the residual equity interest of existing listed securities holders and (iii) concerns about the Company's ability to sustain compliance with all requirements for continued listing on Nasdaq.

Pursuant to the Nasdaq Notice, trading of the QVC Group Listed Securities will be suspended at the opening of business on April 24, 2026, and a Form 25-NSE will be filed with the SEC, which will remove the QVC Group Listed Securities from listing and registration on Nasdaq. The Company has the right to appeal Nasdaq's delisting determination pursuant to the procedures set forth in the Nasdaq Listing Rule 5800 Series. The Company does not intend to appeal this determination.

The Company does not expect the Nasdaq delisting to affect the Company Parties' business operations or the Chapter 11 Cases. The Company anticipates that following suspension from trading, its capital stock will commence trading on one of the markets operated by OTC Markets Group. The Company can provide no assurance that the capital stock will commence or continue to trade on this market, whether broker-dealers will continue to provide public quotes of the capital stock on this market, whether the trading volume of the capital stock will be sufficient to provide for an efficient trading market or whether quotes for the capital stock will continue on this market in the future.

Separately, on April 17, 2026, the Company was notified by OTC Markets Group that, due to the Company's bankruptcy filing, the Company's Series B common stock (OTCQB: QVCGB) is being moved from the OTCQB Venture Market to the OTCID Basic Market, effective prior to market open on April 20, 2026. The downgrade to the OTCID Basic Market reflects the Company's current status under the Bankruptcy Code and does not affect the Company Parties' business operations or the Chapter 11 Cases.

**Cautionary Note Regarding the Company's Securities**

The Company cautions that trading in the Company's securities now and during the pendency of the Chapter 11 Cases is highly speculative and poses substantial risks. Trading prices for the Company's securities may bear little or no relationship to the actual recovery, if any, by holders of the Company's securities in the Chapter 11 Cases. The Company expects that holders of the Company's capital stock, including its Series A common stock, Series B common stock and 8.0% Series A Cumulative Redeemable Preferred Stock, will not receive distributions in the Chapter 11 Cases, and that all such interests will be cancelled under our "prepackaged" Chapter 11 plan of reorganization for no consideration.

**Cautionary Statement Regarding Forward Looking Statements**

This Current Report on Form 8-K (this "Current Report") includes certain forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, including statements about the Company's expectations with respect to operating in the normal course, the Chapter 11 Cases process (including the Company's ability to successfully emerge from the process and the timing thereof) and the delisting of the QVC Group Listed Securities from the Nasdaq and OTCQB Venture Market, respectively. These forward-looking statements involve many risks and uncertainties that could cause actual results to differ materially from those expressed or implied by such statements, including, without limitation, risks attendant to the bankruptcy process, including the Company's ability to obtain court approval from the Bankruptcy Court with respect to motions or other requests made to the Bankruptcy Court throughout the course of the Chapter 11 Cases; the potential adverse effects of the Chapter 11 Cases, including increased legal and other professional costs necessary to execute the Company's restructuring process, on the Company's liquidity and results of operations (including the availability of operating capital during the pendency of the Chapter 11 Cases); objections to the Company's restructuring process or other pleadings filed that could protract the Chapter 11 Cases; Bankruptcy Court rulings in the Chapter 11 Cases, and the outcome of the Chapter 11 Cases in general; the length of time that the Company will operate under Chapter 11 protection and the continued availability of operating capital during the pendency of the Chapter 11 Cases; the impact of the delisting of the QVC Group Listed Securities from the Nasdaq and the downgrade of the

2

Company's Series B common stock from the OTCQB Venture Market to the OTCID Basic Market; the Company's ability to comply with the restrictions imposed by the terms and conditions of certain financing arrangements; the effects of the Chapter 11 Cases on the interests of various constituents and financial stakeholders; and employee attrition and the Company's ability to retain senior management and other key personnel due to the distractions and uncertainties. These forward-looking statements speak only as of the date of this Current Report, and the Company expressly disclaims any obligation or undertaking to disseminate any updates or revisions to any forward-looking statement contained herein to reflect any change in the Company's expectations with regard thereto or any change in events, conditions or circumstances on which any such statement is based. Please refer to the publicly filed documents of the Company, including the most recent Form 10-K, for additional information about the Company and about the risks and uncertainties related to the Company's business, which may affect the statements made in this Current Report.

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: April 20, 2026

QVC GROUP, INC.

By: /s/ Katherine C. Jewell

Name: Katherine C. Jewell

Title: Vice President and Secretary

4

# EXHIBIT 3

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**

WASHINGTON, D.C. 20549

**FORM 8-K**

**CURRENT REPORT**

Pursuant to Section 13 or 15(d)
of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): **April 16, 2026 (April 16, 2026)**

# QVC GROUP, INC.

(Exact name of registrant as specified in its charter)

| Delaware | 001-33982 | 84-1288730 |
|:---:|:---:|:---:|
| (State or other jurisdiction | (Commission | (IRS Employer |
| of incorporation) | File Number) | Identification No.) |

**1200 Wilson Drive**
**West Chester, Pennsylvania 19380**
(Address of principal executive offices, including zip code)

**(484) 701-1000**
(Registrant's telephone number, including area code)

**N/A**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading symbol(s) | Name of each exchange on which registered |
|:---:|:---:|:---:|
| Series A common stock | QVCGA | The Nasdaq Stock Market LLC |
| Series B common stock | QVCGB | OTCQB Venture Market |
| 8.0% Series A Cumulative Redeemable Preferred Stock | QVCGP | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 1.01**        **Entry into a Material Definitive Agreement.**

*Restructuring Support Agreement*

On April 16, 2026, QVC Group, Inc. ("QVC Group" or the "Company" and together with certain of its affiliates, the "Company Parties") entered into a Restructuring Support Agreement (the "Restructuring Support Agreement" with (i) certain holders of the 4.750% Senior Secured Notes due 2027, 4.375% Senior Secured Notes due 2028, 6.875% Senior Secured Notes due 2029, 5.450% Senior Secured Notes due 2034, 5.950% Senior Secured Notes due 2043, 6.375% Senior Secured Notes due 2067 and 6.250% Senior Secured Notes due 2068 (collectively, the "QVC Notes") issued by QVC, Inc. ("QVC") (such holders, the "Consenting QVC Noteholders"), (ii) certain holders of the 3.75% senior unsecured exchangeable debentures due 2030, 4.00% senior unsecured exchangeable debentures due 2029, 8.25% senior unsecured debentures due 2030, and 8.50% senior unsecured debentures due 2029 (collectively, the "LINTA Notes") issued by Liberty Interactive LLC ("Liberty LLC") (such holders, the "Consenting LINTA Noteholders") and (iii) certain lenders (the "Consenting RCF Lenders" and, together with the Consenting QVC Noteholders and the Consenting LINTA Noteholders, the "Consenting Stakeholders") providing revolving commitments and extensions of credit pursuant to that certain Fifth Amendment and Restatement Agreement dated as of October 27, 2021, by and among QVC and QVC Global Corporate Holdings, LLC, as borrowers, the lenders from time to time party thereto, and JPMorgan Chase Bank, N.A., as administrative and collateral agent. (the "Credit Agreement," and the revolving credit facility thereunder, the "Credit Facility," and such lenders, the "RCF Lenders"). The Credit Facility, together with the QVC Notes and LINTA Notes, are herein referred to as the "Debt Instruments". The transactions contemplated in the Restructuring Support Agreement are expected to be implemented through a prepackaged chapter 11 process (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").

The Restructuring Support Agreement and the proposed prepackaged plan of reorganization (the "Plan") attached thereto contemplate the restructuring of the Company Parties' outstanding funded debt obligations, including approximately $2.15 billion of outstanding QVC Notes, approximately $1.5 billion of outstanding LINTA Notes and approximately $2.9 billion outstanding under the Credit Facility. Specifically, the material terms of the Restructuring Support Agreement and the Plan include, among other things, that:

- QVC or any successor or assign thereto, by merger, consolidation, or otherwise (such entity, "Reorganized QVC") shall issue approximately $1.3 billion in aggregate original principal amount of takeback debt (the "Takeback Debt") on the terms and conditions set forth in the Takeback Debt Documents (as defined in the Restructuring Support Agreement);

- on or as soon as reasonably practicable following the effective date of the Plan (the "Effective Date"), receipt by the holders of claims arising under, in connection with, or on account of the Credit Facility and the QVC Notes of their pro rata share of: (i) QVC Distributable Cash (as defined in the Plan); (ii) the Takeback Debt; and (iii) 100% of the equity in Reorganized QVC, subject to dilution by the management incentive plan;

- non-funded debt general unsecured claims (including all trade claims and contract and lease claims) will be unimpaired; and

- QVC will enter into a $300.0 million debtor-in-possession letter of credit facility (the "DIP LC Facility") with JPMorgan Chase Bank, N.A., as agent, to issue new letters of credit and roll existing letters of credit to support operations during the pendency of the Chapter 11 Cases, cash collateralized by $315 million deposited in a cash collateral account; commitments under the DIP LC Facility would expire upon the earliest of (i) six months from the Petition Date, (ii) the Effective Date and (iii) the occurrence of an event of default, all as more fully set forth in the DIP LC Facility Term Sheet attached as Exhibit D to the Restructuring Support Agreement, which is filed as part of Exhibit 10.1 hereto, and subject to Bankruptcy Court approval pursuant to interim and final DIP orders.

In accordance with the Restructuring Support Agreement, each Consenting Stakeholder agreed, among other things, to (i) support the Restructuring Transactions (as defined in the Restructuring Support Agreement) and vote and exercise any powers or rights available to it in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions; (ii) use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders; (iii) not object to, delay, impede or take any other action to interfere with acceptance, implementation or consummation of the Restructuring Transactions and use commercially reasonable efforts to oppose any person from taking such action; (iv) give any notice, order, instruction or direction to the applicable agents and trustees as necessary to give effect to the Restructuring Transactions; (v) negotiate in good faith and use commercially reasonable efforts to execute and implement certain documents that are consistent with the Restructuring Support Agreement; and (vi) vote to accept the Plan on a timely basis following commencement of the Solicitation.

In accordance with the Restructuring Support Agreement, the Company Parties agreed, among other things, to (i) support and take all steps reasonably necessary and desirable to implement and consummate the Restructuring Transactions in accordance with the Restructuring Support Agreement and the Definitive Documents (as defined in the Restructuring Support Agreement) (ii) to the extent any legal, regulatory, financial or structural impediment arises that would prevent, hinder or delay the consummation of the Restructuring Transactions, take all steps reasonably necessary and desirable to address any such impediment; (iii) use commercially reasonable efforts to obtain any and all required regulatory or other third-party approvals for the Restructuring Transactions; (iv) negotiate in good faith and take all steps reasonably necessary to execute and deliver any required agreements to effectuate and consummate the Restructuring Transactions; (v) use commercially reasonable efforts to seek additional support for the Restructuring Transactions from other material stakeholders to the extent reasonably prudent; (vi) provide draft copies of all Definitive Documents to counsel to the Consenting Stakeholders as soon as reasonably practicable, but in no event less than two business days prior to the date when the Company Parties intend to file such documents with the Bankruptcy Court; (vii) not object to, delay, impede or take any other action that would be reasonably expected to interfere with acceptance, implementation or consummation of the Restructuring Transactions; and (viii) not seek to amend, terminate or modify the Plan or any Definitive Document in a manner that is not consistent with the Restructuring Support Agreement.

The Restructuring Support Agreement contains various milestones, or dates by which the Company Parties are required to, among other things, obtain certain orders of the Bankruptcy Court and consummate the Restructuring Transactions, including the following (a) filing the Plan and Disclosure Statement with the Bankruptcy Court no later than the Petition Date; (b) obtaining confirmation of the Plan no later than 75 days of the Petition Date; and (c) the occurrence of the Plan Effective Date no later than 90 days of the Petition Date.

The signatories to the Restructuring Support Agreement may terminate the Restructuring Support Agreement under certain circumstances, including the failure to meet the milestones set forth above. Additionally, each of the Company Parties may terminate the Restructuring Support Agreement in the event the board of directors, board of managers or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal (as defined in the Restructuring Support Agreement). In addition, the Restructuring Support Agreement shall automatically terminate upon the occurrence of the Effective Date.

The Plan remains subject to Bankruptcy Court approval and the satisfaction of certain conditions precedent. Accordingly, no assurance can be given that the transactions described in the Restructuring Support Agreement or the Plan will be consummated.

The foregoing descriptions of the Restructuring Support Agreement (and the Plan and other exhibits attached thereto) do not purport to be complete and are qualified in their entirety by references to the full text of the Restructuring Support Agreement (and the Plan and other exhibits attached thereto) and Disclosure Statement. Copies of the Restructuring Support Agreement and Disclosure Statement (as defined below) are filed as Exhibits 10.1 and 99.1 to this Current Report on Form 8-K and are incorporated by reference in this Item 1.01.

Case 26-20412 Document 746-315 File Page TX300 on Date Filed: 07/30/2026 14

**Item 1.03          Bankruptcy or Receivership.**

*Voluntary Petition for Reorganization*

On April 16, 2026 (the "Petition Date"), the Company Parties commenced the Chapter 11 Cases under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court to implement the Restructuring Transactions and the Plan, in accordance with the Restructuring Support Agreement. Concurrently, the Company filed the Plan with the Bankruptcy Court. The Company has requested that the Bankruptcy Court administer the Chapter 11 Cases jointly for administrative purposes only under the caption, *In re QVC Group, Inc. et al.*

The Company Parties expect to continue to operate their businesses as "debtors-in-possession" under the jurisdiction of the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code and the orders of the Bankruptcy Court. QVC Group and QVC are requesting approval from the Bankruptcy Court for a variety of "first day" motions to continue their ordinary course operations during the Chapter 11 Cases. The Plan and requested first day relief anticipate that non-funded debt general unsecured claims, including trade, contract and lease claims, will be unimpaired and paid in full in the ordinary course of business.

Subject to Bankruptcy Court approval with respect to the solicitation of votes necessary to approve the Plan (the "Solicitation"), as well as the scheduling of a combined hearing to approve the adequacy of the proposed Disclosure Statement (as defined below) and to confirm the Plan, in each case, on the timeline requested by the Company Parties, the Company Parties anticipate emerging from the Chapter 11 Cases within approximately 90 days of the Petition Date.

**Item 2.04          Triggering Events that Accelerate or Increase a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement.**

The filing of the Chapter 11 Cases described above in Item 1.03 constitutes an event of default that accelerated the Company Parties' obligations under the following Debt Instruments:

- Approximately $2.9 billion of borrowings (plus any accrued but unpaid interest in respect thereof) under the Credit Agreement.

- Approximately $2.15 billion aggregate principal amount of QVC's outstanding senior secured notes (plus any accrued but unpaid interest in respect thereof), consisting of: (a) $44.0 million of 4.750% senior secured notes due 2027; (b) $72.0 million of 4.375% senior secured notes due 2028; (c) $605.0 million of 6.875% senior secured notes due 2029; (d) $400.0 million of 5.450% senior secured notes due 2034; (e) $300.0 million of 5.950% senior secured notes due 2043; (f) $225.0 million of 6.375% senior secured notes due 2067; and (g) $500.0 million of 6.250% senior secured notes due 2068, each issued pursuant to their respective indentures and supplemental indentures, as applicable.

- Approximately $1.5 billion aggregate principal amount of Liberty LLC's outstanding debentures (plus any accrued but unpaid interest in respect thereof), consisting of: (a) $413.0 million of 3.75% exchangeable senior debentures due 2030; (b) approximately $287 million of 8.50% senior unsecured debentures due 2029; (c) $280.0 million of 4.00% senior unsecured exchangeable debentures due 2029; and (d) $505.0 million of 8.25% senior unsecured debentures due 2030, each issued pursuant to that certain indenture dated as of July 7, 1999, as amended, supplemented or otherwise modified from time to time, by and among Liberty LLC (f/k/a Liberty Media Corporation) and The Bank of New York Mellon Trust Company, N.A. (as successor-in-interest to The Bank of New York Mellon), as trustee.

The Credit Facility and QVC Notes provide that, as a result of the Chapter 11 Cases, the principal and interest due thereunder shall be immediately due and payable. The exchangeable senior debentures provide that the amount accelerated is the greater of (x) the current principal amount of the exchangeable senior debentures or (y) the market value of the reference shares, plus all accrued and unpaid interest and all pass-through distributions due with respect to the reference shares shall be immediately due and payable. Any efforts to enforce such payment obligations under the Debt Instruments were automatically stayed as a result of the Chapter 11 Cases (the "Automatic Stay"), and the stakeholders' rights of enforcement in respect of the Debt Instruments are subject to the applicable provisions of the Bankruptcy Code, including the Automatic Stay.

**Item 7.01          Regulation FD Disclosure.**

*Commencement of the Solicitation*

Pursuant to the Restructuring Support Agreement, on April 16, 2026, prior to filing the Chapter 11 Cases, the Company Parties commenced the Solicitation, including by distributing a disclosure statement relating to the Plan (the "Disclosure Statement") and other solicitation materials to certain eligible holders of claims against the Company Parties that are entitled to vote on the Plan. A copy of the Disclosure Statement is furnished with this Report as Exhibit 99.1.

This Report does not constitute an offer to sell or a solicitation of an offer to buy any securities, any securities referred to herein, nor is this Report a solicitation of consents to or votes to accept the Plan. Any solicitation or offer will only be made pursuant to the Disclosure Statement (as may be amended) and only to such persons and in such jurisdictions as is permitted under applicable law.

*Press Release*

On April 16, 2026, the Company issued a press release announcing the Company's entry into the Restructuring Support Agreement, commencement of the Solicitation, and the filing of the Chapter 11 Cases. A copy of the press release is attached hereto as Exhibit 99.2 and is incorporated by reference herein.

*Cleansing Material*

Prior to the filing of the Chapter 11 Cases, the Company entered into confidentiality agreements (collectively, the "NDAs") with certain RCF Lenders, QVC Noteholders, and LINTA Noteholders and their advisors (the "NDA Parties") to continue confidential discussions and negotiations concerning a potential transaction. Pursuant to the NDAs, the Company provided the NDA Parties with confidential information and agreed to publicly disclose certain information (the "Cleansing Material") upon the occurrence of certain events set forth in the NDAs. A copy of the Cleansing Material is attached to this Current Report on Form 8-K as Exhibit 99.3.

The Cleansing Material was prepared by the Company solely to facilitate a discussion with the parties to the NDAs and was not prepared with a view toward public disclosure and should not be relied upon to make an investment decision with respect to the Company. The Cleansing Material should not be regarded as an indication that the Company or any third party considers the Cleansing Material to be a reliable prediction of future events, and the Cleansing Material should not be relied upon as such. The Cleansing Material includes certain values for illustrative purposes only and such values are not the result of, and do not represent, actual valuations, estimates, forecasts or projections of the Company or any third party and should not be relied upon as such. Neither the Company nor any third party has made or makes any representation to any person regarding the accuracy of any Cleansing Material or undertakes any obligation to publicly update the Cleansing Material to reflect circumstances existing after the date when the Cleansing Material was prepared or conveyed or to reflect the occurrence of future events, even in the event that any or all of the assumptions underlying the Cleansing Material are shown to be in error. The Company's independent accountants have not examined, compiled, or otherwise applied procedures to any such projections or forecasts and, accordingly, do not express an opinion or any other form of assurance with respect thereto. Inclusion of the Cleansing Material should not be regarded as an indication that the Company or its representatives consider the Cleansing Material to be a reliable prediction of future events, and the Cleansing Material should not be relied upon as such.

*Additional Information on the Chapter 11 Cases*

Bankruptcy Court filings and other information related to the Chapter 11 Cases are available at a website administered by the Company Parties' claims agent, Kroll Restructuring Administration, LLC, at https://restructuring.ra.kroll.com/QVC. Information may also be obtained by calling Kroll representatives toll-free at +1 (888) 575-5337, or +1 (347) 292-4386 for calls originating outside of the U.S. or Canada, or by emailing ProjectQuartzBallot@ra.kroll.com with "In re: QVC -- Solicitation Inquiry" in the subject line.

The information contained in this Item 7.01, including in Exhibits 99.1, 99.2 and 99.3 shall not be deemed to be "filed" for purposes of Section 18 of the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section, and shall not be deemed to be incorporated by reference into any of the Company's filings under the Securities Act of 1933, as amended (the "Securities Act") or the Exchange Act, whether made before or after the date hereof and regardless of any general incorporation language in such filings, except to the extent expressly set forth by specific reference in such a filing. Court filings and other information related to the Chapter 11 Cases are available at the claims agent website identified above; the documents and other information available via any website referenced herein are not part of this Current Report on Form 8-K and shall not be deemed incorporated herein.

**Cautionary Note Regarding the Chapter 11 Cases**

The Company cautions that trading in the Company's securities now and during the pendency of the Chapter 11 Cases is highly speculative and poses substantial risks. Trading prices for the Company's securities may bear little or no relationship to the actual recovery, if any, by holders of the Company's securities in the Chapter 11 Cases. The Company expects that holders of the Company's capital stock, including its Series A common stock, Series B common stock and preferred stock, will not receive distributions in the Chapter 11 Cases, and that all such interests will be canceled under the Plan for no consideration.

**Cautionary Statement Regarding Forward Looking Statements**

This Current Report on Form 8-K (this "Current Report") includes certain forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, including statements about the Company's expectations with respect to operating in the normal course, the Chapter 11 Cases process (including the Company's ability to successfully emerge from the process and the timing thereof) and the potential delisting and downgrade of the Company's capital stock from the Nasdaq Capital Market and OTCQB Venture Market, respectively. These forward-looking statements involve many risks and uncertainties that could cause actual results to differ materially from those expressed or implied by such statements, including, without limitation, risks attendant to the bankruptcy process, including the Company's ability to obtain court approval from the Bankruptcy Court with respect to motions or other requests made to the Bankruptcy Court throughout the course of the Chapter 11 Cases; the potential adverse effects of the Chapter 11 Cases, including increased legal and other professional costs necessary to execute the Company's restructuring process, on the Company's liquidity and results of operations (including the availability of operating capital during the pendency of the Chapter 11 Cases); objections to the Company's restructuring process or other pleadings filed that could protract the Chapter 11 Cases; Bankruptcy Court rulings in the Chapter 11 Cases, and the outcome of the Chapter 11 Cases in general; the length of time that the Company will operate under Chapter 11 protection and the continued availability of operating capital during the pendency of the Chapter 11 Cases; the impact of the expected delisting and downgrade of the Company's capital stock by the Nasdaq Capital Market and OTCQB Venture Market, as applicable; the Company's ability to comply with the restrictions imposed by the terms and conditions of certain financing arrangements; the effects of the Chapter 11 Cases on the interests of various constituents and financial stakeholders; and employee attrition and the Company's ability to retain senior management and other key personnel due to the distractions and uncertainties. These forward-looking statements speak only as of the date of this Current Report, and the Company expressly disclaims any obligation or undertaking to disseminate any updates or revisions to any forward-looking statement contained herein to reflect any change in the Company's expectations with regard thereto or any change in events, conditions or circumstances on which any such statement is based. Please refer to the publicly filed documents of the Company, including the most recent Form 10-K, for additional information about the Company and about the risks and uncertainties related to the Company's business, which may affect the statements made in this Current Report.

**Item 9.01.     Financial Statements and Exhibits.**

**(d) Exhibits**

| Exhibit No. | Description |
|---|---|
| 10.1* | Restructuring Support Agreement, dated as of April 16, 2026, by and among QVC Group, Inc., certain of its affiliates and the Consenting Stakeholders (as defined therein). |
| 99.1 | Disclosure Statement, dated as of April 16, 2026. |
| 99.2 | Press Release, dated as of April 16, 2026. |
| 99.3 | Cleansing Material. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL Document) |

*Certain schedules, annexes and similar attachments have been omitted pursuant to Item 601(a)(5) of Regulation S-K and will be provided on a supplemental basis to the Securities and Exchange Commission upon request.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this Report to be signed on its behalf by the undersigned hereunto duly authorized.

QVC GROUP, INC.

Date: April 16, 2026

By: /s/ Katherine C. Jewell
    Name: Katherine C. Jewell
    Title: Vice President and Secretary

EX-99.3 5 tm2611635d1_ex99-3.htm EXHIBIT 99.3

Exhibit 99.3



# QVC Group, Inc.

## Cleansing Exhibit

April 2026



QVC Group, Inc.

Management Presentation

5 Year Financial Projections

November 2025

# Disclaimer

By accepting this presentation, recipients acknowledge that they have read, understood and accepted the terms of this disclaimer.

This presentation is subject to the confidentiality provisions set forth in the recipients' applicable non-disclosure agreements. This presentation is the property of, and contains the proprietary and confidential information of QVC GROUP, INC. and its subsidiaries (collectively, the "Company").

This presentation is being provided for informational purposes only and is intended solely to facilitate a discussion with the recipient. No representation or warranty, express or implied, is or will be given by the Company or its affiliates, directors, officers, partners, employees, agents or advisers or any other person as to the accuracy, completeness, reasonableness or fairness of any information contained in this presentation and no responsibility or liability whatsoever is accepted for the accuracy or sufficiency thereof or for any errors, omissions or misstatements, negligent or otherwise, relating thereto. No information included in this presentation constitutes, nor can it be relied upon as, legal, tax, investment or other advice. Any statement herein regarding tax matters was written in connection with the promotion or marketing of the matters described herein and was not intended or written to be used, and cannot be used by any person, for the purposes of avoiding tax-related penalties under federal, state or local tax law. Recipients should consult their independent advisors.

This presentation should not be relied upon for the purpose of evaluating the performance of the Company or for any other purpose, and neither the Company nor any of its affiliates, directors, officers, partners, employees, agents or advisers nor any other person, shall be liable for any direct, indirect or consequential liability, loss or damages suffered by any person as a result of this presentation or their reliance on any statement, estimate, target, projection or forward-looking information in or omission from this presentation and any such liability is expressly disclaimed. In all cases, interested parties should conduct their own investigation and analysis of the Company and the information contained herein. This presentation should not be considered as a recommendation by the Company or any affiliate or other person in relation to the Company or any of its subsidiaries, nor does it constitute an offer to sell or a solicitation for an offer to buy the securities, assets or business of the Company, nor shall there be any sale of securities in any state or jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such state or jurisdiction or pursuant to an exemption therefrom. This presentation shall not form the basis of any contract. Any references to any future or proposed transaction are for illustrative purposes only and the terms of any such transaction should it occur may be materially different than the terms in this presentation.

This presentation contains forward-looking statements that are subject to risks, uncertainties and other factors. All statements other than statements of historical fact or relating to present facts or current conditions included in this presentation are forward-looking statements. Forward-looking statements give the Company's current expectations and projections relating to the Company's financial condition, results of operations, plans, objectives, future performance and business. You can identify forward-looking statements by the fact that they do not relate strictly to historical or current facts. These statements may include words such as "anticipate," "estimate," "expect," "project," "seek," "plan," "intend," "believe," "contemplate," "assume," "will," "may," "could," "would," "continue," "likely," "should," and other words and terms of similar meaning in connection with any discussion of the timing or nature of future operating or financial performance or other events, but not all forward-looking statements contain these identifying words. Risks, uncertainties and other factors may cause future results to differ materially from these forward-looking statements, and potentially adversely from the historical results contained herein. For a further list and description of such risks and uncertainties, please refer to the Company's filings with the SEC, including the section titled "Risk Factors" in the Company's Annual Report on Form 10-K, that are available at www.sec.gov.

You are cautioned not to place undue reliance on the utility of the information in this presentation as a predictor of future performance of the Company, as projected financial and other information are based on estimates and assumptions that are inherently subject to various significant risks, uncertainties and other factors, many of which are beyond the Company's control.

All information herein speaks only as of (1) the date hereof, in the case of information about the Company and (2) the date of such information, in the case of information from persons other than the Company. The Company does not undertake any duty to update or revise the information contained herein, publicly or otherwise. The Company has not independently verified any third-party information and makes no representation as to the accuracy or completeness of any such information.

THIS PRESENTATION MAY CONTAIN MATERIAL, NON-PUBLIC INFORMATION WITHIN THE MEANING OF THE UNITED STATES FEDERAL SECURITIES LAWS WITH RESPECT TO THE COMPANY AND ITS SUBSIDIARIES AND THEIR RESPECTIVE SECURITIES. The recipient is aware that applicable securities laws restrict any person who has material, non-public information about a company from purchasing or selling securities of such company (and options, warrants and rights relating thereto) and from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities. Accordingly, the recipient agrees not to purchase or sell such securities in violation of any such laws, including without limitation, securities of the Company.

This presentation includes Adjusted OIBDA, which is a non-GAAP financial measure, together with a reconciliation to operating income, as determined under GAAP. QVC Group defines Adjusted OIBDA as operating income (loss) plus depreciation and amortization, stock-based compensation, and where applicable, separately identified impairments, litigation settlements, restructuring, penalties, acquisition-related costs, fire related costs, net (including Rocky Mount inventory losses), and (gains) losses on sale leaseback transactions.

QVC Group believes Adjusted OIBDA is an important indicator of the operational strength and performance of its businesses by identifying those items that are not directly a reflection of each business's performance or indicative of ongoing business trends. In addition, this measure allows management to view operating results and perform analytical comparisons and benchmarking between businesses and identify strategies to improve performance. Because Adjusted OIBDA is used as a measure of operating performance, QVC Group views operating income as the most directly comparable GAAP measure. Adjusted OIBDA is not meant to replace or supersede operating income or any other GAAP measure, but rather to supplement such GAAP measures in order to present investors with the same information that QVC Group's management considers in assessing the results of operations and performance of its assets.

3



# Glossary

| ACROYNYM | TERM | DEFINITION |
|---|---|---|
| FAST | Free Ad-Supported Streaming TV | Streaming TV channels that are free to watch and supported by ads (e.g. Pluto TV, Tubi) |
| - | Gross Margin / Profit | Net revenue less total COGS (including product and fulfillment / supply chain costs) |
| - | Initial Margin | Gross shipped sales costs less product merchandise costs only |
| - | Linear TV | Television content that is scheduled and viewed via satellite or cable networks according to set programming times, rather than being streamed on-demand to individual users |
| LTA | Last Touch Attribution | Assigns all credit of conversion to the final interaction a customer had with a brand before making a purchase or taking an action |
| MAU | Monthly Active Users | Pertains to QVC's streaming services and is the number of unique households that watched for any length of time during the month |
| MTA | Multi Touch Attribution | Assigns credit of conversion to multiple touchpoints a customer interacted with along their journey such as display ads, emails, social media, and search, based on their influence |
| MVPD | Multichannel Video Programming Distributor | Traditional cable or satellite TV providers offering multiple channels (e.g., Comcast, DirecTV) |
| MVPD distro | MVPD Distribution | The distribution of TV content through traditional cable / satellite platforms |
| OIBDA | Operating Income Before Depreciation and Amortization | Operating income (loss) plus depreciation and amortization, stock-based compensation, and where applicable, separately identified impairments, litigation settlements, restructuring, penalties and fire related costs, net (including Rocky Mount inventory losses), and gains on sale of assets and leaseback transactions |
| OnO | Own and Operate | Company owns and directly manages the channel or platform via ap (e.g. Netflix, Prime Video). For QVC, this is the QVC streaming app |
| OTA | Over-The-Air | Method of broadcasting television signals that are received by an antenna |
| PL | Private label | Private label |
| - | Product Margin | Net Revenue less all product-related costs (product merchandise COGS, returns COGs). Excludes impact of fulfillment / supply chain costs such as freight, warehouse, and obsolescence expenses |
| ROAS | Return on Advertising Spend | Measures the revenue generated for every dollar spent on advertising |
| - | Scripted | Programming on 5 QVC / HSN channels |
| - | Shipped Margin | Gross shipped sales less product merchandise costs only measured as a % of Gross Shipped Sales |
| - | Streaming channel | Includes vMVPD, Fast, and OnO |
| - | Unscripted | QVC.com or phone orders which are not tagged to an aired show |
| vMVPD | Virtual MVPD | Online services that stream live TV channels w/o cable (e.g., YouTube TV, Hulu + Live TV) |

4



# Today's presenters

Executive Team



**David Rawlinson II**
President &
Chief Executive Officer



**Bill Wafford**
Chief Administrative Officer &
Chief Financial Officer



**Executive summary**

Business overview

Phase 1: Project Athens

Phase 2: WIN strategy

Financial overview

Appendix



# Executive summary

**An on-going turnaround story**

- QVC Group, Inc. ("QVCG") was founded on traditional linear TV, which is now in decline as consumer attention fragments and shifts to digital, streaming, and social platforms

- QVCG's 2-phase turnaround is well underway, but 2 years away from full realization

  — Phase 1: **Project Athens** (*complete*): reset cost and margin base of the business

  — Phase 2: **WIN strategy** (*on-going*): return the business to growth. The WIN strategy recognizes that cost cutting has limits, and negative operating leverage is pronounced in this business. Therefore, the only way to maximize long-term value is to achieve revenue stability and sustainable levels of OIBDA

- QVCG must do the following to successfully implement the WIN strategy:

  1. Grow social and streaming revenue in the U.S.

  2. Sustain the shrinking, but high cash flow U.S. linear distribution channels

  3. Retain relatively flat revenue and profit from the international businesses

  4. Capture incremental opportunities in cost and margin across the enterprise

  5. Maximize value realization from Cornerstone Brands

- These five priorities create the path to top and bottom-line growth starting in 2028, while keeping OIBDA above $600M




# Executive summary (cont.)

**Business operations have faced multiple challenges in recent years**

**A** Linear TV viewership has continued to decline, putting pressure on revenue and profitability in our core QxH business

**B** Supply chain crisis during COVID

**C** Rocky Mount distribution center fire in Dec 2021

**D** Sale lease back of existing facilities with $67M annual impact

**E** Zulily disposition

**F** Tariff impact and disruption of HSN + QVC campus consolidation



QVCG historical timeline of significant events, OIBDA and MVPD subscriber count ($, in M)

*COVID-19*

*Project Athens was launched in early 2022 to combat the cord-cutting and business headwinds, which helped to temporarily overcome profit headwinds*

*2017 HSN acquisition*

*Disruptive HSN move*

$2,154 — $2,029 — $2,198 — $2,080 (B) — (C) — $1,064 (D) — $1,074 — $1,103 (E) — (F) Tariffs $795

90 (A) — 84 — 77 — 71 — 63 — 57 — 51 — 47

*Zulily was purchased in 2015 for ~$2.3bn but proved to be an unprofitable acquisition and was later divested in 2023*

— Consolidated QVCG Adj. OIBDA ($M)
—(A)— US MVPD Subscribers (M)

| | 2018 | 2019 | 2020 | 2021 | 2022 [1] | 2023 [1] | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| Net Debt & Pref.: | $6,938 | $6,675 | $7,097 | $7,557 | $6,886 | $6,088 | $5,864 | $6,070 |
| Net Leverage: | 3.2x | 3.3x | 3.2x | 3.6x | 6.5x | 5.7x | 5.3x | 6.8x[2] |

Notes:
1. Includes Zulily for 2022 and 2023.
2. Net Leverage as of LTM Q3'25.

8





# Executive summary (cont.)

**5-Year Business Plan Forecast ($, in M)**

- QVCG's business is transforming as linear subscriber count declines, and social media channels deliver rapid and sustainable growth. Revenue and OIBDA are expected to stabilize in 2027 as our scaled social platform revenue growth offsets declines in the Linear business

**QVCG Revenue** [1,3] ($, in M)



**QVCG OIBDA & Margin** [1,2,3] ($, in M)



- With ~$6B in net debt and preferred equity, our business can no longer sustain a capital structure built for a past era of TV and a low tariff environment

- **We are taking steps to recapitalize our balance sheet so we can stay strong and competitive, even as we face significant challenges ahead**

Notes:
1. Excludes Zulily for 2022 and 2023.
2. QVCG includes corporate and other costs.
3. Includes $30M of estimated OIBDA impact from potential capital structure transaction-related operating disruption in Q1'26.

9



Case: 26-2041    Document: 16-3    Filed: EX-315    on Date Filed: 07/30/2026



Executive summary

**Business overview**

Phase 1: Project Athens

Phase 2: WIN strategy

Financial overview

Appendix





**BUSINESS OVERVIEW**

FY 2025E

**$9.2B**
Revenue

**$795M**
Adj. OIBDA

**~14K**
Employees



| | | Revenue[1] | OIBDA[1] | Customers[2] | Households[3] |
|---|---|---|---|---|---|
| QxH | QVC \| HSN | $6.0B | $554M | 7.2M | 88M |
| QI | INTERNATIONAL | $2.3B | $293M | 3.9M | 114M |
| CBI | Cornerstone Brands, Inc. BALLARD DESIGNS \| FRONTGATE Garnet Hill \| grandinroad | $930M | $15M | 1.8M | N/A |

Notes:
1. All Net Revenue, Adj. OIBDA figures are FY25E; QVC Group OIBDA includes a portion of group corporate costs.
2. Customer figure is based on LTM June 2025. Excludes new customers from TikTok shop (~605K YTD through October).
3. QVC/HSN/QI Household distribution / subscribers as of June 2025.

11

Case 26-2041, Document 15, EXST on Date Filed: 07/30/2026

BUSINESS OVERVIEW

# Our customers love us, have high engagement and buy a lot with us

**Leading customer loyalty and engagement**

**90%**
Retention of existing QxH customers[1]

**18**
Avg units a year per existing QxH customer[2]

**Large-scale content creation and distribution**

**40K+**
Hours of content produced per year on 20+ soundstages[3]

**63B+**
Minutes viewed per year on 5 US QxH TV networks[2]

**Sophisticated brand and merchandising expertise**

**~400K**
Products in our retail ecosystem[3]

**30%+**
Sales from proprietary & exclusive brands[3]

**High volume sales and fulfillment capabilities**

**~$900**
Average annual spend per existing QxH customer[4]

**130M+**
Units shipped to customers in FY2024[4]

Notes: Statistics represent QxH business.
1. Average based on 365-day retention at QVC, weighted by customer base size as of June 30, 2025.
2. LTM ending July 2025 reflecting vMVPD and MVPD.
3. QxH LTM ended September 30, 2024.
4. As of fiscal year ended December 31, 2024.

12

QVC Group

BUSINESS OVERVIEW

# QxH has ~50% avg. shipped margin across product categories



QxH revenue by product category[1] ($, in M)

Categories and 2025 Gross Sales values: Accessories & Footwear 824; Apparel 1,273; Beauty 1,005; Culinary 844; Electronics & Floorcare 635; Home Décor 672; Home Innovations 597; Jewelry 302; Others 157. QxH Average Shipped Margin[2] shown as dashed line ~50.

Notable brands on QVC

 
    
   

Notes:
1. Gross sales are derived from the FY25 OTB Plan, which generally corresponds with the FY25 business plan.
2. Shipped margin reflects year-to-date figures as of 9/28/25.

13





BUSINESS OVERVIEW

# Our multiple channels to engage customers

## SOCIAL PLATFORMS
(established and new) that are leveraging "live" & "live-like" experiences to enhance their commerce growth
**Primary Delivery:** Mobile apps
**Established/Emerging Players:**

   
 

## STREAMING SERVICES
that provide destinations/portals for "live" & "live-like" shopping experience
**Primary Delivery:**
Streaming services/ integrated TV apps/mobile apps
**Established/Emerging Players:**





## DEDICATED LINEAR CHANNELS
with "live" & "live-like" shopping experiences

**Primary Delivery:** Cable services or OTA
**Established Players:**




## TRADITIONAL ECOMMERCE
enhanced by "live" & "live-like" experiences

**Primary Delivery:** websites/apps of pure play & brick/mortar retail

Notes:
1. Exclude CBI stores and catalogue.

14



BUSINESS OVERVIEW

# We have on-going relationships with over 100+ celebrities




Miranda Kerr



Martha Stewart



Kevin O'Leary



Scarlett Johansson



John Legend



Kevin Hart



Hillary Duff



Elton John

15



BUSINESS OVERVIEW

# Our global footprint

We operate across three continents with 30% of Adj. OIBDA[1] generated outside the US



### QVC US

**US[2]:** $7,638M FY'24 Revenue / $801M FY'24 Adj. OIBDA

### QVC International

**JP[3]:** $870M FY'24 Revenue

**Others:** $743M FY'24 Revenue

**Germany:** $785M FY'24 revenue

**Legend**

- ☆ Corporate HQ
- △ Distribution Center
- ○ Multi-functional
- ◇ Office
- ■ CBI
- ■ QxH
- ■ QVC – International
- ■ Active
- ▨ Recently Closed

Notes:
1. OIBDA numbers exclude corporate overhead.
2. 34 CBI stores are excluded from the map.
3. 40% owned by Mitsui through JV agreement.

16

BUSINESS OVERVIEW

# Rocky Mount fire

### 2021 fire at Rocky Mount fulfilment center significantly impacted QVC operations and finances

**Background**

- On December 18, 2021, the Rocky Mount (NC) fulfillment center had a catastrophic fire. The fire was the largest structural fire in NC history

- The facility was QVC's 2nd largest. It processed ~25%-30% of volume for QVC & HSN and was the primary returns center for hard goods



**Financial and operational impact**

- QVC diverted inbound orders, leveraged its existing fulfillment centers and supplemented these facilities with short-term leased space

  — The Company experienced impaired delivery times and had to outsource returns processing resulting in higher-than-expected warehouse and logistics costs

- QVC lost over 1M customers and more than $500M in revenue due to compromised product and service availability

- QVC recorded $134M and $95M in loss on inventory in 2021 and 2022, $87M in loss on fixed assets in 2021, and $29M and $62M in other fire-related costs in 2021 and 2022

**Recovery efforts**

- ✓ Sold the Rocky Mount facility in 2023 and invested in expanding capacity and increasing throughput at other facilities

- ✓ Resumed in-house returns processing and improved delivery times to better than pre-Rocky Mount levels

- ✓ Received a total of $660M in insurance proceeds

- ✓ QVC has efficiently managed the operational and financial challenges resulting from the fire

17



**BUSINESS OVERVIEW**

# Turnaround initiatives

- We have taken numerous actions to mitigate top-line erosion and support profitability, including:

  ✓ Delivered over $500M of annual Adj. OIBDA impact via Project Athens

  ✓ Implemented additional workforce optimization program in Q1-2025

  ✓ Outsourced majority of IT activities

  ✓ Increased bonus targets, resulting in payouts substantially below targets

  ✓ Executed on sale leasebacks

  ✓ Reduced net debt by approximately $1.5B since 2021

  ✓ Divested the Zulily business in 2023

  ✓ Exited HSN's headquarters in St. Petersburg, FL and consolidated primary corporate and studio operations to West Chester, PA

  ✓ Deployed various tactics to mitigate the impact of tariffs including: negotiating costs with suppliers, sourcing from low-cost countries, optimizing product mix and pricing actions

- **Most importantly for the company's long-term strategic outlook, we are building a scalable social and streaming business from the ground up to be a leader in the new world of social shopping**

18



BUSINESS OVERVIEW

# Business risks

Possible risks emerge during the projection period

| | |
|---|---|
| Further linear decline rate | Employee retention / stability |
| Marketing ROAS improvement | Japan financial performance |
| Customer reaction from restructuring | TikTok sale implications |
| Continued cost cutting impact on business | Additional tariff risk |
| Vendor supply chain risk – loss of celebrity partners | |






BUSINESS OVERVIEW

# Consumer attention is fragmenting

Media consumption trends are shifting drastically

**Viewers (in M)**

302 · 300 · 236 · 237 · 246 · 236
228 · 229
149 · 183 · 181
135

— YouTube viewers — Social network users — Linear TV viewers

2010 · 2015 · 2020 · 2025

**Avg. time spent by major media in 2025 [1] (in %)**

- TV 22%
- Digital gaming 9%
- Digital audio 12%
- Others[2] 17%
- Social 19%
- Streaming 20%

**Secular decline in linear / pay TV**



99 98 97 92 90 86 84 83 82 80 78 75 75 74 72 70 69 66 64 62 60 59 58 56 56 54 52 49 47

-0.8% -1.6% -2.5% -6.7% -7.1% -6.1% -6.3% -7.3% -9.5% -8.1% -8.3% -8.2% -10.1% -10.7% -11.1% -12.9% -10.8% -10.2% -10.0% -6.0% -10.4% -13.3%

2014 2015 2016 2017 2018 1Q19 2Q19 3Q19 4Q19 1Q20 2Q20 3Q20 4Q20 1Q21 2Q21 3Q21 4Q21 1Q22 2Q22 3Q22 4Q22 1Q23 2Q23 3Q23 4Q23 1Q24 2Q24 3Q24 4Q24 1Q25

— YoY Change (%) — MVPD subscribers (M)

Subscriber Count (M) / YoY change (%)

Source: Various bank analyst reports, Emarketer.
Notes:
1. As of May 2025; Age 18+; Time spent with each medium includes multitasking.
2. Others include radio, messaging, and print.

20





Executive summary

Business overview

**Phase 1: Project Athens**

Phase 2: WIN strategy

Financial overview

Appendix



QVC
GROUP

21

















PROJECT ATHENS

# Project Athens – Initiative summary

## Summary of initiatives[1]

| P&L impacts | Top initiatives | FY 2023 | FY 2024 |
|---|---|---|---|
|  Gross shipped sales | • Digital traffic and conversion optimization<br>• Sell time optimization (TSV[2], Non TSV)<br>• Strategic assortment planning – Including ASP | $39M | $87M |
| Product margin rate | • Inbound/outbound freight negotiations<br>• Promotion and pricing guidelines<br>• Cost of goods negotiations & playbook | $115M | $79M |
| Operations in COGS | • Variable labor reductions<br>• Pack factor improvements, multi-line expansion<br>• Network fulfillment optimization/closures | $55M | $21M |
| SG&A | • Right size & restructure organization<br>• Marketing efficiency | $73M | $26M |
| Other | • Improve cost efficiency of distribution broadcast contracts | $4M | $9M |
| **Annual Athens OIBDA impact** | | **$286M** | **$222M** |
| | | **$508M Total Cumulative Value** | |

Notes:
1. Excludes QI, Zulily, & CBI.
2. TSV = Today's Special Value.

23



**PROJECT ATHENS**

# Improved efficiency & growth from combined QVC and HSN operations

### HSN HQ to West Chester, PA




- In January 2025, we announced the consolidation of QVC and HSN operations to Studio Park in West Chester, PA, and the closing of the St. Petersburg, FL campus

- Actions resulted in ~$8M in annual savings and the avoidance of ~$50M of deferred maintenance

- HSN TV channels (HSN and HSN2) and digital properties (HSN.com and the HSN mobile app) will continue to broadcast and serve customers

- This consolidation will create efficiencies and better collaboration across common functions such as, content production, broadcasting, merchandising, operations, technology, and human resources

**QxH will work more efficiently, build new capabilities faster and unlock an even better customer experience**

24





Executive summary

Business overview

Phase 1: Project Athens

**Phase 2: WIN strategy**

Financial overview

Appendix





# WIN

QVC Group is organized around three priorities to *Win* in live-social shopping and streaming





**W**

**Wherever she shops**



Drive live shopping content to everywhere she spends her time

**I**

**Inspiring people and products**



Create the world's leading live social shopping content engine, inspiring human connection with incredible finds

**N**

**New ways of working**



Lean into technology and continuous improvement to fund expansion onto new platforms and into new audiences

26



SOCIAL - WHEREVER SHE SHOPS

# Tremendous opportunity available in social shopping

Consumers love social shopping and it is experiencing exponential growth

- QVC stands out by having several key factors needed to succeed in this opportunity, including
    - Close relationships with celebrities and hosts that we combine with content creation and production expertise
    - Deep global vendor relationships with a mature distribution network
    - Customer trust with installed customer base and fast-growing customer count
- We are investing heavily into our business to be in a prime position to capture market share in high growth channels such as Meta, TikTok and YouTube






**US linear TV viewers and social media users** (in M)



Source: eMarketer.
Notes:
1. Current estimate of ecommerce share.
2. GMV = Gross Merchandise Value.

**US social commerce GMV** ($, in B)



At 0.7%[1] share of estimated GMV[2], this would represent **$1B+** opportunity



27



SOCIAL - WHEREVER SHE SHOPS

# Social viewership now exceeds linear viewership. TikTok alone now exceeds total time vs linear TV

**Viewers** (in M)

**Avg. time spend TV vs. Social** (hrs:mins)[1]

**Avg. time spend TV vs. TikTok (Gen Z)** (hrs:mins)[2]

YouTube beats TV

302 — 300

237
228 — 236
246
229

183
181
149
135

YouTube beats social

Social media beats TV

3:55
2:55

0:23
0:13
0:52
0:36

1:16

TikTok beats TV

0:57
0:46
0:15

2010  2015  2020  2025  2017 2018 2019 2020 2021 2022 2023 2024  2019 2020 2021 2022 2023 2024 2025

— YouTube viewers   — Linear TV viewers       — TV  — Youtube  — Social Video       — TV  — TikTok
— Social network users

Source: eMarketer.
Notes:
1. Ages: 18+; TV includes live, digital video recorder, and other prerecorded videos; excludes digital; social video includes all time spent with online video activities on social network platforms; Estimates as of Jun'24.
2. Ages 18-24; TV includes live, digital video recorder, and other prerecorded videos; excludes digital; Estimates as of Jun'24.

28

QVC

SOCIAL - WHEREVER SHE SHOPS

# Shopping on social media is booming

**Social shopping is a fast-growing new way to shop and be entertained**

- Social media platforms are shaping trends in media, retail, and consumer products

- Live shopping, which originated from television home shopping networks like QVC, offers advantages that videos and images cannot match

  — Algorithms assist in targeting audience during live content broadcasts

  — Live shopping combines video streaming with instant purchasing, bringing more interactions into the shopping experience

**U.S. social commerce sales ($, in M)**



Source: eMarketer, Statista.

 TikTok — 23-29 Rev CAGR: 13% / QVC Social: Y

 Instagram — 23-29 Rev CAGR: 12% / QVC Social: Y

 YouTube — 23-29 Rev CAGR: 12% / QVC Social: Y

 Pinterest — 23-29 Rev CAGR: 12% / QVC Social: Y

**Social shopping also fuels the growth in digital**



SQUAWK BOX — SHOPPING ON SOCIAL MEDIA BOOMS

29





 



  

31



SOCIAL - NEW WAYS OF WORKING

# TikTok partnership leading to accelerated growth MoM

TikTok channel is now experiencing accelerated growth MoM

**Recent wins**

**Rapid overall growth**

TikTok platform is growing significantly, from new customer acquisition, followers count to GMV and shop ranking since the launch

**"Super Brand Day"**

Specially promoted event that spotlights a single brand for an entire day across QVC's platforms, marking a major step in TikTok partnership

**Launch of targeted collabs**

Launched 'Seller Funded Task' initiative (targeted collabs with top gross margin sellers) to incentivize affiliate content creation



**Current initiatives**

**Increase TikTok marketing spend**

Continue to refine understanding of algorithm to improve ROAS (return on ad spend) (e.g., paying to "boost" or enhance our live shopping feeds)

**Generate more content per week**

Specifically, generate 1,000-2,000 more pieces of content per week (or 5 – 15 versions of same products)

**Integrate social & planning teams**

Enables Merch/Planning teams to make more informed decisions around appropriate product selection and promo pricing tailored for TikTok

**Enhance IT support integration**

33



SOCIAL - WHEREVER SHE SHOPS

# Leading social shopping platforms: TikTok and Meta

**Social commerce user purchase share in the U.S.** (in %)



**FY24 popularity by digital shoppers in the U.S.** (in %)



- Over the past few years, TikTok has expanded significantly in the U.S. and by 2024, ranked behind Facebook in popularity

- Since its inception, TikTok has increased the proportion of purchasing users compared to Facebook and Instagram, indicating its growing success in converting users into buyers

Source: eMarketer, Statista.

34



STREAMING - WHEREVER SHE SHOPS

# Streaming is taking share from linear TV

**Streaming now beats linear (time viewership %)[1]**



Streaming TV expected to exceed traditional TV this year

**... and has eaten away at cable share (subscription %)[2]**




Total Streaming: 44.8%

**Challenges of moving from cable to streaming:**

x   QVC does not have access to closed ecosystems such as Netflix

x   Movement toward other types of content consumption that does not favor QVC

x   New platforms are more expensive to acquire new customers

- Streaming usage up 71% since 2021, with YouTube, Netflix and other platforms showing dramatic growth over the past four years
- FAST services continue to grow as PlutoTV, Roku Channel and Tubi Combine for 5.7% of TV Viewing in May

Source: Various bank analyst reports, Nielsen.
Notes:
1.   Figures as of January 2025.
2.   Figure as of May 2025.
3.   7.3% of other streaming includes Tubi, Pluto, Peacock, Paramount+, Max.
4.   Over-the-air (OTA) networks.
5.   Other TV includes: The primary components of this are VOD, Streaming through a cable set top box, Gaming, and other device (DVD Playback) use.

35



STREAMING - WHEREVER SHE SHOPS

# Our streaming platform has grown to ~1.5M MAU per month

Streaming strategy overview



QVC and HSN have built a streaming platform that drives **~1.5M MAU / month**, tracking to over 10% of QxH revenue on attributed basis in 2025, and will continue to scale in 2026+

At the same time, brands / retailers want to be curated by influencers who inspire purchase, but struggle to bridge that inspiration to meaningful transaction volume, especially on marketplaces

To address this gap, the Company is implementing a next-gen user experience that provides third-party brands and retailers with exposure to our valuable streaming audience, enabling a scaled video commerce marketplace

The existing streaming platform is expected to grow both profitably and quickly, **at 5.5% YoY in 2025**, with additional potential for growth

**Historical Growth** (in 000s)





36

WIN STRATEGY – SPECIFIC INITIATIVES

# Initiative summary

### Initiative Summary & Description

| | |
|---|---|
| **Custom channel merchandising strategy** | • Category roles and definitions fit for business purpose<br>• Targeted marketing that aligns with merchandise strategy |
| **Supply chain operational improvements** | • Opportunities exist in supply chain include multipack, inventory placement, and WMS implementation to reduce delivery costs<br>• Closure of Greenville distribution center and potential others<br>• Option for partial fulfillment center migration<br>• Option for complete fulfillment center outsourcing |
| **Marketing ROAS** | • Marketing efficiency strategies to improve marketing ROAS in digital and social<br>• Continue to deploy tried-and-tested tactical levers such as testing, attribution and other techniques to maximize the effectiveness of spend within each media channel |
| **G&A optimization** | • Outsourcing IT labor for run + build services yields significant OIBDA savings<br>• Savings and expected benefits from modernized IT and consolidated software programs fund investment in Core Retail platforms<br>• Optimize third party and discretionary spend<br>• Drive savings through AI and self-service functionalities<br>• Reduced corporate footprint by closing HSN Headquarters in St. Petersburg, FL |
| **CBI turnaround plan** | • 4 waves of workstreams to reach the full potential through various workstreams such as eCommerce, paid media, sourcing and store expansion etc. |

37



WIN STRATEGY – SPECIFIC INITIATIVES

# Tariff | Multiple levers in place to navigate uncertainties

**~$70M to $100M estimated 12-month OIBDA impact**

### Ongoing mitigation actions

**A** **Vendor support**
— Adjusted cost pass-through rates accordingly to adjust to the volatility of tariffs

**B** **Order management**
— Remain in active talks regarding order plans, balancing near-term needs with long-term supply planning considerations

**C** **Alternative sourcing**

**D** **Strategic retail price increases**
— Retail price adjustments remain in effect to balance margin

**E** **Event shifts / contingencies**
— Assessing tariff impact to marquee events and contingency plans to shift (ex: shift Christmas in July to later in summer / rest of the year)

**F** **Strategic margin relief (QVCG absorbs SOME cost)**
— Category dependent, relief range permitted is variable based on base margin

### Freight on board inventory[1]

QVCG has more up-front risk / exposure, but also more control over the recourse of action on the goods

- <u>Order freeze</u>: Pausing new China orders until alternate sourcing secured

- <u>Shipment pause</u>: All goods produced but not yet shipped are to be held in China until approved to be released

- <u>Order shifts</u>: Actively reallocating future orders to India, Cambodia, Vietnam

### Non-freight on board inventory[2]

QVCG has less control over recourse of action on the goods, but more leverage on cancels / reductions

- <u>COGS / Athens negotiations</u>: Will not allow relief through undoing Athens work to maintain future leverage

- <u>Minimum advertised price (MAP)</u>: Match national brand pricing to remain competitive

- <u>Opportunity buys</u>: Leverage existing in-stock U.S. inventory to fix price

- <u>Alternative sourcing</u>: Shift Oct-Dec production out of China

Notes:
1. QVCG is importer of record, includes private brands and some proprietary brands.
2. Vendor is importer of record, includes national and market brands and some proprietary brands.

38



Executive summary
Business overview
Phase 1: Project Athens
Phase 2: WIN strategy
**Financial overview**
- QVCG
- QxH
- QI
- CBI
Appendix



39



Executive summary
Business overview
Phase 1: Project Athens
Phase 2: WIN strategy
**Financial overview**
- **QVCG**
- QxH
- QI
- CBI
Appendix



FINANCIAL OVERVIEW

# QVCG financial summary

## 5-YEAR BUSINESS PLAN FORECAST ($, in M)

- 2026-2029 QxH forecast is driven by growth and profitability of channels (Linear, Streaming, Social and Digital)
  - Revenue framework based upon multi-touch attribution (MTA) methodology (i.e., channels are attributed % Revenue across customer journey touch points)
  - Gross margins by channel reflect MTA revenue allocation. Operating expense by channel based on direct measured costs, cost allocations and marketing spend ROAS assumptions

- 2026-2029 QI forecast is driven by markets with Social and Streaming channels built in UK, DE and JP; CBI is forecasted at brand level

**QVCG Revenue** [1, 3] ($, in M)



**QVCG OIBDA & Margin** [1, 2, 3] ($, in M)



Notes:
1. Excludes Zulily for 2022 and 2023.
2. QVCG includes corporate and other costs.
3. Includes $30M of estimated OIBDA impact from potential capital structure transaction-related operating disruption in Q1'26.

41



FINANCIAL OVERVIEW

# QVCG consolidated P&L summary

## QVCG consolidated P&L summary historical and projections ($, in M)

| ($, in M) | 2022A[2] | 2023A[2] | 2024A | 2025E | 2026E | 2027E | 2028E | 2029E |
|---|---|---|---|---|---|---|---|---|
| **Net Revenue** | 11,200 | 10,613 | 10,037 | 9,208 | 8,567 | 8,455 | 8,578 | 8,829 |
| YoY Growth | | -5% | -5% | -8% | -7% | -1% | 1% | 3% |
| COGS[1] | 7,601 | 6,989 | 6,524 | 6,039 | 5,645 | 5,548 | 5,607 | 5,753 |
| **Gross Margin** | **3,600** | **3,624** | **3,513** | **3,170** | **2,923** | **2,906** | **2,971** | **3,075** |
| Gross Margin % | 32% | 34% | 35% | 34% | 34% | 34% | 35% | 35% |
| Operating expense | 807 | 785 | 734 | 671 | 616 | 580 | 588 | 605 |
| Marketing | 513 | 504 | 504 | 523 | 553 | 582 | 605 | 627 |
| Selling, general and administrative expense | 1,118 | 1,220 | 1,172 | 1,182 | 1,136 | 1,136 | 1,162 | 1,190 |
| **OIBDA** | **1,161** | **1,115** | **1,103** | **795** | **618** | **608** | **617** | **653** |
| OIBDA Margin % | 10% | 11% | 11% | 9% | 7% | 7% | 7% | 7% |

## Commentary

1. Revenue stabilization in the U.S. as Social + Streaming channels mitigate Linear decline. International revenue largely flat. CBI reflects consistent growth on small base

2. Stable GM% - continued Athens rigor

3. Opex largely variable with revenue

4. Marketing spend growth driven by social shopping channels

5. Flat SG&A as cost optimization mitigates inflation

6. 2028 returns to OIBDA growth driven by revenue improvements

Notes:
1. $95M has been deducted from COGS in 2022, as the obsolescence charge was excluded from OIBDA.
2. Excludes Zulily for 2022 and 2023.

42



FINANCIAL OVERVIEW

# QVCG consolidated cash flow summary

**QVCG consolidated cash flow[1]** ($, in M)

| ($, in M) | 2025E[1] | 2026E | 2027E | 2028E | 2029E |
|---|---|---|---|---|---|
| OIBDA | $795 | $618 | $608 | $617 | $653 |
| (-) Cash paid for taxes[2] | (137) | (136) | (100) | (104) | (117) |
| (-) Capex & TV Distribution Right expenditure | (271) | (232) | (316) | (242) | (291) |
| (+ / -) Change in W/C[3] | 18 | 59 | 22 | (6) | 6 |
| (+ / -) Others[4] | (46) | (100) | 21 | (22) | (23) |
| **Free Cash Flow Available for Debt Service** | **$359** | **$208** | **$235** | **$242** | **$228** |

Notes:
1. Based on 8+4 FY25 forecast.
2. Preliminary FY25 cash tax estimate from Company, declining in line with OIBDA in the outer years. Subject to material change based on potential transaction structures, capital structure modifications, or revisions to profitability estimates.
3. Net working capital change for QxH excludes the cash tax payment that runs through Other Current Liabilities, as it is presented separately above.
4. Others include severance and exit cost, proceeds from property sales, accrued compensation liability, and others.

43



## FINANCIAL OVERVIEW

# Capex summary

### Historical and projected Capex[1] ($, in M)

| ($, in M) | 2022A | 2023A | 2024A | 2025E | 2026E | 2027E | 2028E | 2029E |
|---|---|---|---|---|---|---|---|---|
| Capex - QVC Inc. | n.a. | n.a. | n.a. | 149 | 179 | 200 | 187 | 179 |
| Capex - CBI | n.a. | n.a. | n.a. | 23 | 23 | 23 | 24 | 25 |
| **Total Capex** | **$268** | **$230** | **$199** | **$171** | **$202** | **$224** | **$211** | **$204** |
| *% of Total Revenue* | *2.4%* | *2.2%* | *2.0%* | *1.9%* | *2.4%* | *2.6%* | *2.5%* | *2.3%* |

**Commentary**

- The increase from 2025 to 2026 at QVC is mainly due to investments in Core Retail systems

  — Warehouse Management System

  — Order Management System

  — Growth platforms to support digital capabilities for social, streaming, etc.

- Thereafter, Capex is projected as a percentage of Net Revenue, with the assumption that as sales grow capabilities and demands on our systems will increase

### FY25 Capex breakdown[1] ($, in M)



- IT - Keep-the-lights on
- IT - Software renewals
- IT - Discretionary, growth, core retail, & all other
- Supply chain / corporate real estate workplace services
- Global broadcast engineering
- Commerce
- CBI

Notes:
1. Based on 8+4 FY25 forecast.

44



Case: 26-2041 Document 716-3 Filed: Page EX 350 on Date Filed: 07/30/2026 14



Executive summary
Business overview
Phase 1: Project Athens
Phase 2: WIN strategy
**Financial overview**
- QVCG
- **QxH**
- QI
- CBI
Appendix



FINANCIAL OVERVIEW

# QxH snapshot

**Driving Engagement Through Linear, Digital, Streaming, and Social**

- QxH represents the combined operations of QVC U.S. (QUS) and HSN (Home Shopping Network)

- QxH revenue can be attributed to the following channels:

  — **Linear**: The traditional live broadcast model, generating a significant share of sales through scheduled programming and product demonstrations

  — **Digital**: E-commerce websites and mobile apps for QVC and HSN, which have become increasingly important as consumers shift to online shopping

  — **Streaming**: Customers to shop from live and on-demand content on platforms such as Roku and Apple TV. Also includes vMVPD such as YoutubeTV and Hulu + Live TV

  — **Social**: Interactive shopping experiences via TikTok and other social commerce platforms

**QxH Financial Summary** ($, in M)

|  | QxH |
|---|---|
| **Revenue**[1] | $5,971M |
| **Gross Profit**[1] | $1,975M |
| **Gross Margin %**[1] | 33.1% |

Notes:
1. Based on FY25E figures.

46



Case: 26-2041 Document: 71-3 Filed: EX-352 on Date Filed: 07/30/2026 114

FINANCIAL OVERVIEW

# QxH | Linear revenue decline of -9% CAGR is in line with expected MVPD household declines (including 2025/2026 disruptive factors)



Linear revenue[1] ($, in M)    US households (in M)

Source: S&P.
Notes:
1. Revenue is MTA based. MTA methodology used in long range plan is based on new third-party methodology for social revenue and attributed vMPVD sales to streaming. MTA methodology used for external reporting is based existing internal MTA for social revenue and attributes vMPVD sales to linear.

47



FINANCIAL OVERVIEW

## QxH | Digital is forecasted to stabilize by 2027/2028 as Social and Streaming platforms mitigate the decline in Linear subscriber count

**Digital revenue[1] ($, in M)**

Includes restructuring impact

-9%

2,058 | 1,873 | 1,809 | 1,840 | 1,896

-3% | +2% | +3%

2025 | 2026 | 2027 | 2028 | 2029

**MVPD (in M)**

CAGR: -6%

41 | 38 | 36 | 34 | 32

**QxH Paid ad spend ($, in M)**

CAGR: +6%

84 | 89 | 95 | 100 | 107

2025 | 2026 | 2027 | 2028 | 2029

Increased in Ads spending to offset further decline in households

Source: S&P.
Notes:
1. Revenue is MTA based. MTA methodology used in long range plan is based on new third-party methodology for social revenue and attributed vMPVD sales to streaming. MTA methodology used for external reporting is based existing internal MTA for social revenue and attributes vMPVD sales to linear.



48

FINANCIAL OVERVIEW

# QxH | Social and Streaming revenue is forecasted to grow quickly at 15% and 5% CAGR, mitigating Linear and Digital declines by 2028

**Social MTA[1] revenue & contribution margin[2]** ($, in M)



Growth due to the TikTok launch, increase in marketing spending and improvement in ROAS

**Linear MTA[1] revenue & contribution margin[2]** ($, in M)



Linear declining at a slower rate due to the decline in MVPD projection

**Streaming MTA[1] revenue & contribution margin[2]** ($, in M)



Growth due to increasing users in vMVPD

**Digital MTA[1] revenue & contribution margin[2]** ($, in M)



Digital declining in early years due to its dependence on MVPD and linear

Notes:
1. MTA methodology used in long range plan is based on new third-party methodology for social revenue and attributed vMPVD sales to streaming. MTA methodology used for external reporting is based existing internal MTA for social revenue and attributes vMPVD sales to linear.
2. Contribution Margin excludes SG&A cost.

49



**FINANCIAL OVERVIEW**

# QxH | Social and Streaming revenue growth should drive total QxH revenue to positive YoY growth by 2028

2025 – 2029 revenue bridge[1] ($, in M)

Legend: Total QxH Revenue · Restructuring Impact · QxH Social · QxH Streaming · QxH Digital · QxH Linear

Notes:
1. Revenue is MTA based. MTA methodology used in long range plan is based on new third-party methodology for social revenue and attributed vMPVD sales to streaming. MTA methodology used for external reporting is based existing internal MTA for social revenue and attributes vMPVD sales to linear.

50

QVC

FINANCIAL OVERVIEW

# QxH | SG&A and Opex summary

**2025 SG&A[1]** ($, in M)



**2025 Opex[1]** ($, in M)





Notes:
1. Based upon 8+4 FY25 budget.
2. No labor/non-labor split is available.
3. Others include IT, Commerce & Merch, Fixed SG&A, HR, Admin, Finance, Growth, bad debt.

51

FINANCIAL OVERVIEW

# QxH | Forecast assumptions summary

| | Linear | Streaming | Social | Digital |
|---|---|---|---|---|
| **Channel description** | • Traditional cable, broadcast and internet cable television (MVPD, and OTA)<br>• Scripted – purchased within 24 hours of airtime | • FAST + OnO streaming platforms (including vMVPD)<br>• 24-hour viewership match (i.e. IP address via Conviva) | • Primarily Meta and TikTok | • Represents digital (QVC.com + HSN.com)<br>• Unscripted – purchases not tied to aired show (or beyond parameters of airtime) |
| **Revenue drivers** | • MVPD and OTA distro forecast<br>• Engaged reach[1] and customer conversion | • vMVPD distro forecast<br>• Active User growth[2]<br>• Customer conversion | • Increase in marketing spend and efficiency | • Liner revenue growth rate<br>• Performance Marketing – increase in spend & efficiency<br>• Halo from Streaming and Social growth |
| **Cost assumptions** | • Stable gross margin as pricing and cost initiatives mitigate inflation and channel margin differences<br>• Operating expense and SG&A (excluding marketing): Percent of Net Revenue held constant respectively starting in FY26<br>• Corporate SG&A: 5% YoY decrease | | | |
| **Marketing** | • Declining dollar spend as channel revenue declines | • Spend in the 4.5% to 5.0% range of net revenue | • Marketing % of revenue (MTA basis) averaging ~20% through 2029 with material improvements in ROAS in 2028 and 2029 | • Consistent rate of spend aligned with revenue growth |



Notes:
1. Average daily engaged reach is the number of distinct households that tuned into QxH main channel for at least 2-consecutive minutes within a day.
2. Active user growth assumed outpace OnO and FAST viewership growth due to late adoption of streaming platform.

52



FINANCIAL OVERVIEW

# QxH | Financial summary

**QxH 2025 – 2029 P&L Summary** ($, in M)

| ($, in M) | 2025 | 2026 | 2027 | 2028 | 2029 |
|---|---|---|---|---|---|
| **Net Revenue** | **$5,971** | **$5,472** | **$5,338** | **$5,411** | **$5,576** |
| YoY % | (9.5%) | (8.4%) | (2.5%) | 1.4% | 3.0% |
| Gross Profit | 1,975 | 1,767 | 1,739 | 1,784 | 1,848 |
| % Gross Margin | 33.1% | 32.3% | 32.6% | 33.0% | 33.1% |
| Operating Expenses | 453 | 411 | 373 | 379 | 391 |
| % Net Revenue | 7.6% | 7.5% | 7.0% | 7.0% | 7.0% |
| Marketing | 323 | 346 | 363 | 374 | 381 |
| % Net Revenue | 5.4% | 6.3% | 6.8% | 6.9% | 6.8% |
| SG&A (Excl. marketing) | 645 | 652 | 659 | 664 | 670 |
| % Net Revenue | 10.8% | 13.2% | 13.5% | 13.4% | 13.2% |
| **OIBDA** | **$554** | **$358** | **$344** | **$366** | **$405** |
| % OIBDA Margin | 9.3% | 6.5% | 6.5% | 6.8% | 7.3% |





**Executive summary**
**Business overview**
**Phase 1: Project Athens**
**Phase 2: WIN strategy**
**Financial overview**
- QVCG
- QxH
- QI
- CBI

**Appendix**



54

FINANCIAL OVERVIEW

# QVC International (QI) snapshot

**Our International business is scaled, stable, and highly profitable**

- QVC International brings our curated shopping experience to 124M households across Europe and Asia
- QVC International distributes televised shopping programs to its consumers via local QVC channels
  - We also engage our international customers via websites, mobile applications, and social media pages
- The Japanese operations ("QVC Japan") are conducted through a joint venture with Mitsui & Co. LTD.
  - QVC Japan is owned 60% by the Company and 40% by Mitsui
- The international businesses, except for Italy, are cash generative and distribute their excess cash to QVC, Inc. via dividends
- Cord cutting trends are weaker internationally, providing a strong baseline support to our international business
- Our international e-commerce penetration as percentage of sales is only 52%, compared to 64% in the United States, creating a durable growth avenue

**QI Financial Summary** ($, in M)

| | [3] | 🇩🇪 | Others | Total |
|---|---|---|---|---|
| **Revenue**[1] | $807M | $767M | $732M | **$2,399M** |
| **Households**[2] | 29M | 42M | 53M | **124M** |
| **Customers**[2] | 1.4M | 1.3M | 1.2M | **3.9M** |
| **OIBDA**[1] | | | | **$333M** |
| **OIBDA Margin %**[1] | | | | **13.9%** |

Notes:
1. Based on FY25E figures.
2. Based on FY24 figures.
3. Japanese figures shown on a consolidated basis.

55

FINANCIAL OVERVIEW

# QI historical revenue

Japan ($, in M)

CAGR: -7%

| 2022 | 2023 | 2024 |
|------|------|------|
| 1,017 | 945 | 870 |

Germany ($, in M)

CAGR: -2%

| 2022 | 2023 | 2024 |
|------|------|------|
| 813 | 788 | 785 |

Others ($, in M)

CAGR: +3%

| 2022 | 2023 | 2024 |
|------|------|------|
| 698 | 721 | 743 |

Total QI ($, in M)

CAGR: -3%

| 2022 | 2023 | 2024 |
|------|------|------|
| 2,528 | 2,454 | 2,399 |
| 357 | 325 | 333 |

Revenue

OIBDA

56



FINANCIAL OVERVIEW

# QI consolidated financial forecast

($, in M)



Executive summary
Business overview
Phase 1: Project Athens
Phase 2: WIN strategy
**Financial overview**
  - QVCG
  - QxH
  - QI
  - **CBI**
Appendix



FINANCIAL OVERVIEW

# Cornerstone Brands (CBI) snapshot

### Cornerstone serves a differentiated customer niche

- Cornerstone Brands (CBI) is a portfolio of four direct-to-consumer home and apparel brands

  — Home brands offer indoor and outdoor furnishings

- The segment is a complementary, yet a largely independent part of QVCG
- The brands primarily focus on the higher-end of the market, offering aspirational merchandise to its 1.9M[1] active customers, which reflects in a ~$375[2] average order value and ~40% gross margins
- CBI sells through 34[3] retail stores across the United States and their websites

  — A key touchpoint in the customer journey are curated catalogues distributed to consumers with an annual circulation of 93M

  — Physical retail locations are the main use of Capex

  — Sales are mostly done at point of purchase, resulting in limited accounts receivable

- Recent results have suffered from a cyclically depressed housing market

  — CBI still maintained OIBDA profitability

- Building on the execution experience from Athens, CBI is currently undergoing an operational restructuring focused on cross-brand commerce, improved sourcing, call center optimization, and marketing overhaul

**CBI Financial Summary** ($, in M)

| Brands | Stores[3] |
|---|---|
| FRONTGATE | 7 |
| BALLARD DESIGNS | 25 |
|  grandinroad | 4[4] |
| Garnet Hill | 2 |
| Cornerstone Brands, Inc. | 34 |

Notes:
1. 12-month active file of customers.
2. YTD through Q2'25.
3. As of August 25, Including outlet stores.
4. Grandin Road's 4 outlets share space/location with the Frontgate outlets.

QVC

FINANCIAL OVERVIEW

# CBI summary

## CBI financials trend ($, in M)



| | 2020A | 2021A | 2022A | 2023A | 2024A | 2025E | 2026E | 2027E | 2028E | 2029E |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 1,070 | 1,238 | 1,313 | 1,165 | 1,040 | 930 | 940 | 950 | 978 | 1,008 |
| OIBDA | 94 | 137 | 78 | 67 | 36 | 15 | 30 | 33 | 35 | 42 |
| OIBDA Margin | 9% | 11% | 6% | 6% | 3% | 2% | 3% | 4% | 4% | 4% |

- Revenue
- OIBDA
- OIBDA Margin

## CBI revenue ($, in M) vs. U.S. Homes sold (In units)



- CBI Revenue ($, in M)
- # Homes Sold

## Comments

- CBI sales typically follow the US housing market - fewer home sales mean weaker furniture demand
- Revenue projected to decline 11% in FY25 on lower shipments and softness in home segment
- Housing recovery expected in 2026, supporting sales growth and OIBDA margin improvement
- CBI is expected to align strategy with broader macro trends

Source: Redfin Monthly Housing Market Data.

60







FINANCIAL OVERVIEW

# CBI 3.0 strategy update

**Four focus areas for Cornerstone performance improvement**

**0 - 200 bps**




**0 - 200 bps**



**0 - 100 bps**



**0 - 100 bps**



| Product margin improvement | Cost to serve | Marketing efficiency | Store operating leverage |
|---|---|---|---|
| • Tariff mitigation strategies; selectively moving country of origin, cost engineering of product, and leveraging portfolio scale, to lower product cost | • Modifications to high velocity picking process and racking infrastructure resulting in $1M of payroll savings annually | • Building centralized marketing and ecommerce team to get cost and learnings leverage across the business | • Exit high cost, low traffic mall locations in favor of neighborhoods and lifestyle centers |
| • Leveraging technology to increase speed to market for our excusive product designs, enabling first mover advantage pricing | | • Leveraging AI to help with Media Mix Modeling on digital spend | • Re-merchandise store to balance high velocity attraction items with powerful assortments of key furniture categories |
| • Leveraging AI tool to set retail prices and promotions to optimize gross margin dollar generation | | • Testing into optimal use of high-cost print marketing programs | • Train and lead a results driven sales organization with focus on design services online, in-store and in-home |

62





Executive summary

Business overview

Phase 1: Project Athens

Phase 2: WIN strategy

Financial overview

**Appendix**



# The complex Omni channel customer journey for QVC customers

Illustrative customer journey from trigger to sales attribution



**DEFINITIONS**

- **3rd Party**: TikTok shop purchases
- **Auto Delivery**: subscription purchase typically tagged to Linear business
- **Brand Marketing**: non-performance / retentional marketing primarily related to Linear
- **Email / Push / SMS**: retention based marketing strategies
- **Direct**: sales is attributed 100% to a channel primarily Linear
- **Organic**: customer sees QVC content through Channels w/o marketing
- **MVPD**: Traditional cable or satellite TV providers offering multiple channels (e.g., Comcast, DirecTV)
- **vMVPD**: Online services that stream live TV channels without cable (e.g., YouTube TV, Hulu + Live TV)
- **Paid Marketing**: refers to programmatic ad spend, google ads, etc.
- **Scripted/On Air**: refers to programming on 5 QVC / HSN channels
- **Social Marketing**: Meta, Pinterest and Youtube ads
- **Social Shop**: TikTok shop
- **Unscripted/On-Demand**: QVC.com or phone orders which are not tagged to an aired show

64

APPENDIX

# Q3'25 Capitalization

| ($, in M) <br> CCR: Caa3 / CCC | 9/30/25 <br> Face | Interest <br> Rate | Cash <br> Interest | Maturity | Credit <br> Rating | Net Leverage |
|---|---|---|---|---|---|---|
| QVC Cash & Equivalents | $1,328 | | | | | |
| Corporate and Other Cash[1] | 489 | | | | | |
| **Total Cash & Equivalents** | **$1,817** | | | | | |
| **QVC RCF** | | | | | | |
| $3.25bn RCF due 2026 | $2,900 | S + 162.5 | $169 | Oct-26 | Caa3 / CCC | |
| **QVC Subsidiary Debt** | | | | | | |
| 4.750% QVC Notes due 2027 | $44 | 4.750% | $2 | Feb-27 | Caa3 / CCC | |
| 4.375% QVC Notes due 2028 | 72 | 4.375% | 3 | Sep-28 | Caa3 / CCC | |
| 6.875% QVC Notes due 2029 | 605 | 6.875% | 42 | Apr-29 | Caa3 / CCC | |
| 5.450% QVC Notes due 2034 | 400 | 5.450% | 22 | Aug-34 | Caa3 / CCC | |
| 5.950% QVC Notes due 2043 | 300 | 5.950% | 18 | Mar-43 | Caa3 / CCC | |
| 6.375% QVC Notes due 2067 | 225 | 6.375% | 14 | Sep-67 | Caa3 / CCC | |
| 6.250% QVC Notes due 2068 | 500 | 6.250% | 31 | Nov-68 | Caa3 / CCC | |
| **QVC Subsidiary Debt (excl. RCF)** | **$2,146** | | **$132** | | | **2.4x** |
| **QVC Subsidiary Debt (incl. RCF)** | **$5,046** | | **$301** | | | **5.7x** |
| *Net QVC Subsidiary Debt (incl. RCF)* | *3,718* | | | | | *4.2x* |
| **Liberty Interactive Subsidiary Debt** | | | | | | |
| 8.500% Liberty Notes due 2029 | $287 | 8.500% | $24 | Jul-29 | C / CC | |
| 8.250% Liberty Notes due 2030 | 505 | 8.250% | 42 | Feb-30 | C / CC | |
| 4.000% Exch. Liberty Notes due 2029 | 350 | 4.000% | 14 | Nov-29 | C / CC | |
| 3.750% Exch. Liberty Notes due 2030 | 427 | 3.750% | 16 | Feb-30 | C / CC | |
| **Liberty Interactive Sub. Debt** | **$1,569** | | **$96** | | | **1.8x** |
| **Total Debt** | **$6,615** | | **$397** | | | **7.4x** |
| *Net Debt* | *4,798* | | | | | *5.4x* |
| Preferred Stock | $1,272 | 8.000% | $102 | Mar-31 | NA | |
| **Total Debt and Preferred Stock** | **$7,887** | | **$499** | | | **8.8x** |
| *Net Debt and Preferred Stock* | *6,070* | | | | | *6.8x* |
| **Memo:** | | | | | | |
| Q3'25 QVCG LTM Adj. OIBDA | $888 | | | | | |

Cap Table Leverage is shown on fully consolidated OIBDA

Source: Company Filings, Company Earnings Transcript, FactSet.
Notes:
1. Corporate and Other Cash includes $250mm of QVCG, $160mm of LI LLC, and $79mm of CBI cash.

### Consolidated Liquidity

| | |
|---|---|
| QVC RCF Commitment | $3,250 |
| (-) Letters of Credit | (169) |
| (-) Borrowings | (2,900) |
| **QVC RCF Availability** | **$181** |
| (+) Cash & Equivalents | 1,817 |
| **Total Liquidity** | **$1,998** |

65





APPENDIX

# Q3'25 Summary organizational structure



66

Notes:
1. LTM OIBDA shown exclusive of $45mm of corporate overhead; balances shown as of 9/30/25.





# Disclaimer

By accepting this presentation, recipients acknowledge that they have read, understood and accepted the terms of this disclaimer.

This presentation is subject to the confidentiality provisions set forth in the recipients' applicable non-disclosure agreements. This presentation is the property of, and contains the proprietary and confidential information of QVC GROUP, INC. and its subsidiaries (collectively, the "Company").

This presentation is being provided for informational purposes only and is intended solely to facilitate a discussion with the recipient. No representation or warranty, express or implied, is or will be given by the Company or its affiliates, directors, officers, partners, employees, agents or advisers or any other person as to the accuracy, completeness, reasonableness or fairness of any information contained in this presentation and no responsibility or liability whatsoever is accepted for the accuracy or sufficiency thereof or for any errors, omissions or misstatements, negligent or otherwise, relating thereto. No information included in this presentation constitutes, nor can it be relied upon as, legal, tax, investment or other advice. Any statement herein regarding tax matters was written in connection with the promotion or marketing of the matters described herein and was not intended or written to be used, and cannot be used by any person, for the purposes of avoiding tax-related penalties under federal, state or local tax law. Recipients should consult their independent advisors.

This presentation should not be relied upon for the purpose of evaluating the performance of the Company or for any other purpose, and neither the Company nor any of its affiliates, directors, officers, partners, employees, agents or advisers nor any other person, shall be liable for any direct, indirect or consequential liability, loss or damages suffered by any person as a result of this presentation or their reliance on any statement, estimate, target, projection or forward-looking information in or omission from this presentation and any such liability is expressly disclaimed. In all cases, interested parties should conduct their own investigation and analysis of the Company and the information contained herein. This presentation should not be considered as a recommendation by the Company or any affiliate or other person in relation to the Company or any of its subsidiaries, nor does it constitute an offer to sell or a solicitation for an offer to buy the securities, assets or business of the Company, nor shall there be any sale of securities in any state or jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such state or jurisdiction or pursuant to an exemption therefrom. This presentation shall not form the basis of any contract. Any references to any future or proposed transaction are for illustrative purposes only and the terms of any such transaction should it occur may be materially different than the terms in this presentation.

This presentation contains forward-looking statements that are subject to risks, uncertainties and other factors. All statements other than statements of historical fact or relating to present facts or current conditions included in this presentation are forward-looking statements. Forward-looking statements give the Company's current expectations and projections relating to the Company's financial condition, results of operations, plans, objectives, future performance and business. You can identify forward-looking statements by the fact that they do not relate strictly to historical or current facts. These statements may include words such as "anticipate," "estimate," "expect," "project," "seek," "plan," "intend," "believe," "contemplate," "assume," "will," "may," "could," "would," "continue," "likely," "should," and other words and terms of similar meaning in connection with any discussion of the timing or nature of future operating or financial performance or other events, but not all forward-looking statements contain these identifying words. Risks, uncertainties and other factors may cause future results to differ materially from these forward-looking statements, and potentially adversely from the historical results contained herein. For a further list and description of such risks and uncertainties, please refer to the Company's filings with the SEC, including the section titled "Risk Factors" in the Company's Annual Report on Form 10-K, that are available at www.sec.gov.

You are cautioned not to place undue reliance on the utility of the information in this presentation as a predictor of future performance of the Company, as projected financial and other information are based on estimates and assumptions that are inherently subject to various significant risks, uncertainties and other factors, many of which are beyond the Company's control.

All information herein speaks only as of (1) the date hereof, in the case of information about the Company and (2) the date of such information, in the case of information from persons other than the Company. The Company does not undertake any duty to update or revise the information contained herein, publicly or otherwise. The Company has not independently verified any third-party information and makes no representation as to the accuracy or completeness of any such information.

THIS PRESENTATION MAY CONTAIN MATERIAL, NON-PUBLIC INFORMATION WITHIN THE MEANING OF THE UNITED STATES FEDERAL SECURITIES LAWS WITH RESPECT TO THE COMPANY AND ITS SUBSIDIARIES AND THEIR RESPECTIVE SECURITIES. The recipient is aware that applicable securities laws restrict any person who has material, non-public information about a company from purchasing or selling securities of such company (and options, warrants and rights relating thereto) and from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities. Accordingly, the recipient agrees not to purchase or sell such securities in violation of any such laws, including without limitation, securities of the Company.

This presentation includes Adjusted OIBDA, which is a non-GAAP financial measure, together with a reconciliation to operating income, as determined under GAAP. QVC Group defines Adjusted OIBDA as operating income (loss) plus depreciation and amortization, stock-based compensation, and where applicable, separately identified impairments, litigation settlements, restructuring, penalties, acquisition-related costs, fire related costs, net (including Rocky Mount inventory losses), and (gains) losses on sale leaseback transactions.

QVC Group believes Adjusted OIBDA is an important indicator of the operational strength and performance of its businesses by identifying those items that are not directly a reflection of each business's performance or indicative of ongoing business trends. In addition, this measure allows management to view operating results and perform analytical comparisons and benchmarking between businesses and identify strategies to improve performance. Because Adjusted OIBDA is used as a measure of operating performance, QVC Group views operating income as the most directly comparable GAAP measure. Adjusted OIBDA is not meant to replace or supersede operating income or any other GAAP measure, but rather to supplement such GAAP measures in order to present investors with the same information that QVC Group's management considers in assessing the results of operations and performance of its assets.

 

Case 26-4041   Document 15   Page EXST on Date Filed: 07/30/2026

# Today's presenters

**Executive Team**



**David Rawlinson II**
President &
Chief Executive Officer



**Bill Wafford**
Chief Administrative Officer &
Chief Financial Officer



**Tom Bazzone**
President of Cornerstone Brands







**Executive summary**

Business overview

Transformation

Financial overview



# Executive summary

**5-Year Business Plan Forecast ($, in M)**

- Cornerstone Brands (CBI) is a portfolio of four direct-to-consumer home and apparel brands. We compete in a $300B fragmented market. We have a fleet of 34 stores, an internally staffed phone sales/service team and websites across our four brands



**CBI Revenue ($, in M)**



**CBI OIBDA & Margin ($, in M)**

- Revenue and OIBDA are expected to improve starting in 2025 as we embark on the phase 2 of our turnaround initiatives. One year into our transformation, we have adopted new ways of working to achieve growth via CBI strategy 3.0




# Cornerstone Brands (CBI) overview

**Cornerstone serves a differentiated customer niche**

- Cornerstone Brands (CBI) is a portfolio of four direct-to-consumer home and apparel brands
  - Ballard Designs, Frontgate, Grandin Road ("Home" brands; combine for 82% of revenue), and Garnet Hill ("Apparel"; 18% of revenue)
  - Home brands offer indoor and outdoor furnishings
- The segment is a complementary, yet a largely independent part of QVCG
- CBI sells through 34[3,4] retail stores across the United States and their websites
  - A key touchpoint in the customer journey are curated catalogues distributed to consumers with an annual circulation of 93M
  - IT Apps & Infrastructure are the main use of Capex
  - Sales are mostly done at point of purchase, resulting in limited accounts receivable
- Recent results have suffered from a cyclically depressed housing market
  - CBI still maintained OIBDA profitability
- Building on the execution experience from Athens, CBI is currently undergoing an operational restructuring focused on cross-brand commerce, improved sourcing, call center optimization, and marketing overhaul

**CBI Financial Summary ($, in M)**

| Brands | Stores[3] |
|---|---|
| FRONTGATE | 7 |
| BALLARD DESIGNS | 25 |
|   grandinroad | 4 |
| Garnet Hill | 2 |
| Cornerstone Brands, Inc. | 34[4] |

Notes:
1. 12-month active file of customers.
2. YTD through Q2'25.
3. As of August 25, Including outlet stores.
4. Grandin Road's 4 outlets share space/location with the Frontgate outlets.

6

QVC



# CBI revenue vs. housing market

**CBI revenue ($, in M) vs. U.S. Homes sold** (In units)

**Comments**

- CBI sales typically follow the US housing market - fewer home sales mean weaker furniture demand
- Revenue projected to decline 11% in FY25 on lower shipments and softness in home segment
- Some improvement in housing expected in 2026, supporting sales growth and OIBDA margin improvement
- CBI is expected to align strategy with broader macro trends

Source: Redfin Monthly Housing Market Data.

7





Executive summary

**Business overview**

Transformation

Financial overview



QVC Group

BUSINESS OVERVIEW

# The evolution of Cornerstone Brands



**1995**
Cornerstone Brands Founded
Frontgate Acquired

**1998**
Smith+Noble Acquired

**1999**
CBI West Chester Facility Opened

**2003**
Grandin Road Launched

**2005**
Improvements Acquired from HSN
Cornerstone Brands Acquired by IAC

**2015**
Ballard Designs Retail Expansion Commenced

**2017**
Cornerstone Brands Acquired by Liberty Interactive / Qurate Retail (29-Dec)

2021 Peak Sales & Profit

1995  1997  1999  2001  2003  2005  2007  2009  2011  2013  2015  2017  Today

**1996**
Initial TravelSmith Investment
Ballard Designs, Garnet Hill & Territory Ahead Acquired

**2004**
Acquisition of TravelSmith Completed

**2008**
HSN & Cornerstone Brands Spin-off from IAC to Form HSNi

**2012**
Territory Ahead and Smith+Noble Divested
Chasing Fireflies Acquired

**2016**
Chasing Fireflies and TravelSmith Divested

**2018**
Improvements Transitioned Back to HSN

**2025**
Transforming to WIN

■ Corporate Events    ■ Acquisitions and Launches    ■ Divestitures and Closures

9



BUSINESS OVERVIEW

# CBI Portfolio

**Different styles of brands**

| Brands | Home brand FRONTGATE | Home brand BALLARD DESIGNS | Home brand grandinroad. | Home & apparel brand Garnet Hill |
|---|---|---|---|---|
| **Current platform** | **Luxury for Real Life** <br><br> • Livable, worry-free spaces <br> • Sophisticated not pretentious <br> • Enabling connection as luxury, e.g., the space to host, have overnight guests, parties, etc. and make it look effortless <br> • Spaces to relax & have fun | **Tradition for Modern Life** <br><br> • Creative, one-of-a-kind spaces <br> • Sophisticated contrast of color, pattern, material, finish, etc. <br> • Mix of vintage and modern <br> • Comfortable & inviting | **Welcome to the Joy of Home** <br><br> • Full of joyful personality, rooted in the seasons and holidays <br> • Sturdy essentials that last <br> • Comfortable, classic, and versatile styling <br> • Strive to be the best value for your money | **Modern Heritage** <br><br> • Modern take on country living, less rustic more refined <br> • Nostalgia for warmth & comfort of classic country life, but streamlined & clutter-free <br> • Artful style inspired by Nature |
| **Competitors** | ARHAUS | ETHAN ALLEN | Crate&Barrel  POTTERY BARN | J.Jill  POTTERY BARN |



10



BUSINESS OVERVIEW

# Complimentary product offering across the brands

### Each brand has different focuses to compliment each other



Legend:
- Apparel
- Flooring
- Holiday/seasonal
- Indoor décor and furniture
- Outdoor décor and furniture
- Softgoods and textiles

Note:
1. LTM Oct'25
2. Softgoods and textiles include materials and fabric-based products, excluding apparel.

11



BUSINESS OVERVIEW

# Our retail store network

Significant revenue upside from potential store and market expansion

**Current footprint**



**Ballard Designs:
25 Current Locations[2]**



Expanding on proven concepts of full-line stores and Design Studios based on market

**Frontgate:
7 Current Locations[2]**



Opened new retail experience concepts in Dallas, TX (11/23) and Columbus, OH (3/24)

**Garnet Hill:
2 Current Location[2]**



Opened first retail concept in January 2024 in Dedham, MA



~$3.6M  **Store average Gross Demand[3]**

**Legend**

△ Ballard Designs ▲ Frontgate ▲ Garnet Hill ▲ Grandin Road ◆ Distribution Center

Notes:
1. Grandin Road's 4 outlets share space/location with the Frontgate outlets. Ballard's 2 outlets locations have the same location as Frontgate/Grandin Road.
2. Figures represent LTM as of September 2025. Includes outlets.
3. Excludes outlets.

12



BUSINESS OVERVIEW

# Customer file

Targeting the middle-aged demographic with high earnings



**12-month customer file[1]** (in thousands)



**New customer YTD[1]** (in thousands)

### Demographic profile

BALLARD DESIGNS

- 67% of customers are 35-64 years old

FRONTGATE

- 65% of customers are 35-64 years old

Garnet Hill

- 49% of customers are 35-64 years old

grandinroad

- 58% of customers are 35-64 years old

Note:
1. As of October 2025.

13



Executive summary

Business overview

**Transformation**

Financial overview



TRANSFORMATION

# CBI 3.0 strategy update

Four focus areas for Cornerstone performance improvement

| 0 - 200 bps | 0 - 200 bps | 0 - 100 bps | 0 - 100 bps |
|---|---|---|---|

   

**Product margin improvement**

- Tariff mitigation strategies; selectively moving country of origin, cost engineering of product, and leveraging portfolio scale, to lower product cost

- Leveraging technology to increase speed to market for our excusive product designs, enabling first mover advantage pricing

- Leveraging AI tool to set retail prices and promotions to optimize gross margin dollar generation

**Cost to serve**

- Modifications to high velocity picking process and racking infrastructure resulting in $1M of payroll savings annually

**Marketing efficiency**

- Building centralized marketing and ecommerce team to get cost and learnings leverage across the business

- Leveraging AI to help with Media Mix Modeling on digital spend

- Testing into optimal use of high-cost print marketing programs

**Store operating leverage**

- Train and lead a results driven sales organization with focus on design services online, in-store and in-home

- Re-merchandise store to balance high velocity attraction items with powerful assortments of key furniture categories

- Exit high cost, low traffic mall locations in favor of neighborhoods and lifestyle centers

15



Case 2:24-cv-... Document 716-15 Filed ... PageX 388 ... 114



TRANSFORMATION

# CBI 3.0 key focus

| | Details |
|---|---|
| Product margin | • Focus on total lowest landed product cost<br>    — Being more cost engineering work: Aggregate purchasing at CBI level to increase leverage<br>    — Considering centralizing sourcing for better plan and inventory flow<br>    — Reducing impact of "misses" in assortment through a thoughtful evolution of country-of-origin selection<br>• Strategic about price<br>    — Setting retail prices leveraging AI<br>    — Reducing "site wide" discounts and leveraging more "up to" messaging<br>    — Sharpening focus on features and benefits rather than leading with discount<br>    — Leveraging elasticity models to set optimum discounts |
| Lower cost to serve | • More efficient pick process improvement for high velocity SKUs<br>• Focusing on inventory productivity and optimize network facilities |
| Marketing efficiency | • Moving to centralized marketing team<br>    — Adoption of best practices<br>• Agency / vendor consolidation will yield savings<br>    — Leveraging procurement team to negotiate<br>• Allowing for investment in areas not every brand could afford<br>    — Consumer insights and CRM, retail marketing, business development and program management (PLCC) |
| Store performance improvement | • Assortment: Improving overall assortment by style, breadth, and channel mix to better align with customer preferences<br>• Layout, visuals, and experience: Piloting store changes to layout, visuals and experience based on findings to improve in-store conversion and appeal to a broader audience<br>• Store specifics: Conducting targeted designs for bottom performing stores<br>• Circulations, eCommerce, and traffic: Increasing circulations and digital spend in targeted RTAs<br>• Fulfilment: Enhancing in-home fulfillment through white glove service to improve conversion across channels<br>• Location and proximity: Optimizing store locations based on market data to improve store traffic, and therefore overall demand for stores |
| Productivity improvement | • Social selling: Leveraging from QVC experience and expertise<br>• Continued categorical expansion and key item focus |



16  QVC



## FINANCIAL OVERVIEW
# CBI summary

**CBI financials trend ($, in M)**



18

Case: 26-2042 Document 116-3 Filed EX 91 on Date Filed: 07/30/2026 Page 14

FINANCIAL OVERVIEW

# Recent financial performance



### Net Revenue Monthly YoY change

- Net Revenue (% Change)
- Trendline

Values on chart: -15.0%, -20.0%, -6.0%, -8.7%, -7.4%, -7.3%, -7.1%, -12.0%, -6.6%

X-axis: Jan-25, Feb-25, Mar-25, Apr-25, May-25, Jun-25, Jul-25, Aug-25, Sep-25

**Comments**

- Recent CBI performance has shown signs of stabilization, despite on-going headwinds in the housing environment (low inventory, high interest)

- Although YTD revenue is down -10% September and October 2025 revenue is down 7% and 10% vs. 2024, respectively

- Due to on-going CBI 3.0 measures SG&A has improved by 317 and 396 basis points in September and October 2025 vs. prior year

- OIBDA has improved by 81 and 16 basis in September and October 2025 vs. prior year




19

Case: 26-2041 Document: 716-3 15 Filed: Page: EX-392 on Date: 16 Filed: 07/30/2026 14

FINANCIAL OVERVIEW

# CBI consolidated financials forecast

| ($, in M) | 2025E | 2026E | 2027E | 2028E | 2029E |
|---|---|---|---|---|---|
| **Net Revenue** | **$930** | **$940** | **$950** | **$978** | **$1,008** |
| YoY % | (10.6%) | 1.1% | 1.0% | 3.0% | 3.0% |
| Gross Profit | 374 | 388 | 397 | 412 | 435 |
| % Gross Margin | 40.2% | 41.2% | 41.8% | 42.1% | 43.1% |
| Operating Expenses | 38 | 38 | 38 | 39 | 41 |
| % Net Revenue | 4.1% | 4.0% | 4.0% | 4.0% | 4.0% |
| Marketing | 162 | 167 | 172 | 179 | 188 |
| % Net Revenue | 17.4% | 17.8% | 18.1% | 18.3% | 18.6% |
| SG&A | 158 | 152 | 154 | 158 | 164 |
| % Net Revenue | 17.0% | 16.2% | 16.2% | 16.2% | 16.3% |
| **OIBDA** | **$15** | **$30** | **$33** | **$35** | **$42** |
| % OIBDA Margin | 1.6% | 3.2% | 3.5% | 3.6% | 4.2% |





20




FINANCIAL OVERVIEW

# CBI consolidated cash flow

| ($, in M) | 2025E | 2026E | 2027E | 2028E | 2029E |
|---|---|---|---|---|---|
| **OIBDA** | $15 | $30 | $33 | $35 | $42 |
| (-) Cash paid for taxes [1] | (12) | (3) | (7) | (7) | (8) |
| (-) Capex | (23) | (20) | (23) | (24) | (25) |
| (+/-) Change in W/C | (22) | (45) | (1) | (3) | 3 |
| **Free Cash Flow Available for Debt Service** | **($42)** | **($37)** | **$2** | **$1** | **$12** |

Note:
1. Preliminary cash tax estimate from Company. Subject to material change based on potential transaction structures, capital structure modifications, or revisions to profitability estimates.

21

QVC GROUP





# Cornerstone Brands, Inc.

## Cleansing Package

April 2025

# CBI Financial Statement Selected Metrics

| Balance Sheet | FY 2025 Actuals in $(000s) |
|---|---|
| Cash and Cash Equivalents | $101,199 |
| Total Current Assets | $277,769 |
| Total Net Property and Equipment | $85,140 |
| Total Other Assets | $131,248 |
| Total Assets | $494,156 |
| Total Current Liabilities | $122,246 |
| Total Long Term Debt | $107,169 |
| Total Liabilities | $229,415 |

| Income Statement | FY 2025 Actuals in $(000s) |
|---|---|
| Net Revenue | $937,782 |
| Gross Profit | $378,311 |
| Operating Expenses | $38,365 |
| SG&A | $324,189 |
| Total OIBDA (incl. Indirects) | $15,757 |
| Operating Income | $(26,429) |
| Net income/(loss) | $(22,479) |

| Cash Flow | FY 2025 Actuals in $(000s) |
|---|---|
| Cash Flow from Operating Activities | $(11,506) |
| Cash Flow from Investing Activities | $(22,450) |
| Free Cash Flow | $(33,956) |





2

# CBI Income Statement Selected Metrics

| $ in 000s Total | Actuals 2022 | Actuals 2023 | Actuals 2024 | Actuals 2025 | Forecast 2026 |
|---|---|---|---|---|---|
| Net Revenue | $1,312,744 | $1,165,278 | $1,039,725 | $937,782 | $940,421 |
| Gross Profit | $463,280 | $447,968 | $421,080 | $378,311 | $387,895 |

| | FY 2025 Actuals in $(000s) |
|---|---|
| Marketing costs | $163,349 |
| Bad debt | $2,844 |
| Total Fixed | $157,996 |
| SG&A | $324,189 |



**CBI Demand Sales by Channel in 2025**

- Call Center: 10%
- Digital: 77%
- Stores: 13%





3

## CBI TTM (Dec. 2025) Merchandise Spend by Country

| Country | Vendor Spend (TTM Dec. 2025) in $(000s) |
|---|---|
| USA | $105,124 |
| CHINA | 53,447 |
| INDIA | 34,318 |
| INDONESIA | 23,766 |
| VIETNAM | 17,131 |
| TURKEY | 10,941 |
| TAIWAN | 8,755 |
| PORTUGAL | 6,300 |
| PHILIPPINES | 5,675 |
| PERU | 3,497 |
| Other | 11,470 |
| **Total** | **$280,424** |

## CBI Summary of 2025 Tariff Duties

| | Entered Value | Total Duty | Effective Duty Rate | % of Entries | Impacted Lines |
|---|---|---|---|---|---|
| Total | $195,435,825 | $37,542,854 | 19% | 100% | 54,257 |



4



CBI Funding Analysis Cleansing Materials – March 20, 2026

# CBI scenario overview



Scenario 1
- 2+10 outlook for FY26, plus contracted trade terms
- Assumes Supreme Court disallowance of the IEEPA fentanyl / reciprocal - related tariffs remains in place and no new tariffs
- CBI's primary credit card processor is in the process of holding $15M in funds. This scenario anticipates the return of this processor reserve over 15 weeks beginning in August 2026
- Trade terms assume to normalize in August 2026

Scenario 2 (same as Scenario 1 plus)
- No return of the processor reserve (per contractual terms, there is no set date the reserve needs to be returned)
- Trade terms assume to normalize over August 2026 through September 2026

Scenario 3 (same as Scenario 1 plus)
- 2+10 outlook for FY26 with impact of 3% revenue decline, offset by certain variable costs
- Tariff burden is consistent with the original FY26 budget (prior to the Supreme Court ruling on IEEPA tariffs) beginning July 2026

| | 2+10 outlook | Cash return of credit card processor reserve | Return of trade terms | No IEEPA fentanyl / reciprocal tariffs | 3% revenue degradation on 2+10 |
|---|---|---|---|---|---|
| Scenario 1 | ✓ | ✓ | ✓ | ✓ | |
| Scenario 2 | ✓ | | ✓ | ✓ | |
| Scenario 3 | ✓ | ✓ | ✓ | | ✓ |

5



CBI Funding Analysis Cleansing Materials – March 20, 2026

# In Scenario 1, cash is forecasted to increase from current levels by year-end

**Scenario comparison ($ in M)**



## Scenario bridge

| | Post-emergence | | |
|---|---|---|---|
| | Scenario 1 | Scenario 2 | Scenario 3[1] |
| Cash at 7/31 | $44M | $44M | $34M |
| Cash from operations | $27M | $27M | $10M |
| Processor reserve return[2] | $15M | — | $15M |
| Return of trade terms[2] | $8M | $8M | $8M |
| Cash at 12/31 | $94M | $79M | $67M |

## Notes

1. Scenario 3 contains the following:
   - 3% revenue decline offset by direct variable costs including product COGS, outbound freight, credit card fees and misc. other COGS
   - Tariff increase to amounts prior to the Supreme Court ruling

2. $7.9M of processor reserves was held in February, with an additional $6.6M expected to be held in March. There is also ~$8M total of trade contraction embedded in March and April. The Company has experienced recent tightening of trade terms with certain merchandise vendors.

3. CBI paid $37.5M total customs in FY25 on $195M of merchandise, representing an effective rate of 19%.

6



CBI Funding Analysis Cleansing Materials – March 20, 2026

# In Scenario 1, FY26 cash is neutral; In Scenario 3, CBI would burn $29M in FY26 driven by tariff escalation and rev. decline



## Scenario 1 ($ in M)

| ($ in 000s) | Dec-25 | Jan-26 | Feb-26 | Mar-26 (Filing ->) | Apr-26 | May-26 | Jun-26 | Jul-26 | Aug-26 (<- Exit) | Sep-26 | Oct-26 | Nov-26 | Dec-26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OIBDA per 10+2 budget, sensitized | | (9,844) | (3,296) | 2,877 | 1,491 | 9,670 | 4,881 | (2,105) | (1,524) | 10,677 | 1,709 | 12,212 | 1,251 |
| (-) Cash taxes | | | | - | (3,065) | - | - | - | - | - | - | - | (1,500) |
| (-) Capex | | | | (1,692) | (2,115) | (1,692) | (1,692) | (2,115) | (1,692) | (1,692) | (2,115) | (1,692) | (2,115) |
| Change in WC | | | | (9,825) | (5,917) | 5,338 | 1,982 | (9,175) | (3,271) | (1,235) | 8 | 16,190 | 11,049 |
| Total operating cash flow | | | | (8,641) | (9,607) | 13,316 | 5,171 | (13,395) | (6,487) | 7,749 | (399) | 26,710 | 8,685 |
| Payment processor holdback | | | | (6,600) | - | - | - | - | 4,281 | 4,143 | 4,281 | 1,795 | - |
| Professional fees | | | | (590) | (340) | (190) | (190) | (190) | - | - | - | - | - |
| Net Cash Flow | | | | (15,831) | (9,947) | 13,126 | 4,981 | (13,585) | (2,206) | 11,892 | 3,882 | 28,506 | 8,685 |
| Beginning Unrestricted Cash | | | | 66,518 | 50,437 | 40,240 | 53,116 | 57,847 | 44,012 | 41,556 | 53,198 | 56,830 | 85,086 |
| Net Cash Flow | | | | (15,831) | (9,947) | 13,126 | 4,981 | (13,585) | (2,206) | 11,892 | 3,882 | 28,506 | 8,685 |
| Net Intercompany | | | | (250) | (250) | (250) | (250) | (250) | (250) | (250) | (250) | (250) | (250) |
| Ending Cash | 95,408 | 75,929 | 66,518 | 50,437 | 40,240 | 53,116 | 57,847 | 44,012 | 41,556 | 53,198 | 56,830 | 85,086 | 93,520 |

## Scenario 3 ($ in M)

| ($ in 000s) | Dec-25 | Jan-26 | Feb-26 | Mar-26 (Filing ->) | Apr-26 | May-26 | Jun-26 | Jul-26 | Aug-26 (<- Exit) | Sep-26 | Oct-26 | Nov-26 | Dec-26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OIBDA per 10+2 budget, sensitized | | (9,844) | (3,296) | 2,790 | 1,446 | 9,380 | 4,735 | (2,042) | (1,478) | 10,357 | 1,658 | 11,846 | 1,214 |
| (-) Cash taxes | | | | - | (3,065) | - | - | - | - | - | - | - | (1,500) |
| (-) Capex | | | | (1,692) | (2,115) | (1,692) | (1,692) | (2,115) | (1,692) | (1,692) | (2,115) | (1,692) | (2,115) |
| Change in WC | | | | (12,032) | (8,096) | 1,142 | 1,067 | (9,449) | (8,766) | (5,490) | (2,239) | 14,000 | 9,586 |
| Total operating cash flow | | | | (10,934) | (11,830) | 8,830 | 4,109 | (13,606) | (11,936) | 3,174 | (2,697) | 24,154 | 7,185 |
| Payment processor holdback | | | | (6,600) | - | - | - | - | 4,281 | 4,143 | 4,281 | 1,795 | - |
| Professional fees | | | | (590) | (340) | (190) | (190) | (190) | - | - | - | - | - |
| Net Cash Flow | | | | (18,124) | (12,170) | 8,640 | 3,919 | (13,796) | (7,655) | 7,317 | 1,584 | 25,949 | 7,185 |
| Beginning Unrestricted Cash | | | | 66,518 | 48,144 | 35,724 | 44,113 | 47,783 | 33,736 | 25,831 | 32,899 | 34,233 | 59,932 |
| Net Cash Flow | | | | (18,124) | (12,170) | 8,640 | 3,919 | (13,796) | (7,655) | 7,317 | 1,584 | 25,949 | 7,185 |
| Net Intercompany | | | | (250) | (250) | (250) | (250) | (250) | (250) | (250) | (250) | (250) | (250) |
| Ending Cash | 95,408 | 75,929 | 66,518 | 48,144 | 35,724 | 44,113 | 47,783 | 33,736 | 25,831 | 32,899 | 34,233 | 59,932 | 66,867 |



7

CBI Separation Analysis Cleansing Materials – January 21, 2026

# FY26-FY29 CBI Pro-forma Business Plan

| CBI Pro-forma OIBDA | | | | | |
|---|---|---|---|---|---|
| in $000s | Note | 2026 | 2027 | 2028 | 2029 |
| Gross Profit (Baseline) | A | 387,895 | 397,257 | 412,162 | 434,696 |
| COGS Separation Adjustments | B | – | 3,802 | 8,428 | 9,341 |
| Pro-forma Gross Profit | C=A-B | **387,895** | **393,455** | **403,734** | **425,354** |
| Operating expense (Baseline) | D | 37,807 | 38,185 | 39,330 | 40,510 |
| SG&A (Baseline) | E | 319,805 | 325,787 | 337,537 | 351,880 |
| SG&A Separation Adjustments | F | 1,543 | 1,424 | 1,479 | 1,537 |
| Pro-forma SG&A | G=E+F | 321,348 | 327,212 | 339,016 | 353,417 |
| OIBDA (Baseline) | H=A-D-E | **30,283** | **33,285** | **35,295** | **42,305** |
| Total Pro-forma Separation Adjustments | I=B+F | 1,543 | 5,226 | 9,907 | 10,878 |
| **Pro-forma OIBDA** | J=H-I | **28,740** | **28,058** | **25,388** | **31,427** |

## General Assumptions

- Year-over-year cost escalation is aligned with the assumptions in the business plan

- TSA fees assumed to be the same costs as existing shared service allocation, so no incremental cost added

- No fees for the board of directors are assumed

- One-time costs are estimated at $607,000, which occur in 2026

### Notes:

B. The COGs related separation impact is largely driven by an assumed pricing impact on freight costs with CBI moving from the QVC enterprise pricing construct to that of a comparatively smaller standalone business at the existing contract's expiration in 2027

E. Baseline SG&A incorporates costs attributed to the Management Fee charged by QxH for various corporate services and support across different SG&A departments. The Management Fee would be eliminated in H2 2026 as new staff are retained and services are now contracted by CBI that were previously obtained through QxH

F. The impact of a separation on CBI's SG&A costs includes the addition of incremental staff and third- party service costs to replace functions currently provided by QxH, with a corresponding elimination of the Management Fee. Also assumed are increases in costs relative to current pricing of shared global services currently obtained through QVC.

1



QVC Funding Analysis Cleansing Materials – March 12, 2026

# QVC, Inc. four-month prepack scenario

## Key assumptions

- Assumes a four-month prepackaged case including all domestic entities
- Reflects Company term sheet dated March 1, 2026 – $750M RCF upon emergence (undrawn) at SOFR + [300bp - placeholder]; $1B Exit Secured Note at 7.0%
- Emergence cash includes: $350M QVC, Inc. plus $83M reserved for updated cash taxes (post-emergence cash tax estimates are still subjected to review and change pending ongoing PWC analysis; $83M excludes $62.5M of cash taxes owed in second half of 2026 payable in Sep and Dec)
- Assumes $100M cash collateralized LC facility that is used for (1) RCF LCs expiring between now and the assumed filing date (2) New LC needs between now and assumed filing date to support factors and vendors. Issuing bank requires $150M relationship deposit, with required balance reductions beginning after 6 months

| ($ in 000s) | Filing -> Mar-26 | Apr-26 | Chapter 11 May-26 | Jun-26 | Jul-26 | <- Exit Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 |
|---|---|---|---|---|---|---|---|---|---|---|
| OIBDA per FY26 Budget | 29,872 | 33,508 | 40,252 | 40,098 | 22,040 | 34,164 | 43,535 | 34,730 | 24,122 | 34,807 |
| | | | | | | | | | | |
| Cash flow items | (20,748) | (32,300) | (14,488) | (23,368) | (17,511) | (7,251) | (80,323) | (7,721) | (9,006) | (44,043) |
| Net change in WC | 67,228 | 249,012 | 89,630 | (16,470) | 8,485 | 39,485 | (13,971) | 8,108 | 52,985 | (51,862) |
| Prepetition-related operating disb. | – | (195,546) | (60,139) | – | (170,367) | – | – | – | – | – |
| Total operating cash flow | 76,352 | 54,673 | 55,255 | 260 | (157,353) | 66,398 | (50,759) | 35,118 | 68,101 | (61,098) |
| | | | | | | | | | | |
| One-time items | (365,872) | (2,500) | (4,502) | (6,188) | (491,904) | – | (645) | – | – | (645) |
| Net Cash Flow | (289,520) | 52,173 | 50,753 | (5,928) | (649,256) | 66,398 | (51,405) | 35,118 | 68,101 | (61,744) |
| | | | | | | | | | | |
| Beginning Unrestricted Cash | 974,543 | 646,444 | 699,867 | 751,870 | 747,192 | 258,000 | 320,872 | 265,048 | 279,372 | 343,935 |
| Net Cash Flow | (289,520) | 52,173 | 50,753 | (5,928) | (649,256) | 66,398 | (51,405) | 35,118 | 68,101 | (61,744) |
| Net Intercompany | (3,750) | 1,250 | 1,250 | 1,250 | 160,064 | (3,250) | (3,250) | (3,250) | (3,250) | 99,683 |
| Remaining Debt Service | (34,830) | – | – | – | – | (275) | (1,169) | (17,544) | (288) | (288) |
| QxH, ending cash | 646,444 | 699,867 | 751,870 | 747,192 | 258,000 | 320,872 | 265,048 | 279,372 | 343,935 | 381,586 |
| QI cash, ending cash | 352,706 | 353,016 | 356,773 | 343,393 | 175,000 | 163,165 | 158,023 | 170,410 | 201,841 | 175,000 |
| QVC, Inc., ending cash | 999,150 | 1,052,883 | 1,108,643 | 1,090,585 | 433,000 | 484,037 | 423,071 | 449,782 | 545,776 | 556,586 |
| | | | | | | | | | | |
| Beginning restricted cash | 88,625 | 339,364 | 339,364 | 339,364 | 339,364 | 339,364 | 339,364 | 289,364 | 289,364 | 289,364 |
| LC cash collateralization | 100,739 | – | – | – | – | – | – | – | – | – |
| Cash collateralization bank deposit | 150,000 | – | – | – | – | – | (50,000) | – | – | (50,000) |
| Ending restricted cash | 339,364 | 339,364 | 339,364 | 339,364 | 339,364 | 339,364 | 289,364 | 289,364 | 289,364 | 239,364 |

Notes:
- Total outstanding LCs as of 3/31/26 filing are [$289M]
- No assumption of any refunds with respect to recent tariff payments. Company has paid ~$123M in customs from January 2025 to February 2026, where the company was the importer of record
- Prior to potential distributions, QxH and QI, LINTA and QVCG cash on hand at emergence is projected to be $878M, $63M, and $209M, respectively
- As of year-end 2025, QxH had $752.9M and $621.9M of net A/R and inventory, respectively
- In January 2026, aggregate QxH, QVC Japan, Germany and UK sale collections totaled $648M

1



PROPOSED CLEANSING MATERIALS

# LINTA Note/Exchangeable Diligence

November 26, 2025

---

THESE MATERIALS ARE BEING TRANSMITTED PURUSANT TO APPLICABLE NDAS AS PROPOSED CLEANSING MATERIALS. UNTIL THESE MATERIALS ARE DISCLOSED PURSUANT TO SUCH NDAS, THESE MATERIALS CONSTITUTE CONFIDENTIAL INFORMATION.

THE DISINTERESTED DIRECTORS AND MANAGERS OF EACH OF QVC GROUP, INC., QVC, INC., LIBERTY INTERACTIVE LLC, AND QRI CORNERSTONE, INC., IN CONSULTATION WITH THEIR INDEPENDENT ADVISORS, ARE SEPARATELY REVIEWING THE FACTS UNDERLYING THESE MATERIALS AND WILL EACH REPRESENT THEIR RESPECTIVE COMPANY ENTITY IN ANY NEGOTIATIONS REGARDING ANY ACTUAL CONFLICTS MATTERS. THE DISINTERESTED DIRECTORS AND MANAGERS OF EACH OF THE ENTITES RESERVE ALL RIGHTS IN CONNECTION WITH THE TREATMENT OF ANY INTERCOMPANY CLAIMS AS WELL AS WHICH ESTATES MAY BE LIABLE FOR AND/OR COMPROMISE SUCH CLAIMS.

TAX MODELING AND ANALYSIS REMAIN ONGOING. THIS ANALYSIS REMAINS SUBJECT TO REVISION IN ALL RESPECTS TO ACCOUNT FOR THE ULTIMATE RESULTS OF SUCH TAX ANALYSIS.

---

© 2025 Kirkland & Ellis LLP. All rights reserved.

ATTORNEY WORK PRODUCT

PRIVILEGED AND CONFIDENTIAL

## Cash Tax Exposure on Exchangeable Notes

The Company is currently of the view that the discharge of the Exchangeable Notes pursuant to a Title 11 case is not expected to give rise to a cash tax liability. However, if it were ultimately determined that a cash tax liability were to be incurred in connection with the discharge of the Exchangeable Notes pursuant to such a Title 11 case, such cash tax liability (calculated as of [9/30/25]) is estimated to be approximately $1 billion. This estimate of such cash tax liability (i) is based on certain assumptions regarding the number of outstanding bonds and other items as of such date, (ii) takes into account the availability of certain interest deduction carryforwards, and (iii) is calculated without respect to any penalties, interest, or other additions to tax.

## Tax Assets

The Company does not have material U.S. federal income tax attributes other than a carryforward of excess interest expense under Section 163(j) of the Code which is estimated to be $1,081,258,461 as of 9/30/2025.



QVC GROUP, INC.
QVC
LEGAL ORGANIZATION CHART

11/25/2025

Note: This depiction is of a simplified structure and is intended to be illustrative and is for discussion purposes only.

PAGE 1

CORPORATIONS THAT ARE INCLUDED IN THE US CONSOLIDATED GROUP TAX RETURN  11/25/2025

| | |
|---|---|
| QVC GROUP, INC. | QVC, INC. |
| QURATE RETAIL GROUP, INC. | DMS DE, INC. |
| LIBERTY ALTERNATIVE ENERGY, LLC. | NSTBC INC. |
| LIBERTY CLEAN FUELS, INC. | DIAMONIQUE CANADA HOLDINGS, INC. |
| LIBERTY CLEAN FUELS 2, LLC. | ER DEVELOPMENT INTERNATIONAL, INC. |
| LIBERTY SOLAR ENERGY, LLC. | INNOVATIVE RETAILING, INC. |
| QURATE DJCF INVESTOR, LLC. | QHEALTH, INC. |
| QURATE HCF INVESTOR, LLC. | QLOCAL, INC. |
| QURATE MCCF INVESTOR, LLC. | QVC GLOBAL DDGS, INC. |
| QURATE TCF INVESTOR, LLC. | QVC INDIA, LTD. |
| QRI CORNERSTONE, INC. | QVC HK HOLDINGS, LLC. |
| CORNERSTONE BRANDS, INC. | QVC ROCKY MOUNT, INC. |
| HSN CATALOG SERVICES, INC. | QVC SHOP INTERNATIONAL, INC. |
| THE CORNERSTONE BRANDS GROUP, INC. | QVC ST. LUCIE, INC. |
| BALLARD DESIGNS, INC. | QVC GLOBAL HOLDINGS I, INC. |
| GARNET HILL, INC. | AFFILIATE INVESTMENT, INC. |
| THE CORNERSTONE HOLDINGS GROUP, INC. | AFFILIATE RELATIONS HOLDINGS, INC. |
| CONTRACT DÉCOR, INC. | AFFILIATE DISTRIBUTION & MKTG INC. |
| FRONTGATE MARKETING, INC. | AMI 2, INC. |
| HSN, INC. | ER MARKS, INC. |
| HSN HOLDING, LLC. | GC MARKS, INC. |
| NLG MERGER CORP. | IC MARKS, INC. |
| VENTANA TELEVISION HOLDINGS, INC. | QC MARKS, INC. |
| VENTANA TELEVISION, INC. | QVC CHINA, INC. |
| QVC DELAWARE HOLDINGS, INC. | QVC VENDOR DEVELOPMENT, INC. |

# Distributable cash summary assuming 4/15 filing and 8/31 emergence

Scenario A: 4.7% of professional fees allocated to LINTA
Scenario B: 12.5% of professional fees allocated to LINTA[3]

| Scenario B | Sources | Uses | Note |
|---|---|---|---|
| QxH and QI cash on hand at emergence | $ 1,135,953,955 | $ - | 1 |
| LINTA cash on hand at emergence | 54,462,871 | - | |
| QVCG cash on hand at emergence | 201,388,865 | - | |
| QxH cash reserved for updated cash taxes | - | 68,000,000 | 2 |
| QxH and QI cash to the balance sheet | - | 350,000,000 | 4 |
| Distribution to LINTA bondholders | - | 36,290,696 | |
| Distribution to RCF holders and senior secured noteholders | - | 937,514,995 | 3 |
| **Total sources and uses at emergence** | **$ 1,391,805,691** | **$ 1,391,805,691** | |

Notes:

1. Assumes cash collateral posted ($30.75M) is returned at emergence for distribution. Distribution subject to timing with respect to cash collateralization of DIP LCs, analysis assumes any cash posted for DIP LCs is returned to the Company and included in the distribution above. Furthermore, if there are delays to release of cash supporting LCs, it may disrupt the timing of distribution.
2. $68M is an approximate figure for tax related to restructuring to be reserved
3. Scenario A and B are consistent with the Disinterested Director Settlement Framework Proposal. This distributable cash analysis assumes for illustrative purposes only the application of Scenario B. Scenario A would reduce the distribution payment at emergence to RCF holders and senior secured noteholders by ~$16M
4. Scenario B assumes total ~$173M professional fees prepetition through the postpetition period to emergence
5. For avoidance of doubt, $350M includes all global cash excluding CBI and does not include restricted cash
6. Cash as of 4/3 is $1,029M at QxH, $335M at QI, $76M at CBI, $88M at LINTA and $203M at QVCG



1

# EXHIBIT 4

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| QVC GROUP, INC., *et al.*,[1] | Case No. 26-90447 (ARP) |
| Debtors. | (Jointly Administered) |

**ORDER GRANTING PREFERRED SHAREHOLDERS' EMERGENCY
MOTION FOR STAY PENDING APPEAL OF CONFIRMATION ORDER
UNDER BANKRUPTCY RULE 8007(A), OR, IN THE ALTERNATIVE,
FOR LIMITED STAY AND INTERIM STAY PENDING HEARING**

Upon the emergency motion (the "Motion")[2] of Preferred Shareholders (the "Preferred

Shareholders")[3] of QVC Group, Inc. ("QVCG" and, together with its subsidiaries and affiliates in

the above-captioned Chapter 11 Cases, the "Debtors"), for entry of an order staying, pending

appeal, the Court's forthcoming order (the "Confirmation Order") confirming the Debtors' *Second

Amended Joint Prepackaged Plan of Reorganization* [Dkt. No. 389] (the "Plan"), under Rule 8007

of the Federal Rules of Bankruptcy Procedure; and the Court having found that the Court may

enter a final order with respect to the Motion consistent with Article III of the United States

Constitution; and the Court having found that venue of the Motion in this district is proper pursuant

to 28 U.S.C. §§ 1408 and 1409; and it appearing that proper and adequate notice of the Motion has

been given and that no other or further notice is necessary; and upon the record herein; and after

---

[1] A complete list of each of the Debtors in these Chapter 11 cases (the "Chapter 11 Cases") may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/QVC. The location of Debtor QVC Group, Inc.'s corporate headquarters and the Debtors' service address in these Chapter 11 Cases is 1200 Wilson Drive, West Chester, Pennsylvania 19380.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

[3] The Preferred Shareholders are certain institutional and individual holders of the 8.000% Series A Cumulative Redeemable Preferred Stock issued by QVCG as identified in the Notice of Appeal filed concurrently herewith.

due deliberation thereon; and the Court having determined that there is good and sufficient cause for the relief granted in this order, it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is GRANTED to the extent set forth herein.

2.      All provisions of the Confirmation Order are hereby stayed pending appeal and the Debtors are prohibited from causing the Effective Date to occur while any stay remains in effect.

3.      Alternatively, the QVCG-specific provisions of the Plan are hereby stayed, including implementation of the Intercompany Settlement, transfer or distribution of QVCG distributable cash, transfer of QVCG's 62% Cornerstone interest, cancellation of Preferred Stock, and enforcement of releases against the Preferred Shareholders.

4.      An immediate interim stay is hereby granted pending the Fifth Circuit's consideration of direct appeal authorization and any further stay relief.

5.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

6.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated: _____, 2026

_____
ALFREDO R. PEREZ
UNITED STATES BANKRUPTCY JUDGE

2

# Exhibit F

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| QVC GROUP, INC., *et al.*,[1] | ) | Case No. 26-90447 (ARP) |
|  | ) |  |
|  | ) | (Jointly Administered) |
| Debtors. | ) |  |
|  | ) |  |

**DEBTORS' OBJECTION TO PREFERRED SHAREHOLDERS' EMERGENCY
MOTION FOR STAY PENDING APPEAL [DOCKET NO. 716]**

---

[1]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/QVC. The location of Debtor QVC Group, Inc.'s corporate headquarters and the Debtors' service address in these chapter 11 cases is 1200 Wilson Drive, West Chester, Pennsylvania 19380.

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................i

TABLE OF AUTHORITIES ...........................................................................................ii

PRELIMINARY STATEMENT ..................................................................................... 1

BACKGROUND ............................................................................................................. 4

      A.     QVC Group's Story. ............................................................................ 4

      B.     QVC Group's Chapter 11 Cases. ...................................................... 5

      C.     The Intercompany Settlement. .......................................................... 7

      D.     The Chapter 11 Plan........................................................................... 8

      E.     Cornerstone's Dependence on QVC.................................................. 9

      F.     Confirmation and This Court's Findings. ......................................... 11

      G.     The Preferred Shareholders' Appeal and Stay Motion. .................... 11

      H.     Time Is of the Essence. ....................................................................... 12

ARGUMENT ................................................................................................................. 13

I.     The Stay Factors Weigh Heavily Against A Stay Pending Appeal. ......................... 13

      A.     The Preferred Shareholders have not Shown a Likelihood of Success on Appeal. .................................................................................... 14

      B.     The Preferred Shareholders Have Not Shown They Will Suffer Irreparable Harm. ....................................................................................... 29

      C.     A Stay Would Substantially and Irreparably Harm the Debtors, Their Creditors, Other Stakeholders, and Numerous Other Parties. .............. 31

      D.     The Public Interest Disfavors a Stay.................................................. 37

II.    At A Minimum, A Stay Pending Appeal Should Require The Preferred Shareholders To Post A $900 Million Bond. ................................................... 38

CONCLUSION ............................................................................................................. 43

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for Hippocratic Med. v. F.D.A.*,
No. 23-10362, 2023 WL 2913725 (5th Cir. Apr. 12, 2023) .......................................................31

*Azby Fund v. Wadsworth Ests., LLC*,
No. 22-30092, 2022 WL 17582273 (5th Cir. Dec. 12, 2022) ...................................................25

*Bank of America, N.A. v. Mega World Builder Corp.*,
No. 4:24-cv-3021, 2025 WL 1485868 (S.D. Tex. Jan. 8, 2025) ..............................................36

*Cook v. Waldron*,
No. H-05-3438, 2006 WL 1007489 (S.D. Tex. Apr. 18, 2006) ................................................23

*F.D.I.C. v. Belcher*,
No. 19-12561, 2020 WL 242781 (E.D. La. Jan. 16, 2020) .......................................................36

*Hilton v. Braunskill*,
481 U.S. 770 (1987) ..................................................................................................................14

*In re 1300 Desert Willow Rd., LLC*,
677 B.R. 176 (Bankr. S.D.N.Y. 2026) .....................................................................................15

*In re Adelphia Commc'ns Corp.*,
361 B.R. 337 (S.D.N.Y. 2007) ...................................................................................4, 38, 39, 41

*In re Allied Props., LLC*,
No. 06-33754, 2007 WL 1849017 (Bankr. S.D. Tex. June 25, 2007) .....................................22

*In re American Solar King Corp.*,
90 B.R. 808 (Bankr. W.D. Tex. 1988) ......................................................................................16

*In re Babcock & Wilcox*,
No. CIV.A.00-1410, 2000 WL 1092434 (E.D. La. Aug. 2, 2000) ..........................................37

*In re Boca Del Rio Props., Inc.*,
No. H-0602439, 2006 WL 2459445 (S.D. Tex. Aug. 23, 2006) ..............................................36

*In re Boy Scouts of Am. & Delaware BSA, LLC*,
642 B.R. 504 (Bankr. D. Del. 2022) .........................................................................................19

*In re Boy Scouts of Am.*,
137 F.4th 126 (3d Cir. 2025) .....................................................................................................19

*In re Cajun Elec. Power Co-op., Inc.*,
119 F.3d 349 (5th Cir. 1997) ...................................................................................18, 22, 26

*In re Calpine Corp.*,
No. 05-60200 (BRL), 2008 WL 207841 (Bankr. S.D.N.Y. Jan. 24, 2008) ...................4, 37, 39

*In re Camp Arrowhead*,
No. SA-10-CV-11-XR, 2010 WL 363773 (W.D. Tex. Jan. 22, 2010) ....................................30

*In re Charter Commc'ns*,
419 B.R. 221 (Bankr. S.D.N.Y. 2009) ................................................................................19

*In re Container Store Grp., Inc.*,
676 B.R. 356 (S.D. Tex. 2026) ....................................................................................15, 16

*In re Container Store Grp., Inc.*,
No. 24-90627, 2025 WL 4226766 (Bankr. S.D. Tex. Apr. 7, 2025) ...........................29, 30, 31

*In re Coram Healthcare Corp.*,
271 B.R. 228 (Bankr. D. Del. 2001) ...................................................................................28

*In re Dewey & LeBoeuf LLP*,
478 B.R. 627 (Bankr. S.D.N.Y. 2012) ................................................................................19

*In re Emerald Oil Co.*,
807 F.2d 1234 (5th Cir. 1987) ...........................................................................................23

*In re Foster Mortgage Corp.*,
68 F.3d 914 (5th Cir. 1995) ..................................................................................18, 21, 27

*In re Gen. Motors Corp.*,
409 B.R. 24 (Bankr. S.D.N.Y. 2009) ...............................................................................4, 39

*In re Gleasman*,
111 B.R. 595 (Bankr. W.D. Tex. 1990) ...............................................................................39

*In re Hanish, LLC*,
570 B.R. 4 (Bankr. D.N.H. 2017) ......................................................................................15

*In re Highland Capital Mgmt., L.P.*,
132 F.4th 353 (5th Cir. 2025) .......................................................................................31, 32

*In re Houston Reg'l Sports Network, L.P.*,
886 F.3d 523 (5th Cir. 2018) .......................................................................................31, 32

*In re Jackson Brewing Co.*,
624 F.2d 599 (5th Cir. 1980) ....................................................................................18, 22, 24

*In re K Lunde, LLC*,
513 B.R. 587 (Bankr. D. Colo. 2014) ................................................................................16

*In re LATAM Airlines Grp. S.A.*,
No. 20-11254 (JLG), 2022 WL 272167 (Bankr. S.D.N.Y. Jan. 28, 2022) ...........................19

*In re Motors Liquidation Co.*,
539 B.R. 676 (Bankr. S.D.N.Y. 2015) ................................................................................40

*In re Nat'l CineMedia, LLC*,
No. 4:23-CV-02414, 2023 WL 5030098 (S.D. Tex. Aug. 4, 2023) ......................................29

*In re North American Specialty Insurance Co.*,
No. 4:21-cv-02201 (S.D. Tex.) ...................................................................................31, 32

*In re Permian Producers Drilling, Inc.*,
263 B.R. 510 (W.D. Tex. 2000)..........................................................................................19

*In re Perry*,
No. CV 23-5265, 2024 WL 68257 (E.D. La. Jan. 5, 2024) .................................................40

*In re Quintela Grp., LLC*,
No. 4:20-cv-03499 (S.D. Tex.) ....................................................................................31, 32

*In re Raborn*,
No. 15-10938, 2017 WL 4536090 (Bankr. M.D. La. 2017) .................................................37

*In re RNI Wind Down Corp.*,
348 B.R. 286 (Bankr. D. Del. 2006) ...................................................................................27

*In re Serta Simmons Bedding, LLC*,
125 F.4th 555 (5th Cir. 2024) ......................................................................................31, 32

*In re Serta Simmons Bedding LLC*,
No. 23-90020, 2023 WL 4275019 (S.D. Tex. June 29, 2023)..............................................31

*In re Smith*,
397 B.R. 134 (Bankr. D. Nev. 2008) ..................................................................................37

*In re Spirit Airlines, Inc.*,
668 B.R. 689 (Bankr. S.D.N.Y. 2025).........................................................................15, 16

*In re Stewart*,
604 B.R. 900 (Bankr. W.D. Okla. 2019) .............................................................................37

*In re Texaco Inc.*,
84 B.R. 893 (Bankr. S.D.N.Y. 1988)...................................................................................17

*In re Texas Equip. Co.*,
283 B.R. 222 (Bankr. N.D. Tex. 2002) ................................................................3, 38

*In re Theatre Holding Corp.*,
22 B.R. 884 (Bankr. S.D.N.Y. 1982) ........................................................................38

*In re Tribune Co.*,
477 B.R. 465 (Bankr. D. Del. 2012) ..................................................................39, 41

*In re Tribune Media Co.*,
799 F.3d 272 (3d Cir. 2015)................................................................................38, 39

*In re Ultra Petroleum Corp.*,
943 F.3d 758 (5th Cir. 2019) ....................................................................................16

*In re Ultra Petroleum Corp.*,
No. 20-32631 (Bankr. S.D. Tex.)...............................................................................32

*In re Village at Camp Bowie I, L.P.*,
710 F.3d 239 (5th Cir. 2013) ....................................................................................16

*In re Village at Camp Bowie I, L.P.*,
No. 10-45097 (DML), 2012 WL 79091 (Bankr. N.D. Tex. Jan. 11, 2012)..............30

*Nken v. Holder*,
556 U.S. 418 (2009)............................................................................................35, 37

*Patino v. City of Pasadena*,
229 F. Supp. 3d 582 (S.D. Tex. 2017) ......................................................................36

*Plaquemines Parish v. Chevron USA, Inc.*,
84 F.4th 362 (5th Cir. 2023) .....................................................................................35

*Poplar Grove Planting & Refin. Co. v. Bache Halsey Stuart Inc.*,
600 F.2d 1189 (5th Cir. 1979) ....................................................................................3

*Preston Wood & Assocs., LLC v. Cameron Architects, Inc.*,
No. H-16-1427, 2019 WL 2904297 (S.D. Tex. Apr. 26, 2019)................................40

*Rhoten v. Stromen*,
No. 1:16-CV-00648, 2020 WL 3545661 (W.D. Tex. June 30, 2020) ......................36

*Ruff v. Ruff*,
No. 4:22-CV-00321, 2023 WL 2574021 (E.D. Tex. Mar. 20, 2023) .......................39

*Ruiz v. Estelle*,
650 F.2d 555 (5th Cir. 1981) ....................................................................................36

*Schaeffler v. United States*,
   889 F.3d 238 (5th Cir. 2018) .................................................................................17

*Texas v. United States*,
   40 F.4th 205 (5th Cir. 2022) .................................................................................13

*Thomas v. Bryant*,
   919 F.3d 298 (5th Cir. 2019) .................................................................................14

*Trend Intermodal Chassis Leasing LLC v. Zariz Transp. Inc.*,
   711 F. Supp. 3d 627 (N.D. Tex. 2024) ..................................................................14

*Trend Intermodal Chassis Leasing, LLC v. Zariz Transp. Inc.*,
   No. 24-10105, 2024 WL 3423217 (5th Cir. July 16, 2024) ...................................14

*United States v. Texas*,
   97 F.4th 268 (5th Cir. 2024) .................................................................................13

*Vine v. PLS Fin. Servs., Inc.*,
   No. 4:18-CV-00450, 2019 WL 4257108 (E.D. Tex. Sept. 9, 2019) ......................14

*Weinberger v. UOP, Inc.*,
   457 A.2d 701 (Del. 1983) .................................................................................18, 19

*Yucaipa Corp. Initiatives Fund, ILP v. Piccadilly Rests., LLC*,
   No. 14-0609, 2014 WL 1871889 (W.D. La. May 6, 2014) ...............................29, 37

*Zehr v. Osherow*,
   No. 5:18-CV-355-DAE, 2019 WL 266973 (W.D. Tex. Jan. 17, 2019) ..................14

**Statutes**

11 U.S.C. § 1123 ...............................................................................1, 15, 16, 17

11 U.S.C. § 1124 ...............................................................................1, 15, 16, 17

11 U.S.C. § 1129 .............................................................................12, 15, 16, 17

28 U.S.C. § 158 ..............................................................................................11

**Rules**

Fed. R. Bankr. P. 8007(c) ........................................................................1, 3, 38

Fed R. Bankr. P. 9019 ............................................................................... *passim*

Fed. R. Civ. P. 62(d) ......................................................................................40

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this objection (the "Objection") to the *Preferred Shareholders' Emergency Motion for Stay Pending Appeal of Confirmation Order Under Bankruptcy Rule 8007(A), or, in the Alternative, For Limited Stay and Interim Stay Pending Hearing* [Docket No. 716] (the "Motion").

**PRELIMINARY STATEMENT**

1.      There is no basis for a stay pending appeal. Granting the requested relief would do nothing more than allow a handful of hedge funds to run out the last legs of their option play at the expense of the Debtors' creditors. The Court should deny the Motion.

2.      The Preferred Shareholders satisfy none of the factors necessary to carry their heavy burden and secure the extraordinary relief they seek.

3.      *First*, rather than argue that they will likely succeed on appeal, the Preferred Shareholders target a narrow exception—which asks whether their appeal poses a substantial question—that is available only when the remaining factors tilt *heavily* in favor of a stay. But none of the factors support the Preferred Shareholders, so the alternative framework they invoke is off limits. For that reason alone, the Preferred Shareholders lose on the first factor.

4.      At any rate, the Preferred Shareholders could not surpass the substantial-question threshold even were it available to them. They posit three questions, none of which cast any doubt on this Court's approval of the Intercompany Settlement or confirmation of the Plan. The Preferred Shareholders begin by asking whether a creditor's claim is unimpaired under section 1124 if the creditor, pursuant to section 1123(a)(4), accepts less than the full value to which it would otherwise be entitled. Section 1124's text, which excludes from the definition of impairment the situations outlined in section 1123(a)(4), unambiguously answers the question: Yes. The Preferred Shareholders also ask whether Bankruptcy Rule 9019's standard for the review and approval of

settlements should sometimes use an "entire fairness" test, which originates from Delaware corporate law, not federal bankruptcy law. Court after court to consider the question has reached the same conclusion: No, the issues under Rule 9019 are different than the merger-related issues that gave rise to the "entire fairness" test. And the Fifth Circuit's standard, which this Court applied factor for factor, has been settled for over 30 years. Finally, the Preferred Shareholders ask whether the Court applied the Rule 9019 factors correctly. The Preferred Shareholders accuse the Court of casting aside its responsibilities in deference to the Disinterested Directors' business judgment, but even a passing glance at the Court's 103-page Memorandum Decision belies their contention. When deploying the wide discretion it holds to approve or reject settlements, the Court must be informed of all relevant facts and information so that it can make an independent judgment as to whether a proposed settlement is fair and reasonable under the circumstances. The four-day evidentiary hearing, testimony of eight witnesses, and hundreds of exhibits informed the Court of everything it needed to know to make that assessment. That the Court ultimately reached the same conclusion as the Debtors does not mean that it abdicated its duties in deference to them.

5. *Second*, the Preferred Shareholders have not established that without a stay, they will suffer irreparable harm. They argue that if the Confirmation Order goes into effect and the Debtors consummate the Plan, their appeal will become equitably moot. But that is not enough. As courts throughout the Fifth Circuit have recognized, the possible application of the equitable-mootness doctrine does *not* demonstrate irreparable injury.

6. *Third*, a stay would be devastating for the Debtors, their creditors, other stakeholders, and numerous other parties. In the three months leading up to their chapter 11 filings and the three months they have been in bankruptcy, the Debtors experienced substantial business turmoil and double-digit declines in topline revenue. Remaining stranded in bankruptcy for the

2

two years (or more) that it would take the appellate process to play out would compound those problems, deprive the Debtors of crucial opportunities to grow their business, and jeopardize the ability of Cornerstone Brands, Inc. ("Cornerstone," as defined in the Plan) to continue operating as a going concern. A stay would also hold up hundreds of millions of dollars in distributions to creditors who will have already waited nearly two months beyond the approved schedule to be paid, forcing them to bear meaningful lost opportunity costs on funds they could otherwise put to work. And every additional month in chapter 11 would fuel a mounting professional-fee burn (already tens of millions of dollars) that steadily erodes estate value with no offsetting benefit. Keyes Decl. ¶ 10.

7. *Fourth*, the public interest disfavors a stay. In a bankruptcy case, the public interest lies in promoting a successful reorganization, which the Debtors are on the cusp of achieving. Implementation of the Plan will allow Reorganized QVC, Inc. ("Reorganized QVC," as defined in the Plan) to emerge better positioned for long-term growth, which will benefit not only the company but also its employees, vendors, and commercial counterparties.

8. All four factors strongly disfavor a stay, but if the Court were nevertheless to consider granting one, then it must be conditioned on the Preferred Shareholders posting a substantial bond to cover the extensive harm that the Debtors, their estates, and various stakeholders would suffer. Under Rule 8007(c), courts commonly require the posting of a bond "to preserve the status quo while protecting the non-appealing party's rights pending appeal." *In re Texas Equip. Co.,* 283 B.R. 222, 229 (Bankr. N.D. Tex. 2002) (citing *Poplar Grove Planting & Refin. Co. v. Bache Halsey Stuart Inc.*, 600 F.2d 1189, 1190–91 (5th Cir. 1979)). And in recognition of the magnitude of the potential loss to debtors from staying the completion of a plan confirmation process, courts have generally held that, to obtain such a stay, movants must post

3

bonds for many hundreds of millions or billions of dollars.  *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 368 (S.D.N.Y. 2007) (imposing bond of $1.3 billion on basis that this security was "near the full amount of the potential harm to the non-moving parties"); *cf. In re Gen. Motors Corp.*, 409 B.R. 24, 34 (Bankr. S.D.N.Y. 2009) (denying stay but noting "a bond would have to be posted in an amount no less than $7.4 billion" given the magnitude of harms faced by non-movants); *In re Calpine Corp.*, No. 05-60200 (BRL), 2008 WL 207841, at *7 (Bankr. S.D.N.Y. Jan. 24, 2008) (denying stay but noting in dicta that "no stay would be issued without the posting of a bond to cover the enormous risk of loss to the Debtors, their estates, creditors and interest holders in the range of $900 million to $1 billion").  Any stay here would warrant a similarly significant bond.  As the Debtors will establish at tomorrow's hearing, the proper bond amount would be no less than $900 million.

## BACKGROUND

### A.      QVC Group's Story.

9.       QVC Group, Inc. ("QVC Group" or "QVCG," as defined in the Plan) is a global, multi-platform retailer whose value lies in the scale and continuity of its operating business.  Its roots trace back as far as HSN's initial radio broadcast in 1977.  QVC Group was broadcasting nationally on cable and local television stations 24/7 by 1985 and broke the record for how fast a new American public company could reach $100 million in sales in 1988.  Today, it has grown into what this Court described as "one of the world's largest multimedia retailers," distributing curated, video-rich shopping experiences to over 200 million households each day across 15 television channels, while also reaching customers through e-commerce sites, streaming services, social platforms, and mobile applications.  ECF No. 4 at 7–10, 14–15; ECF No. 710 at 2–3.

10.      The business now operates through three principal engines:  QxH, QVC International, and Cornerstone.  QxH, the combined U.S. QVC and HSN business, reaches

approximately 88 million homes through five television channels, provides live programming 20 hours per day, 364 days per year, and has become increasingly digital, with approximately 89% of new QxH customers in 2024 making their first purchase through digital platforms. ECF No. 4 at 14–16. For the year ending December 31, 2025, QxH contributed $5.9 billion, or 64%, of consolidated net revenue and $529 million of Adjusted OIBDA. *Id.* at 16–17. QVC International reaches approximately 124 million homes through ten television networks and reaches millions more through websites, mobile apps, smart TV apps, and social pages; in 2025, it generated $2.4 billion, or 26%, of consolidated net revenue and $292 million of Adjusted OIBDA, and its international businesses were generally net cash-flow positive as a whole. *Id.* at 17–18. Cornerstone comprises four brands dedicated to apparel and home lifestyle items including Frontgate, Ballard Designs, Garnet Hill, and Grandin Road and generates approximately 10 percent of QVC Group's net revenue. *Id.* at ¶ 31.

11. That platform depends on thousands of employees and significant infrastructure. QVC Group employs approximately 15,800 people, including roughly 8,341 employees at QxH, 5,952 employees at QVC International, and 1,527 employees at Cornerstone. *Id.* at 19. QVC, Inc. ("QVC," as defined in the Plan) operates nine distribution centers and four contact centers worldwide, while Cornerstone operates 35 retail locations and four fulfillment centers. *Id.*

12. In other words, the value at stake is not abstract. It is the going-concern value of an operating enterprise—value that this Court found the Debtors' reorganization would preserve while maximizing asset value for creditors and safeguarding thousands of jobs and vendor relationships. *Id.* at 34; ECF No. 710 at 83–84.

**B.     QVC Group's Chapter 11 Cases.**

13. By the eve of these cases, the Debtors were in genuine financial distress, a fact this Court found "cannot be ignored." ECF No. 710 at 6. In recent years, the Debtors faced a

confluence of headwinds: accelerating "cord cutting," record inflation, supply-chain disruption, elevated labor costs, tariff uncertainty, and a December 2021 fire at the Rocky Mount distribution center that cost the Debtors more than one million customers and over $500 million in revenue. *Id.* at 5–6. Those pressures weighed on a complex, four-part intercompany capital structure carrying more than $6 billion in funded debt and equity obligations, including approximately $4.97 billion in notes and revolving credit facility obligations at QVC alone. ECF No. 4 at 4, 33–34.

14. Before filing, the Debtors pursued years of liability management and operational initiatives to buy time for a digital transformation, including the 2020 Restructuring, the 2022 Cash Management Plan, the 2024 Capital Contribution and Exchange, Project Athens, and the ongoing WIN Strategy. *Id.* at 22–28; ECF No. 710 at 6–7. Those initiatives were effective but not a panacea. Project Athens alone delivered more than $500 million of annual adjusted OIBDA impact, but QVC Group's debt burden, built on declining linear TV cash flows, impaired its ability to invest at the level necessary to complete the transition to the digital and live social shopping age. ECF No. 4 at 3, 26–27.

15. That is why the Debtors focused on a restructuring with "high levels of support and execution certainty" and "low impact on business and operations." *Id.* at 3–4. They and their advisors spent nearly eight months negotiating with their major creditor constituencies beginning in October 2025, producing over 22,000 pages of diligence, together with extensive financial modeling. *Id.* at 33–34. Management engaged directly with key stakeholders throughout the process. *Id.*

16. Those efforts produced the Restructuring Support Agreement, executed on April 16, 2026, and these chapter 11 cases, which the Debtors commenced on April 16, 2026. ECF No.

710 at 9.  Speed was central from the start:  as the First Day Declaration explained, the RSA contemplated that QVC Group would "move efficiently through chapter 11 and emerge in less than two months," because "[a] prolonged chapter 11 would unnecessarily result in larger administrative claims and greater risk to customer and supplier confidence."  ECF No. 4 at 4–5. This Court later described the resulting settlement as one designed to achieve a global resolution, preserve or maximize value for the Debtors' estates, set up the company for a successful reorganization, pay all third-party general unsecured claims in full, and put the go-forward operating entity on the path toward long-term success.  ECF No. 710 at 1.

### C. The Intercompany Settlement.

17.  The Debtors' capital structure made the Intercompany Settlement indispensable. This Court found that QVCG, LINTA, QVC, and Cornerstone Brands, Inc. were the four key entities in a corporate family shaped by historical intercompany transactions and potential intercompany claims.  ECF No. 710 at 3.  This Court further found that the settlement "functions effectively as the keystone" to both the RSA and the Plan.  *Id.* at 9.  Put simply, QVCG had no path out of chapter 11 without resolving potential avoidance, fraudulent-transfer, shared-cost, and tax-sharing disputes with QVC, its own subsidiary and largest creditor.  ECF No. 359 at 29–30.

18.  To address inherent conflicts, the Debtors implemented governance changes to ensure that each key entity had "independent and qualified fiduciaries" advocating for its own interests and the interests of its stakeholders.  ECF No. 710 at 7.  This Court found that each disinterested fiduciary who testified was "very credible," that the relevant governing bodies retained separate counsel, and that the Disinterested Directors engaged in a "fulsome and comprehensive assessment" of potential claims and defenses.  *Id.* at 8–9.  Throughout that process, they acted separately and independently, with the assistance of their own counsel.  *Id.* at 9.

19.     The resulting outcome was not preordained.  This Court found that "[n]o Disinterested Director or Special Committee member at any Key Entity capitulated," and that the settlement terms were reached through a "thorough, complete, and arm's-length process."  *Id.* at 34–35.  It later reiterated that the settlement was achieved through a "fair, arm's-length process devoid of fraud and collusion."  *Id.* at 72–73.  The resulting Intercompany Settlement resolved the full range of intercompany disputes and delivered value across each of the estates, including unimpaired treatment for QVCG's general unsecured creditors and releases for QVCG's preferred equityholders, who had received more than $456 million in aggregate preferred dividends.  *Id.* at 74.

20.     The alternative was value-destructive litigation and uncertainty.  As this Court put it, without the settlement the Debtors faced "an uncertain future" and "the dark waters of litigating the intercompany claims," along with funding uncertainty for the go-forward business, particularly at Cornerstone.  ECF No. 710 at 72.  No creditor objected to the Intercompany Settlement or the Plan, and the Plan was accepted by "a wide majority of each creditor-voting class."  *Id.*  That creditor support reflected the practical reality that the settlement was the only viable path to a global resolution.  ECF No. 359 at 29–30; *Id.* at 72.

**D.     The Chapter 11 Plan.**

21.     The Plan built on that settlement and achieved what this Court called "good results" for the Debtors and their creditors.  ECF No. 710 at 83.  It rests on four pillars designed to maximize recoveries while preserving the Debtors' going-concern value.  ECF No. 4 at 34.

22.     First, the Plan provides for *substantial deleveraging*, eliminating more than $5 billion in funded debt obligations and allowing the Debtors to "right-size their balance sheet, improve liquidity, and position their go-forward operating entity QVC for long-term success."  *Id.* at 34; ECF No. 710 at 83.

23. Second, the Plan *leaves unimpaired* all trade and other unsecured creditors, who held over $400 million in claims: a remarkable result in a case of this magnitude. ECF No. 389, Art. III.B.3–4; ECF No. 710 at 83. This Court found that the Debtors were "able to pay all third-party GUC claims in full," a result tied directly to the Intercompany Settlement. ECF No. 710 at 83.

24. Third, the Plan enjoys *overwhelming creditor support*. The Consenting RCF Lenders, the Consenting QVC Noteholders, and the Consenting LINTA Noteholders support the deal, and this Court found that all voting classes accepted the Plan "by large margins," with the Unsecured Creditors' Committee also expressing support. ECF No. 4 at 34; ECF No. 710 at 84.

25. Fourth, and most relevant here, the Plan *preserves going-concern value*. QVC will emerge as Reorganized QVC, and Cornerstone will continue as its subsidiary, saving thousands of skilled jobs, including 1,527 at Cornerstone, and maintaining the vendor relationships on which the business depends. ECF No. 4 at 34. This Court found that these results are "consistent with the Bankruptcy Code's underlying purpose of preserving the company as a going-concern, and maximizing asset value for creditors." ECF No. 710 at 83–84.

**E. Cornerstone's Dependence on QVC.**

26. Cornerstone occupies a singular position in the QVC Group enterprise: it presently cannot survive as a standalone business and depends on QVC. ECF No. 4 at 18. QVC supplies Cornerstone with "all the back office functions, including IT" and "a tremendous amount of synergies," including, most critically, the UPS shipping discount that QVC earns through its own shipping volume; without QVC, "the discount goes away." Keglevic Testimony, Day 3: 51:11–

9

17; Meltzer Testimony, Day 3: 187:23–188:4, 188:13–19. [2] As the Debtors told the Court at confirmation, "[t]here is no more Cornerstone if it's not operated by QVC, Inc." Sussberg Opening Statement, Day 1: 12:16–22.

27.     Cornerstone's financial fragility compounds that operational dependence. Months before the Petition Date, its credit-card processor advised that it "would no longer service Cornerstone," forcing Cornerstone onto QVC's facility, another service that would vanish outside the QVC umbrella. Keglevic Testimony, Day 3: 51:4–10. A February 2026 management study concluded that "the liquidation value of Cornerstone to shareholders was zero," and when the LINTA noteholders were offered Cornerstone, they answered: "We don't want it." *Id.* at 51:18–23.

28.     No party has been willing to fund Cornerstone on a standalone basis. Coming off a year in which revenue fell roughly 10% and incremental tariffs strained its cash position, Cornerstone faced "a potential . . . need of a cash infusion," yet no one was "interested in making a capital injection in the business." Wafford Testimony, Day 2: 344:7–22. It was "very questionable" whether Topco had enough cash to support Cornerstone as a standalone entity, and QVC was "[a]bsolutely not" offering that cash. Meltzer Testimony, Day 3: 191:23–192:4. This Court found that the Plan "rescued CBI from its silo and brought it under QVC's umbrella," enabling synergies that "might otherwise save an entity which the Disinterested Directors believed had an uncertain future." ECF No. 710 at 83.

---

[2]     With respect to any testimony cited in this Motion, "Day 1" references the first day of the Combined Hearing held on June 4, 2026; "Day 2" references the second day of the Combined Hearing held on June 5, 2026; "Day 3" references the third day of the Combined Hearing held on June 8, 2026.

29.     In short, the livelihoods of Cornerstone's 1,527 employees depend on QVC's continued operations.  Any delay that prevents QVC from emerging as Reorganized QVC places every one of those jobs in real jeopardy.  ECF No. 4 at 18.

**F.     Confirmation and This Court's Findings.**

30.     After a four-day evidentiary hearing that featured "eight highly credible Debtor-witnesses" and "hundreds of exhibits," this Court issued its Memorandum Decision approving the Disclosure Statement, confirming the Plan, and granting related relief, with the order following on July 20, 2026.  ECF No. 710 at 2.  This Court was emphatic: after reviewing the evidence, "all facts demonstrate the negotiations were, in reality, a thorough, fair, and arm's-length process."  *Id.*  It also found that "[n]o disinterested fiduciaries capitulated to any other, and the ultimate outcome for stakeholders was not preordained."  *Id.*

31.     Those findings dispose of the Preferred Shareholders' narrative.  This Court found that the Intercompany Settlement is "fair and equitable and in the best interest of the estates and their creditors," that it "reflects a sound exercise of the Debtors' business judgment," and that all applicable confirmation requirements were satisfied.  *Id.* at 74.  This Court also found that the Second Amended Plan was "proposed with a legitimate and honest purpose of reorganizing the business," had "a reasonable hope of success," and represented "a robust compromise where many, if not all stakeholders made concessions to achieve the result."  *Id.* at 83–84.  Finally, this Court rejected the Preferred Shareholders' disclosure and governance complaints, explaining that they "miss the mark" and that no record evidence supported a lack of good faith.  *Id.* at 84–85.

**G.     The Preferred Shareholders' Appeal and Stay Motion.**

32.     One day after the Memorandum Decision, on July 16, 2026, the Preferred Shareholders filed the Motion.  ECF No. 716.  They simultaneously noticed an appeal and stated an intention to seek certification of a direct appeal to the Fifth Circuit under 28 U.S.C. § 158(d)(2).

11

ECF No. 716 at 11. And earlier today (July 20, 2026), they filed a nearly identical stay motion in the district court. *See* ECF No. 3, *In re QVC Group, Inc.*, *et al.*, No. 4:26-cv-05680 (S.D. Tex.).

33. The Motion asks the Court to stay the Confirmation Order in its entirety or, in the alternative, to stay the "QVCG-specific" provisions of the Plan, including the Intercompany Settlement, the transfer of QVCG's distributable cash, the transfer of QVCG's 62% Cornerstone interest, and the cancellation of the Preferred Stock, together with an immediate interim stay. ECF No. 716 at 18–19, 36. The Preferred Shareholders contend that they present a substantial case on insider-settlement standards under Bankruptcy Rule 9019 and impairment under section 1129(a)(10), that they will be irreparably harmed by equitable mootness absent a stay, that a stay would not substantially harm others, and that the public interest favors a stay. *Id.* at 20, 32, 34–35. As shown below, each contention fails.

### H. Time Is of the Essence.

34. The Debtors cannot absorb the indefinite delay a stay would impose. The RSA sets firm milestones under Section 4.01 and currently requires that the Plan must be confirmed by July 29, 2026 and go effective by August 17, 2026. RSA § 4.01. These dates may be further extended only with the consent of the Required Consenting QVC Noteholders, the Required Consenting RCF Lenders, and the Required Consenting LINTA Noteholders and future extensions are not guaranteed. If those milestones are missed, the Consenting RCF Lenders, the Consenting QVC Noteholders, and the Consenting LINTA Noteholders can each terminate the RSA. *Id.* § 12.01(f). Additionally, each individual Consenting Stakeholder also holds a separate termination right 180 days after the Agreement Effective Date (*i.e.*, October 13, 2026). *Id.* § 12.01(t). Upon termination, each party regains "the rights and remedies that it would have had, had it not entered into this Agreement." *Id.* § 12.05.

12

35. There is no replacement transaction waiting in the wings. No creditor group has offered to support an alternative path, and the Debtors' committed $600 million exit financing is conditioned on consummation of the Plan. ECF No. 359 at 35; ECF No. 389 at 67–68. The Debtors' debtor-in-possession financing compounds the risk: the DIP facility matures on the earlier of October 16, 2026 and the Effective Date, so any stay that pushes emergence past that date would trigger the DIP's maturity. And because a significant portion of the DIP Lenders have since sold their revolving credit facility positions and are no longer RSA parties, they have little incentive to extend the DIP, leaving the Debtors without a committed source of financing to bridge a prolonged appeal. Meanwhile, every additional week in chapter 11 depletes estate value: the Debtors incurred approximately $41 million in professional fees in just the first six weeks of these cases, and costs would continue to mount over the pendency of an appeal. Wafford Testimony, Day 2: 379:4–9.

36. QVC is poised to emerge with a balance sheet deleveraged by billions, healthy vendor relationships, and ample liquidity to resume ordinary-course operations. A stay would put all of that at risk by jeopardizing the RSA and stranding Cornerstone. The Plan should be allowed to do what this Court found it will: preserve the company as a going concern and maximize asset value for creditors. ECF No. 710 at 83–84.

## ARGUMENT

### I. The Stay Factors Weigh Heavily Against A Stay Pending Appeal.

37. A stay pending appeal is "an extraordinary remedy," *Texas v. United States*, 40 F.4th 205, 215 (5th Cir. 2022) (internal quotations omitted), "not a matter of right," *United States v. Texas*, 97 F.4th 268, 274 (5th Cir. 2024). The Preferred Shareholders' burden "is a substantial one." *Texas*, 40 F.4th at 215. They have not carried it.

13

38.     Whether to grant a stay turns on four factors:  "1) whether the applicant has made a strong showing of likelihood to succeed on the merits; 2) whether the movant will be irreparably harmed absent a stay; 3) whether issuance of a stay will substantially injure other interested parties; and 4) where the public interest lies."  *Thomas v. Bryant*, 919 F.3d 298, 303 (5th Cir. 2019).  Here, all four weigh heavily against a stay.

**A.     The Preferred Shareholders Have Not Shown a Likelihood of Success on Appeal.**

39.     The Preferred Shareholders fail to establish anything close to the required "strong showing that [it] is likely to succeed on the merits."  *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).  Ordinarily, this standard requires that the movant show that "success on appeal is probable."  *Zehr v. Osherow*, No. 5:18-CV-355-DAE, 2019 WL 266973, at *2 (W.D. Tex. Jan. 17, 2019).  It is not enough to show that there is "a mere possibility of relief."  *Trend Intermodal Chassis Leasing LLC v. Zariz Transp. Inc.*, 711 F. Supp. 3d 627, 640 (N.D. Tex. 2024), aff'd sub nom. *Trend Intermodal Chassis Leasing, LLC v. Zariz Transp. Inc.*, No. 24-10105, 2024 WL 3423217 (5th Cir. July 16, 2024) (internal quotations omitted).

40.     The Preferred Shareholders, however, seek refuge in a narrow exception:  When the "other three factors strongly favor interim relief" and "a serious legal question is involved," the "court may lessen the burden … from a strong showing of succeeding on the merits, to a substantial case on the merits."  *Vine v. PLS Fin. Servs., Inc.*, No. 4:18-CV-00450, 2019 WL 4257108, at *2 (E.D. Tex. Sept. 9, 2019).  For the exception to be applicable, the other three factors must be "*heavily* tilted in the movant's favor."  *Id.* (emphasis in original).  This case does not present a substantial legal question, and the other factors do not tilt in the Preferred Shareholders' favor at all, much less *heavily* so.

14

### 1.     The Plan Complies with Section 1129(a)(10).

41.     Section 1129(a)(10) provides that if a "class of claims is impaired under the plan," then "at least one class of claims that is impaired under the plan" must accept the plan.  11 U.S.C. § 1129(a)(10).  The Court correctly concluded that section 1129(a)(10) does not apply to QVCG because QVCG has no impaired class of claims.  The Preferred Shareholders take issue with that ruling, but their argument overlooks the clear text of the Bankruptcy Code, which dooms their position.

42.     Section 1129(a)(10) triggers only when a class is "impaired."  11 U.S.C. § 1129(a)(10).  Section 1124 outlines what constitutes "impairment," but it carves out exceptions "as provided in section 1123(a)(4)."  11 U.S.C. § 1124.  Section 1123(a)(4), in turn, provides that a plan must give each claim in a class the same treatment "unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4).  The carve-out clause in section 1124 is not surplusage; it removes treatment in accordance with section 1123(a)(4) from the definition of "impairment."  Putting the words of the three sections together:  consensual "less favorable treatment of [a] particular claim or interest" is not impairment under section 1124, and so cannot trigger section 1129(a)(10).

43.     Courts applying that text agree that when a creditor "consent[s] to specific treatment that is less than the creditor's full legal and equitable rights," its claim is no longer considered impaired.  *In re Spirit Airlines, Inc.*, 668 B.R. 689, 702 (Bankr. S.D.N.Y. 2025); *see also In re Container Store Grp., Inc.*, 676 B.R. 356, 377 (S.D. Tex. 2026) ("Parties who agree to a settlement under this provision are considered unimpaired"); *In re 1300 Desert Willow Rd., LLC*, 677 B.R. 176, 184 n.4 (Bankr. S.D.N.Y. 2026) ("[A] creditor's consent to receive less than its full legal and equitable rights does not constitute impairment."); *In re Hanish, LLC*, 570 B.R. 4, 20 (Bankr. D.N.H. 2017) ("[A]n agreement to less favorable treatment under 11 U.S.C. § 1123(a)(4)

15

does not create an impairment, it removes one."); *In re K Lunde, LLC*, 513 B.R. 587, 595 n.5 (Bankr. D. Colo. 2014) ("An agreement or consent to a particular treatment removes the claim from the presumption of impairment."). That is exactly what happened here. The Preferred Shareholders contend that QVC's claim, and the single-claim class in which it resided, was impaired. But QVC agreed to accept a $400 million claim to be satisfied in full and finally by the QVCG Distributable Cash. That agreement is a section 1123(a)(4) agreement to less favorable treatment, so by the plain text of section 1124 both QVC's claim and its class are unimpaired. Section 1129(a)(10)'s requirements therefore do not apply.

44.    Nothing in the three cases the Preferred Shareholders cite states otherwise, let alone addresses section 1123(a)(4). *Ultra Petroleum* and *American Solar King* answered a different question: whether a claim is impaired when the plan alters the creditor's rights (it is) or when the Bankruptcy Code itself does (it is not). 943 F.3d 758, 763 (5th Cir. 2019); 90 B.R. 808, 819 (Bankr. W.D. Tex. 1988). *Village at Camp Bowie*, for its part, concerned artificial impairment, holding that section 1129(a)(10) imposes no motive or materiality requirement because section 1124 must be read literally. 710 F.3d 239, 245 (5th Cir. 2013). Stringing these inapposite decisions together does not manufacture a serious legal question, much less create a likelihood of success on the merits.

45.    The Preferred Shareholders separately contend that the three decisions on which the Court relied (*In re Container Store Grp., Inc.*, 676 B.R. 356 (S.D. Tex. 2026), *In re Spirit Airlines, Inc.*, 668 B.R. 689 (Bankr. S.D.N.Y. 2025), and *In re K Lunde, LLC*, 513 B.R. 587 (Bankr. D. Colo. 2014)) do not compel a different result because they arose in different factual settings, namely third-party-release opt-outs and statutory tax-claim treatment. *See* ECF No. 716 at 22. But those decisions were cited for a single proposition: that a creditor's consent to less favorable

16

treatment under section 1123(a)(4) removes impairment under section 1124. That proposition holds regardless of the factual vehicle in which the consent arrives, and the Preferred Shareholders nowhere contend that it is wrong. Nor could they, because it follows directly from the statutory text, and unambiguous text is where the analysis begins and ends. *See Schaeffler v. United States*, 889 F.3d 238, 242 (5th Cir. 2018) ("In the absence of any ambiguity, our examination is confined to the words of the statute." (internal quotation marks and citation omitted)). Indeed, the Preferred Shareholders do not dispute that QVC consented to its treatment; they contest only whether that consent renders the claim unimpaired, which is the precise question section 1124's cross-reference to section 1123(a)(4) answers.

46. The Preferred Shareholders also accuse the Debtors of "flip-flopping" by treating the QVC-QVCG Settlement Claim as unimpaired while classifying the settling RSA parties as impaired and soliciting their votes. *See* ECF No. 716 at 23. There is no inconsistency; the two situations differ in a way that section 1124 specifically contemplates. *See* 11 U.S.C. § 1124 ("Except as provided in section 1123(a)(4) of this title, *a class* of claims or interests is impaired under a plan unless, *with respect to each claim or interest of such class*, the plan…."). Class A4 (QVC-QVCG Settlement Claim) has a single member that accepted its treatment, so the entire class is definitionally unimpaired. In contrast, the multi-member RSA classes were each impaired because each class contained non-settling creditors. Far from "gerrymandering" impairment status, ECF No. 716 at 24, the Debtors applied the boundaries as section 1124 draws them.

47. Finally, the Preferred Shareholders argue that the Plan impairs the QVC-QVCG Settlement Claim by liquidating and reducing its potential prepetition liability. But a prepetition claim can be modified by agreement without creating impairment. *See In re Texaco Inc.*, 84 B.R. 893, 894–99, 910 (Bankr. S.D.N.Y. 1988) (finding section 1129(a)(10) inapplicable where

17

Pennzoil, Texaco Inc.'s largest unsecured creditor, settled its $11.12 billion pre-petition judgment, a portion of which Pennzoil held the right to further dispute, for $3 billion—*post-petition*). So their position is unavailing.

### 2. Bankruptcy Rule 9019's Standard Is Well Settled, Does Not Incorporate the Test That the Preferred Shareholders Propose, and Would Not Change the Outcome If Expanded.

48. All agree that "courts are empowered to approve a compromise settlement of a debtor's claim under Bankruptcy Rule 9019(a)." *In re Cajun Elec. Power Co-op., Inc.*, 119 F.3d 349, 355 (5th Cir. 1997). And no one contests that courts in the Fifth Circuit must consider three factors: "(1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) all other factors bearing on the wisdom of the compromise," *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980) (internal citation omitted), which includes both (3)(a) "the best interests of the creditors, with proper deference to their reasonable views" and (3)(b) "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion," *Cajun Elec.*, 119 F.3d at 356. The standard is the standard; it has operated unchanged for over 30 years. *See In re Foster Mortgage Corp.*, 68 F.3d 914 (5th Cir. 1995) (last expansion of standard, in 1995).

49. Yet the Preferred Shareholders claim to have spotted a substantial question on "the standard of review" lurking in the shadows of state law. ECF No. 716 at 24. They advocate for what is called the "entire fairness" test, which originated not in bankruptcy, but in a case in which minority shareholders sought to set aside a merger under Delaware law. *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983). In that context, the Delaware Supreme Court held that when "one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts." *Id.*

18

50.     Problems pervade the Preferred Shareholders' position.  First, the Rule 9019 standard does *not* contain the "entire fairness" test.  Dissatisfied parties frequently advocate for its inclusion, but courts have rejected the invitation time and again.  *See, e.g.*, *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 641 (Bankr. S.D.N.Y. 2012) (declining to apply the entire fairness test because the "issues under Rule 9019 are different"); *In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 272167, at *16 (Bankr. S.D.N.Y. Jan. 28, 2022); *In re Boy Scouts of Am. & Delaware BSA, LLC*, 642 B.R. 504, 644 (Bankr. D. Del. 2022), *supplemented*, No. 20-10343 (LSS), 2022 WL 20541782 (Bankr. D. Del. Sept. 8, 2022), *aff'd*, 650 B.R. 87 (D. Del. 2023), *aff'd in part, rev'd in part, dismissed in part sub nom. In re Boy Scouts of Am.*, 137 F.4th 126 (3d Cir. 2025), and *aff'd*, 650 B.R. 87 (D. Del. 2023) (rejecting pleas to apply entire fairness standard to settlement because the court found "no reason to impose a higher burden than required under the Code"); *In re Charter Commc'ns*, 419 B.R. 221, 241 (Bankr. S.D.N.Y. 2009) (holding the settlement "should be evaluated under the standards applicable to approval of bankruptcy settlements in this Circuit and not under the 'entire fairness' standard of Delaware law applicable to transactions with controlling insiders").  Although Preferred Shareholders suggest that a substantial question looms because the Fifth Circuit has not yet weighed in on the issue, ECF No. 716 at 24–25, there can be no substantial question when courts uniformly reject their position, *In re Permian Producers Drilling, Inc.*, 263 B.R. 510, 516 (W.D. Tex. 2000) (finding no serious legal question when "a survey of case law and legal scholarship indicates a general agreement" on the issue).

51.     Second, the Intercompany Settlement would not trigger the "entire fairness" standard even if it fell within the Rule 9019 framework.  The parties who negotiated the Intercompany Settlement were the Disinterested Directors, each represented by independent outside counsel.  Far from "stand[ing] on both sides of [the] transaction," *Weinberger*, 457 A.2d

19

at 710, they were appointed as "independent and qualified fiduciaries to advocate for each of their respective interests and the interests of their stakeholders, and to address potential conflicts," ECF No. 710 ¶ 14. Nor were they the directors who authorized the historical dividends or intercompany transactions that gave rise to the potential claims in the first place. ECF No. 710 at 62–63. Instead, as this Court found, they were newly appointed, investigated independently, and reached independent conclusions with the benefit of separate counsel. *Id.*

52.     Third, the Intercompany Settlement was *eminently and entirely fair*, and the Preferred Shareholders' arguments to the contrary evince nothing more than an unwillingness to accept this Court's extensive fact findings. The Preferred Shareholders insist that the "purportedly independent directors simply capitulated," but the Court found that "[n]o disinterested fiduciaries capitulated to any other" and no "Disinterested Director or Special Committee member at any Key Entity capitulated during the negotiations." *Compare* ECF No. 716 at 20 *with* ECF No. 710 at 2, 34–35. The Preferred Shareholders declare that "this settlement was . . . preordained," the "outcome was preordained," yet the Court found that "the terms of the negotiated Intercompany Settlement were not preordained" and were in fact reached "as part of a thorough, complete, and arm's-length process." *Compare* ECF No. 716 at 7, 9 *with* ECF No. 710 at 35. They contend that the $400 million claim was "manufactured" to engineer confirmation, but the Court found that the figure "was not arrived at to manufacture Plan confirmation" and was instead "the lowest figure [the QVC Disinterested Directors] could accept as fiduciaries." *Compare* ECF No. 716 at 8 *with* ECF No. 710 at 63, 73. And they protest that the process was "non-arm's-length" and infected by insider conflict, yet the Court found "the investigation and negotiation of the Intercompany Settlement was not subject to a conflict" and was "achieved through a fair, arm's-length process devoid of fraud and collusion." *Compare* ECF No. 716 at 30 *with* ECF No. 710 at 66, 73. These

20

aspects of the Intercompany Settlement and the process that led to it show why, during opening statements, the Debtors told the Court: "[G]o ahead. Apply the entire fairness standard." Sussberg Opening Statement, Day 1: 18:2-4. The Debtors' point was not, as the Preferred Shareholders incorrectly suggest, an "admission concerning the proper standard of review." ECF No. 716 at 25. Instead, it was simply a recognition that the Intercompany Settlement would pass the "entire fairness" test if that were the applicable standard. *See* id. at 18:6–7 ("We satisfied [the entire fairness standard] in spades over and over and over again because we did this right.").

53.     The Preferred Shareholders also stretch for Fifth Circuit precedent to support their position, but it does them no good. They emphasize that in *In re Foster Mortgage Corporation*, the Fifth Circuit recognized that "a court's scrutiny must be great" when a settlement involves an insider and most creditors oppose it. ECF No. 716 at 25 (quoting 68 F.3d 914, 919 (5th Cir. 1995)). But in *Foster Mortgage*, the Fifth Circuit reversed after a bankruptcy court "gave no consideration to" "the paramount interest of creditors with proper deference to their reasonable views" and "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Id.* at 917–18. And the *Foster Mortgage* court recognized that at the time, the Fifth Circuit "ha[d] not elaborated on the other factors bearing on the wisdom of the compromise," so it took the opportunity to "do so" by outlining creditors' interests and arms-length bargaining as two such factors. *Id.* at 197. So what the Preferred Shareholders suggest is a heightened level of scrutiny is really just today's Rule 9019 standard, which this Court faithfully applied.

54.     Finally, the Preferred Shareholders accuse the Court of "simply defer[ring] to the business judgment of the debtors." ECF No. 716 at 27. That is not what happened. "The Court conducted a four-day evidentiary hearing where testimony was adduced from eight highly credible Debtor-witnesses, and the parties introduced hundreds of exhibits." ECF No. 710 at 2. It

"extensively" reviewed the historical intercompany transactions. *Id.* at 2; 67–68. Ultimately, after considering the evidence, the Court concluded, in a thorough, 103-page Memorandum Decision, that "all facts demonstrate the negotiations were, in reality, a thorough, fair, and arm's-length process." *Id.* The Court further determined that "[n]o disinterested fiduciaries capitulated to any other, and the ultimate outcome for stakeholders was not preordained," rather, "[t]he equity holders' treatment under the settlement is a result of the range and magnitude of potential claims the parent-Debtor entity they hold interests in was facing from its subsidiaries and other sources— as well as their own liability." *Id.* at 2.

### 3. The Court Did Not Abuse Its Discretion in Approving the Intercompany Settlement, and the Preferred Shareholders Cannot Show Otherwise.

55. The Preferred Shareholders also take issue with the Court's application of the Rule 9019 factors and its decision to approve the Intercompany Settlement. ECF No. 716 at 26–32. They contest how the Court analyzed every factor of the test. To overturn the Court's decision, they must show an abuse of discretion. *Cajun Elec.*, 119 F.3d at 355. They cannot make that showing.

56. Rule 9019 requires that a settlement be "fair, equitable, and in the best interest of the estate." *Jackson Brewing Co.*, 624 F.2d at 602 (internal quotation marks omitted). To clear that bar, a settlement need only fall "within the range of reasonable litigation alternatives." *In re Allied Props., LLC*, No. 06-33754, 2007 WL 1849017, at *4 (Bankr. S.D. Tex. June 25, 2007) (internal quotation marks omitted). That bar "is not high." *Id.* "After all, compromises are a normal part of the process of reorganization, oftentimes desirable and wise methods of bringing to a close proceedings otherwise lengthy, complicated and costly." *Id.* (citing Cajun Elec., 119 F.3d at 354). When applying Rule 9019's factors, a court need not "conduct a mini-trial to determine the probable outcome of any claims waived in the settlement." *Cajun Elec.*, 119 F.3d at 356.

22

Instead, it must simply "be informed of all relevant facts and information in order to make an independent judgment as to whether settlement is fair and reasonable under the circumstances." *Cook v. Waldron*, No. H-05-3438, 2006 WL 1007489 at *4 (S.D. Tex. Apr. 18, 2006). The Court's Rule 9019 analysis passes that test with flying colors.

### a. Probability of Success.

57. The Preferred Shareholders attack the Court's analysis of Rule 9019 factor one: the probability of success in the litigation, with due consideration for the uncertainty in fact and law. They posit that the Court "deferred entirely to the Disinterested Directors' judgment rather than independently assessing the merits." ECF No. 716 at 27. But they mischaracterize the Court's analysis. As discussed above, the Court did not simply defer to the Disinterested Directors. Instead, it detailed the nature of each type of claim, the available defenses, and the reasons why the outcome was uncertain. *See* ECF No. 710 at 26–34. That the Court's decision aligned with the Disinterested Directors' assessment does not mean the Court abdicated its role; it means the record supported the Disinterested Directors' conclusions.

58. The Preferred Shareholders invoke *In re Emerald Oil Co*., 807 F.2d 1234 (5th Cir. 1987), arguing that its holding "is instructive." ECF No. 716 at 28. But there, the Fifth Circuit disagreed with a bankruptcy court's assessment because "the trustee…probably could set the transfer aside as a matter of law." 807 F.2d at 1239. Here, by contrast, no party demonstrated that any of the Intercompany Claims would succeed or fail as a matter of law. Rather, the Disinterested Directors at QVCG concluded that insolvency was litigable, and the "claims [had] various legal and factual contingencies that would need to be determined or proved up in litigation." ECF No. 710 at 68–69. So unlike *Emerald Oil*, where the factual record largely pointed in one direction, the record here demonstrated genuine uncertainty on both sides. *Id.* at 65. (The only one-sided aspect of the disputes was which party would be liable for them: QVCG.) This uncertainty as to

23

the strength of claims is precisely the "due consideration for the uncertainty in fact and law" that the Court is required to consider, and the quintessential circumstance where compromise is most appropriate. *Jackson Brewing* Co., 624 F.2d at 604 ("The Court concluded, after extensive testimony, and we agree, that the resolution of these questions was sufficiently uncertain not to risk the consequences of an adverse decision.").

59.     That the Preferred Shareholders disagree with this Court's assessment of the probability of success and consideration of uncertainty does not mean that it was unintelligent and uninformed.  They cannot show any error in the Court's analysis—and therefore have not identified a substantial question weighing in favor of a stay pending appeal.

### b.     Complexity and Duration of the Litigation.

60.     The Preferred Shareholders also take issue with the Court's assessment of factor two:  the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay.  They say that "[c]omplexity may justify compromise" but "cannot justify total capitulation."  ECF No. 716 at 29.  Their argument simply repeats their incorrect, disproven, and rejected contention that QVCG traded everything for nothing in the Intercompany Settlement just because they do not personally value the releases the agreement provides.  It also ignores the factor's inclusion of attendant expense, inconvenience, and delay—all of which matter to the QVCG estate but make no difference to the Preferred Shareholders because they have nothing to lose.

61.     The Preferred Shareholders also dismiss the Court's recognition that the Intercompany Claims "implicate manifold legal issues" as well as "complicated factual issues" that would be time-consuming and expensive to litigate.  They suggest that the same could be said "of any settlement of significant bankruptcy litigation claims."  ECF No. 716 at 28.  That's true, but only because the reasoning is circular:  significant bankruptcy litigation claims, if not settled,

24

necessarily involve significant litigation. And the conclusion that the Preferred Shareholders draw from their analytical loop—that if complex and expensive-to-litigate claims always favored settlement, then the factor would be "meaningless," ECF No. 716 at 28—misses the point. That litigation would be costly or complex is *always* relevant under factor two because that's the whole point of the factor. The more complicated and expensive a claim would be to litigate, the better it is for the debtor's estate to settle the claim.

62.     The Preferred Shareholders then argue that "litigation would have given QVCG *some chance of a recovery*, whereas th[e] [S]ettlement eliminated any chance of one." ECF No. 716 at 28. But that suggestion paints only half the picture. QVCG might not have recovered money, but it obtained considerable *value*. The company secured go-forward indemnification from potential tax liability that could have stretched into the billions, and it procured releases for its preferred shareholders—many of whom had received part of the $450 million in dividends that QVC otherwise would have sought to claw back. ECF No. 710 at 83. What the Preferred Shareholders really mean is that litigation might have resolved the Intercompany Claims for less than the settled amount, which in turn might have meant that *they* recovered money after all senior claims and interests were paid. In other words, they contend that factor two counseled against settlement because it was not in their best interests. Yet the Preferred Shareholders are not the only—or even the paramount—stakeholders whose interests the Disinterested Directors had to consider. Just the opposite: "[A] debtor in possession, like a trustee, takes on fiduciary responsibilities to all creditors." *Azby Fund v. Wadsworth Ests., LLC*, No. 22-30092, 2022 WL 17582273, at *2 (5th Cir. Dec. 12, 2022). QVCG and the Disinterested Directors therefore had to assess what complexity and cost meant for the entire estate, not just those who recovered no money and did not value the releases they received.

25

           **c.**       **The Best Interests of Creditors and Existence of Arm's-Length Bargaining.**

63.      The Preferred Shareholders last challenge the Court's treatment of Rule 9019's third factor, which weighs "the best interests of the creditors, with proper deference to their reasonable views," together with "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Cajun Elec.*, 119 F.3d at 356 (internal quotation marks omitted). The Court considered both components at length and made detailed factual findings on each. The Preferred Shareholders' disagreement with those findings falls well short of the abuse of discretion they must show.

64.      Start with the interests of creditors. The Court found that the Intercompany Settlement served the best interests of creditors because it "functions as the keystone to the RSA and the Plan," and that without it the Debtors faced "an uncertain future, both in terms of the dark waters of litigating the intercompany claims, as well as funding their go-forward operations absent the proposed reorganization." ECF No. 710 at 72. The record bore that out: no creditor objected to the Intercompany Settlement or the Plan, and the Plan was accepted by a wide majority of each voting class. *Id.* at 71–72. Creditor support of that breadth is powerful evidence that the compromise served the estate's best interests.

65.      The Preferred Shareholders recast the Court's "keystone" reasoning as a failure to conduct a QVCG-specific inquiry, arguing that QVCG should not have contributed its distributable cash and 62% Cornerstone interest while Preferred Shareholders received nothing. ECF No. 716 at 30–31. But Rule 9019 asks whether the Intercompany Settlement was fair, equitable, and in the estate's and creditors' best interests, not whether it preserved an out-of-the-money equity recovery. Because the Intercompany Settlement paid QVCG's general unsecured creditors in full and enabled the creditor-supported Plan, its central role supports approval.

66.     The Preferred Shareholders' real complaint is that the Court did not treat their opposition as dispositive, insisting that they are the "only stakeholders with a meaningful economic interest in QVCG."  ECF No. 716 at 14.  But *Foster Mortgage* makes creditor views paramount:  "in the bankruptcy context, the interests of the creditors not the debtors are paramount," and courts should give "proper deference to their reasonable views."  68 F.3d at 917.  Here, no creditor objected to the Intercompany Settlement or the Plan.  ECF No. 710 at 67, 72.  Equity holders standing behind creditors in a debtor facing potential liabilities far beyond its available assets cannot override the creditor support the factor actually prioritizes.

67.     Nor does *RNI* help them.  There, the court considered equity's interests only because creditors were "in the money" by approximately $100 million and, unlike in "most bankruptcy cases," there was a "likelihood of a recovery for equity."  *In re RNI Wind Down Corp.*, 348 B.R. 286, 298 (Bankr. D. Del. 2006).  That premise is absent here:  the Court found, based on the only record evidence addressing the Preferred Shareholders' proposed alternative, that "equity would still receive no recovery."  ECF No. 710 at 90.  *RNI* therefore confirms that equity interests may matter when equity is realistically in the money, not when the record shows equity is out of the money under any alternative.

68.     The arm's-length component fares no better for the Preferred Shareholders.  After a four-day evidentiary hearing, the Court found that the Intercompany Settlement was "achieved through a fair, arm's-length process devoid of fraud and collusion."  *Id.* at 73.  Each Key Entity was represented by Disinterested Directors advised by their own independent conflicts counsel, and the negotiation unfolded as a "robust process" of posturing, counterproposals, and ultimately give-and-take.  *Id.* at 63–64, 72–73.  The QVCG Special Committee opened with "the most

aggressive position" it could take and then negotiated as its understanding of QVCG's leverage evolved, the hallmark of genuine arm's-length bargaining, not capitulation. *Id.* at 63–64.

69. Against these findings, the Preferred Shareholders offer little more than the assertion that titles and process labels "are not talismans." But the Court did not rest on labels. It examined the very negotiating sequence the Preferred Shareholders now recite, including the QVCG Special Committee's early framing, QVCG's opening position that QVC's clawback claims were not likely viable, and the parties' progression to a $400 million claim. The Court found that sequence to be consistent with legitimate negotiating tactics rather than a preordained outcome. ECF No. 710 at 63–64. The Preferred Shareholders never engage with that analysis, let alone identify the clear error required to set it aside.

70. The Preferred Shareholders separately fault the QVCG Disinterested Directors for declining to retain additional advisors and for not securing a Preferred Shareholder recovery, likening the process to the retention of a nominally independent fiduciary to "sprinkle holy water" on a conflicted transaction. ECF No. 716 at 30 (citing *In re Coram Healthcare Corp.*, 271 B.R. 228, 240 (Bankr. D. Del. 2001)). *Coram* is nothing like this case. There, the debtor's CEO had a continuing, actual conflict arising from a nearly $1 million annual consulting arrangement with one of the debtor's largest creditors, and that conflict tainted the debtors' restructuring efforts even after it came to light in discovery. *Id.* at 232, 235–36, 238–40. Here, by contrast, the Court found that the Disinterested Directors "engaged in a fulsome and comprehensive assessment of potential claims and defenses," acted "separately and independently of one another, with and through each's respective counsel," and "made their own independent determinations, through the advice of counsel." ECF No. 710 at 9, 63. The Memorandum Decision also found that the information flow included "diligence, fund flow analyses, financial projections, solvency analysis, and valuation

28

analysis," and that the shared advisors "did not … tell the Disinterested Directors what opinions to formulate." *Id.* at 63. That the Directors chose not to layer duplicative advisors atop the process does not make the Intercompany Settlement anything other than the product of arm's-length bargaining.

71.     In short, the Court weighed both the interests of creditors and the integrity of the negotiating process and made supported findings on each. The Preferred Shareholders' quarrel with those findings identifies no abuse of discretion, and therefore no substantial question warranting a stay pending appeal.

### B.     The Preferred Shareholders Have Not Shown They Will Suffer Irreparable Harm.

72.     The irreparable injury prong also counsels against a stay pending appeal. The Preferred Shareholders claim that absent a stay, consummation of the Plan may render "appellate review [] equitably moot." *See* ECF No. 716 at 32. They argue that if the Confirmation Order goes into effect and the Debtors consummate the Plan, "they would implement the very QVCG-specific transactions that the Preferred Shareholders seek to challenge on appeal." *Id.* at 33. And once "QVCG distributable cash and the 62% Cornerstone interest are transferred, releases become operative, and the Preferred Stock is canceled," the Preferred Shareholders protest that they "cannot be restored fully after the fact." *Id.* at 33.

73.     That is not enough. "[T]he possibility of the application of equitable mootness does not demonstrate irreparable injury." *In re Container Store Grp., Inc.*, No. 24-90627, 2025 WL 4226766, at *9 (Bankr. S.D. Tex. Apr. 7, 2025). It is not a close question, either; "many courts in the Fifth Circuit have held" as much. *Id.*; *see also In re Nat'l CineMedia, LLC*, No. 4:23-CV-02414, 2023 WL 5030098 at *8 (S.D. Tex., Aug. 4, 2023); *Yucaipa Corp. Initiatives Fund, ILP v. Piccadilly Rests., LLC*, No. 14-0609, 2014 WL 1871889, at *4 (W.D. La. May 6, 2014); *In re*

29

*Village at Camp Bowie I, L.P.*, No. 10-45097 (DML), 2012 WL 79091, at \*2 (Bankr. N.D. Tex. Jan. 11, 2012); *In re Camp Arrowhead*, No. SA-10-CV-11-XR, 2010 WL 363773 at \*7 (W.D. Tex., Jan. 22, 2010).

74.  Rather than confront the overwhelming caselaw that rejects their contention, the Preferred Shareholders invoke out-of-circuit cases and Fifth Circuit decisions addressing whether certain appeals have actually become moot. *See* ECF No. 716 at 32–33.  Yet nowhere do they attempt to explain why the uniform approach in this Circuit is wrong while the approach elsewhere is right.  Nor would any argument on the point be persuasive.  The Preferred Shareholders' view collapses the rule into the exception:  If mootness alone were enough to show irreparable harm, then "anytime an appeal is mooted, a stay would be required." *In re Container Store Grp.*, 2025 WL 4226766, at \*9 (no irreparable harm).  And what the Fifth Circuit has said when ruling on the merits of a mootness argument is an entirely different issue.  At this stage, the question is not whether the Preferred Shareholders' appeal will become moot, but whether the possibility that the equitable-mootness doctrine could trigger is itself irreparable harm.  It is not. *See In re Container Store Grp.*, 2025 WL 4226766.

75.  A stay would not prevent the harm, either.  This Court made a finding of fact, supported by the only record evidence on the matter, that under any alternative scenario, "equity would still receive no recovery." *See* ECF No. 710 at 90.  The Preferred Shareholders nevertheless want QVCG to press its luck and litigate QVC's claims against it.  But as this Court also found, that long, expensive, contentious process would be "value destructive," and "all QVCG stakeholders would be worse off." *See id.*  As much as the Preferred Shareholders worry that without a stay, they "cannot be restored fully after the fact," ECF No. 716 at 33, the combination

30

of QVCG's limited assets, its significant liabilities, and the Bankruptcy Code's priority scheme mean that regardless of what happens, there will be nothing to restore.

### C. A Stay Would Substantially and Irreparably Harm the Debtors, Their Creditors, Other Stakeholders, and Numerous Other Parties.

76. The harm the Debtors and interested parties face from a stay would be extraordinary and preventable. The third stay factor considers whether there is an "absence of substantial harm to the other parties from granting of the stay[.]" *In re Serta Simmons Bedding LLC*, No. 23-90020, 2023 WL 4275019, at *2 (S.D. Tex. June 29, 2023). "To succeed on this prong, applicants must show that the requested stay *will not harm* the opposing appellees or other interested parties." *All. for Hippocratic Med. v. F.D.A.*, No. 23-10362, 2023 WL 2913725, at *19 (5th Cir. Apr. 12, 2023) (emphasis added). The Preferred Shareholders have not made—and cannot make—that showing.

### 1. A Stay of the Confirmation Order Would Have Devastating Consequences.

77. Although the Preferred Shareholders ask the Court to "stay[] the Confirmation Order pending appeal" and to "prohibit[] the Debtors from causing the Effective Date to occur while any stay remains in effect," ECF No. 716 at 37, nowhere do they acknowledge (much less confront) the sweeping ramifications of such a stay.

78. The delay a stay would impose would likely last years. Recent chapter 11 confirmation appeals confirm that the process routinely stretches well beyond a year, and frequently past two. In the Fifth Circuit, such appeals have taken as long as 939 days from notice of appeal to final order. *See, e.g.*, *In re Houston Reg'l Sports Network, L.P.*, 886 F.3d 523 (5th Cir. 2018) (939 days); *In re Highland Capital Mgmt., L.P.*, 132 F.4th 353 (5th Cir. 2025) (684 days); *In re Serta Simmons Bedding, LLC*, 125 F.4th 555 (5th Cir. 2024) (614 days). Appeals resolved at the district-court level in this District have taken comparable time. *See, e.g.*, *N. Am. Specialty Ins. Co.*, No. 4:21-cv-02201 (S.D. Tex.) (615 days); *In re Quintela Grp., LLC*, No. 4:20-

cv-03499 (S.D. Tex.) (350 days).  And where review proceeds to the Supreme Court, the delay is greater still.  *See In re Ultra Petroleum Corp.*, No. 20-32631 (Bankr. S.D. Tex.) (close to 1,000 days from confirmation to denial of certiorari).  Combining the median resolution times in the five most recent confirmation appeals that the Debtors could locate in this District and the Fifth Circuit[3] yields an expected delay of roughly 31 months—well over two years.

79.     Make no mistake:  a stay of the Confirmation Order would wreak havoc.  Start with the Debtors.  Even just the threat of a potential chapter 11 proceeding "put a lot more stress on the system."  Wafford Testimony, Day 2:  347:22–23.  It caused vendors to demand letters of credit or prepayment before shipping inventory.  It increased employee anxiety, which prompted the need for retention and incentive plans to convince valued team members to stay on.  And it caused the Debtors to incur tens of millions of dollars in professional fees.  These harms were felt even while the Debtors were able to message to the public and their stakeholders that their stay in bankruptcy would be brief.  Keyes Decl. ¶ 9.  The Debtors are now over a month beyond the timeline messaged in their initial scheduling motion, which contemplated emergence by June 8, 2026.  *Id.*

80.     If the Debtors could not emerge from chapter 11 until the Preferred Shareholders saw their appeal through to the bitter end, all those problems (and the costly solutions to them) would compound.  In the wake of these chapter 11 cases, vendors' letter-of-credit requirements have ballooned to $300 million.  Keyes Decl. ¶ 9.  No rational vendor, when informed that the Debtors face an indefinite stay in bankruptcy, would reduce its demands.  The Debtors' retention

---

[3]     *See In re Houston Regional Sports Network, L.*P., 886 F.3d 523 (5th Cir. 2018) (939 days)*; In re Highland Capital Management, L.*P., 132 F.4th 353 (5th Cir. 2025) (684 days)*; In re Serta Simmons Bedding, L*LC, 125 F.4th 555 (5th Cir. 2024) (614 days:  median of Fifth Circuit appeals)*; In re Live*ly, 717 F.3d 406 (5th Cir. 2013) (400 days)*; In re Fieldwood Energy L*LC, 93 F.4th 817 (5th Cir. 2024) (340 days)*; In re North American Specialty Insurance C*o., No. 4:21-cv-02201 (S.D. Tex.) (615 days)*; In re GuangDong Midea Consumer Electric Mf'g Co. Lt*d., No. 4:24-cv-00847 (S.D. Tex.) (387 days)*; In re Quintela Group, L*LC, No. 4:20-cv-03499 (S.D. Tex.) (350 days:  median for Southern District of Texas appeals)*; In re Costagl*io, No. 4:25-cv-03616 (S.D. Tex.) (294 days)*; In re Ovation Servic*es, No. 2:22-cv-00309 (S.D. Tex.) (243 days).

and compensation agreements for key employees expire in January. Should the stay extend the effective date beyond January, the Debtors will be forced to renew a key employee retention and incentive program that previously cost $72.6 million to put in place. *Id.* And professional fees—already averaging $17 million per month since the retention of shared professionals—would inevitably continue to mount.

81.     An extended stay in bankruptcy would also rob the Debtors of crucial opportunities in the coming months. Without completing their reorganization, freeing themselves from chapter 11 restrictions, and obtaining access to post-emergence liquidity, the Debtors may miss the narrow window to transition from traditional media to social media. Keyes Decl. ¶ 9.

82.     But the Court need not take the Debtors' word for it; recent developments reveal the effects that the Debtors' need to reorganize has caused. For Q1 2026, the quarter immediately prior to the chapter 11, QVC experienced an 8.5% year-over-year decline in topline revenue. In Q2, while the Company was in chapter 11, the decline accelerated to 10.3%. That represents a 180 basis point acceleration in decline, even with a proposed efficient, short stay in bankruptcy. Assuming this 180 basis point acceleration is maintained, QVC would experience a hit to topline revenue of approximately $135 million over a 12-month stay, a $209 million hit over an 18-month stay, and a $270 million hit over a 24-month stay against the projections introduced at the confirmation trial. Keyes Decl. ¶ 9. All told, should the Court stay the Confirmation Order pending appeal, the Debtors' businesses would degrade at a time when they are primed to flourish.

83.     *Any* stay (including the "narrow" stay the Preferred Shareholders propose) would also leave Cornerstone in limbo, threatening its ability to continue on a go-forward basis and risking a liquidation of that brand, jeopardizing the livelihoods of its 1,527 employees. Prior to the Debtors' chapter 11 cases, the Cornerstone business was operating on razor-thin margins, even

33

while receiving significant support from QVC. Keyes Testimony, Day 1: 264:6–15; 268:14–16; 271:18–272:2 (Jason Keyes noting that Cornerstone benefits substantially from QVC's agreement with UPS); 272:15–25 (noting QVC provides certain administrative services to Cornerstone); 273:2–14 (noting QVC provides roughly $700,000 in third-party services to Cornerstone, including audit and tax services); 273:15–25 (noting the IT and Audit services QVC provides to Cornerstone). In an event where Cornerstone remained owned by QVCG and LINTA and the Debtors collectively remain in bankruptcy, Cornerstone faces a real and substantial risk of liquidation. Keglevic Testimony, Day 3: 51:18–23 ("So management had done a study in February that said the liquidation value of Cornerstone to shareholders was zero. And, you know, interestingly, LINTA said, we don't want it."); *id.* at 53:1–10 ("Now, there's, in fact, a study in February that says there's zero liquidation value associated with [Cornerstone]. So people are making - - would have to make assumptions. And, of course, in the valuation assumptions that everybody issues, they use the company's projections again, which have proved to be too high, both from a profit standpoint and from a revenue standpoint."). Should the Court issue a stay of its confirmation order, the Debtors estimate the losses to Cornerstone's topline revenue of approximately $20 million over a 12-month stay, $30 million over an 18-month stay, and $40 million over a 24-month stay against the projections introduced at the confirmation trial. Keyes Decl. ¶ 9. It is only after emergence, with Cornerstone owned directly by QVC, that the Cornerstone business has a chance to realize any value. Keglevic Testimony, Day 3: 52:8–13 ("So if there was going to be any value at Cornerstone, you know, [QVC was] the only one that could capture it because there was zero value to LINTA and zero value to TopCo."); *id.* at 53:11–16 ("So, you know, [QVC] ascribe[s] very little value to Cornerstone. It's going to take a turnaround and it might have some value but I think you could certainly argue the value range

34

starts with zero."); *id*. at 51:11–17 ("QVC, Inc. provides, I think it was testified to, all the back office functions, including IT. And also, there's a tremendous amount of synergies. I think the one that was brought up, UPS is probably by far the biggest one, the rate that Cornerstone got.").

### 2. A Tailored Stay Would Not Prevent the Harm.

84. Rather than acknowledge the widespread harm their requested blanket stay would impose, the Preferred Shareholders focus instead on the consequences of a narrower stay. They submit that a stay "will not substantially harm other parties *because the Court can tailor relief to the QVCG-specific provisions....*" ECF No. 716 at 34 (emphasis added). And they proffer a stay that would stop "transfer or distribution of QVCG distributable cash, the transfer of QVCG's 62% Cornerstone interest, the cancellation of Preferred Stock, and enforcement of releases against the Preferred Shareholders." ECF No. 716 at 34. "Practically speaking," they say, blocking those events "will result only in lowering the amount of distribution certain of QVC's creditors will take at emergence." ECF No. 716 at 34. Not so.

85. As an initial matter, the Preferred Shareholders' maneuver signals a tacit admission of the harm that will follow from the full stay they request. But even the so-called "tailored" stay is a wolf in sheep's clothing. The transfers and releases that Preferred Shareholders seek to block are foundational components of the Intercompany Settlement. And the Intercompany Settlement "functions as the keystone to the RSA and the Plan." ECF No. 710 at 72. So without those items, there is no Intercompany Settlement. And without the Intercompany Settlement, there is no Plan. The alternative stay that the Preferred Shareholders propose might be narrow in form, but its function would be no different than a full stay of the Confirmation Order.

### 3. The Harm of a Stay Greatly Outweighs Any Harm Absent One.

86. These injuries are real, substantial, and serious and far exceed any alleged injury to the Preferred Shareholders in absence of a stay. "A stay is not a matter of right, even if irreparable

35

injury might otherwise result." *Plaquemines Parish v. Chevron USA, Inc.*, 84 F.4th 362, 373 (5th Cir. 2023) (quoting *Nken v. Holder*, 556 U.S. 418, 433 (2009)). "It is ultimately necessary to balance the equities – to explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Rhoten v. Stromen*, No. 1:16-CV-00648, 2020 WL 3545661, at *3 (W.D. Tex. June 30, 2020) (citation modified); *see also F.D.I.C. v. Belcher*, No. 19-12561, 2020 WL 242781, at *6 (E.D. La. Jan. 16, 2020) ("A determination of the balance of equities, 'i.e., consideration of the other three factors,' is critically relevant to the court's determination." (quoting *Ruiz v. Estelle*, 650 F.2d 555, 565–66 (5th Cir. 1981)).

87. Notwithstanding stay applicants' own irreparable injuries, courts in this District have routinely denied stays to the applicants where the opposing party would suffer substantial harm under a stay. *Bank of America, N.A. v. Mega World Builder Corp.*, No. 4:24-cv-3021, 2025 WL 1485868, at *2–3 (S.D. Tex. Jan. 8, 2025) (denying a stay whereby the party opposing the stay would see "millions of dollars of [its] assets" dissipated, notwithstanding the movant's evidence "at best, show[ing] some possibility that the Court's order will irreparably injure" them.); *In re Boca Del Rio Props., Inc.*, No. H-0602439, 2006 WL 2459445, at *1–2 (S.D. Tex. Aug. 23, 2006) (denying a stay where the party opposing the stay would see its collateral used rent free by the debtor, notwithstanding the debtor, the movant, possibly seeing its appeal become equitably moot); *Patino v. City of Pasadena*, 229 F. Supp. 3d 582, 588–90 (S.D. Tex. 2017) (denying the City's request for a stay of an injunction against its recently enacted voting districts, where the party opposing the stay would suffer substantial injury from the dilution of their right to vote, notwithstanding the city's irreparable injury of not being able to enforce its laws). Here, the Debtors' and other stakeholders' injuries far outweigh the Preferred Shareholders' claims of harm

36

that might befall them. That the balance of the equities tilts so significantly in the Debtors' favor is even more reason to deny the Motion.

### D. The Public Interest Disfavors a Stay.

88. Finally, the fourth stay factor, which asks "where the public interest lies," also weighs against a stay. *Nken*, 556 U.S. at 434. "In a bankruptcy case, the public interest is in promoting a successful reorganization." *In re Raborn*, No. 15-10938, 2017 WL 4536090, at *4 (Bankr. M.D. La. 2017) (quoting *In re Babcock & Wilcox*, No. CIV.A.00-1410, 2000 WL 1092434, at *3 (E.D. La. Aug. 2, 2000)); *see also In re Smith*, 397 B.R. 134, 148 (Bankr. D. Nev. 2008) ("great public interest in the efficient administration of the bankruptcy system" weighed against issuance of a stay pending appeal); *In re Stewart*, 604 B.R. 900, 909 (Bankr. W.D. Okla. 2019) (public interest in expeditious administration of bankruptcy cases weighs against issuance of stay). And "[c]ourts recognize the strong public 'need for finality of decisions, especially in a bankruptcy proceeding.'" *Piccadilly Rests.*, 2014 WL 1871889, at *5 (denying stay pending appeal) (quoting *In re Calpine Corp.*, 2008 WL 207841, at *7).

89. Implementation of the Plan will allow Reorganized QVC to emerge better positioned for long-term growth. This will benefit all parties, including Reorganized QVC's employees, vendors, and commercial counterparties. Granting the Preferred Shareholders' request for a stay would severely hinder the public interest by delaying the reorganization process, causing uncertainty and potential harm to creditors and other stakeholders who are relying upon the finality of the Confirmation Order, and undermining the success of Reorganized QVC's reorganization. That result benefits only the Preferred Shareholders, who would enjoy tremendous hold-up leverage. Such an outcome would be directly contrary to the public's interest.

90. In response, the Preferred Shareholders offer a vague claim that the public interest "favors correct application of the Bankruptcy Code's confirmation requirements." ECF No. 716

37

at 35. This argument assumes that the Preferred Shareholders are right about the law. Not only is that assumption incorrect for the reasons explained above, but the argument itself conflates the likelihood-of-success factor with the public interest factor.

91. In arguing that the public interest favors a stay, the Preferred Shareholders further assert that "loss of appellate rights is irreparable prejudice." *Id*. Setting aside the merits of the claim, it similarly confuses the question of whether they face a risk of irreparable harm with the question of whether the *public interest* would be served by a stay. Whatever the scope of that interest, it pales in comparison to the interest in preserving the tangible benefits of a highly successful restructuring.

## II. At A Minimum, A Stay Pending Appeal Should Require The Preferred Shareholders To Post A $900 Million Bond.

92. If the Court finds that the Preferred Shareholders have carried their burden in proving that a stay is appropriate (they have not), then under Bankruptcy Rule 8007(c), the Court should impose a bond. Doing so will account for the vast harm that the stay would cause the Debtors, their creditors, and other stakeholders.

93. "The purpose of requiring such a 'bond in a bankruptcy court is to indemnify the party prevailing in the original action against loss caused by an unsuccessful attempt to reverse the holding of the bankruptcy court.'" *In re Tribune Media Co.*, 799 F.3d 272, 281 (3d Cir. 2015) (citing *In re Theatre Holding Corp.*, 22 B.R. 884, 885 (Bankr. S.D.N.Y.1982)). "In determining whether a bond should be ordered, the court looks to whether the bond would be necessary to protect 'against diminution in the value of property pending appeal' and to 'secure the prevailing party against any loss that might be sustained as a result of an ineffectual appeal.'" *In re Adelphia Commc'ns*, 361 B.R. at 350 (citation omitted); *In re Texas Equip. Co., Inc.*, 283 B.R. at 229 (similar). "Moreover, the posting of a bond 'guarantees the costs of delay incident to the appeal.'"

*In re Adelphia Commc'ns*, 361 B.R. at 350 (citation omitted). "The form, the amount and the sufficiency of that security are generally matters within the discretion of and for determination by the bankruptcy court." *Ruff v. Ruff*, No. 4:22-CV-00321, 2023 WL 2574021, at *3 (E.D. Tex. Mar. 20, 2023) (quoting *In re Gleasman*, 111 B.R. 595, 602 (Bankr. W.D. Tex. 1990)).

94. When calculating the amount of the bond, courts evaluate the costs to the non-moving party and its creditors that a stay would cause, including additional professional fees, opportunity costs to creditors who would now receive delayed distributions, and loss in market value to equity investors caused by delayed emergence from bankruptcy, among other factors. *See, e.g.*, *In re Tribune Media*, 799 F.3d at 282. The Court should generally "set a bond at or near the full amount of the potential harm to the non-moving parties." *In re Adelphia Commc'ns,* 361 B.R. at 368. Such bonds can reach amounts ranging into the hundreds of million or billions of dollars. *See, e.g.*, *id.* (ordering appellants to post bond in amount of $1.3 billion with ten percent to be posted within twenty-four hours of the opinion and remainder to be posted within seventy-two hours); *id.* at n.166 (collecting cases); *In re Tribune Media*, 799 F.3d at 282 (finding bankruptcy court's calculation of supersedeas bond in amount of $1.5 billion "was well-considered and as convincing as the alchemy of valuation in bankruptcy can be"); *In re Tribune Co.*, 477 B.R. 465, 480–83 (Bankr. D. Del. 2012) (ordering same); *cf. In re Gen. Motors Corp.*, 409 B.R. at 34 (denying stay but noting "a bond would have to be posted in an amount no less than $7.4 billion" given the magnitude of harms faced by non-movants); *In re Calpine Corp.*, 2008 WL 207841, at *7 (denying stay but noting in dicta that "no stay would be issued without the posting of a bond to cover the enormous risk of loss to the Debtors, their estates, creditors and interest holders in the range of $900 million to $1 billion").

95.     The burden is on the appealing party to prove that a bond in the full amount of the potential harm is not required. *See In re Perry*, No. CV 23-5265, 2024 WL 68257, at *4 n.41 (E.D. La. Jan. 5, 2024) ("A bond is generally required for a stay. While posting an appeal bond is not mandatory, 'if the movant seeks imposition of a stay without a bond, the applicant has the burden of demonstrating why a court should deviate from the ordinary full security requirement'" (quoting *In re Motors Liquidation Co.*, 539 B.R. 676, 686 (Bankr. S.D.N.Y. 2015))); *see also Preston Wood & Assocs., LLC v. Cameron Architects, Inc.*, No. H-16-1427, 2019 WL 2904297, at *2 (S.D. Tex. Apr. 26, 2019) (under Fed. R. Civ. P. 62(d), "'If a court chooses to depart from the usual requirement of a full security supersedeas bond,' the burden is on the moving party to 'objectively demonstrate' that posting a full bond would impose an undue financial burden.").

96.     The Preferred Shareholders have failed to carry their burden here. Not only have the Preferred Shareholders failed to explain why the Court should deviate from the standard practice of requiring a supersedeas bond, the Preferred Shareholders also ignore the substantial, quantifiable harm to the Debtors, their creditors, and other stakeholders that would result should any stay be ordered. Any stay would result in significant business decline, including decreased topline revenue, heightened vendor anxiety, and significant employee retention concerns. *See* Keyes Decl. ¶ 9 (explaining that QVC is directly seeing the impact of the bankruptcy in its revenue); *id.* (explaining that vendors have demanded letters of credit now totaling $300 million and should a stay be enacted the Company will not see the return of a budgeted $100 million in liquidity slated to return from their expiration); *id.* (explaining that any stay may result in the Debtors needing to renew employee retention programs that previously cost the business $72.6 million to enact). Any stay would also result in continued professional fees, to the tune of at least $8 million per month over the course of the stay. *Id.* ¶ 9. A stay too would cause the

40

company to incur increased fees to the U.S. Trustee, amounting to $3 million over a twelve-month stay, $4.5 million over an eighteen-month stay, and $6 million over a twenty-four-month stay. *Id.* Any stay would necessarily also result in further devaluation of the Cornerstone business, likely leading to a substantial liquidity crisis for Cornerstone such that its 1,527 employees' jobs are threatened. *See id.* Courts have found these types of quantifiable harms persuasive in evaluating whether to institute a bond. *See, e.g.*, *In re Adelphia Commc'ns*, 361 B.R. at 352–54, 368 (discussing factors influencing finding that value erosion would occur should a stay be put in place); *In re Tribune Co.*, 477 B.R. at 478–83 (weighing factors raised by the parties).

97.     Further, any stay would also result in additional financial harms that are harder to quantify, including lost investment opportunities for creditors, potential loss of the exit ABL facility, which is contingent on the consummation of the restructuring transactions in the Plan within 180 days, the maturity of the Debtors' debtor-in-possession financing on October 16, 2026, and the significant risk of an unraveling of the RSA and Plan, which would wreak havoc on the Debtors' restructuring efforts. This type of value erosion is something courts have highlighted when determining whether to implement a bond. *See, e.g.*, *In re Adelphia Commc'ns*, 361 B.R. at 354.

98.     The Preferred Shareholders' arguments that no bond need be posted—arguments for which they provide no supporting case law, *see* ECF No. 716 at 35—ignore the vast harm that would result to the Debtors. The Preferred Shareholders argue that "[t]he assets at issue during the pendency of the stay … will remain intact and available to be transferred to the Debtors or other parties *later* should the Preferred Shareholders not prevail on appeal." *Id.* (emphasis added). The Preferred Shareholders fail to account for the real harm that any delay in transfer of the assets would work on the Debtors and other stakeholders by wrongfully assuming—as they have

41

repeatedly—that QVCG can just be carved out of the Intercompany Settlement. As Mr. Keyes details, decreased topline revenue at QVC and Cornerstone, continued fee burn, U.S. Trustee fees, lost investment opportunities for creditors, and employee retention could materialize into approximately $419 million over a 12-month stay, $603 million over an 18-month stay, and $776 million over a 24-month stay—even before taking into account the loss of a planned $100 million in additional liquidity as letters of credit would otherwise begin to expire. *See* Keyes Decl. ¶ 10.

99.     What's more, the Preferred Shareholders' alternative argument that "the Debtors are already holding approximately $75 million in professional fees that QVCG funded … and for which QVCG is entitled to reimbursement" and which therefore "can serve as adequate security for a stay… without requiring the Preferred Shareholders to post any additional collateral," ECF No. 716 at 35, gets the requirement exactly backwards. To obtain a stay, it is the Preferred Shareholders who must post the bond—and they must do so with their own money, not money at QVCG and not money QVCG is purportedly owed by its professionals or another debtor entity.

100.     Should the Court find that a stay is warranted, it should order that the moving Preferred Shareholders post a bond in the amount of $900 million, on account of the decreased topline revenue at QVC and Cornerstone, continued fee burn, U.S. Trustee fees, lost investment opportunities for creditors, employee retention costs totaling approximately $419 million over a 12-month stay, $603 million over an 18-month stay, and $776 million over a 24-month stay—even before taking into account the loss of a planned $100 million in additional liquidity as letters of credit would otherwise begin to expire—plus the incalculable and irreparable harm to the business of being prevented from achieving its planned transition to social media and one-time opportunity to seize market share. Only such a bond would ensure the value of the enterprise can be protected

from the risks it inevitably will face due to delays in the Debtors' reorganization necessitated by a stay pending appeal.

## CONCLUSION

101.    The Debtors have covered a marathon's distance at a sprinter's pace.  Nothing warrants barricading the finish line for two years while the Preferred Shareholders pursue a long-shot appeal.  The Court should deny the Motion.

[*Remainder of page intentionally left blank.*]

Dated: July 20, 2026

*/s/ Jason S. Brookner*

| | |
|---|---|
| **GRAY REED** | **KIRKLAND & ELLIS LLP** |
| Jason S. Brookner (TX Bar No. 24033684) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Lydia R. Webb (TX Bar No. 24083758) | Joshua A. Sussberg, P.C. (admitted *pro hac vice*) |
| Emily F. Shanks (TX Bar No. 24110350) | Aparna Yenamandra, P.C. (admitted *pro hac vice*) |

GRAY REED
Jason S. Brookner (TX Bar No. 24033684)
Lydia R. Webb (TX Bar No. 24083758)
Emily F. Shanks (TX Bar No. 24110350)
1300 Post Oak Blvd.
Suite 2000
Houston, Texas 77056
Telephone:     (713) 986-7000
Facsimile:     (713) 986-7100
Email:          jbrookner@grayreed.com
                   lwebb@grayreed.com
                   eshanks@grayreed.com

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                   aparna.yenamandra@kirkland.com

- and -

Chad J. Husnick, P.C. (admitted *pro hac vice*)
Gabriela Zamfir Hensley (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          chad.husnick@kirkland.com
                   gabriela.hensley@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*

*Co-Counsel for the Debtors and Debtors in Possession*

**Certificate of Service**

I certify that on July 20, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Jason S. Brookner*
Jason S. Brookner

# Exhibit G

Case: 26-90447 Document 1295 Filed in TXSB on Date Filed: 07/30/2026

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
| QVC GROUP, INC., *et al.*,[1] | ) |
|  | ) Case No. 26-90447 (ARP) |
|  | ) |
| Debtors. | ) Jointly Administered |
|  | ) |

**DECLARATION OF JASON KEYES IN SUPPORT OF
DEBTORS' OPPOSITION TO THE PREFERRED SHAREHOLDERS' EMERGENCY
MOTION FOR STAY PENDING APPEAL OF CONFIRMATION ORDER UNDER
BANKRUPTCY RULE 8007(A), OR, IN THE ALTERNATIVE, FOR LIMITED STAY
AND INTERIM STAY PENDING HEARING**

I, Jason Keyes, hereby declare under penalty of perjury, to the best of my knowledge, information, and belief:

1.      I am a Partner and Managing Director at AlixPartners, LLP ("AlixPartners"), the financial advisor to the above-captioned debtors and debtors in possession (collectively, the "Debtors" or the "Company"). I submit this declaration (the "Declaration") in support of the *Debtors' Opposition to the Preferred Shareholder's Emergency Motion for Stay Pending Appeal of Confirmation Order Under Bankruptcy Rule 8007(a), or, In the Alternative, For a Limited Stay and Interim Stay Pending Hearing*. I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors.

2.      The Declaration is based upon (a) my experience and personal knowledge, (b) information obtained from members of the Debtors' management team, employees, or

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/QVC. The location of Debtor QVC Group, Inc.'s corporate headquarters and the Debtors' service address in these chapter 11 cases is 1200 Wilson Drive, West Chester, Pennsylvania, 19380.

advisors, (c) my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, and  (d) my opinions based upon my experience and knowledge.  If called as a witness, I could and would testify competently to the facts and opinions set forth in this Declaration.

### Professional Background

3. AlixPartners is a global independent restructuring consulting firm that has a wealth of experience in providing restructuring advisory services, and has assisted and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous chapter 11 cases of similar size and complexity to these chapter 11 cases.

4. I have over fifteen years of restructuring, corporate finance, accounting, and turnaround experience, including business plan development, plan negotiations, and interim management experience.  Since joining AlixPartners, I have provided restructuring advice to companies, creditors, and investors, both in chapter 11 and on an out-of-court basis, in the retail, transportation, technology, infrastructure, energy, aerospace, and mining industries.  As an advisor, I have been involved in a number of chapter 11 cases, including STG Logistics, Inc., Riverbed Technology, Inc., J. Crew Group, Inc., Toisa Ltd., Aegean Marine Petroleum Network Inc., UCI International, LLC, Chassix Holdings, Inc., Allied Nevada Gold Corp., American Roads Holding LLC, Essar Steel Minnesota LLC, and Walter Energy, Inc.  I have worked on six retail restructurings and turnarounds, on both an in-court and out-of-court basis.

5. I, together with my team members at AlixPartners, have been assisting the Company with financial planning and strategic alternative assessment since May 2025.  In that role I have become familiar with the Debtors' business and books and records.  I have also become familiar with the Debtors' operations, including its interactions with its customers, vendors, and trade base.  I have worked closely with the Debtors' senior management to evaluate liquidity and

credit issues, and formulate strategies necessary to successfully implement the Debtors' business plan and restructuring transactions. Further, I have assisted the Debtors with the development of projections and analyses that formed the foundation of the Restructuring Support Agreement (the "RSA"), the Plan of Reorganization (the "Plan"), and the Debtor's exit financing (the "Exit ABL").

### The Confirmed Plan is a Tremendous Success

6.      The confirmed Plan is a terrific accomplishment for each of the Debtors' estates, including QVC Group, Inc. ("QVC Group"). As the Court noted, this global settlement is the "keystone" of the Plan (and RSA). *See* ECF No. 710 at 9, 72. Because of its many benefits, the Plan earned near universal consensus. As set forth in the Voting Report, the Plan received the support of every class eligible to vote in favor of confirmation. Holders of 100% in principal amount and 100% in number of the Class B3 Claims, 99.88% in principal amount and 85.56% in number of the Class B4 Claims, and 98.95% in principal amount and 81.91% in number of the Class C3 Claims have voted to accept the Plan.

7.      The overwhelming support from the Debtors' stakeholders primes the Debtors to emerge from chapter 11 as a strong, well-positioned company with QVC, Inc. ("QVC Inc.") at the helm. The Plan preserves the jobs of approximately 15,800 employees; right sizes the Debtors' balance sheet, resolves all material intercompany claims between and among the Debtors, and provides releases to QVC Group's Preferred Shareholders, protecting primarily non-institutional investors from avoidance action risk on account of nearly $450 million in dividend payments they received in recent years. Among other benefits to the estate, the Plan accomplishes:

- *Substantial Deleveraging*. Through the restructuring transactions, the Debtors will eliminate more than $5 billion in funded debt obligations, which will free up capital and opportunities for the reorganized Debtors to continue their transformation efforts.

- *Satisfaction of All Third-Party Unsecured Claims*. Through the Plan, the Debtors, with the support of their funded debt Creditors (who themselves are taking significant concessions in their recoveries) are satisfying in full all third-party unsecured claims

across every Debtor entity, including all employee and vendor claims.  The result is that all third-party general unsecured creditors across the Debtors' corporate structure have received payment in full of over $330 million in payments related to pre-petition claims.

- *Resolution of Complex Intercompany Claims Facilitates Distributions; Avoids Multi-Year Protracted Litigation*.  The Plan provides for the settlement and releases related to numerous intercompany claims that have the potential to exceed $2 billion in total between QVC, QVC Group, Liberty Interactive LLC ("LINTA"), and QRI Cornerstone ("Cornerstone").  The intercompany claims resolved include potential fraudulent transfers, tax obligations, and possible deferred tax liability resulting from LINTA notes.  The resolution of these claims, rather than their litigation, expedites distributions and saves all parties millions of dollars in professional fees that can otherwise be distributed to the Debtors' stakeholders.

- *Exit Financing*. The Debtors have obtained commitments for the Exit ABL in an amount of $600 million, which will significantly bolster liquidity upon emergence. The Exit ABL reflects the confidence of the sophisticated lenders in the Debtors' post-emergence business plan and positions the Company for long-term, sustainable growth.

- *Preserving the Going Concern Value of the Business*. Most importantly, the Plan provides the Debtors with negotiated commitments that ensures each of QVC and Cornerstone continue as a going concern post emergence.  Cornerstone, an otherwise challenged business with limited free cash flows in recent years, will be sustained as a subsidiary of QVC and benefit from QVC's economics of scale.  By preserving themselves as a going concern, the Debtors are saving thousands of skilled jobs and minimizing disruption to the Debtors' vendor networks.

8.      All of these benefits will likely be lost if the Plan is stayed and does not go effective. The Plan is the only path currently available for the Debtors to holistically and successfully emerge from chapter 11 as a strong enterprise.  I am aware of no actionable alternative, nor am I aware of an alternative proposal that would preserve the Debtors go-forward business plan and see them exit chapter 11 as a healthy, right-sized company.

### The Harm Created by the Stay

9.      If a stay motion is granted, the Debtors and their stakeholders will suffer severe harm—some of which can be quantified, and some of which is existential and irreparable.

- *Decreased QVC Revenue*.  Customers have expressed skepticism over the Debtors' continued operations in chapter 11 as indicated by a precipitous drop in QVC's net promoter score over Q1 and Q2 2026.  QVC, Inc. is directly seeing this impact in its

4

revenue. For Q1 2026, the quarter immediately prior to the chapter 11, QVC, Inc. experienced an 8.5% year-over-year decline. In Q2, while the Company was in chapter 11, the decline accelerated to 10.3%. That represents a 180 basis point acceleration in decline, even with an efficient and proposed short stay in bankruptcy. Assuming this 180 basis point acceleration is maintained, QVC, Inc. would experience a hit to topline revenue of approximately $135 million over a 12-month stay, a $209 million hit over an 18-month stay, and a $270 million hit over a 24-month stay against the projections introduced at the confirmation trial. An extended stay in chapter 11 could easily cause an even larger basis point reduction in topline revenue as the below issues arise, leading to a far larger hit to topline revenue than identified here.

- *Decreased Cornerstone Revenue*. Cornerstone is also feeling the impact of the chapter 11. For Q1 2026, the quarter immediately prior to the chapter 11, Cornerstone experienced a 5.8% year-over-year decline in revenue. In Q2, while the Company was in chapter 11, the decline accelerated to 7.9%. That represents a 210 basis point acceleration in decline, even with an efficient and proposed short stay in bankruptcy. Assuming this 210 basis point acceleration is maintained, Cornerstone would experience a hit to topline revenue of approximately $20 million over a 12-month stay, $30 million over an 18-month stay, and $40 million over a 24-month stay against the projections introduced at the confirmation trial. An extended stay in chapter 11 could easily cause an even larger basis point reduction in topline revenue as the below issues arise, leading to a far larger hit to topline revenue than identified here. Absent continued support from the QVC mothership and the benefit of a successful emergence, Cornerstone may be unable to fund its operations, jeopardizing the livelihoods of its approximately 1,500 employees.

- *Narrow Window to Transition to Social Media.* A prolonged and uncertain stay in bankruptcy may leave the Debtors unable to achieve their long-planned objectives to transition the company into the social-media age and enhance operational efficiencies. The Debtors have a narrow window to complete the transition from traditional media to social media, including through establishing market position and competitive advantage on TikTok, and that window could be missed if the Debtors are unable to make the necessary reinvestment efforts that they have planned at emergence. If the Debtors remain in a prolonged bankruptcy, they may miss the narrow window to further establish a digital foothold—a window that may not open again, preventing the Debtors from achieving their business plan. Missing this narrow window may result in significant underperformance in the Debtors' financial projections, which relies upon the success of the social media strategy.

- *Significant Impact to the Business*. In the absence of a quick and efficient exit from chapter 11, the Debtors will continue to face significant economic headwinds. Since the release of a February 2026 Bloomberg News article regarding the Debtors' potential restructuring, the Debtors have faced significant additional business and economic stress. Vendors have pushed back and demanded letters of credit or prepayments. Employees have experienced heightened anxiety about their job security. That friction would only increase as we get closer to the holiday buying season.

- *Additional Letters of Credit*. An extended stay in bankruptcy may force the Debtors to increase the letters of credit provided to vendors to ensure delivery of products. Up to this point, the Debtors have approximately $300 million in letters of credit outstanding for the vendors. The Debtors plan (assuming a mid-year effective date) to reduce letters of credit outstanding by over $100 million over the next six to nine months, as their expiration and removal is a core component of the go forward liquidity plan. An extended stay in bankruptcy would eliminate that liquidity infusion. In addition, with an uncertain additional period of chapter 11, vendors may require additional letters of credit. Each dollar held as collateral to support these letters of credit is one less dollar of liquidity available to the Debtors.

- *Renegotiation of DIP LC Facility*. Further, the Debtors' DIP LC Facility is set to terminate six months from the petition date, and each letter of credit has an expiration date of no more than twelve months from issuance. A protracted bankruptcy would require the renegotiation of the DIP LC facility, potentially at increased costs to the Debtors.

- *Significant Employee Retention Concerns*. A stay could potentially result in significant costs associated with the retention of management and key employees. In August 2025, the Debtors enacted a holistic retention plan, which the company prepaid in the amount of $72.6 million. If the Debtors are still in chapter 11 when that initial plan terminates in December 2026, the Debtors would need to design and seek approval for a replacement.

- *Unraveling of the RSA and Plan After August 3*. A stay poses significant risk that the Debtors' RSA and Plan unravel, thereby jeopardizing the Debtors restructuring efforts. The RSA represents months of arm's-length negotiations and is the only viable path to restructuring the Debtors. The RSA required that the Debtors satisfy certain milestones, including achieving the Plan Effective Date no later than 90 days after the Petition Date. The RSA parties have since extended the Effective Date milestone to August 3, 2026, but they are under no obligation to do so again. If granted, a stay would necessarily extend the effective date beyond the RSA milestone deadline, and the RSA parties could exercise their rights to terminate the RSA. Further, a stay that could last upwards of one year will certainly put a strain on the RSA parties' willingness to maintain the RSA and Plan. Just one constituency deciding to exercise its termination right could imperil the entire RSA structure and the support for the interlocking intercompany settlements underlying the Plan. The RSA is premised on a delicate, intertwined compromise, and there is no guarantee that consensus will remain over a prolonged timeline.

- *Loss of the Exit ABL Facility*. A stay would jeopardize the Exit ABL facility, preventing the Debtors from accessing a much-needed $600 million facility. It is my understanding that the Exit ABL lenders can terminate the Exit ABL commitment 180 days following the execution of the commitment documents. Further, it is my understanding that the Exit ABL commitment cannot take effect until the restructuring transactions in the Plan are consummated, which includes the transactions with respect to QVC Group.

6

- *Lost Investment Opportunities for Creditors*. Any stay would significantly reduce the investment opportunities currently available to creditors. The Debtors' creditors are scheduled to receive over $930 million at emergence. In total, conservatively assuming a 10% rate of return,[2] lost investment opportunities for creditors could total approximately $93 million over a 12-month stay, $143 million over an 18-month stay, and $195 million over a 24-month stay.

- *Increased Professional Fees*. A prolonged bankruptcy will cause the Debtors, and primarily QVC, to incur millions of dollars in excess professional fees. Since the shared professionals were retained 13 months ago, the total costs of the restructuring have been approximately $219 million to date (averaging approximately $17 million per month). Assuming an estimated fee run rate of $8 million per month to account for significant costs associated with administering a prolonged and stalled restructuring, fees could total approximately $96 million over a 12-month stay, $144 million over an 18-month stay, and $192 million over a 24-month stay. These excess fees will unnecessarily deplete estate resources.

- *Increased United States Trustee Fees*. A prolonged period of bankruptcy will also cause the Debtors to incur millions of dollars in excess fees due to the United States Trustee. To date, the Debtors have unpaid obligations of approximately $750,000 in United States Trustee fees. Should a stay be issued, future fees to the United States Trustee could total approximately $3 million over a 12-month stay, $4.5 million over an 18-month stay, and $6 million over a 24-month stay. These excess fees will unnecessarily deplete estate resources.

10.    In sum, the overall harm to the Debtors and their constituencies from a protracted stay in bankruptcy would be massive. Decreased topline revenue at QVC, Inc. and Cornerstone, continued fee burn, U.S. Trustee fees, lost investment opportunities for creditors, and employee retention could materialize into approximately $419 million over a 12-month stay, $603 million over an 18-month stay, and $776 million over a 24-month stay—even before taking into account the loss of a planned $100 million in additional liquidity as letters of credit would otherwise begin to expire. In addition to those quantifiable categories, other portions of the harm to the estate—such as the failure to capture a narrow window to transition to social media—are incalculable.

---

[2]    For reference, QVC's cost of capital the Court accepted in Evercore's valuation of Cornerstone is 12-14%. *See* DX 384.

7

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of information and belief.


Dated: July 20, 2026                          */s/ Jason Keyes*
                                              Jason Keyes

# Exhibit H

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| QVC GROUP, INC., *et al.*,[1] | ) | Case No. 26-90447 (ARP) |
| | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER (I) APPROVING THE DEBTORS'
DISCLOSURE STATEMENT FOR THE JOINT
PREPACKAGED PLAN OF REORGANIZATION OF QVC
GROUP, INC. AND ITS DEBTOR AFFILIATES PURSUANT
TO CHAPTER 11 OF THE BANKRUPTCY CODE, (II) CONFIRMING THE
SECOND AMENDED JOINT PREPACKAGED PLAN OF REORGANIZATION
OF QVC GROUP, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO
CHAPTER 11 OF THE BANKRUPTCY CODE, AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors (collectively, the "Debtors")[2] having:

a.    on April 16, 2026:

i.    entered into the restructuring support agreement (as may be amended, modified, or supplemented from time to time in accordance with its terms, the "RSA") with holders of over (1) 99% of RCF Claims, (2) 53% of the QVC Notes Claims, and (3) 46% of LINTA Notes Claims; and

ii.    commenced solicitation of votes to accept or reject the Plan by, among other

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/QVC. The location of Debtor QVC Group, Inc.'s corporate headquarters and the Debtors' service address in these chapter 11 cases is 1200 Wilson Drive, West Chester, Pennsylvania 19380.

[2]    Capitalized terms used but not defined in these findings of fact, conclusions of law, and order (collectively, this "Confirmation Order") have the meanings ascribed to them in the *Second Amended Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 389] (as modified, amended, or supplemented from time to time, the "Plan," a copy of which is attached hereto as **Exhibit A**) or the *Disclosure Statement for the Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 14] (including all exhibits attached thereto, and as modified, amended, or supplemented from time to time, the "Disclosure Statement"), as applicable. The rules of interpretation set forth in Article I.B of the Plan apply herein.

things, commencing service of the Solicitation Packages[3] to Holders of Claims in Class B3 (RCF Claims), Class B4 (QVC Notes Claims), and Class C3 (LINTA Notes Claims), in accordance with the applicable provisions of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules");

b. after commencing solicitation of votes to accept or reject the Plan, on April 16, 2026 (the "Petition Date"), commenced these Chapter 11 Cases by Filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code;

c. on April 17, 2026 Filed:

  i. the *Declaration of Bill Wafford in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 4] (the "First Day Declaration"), detailing the facts and circumstances of these Chapter 11 Cases;

  ii. the Debtors' First-Day Pleadings;

  iii. the Debtors' *Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 15];

  iv. the Disclosure Statement [Docket No. 14]; and

  v. the Scheduling Motion, including the Ballots attached as Exhibits 3A, 3B, 3C, 3D, and 3E thereto [Docket No. 41];

d. obtained, on April 17, 2026, entry of the *Order (I) Scheduling a Combined Disclosure Statement and Plan Confirmation Hearing, (II) Approving the Solicitation Procedures, (III) Approving the Deadlines and Notices Related Thereto; (IV) Waiving Certain Requirements in Connection Therewith, and (V) Granting Related Relief* [Docket No. 70] (the "Scheduling Order"), approving:

  i. the *Notice of (I) Commencement of Prepackaged Chapter 11 Bankruptcy Cases; (II) Hearing Approving the Disclosure Statement, Confirming the Joint Prepackaged Chapter 11 Plan, and Related Matters; and (III) Objection Deadlines and Summary of the Debtors' Joint Prepackaged Chapter 11 Plan* (the "Combined Hearing Notice"), attached to the Scheduling Order as Exhibit 1, which contained notice of the

---

[3] The solicitation packages (the "Solicitation Packages") included (a) the Plan; (b) the Disclosure Statement (including all exhibits attached thereto); and (c) the respective Ballots for each voting class as outlined in, and attached as exhibits to, the *Debtors' Emergency Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement and Plan Confirmation Hearing, (II) Approving the Solicitation Procedures, (III) Approving the Deadlines and Notices Related Thereto; (IV) Waiving Certain Requirements in Connection Therewith, and (V) Granting Related Relief* [Docket No. 41] (the "Scheduling Motion").

2

commencement of these Chapter 11 Cases, the date and time set for the Combined Hearing, and the deadline for Filing objections to the Plan and Disclosure Statement (the "Objection Deadline");

    ii.    the notice of publication attached as Exhibit 2 to the Scheduling Order (the "Publication Notice");

    iii.    the Ballots attached to the Scheduling Order as Exhibits 3A, 3B, 3C, 3D, and 3E; and

    iv.    the *Notice of (I) Non-Voting Status of Certain Unimpaired Claims Presumed to Accept and (II) Opportunity for Holders of Such Claims and Interests to Opt Out of the Plan Release* (the "Opt-Out Form") and the *Notice of (I) Non-Voting Status of Certain Impaired Claims and Interests Deemed to Reject (II) Opportunity for Holders of Such Claims and Interests to Opt In to the Plan Release* (the "Opt-In Form," collectively with the Opt-Out Form, the "Notice of Non-Voting Status"), attached to the Scheduling Order as Exhibits 4A and 4B, respectively, that were distributed to Holders of Claims in the Unimpaired Non-Voting Classes and the Impaired Non-Voting Classes (each, as defined below);

e.    twenty-eight days before the Voting Deadline and Objection Deadline, commenced service of (a) the Opt-Out Form, (b) the Opt-In Form, and (c) the Combined Hearing Notice on Holders of Claims or Interests deemed to accept or reject the Plan;

f.    on April 23, 2026, and April 27, 2026, respectively, published a version of the Publication Notice, modified for publication in *The New York Times* (national and international edition), as evidenced by The New York Times Proof of Publication of Notice of Commencement [Docket No. 145] and The New York Times International Edition's Proof of Publication of Notice of Commencement [Docket No. 146] (the "Proof of Publication");

g.    on May 4, 2025, Filed the *Notice of Filing of Valuation Analysis as an Exhibit to the Disclosure Statement* [Docket No. 196];

h.    on May 12, 2026, Filed the *Plan Supplement for the Debtors' Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 212] (as modified, amended, or supplemented from time to time, including by the *Second Plan Supplement for the Debtors' Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 293], the *Third Plan Supplement for the Debtors' Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 503], and the *Fourth Plan Supplement for the Debtors' Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*

[Docket No. 597], the "Plan Supplement" and which, for purposes of the Plan and this Confirmation Order, is included in the definition of "Plan");

i.    on May 19, 2026, Filed the *First Amended Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 289];

j.    on May 27, 2026, obtained entry of the *Stipulation and Order Establishing Certain Confirmation-Related Dates* [Docket No. 327];

k.    on June 1, 2026, Filed:

    i.    the *Affidavit of Service of Solicitation Materials* regarding the Debtors' prepetition service of solicitation materials on Holders of Claims in Class B3 (RCF Claims), Class B4 (QVC Notes Claims), and Class C3 (LINTA Notes Claims) [Docket No. 361] (together with the Proof of Publication (as defined below), the "Affidavits")

    ii.    the *Declaration of Craig E. Johnson on behalf of Kroll Restructuring Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, which detailed the results of the Plan voting process [Docket No. 364] (the "Voting Report"); and

    iii.    the *Debtors' Memorandum of Law in Support of an Order (I) Approving the Debtors' Disclosure Statement for the Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, (II) Confirming the Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, and (III) Granting Related Relief* [Docket No. 359] (the "Confirmation Brief");

l.    on June 2, 2025, Filed:

    i.    the *Declaration of Bill Wafford in Support of (I) Approval of the Debtors' Disclosure Statement on a Final Basis and (II) Confirmation of the Second Amended Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 377] (the "Wafford Declaration"); and

    ii.    the *Second Amended Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 389];

m.    on June 3, 2026, Filed:

4

i.    the *Declaration of Jonathan F. Foster in Support of Confirmation of the Second Amended Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 398] (the "<u>Foster Declaration</u>"); and

ii.    the *Declaration of Thomas B. Walper, Independent Manager of LINTA, in Support of Confirmation of the Second Amended Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 399] (the "<u>Walper Declaration</u>" and, together with the Wafford Declaration and the Foster Declaration, the "<u>Confirmation Declarations</u>");

n.    operated their businesses and managed their properties during these Chapter 11 Cases as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On June 1, 2026, the RCF Lender Group, the QVC Noteholder Group, and the LINTA Noteholder Group each, respectively, having Filed:

a.    the *Joinder of the RCF Lender Group to Debtors' Memorandum in Support of the Disclosure Statement and Confirmation of the Plan of Reorganization* [Docket No. 360];

b.    the *Reply of the QVC Noteholder Group (I) to the Preferred Shareholders' Objection and (II) in Support of Confirmation of the Debtors Joint Prepackaged Chapter 11 Plan of Reorganization* [Docket No. 363]; and

c.    the *Statement Of the LINTA Ad Hoc Group in Support of Confirmation of the First Amended Joint Prepackaged Plan of Reorganization of QVC Group, Inc. And Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 365];

On June 2, 2026, the Disinterested Directors of the Governing Bodies of QVCG, LINTA, QVC, and CBI each, respectively, having Filed:

a.    the *Joinder in Support of Confirmation of First Amended Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 367] (the "<u>QVCG Disinterested Director Joinder</u>");

b.    the *Joinder of the LINTA Independent Managers to the Debtors' Memorandum of Law in Support of an Order (I) Approving the Debtors' Disclosure Statement for the Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, (II) Confirming the Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates*

5

*Pursuant to Chapter 11 of the Bankruptcy Code, and (III) Granting Related Relief* [Docket No. 368] (the "LINTA Disinterested Director Joinder");

c. the *Joinder of the Disinterested Directors of QVC, Inc. to the Debtors' Memorandum of Law in Support of Confirmation of the Joint Prepackaged Chapter 11 Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates* [Docket No. 372] (the "QVC Disinterested Director Joinder"); and

d. the *Joinder of Special Committee of the Board of Directors of Debtor QRI Cornerstone, Inc. to the Debtors' Memorandum of Law in Support of Approval of Debtors' Disclosure Statement and Confirmation of the Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates* [Docket No. 374] (the "CBI Disinterested Director Joinder," collectively, with the QVCG Disinterested Director Joinder, the QVC Disinterested Joinder, and the LINTA Disinterested Director Joinder, the "Disinterested Directors Joinders");

The United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") having:

a. reviewed the solicitation procedures in the Scheduling Motion regarding votes to accept or reject the Plan (the "Solicitation Procedures");

b. heard the statements and arguments made by counsel and parties with respect to the approval of the requested relief in the Scheduling Motion, including the approval of the Solicitation Procedures and the Confirmation Schedule (as defined in the Scheduling Motion), and approved the relief requested therein;

c. taken notice of the Plan, the Disclosure Statement, the Scheduling Motion, the Plan Supplement, the Confirmation Brief, the Confirmation Declarations, the Voting Report, Disinterested Directors Joinders, the Combined Hearing Notice, the Affidavits, and all filed pleadings, exhibits, statements, and comments regarding approval of the Disclosure Statement and Confirmation, including any and all objections, statements, joinders, and reservations of rights;

d. reviewed the discharge, compromises, settlements, releases, exculpations, and injunctions set forth in Article VIII of the Plan;

e. commenced the hearing on June 4, 2026, at 1:00 p.m., prevailing Central Time, pursuant to Bankruptcy Rules 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code to consider approval of the Disclosure Statement and Confirmation (the "Combined Hearing");

f. heard the statements and arguments made by counsel and parties in interest in respect of both approval of the Disclosure Statement and Confirmation;

g. considered all oral representations, testimony, documents, filings, and other evidence regarding both approval of the Disclosure Statement and Confirmation;

6

h.    on July 15, 2026, issued and entered the *Memorandum Decision (I) Approving Disclosure Statement, (II) Confirming Second Amended Plan, And (III) Granting Related Relief* [Docket No. 710] (the "<u>Confirmation Opinion</u>");

i.    overruled, including for any reasons stated on the record of the Confirmation Hearing, any and all objections to approval of the Disclosure Statement and Confirmation and all statements and reservations of rights not consensually resolved, waived, settled, or withdrawn unless otherwise indicated herein, on the record at the Confirmation Hearing, or in the Confirmation Opinion; and

j.    taken judicial notice of all pleadings and other documents Filed, all orders entered, and all evidence and arguments presented in these Chapter 11 Cases.

NOW, THEREFORE, it appearing to the Bankruptcy Court that notice of the Combined Hearing and the opportunity for any party in interest to object to both approval of the Disclosure Statement and Confirmation were adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby, and that the legal and factual bases set forth in the documents Filed in support of both approval of the Disclosure Statement and Confirmation, other evidence presented at the Combined Hearing, and the entire record of these Chapter 11 Cases establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefor, the Bankruptcy Court makes and issues the following findings of fact and conclusions of law, and orders:

<b><u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u></b>

IT IS DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:

**A.    Findings and Conclusions.**

1.    The determinations, findings, judgments, decrees, orders, and conclusions set forth in the Confirmation Opinion, herein, and in the record of the Combined Hearing constitute the Bankruptcy Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014. All findings of fact and conclusions of Law announced by the Bankruptcy Court at the Combined Hearing in

7

relation to Confirmation, including the Confirmation Opinion and any rulings made on the record at the Combined Hearing are hereby incorporated into this Confirmation Order. To the extent any of the following conclusions of law constitute findings of fact, or vice versa, they are adopted as such.

**B.  Jurisdiction, Venue, and Core Proceeding.**

2.  The Bankruptcy Court has jurisdiction over these Chapter 11 Cases pursuant to 28 U.S.C. § 1334. The Bankruptcy Court has exclusive jurisdiction to determine whether the Disclosure Statement and the Plan comply with the applicable provisions of the Bankruptcy Code and should be approved on a final basis and confirmed, respectively. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. Approval of the Disclosure Statement and Confirmation are core proceedings as defined in 28 U.S.C. § 157(b)(2). The Bankruptcy Court may enter a Final Order consistent with Article III of the United States Constitution.

**C.  Eligibility for Relief.**

3.  The Debtors were and are Entities eligible for relief under section 109 of the Bankruptcy Code, and the Debtors are proper proponents of the Plan under section 1121(a) of the Bankruptcy Code.

**D.  Commencement and Joint Administration of these Chapter 11 Cases.**

4.  On the Petition Date, each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code. On April 17, 2026, the Bankruptcy Court entered an order [Docket No. 17] authorizing the procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1. Since the Petition Date, the Debtors have operated their businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases.

**E.      Committee**

5.      On May 6, 2026, the United States Trustee for Region 7 (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code to represent the interests of the unsecured creditors of the Debtors in these Chapter 11 Cases [Docket No. 198].

**F.      Burden of Proof—Confirmation of the Plan.**

6.      The Debtors, as proponents of the Plan, have met their burden of proving the applicable elements of sections 1123, 1129(a), and 1129(b) of the Bankruptcy Code by a preponderance of the evidence or the applicable evidentiary standard for Confirmation.   In addition, and to the extent applicable, the Plan is confirmable under the clear and convincing evidentiary standard.

**G.      Notice.**

7.      As evidenced by the Affidavits and the Voting Report, the Debtors provided due, adequate, and sufficient notice of the commencement of these Chapter 11 Cases, the Disclosure Statement, the Plan (and the opportunity to opt out of the Third-Party Release therein), the Plan Supplement, and the Combined Hearing, in compliance with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, including Bankruptcy Rules 2002(b), 3017, 3019, and 3020(b), the Bankruptcy Local Rules, and the Scheduling Order.   Further, the Plan, Disclosure Statement, Scheduling Order, Combined Hearing Notice, and all other documents Filed in these Chapter 11 Cases were and continue to be available at no charge to all members of the public on the   case   website   maintained   by   the   Claims   and   Noticing   Agent   at: https://restructuring.ra.kroll.com/QVC.  No other or further notice is or shall be required.

**H.** **Disclosure Statement.**

8. The Disclosure Statement contains (a) sufficient information of a kind necessary to satisfy the disclosure requirements of all applicable non-bankruptcy laws, rules, and regulations, including the Securities Act, and (b) "adequate information" (as such term is defined in section 1125(a) of the Bankruptcy Code and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, and the transactions contemplated therein. The Filing of the Disclosure Statement with the Bankruptcy Court satisfied Bankruptcy Rule 3016(b). The Debtors' use of the Disclosure Statement in solicitation of acceptances of the Plan is approved, and the Disclosure Statement is approved on a final basis pursuant to this Confirmation Order.

**I.** **Ballots.**

9. Class B3 (RCF Claims), Class B4 (QVC Notes Claims), and Class C3 (LINTA Notes Claims) were the only classes of claims entitled under the Plan to vote to accept or reject the Plan (the "Voting Classes").

10. The ballots the Debtors used to solicit votes to accept or reject the Plan from Holders of Claims in the Voting Classes (the "Ballots") adequately addressed the particular needs of these Chapter 11 Cases and were appropriate for Holders of Claims in the Voting Classes to vote to accept or reject the Plan.

**J.** **Solicitation.**

11. The solicitation of votes on the Plan was appropriate and satisfactory based upon the circumstances of these Chapter 11 Cases and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and any other applicable rules, laws, and regulations, including the Securities Act.

12. As described in the Confirmation Declarations, the Voting Report, the Affidavits, the Scheduling Motion, and the Confirmation Brief, prior to the Petition Date, the Debtors caused

the Solicitation Packages to be transmitted and served to all Holders of Claims in the Voting

Classes that held such Claims as of April 13, 2026 (the "Voting Record Date") in compliance with

the Bankruptcy Code, including sections 1125 and 1126 thereof, the Bankruptcy Rules, including

Bankruptcy Rules 3017 and 3018, the Bankruptcy Local Rules, and any applicable non-bankruptcy

law. The posting and service of the Solicitation Packages were timely, adequate, and sufficient

under the facts and circumstances of these Chapter 11 Cases. The establishment and notice of the

Voting Record Date was reasonable and sufficient, and the period during which the Debtors

solicited votes to accept or reject to the Plan was a reasonable and sufficient period for Holders of

Claims in the Voting Classes to make an informed decision to accept or reject the Plan and

complies with Bankruptcy Rule 2002 and 17 CFR § 240. 14e-1(a), to the extent applicable. None

of the post-solicitation technical modifications to the Plan merit re-solicitation. No other or further

notice or opportunity to vote on the Plan is or shall be required.

13. Certain Holders were not provided a Solicitation Package because such Holders

(a) are unimpaired under, and conclusively presumed to accept pursuant to section 1126(f) of the

Bankruptcy Code, the Plan (the "Unimpaired Non-Voting Classes"), (b) do not receive or retain

any property under, and are conclusively deemed to reject pursuant to section 1126(g) of the

Bankruptcy Code, the Plan (the "Impaired Non-Voting Classes" or the "Deemed Rejecting

Classes"), or (c) are Holders of certain Intercompany Claims and Intercompany Interests that are

either (i) unimpaired and conclusively presumed to accept the Plan or (ii) do not receive or retain

any property under, and are conclusively deemed to reject, the Plan pursuant to sections 1126(f)

and 1126(g) of the Bankruptcy Code, respectively (the "Non-Voting Intercompany Classes").[4]

---

[4]     The Unimpaired Non-Voting Classes include Holders of Claims in Class A1 (Other Secured Claims against QVCG), Class A2 (Other Priority Claims against QVCG), Class A3 (General Unsecured Claims against QVCG), Class A4 (QVC-QVCG Settlement Claims), Class B1 (Other Secured Claims against the QVC Debtors), Class

Accordingly, Holders of Claims and Interests in the Unimpaired Non-Voting Classes, the Impaired Non-Voting Classes, and the Non-Voting Intercompany Classes (collectively, the "Non-Voting Classes") were not solicited. No further notice shall be required for Holders of Claims and Interests in Non-Voting Classes.

### K. Voting.

14. As evidenced by the Voting Report, the procedures used to solicit and tabulate the Ballots were fair, reasonable, and conducted in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Disclosure Statement, and any applicable non-bankruptcy law, rule, or regulation. As evidenced by the Voting Report, the Voting Classes voted to accept the Plan with respect to each applicable Debtor.

### L. Opt-Out and Opt-In Procedures.

15. The applicable procedures to opt out of or opt into the Third Party Release set forth in the Ballots and service of the Combined Hearing Notice, the Publication Notice, the Notices of Non-Voting Status, Opt-Out Form, and Opt-In Form as applicable, are good, sufficient, and adequate to bind the applicable parties to the Third-Party Release and are approved in all respects.

---

B2 (Other Priority Claims against the QVC Debtor), Class B5 (General Unsecured Claims against the QVC Debtors), Class C1 (Other Secured Claims against LINTA), Class C2 (Other Priority Claims against LINTA), Class C4 (General Unsecured Claims against LINTA), Class D1 (Other Secured Claims against the CBI Debtors), Class D2 (Other Priority Claims against the CBI Debtors), and Class D3 (General Unsecured Claims against the CBI Debtors).

The Impaired Non-Voting Classes include Holders of Claims and Interests in Class A6 (QVCG Preferred Equity Interests), Class A7 (QVCG Common Equity Interests), Class A8 (Section 510(b) Claims against QVCG), Class B8 (Section 510(b) Claims against the QVC Debtors), Class C7 (Section 510(b) Claims against LINTA), and Class D6 (Section 510(b) Claims against the CBI Debtors).

The Non-Voting Intercompany Classes include Holders of Claims and Interests in Class A5 (Other Intercompany Claims against QVCG), Class B6 (Intercompany Claims against the QVC Debtors), Class B7 (Intercompany Interests in the QVC Debtors), Class C5 (Other Intercompany Claims against the LINTA Debtors), Class C6 (Intercompany Interests in the LINTA Debtors), Class D4 (Intercompany Claims against the CBI Debtors), and Class D5 (Intercompany Interests in the CBI Debtors).

12

The process described in the Scheduling Motion (as authorized by the Scheduling Order) and the Voting Report that the Debtors and the Claims and Noticing Agent followed to identify the relevant parties on which to serve the applicable Ballot or Notice of Non-Voting Status and Opt-Out Form or Opt-In Form (a) is consistent with practices used in other complex chapter 11 cases, and (b) was reasonably calculated to ensure that each Holder of Claims and Interests in each Class was informed of its ability to opt out of or opt into the Third-Party Release, as applicable, and the consequences for failure to do so timely. Any party that elected in its Ballot, its Opt-Out Form or its Opt-In Form, as applicable, to opt out of or opt into the Third-Party Release and timely submitted such election to the Claims and Noticing Agent in accordance with the Solicitation Procedures prior to any deadline to submit such Ballot, Opt-Out Form, or Opt-In Form, as applicable, whether under any original or extended deadline, shall be neither a Released Party nor a Releasing Party under the Plan. The procedures used for tabulation of elections to opt out of the Third-Party Release are approved in all respects.

**M. Objections.**

16. This Bankruptcy Court takes judicial notice of the docket of these Chapter 11 Cases maintained by the clerk of the Bankruptcy Court including all pleadings and other documents Filed, and orders entered thereon. Any resolution of objections to approval of the Disclosure Statement and Confirmation explained on the record at the Confirmation Hearing is hereby incorporated by reference. All unresolved objections, statements, informal objections, and reservations of rights, if any, related to approval of the Disclosure Statement and Confirmation are overruled on the merits.

**N. Plan Supplement.**

17. The Plan Supplement complies with the Bankruptcy Code and the terms of the Plan, and the Filing and notice of such documents are good and proper in accordance with the

13

Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, and all other applicable rules, laws, and requirements, and no other or further notice is required. All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan. Subject to the terms of the Plan and the parties' consent and approval rights under the RSA (the "RSA Rights"), the Debtors reserve the right to alter, amend, update, or modify, in each case in whole or in part, and to add additional documents to, the Plan Supplement on or before the Effective Date or any such other later date as may be provided by the Plan or by order of the Bankruptcy Court. The Debtors served the Plan Supplement on all members of the Voting Classes and made the Plan Supplement publicly available on the Claims and Noticing Agent's website. No other or further notice is or shall be required.

### O. Compliance with Bankruptcy Code Requirements—Section 1129(a)(1).

18. The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code. In addition, the Plan is dated and identifies the Entities submitting it, thereby satisfying Bankruptcy Rule 3016(a). The discharge, release, injunction, and exculpation provisions of the Plan are set forth in bold therein and in the Disclosure Statement, thereby complying with Bankruptcy Rule 3016(c).

### (i) Proper Classification—Sections 1122 and 1123.

19. The Plan satisfies the requirements of sections 1122(a) and 1123(a)(1) of the Bankruptcy Code. Article III of the Plan provides for the separate classification of Claims and Interests into twenty-nine Classes. Valid business, factual, and legal reasons exist for the separate classification of such Classes of Claims and Interests. The classification scheme contained in the Plan does not reflect any improper purpose and does not unfairly discriminate between, or among, Holders of Claims or Interests. Each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.

14

      **(ii)**    **Specified Unimpaired Classes—Section 1123(a)(2).**

20.     The Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code. Article III of the Plan specifies the Claims in the following Classes that are Unimpaired (the "Unimpaired Classes") under the Plan within the meaning of section 1124 of the Bankruptcy Code:

| Class | Designation |
|---|---|
| Class A1 | Other Secured Claims against QVCG |
| Class A2 | Other Priority Claims against QVCG |
| Class A3 | General Unsecured Claims against QVCG |
| Class A4 | QVC-QVCG Settlement Claim |
| Class B1 | Other Secured Claims against the QVC Debtors |
| Class B2 | Other Priority Claims against the QVC Debtors |
| Class B5 | General Unsecured Claims against the QVC Debtors |
| Class C1 | Other Secured Claims against the LINTA Debtors |
| Class C2 | Other Priority Claims against the LINTA Debtors |
| Class C4 | General Unsecured Claims against the LINTA Debtors |
| Class D1 | Other Secured Claims against the CBI Debtors |
| Class D2 | Other Priority Claims against the CBI Debtors |
| Class D3 | General Unsecured Claims against the CBI Debtors |

21.     Class A4 (QVC-QVCG Settlement Claim) is properly designated as Unimpaired in accordance with section 1124 of the Bankruptcy Code. Additionally, Article II of the Plan specifies that Allowed Administrative Claims, Priority Tax Claims, DIP LC Claims, Professional Fee Claims, Disinterested Director Fee Claims, QVC Restructuring Expenses, and LINTA Restructuring Expenses will be paid in full in accordance with the terms of the Plan; although these Claims are not classified under the Plan.

      **(iii)**    **Specified Treatment of Impaired Classes—Section 1123(a)(3).**

22.     The Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code. Article III of the Plan specifies the Claims and Interests in the following Classes that are Impaired (the "Impaired Classes") under the Plan within the meaning of section 1124 of the Bankruptcy Code, and describes the treatment of such Classes:

| Class | Designation |
|---|---|
| Class A6 | QVCG Preferred Equity Interests |
| Class A7 | QVCG Common Equity Interests |
| Class A8 | Section 510(b) Claims against QVCG |
| Class B3 | RCF Claims against the QVC Debtors |
| Class B4 | QVC Notes Claims against the QVC Debtors |
| Class B8 | Section 510(b) Claims against the QVC Debtors |
| Class C3 | LINTA Notes Claims |
| Class C7 | Section 510(b) Claims against the LINTA Debtors |
| Class D6 | Section 510(b) Claims against the CBI Debtors |

23.     For the avoidance of doubt, Holders of Claims and Interests in the Non-Voting Intercompany Classes are Unimpaired and conclusively presumed to accept the Plan (to the extent Reinstated), or are Impaired and deemed to reject the Plan (to the extent canceled), and, in either event, are not entitled to vote to accept or reject the Plan.

### (iv)     No Discrimination—Section 1123(a)(4).

24.     The Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code. The Plan provides for the same treatment by the Debtors for each Claim or Interest in each respective Class unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest.

### (v)     Adequate Means for Plan Implementation—Section 1123(a)(5).

25.     The Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code. Article IV of the Plan, the exhibits and attachments to the Plan, the Plan Supplement, and the Disclosure Statement, provide, in detail, adequate and proper means for the Plan's implementation, including:  (a) the general settlement of Claims and Interests; (b)  the Intercompany Settlement; (c) authorization to effectuate the Restructuring Transactions, including all New Debt Documents and related security agreements and mortgages; (d) the vesting of authority in the Reorganized Debtors; (e) the funding and sources of consideration for distributions under the Plan, including the Cash on hand, QVC New Equity Interests, and the Exit Financing; (f) the preservation of each

16

Debtor's corporate existence after the Effective Date; (g) the vesting of assets in the Reorganized Debtors; (h) the cancellation of all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements, note purchase agreements, and indentures; (i) the authorization and approval of certain corporate actions under the Plan; (j) the adoption of the New Organizational Documents by the Reorganized Debtors; (k) the appointment of the New Board and the other Governing Bodies; (l) the effectuation and implementation of other documents and agreements contemplated by, or necessary to effectuate, the transactions contemplated by the Plan; (m) the exemption from certain securities laws; (n) the exemptions consistent with section 1146 of the Bankruptcy Code; (o) the assumption of certain employment obligations; (p) the assumption of the D&O Liability Insurance Policies; (q) the authorization of the Management Incentive Plan as adopted and implemented by the New Board following the Effective Date; (r) the preservation of Claims and Causes of Action not released pursuant to the Plan; (s) the release of Avoidance Actions; and (t) Reorganized QVC's emergence from chapter 11 as a public company.

### (vi) Voting Power of Equity Securities—Section 1123(a)(6).

26. The Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code. Article IV.J of the Plan provides that the New Organizational Documents will comply with section 1123(a)(6) of the Bankruptcy Code. The New Organizational Documents will prohibit the issuance of non-voting securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.

### (vii) Directors and Officers—Section 1123(a)(7).

27. The Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code. Article IV.K of the Plan provides for the appointment of the New Board and the other Governing Bodies, the initial members of which (and any successors thereto) (a) will be designated, selected, and appointed, as applicable, in accordance with the terms set forth in the Governance Term Sheet

17

and the New Organizational Documents, as applicable, which is consistent with the interests of creditors and equityholders and with public policy; and (b) were disclosed in the Plan Supplement to the extent known.

### (viii) Impairment / Unimpairment of Classes—Section 1123(b)(1).

28. The Plan is consistent with section 1123(b)(1) of the Bankruptcy Code. Article III of the Plan impairs or leaves Unimpaired each Class of Claims and Interests.

### (ix) Assumption—Section 1123(b)(2).

29. The Plan is consistent with section 1123(b)(2) of the Bankruptcy Code. Article V of the Plan provides for the assumption of the Debtors' Executory Contracts and Unexpired Leases, and the payment of Cures, if any, related thereto, not previously assumed, assumed and assigned, or rejected during these Chapter 11 Cases under section 365 of the Bankruptcy Code. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates.

### (x) Compromise and Settlement—Section 1123(b)(3).

30. In accordance with section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan (including the Intercompany Settlement) shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan. The compromises and settlements embodied in the Plan (including the Intercompany Settlement) are the result of extensive, arm's-length, good-faith negotiations that, in addition to the Plan, resulted in the execution of the RSA, which preserve value for the Debtors, their Estates, and all their stakeholders, avoid extended, uncertain, time-consuming, and value-destructive litigation, and represent a fair and reasonable compromise

18

of all Claims, Interests, Causes of Action, and controversies, and entry into which represented a sound exercise of the Debtors' business judgment. The compromises and settlements in the Plan (including the Intercompany Settlement) are fair, equitable, reasonable, and in the best interests of the Debtors and their Estates and satisfy the requirements of applicable law for approval pursuant to Bankruptcy Rule 9019.

### (xi) Debtor Release.

31. Article VIII.C of the Plan describes certain releases granted by the Debtors in accordance with section 1123(b) of the Bankruptcy Code (the "Debtor Release"). The Debtors have demonstrated that the releases provided under the Debtor Release constitute a sound exercise of their business judgment, and the Debtors have otherwise established the propriety of the Debtor Release and satisfied the requirements of Bankruptcy Rule 9019 with respect thereto. Each of the Released Parties has made a substantial contribution to the Plan and to the Debtors' reorganization. The Debtor Release is a necessary and integral element of the Plan, and is fair, equitable, reasonable, and in the best interests of the Debtors, the Estates, and Holders of Claims and Interests. The Debtors' or the Reorganized Debtors' pursuit of any such Claims and Causes of Action against the Released Parties is not in the best interests of the Estates' various constituencies because the costs involved would outweigh any potential benefit from pursuing such Claims and Causes of Action. The scope of the Debtor Release is appropriately tailored under the facts and circumstances of these Chapter 11 Cases. The Debtor Release is appropriate in light of, among other things, the value provided by the Released Parties to the Estates and the critical nature of the Debtor Release to the Plan.

32. The Debtor Release appropriately offers protection to parties who provided consideration to the Debtors and whose participation in the Debtors' restructuring process and these Chapter 11 Cases was and continues to be critical to the Debtors' successful implementation

19

of the Restructuring Transactions and emergence. Specifically, the Released Parties under the Plan made significant concessions and contributions to these Chapter 11 Cases, including by actively supporting the Plan and these Chapter 11 Cases. In particular, the Holders of RCF Claims, QVC Notes Claims, and LINTA Notes Claims comprise the Voting Classes and voted in favor of the Plan. The Consenting RCF Lenders, the Consenting QVC Noteholders, and the Consenting LINTA Noteholders have supported and committed to continue to support the Debtors' restructuring pursuant to the RSA, including the Intercompany Settlement. With the support of the Consenting Stakeholders, certain Consenting RCF Lenders (the DIP LC Issuing Banks) agreed to provide the DIP LC Facility, which enabled the Debtors to continue to issue and extend letters of credit to critical trade vendors and other critical counterparties of the Debtors. The Required Consenting RCF Lenders and the Required Consenting QVC Noteholders agreed to equitize portions of their claims to facilitate the Debtors' reorganization efforts and have worked with the Debtors to secure or provide, as applicable, the Exit Financing to support the Debtors' businesses on a go-forward basis following consummation of the Plan.

33. The Debtor Release for the Debtors' current and former directors, officers, and managers is appropriate because the Debtors' directors, officers, and managers share an identity of interest with the Debtors, supported and made substantial contributions to the success of the Plan and these Chapter 11 Cases, and actively participated in meetings and negotiations during these Chapter 11 Cases. In sum, the Released Parties played an integral role in the formulation of the Plan, made significant contributions that are essential to the Plan's success, and expended significant time and resources analyzing and negotiating the Plan and the issues presented by the Debtors' prepetition capital structure.

34. As such, the Debtor Release is: (a) the result of a sound exercise of the Debtors' business judgment; (b) an essential part of the agreement among those participating in the negotiations and formulation of the Plan; (c) in exchange for the good and valuable consideration provided by or on behalf of the Released Parties; (d) a good faith settlement and compromise of the Claims and Causes of Action released herein negotiated at arm's-length; (e) in the best interests of the Debtors, their Estates, all Holders of Claims and Interests, and any other parties in interest; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) without limiting the Debtor Release, a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates from asserting any Claim or Cause of Action released pursuant to the Debtor Release. Further, described in each of the Walper and Foster Declarations and the other evidence in support of the Plan that was proffered or adduced at, prior to, or in connection with the Combined Hearing, the Disinterested Directors of the Governing Bodies of QVCG, LINTA, QVC, and CBI each conducted an investigation that analyzed and considered all potential Claims and Causes of Action held by each such respective Debtor and determined that the Debtor Release was appropriate and necessary under the circumstances. In light of the foregoing, the Debtor Release is approved.

### (xii) Release by Holders of Claims and Interests.

35. Article VIII.D of the Plan describes certain releases granted by the Releasing Parties (the "Third-Party Release"). The Third-Party Release is: (a) consensual; (b) essential to the Confirmation; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of such Claims and Causes of Action; (e) in the best interests of the Debtors, their Estates, Holders of Claims and Interests, and all other parties in interest; (f) fair, equitable, and reasonable; (g) given and made after due notice

21

and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

36. The Third-Party Release is an integral part of the Plan. Similar to the Debtor Release, the Third-Party Release was integral to the formulation of the Plan. Like the Debtor Release, the Third-Party Release was critical to incentivizing parties to support the Plan, facilitated participation in the RSA, the Plan, and the chapter 11 process generally, and prevented potentially significant, time-consuming, and value-depleting litigation. The Third-Party Release was a core negotiation point and an integral component of the RSA and was instrumental in developing a Plan that maximized value for the Debtors' stakeholders. As such, the Third-Party Release appropriately offers certain protections to parties who constructively participated in the Debtors' restructuring process by, among other things, supporting the Plan. The scope of the Third-Party Release is appropriately tailored under the facts and circumstances of these Chapter 11 Cases. The Third-Party Release is appropriate in light of, among other things, the value provided by the Released Parties to the stakeholders and the critical nature of the Third-Party Release to the Plan.

37. The Third-Party Release is consensual as to all relevant parties, including all Releasing Parties, and such parties were provided sufficient notice of these Chapter 11 Cases, the Plan, and the deadline to object to Confirmation, received the Combined Hearing Notice and the Opt-Out Form, Opt-In Form, or a Ballot, as applicable, and were properly informed that certain of the Holders of Claims against or Interests in the Debtors (the Voting Classes and the Unimpaired Non-Voting Classes) that did not check a prominently featured and clearly labeled box on the applicable Ballot or Opt-Out Form, returned in advance of the Voting Deadline, would be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release and discharge of all Claims and Causes of Action against the Debtors and the Released

22

Parties. The other Holders of Claims against or Interests in the Debtors (the Impaired Non-Voting Classes) were given the opportunity to participate in the Third Party Release as a Releasing Party by affirmatively opting in to the Third Party Release. Furthermore, the Plan provides that any Entity shall not be a Released Party if it timely opts out of, or objects to, the Third-Party Release. Additionally, the release provisions of the Plan were conspicuous, emphasized with boldface type in the Plan, the Disclosure Statement, the Ballots, the Opt-Out Form, the Opt-In Form, and the Combined Hearing Notice. The Ballot, Opt-Out Form, and the Opt-In Form also contained information on how to return the Opt-Out Form or Opt-In Form, as applicable, by mail and how to access an electronic online portal whereby a Holder can opt out of or opt in to the Third-Party Release, as applicable.

38. The Third-Party Release provides finality for the Debtors, the Reorganized Debtors, and the Released Parties regarding the parties' respective obligations under the Plan and with respect to the Reorganized Debtors. The Third-Party Release is specific in language, is integral to and a condition of the compromises and settlements embodied in the Plan, and is appropriately tailored under the facts and circumstances of these Chapter 11 Cases. The Combined Hearing Notice sent to Holders of Claims and Interests and published in *The New York Times* on April 23, 2026, and *The New York Times International Edition* on April 27, 2026, and the Ballots sent to all Holders of Claims and Interests entitled to vote on the Plan, in each case, unambiguously stated that the Plan contains the Third-Party Release. The Releasing Parties were given due and adequate notice of the Third-Party Release, including the deadline to object to, opt out of, or opt into the Third-Party Release, as applicable, and thus the Third-Party Release is consensual under controlling precedent in the Fifth Circuit as to those Releasing Parties that did not timely object or

23

elect to opt out of or affirmatively elect to opt into granting the Third-Party Release. The Third-Party Release is authorized and approved.

### (xiii) Exculpation.

39. The exculpation provision set forth in Article VIII.E of the Plan and incorporated into this Confirmation Order is essential to the Plan, appropriate under applicable law, including *In re Highland Capital Management, L.P.*, 48 F.4th 419 (5th Cir. 2022) and *In re Highland Capital Mgmt., L.P.*, 132 F. 4th 353 (5th Cir. 2025) (hereinafter *Highland II*), and constitute a proper exercise of the Debtors' business judgment. The record in these Chapter 11 Cases fully supports the exculpation and the exculpation provision set forth in Article VIII.E of the Plan, which are appropriately tailored to protect the Debtors and the Exculpated Parties from inappropriate litigation. The exculpation, including the carve-out for actual fraud, willful misconduct, and/or gross negligence, is consistent with section 1125(e) of the Bankruptcy Code. The Debtors and the Exculpated Parties subject to the exculpation provision have, and upon entry of this Confirmation Order will be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan, or such distributions made pursuant to the Plan.

### (xiv) Injunction.

40. The injunction provision set forth in Article VIII.F of the Plan is necessary to implement, preserve, and enforce the Debtors' discharge, the Debtor Release, the Third-Party Release, and exculpation provision. The injunction provisions are appropriately tailored to achieve those purposes and appropriate under applicable law, including *Highland II*. Without limiting Article VIII.F of the Plan, and notwithstanding anything to the contrary in this Confirmation Order,

no Person or Entity may commence or pursue a Claim or Cause of Action, as applicable, of any kind against the Exculpated Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action, as applicable, subject to the terms of the Plan, without the Bankruptcy Court (a) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim not subject to exculpation under the Plan, and (b) specifically authorizing such Person or Entity to bring such Claim or Cause of Action, as applicable, against any such Exculpated Party.

### (xv) Preservation of Claims and Causes of Action.

41. Article IV.R of the Plan appropriately provides that the Reorganized Debtors will retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code. The Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date or any other provision of the Plan to the contrary, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be released and waived by the Debtors and the Reorganized Debtors as of the Effective Date. The provisions regarding the preservation of Causes of Action in the Plan, including the Schedule of Retained Causes of Action, are appropriate, fair, equitable, and reasonable, and are in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests.

### (xvi) Release of Liens.

42. The release and discharge of all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates described in Article VIII.B of the Plan

(the "Release of Liens") are necessary to implement the Plan. The provisions of the Release of Liens are appropriate, fair, equitable, and reasonable, and are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.

### (xvii) Additional Plan Provisions—Section 1123(b)(6).

43. The other discretionary provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1123(b)(6) of the Bankruptcy Code.

### (xviii) Cure of Defaults—Section 1123(d).

44. Article V.C of the Plan provides for the satisfaction of Cures associated with each Executory Contract and Unexpired Lease to be assumed in accordance with section 365(b)(1) of the Bankruptcy Code. The Debtors or the Reorganized Debtors, as applicable, shall pay the Cure amount, if any, on the Effective Date or as soon as reasonably practicable thereafter, with the amount and timing of payment of any such Cure dictated by the underlying agreements and/or the ordinary course of business among the parties thereto, as applicable; *provided*, *however*, that with respect to any Cure amount payable in connection with an assumption or assumption and assignment of an Executory Contract or an Unexpired Lease to which any of the LINTA Debtors is a party, such payment shall be payable by the Reorganized QVC Debtors and shall not be payable by any LINTA Debtor or any Reorganized LINTA Debtor, *provided*, that the Required Consenting RCF Lenders and Required Consenting QVC Noteholders consent to such assumption or assumption and assignment. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease all requests for payment of Cures that differ from the amounts paid or proposed to be paid, including in the ordinary course, by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such request that is not timely Filed shall be

26

disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure in the Debtors' ordinary course of business; *provided* that nothing in the Plan shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

45. If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the Cure amount shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The Debtors and Reorganized Debtors, as applicable (with the consent of the Required Consenting QVC Noteholders and the Required Consenting RCF Lenders) (which consent shall not be unreasonably withheld, conditioned, or delayed), reserve the

27

right at any time to move to reject any Executory Contract or Unexpired Lease based upon the existence of any such unresolved dispute.

**P.  Debtors' Compliance with the Bankruptcy Code—Section 1129(a)(2).**

46.  The Debtors complied with the applicable provisions of the Bankruptcy Code and, thus, satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.  Specifically, each Debtor:

a.  is an eligible debtor under section 109 of the Bankruptcy Code, and a proper proponent of the Plan under section 1121(a) of the Bankruptcy Code;

b.  has complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Bankruptcy Court; and

c.  complied with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126, the Bankruptcy Rules, the Bankruptcy Local Rules, any applicable non-bankruptcy law, rule, regulation, and all other applicable Law, in transmitting the Solicitation Packages, and related documents and notices, and in soliciting and tabulating the votes on the Plan.

**Q.  Plan Proposed in Good Faith—Section 1129(a)(3).**

47.  The Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code. The Debtors proposed the Plan and the Restructuring Transactions (and all documents necessary to effectuate the Plan, including the Plan Supplement) in good faith and not by any means forbidden by law, and all acceptances and rejections of the Plan were solicited and submitted in good faith and not by any means forbidden by law.  In so determining, the Bankruptcy Court has examined the totality of the circumstances surrounding the Filing of these Chapter 11 Cases, the Plan, the Plan Supplement, the RSA, all Definitive Documents, the process leading to Confirmation, including its overwhelming support by Holders of Claims in the Voting Classes, and the transactions to be implemented pursuant thereto.  The Debtors and their agents Filed these Chapter 11 Cases and proposed the Plan in good faith with the legitimate purpose of allowing the Debtors to implement the Restructuring Transactions on an prepackaged timeline so as to minimize

disruption to the Debtors' business operations, reorganize, and emerge from bankruptcy with a capital and organizational structure that will allow the Reorganized Debtors to conduct their business and satisfy their obligations with sufficient liquidity.

**R.  Payment for Services or Costs and Expenses—Section 1129(a)(4).**

48. The procedures set forth in the Plan for the Bankruptcy Court's review and ultimate determination of the fees and expenses to be paid by the Debtors in connection with these Chapter 11 Cases, or in connection with the Plan and incident to these Chapter 11 Cases, satisfy the objectives of, and are in compliance with, section 1129(a)(4) of the Bankruptcy Code.

**S.  Directors, Officers, and Insiders—Section 1129(a)(5).**

49. Article IV.K of the Plan provides for the appointment of the New Board and the other Governing Bodies, the initial members of which (and any successors thereto) (a) will be designated, selected, and appointed, as applicable, in accordance with the Governance Term Sheet and the applicable New Organizational Documents, as applicable, which is consistent with the interests of creditors and equityholders and with public policy; and (b) were disclosed in the Plan Supplement to the extent known. Accordingly, the Debtors satisfy the requirements of section 1129(a)(5) of the Bankruptcy Code.

**T.  No Rate Changes—Section 1129(a)(6).**

50. Section 1129(a)(6) of the Bankruptcy Code is not applicable to these Chapter 11 Cases. The Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission and will not require governmental regulatory approval.

**U.  Best Interest of Creditors—Section 1129(a)(7).**

51. The Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code. The Liquidation Analysis attached to the Disclosure Statement as Exhibit D and the other evidence related thereto in support of the Plan that was proffered or adduced at, prior to, or in connection

with the Combined Hearing: (a) are reasonable, persuasive, credible, and accurate as of the dates such analysis or evidence was prepared, presented, or proffered; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; and (d) establish that Holders of Allowed Claims and Interests in each Class will recover at least as much under the Plan on account of such Claim or Interest, as of the Effective Date, as such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

V. **Acceptance by Certain Classes—Section 1129(a)(8).**

52. Classes A1, A2, A3, A4, B1, B2, B5, C1, C2, C4, D1, D2, and D3 constitute Unimpaired Classes, each of which is conclusively presumed to accept the Plan in accordance with section 1126(f) of the Bankruptcy Code. The Voting Classes (Class B3, B4, and C3) voted to accept the Plan. Classes A5, B6, B7, C5, C6, D4, and D5 are conclusively presumed to accept the Plan (to the extent reinstated) or are Impaired and deemed to reject the Plan (to the extent canceled), and, in either event, are not entitled to vote to accept or reject the Plan. The Deemed Rejecting Classes (Classes A6, A7, A8, B8, C7 and D6) are conclusively deemed to reject the plan and consequently are not entitled to vote on the Plan. Given not all Classes have accepted the Plan, the Plan does not satisfy section 1129(a)(8) of the Bankruptcy Code with respect to the Deemed Rejecting Classes; however, as discussed below, the Plan can be confirmed pursuant to section 1129(b) of the Bankruptcy Code.

W. **Treatment of Claims Entitled to Priority under Section 507(a) of the Bankruptcy Code—Section 1129(a)(9).**

53. The treatment of Allowed Administrative Claims, Priority Tax Claims, DIP LC Claims, and Professional Fee Claims under Article II of the Plan, and of Other Priority Claims, under Article III of the Plan, satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

**X.      Acceptance by At Least One Impaired Class—Section 1129(a)(10).**

54.      The Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code. As evidenced by the Voting Report, the Voting Classes voted to accept the Plan by the requisite numbers and amount of Claims, without including any acceptance of the Plan by any insider (as that term is defined in section 101(31) of the Bankruptcy Code), specified under the Bankruptcy Code.  As to QVCG and the CBI Debtors, section 1129(a)(10) of the Bankruptcy Code is inapplicable because there are no Classes of Claims against QVCG or the CBI Debtors Impaired by the Plan.

**Y.      Feasibility—Section 1129(a)(11).**

55.      The Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code. The Financial Projections attached to the Disclosure Statement as <u>Exhibit C</u>, the Wafford Declaration, and the other evidence supporting Confirmation proffered or adduced by the Debtors at, or prior to, the Combined Hearing:  (a) are reasonable, persuasive, credible, and accurate as of the dates such analysis or evidence was prepared, presented, or proffered; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; (d) establish that the Plan is feasible and Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization of, the Reorganized Debtors or any successor to the Reorganized Debtors under the Plan, except as provided in the Plan; (e) establish that the Reorganized Debtors will have sufficient funds to meet their obligations under the Plan; and (f) establish that the Reorganized Debtors will have the financial wherewithal to pay any Claims that accrue, become payable, or are Allowed following the Effective Date.

**Z.      Payment of Fees—Section 1129(a)(12).**

56.      The Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code. Article XII.C of the Plan provides for the payment of all fees payable by the Debtors or the

31

Reorganized Debtors (or the Disbursing Agent on behalf of each of the Debtors or Reorganized Debtors) under 28 U.S.C. § 1930(a).

### AA. Continuation of Retiree Benefits—Section 1129(a)(13).

57.     The Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code. Article IV.O of the Plan provides that, except as otherwise set forth in the Plan, the Debtors shall (a) assume all employment agreements, indemnification agreements, or other employment-related agreements entered into with current or former employees as of the Petition Date or (b) enter into new agreements with such employees, including the Compensation and Benefits Program, on terms and conditions acceptable to the Reorganized Debtors and such employees, and, in the case of any executive officer of the Reorganized QVC Debtors, on terms and conditions reasonably acceptable to the Required Consenting QVC Noteholders and Required Consenting RCF Lenders. A counterparty to or participant in a Compensation and Benefits Program assumed pursuant to the Plan shall have the same rights under such Compensation and Benefits Program as such counterparty had thereunder immediately prior to such assumption (unless otherwise agreed by such counterparty and the applicable Reorganized Debtor(s)); *provided* that any assumption of Compensation and Benefits Programs pursuant to the Plan or any of the Restructuring Transactions (including the disposition of, dissolution, winding down, or liquidating of the Reorganized LINTA Debtors and/or Reorganized QVCG) shall not (a) trigger or be deemed to trigger any provisions relating to any change of control, change in control, "approved transaction," "board change," "control transaction" or other same or similar term, including with respect to accelerated, immediate, or enhanced vesting, severance or termination, or similar provisions therein or (b) be deemed to constitute an involuntary or constructive termination or otherwise trigger or be deemed to trigger an event of "Good Reason" (or a term of like import), in each case, as a result of or in connection with the consummation of the Restructuring Transactions or any other transactions

32

contemplated by the Plan, including with respect to any changes in corporate structure which will not, in and of itself, be deemed to result in an adverse change (or term of like import) to any employee's employment (including, without limitation, any duties, authority or responsibilities of any employee); *provided*, *further*, that any "Good Reason" (or term of like import) resignation rights relating to a failure to provide any specific long-term or equity incentives (including, without limitation, under the Management Incentive Plan or otherwise) set forth in any Compensation and Benefits Program assumed pursuant to the Plan shall cease to apply, and no counterparty thereunder shall have any rights, claims or entitlements in connection with any such rights from and after the assumption of such Compensation and Benefits Program under the Plan. No counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

### BB. Non-Applicability of Certain Sections—Sections 1129(a)(14), (15), and (16).

58. Sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to these Chapter 11 Cases. The Debtors owe no domestic support obligations, are not individuals, and each of the Debtors is a moneyed, business, or commercial corporation.

### CC. "Cram Down" Requirements—Section 1129(b)

59. Notwithstanding the fact that the Deemed Rejecting Classes are deemed to reject the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code. First, all of the requirements of section 1129(a) of the Bankruptcy Code other than section 1129(a)(8) of the Bankruptcy Code have been satisfied or are inapplicable. Second, the Plan is fair and equitable with respect to the Deemed Rejecting Classes. The Plan has been proposed in good faith, is reasonable, and meets the requirements that (a) no Holder of any Impaired Claim or Interest that is junior to each such rejecting Class will receive or retain any property under the Plan on account of such junior Claim or Interest and (b) no Holder of a Claim or Interest in a Class senior to such

33

Impaired Class is receiving more than 100% on account of its Claim. Accordingly, the Plan is fair and equitable to all Holders of Claims and Interests in the Deemed Rejecting Classes. Third, the Plan does not discriminate unfairly with respect to the Deemed Rejecting Classes because similarly situated Claim and Interest Holders in such Classes that have not accepted the Plan will receive substantially similar treatment on account of their Claims and Interests irrespective of Class.

60. As a result, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code and can be confirmed even though not all Impaired Classes have voted to accept the Plan and section 1129(a)(8) is not satisfied. After entry of this Confirmation Order and upon the occurrence of the Effective Date, the Plan shall be binding on the members of the Deemed Rejecting Classes.

**DD. Only One Plan—Section 1129(c).**

61. The Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code. The Plan is the only chapter 11 plan Filed in each of these Chapter 11 Cases.

**EE. Principal Purpose of the Plan—Section 1129(d).**

62. Section 1129(d) of the Bankruptcy Code is inapplicable. The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act. No Governmental Entity has requested that the Bankruptcy Court refuse to confirm the Plan on the grounds that the principal purpose of the Plan is such avoidance.

**FF. Small Business Case—Section 1129(e).**

63. None of these Chapter 11 Cases are a "small business case," as that term is defined in the Bankruptcy Code, and, accordingly, section 1129(e) of the Bankruptcy Code is inapplicable.

**GG. Good Faith Solicitation—Section 1125(e).**

64. The Exculpated Parties, the Consenting Stakeholders, the directors and officers of any of the Debtors, each of the Reorganized Debtors, and with respect to the foregoing, the Related

34

Parties thereto, have acted fairly, in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code, and in a manner consistent with the Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations in connection with all of their respective activities relating to support and consummation of the Plan, including the execution, delivery, and performance of the RSA, the solicitation and tabulation of votes on the Plan, and the activities described in section 1125 of the Bankruptcy Code, as applicable, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

65.     The Debtors and their agents participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(g), with regard to the offering, issuance, and distribution of recoveries under the Plan and therefore are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or distributions made pursuant to the Plan, so long as such distributions are made consistent with and pursuant to the Plan.

**HH.     Satisfaction of Confirmation Requirements.**

66.     Based on the foregoing and all other pleadings and evidence proffered or adduced at or prior to the Combined Hearing, the Plan satisfies the requirements for Confirmation set forth in section 1129 of the Bankruptcy Code.  The failure to specifically address a provision of the Bankruptcy Code in this Confirmation Order shall not diminish or impair the effectiveness of this Confirmation Order.

**II.     Satisfaction of Conditions Precedent to the Effective Date.**

67.     The Plan shall not become effective unless and until the conditions set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan. The Debtors are authorized to take all actions necessary to satisfy each of the conditions precedent

35

to the Effective Date set forth in Article IX.A of the Plan that have not yet been satisfied or waived in accordance with the RSA Rights and Article IX.B of the Plan.

### JJ. Implementation.

68. All documents and agreements necessary to implement the Plan, including those contained in the Plan Supplement, the Definitive Documents, and all other relevant and necessary documents, have been or will be negotiated in good faith and at arm's-length, are in the best interests of the Debtors, and shall, upon completion of documentation and execution, be valid, binding, and enforceable documents and agreements not in conflict with any federal, state, or local law. The documents and agreements are essential elements of the Plan, and entry into and consummation of the transactions contemplated by each such document or agreement are in the best interests of the Debtors, the Estates, and the Holders of Claims and Interests. The Debtors have exercised reasonable business judgment in determining which documents and agreements to enter into and have provided sufficient and adequate notice of such documents and agreements. The Debtors and the Reorganized Debtors, as applicable, are authorized, without any further notice to or action, order or approval of the Bankruptcy Court, to finalize, execute, and deliver all agreements, documents, instruments, and certificates relating thereto and perform their obligations thereunder in accordance with the Plan.

### KK. Disclosure of Facts.

69. The Debtors disclosed all material facts regarding the Plan, including with respect to consummation of the Restructuring Transactions, and the fact that each Debtor will emerge from its respective Chapter 11 Case as a validly existing separate corporate entity, limited liability company, partnership, or other form, as applicable.

**LL.     Good Faith.**

70.     The Debtors proposed the Plan in good faith and not by any means prohibited by law, with the legitimate and honest purpose of maximizing the value of the Debtors' Estates for the benefit of their stakeholders.  The Plan accomplishes this goal.  The Plan is the product of extensive, good faith, arm's-length negotiations among the Debtors and their principal constituencies, including the Consenting Stakeholders.  Accordingly, the Debtors, the Released Parties, and the Exculpated Parties have been, are, and will continue to be acting in good faith within the meaning of section 1125(e) of the Bankruptcy Code if they proceed to:  (a) consummate the Restructuring Transactions in accordance with the Plan and the agreements, settlements, transactions, transfers, and other actions contemplated thereby, regardless of whether such agreements, settlements, transactions, transfers, and other actions are expressly authorized by this Confirmation Order; and (b) take any actions authorized and directed or contemplated by this Confirmation Order and the Plan to reorganize the Debtors' businesses and effectuate the Restructuring Transactions and the Intercompany Settlement.

**MM.     Essential Elements of the Plan.**

71.     The New Debt Documents and the New Organizational Documents are essential elements of the Plan, are necessary for Confirmation and Consummation of the Plan, and are critical to the overall success and feasibility of the Plan.  The execution, performance, and incurrence of all obligations by the Reorganized Debtors, and/or any successors, assigns, or transferees of the applicable Debtors or the Reorganized Debtors, including in connection with the Restructuring Transactions, are necessary and appropriate for Confirmation and the operations of the Reorganized Debtors.  The Debtors have exercised sound business judgment in deciding to pursue and enter into the New Debt Documents and the New Organizational Documents and have provided adequate notice thereof.

37

72.      The Debtors have provided sufficient and adequate notice of the material terms of the New Debt Documents and the New Organizational Documents to all parties in interest in these Chapter 11 Cases.  The execution, delivery, or performance by the Debtors or the Reorganized Debtors, as applicable, of all Definitive Documents and any agreements related thereto and compliance by the Debtors or the Reorganized Debtors, as applicable, with the terms thereof is authorized by, and will not conflict with, the terms of the Plan or this Confirmation Order.

**NN.      Valuation.**

73.      The evidence with respect to the valuation analysis of the Debtors that was (a) set forth in Exhibit E to the Disclosure Statement filed on May 4, 2026 [Docket No. 196] and (b) introduced at the Combined Hearing with respect to the CBI Debtors, provides the basis and support for the distributions and recoveries to Holders of Claims and Interests, as applicable, under the Plan, is reasonable, persuasive, and credible, and uses reasonable and appropriate methodologies and assumptions.  All parties in interest have been given a fair and reasonable opportunity to challenge the valuation analysis.  Given such valuation of the Debtors, pursuant to the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, the Plan's treatment of Claims and Interests is appropriate and reasonable as set forth herein.

**OO.      Modifications to the Plan**

74.      Pursuant to section 1127 of the Bankruptcy Code, the modifications to the Plan described or set forth in this Confirmation Order, including any modifications to the Plan after solicitation of the Plan, constitute technical or clarifying changes, changes with respect to particular Claims by agreement with Holders of such Claims, or modifications that do not otherwise materially and adversely affect or change the treatment of any other Claim or Interest under the Plan.  These modifications are consistent with the disclosures previously made pursuant to the Disclosure Statement and the Solicitation Packages served prior to the Petition Date, and

notice of these modifications was adequate and appropriate under the facts and circumstances of the Chapter 11 Cases. In accordance with Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, and they do not require that holders of Claims or Interests be afforded an opportunity to cast new votes on the Plan or change previously cast acceptances or rejections of the Plan. All Holders of Claims and Interests who voted to accept the Plan or who are conclusively presumed to accept the Plan are deemed to have accepted the Plan, and all Holders of Claims and Interests who are conclusively deemed to have rejected the Plan are deemed to have rejected the Plan.

75. Accordingly, the Plan is properly before this Court and all votes cast with respect to the Plan prior to such modification shall be binding and shall apply with respect to the Plan.

## **ORDER**

IT IS ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:

76. **Disclosure Statement.** The Disclosure Statement is **APPROVED** in all respects.

77. **Confirmation.** The Plan, as may be amended by this Confirmation Order, is approved in its entirety and **CONFIRMED** under section 1129 of the Bankruptcy Code. The terms of the Plan, including the Plan Supplement (including any supplements, amendments, or modifications thereof in accordance with this Confirmation Order, the Plan, and the RSA Rights) and the Definitive Documents, are incorporated by reference into and are an integral part of this Confirmation Order. Subject to the RSA Rights, without any further notice to or action, order or approval of the Bankruptcy Court, the Debtors, the Reorganized Debtors, and their successors are authorized and empowered to make all modifications to all documents included as part of the Plan Supplement that are consistent with and subject to the Plan and the RSA Rights.

39

78. **Solicitation.** To the extent applicable, the solicitation of votes on the Plan complied with the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, and was appropriate and satisfactory and is approved in all respects.

79. **Objections Overruled.** To the extent that any objections (including any reservations of rights, joinders, or statements contained therein) pertaining to the final approval of the Disclosure Statement or Confirmation that have not been withdrawn, waived, or settled before entry of this Confirmation Order, are not cured by the relief granted in this Confirmation Order, or have not otherwise been resolved as stated on the record at the Combined Hearing, all such objections (including any reservation of rights, joinders, or statements contained therein), are hereby OVERRULED in their entirety and DENIED on the merits.

80. All objections to Confirmation or final approval of the Disclosure Statement not Filed and served prior to the Objection Deadline (as may have been extended by the Debtors) are deemed waived and shall not be considered by the Bankruptcy Court.

81. **Deemed Acceptance of Plan.** In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims who voted to accept the Plan or who are conclusively presumed to accept the Plan are deemed to accept the Plan, as modified. The modifications to the Plan or Plan Supplement made after the Voting Deadline do not adversely change the treatment of any Claims or Interests, do not require re-solicitation, and are hereby approved pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

82. **No Action Required.** Under section 1142(b) of the Bankruptcy Code and any other comparable provisions under applicable law, no further action of the respective directors, managers, members, stockholders, or other equityholders of any of the Debtors is required to authorize the Debtors to enter into, execute, deliver, file, adopt, amend, restate, consummate, or

effectuate, as the case may be, the Plan, the Restructuring Transactions, this Confirmation Order, and any contract, assignment, certificate, instrument, or other document to be executed, delivered, adopted, or amended in connection with the implementation of the Plan, including the Definitive Documents.

83.     The transactions described in the Plan (as may be subsequently amended, modified, or supplemented from time to time consistent with the Plan), the Plan Supplement (as may be subsequently amended, modified, or supplemented from time to time consistent with the Plan), the Definitive Documents, and this Confirmation Order, including the Restructuring Transactions, are hereby approved.  Subject to the RSA Rights and the Plan, whether prior to, on or after the Effective Date, as applicable, and without any further order of the Bankruptcy Court, the Debtors, the Reorganized Debtors, all Holders of Claims and Interests, as applicable, and their respective directors, managers, officers, employees, members, agents, attorneys, financial advisors, and investment bankers, are hereby authorized, directed, and empowered pursuant to section 1142(b) of the Bankruptcy Code and any other applicable law to, and shall take any action that the Debtors or Reorganized Debtors determine is reasonably necessary, advisable, or appropriate to implement, effectuate, and consummate the Plan, the Plan Supplement, the Definitive Documents, the Restructuring Transactions, or any other transaction set forth in, contemplated by, or consistent with the Plan (including the Plan Supplement) or this Confirmation Order.

84.     **Binding Effect.**  Upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are presumed to have accepted or deemed to reject the Plan), all Entities that are parties to or are subject to the

41

settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. Pursuant to sections 1123(a) and 1142(a) of the Bankruptcy Code, the provisions of this Confirmation Order and the Plan shall apply and be binding and enforceable notwithstanding any otherwise applicable non-bankruptcy Law.

85. **Incorporation by Reference.** The terms and provisions of the Plan, the Plan Supplement, this Confirmation Order, the Definitive Documents, all other relevant and necessary documents, and each of the foregoing's schedules and exhibits constitute essential elements of the Plan and shall, on and after the Effective Date, be incorporated herein by reference and are an integral part of this Confirmation Order.

86. **Vesting of Assets in the Reorganized Debtors.** Except as otherwise provided in this Confirmation Order, the Plan, or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances (except for Liens granted to secure the obligations under the New Debt Documents). On and after the Effective Date, except as otherwise provided in the Plan, this Confirmation Order, or any agreement, instrument, or other document incorporated in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, enter into transactions, agreements, understandings or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers or otherwise in connection with any of the foregoing, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the

Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules. For the avoidance of doubt, no Reorganized Debtor shall be treated as being liable on any Claim that is discharged pursuant to the Plan. After the Effective Date, a certified copy of this Confirmation Order may be Filed with the appropriate clerk or recorded with the recorder of any federal, state, province, country, or local authority whether foreign or domestic, to effectuate the transfer of all property in each Estate to each respective Reorganized Debtor, vesting the Reorganized Debtors with all rights, titles, and interests of the Debtors to the property in each Estate, free and clear of all Liens, Claims, Interests, and other encumbrances of record. The terms and provisions of the Plan, the Plan Supplement, this Confirmation Order, the Definitive Documents, all other relevant and necessary documents, and each of the foregoing's schedules and exhibits shall, on and after the Effective Date, be binding in all respects upon, and shall, in the case of the Reorganized Debtors, inure to the benefit of, the Debtors and Reorganized Debtors, the Debtors' Estates and their creditors, and their respective successors and assigns, any affected third parties, all Holders of Claims and Interests, whether known or unknown, against the Debtors, including to any trustees, examiners, administrators, responsible state officers, estate representatives, or similar entities for the Debtors, if any, subsequently appointed in any of these Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of these Chapter 11 Cases, and each of their respective affiliates, successors, and assigns.

87. **Cancellation of Existing Securities, Agreements, and Interests.** On the Effective Date, except as otherwise provided in the Plan (including with respect to the DIP LC Credit Agreement), this Confirmation Order, or other Definitive Documents (including the Plan Supplement and the New Debt Documents), as applicable, all notes, instruments, certificates, credit agreements, note purchase agreements, indentures, and other documents evidencing Claims

43

(excluding Reinstated Claims and Unimpaired Claims, but including, for the avoidance of doubt, the RCF Credit Agreement, the QVC Notes Indentures, the LINTA Notes Indenture, the LINTA Promissory Note, the DIP LC Credit Agreement, and all related collateral and credit documentation to the extent provided in the Plan and, with respect to the DIP LC Credit Agreement, to the extent the obligations thereunder are satisfied in accordance with the DIP LC Credit Agreement, the DIP LC Orders, and the Plan), and Interests, shall, be canceled, and any rights of any Holder in respect thereof shall be deemed canceled and of no force or effect, and all prior, present and future obligations and liabilities, actions, suits, accounts or demands, or covenants (other than indemnities preserved by the Plan), under or in connection with the RCF Credit Agreement, the QVC Notes Indentures, the LINTA Notes Indenture, the LINTA Promissory Note, the DIP LC Credit Agreement the Debtors or Reorganized Debtors, as applicable, and any Non-Debtor Affiliates, or any other parties thereunder, or in any way related thereto, shall be deemed satisfied in full, released, canceled, discharged, and of no force or effect, and the Agents/Trustees and each of the lenders and holders and their respective agents, successors and assigns, shall each be automatically and fully released and discharged of and from all duties and obligations thereunder without any need for further action or approval by the Bankruptcy Court or for a Holder to take further action; *provided*, that the Liens granted to the DIP LC Agent pursuant to the DIP LC Credit Agreement shall remain in full force and effect until all letters of credit thereunder are treated in accordance with the Plan, the DIP LC Credit Agreement, and the DIP LC Orders *provided*, *further*, that the rollover of DIP Letters of Credit into the Exit ABL Facility in accordance with the Plan shall be deemed to satisfy the lien release requirements under the DIP LC Credit Agreement, the DIP LC Orders, and the Plan.

88.     **Effectiveness of All Actions.**  All actions contemplated by the Plan, including all actions in connection with or pursuant to the RSA and the Definitive Documents, as may be modified, in accordance with their respective terms, from time to time prior to the Effective Date (including any restructuring transaction steps set forth in one or more exhibits to the Plan Supplement), are hereby effective and authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Confirmation Order, without further application to, or order of the Bankruptcy Court, or further action by the respective officers, directors, managers, members, or equityholders of the Debtors or the Reorganized Debtors and with the effect that such actions had been taken by the unanimous action, consent, approval, and vote of each of such officers, directors, managers, members, or equityholders.

89.     **Restructuring Transactions.**  The Debtors or the Reorganized Debtors, as applicable, are authorized to enter into and effectuate the Restructuring Transactions contemplated by the Plan, the RSA, and the other Definitive Documents, and to take any actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan (including the Plan Supplement) that are consistent with and pursuant to the terms and conditions of the Plan (and in accordance with the RSA Rights, where applicable) including the transactions described in Article IV.C and Article VI.N of the Plan and in the Restructuring Steps Plan.  Any transfers of assets or equity interests effectuated or any obligations incurred through the Restructuring Transactions are hereby approved and shall not constitute fraudulent conveyances or fraudulent transfers or otherwise be subject to avoidance.  To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, all transfers contemplated herein and in the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, transfer tax, sales tax, mortgage recording tax,

45

Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. Distributions of the QVC New Equity Interests and the Other Securities and other instruments pursuant to the Plan, in each case, comply with applicable securities laws.

90. **Distributions.** The provisions governing distributions contained in Article VI of the Plan are approved in their entirety. The distributions and payments made pursuant to the Plan shall be permanent, irrevocable, and indefeasible and shall not be subject to avoidance, turnover, recharacterization, or adjustment in any respect unless otherwise specifically provided in the Plan or this Confirmation Order.

91. **Claims Register.** Any duplicate Claim or any Claim that has been paid, satisfied, amended, or superseded may be adjusted or expunged (including pursuant to the Plan) on the Claims Register by the Debtors or Reorganized Debtors or the Claims and Noticing Agent without the Debtors or Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court.

92. **Exit ABL Facility.** On the Effective Date, Reorganized QVC and the applicable Reorganized QVC Debtors (including the Reorganized CBI Debtors) shall enter into the Exit ABL Facility, pursuant to the Exit ABL Facility Documents and which terms shall be in all respects consistent with the RSA and the Plan. Confirmation shall constitute (a) approval of the Exit ABL Facility and the Exit ABL Facility Documents (including the transactions and related agreements

46

contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith); and (b) authorization for the QVC Debtors and the applicable Reorganized QVC Debtors (including the Reorganized CBI Debtors), as applicable, to, without any further notice to or order of the Bankruptcy Court, take any and all actions necessary or appropriate to consummate the Exit ABL Facility, including executing and delivering the Exit ABL Facility Documents. The financial accommodations to be extended pursuant to the Exit ABL Facility are being extended, and shall be deemed to have been extended, in good faith, following arm's-length negotiations, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recovery, turnover, recharacterization, adjustment, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy Law. On the Effective Date, the Exit ABL Facility shall be entered into pursuant to, and in accordance with, the Plan. On the Effective Date, all of the Liens and security interests to be granted, carried forward, continued, amended, extended, and/or reaffirmed (including in connection with any DIP LC Claims that are refinanced by the Exit ABL Facility, if any) by the QVC Debtors or Reorganized QVC Debtors, as applicable in accordance with the Exit ABL Facility Documents: (a) shall be deemed to be granted, carried forward, continued, amended, extended, reaffirmed, and deemed automatically perfected on the Effective Date; (b) shall be continuing legal, valid, binding, automatically perfected, non-avoidable, first-priority (subject to any applicable intercreditor agreements), and enforceable Liens on, and security interests in, the applicable collateral specified in the Exit ABL Facility Documents, including, without limitation, the Liens and security interests in any deposit account of any

47

Reorganized QVC Debtor without the necessity of entering into any lockbox or deposit account control agreement with respect to such deposit account; and (c) shall not be subject to avoidance, recovery, recharacterization, turnover, adjustment, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy Law. To the extent provided in the Exit ABL Facility Documents, the Exit ABL Facility Agent is authorized to file with the appropriate authorities mortgages, financing statements and other documents, and to take any other action in order to establish, evidence, validate, and perfect such Liens or security interests. The priorities of such Liens and security interests shall be as set forth in the Exit ABL Facility Documents (subject to any applicable intercreditor agreements). The Exit ABL Facility Agent shall be authorized to make all filings and recordings necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and this Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of this Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and shall thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties. The guarantees granted under the Exit ABL Facility Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall not be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-

48

bankruptcy Law. The Debtors or the Reorganized Debtors, as applicable, are authorized to furnish the indemnities and provide the exculpation expressly set forth in, and pursuant to the terms and conditions of, the Exit ABL Facility Documents and any commitment letters executed prior to or in connection therewith, and to make all payments that may be due in connection therewith as allowed administrative expense claims under sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code, without further notice, hearing, or order of the Bankruptcy Court. Any and all indemnification, cost reimbursement, fee, and expense obligations due and payable, accruing, or payable on or prior to the Effective Date in accordance with the terms of the Exit ABL Facility Documents, or any commitment letters, engagement letters, or fee letters (including any advisor fee letters) relating to the Exit ABL Facility, executed prior to or in connection therewith shall constitute allowed administrative expense claims of the Debtors' estates (other than the LINTA Debtors) under sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code, without the need to file any further motion, application, request for payment, or proof of claim, notwithstanding the Administrative Claims Bar Date, and without further notice, hearing, or order of the Bankruptcy Court, and shall not be subject to disgorgement, reduction, setoff, recoupment, recharacterization, or subordination of any kind.

93. **Takeback Debt**. On the Effective Date, Reorganized QVC and the applicable Reorganized QVC Debtors shall issue or enter into the Takeback Debt on the terms set forth in the Takeback Debt Documents. Confirmation shall constitute (a) approval of the Takeback Debt and the Takeback Debt Documents and the transactions contemplated thereby and the distribution of such Takeback Debt; and (b) authorization for the QVC Debtors and the applicable Reorganized QVC Debtors, as applicable, to take any and all actions necessary or appropriate to consummate the Takeback Debt, including executing and delivering the Takeback Debt Documents, in each

case, without any further notice to or order of the Bankruptcy Court. The financial accommodations to be extended pursuant to the Takeback Debt are being extended, and shall be deemed to have been extended, in good faith, following arm's-length negotiations, for legitimate business purposes, are reasonable, shall not be subject to avoidance, turnover, recharacterization, adjustment, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy Law. On the Effective Date, the Takeback Debt shall be issued and distributed pursuant to, and in accordance with, the Plan and the Takeback Debt Certification and Election Procedures, and such distribution complies with all applicable provisions of the Bankruptcy Code and securities laws. As of the Effective Date, all of the Liens and security interests to be granted by the QVC Debtors or Reorganized QVC Debtors, as and if applicable, in accordance with the Takeback Debt Documents: (a) shall be deemed to be granted; (b) shall be legal, valid, binding, automatically perfected, non-avoidable, first priority (subject to any applicable intercreditor agreements) and enforceable Liens on, and security interests in, the applicable collateral specified in the Takeback Debt Documents; and (c) shall not be subject to avoidance, recharacterization, turnover, adjustment, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy Law. The Takeback Debt Agents are authorized to file (at the sole expense of the Debtors) with the appropriate authorities mortgages, financing statements and other documents, and to take any other action in order to establish, evidence, validate, and perfect such Liens or security interests. The priorities of such Liens and security interests shall be as set forth in the Takeback Debt Documents. The Takeback Debt

Agents shall be authorized to make all filings and recordings necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and this Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of this Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and shall thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties. The guarantees granted under the Takeback Debt Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall not be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy Law. The Takeback Debt Certification and Election Procedures, and any forms and documents related thereto, are fair and reasonable and are hereby approved, and the Debtors, Reorganized Debtors, and Disbursing Agent shall be authorized, in their reasonable discretion, to adopt such additional procedures as they deem necessary or appropriate to implement and effectuate the Takeback Debt Certification and Election Procedures, provided that any such procedures are not inconsistent with the Plan or this Confirmation Order.

94. **Issuance of the QVC New Equity Interests.** On the Effective Date, subject to the terms and conditions of the Plan and the Plan Supplement, Reorganized QVC shall issue the QVC New Equity Interests, which distribution or issuance shall be governed by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, including the New Organizational Documents, which terms and conditions shall bind each Entity receiving such

51

distribution or issuance. All of the shares of QVC New Equity Interests issued or distributed pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable and are issued in accordance with all applicable Bankruptcy law and non-bankruptcy Law. The issuance of the QVC New Equity Interests, including equity awards reserved for the Management Incentive Plan, shall be authorized without the need for any further corporate action or without any further action by the Debtors or Reorganized Debtors (or action of any other party, including, without limitation, securityholder, members, limited or general partners, managers, directors, or officers of the Debtors or Reorganized Debtors, as applicable). Any Entity's acceptance of QVC New Equity Interests shall be deemed as its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms. For the avoidance of doubt, upon the occurrence of the Effective Date recipients of QVC New Equity Interests (and any successors thereto or transferees thereof) shall become bound by the New Organizational Documents regardless of whether or not such recipients actually return signature pages thereto.

95. **Distributions Exempt from Securities Laws.** Pursuant to section 1145 of the Bankruptcy Code, or, to the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, the offering, issuance, and distribution of the QVC New Equity Interests as contemplated in the Plan and/or the offering, issuance, and distribution of Other Securities, if any, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. federal, state, or local laws requiring registration of the offering, issuance, distribution, or sale of Securities. The offering of such QVC New Equity Interests and/or Other

Securities prior to the Petition Date shall be exempt from the registration requirements of the Securities Act in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or in reliance on Regulation S under the Securities Act.

96. The shares of QVC New Equity Interests and the Other Securities, if any, to be issued under the Plan on account of Allowed Claims in accordance with, and pursuant to, section 1145 of the Bankruptcy Code will be freely transferable under the Securities Act by the recipients thereof, subject to: (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, the provisions limiting transfers by an "affiliate" of the Debtors (or an "affiliate" within 90 days of such transfer) as defined in Rule 144(a)(1) under the Securities Act, and compliance with applicable securities laws and any rules and regulations of the United States Securities and Exchange Commission or state or local securities laws, if any, applicable at the time of any future transfer of such Securities or instruments (including, to the extent applicable, Rule 144 under the Securities Act); and (b) any restrictions on the transferability of such QVC New Equity Interests and/or Other Securities in the New Organizational Documents. The shares of QVC New Equity Interests and the Other Securities, if any, that may be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration (excluding section 1145 of the Bankruptcy Code) will be considered "restricted securities," will bear customary legends, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act (including, to the extent applicable, Rule 144 under the Securities Act) and subject to any restrictions on the transferability of such QVC New Equity Interests in the New Organizational Documents. The Reorganized

Debtors need not provide any further evidence other than the Plan or this Confirmation Order to any Entity (including DTC, any nominee thereof or any transfer agent for the QVC New Equity Interests and/or Other Securities) with respect to the treatment of the QVC New Equity Interests and/or Other Securities to be issued under the Plan under applicable securities laws.

97. **Compromise of Controversies.** In consideration for the distributions and other benefits, including releases, provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims, Interests, and controversies settled, compromised, satisfied, or otherwise resolved under the Plan—including the Intercompany Settlement—and the entry of this Confirmation Order constitutes approval of such compromise and settlement under Bankruptcy Rule 9019.

98. **Assumption and Assignment of Contracts and Leases.** On the Effective Date, any Executory Contract or Unexpired Lease of the Debtors not listed on the Rejected Executory Contract and Unexpired Lease List is deemed to be an Assumed Executory Contract or Unexpired Lease, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, in accordance with the provisions and requirements of section 365 of the Bankruptcy Code, and the payment of Cures, if any, shall be paid in accordance with Article V.C of the Plan. The Debtors or the Reorganized Debtors, as applicable, may alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List, other than with respect to any Unexpired Leases which treatment cannot be changed after the Confirmation Date unless otherwise agreed to by the affected counterparty, at any time through and including forty-five (45) days after the Effective Date.

99. To the maximum extent permitted by Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan

restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified or otherwise disregarded such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

100.    Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to Article V of the Plan, in the amount and at the time dictated by the Debtors' ordinary course of business (which, in the case of any Executory Contract or Unexpired Lease, means in accordance with the terms of such Executory Contract or Unexpired Lease, or as otherwise agreed to by the affected parties), shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in these Chapter 11 Cases, including pursuant to this Confirmation Order, and for which any Cure has been fully paid pursuant to Article V of the Plan, in the amount and at the time dictated by the Debtors' ordinary course of business, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

101.    The provisions governing the treatment of Executory Contracts and Unexpired Leases set forth in Article V of the Plan (including the procedures regarding the resolution of any

and all disputes concerning the assumption and assignment, as applicable, of such Executory Contracts and Unexpired Leases) shall be, and hereby are, approved in their entirety.

102.    **Indemnification.**  To the fullest extent permitted under applicable Law (including being subject to the limitations of the Delaware General Corporation Law, including the limitations contained therein on a corporation's ability to indemnify officers and directors), all indemnification provisions in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, board consents, indemnification agreements, employment contracts, or otherwise) for the benefit of current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, creditors, and other professionals of, or acting on behalf of, the Debtors, as applicable, shall be (a) reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors than the indemnification provisions in place prior to the Effective Date, and (b) assumed by the Reorganized Debtors; *provided*, that nothing in the Plan or this Confirmation Order shall expand any of the Debtors' indemnification obligations in place as of the Petition Date.

103.    **Authorization to Consummate.**  The Debtors are authorized to consummate the Plan in accordance with the terms thereof after the entry of this Confirmation Order, subject to satisfaction or waiver (by the required parties) of the conditions precedent to Consummation set forth in Article IX of the Plan.

104.    **Professional Compensation.**  All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation

56

Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court and all such Allowed amounts shall be paid promptly, first, from the Professional Fee Escrow Account, which the Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Reserve Amount in accordance with the Plan, and second (solely to the extent the funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the applicable Professionals), by the applicable Debtors or Reorganized Debtors, in each case in accordance with Professional Fee and Restructuring Expense Allocation.

105.   From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate and the Debtors or the Reorganized Debtors, as applicable, may employ and pay any Professional without any further notice to or action, order, or approval of the Bankruptcy Court.

106.   **Restructuring Expenses.**   The provision governing payment of QVC Restructuring Expenses and LINTA Restructuring Expenses in Article II.D of the Plan is approved in its entirety. The provision governing payment of fees, costs, and expenses of the Disbursing Agent (including the Agents/Trustees with respect to their respective debt facilities) in Article VI.C.2 of the Plan is approved in its entirety.

107.   **Release, Exculpation, Discharge, and Injunction Provisions.**   The release, exculpation, discharge, and injunction provisions set forth in Article VIII of the Plan are, subject to the occurrence of the Effective Date, approved and authorized in their entirety, and such provisions are effective and binding on all parties and Entities to the extent provided therein.

a.      Discharge of Claims and Termination of Interests.

108.    The following discharge of Claims and termination of Interests in Article VIII.A of the Plan is approved:

> **Pursuant to section 1141(d) of the Bankruptcy Code and except as otherwise specifically provided in the Plan, this Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan or the Plan Supplement, the distributions, rights, and treatment that are provided herein shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims that the Reorganized Debtors resolve or compromise after the Effective Date), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services that employees of the Debtors have performed prior to the Effective Date, and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (a) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured and no longer continuing as of the Effective Date. Without prejudice to the distributions, rights, and treatment that are provided by the Plan, this Confirmation Order shall be a judicial determination of the discharge of all Claims (other than any Reinstated Claims) and Interests (other than any Intercompany Interests that are Reinstated) subject to the occurrence of the Effective Date, and, upon the Effective Date, all Holders of such Claims and Interests shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such Claim or Interest against the Debtors, Reorganized Debtors, or any of their assets or property.**

b.      Release of Liens.

109.    The following Release of Liens in Article VIII.B of the Plan is approved:

**Except as otherwise provided in the New Debt Documents, the Plan, this Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, benefit, title, and interest of any Holder (and the applicable Agents of such Holder, including the Agents/Trustees) of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert and, as applicable, be reassigned, surrendered, reconveyed, or retransferred to the Reorganized Debtors and their successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder, including the Agents/Trustees) shall be authorized and directed, as soon as practicable on or after the Effective Date, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any possessory collateral) held by such Holder (and the applicable agents for such Holder, including the Agents/Trustees) and to take any and all steps as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf. The presentation or filing of this Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens. All fees and costs incurred by any Holder of any Claim, the RCF Agent, the QVC Notes Trustee, or the DIP LC Agent in connection with the release of liens pursuant to the Plan, shall be reimbursed by the applicable QVC Debtors or Reorganized QVC Debtors, as applicable, in full in Cash on or following the Effective Date as applicable.**

    c.    <u>Releases by the Debtors</u>.

110.    The following releases by the Debtors in Article VIII.C of the Plan are approved:

**Except as otherwise provided in the Plan or this Confirmation Order to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, their Estates, the Reorganized Debtors, and any Person seeking to exercise the rights of the Debtors or their Estates, including any successors to**

59

the Debtors or any Estates or any Estate representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claims or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all claims and Causes of Action whatsoever, including any Avoidance Actions and any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, and their Estates, whether liquidated or unliquidated, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, contingent or noncontingent, in Law, equity, contract, tort or otherwise, under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement or otherwise that the Debtors, their Estates, or the Reorganized Debtors, including any successors to the Debtors or any Estate representatives appointed or selected, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, the Reorganized Debtors, their Estates, or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, and their Estates (including the Debtors' capital structure, management, ownership, or operation thereof), the Chapter 11 Cases, the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the RCF Credit Agreement, the QVC Notes Indentures, the LINTA Notes Indenture, the DIP LC Credit Agreement, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, any related adversary proceedings, intercompany transactions between or among a Debtor and another Debtor or Affiliate of a Debtor, the decision to file the Chapter 11 Cases, the formulation, documentation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the RSA, the Intercompany Settlement, the QVC New Equity Interests, the New Organizational Documents, the Exit Financing, the DIP LC Documents, the New Debt Documents, the Management Incentive Plans, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, any other Definitive Document or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument,

60

document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or this Confirmation Order in lieu of such legal opinion) related to, created, or entered into in connection with any of the foregoing or any Restructuring Transactions, before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Disclosure Statement, or the Plan, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation of the Restructuring Transactions, the administration and implementation of the Plan and the Restructuring Transactions, or the distribution of property under the Plan or any other related agreement, including the issuance or distribution of Securities pursuant to the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence, in each case, taking place on or before the Effective Date relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any Causes of Action identified in the Schedule of Retained Causes of Action; (b) any post-Effective Date obligations of any party or Entity under the Plan, this Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including any Definitive Document, the New Debt Documents, the New Organizational Documents, and other documents set forth in the Plan Supplement) executed to implement the Plan or any claim or obligation arising under the Plan; or (c) Claims or Causes of Action related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud or willful misconduct.

Entry of this Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims and Causes of Action released by the Debtor Release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release, other than as specified above.

d. Releases by the Releasing Parties.

111. The following Third-Party Release in Article VIII.D of the Plan is approved:

Except as otherwise provided in the Plan or this Confirmation Order to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for

61

good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, in each case except for claims arising under, or preserved by, the Plan, to the fullest extent permitted under applicable law, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and every Releasing Party, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claims or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action whatsoever, including any Avoidance Actions and any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, and their Estates, whether liquidated or unliquidated, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, contingent or noncontingent, in Law, equity, contract, tort or otherwise, under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Entities would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, the Reorganized Debtors, or their Estates or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, and their Estates (including the Debtors' capital structure, management, ownership, or operation thereof), the Chapter 11 Cases, the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the RCF Credit Agreement, the QVC Notes Indentures, the LINTA Notes Indenture, the DIP LC Credit Agreement, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, any related adversary proceedings, intercompany transactions between or among a Debtor and another Debtor or Affiliate of a Debtor, the decision to file the Chapter 11 Cases, the formulation, documentation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the RSA, the Intercompany Settlement, the QVC New Equity Interests, the New Organizational Documents, the Exit Financing, the DIP LC Documents, the New Debt Documents, the Management Incentive Plans, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, any other Definitive Document or any Restructuring Transaction, contract, instrument, release, or

62

other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or this Confirmation Order in lieu of such legal opinion) related to, created, or entered into in connection with any of the foregoing or any Restructuring Transactions, before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Disclosure Statement, or the Plan, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation of the Restructuring Transactions, the administration and implementation of the Plan and the Restructuring Transactions, or the distribution of property under the Plan or any other related agreement, including the issuance or distribution of Securities pursuant to the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence, in each case, taking place on or before the Effective Date relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) the rights of any Holder of an Allowed Claim or Allowed Interest (as applicable) to receive distributions under the Plan; (b) any post-Effective Date obligations of any party or Entity under the Plan, this Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including any Definitive Document, the New Debt Documents, the New Organizational Documents, and other documents set forth in the Plan Supplement) executed to implement the Plan or any claim or obligation arising under the Plan; or (c) Claims or Causes of Action related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud or willful misconduct.

Entry of this Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (a) consensual; (b) essential to Confirmation; (c) given in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (d) a good faith settlement and compromise of the Claims and Causes of Action released by the Third Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release, other than as specified above.

e.    Exculpation.

63

112. Pursuant to section 1125(e) of the Bankruptcy Code, the following exculpation of the Exculpation Parties in Article VIII.E of the Plan is approved:

**Notwithstanding anything contained in the Plan to the contrary, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or Third-Party Release, effective as of the Effective Date, no Exculpated Party shall have or incur liability or obligation for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action and any claim arising from or related to any act or omission occurring from the Petition Date through the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the RSA and related prepetition transactions, the Definitive Documents, the QVC New Equity Interests, the Exit Financing, the DIP LC Documents, the New Debt Documents, the Management Incentive Plans, the Disclosure Statement, the Plan, the Plan Supplement, the Restructuring Transactions, or any wind-down transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or this Confirmation Order in lieu of such legal opinion) related to, created, or entered into in connection with the foregoing, any Avoidance Actions, the pursuit of Confirmation, the pursuit of consummation of the Restructuring Transactions, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence, in each case, taking place on or before the Effective Date, except for claims or Causes of Action arising out of or related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.**

**The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder. The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and other applicable Laws, regulations, or rules protecting such Exculpated Parties from liability. In addition, notwithstanding the foregoing, the exculpation shall not release any obligation or liability of any Entity for any post-Effective Date obligation under the Plan or any document,**

instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

    f.    <u>Injunction</u>.

113.    The following injunction in Article VIII.F of the Plan is approved:

**Except as otherwise expressly provided in the Plan or in this Confirmation Order, or for obligations or distributions issued or required to be paid pursuant to the Plan or this Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, liabilities, or Causes of Action that have been extinguished, released, discharged, or are subject to exculpation, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (a) commencing or continuing in any manner any action, suit, or other proceeding of any kind on account of or in connection with or with respect to any such released Claims, Interests, liabilities, or Causes of Action; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, liabilities, or Causes of Action; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, liabilities, or Causes of Action; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, liabilities, or Causes of Action unless such Holder has timely Filed a motion expressly requesting the right to perform such setoff, subrogation or recoupment on or before the Effective Date, and notwithstanding an indication of a Claim, Interest, or Cause of Action or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, liabilities, or Causes of Action released or settled pursuant to the Plan.**

**Upon entry of this Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan (as may be amended, restated, supplemented,**

**or otherwise modified from time to time), shall be deemed to have consented to the injunction provisions set forth in the Plan.**

**No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Exculpated Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of, in whole or in part, a claim or Cause of Action, as applicable, subject to the release and exculpation provisions of Article VIII hereof, without the Bankruptcy Court (a) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim not released or subject to exculpation under the Plan, and (b) specifically authorizing such Entity to bring such claim or Cause of Action, as applicable, against any such Exculpated Party.**

**Notwithstanding anything to the contrary in the foregoing, the injunctions set forth above do not enjoin Claims or Causes of Action against the Exculpated Parties or the Released Parties, as applicable, that relate to (a) the rights of any Holder of an Allowed Claim or Allowed Interest (as applicable) to receive distributions under the Plan; (b) any post-Plan Effective Date obligations of any party or Entity under the Plan, this Confirmation Order, any Restructuring Transaction, or any document, instrument, or Agreement (including any Definitive Document, the New Debt Documents, the New Organizational Documents, and other documents set forth in the Plan Supplement), executed to implement the Plan or any claim or obligation arising under the Plan; or (c) Claims or Causes of Action related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud or willful misconduct.**

114.    **New Organizational Documents.**  On or immediately prior to the Effective Date, except as otherwise provided in the Plan and subject to local Law requirements, the New Organizational Documents shall be automatically adopted or amended in any manner consistent with the terms and conditions set forth in the Governance Term Sheet and as may be necessary to effectuate the transactions contemplated by the Plan.  To the extent required under the Plan or applicable non-bankruptcy Law, each of the Reorganized Debtors will file its New Organizational Documents with the Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate Laws of the respective state, province, or country of incorporation to the extent such filing is required for each such document. The New Organizational Documents will, among other things (a) authorize the issuance of the

66

QVC New Equity Interests and (b) prohibit the issuance of non-voting Equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents as permitted by the laws of its jurisdiction of incorporation or formation and in accordance with the terms thereof, and the Reorganized Debtors may file such amended certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent and governing documents as permitted by the Laws of the respective states, provinces, or countries of incorporation or formation and the New Organizational Documents.

115. **Cooperation by DTC.** To the extent any Securities are issued under the Plan via DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or this Confirmation Order to any Entity (including DTC, any nominee thereof or any transfer agent for the QVC New Equity Interests) with respect to the treatment of the QVC New Equity Interests to be issued under the Plan under applicable securities laws. Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the QVC New Equity Interests through the facilities of DTC, DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the Securities to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC, any nominee thereof and any transfer or similar agent for Securities) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the Securities to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services (to the extent applicable).

67

116.     **Directors and Officers of the Reorganized Debtors.**  As of the Effective Date, the term of the current members of the board of directors or other Governing Body of each of the Debtors shall expire, such current directors shall be deemed to have resigned, and all of the directors for the initial term of the New Board and the other Governing Bodies shall be appointed in accordance with the Governance Term Sheet and the applicable New Organizational Documents of such Reorganized Debtor.  The initial members of the New Board were identified in the Plan Supplement, to the extent known.  Each such member and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.  In subsequent terms, the directors shall be selected in accordance with the New Organizational Documents.

117.     **Compliance with Tax Requirements.**  In connection with the Plan, to the extent applicable, the Debtors, the Reorganized Debtors, the Disbursing Agent, and any applicable withholding or reporting agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, any applicable withholding or reporting agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  All persons shall be required to provide any additional information necessary for the applicable withholding or reporting agent to comply with all tax withholding and reporting requirements imposed by any Governmental Unit.  The Debtors and the

68

Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

118. **Documents, Mortgages, and Instruments.** This Confirmation Order is, and shall be, binding upon and shall govern the acts of all Persons or Entities including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and state officials, and corresponding officials in all applicable jurisdictions, both foreign and domestic, and all other Persons and Entities who may be required, by operation of Law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any document or instrument. Each and every federal, state, local, and foreign government agency is hereby directed to accept any and all documents and instruments necessary, useful, advisable, or appropriate (including financing statements under the applicable uniform commercial code) to effectuate, implement, and consummate the transactions contemplated by the Plan, including the Restructuring Transactions, and this Confirmation Order, without payment of any stamp tax or similar tax imposed by state, local, or foreign Law, and, to the extent such Persons or Entities are not identified by the Debtors or Reorganized Debtors, as applicable, after reasonable due inquiry, the Debtors or Reorganized Debtors, as applicable, shall be granted power of attorney to sign on behalf of such Person or Entity.

119. **Continued Effect of Stays and Injunction.** Unless otherwise provided in the Plan or this Confirmation Order, all injunctions or stays in effect in these Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or this

Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or this Confirmation Order shall remain in full force and effect in accordance with their terms. Notwithstanding anything to the contrary in this paragraph [119], nothing herein shall bar the filing of financing documents (including Uniform Commercial Code financing statements, security agreements, leases, mortgages, trust agreements and bills of sale) or the taking of such other actions as are necessary or appropriate to effectuate the transactions specifically contemplated by the Plan or by this Confirmation Order prior to the Effective Date.

120. **Reversal/Stay/Modification/Vacatur of Confirmation Order.** Except as otherwise provided in this Confirmation Order, if any or all of the provisions of this Confirmation Order are hereafter reversed, modified, vacated, or stayed by subsequent order of the Bankruptcy Court, or any other court, such reversal, stay, modification, or vacatur shall not affect the validity or enforceability of any act, obligation, indebtedness, liability, priority, or lien incurred or undertaken by the Debtors or Reorganized Debtors, or any other party authorized or required to take action to implement the Plan, under or in connection with the Plan before the Effective Date of any such reversal, stay, modification, or vacatur, including the validity of any obligation, indebtedness, or liability incurred by the Reorganized Debtors. Notwithstanding any such reversal, stay, modification, or vacatur of this Confirmation Order, any such act or obligation incurred or undertaken pursuant to, or in reliance on, this Confirmation Order prior to the Effective Date of such reversal, stay, modification, or vacatur shall be governed in all respects by the provisions of this Confirmation Order and the Plan or any amendments or modifications thereto.

121. **Nonseverability of Plan Provisions Upon Confirmation.** Each provision of the Plan is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors, the Required Consenting QVC

Noteholders, and Required Consenting RCF Lenders, and solely to the extent it affects the treatment of economic recovery of the LINTA Notes Claims, the Required Consenting LINTA Noteholders; and (c) nonseverable and mutually dependent.

122. **Post-Confirmation Modifications.** Subject to the RSA Rights, and subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, without need for further order or authorization of the Bankruptcy Court, the Debtors or the Reorganized Debtors, as applicable, are authorized and empowered, to make any and all modifications to any and all documents that are necessary to effectuate the Plan that do not materially modify the terms of such documents and are consistent with the Plan (including applicable RSA Rights).

123. **Applicable Non-bankruptcy Law.** The provisions of this Confirmation Order, the Plan and related documents, or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.

124. **Reporting.** After entry of this Confirmation Order, the Debtors or Reorganized Debtors, as applicable, shall have no obligation to File with the Bankruptcy Court, serve on any parties, or otherwise provide any party with any other report that the Debtors or Reorganized Debtors, as applicable, were obligated to provide under the Bankruptcy Code or an order of the Bankruptcy Court, including obligations to provide any reports to any parties otherwise required under the "first" and "second" day orders entered in these Chapter 11 Cases.

125. **Waiver of Section 341 Meeting of Creditors; Waiver of Schedules and Statements; Waiver of Filings.** Any requirement under section 341(e) for the United States Trustee to convene a meeting of creditors is permanently waived as of the Confirmation Date. Any requirement for the Debtors to File schedules of assets and liabilities and statements of financial

71

affairs is permanently waived as of the Confirmation Date. Any requirement under section 521 of the Bankruptcy Code or Bankruptcy Rule 1007 obligating the Debtors to File any list, schedule, or statement with the Bankruptcy Court or the U.S. Trustee is permanently waived as to any such list, schedule, or statement not Filed as of the Confirmation Date.

126. **Governmental Approvals Not Required.** This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state, federal, or other governmental authority with respect to the dissemination, implementation, or consummation of the Plan and the Disclosure Statement, any certifications, documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement.

127. **Protections Against Discriminatory Treatment.** Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of these Chapter 11 Cases (or during these Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in these Chapter 11 Cases.

128. **Provisions Regarding the BlackRock Consenting Creditors**. For the avoidance of doubt, and notwithstanding anything in the Plan of this Confirmation Order to the contrary, any Related Parties of funds and accounts managed by BlackRock Financial Management, Inc. or its

affiliates that are signatories to the RSA (the "BlackRock Consenting Creditors") (including any separate branch, trading desk, fund and/or business group of a BlackRock Consenting Creditor), shall not be deemed to be Releasing Parties themselves, unless such Related Party has itself signed the RSA.

129. **Provisions Regarding Governmental Units**. Nothing in this Confirmation Order or the Plan shall effect a release of any claim by any Governmental Unit or any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or Person, nor shall anything in this Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action, or other proceedings against any party or person for any liability of such persons whatever, including without limitation any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against such Persons, nor shall anything in this Confirmation Order or the Plan exculpate any party or Person from any liability to any Governmental Unit or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or Person.

130. **Provisions Regarding the Hankins Claim**. Notwithstanding anything to the contrary in the Plan or this Confirmation Order, nothing in the Plan or this Confirmation Order shall satisfy, extinguish, discharge, release, enjoin or otherwise impair any of the claim(s) asserted by Antthony Mark Hankins and Antthony Design Originals, Inc. (collectively, the "Hankins Parties"), including the claims asserted in the action pending in the United States District Court for the Eastern District of Pennsylvania styled Antthony Design Originals, Inc., et al. v. QVC

73

Group, Inc., et al., No. 2:26-cv-00912-MAK (E.D. Pa. 2026) (the "Hankins Claim"). The Hankins Parties shall retain all rights to prosecute, adjudicate, liquidate, and otherwise resolve the Hankins Claim in any court of competent jurisdiction, including the court in which the Hankins Claim is currently pending, and to seek entry and enforcement of any resulting judgment or other relief, whether monetary or injunctive, against the Reorganized Debtors.

131. **Provisions Regarding Liberty Mutual.** For the avoidance of doubt, because each of the insurance policies and related agreements, documents, and instruments relating thereto issued by Liberty Mutual Insurance Company and/or any of its subsidiaries or affiliates (collectively, "Liberty Mutual") to the Debtors (such documents, collectively, the "Liberty Mutual Policies") are assumed as of the Effective Date pursuant to Section V.E of the Plan, then, notwithstanding anything to the contrary in the Plan (including, without limitation, Section VIII.F thereof), the Plan Supplement, or this Confirmation Order, nothing shall extinguish, modify, or otherwise alter any legal and/or equitable rights and defenses that Liberty Mutual has under the Liberty Mutual Policies and applicable law, including, without limitation, the ability for Liberty Mutual to exercise its rights of setoff and/or recoupment against any of the Debtors or any successor to the Debtors, and all such rights and defenses are hereby expressly reserved and preserved.

132. **Provisions Regarding Mitsui**. Notwithstanding anything to the contrary in the Plan or this Confirmation Order, nothing in the Plan, Plan Supplement, or this Confirmation Order shall impair, modify, or otherwise affect any of the terms set forth in that certain *Shareholders Agreement in Respect of QVC Japan, Inc.*, dated as of June 12, 2000 (as amended by the Amendment Agreement dated as of March 4, 2010, the Amendment Agreement dated as of March 30, 2017, the Amendment Agreement dated as of April 8, 2019, and the Amendment Agreement

dated as of March 8, 2024) (the "Shareholders Agreement"), by and among Mitsui & Co., Ltd. ("Mitsui") and QVC UK Holdings, Limited as the successor in interest of QVC Japan Holdings, Inc., any of the agreements referenced therein or attached as exhibits thereto, or any license or services agreements between QVC Japan, Inc. and any Debtor or any Affiliate of any Debtor (in each case, as amended, restated, supplemented or modified from time to time, and collectively, the "QVCJ Agreements"), and any claims, rights or obligations of the parties to the QVCJ Agreements shall be unimpaired and unaffected by the Plan, the Plan Supplement and this Confirmation Order. In addition, any of the QVCJ Agreements to which any of the QVC Debtors may be party, shall be assumed on the Plan Effective Date by Reorganized QVC Inc. and all obligations thereunder (whether or not such obligations are or may be Intercompany Claims) shall be assumed on the terms set forth therein.

133. **Provisions Regarding Reinstated Arbitration Claimants.** Notwithstanding anything to the contrary in the Plan, the Plan Supplement, the Disclosure Statement, or this Confirmation Order (including, for the avoidance of doubt, paragraph 40 hereof):

(a) Labaton Keller Sucharow LLP ("Labaton"), on behalf of the claimants they represent, has asserted certain claims related to alleged data privacy violations against the Debtors and has asserted or will assert arbitration demands in connection with such claims, (the claimants represented by Labaton, the "Arbitration Claimants"; arbitration proceedings in connection with such claims, the "Arbitration Proceedings"; and such claims, the "Arbitration Claims").[5] For the avoidance of doubt, the Arbitration Claims shall be Reinstated, and shall not be Impaired, under

---

[5] A confidential list of Arbitration Claimants are attached as Exhibit A to the opt out form submitted on behalf of the Arbitration Claimants to Kroll (the "Master Opt Out Form") on Thursday May 21, 2026. The Debtors agreed to extend the voting deadline (which covers the submission of opt-out elections) for the Arbitration Claimants to May 21, 2026, at 11:59 p.m. (CT).

the Plan in accordance with section 1124 of the Bankruptcy Code. The Arbitration Claims shall be determined, adjudicated, arbitrated, resolved, or settled as the case may be, and any disputes concerning the existence, validity, amount, enforceability, and arbitrability, of the Arbitration Claims shall be resolved in the ordinary course of business and, as set forth in the Plan, in the same manner as if the Chapter 11 Cases had not been commenced (including, for the avoidance of doubt, without regard to any applicable requirements of Article VI.O.2. of the Plan). The Debtors, the Reorganized Debtors, and the Arbitration Claimants reserve all rights and arguments relating to QVC's General Terms of Use and/or any applicable law, including but not limited to with respect to whether any Arbitration Claim (i) may be estimated pursuant to section 502(c)(1) of the Bankruptcy Code, or (ii) may be subject to any proceeding, supplemental or otherwise under the Bankruptcy Code, and no such estimation, proceeding, or claim objection shall be commenced or pursued absent a further order of a court or other tribunal of competent jurisdiction after notice and a hearing. The Debtors, the Reorganized Debtors, and the Arbitration Claimants also reserve all rights, claims, and defenses with respect to the Arbitration Claims, the Arbitration Proceedings, and the continued pursuit, prosecution and/or merits determination of the Arbitration Claims before the American Arbitration Association. In the event any Proof of Claim is submitted by or on behalf of an Arbitration Claimant, it shall be disregarded as if such Proof of Claim had not been filed, and any such filing shall have no impact on any underlying Arbitration Claim Reinstated as described above. For the avoidance of doubt, the submission of a Proof of Claim by an Arbitration Claimant shall not, by operation of Article VII.A of the Plan or otherwise, impact the merits or the ultimate resolution of the underlying Arbitration Claim.

(b) The Debtor Release, Third-Party Release, Injunction, and related provisions of the Plan and this Confirmation Order shall not release, discharge, enjoin, bar, or otherwise

76

impair or limit any Arbitration Claim, the Arbitration Proceedings, or any rights of any Arbitration Claimant to pursue, liquidate, arbitrate, enforce, or collect on account of any Arbitration Claim against any Debtor or any Reorganized Debtor. The gatekeeping provision set forth in Article VIII.F of the Plan shall be inapplicable to the Arbitration Claims Reinstated as set forth herein and under the Plan, and the Arbitration Claims may be pursued in the ordinary course without any requirement to seek or obtain any Bankruptcy Court approval, determination, or authorization under Article VIII.F of the Plan or this Confirmation Order. For the avoidance of doubt, the Arbitration Claimants shall not be deemed Releasing Parties.

(c)     Until the entry of a final arbitration award, final order of judgment, or settlement of all Arbitration Proceedings relating to any Arbitration Claim, the Debtors, the Reorganized Debtors and any other transferee of the Debtors' books, records, documents, files, electronic data (in whatever format, including native format), or any tangible object potentially relevant to the Arbitration Proceedings, wherever stored (collectively, the "Potentially Relevant Books and Records") shall treat the Potentially Relevant Books and Records as if they were the subject of a continuing request for production of documents from an opposing party under the Federal Rule of Civil Procedure (and shall have no obligation to update the format of the Potentially Relevant Books and Records), and shall not destroy, abandon, transfer, or otherwise render unavailable such Potentially Relevant Books and Records without providing counsel to the Arbitration Claimants at least sixty days' advance written notice and an opportunity to object and be heard by a court or other tribunal of competent jurisdiction. In the event any Arbitration Claimant timely objects to any such destruction, abandonment, or transfer, the Potentially Relevant Books and Records shall be preserved pending a final order of the Bankruptcy Court or other court or other tribunal of competent jurisdiction.

(d)     All injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any other order of the Bankruptcy Court shall be lifted with respect to the Arbitration Proceedings upon the occurrence of the Effective Date.

(e)     The Debtors, Reorganized Debtors, and the Arbitration Claimants reserve all rights, claims, defenses, and arguments with respect to the Bankruptcy Court's jurisdiction or authority to adjudicate, estimate, liquidate, or otherwise determine any aspect of the Arbitration Claims.

134.    **Provisions Regarding the SEC**.  Notwithstanding any language to the contrary contained in the Disclosure Statement, the Plan, and/or this Confirmation Order, no provision of the Plan or this Confirmation Order shall (i) preclude the United States Securities and Exchange Commission ("SEC") from enforcing its police or regulatory powers; or, (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any Claims, Causes of Action, proceedings or investigations against any non-Debtor Person or non-Debtor Entity in any forum.

135.    **Provisions Regarding the Texas Taxing Authorities**.  For the avoidance of doubt, any Allowed Claims of the Texas Taxing Authorities[6] (the "Texas Tax Claims"), shall constitute Other Secured Claims in Class B1 (with respect to Nueces County) and Class D1 (with respect to the remainder of the Texas Tax Claims), including interest properly charged under applicable non-bankruptcy law through the date of payment to the extent that applicable law provides for interest with respect to any portion of the Texas Tax Claims in a manner consistent with sections 506(b) and 511 of the Bankruptcy Code, and for the avoidance of doubt, will be

---

[6]    The "Texas Taxing Authorities" are defined as all governmental entities in the state of Texas collected by the law firm Linebarger Goggan Blair & Sampson and Perdue Brandon Fielder Collins & Mott,  including but not limited to: Dallas County, City of Houston, Houston City College, Houston Independent School District, Nueces County, Tarrant County, City of Cleburne, Cleburne Independent School District, and Johnson County.

Unimpaired. Texas Tax Claims for 2026 taxes shall be paid in the ordinary course of business, including any and all interest and penalties allowed under applicable non-bankruptcy law, if any. The Liens securing the Texas Tax Claims, to the extent such Liens are valid, properly perfected, non-avoidable, and enforceable under applicable non-bankruptcy law (i) shall be retained until the applicable taxes are paid in full, and (ii) shall not be primed or subordinated by any exit financing. All rights and defenses of the Debtors and Reorganized Debtors, as applicable, under applicable Law are reserved and preserved with respect to the Texas Tax Claims, including the right to dispute or object to the Texas Tax Claims and Liens.

136. **Provisions Regarding the Travelers Bonds**. For purposes of these paragraphs 136 through 142, the term "Surety" shall mean Travelers Casualty and Surety Company of America and any of its present or future direct or indirect parent companies, affiliates, subsidiaries, successors, or assigns. The Surety issued customs surety bonds and other miscellaneous bonds (the "Travelers Bonds") on behalf of certain Debtors and Non-Debtor Affiliates. QLocal, Inc., t/a QVC Productions, QVC, Inc. and Cornerstone Brands, Inc. entered into General Contracts of Indemnity dated September 16, 2008 and July 28, 2020 (collectively, the "Indemnity Agreement"). The Debtors' and non-Debtors' obligations connection with and under the Travelers Bonds and Indemnity Agreement are backed by a letter of credit issued by JP Morgan Chase Bank (together with proceeds thereof, the "Travelers LC"), pursuant to the Indemnity Agreement. The Indemnity Agreement and Travelers LC, together with any amendments, modifications and substitutions thereof, may be collectively referred to herein as the "Existing Surety Agreements."

137. Nothing in the Plan or this Confirmation Order shall: (i) release, discharge, preclude, enjoin, limit, condition, or impair any rights of the Surety or the Reorganized Debtors or their Non-Debtor Affiliates under the Travelers Bonds, Indemnity Agreement, Travelers LC, other

contract (if any), common law, statute, regulation, or otherwise (whether contingent, noncontingent, liquidated or unliquidated); (ii) release, discharge, preclude, enjoin, limit, condition, or impair the Surety's or the Reorganized Debtors' or their Non-Debtor Affiliates' right, if any, to setoff, recoupment, or subrogation; (iii) release, discharge, preclude, enjoin, limit, condition, or impair any right of the Surety against the Debtors or their Non-Debtor Affiliates, or the Reorganized Debtors or their Non-Debtor Affiliates against the Surety, whether related to, arising out of, or granted or created under the Travelers Bonds, Existing Surety Agreements, other contract (if any), common law, statute, regulation, or otherwise (whether contingent, noncontingent, liquidated or unliquidated); and/or (iv) be deemed to provide the Surety's consent, whether express or implied, to the cancellation or return, undrawn, of the Travelers LC. All parties' rights to challenge any such rights or interests on any ground other than the Plan or this Confirmation Order are expressly preserved.

138. Nothing in the Plan or this Confirmation Order shall be deemed to affect the Surety's right, if any, to seek the refund or return of any payment made to United States Customs and Border Control under the Travelers Bonds; *provided*, however, that any such right shall be subject to any other party's right to challenge the Surety's interest in or entitlement to refund or return on any grounds other than the Plan or this Confirmation Order.

139. Nothing in the Plan or this Confirmation Order shall relieve any applicable Debtor or non-Debtor (including for the avoidance of doubt the Reorganized Debtors and their Non-Debtor Affiliates, as applicable) of any obligations under the Travelers Bonds, Existing Surety Agreements, or under applicable nonbankruptcy law, including but not limited to the common law of suretyship (as may be applicable under the circumstances) and/or any statutory law or regulation. The applicable Debtors and non-Debtors (including for the avoidance of doubt the

Reorganized Debtors and their Non-Debtor Affiliates, as applicable) shall timely pay all duties, penalties, and interest, whether prepetition or postpetition, to the United States Customs and Border Control when and as due, without application of 11 U.S.C. § 1129(a)(9)(C).

140. Nothing in the Plan or this Confirmation Order shall be interpreted to alter, diminish, or enlarge the rights or obligations of the Surety or the Reorganized Debtors or their Non-Debtor Affiliates under the Travelers Bonds, Existing Surety Agreements or applicable law (including regarding state and federal agencies or any third parties), nor shall anything in the Plan or this Confirmation Order be deemed to condition or enjoin any Surety or the Reorganized Debtors or their Non-Debtor Affiliates from asserting any rights, claims or defenses, regarding or against any state or federal agencies, or third parties, including, without limitation, any of the Sureties' indemnitors, insurers, or otherwise under the Travelers Bonds, Existing Surety Agreements or applicable nonbankruptcy law, including, but not limited to, the common law of suretyship (as may be applicable under the circumstances) and/or statutory or regulatory law.

141. For the avoidance of doubt and without limiting Article VIII of the Plan: (i) without any further action by the Surety, including the execution or submission of an "opt out" form, the Surety shall be deemed to have opted out of the Third-Party Release by Holders of Claims and Interests set forth in Article VIII of the Plan; and Article VIII of the Plan shall not apply to the Surety with respect to any rights, claims, or causes of action of the Surety against the Debtors or non-Debtors or with respect to the Existing Surety Agreements or the Travelers Bonds; (ii) the Surety shall not be deemed to be a Releasing Party under the Plan; (iii) the Surety's right of setoff, recoupment, subrogation, restitution, or other common law rights shall not be cancelled, impaired, or modified by the Plan or this Confirmation Order; (iv) the Existing Surety Agreements shall not be cancelled under the Plan and shall be deemed Reinstated as of the Effective Date; (v) the

Surety's rights with respect to the Travelers LC shall not be modified or impaired by the Plan or this Confirmation Order, and/or (vi) no waiver of the Surety's rights, claims, or defenses shall be implied from any failure to raise a particular objection to the Plan, or this Confirmation Order.

142. To the extent of any conflict between the foregoing paragraphs 137 to 141, on the one hand, and any other provision in the Plan or this Confirmation Order, on the other hand, the foregoing paragraphs 136–142 shall govern and control.

143. **Provisions Regarding Unexpired Leases**. Notwithstanding anything to the contrary contained in the Plan, Plan Supplement or this Confirmation Order, with respect to Unexpired Leases assumed pursuant to the Plan, the Reorganized Debtor shall be, and remain, responsible for all obligations under such Unexpired Leases, *cum onere*, including, without limitation, liabilities for any default under such Unexpired Lease, in each case arising or occurring after assumption, and for the payment and performance of any and all obligations under such Unexpired Lease arising or occurring after such assumption when due in accordance with the terms of such Unexpired Lease (irrespective of whether such obligations accrued before, on, or after assumption of the Unexpired Leases), including with respect to (a) claims for indemnification, and (b) year-end adjustment and reconciliation amounts that become due or accrue after entry of this Confirmation Order, including for rents, utilities, taxes, insurance, fees, common area or other maintenance charges, promotional funds, and percentage rent, in each case subject to the terms and conditions of the Unexpired Lease, and subject to any defenses provided by such Unexpired Lease and applicable non-bankruptcy law unless otherwise agreed with the counterparty to the Unexpired Leases.

144. Notwithstanding anything to the contrary herein, nothing in the Plan or this Confirmation Order shall modify the rights, if any, of any counterparty to an Unexpired Lease to

assert any right of setoff or recoupment that such party may have under applicable bankruptcy Law or non-bankruptcy Law, including, but not limited to, the (a) ability, if any, of such parties to setoff or recoup a security deposit held pursuant to the terms of their Unexpired Lease(s) with the Debtors, or any successors to the Debtors, under the Plan, (b) assertion of rights of setoff or recoupment, if any, in connection with Claims reconciliation, or (c) assertion of setoff or recoupment as a defense, if any, to any Claim or action by the Debtors, the Reorganized Debtors, or any successors of the Debtors.

145. Notwithstanding anything to the contrary contained in the Plan or this Confirmation Order, Proofs of Claim filed in accordance with Article V.B with respect to rejected Unexpired Leases shall not be deemed withdrawn and expunged until after such claim is paid in accordance with the Plan.

146. Notwithstanding anything to the contrary in the Plan, Plan Supplement, or this Confirmation Order, any disallowance or expungement of Proofs of Claims based upon Unexpired Leases pursuant to Article V.C of the Plan shall not limit, modify, impair, or affect the Debtors' obligation to pay Cure (if any) to the affected counterparty in connection with assumption.

147. Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the Liens granted in connection with the Exit Financing shall not encumber (a) leasehold interests of non-residential real property that prohibit or restrict the granting of such Liens in the applicable Unexpired Lease except as permitted pursuant to applicable non-bankruptcy Law (but shall include the proceeds of the sale or disposition of such Unexpired Leases) and (b) any security deposits (in possession of the landlord) or the Debtors' or the Reorganized Debtors', as applicable, interests, if any, in prepaid rent, unless Liens on such security deposits or prepaid rent are expressly permitted pursuant to the underlying lease documents; provided that the Liens granted in connection with

the Exit Financing shall extend to any such security deposits or prepaid rent upon reversion thereof to the Debtors or the Reorganized Debtors, if applicable, if at all. Further, notwithstanding anything to the contrary herein, the rights of the Exit Financing lenders under any of the New Debt Documents to use or occupy any premises subject to a lease of nonresidential real property shall be limited to (i) any such rights agreed to in writing by the applicable landlord, (ii) any rights of and Exit Financing lender that are valid and enforceable under applicable non-bankruptcy Law, if any, or (iii) further order of this Court following notice and a hearing appropriate under the circumstances.

148.     **Notice of Confirmation and Effective Date.**  The Reorganized Debtors shall serve a notice of entry of this Confirmation Order, substantially in the form attached hereto as **Exhibit B**, in accordance with Bankruptcy Rules 2002 and 3020(c) on all Holders of Claims and Interests within ten (10) Business Days after the date of entry of this Confirmation Order.  Notwithstanding the above, no notice of Confirmation or Consummation or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed notice of the Combined Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address," "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address.  As soon as reasonably practicable after the Effective Date, the Reorganized Debtors shall file notice of the Effective Date, substantially in the form attached hereto as **Exhibit C**, and shall serve a copy of the same on the above-referenced parties.  The above-referenced notices are adequate under the particular circumstances of these Chapter 11 Cases and no other or further notice is necessary.

149.     **Failure of Consummation.** If Consummation does not occur for a Debtor, the Plan shall be null and void in all respects as to such Debtor and nothing contained in the RSA, the Plan,

or the Disclosure Statement shall: (a) constitute a waiver or release of any Claims by the Debtors or any Holder of Claims or Interests, or any other Entity; (b) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity, respectively; *provided* that all provisions of the RSA that survive termination thereof shall remain in effect in accordance with the terms thereof; *provided*, *further*, that any Restructuring Expenses that have been paid as of the date of any revocation or withdrawal of the Plan shall remain paid and shall not be subject to disgorgement or repayment.

150. **Substantial Consummation.** On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101(2) of the Bankruptcy Code.

151. **Waiver or Estoppel.** Except as otherwise set forth in the Plan or this Confirmation Order, each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Court before the Confirmation Date.

152. **Dissolution of Statutory Committees.** On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except for purposes of Filing applications for Professional Fee Claims in accordance with the Plan. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date.

153.     **References to and Omissions of Plan Provisions.**  References to articles, sections, and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.  The failure to specifically include or to refer to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Bankruptcy Court that the Plan be confirmed in its entirety, except as expressly modified herein, and incorporated herein by this reference.

154.     **Headings.**  Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

155.     **Effect of Conflict.**  This Confirmation Order supersedes any Bankruptcy Court order entered prior to the Confirmation Date that may be inconsistent with this Confirmation Order.  If there is any inconsistency between this Confirmation Order and the Plan, this Confirmation Order shall control.

156.     **Final Order.**  This Confirmation Order is a Final Order, and the period in which an appeal must be Filed shall commence upon the entry hereof.  In the absence of any party obtaining a stay pending appeal, the Debtors are authorized to consummate the Plan.

157.     **Retention of Jurisdiction.**  The Bankruptcy Court may properly, and upon the Effective Date shall, to the full extent set forth in the Plan and otherwise consistent with applicable law and subject to the terms of the New Organizational Documents and the New Debt Documents,

retain jurisdiction over all matters arising out of, and related to, these Chapter 11 Cases, including

the matters set forth in Article XI of the Plan and section 1142 of the Bankruptcy Code.


Signed: July 20, 2026

_____

Alfredo R Pérez

United States Bankruptcy Judge

**Exhibit A**

**Plan**

Filed at Docket No. 389

**Exhibit B**

**Notice of Entry of Confirmation Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| QVC GROUP, INC., et al.,[1] | ) | Case No. 26-90447 (ARP) |
|  | ) |  |
|  | ) | (Jointly Administered) |

**NOTICE OF ENTRY OF ORDER**
**(I) APPROVING THE DEBTORS' DISCLOSURE**
**STATEMENT FOR THE JOINT PREPACKAGED**
**PLAN OF REORGANIZATION OF QVC GROUP, INC.**
**AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11**
**OF THE BANKRUPTCY CODE, (II) CONFIRMING THE SECOND**
**AMENDED JOINT PREPACKAGED PLAN OF REORGANIZATION**
**OF QVC GROUP, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO**
**CHAPTER 11 OF THE BANKRUPTCY CODE, AND (III) GRANTING RELATED RELIEF**

**PLEASE TAKE FURTHER NOTICE** that, on [●], 2026, the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), entered the *Order (I) Approving the Debtors' Disclosure Statement for the Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, (II) Confirming the Second Amended Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, and (III) Granting Related Relief* [Docket No. [●]] (the "Confirmation Order") confirming the *Second Amended Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 389] (the "Plan").[2]

Copies of the Confirmation Order, the Plan, and all documents filed in these Chapter 11 Cases are available free of charge by visiting https://restructuring.ra.kroll.com/QVC. You may also obtain copies of any pleading by visiting the Court's website at https://ecf.txsb.uscourts.gov in accordance with the procedures and fees set forth therein.

The Debtors will serve a separate notice following the occurrence of the Effective Date.

The Plan and its provisions are binding on the Debtors, the Reorganized Debtors, the Disbursing Agent, any Holder of a Claim against, or Interest in, the Debtors and such Holder's respective successors and assigns, regardless of whether such Holder (1) will receive any property

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/QVC. The location of Debtor QVC Group, Inc.'s corporate headquarters and the Debtors' service address in these Chapter 11 Cases is 1200 Wilson Drive, West Chester, Pennsylvania 19380.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

or interest in property under the Plan or (2) failed to vote to accept or reject the Plan or affirmatively voted to reject the Plan.

Dated: [●], 2026
Houston, Texas

*/s/  Draft*

**GRAY REED**
Jason S. Brookner (TX Bar No. 24033684)
Lydia R. Webb (TX Bar No. 24083758)
Emily F. Shanks (TX Bar No. 24110350)
1300 Post Oak Blvd.
Suite 2000
Houston, Texas 77056
Telephone:      (713) 986-7000
Facsimile:      (713) 986-7100
Email:          jbrookner@grayreed.com
                lwebb@grayreed.com
                eshanks@grayreed.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                aparna.yenamandra@kirkland.com

- and -

Chad J. Husnick, P.C. (admitted *pro hac vice*)
Gabriela Zamfir Hensley (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          chad.husnick@kirkland.com
                gabriela.hensley@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*

*Co-Counsel for the Debtors and Debtors in Possession*

## CERTIFICATE OF SERVICE

I certify that on [●], 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas. Additionally, the foregoing document will be served as set forth in a forthcoming affidavit filed by the Debtor's claims agent.

/s/ *Draft*
Jason S. Brookner

## Exhibit C

**Notice of Effective Date**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| QVC GROUP, INC., et al.,[1] | ) | Case No. 26-90447 (ARP) |
|  | ) |  |
|  | ) |  |
|  | ) | (Jointly Administered) |

**NOTICE OF OCCURRENCE**
**OF THE EFFECTIVE DATE OF**
**THE SECOND AMENDED JOINT PREPACKAGED**
**PLAN OF REORGANIZATION OF QVC GROUP, INC. AND ITS**
**DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**PLEASE TAKE FURTHER NOTICE** that, on [●], 2026, Alfredo R. Peréz, United States Bankruptcy Judge for the United States Bankruptcy Court for the Southern District of Texas (the "Court"), entered the *Order (I) Approving the Debtors' Disclosure Statement for the Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, (II) Confirming the Second Amended Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, and (III) Granting Related Relief* [Docket No. [●]] confirming the *Second Amended Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 389] (the "Plan") of the above-captioned debtors (the "Debtors").[2]

The Effective Date of the Plan occurred on **[●], 2026**.

If you would like to obtain a copy of the Confirmation Order, the Plan, or any other pleadings filed in these Chapter 11 Cases, you may: (a) email QVCInfo@ra.kroll.com; (b) call the Debtors' restructuring hotline at (888) 575-5337 (US toll free) or +1 (347) 292-4386 (international); or (c) visit the Debtors' case website free of charge at https://restructuring.ra.kroll.com/QVC. You may also obtain a copy of the Plan, Confirmation Order, or any other pleadings filed in these Chapter 11 Cases for a fee via PACER at: http://www.pacer.gov.

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/QVC. The location of Debtor QVC Group, Inc.'s corporate headquarters and the Debtors' service address in these Chapter 11 Cases is 1200 Wilson Drive, West Chester, Pennsylvania 19380.

[2] Capitalized terms used but not defined herein have the meanings given to them in the Plan.

The Court has approved certain discharge, release, exculpation, injunction, and related provisions in <u>Article VIII</u> of the Plan.

The Plan and its provisions are binding on the Debtors, the Reorganized Debtors, the Disbursing Agent, any Holder of a Claim against, or Interest in, the Debtors and such Holder's respective successors and assigns, regardless of whether such Holder (1) will receive any property or interest in property under the Plan or (2) failed to vote to accept or reject the Plan or affirmatively voted to reject the Plan.

The Plan and the Confirmation Order contain other provisions that may affect your rights. You are encouraged to review the Plan and the Confirmation Order in their entirety.

[<em>Remainder of page intentionally left blank</em>]

Dated: [●], 2026
Houston, Texas

*/s/  Draft*

**GRAY REED**

Jason S. Brookner (TX Bar No. 24033684)
Lydia R. Webb (TX Bar No. 24083758)
Emily F. Shanks (TX Bar No. 24110350)
1300 Post Oak Blvd.
Suite 2000
Houston, Texas 77056
Telephone:        (713) 986-7000
Facsimile:        (713) 986-7100
Email:            jbrookner@grayreed.com
                  lwebb@grayreed.com
                  eshanks@grayreed.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900
Email:            joshua.sussberg@kirkland.com
                  aparna.yenamandra@kirkland.com

- and -

Chad J. Husnick, P.C. (admitted *pro hac vice*)
Gabriela Zamfir Hensley (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200
Email:            chad.husnick@kirkland.com
                  gabriela.hensley@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*

*Co-Counsel for the Debtors and Debtors in Possession*

**CERTIFICATE OF SERVICE**

I certify that on [●], 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.  Additionally, the foregoing document will be served as set forth in a forthcoming affidavit filed by the Debtor's claims agent.

/s/ *Draft*
Jason S. Brookner

# Exhibit I

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

July 15, 2026

Nathan Ochsner, Clerk

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **CASE NO: 26-90447** |
| **QVC GROUP, INC.,** *et al.*, | § | |
| Debtors. | § | **Jointly Administered** |
| | § | **CHAPTER 11** |

## MEMORANDUM DECISION (I) APPROVING DISCLOSURE STATEMENT, (II) CONFIRMING SECOND AMENDED PLAN, AND (III) GRANTING RELATED RELIEF

## INTRODUCTION

This Court has been asked to confirm the Debtors' joint prepackaged plan of reorganization. The plan is premised on a restructuring support agreement which contains a comprehensive intercompany settlement. The Debtors have a complicated corporate history. Over the last few years, they engaged in, among other things, several intercompany transactions which potentially precipitated various intercompany claims between themselves. The Debtors appointed disinterested fiduciaries to investigate these claims and, if appropriate, to negotiate on behalf of their respective stakeholders, an intercompany settlement. The settlement these disinterested fiduciaries ultimately achieved seeks to resolve all claims in order to achieve a global resolution, preserving—if not maximizing—value for the Debtors' estates, setting up the company for a successful reorganization, paying all third-party general unsecured claims in full, and putting the go-forward operating entity on the path towards long term success. The Debtors ask the Court to approve this settlement and confirm the plan over the objection of a vocal minority of equity holders who feel the process of negotiating the settlement was unfair, it subjects them to disfavorable terms in exchange for little, if any, benefit, and that the plan violates manifold provisions of the Bankruptcy Code. The facts of this case, however, paint a different picture.

1 / 103

The Court conducted a four-day evidentiary hearing where testimony was adduced from eight highly credible Debtor-witnesses, and the parties introduced hundreds of exhibits. After a review of the evidence, the Court concludes all facts demonstrate the negotiations were, in reality, a thorough, fair, and arm's-length process. No disinterested fiduciaries capitulated to any other, and the ultimate outcome for stakeholders was not preordained. The equity holders' treatment under the settlement is a result of the range and magnitude of potential claims the parent-Debtor entity they hold interests in was facing from its subsidiaries and other sources—as well as their own liability. However, a fulsome review of the settlement reveals that the equity holders received valuable releases of claims from the Debtor entities for distributions out of the Debtors' assets totaling more than $450 million. The Court concludes the proposed intercompany settlement meets the requirements of the Bankruptcy Code. With the settlement approved, the remaining confirmation requirements are also satisfied.

It is on the basis of this extensive factual record that the Court makes these Findings of Fact and Conclusions of Law pursuant to Federal Bankruptcy Rules 7052 and 9014. To the extent any Finding of Fact is construed as a Conclusion of Law, it is adopted as such. Moreover, to the extent any Conclusion of Law is construed as a Finding of Fact, it is adopted as such. The Court reserves its right to make additional Findings of Fact and Conclusions of Law as it deems appropriate or as may be requested by any of the parties.

## FINDINGS OF FACT

### I. RELEVANT PREPETITION HISTORY.

#### A. The Debtors' Prepetition Corporate and Capital Structure.

1. QVC Group, Inc. ("QVCG") and its debtor affiliates (collectively, the "Debtors") comprise one of the world's largest

multimedia retailers, specializing in home shopping.[1]  The Debtors primary business is to sell a wide variety of consumer products through engaging, video-rich interactive shopping experiences.[2]  Originally taking form as a radio broadcasting company in 1977, today the Debtors distribute their collective shopping experiences to over 200 million households each day via 15 television channels, in addition to over 12 million customers via their QVC+ and HSN+ streaming experiences, Facebook, Instagram, TikTok, YouTube, and other mobile apps.[3]  The Debtors also operate individual ecommerce sites for each of the four home and apparel lifestyle brands comprising of the Debtors' Cornerstone division (defined below).[4]

2.     The Debtors' prepetition corporate structure can be generally understood with respect to four key entities: (i) QVCG, (ii) Liberty Interactive, LLC ("LINTA"), (iii) QVC, Inc. ("QVC"), and (iv) Cornerstone Brands, Inc. ("CBI") (together with QVCG, LINTA, and QVC, the "Key Entities").[5]  Put simply, QVCG sat at the top of the company and had 100% ownership of LINTA.[6]  LINTA owned 100% of Qurate Retail Group, Inc. ("QRGI"), which in turn owned 100% of QVC, which in turn owned various operating foreign and domestic

---

[1] JX-035, ECF No. 341-070 at 7 ¶ 13.  On June 16, 2026, the Debtors and Preferred Shareholders (defined below) filed the Amended Stipulated Order and Agreement to the Admission Into Evidence of Certain Exhibits, providing a designation of Debtor, Preferred Shareholder, and Joint exhibits admitted at the Combined Hearing (defined below).  ECF No. 548.  On June 17, 2026, the Court entered the Amended Stipulated Order and Agreement to the Admission Into Evidence of Certain Exhibits.  ECF No. 574.  Any reference to "JX," "DX," or "PX" exhibits are references to the Parties' designation of exhibits contained therein.  With respect to any testimony cited in this Memorandum Decision, "Day 1" references the first day of the Combined Hearing held on June 4, 2026; "Day 2" references the second day of the Combined Hearing held on June 5, 2026; "Day 3" references the third day of the Combined Hearing held on June 8, 2026; on the fourth day, June 10, 2026, no testimony was adduced by the Parties.

[2] JX-035, ECF No. 341-070 at 7 ¶ 13.

[3] JX-035, ECF No. 341-070 at 7 ¶¶ 13, 14.

[4] JX-035, ECF No. 341-070 at 7 ¶ 13.

[5] JX-035, ECF No. 341-070 at 5 ¶ 9.

[6] JX-035, ECF No. 341-070 Ex. B2.

subsidiaries.[7]  Under a separate silo, QVCG also owned 62% of QRI Cornerstone, Inc. ("QRI"), with the remaining 38% being owned by LINTA.[8]  QRI, in turn, owned 100% of CBI, which owned 100% of the operating entity The Cornerstone Brands Group, Inc. ("Cornerstone"), housing each of the four subsidiary brands dedicated to apparel and home lifestyle items: Frontgate, Ballard Designs, Garnet Hill, and Grandin Road.[9]

3.        The Debtors' prepetition capital structure is massive and complex, as a result of historical liability management transactions, historical mergers and acquisitions, internal and external reorganizations, dividends, intercompany notes, and shared service and tax sharing agreements.[10]  As of the Petition Date the Debtors had approximately $6.53 billion in total outstanding funded debt obligations—primarily under LINTA and QVC—as well as preferred equity interests with a liquidation preference of approximately $1.272 billion in at the QVCG level.[11]  The Debtors' outstanding funded indebtedness exists in three categories, each important for purposes of the Debtors' restructuring efforts and reorganization Plan.[12]

4.        The first category is approximately $1.48 billion of funded debt obligations, comprised of various notes (the "LINTA Exchangeable Notes") issued pursuant to that certain Indenture dated as of July 7, 1999 (as amended, restated, amended and restated, supplemented,

---

[7] JX-035, ECF No. 341-070 Ex. B2.

[8] JX-035, ECF No. 341-070 Ex. B2.

[9] JX-035, ECF No. 341-070 Ex. B2.

[10] JX-035, ECF No. 341-070 at 20 ¶ 36.

[11] JX-035, ECF No. 341-070 at 20 ¶ 36; JX-035, ECF No. 341-070 Ex. C1, at 1. These interests include the 8% series A cumulative redeemable preferred stock issued by QVCG (the "QVCG Preferred Equity").  The QVCG Preferred Equity originated as a distribution from QVCG on its common stock.  *Wafford Testimony*, Day 2: 330:4–10. The QVCG Preferred Equity Interest Holders were largely comprised of retail shareholders, and accordingly the stock is disparately held today.  *Wafford Testimony*, Day 2: 330:4–10.  Certain QVCG Preferred Equity Interest Holders, representing a portion of the overall QVCG Preferred Equity base (the "Preferred Shareholders") have objected to the Debtors' Plan and Disclosure Statement, and have also filed their own Motion to Terminate Exclusivity.  ECF No. 316; ECF No. 205.

[12] JX-035, ECF No. 341-070 Ex. C1, at 1.

waived, or otherwise modified from time to time, the "LINTA Notes Indenture").[13]   The LINTA Exchangeable Notes are a convertible instrument not guaranteed by any Debtor entity and are unsecured.[14]

5.      The second category is approximately $2.9 billion of funded debt obligations under the currently operative Fifth Amendment and Restatement Agreement by and among QVC, and QVC Global Corporate Holdings, LLC ("QVC Global") as borrowers, QRGI as subsidiary guarantor, the lenders from time to time party thereto, JPMorgan Chase Bank, N.A. as administrative and collateral agent and related ancillary documents, which collectively provide revolving commitments and extensions of credit (the "Revolving Credit Facility" or "RCF").[15]  As part of a 2021 refinancing of the RCF the RCF Lenders received pledges of security interests in the equity and proceeds from the equity (other than distributions made in compliance with the RCF restricted payment covenants) of Cornerstone in addition to the security interests they already held in the equity and proceeds from equity for QVC and Zulily, LLC ("Zulily"), under the prior RCF agreement.[16]

6.      The third category is approximately $2.15 billion of funded debt obligations, comprised of various senior secured notes (the "QVC Inc. Notes") issued pursuant to various note indentures.[17]  The QVC Inc. Notes are secured equally and ratably by the same collateral as the RCF—the equity of QVC.[18]

7.      Neither QVCG nor CBI had funded debt obligations prepetition.[19]   QVCG also had outstanding Series A voting common

---

[13] JX-035, ECF No. 341-070 Ex. C1, at 1, 5.
[14] JX-035, ECF No. 341-070 Ex. C1, at 6.
[15] JX-035, ECF No. 341-070 at 24 ¶ 45.  2.2.6.9_QVC – Fifth Amendment and Restatement Agreement, DX-005, ECF No. 340-005 [hereinafter the "*RCF*"].
[16] JX-035, ECF No. 341-070 at 24 ¶ 45.
[17] JX-035, ECF No. 341-070 Ex. C1 at 3.
[18] JX-035, ECF No. 341-070 Ex. C1 at 3.
[19] JX-035, ECF No. 341-070 at 20 ¶ 36; JX-035, ECF No. 341-070  Ex. B1.

stock traded on the New York Stock Exchange, and outstanding Series B voting common traded on the OTC Markets.[20]

### B.  Relevant Prepetition Initiatives.

8.  In the lead-up to the filing of these chapter 11 cases, the Debtors were becoming increasingly distressed as a company—a fact which cannot be ignored.  In recent years, the Debtors faced a confluence of headwinds that strained their financial performance, including eroding cash flows as a result of an increasing number of customers canceling their TV and cable services ("cord cutting"), record inflation, supply chain disruptions during the COVID era, elevated labor costs, uncertainty caused by the United States' recent tariff policies, and a December 2021 fire at the Rocky Mount distribution center which caused the Debtors to lose more than 1 million customers and more than $500 million in revenue due to compromised product and service ability.[21]  The Debtors reacted to these headwinds through a number of strategic, financing, and governance initiatives over the course of several years.[22]

9.  Between 2020 and 2025, the Debtors engaged in a number of liability management transactions and debt paydowns to reduce funded debt, borrowing costs, administrative costs and tax burdens, and to manage cash levels throughout their capital structure, described more fully in Part II.A.(1).[23]

10.  In June of 2022, the Debtors announced the beginning of a multi-year turnaround plan consisting of two phases: first, Project Athens,[24] and second, the WIN Growth Strategy.[25]

---

[20] JX-035, ECF No. 341-070 Ex. C1 at 7.

[21] JX-035, ECF No. 341-070 at 22 ¶ 39.

[22] *See* JX-035, ECF No. 341-070 at 22–33.

[23] JX-035, ECF No. 341-070 at 22–26.

[24] JX-035, ECF No. 341-070 at 26–27.

[25] JX-035, ECF No. 341-070 at 28.  "WIN" stands for "**W**herever She Shops," "**I**nspiring People & Products," and "**N**ew Ways of Working."  JX-035, ECF No. 341-070 at 28 ¶ 56.

6 / 103

11.    In July and November of 2022, the Debtors also engaged in a number of different foreign and domestic sale-leaseback transactions resulting in the Debtors recognizing substantial gain.[26]

12.    During the second quarter of 2023, the Debtors began ongoing dialogue with Evercore Group L.L.C. ("Evercore") regarding capital structure considerations.[27]  The Debtors also engaged Kirkland & Ellis ("Kirkland") in April 2025, and AlixPartners in May 2025, as they continued to contemplate and undergo prepetition restructuring efforts.[28]

13.    The Debtors' boards and senior management also proactively evaluated the Debtors' corporate governance structure, ultimately recognizing the Key Entities had discrete capital structures and were parties to the aforementioned historical intercompany transactions which may have given rise to potential intercompany claims.[29]

14.    In order to ensure each Key Entity had independent and qualified fiduciaries to advocate for each of their respective interests and the interests of their stakeholders, and to address potential conflicts under the Debtors' then-existing governance structure, the Debtor implemented a number of governance changes and amendments at various Key Entity levels during September of 2025.[30]  These governance efforts ultimately resulted in: (i) the establishment of an independent board of directors at the QVC level, to which Paul Keglevic and Jilly Frizzley were appointed as initial members, then as the sole disinterested board members; (ii) the establishment of an independent board of managers at the LINTA level, to which Eugene Davis and Thomas Walper were appointed as initial members, then as the sole disinterested board members; and (iii) the appointment of disinterested

---

[26] JX-035, ECF No. 341-070 at 27 ¶¶ 54–55.

[27] JX-035, ECF No. 341-070 at 28 ¶ 58.

[28] JX-035, ECF No. 341-070 at 28 ¶ 58.

[29] JX-035, ECF No. 341-070 at 28–29.

[30] JX-035, ECF No. 341-070 at 30.

board members at the QVCG and CBI levels (collectively, with the QVC and LINTA disinterested board members, the "Disinterested Directors").[31]  Each of the Disinterested Directors has an extensive legal or business career, some of them both, and the Court found all of them that testified to be very credible.

15.    Special Committees were formed at the QVCG and CBI levels (each such special committee, a "Special Committee").   Each Special Committee was granted authority consisting of: (i) the exclusive authority to investigate, review, discuss, consider, negotiate, approve, authorize, reject, and act upon any matters in which a conflict exists or is reasonably likely to exist between such entity and any of its stakeholders, including its affiliates and subsidiaries, (each such matter, a "Conflict Matter"), and (ii) the authority to evaluate, review, consider, negotiate, and authorize entry into a transaction, subject to further board approval to the extent such transactions did not constitute a Conflicts Matter.[32]

16.    The QVC and LINTA boards, each comprised solely of Disinterested Directors, and the QVCG and CBI Special Committees (each such governing body, a "Governing Body") each engaged separate counsel with respect to Conflicts Matters: the QVCG Governing Body retained Kobre & Kim, LLP ("Kobre"); the LINTA Governing Body retained Milbank LLP[33]; the QVC Governing Body retained Katten Muchin Rosenman LLP ("Katten"); and the CBI Governing Body retained Seward & Kissel LLP ("S&K").[34]

---

[31] QVCG appointed Carol Flaton and Roger Meltzer as their respective Disinterested Directors.  JX-035, ECF No. 341-070 at 31–32.  CBI appointed Jonathan Foster and Michael Zendan as their respective Disinterested Directors.  JX-035, ECF No. 341-070 at 31–32.  Disinterested Directors were also appointed at QRGI, along with a Special Committee.

[32] JX-035, ECF No. 341-070 at 30.

[33] Milbank also represented the QRGI Special Committee.  JX-035, ECF No. 341-070  at 31 n. 8.

[34] JX-035, ECF No. 341-070 at 31.

17.     Between the time of their appointment and respective retentions, and the date of the Debtors' ultimate chapter 11 filing—April 16, 2026 (the "Petition Date"), the Disinterested Directors, in conjunction with their conflicts counsel, underwent efforts to understand and investigate potential claims and defenses related to the historical intercompany transactions, and evaluate any proposed release, settlement, retention, or prosecution of claims or causes of action, as more fully described in Parts II.A and II.A.(1).[35]  Those efforts ultimately resulted in a global settlement of all actual and potential intercompany claims among the Key Entities (the "Intercompany Settlement"), which functions effectively as the keystone to the Debtors' Restructuring Support Agreement ("RSA") and reorganization Plan.[36]

## II.     THE INTERCOMPANY SETTLEMENT.

### A.     The Disinterested Directors' Investigation.

18.     The Court finds the Disinterested Directors engaged in a fulsome and comprehensive assessment of potential claims and defenses arising out of the historical intercompany transactions during the course of their independent investigations.[37]  The facts of this case demonstrate that throughout the investigation process, the Disinterested Directors at each Key Entity were acting separately and independently of one another, with and through each's respective counsel, and that they relied on broad but detailed sets of information from the Debtor entities, shared advisors' forensic analyses, and their respective counsel's legal

---

[35] JX-026, ECF No. 341-053 at 3, 50–57 [hereinafter the "*Disclosure Statement*"].  The Disclosure Statement was also jointly admitted at the Combined Hearing at JX-026, ECF No. 341-053.

[36] JX-028, ECF No. 341-055 at 38 [hereinafter the "*Plan*"].  The Court's use of the term "*Plan*" in the Findings of Fact is meant to refer to the Plan filed on April 17, 2026.  On June 2, 2026, the Debtors filed their Second Amended Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (the "Second Amended Plan").  ECF No. 389.  This Second Amended Plan is the operative Plan the Debtors seek confirmation of.

[37] *Disclosure Statement* at 3, 51–52.

advice in arriving at their ultimate assessments as to any potential intercompany claims which may have existed.[38]

19.     The Disinterested Directors began with an initial diligence period, issuing numerous formal document and information requests from various Debtor entities seeking *inter alia* board materials and minutes, corporate governance documents, relevant transaction documents, financial and accounting information, and related correspondence.[39]  Kirkland, AlixPartners, and Evercore (the "Joint Debtor Advisors") supported the Disinterested Directors' diligence, information collection efforts, and investigations by serving as intermediaries between the four Governing Bodies and management.[40] The Joint Advisors provided facts to all Governing Bodies at the direction of the Debtors' management team to aid efficiency.[41]   On November 11, 2025, Kirkland provided each Disinterested Director and their counsel with a presentation of the relevant intercompany transactions that took place between 2020 and 2025 that might give rise to potential intercompany claims and defenses, as part of the Disinterested Directors' initial diligence of the company.[42]

20.     After the initial diligence period and the November 11, 2025 Kirkland presentation, the Joint Debtor Advisors began facilitating direct collection of documents on behalf of, and at the request of each Disinterested Director.[43]  The Debtors retained AlixPartners to serve as e-discovery vendor in order to facilitate each Disinterested Directors' investigation.[44]   In December 2025 and January 2026,

---

[38] *Disclosure Statement* at 3, 51–52.

[39] *Disclosure Statement* at 51.

[40] *Disclosure Statement* at 51.

[41] *Disclosure Statement* at 51.

[42] *Disclosure Statement* at 51; 11-11-25 Key Historical Transactions Fact Overview, JX-051, ECF No. 343-025.

[43] *Disclosure Statement* at 51.

[44] *Disclosure Statement* at 51.

Kirkland also conducted custodial interviews and collected certain share drive and email documents.[45]

21.     Through their independent efforts across both the diligence and investigation period, the Governing Bodies collectively reviewed and analyzed tens of thousands of documents related to the historical intercompany transactions produced from various Debtor entities in addition to Liberty Media Corporation ("LMC"), in its capacity as provider of certain services to QVCG pursuant to the Intercompany Services Agreement (defined below).[46]  The Governing Bodies also collectively participated in over 25 meetings with other Disinterested Directors with or through their separate and independent counsels.[47]  To analyze potential tax implications relating to the intercompany settlement, the QVCG Governing Body also retained Holtz, Slavett, Drabkin & Warner as independent tax counsel.[48]  Each Disinterested Directors' counsel also had access to senior management at the company, collectively conducting 7 separate 90-minute interviews of former and current executives regarding their personal knowledge as to the historical intercompany transactions.[49]

22.     The Disinterested Directors also relied on forensic analyses from AlixPartners and Evercore in conducting their respective investigations and assessment of potential intercompany claims and defenses.[50]  The AlixPartners forensic team conducted extensive funds flow and APIC-level analyses of various Key Entities' bank records and general ledgers for the years 2019 through 2025 to help the Disinterested Directors better understand the nature and extent of any

---

[45] *Disclosure Statement* at 51; JX-031, ECF No. 341-060 at 5 ¶ 10, n. 7; JX-032, ECF No. 341-061 at 4 ¶ 11.

[46] *Disclosure Statement* at 51; JX-029, ECF No. 341-056 at 3 ¶ 7; JX-031, ECF No. 341-060 4 ¶ 8, 5 ¶ 12; JX-032, ECF No. 341-061 at 3 ¶ 8.

[47] *Disclosure Statement* at 51; JX-029, ECF No. 341-056; JX-031, ECF No. 341-060; JX-032, ECF No. 341-061.

[48] JX-029, ECF No. 341-056 at 4 ¶ 13.

[49] *Disclosure Statement* at 51; JX-029, ECF No. 341-056; JX-031, ECF No. 341-060; JX-032, ECF No. 341-061.

[50] *Disclosure Statement* at 52; JX-032, ECF No. 341-061 at 3 ¶ 9.

intercompany transfers.[51] The Disinterested Directors' counsel met with the AlixPartners' forensic team and discussed their findings on January 22, 2026, on February 6, 2026, and again on March 6, 2026.[52] On February 11, 2026, AlixPartners also provided a granular analysis on the cash cost to retire the MSI Exchangeables in 2021 to the Disinterested Directors of LINTA and QVC—those being the Key Entities most directly impacted by the 2020 Restructuring (defined and described more fully below in Part II.(A).(1)).[53]

23. Evercore provided all Disinterested Directors, through their respective counsel, a summary of indicia of insolvency using data from 2020 through 2025.[54] The data used included information regarding the Debtors' sales, OIBDA, liquidity, and the trading values of QVCG Preferred Equity and common shares during the relevant period; graphs showing the trading value and yields on QVC and LINTA notes; and a table showing the trading value and yield of QVC notes alongside the dates and amounts of historic distributions from QVC and the amounts of those historic distributions to QVCG.[55] Evercore also provided the Disinterested Directors with an enterprise valuation of CBI to help them better understand its status and how a transfer of that entity would weigh against various considerations the Key Entities might provide or receive under a potential intercompany settlement.[56]

24. Through their collective diligence and investigative efforts, the Disinterested Directors arrived at the following understanding of the relevant prepetition transactions and potential intercompany claims and defenses arising thereunder:

---

[51] *Disclosure Statement* at 52; JX-032, ECF No. 341-061 at 3 ¶ 9; *Stafford Testimony*, Day 1:73:8–83:21.

[52] *Disclosure Statement* at 52.

[53] *Disclosure Statement* at 52.

[54] *Disclosure Statement* at 52; JX-029, ECF No. 341-056 at 4 ¶ 8; JX-032, ECF No. 341-061 at 4 ¶ 10.

[55] *Disclosure Statement* at 52.

[56] CBI 5 Year Financial Projections, JX-004, ECF No. 340-013.

### *(1)*     *Relevant Prepetition Transactions.*

*(a)*     *The 2020 Restructuring.*

25.     In December 2022, the Debtors executed a multi-jurisdiction, 15-step restructuring to increase tax efficiency, optimize capital deployment, and reduce administrative cost (the "2020 Restructuring").[57]

26.     As part of the 2020 Restructuring, the Debtors retired certain intercompany notes, reducing currency exchange risk, and eliminated defunct subsidiaries, reducing governance and compliance costs.[58] The 2020 Restructuring also facilitated future tax savings for the Debtors' consolidated tax group on the retirement of certain 3.5% participating hybrid option note securities due in 2031 issued by LINTA (the "MSI Exchangeables"), which had accrued a substantial deferred tax liability.[59] To accomplish the retirement of the MSI Exchangeables and achieve this tax efficiency for the Debtors' consolidated tax group, LINTA and the newly created subsidiary QVC Global, established under QVC, entered into a series of agreements, including (i) the Nineteenth Supplemental Indenture, which made QVC Global co-obligor on the MSI Exchangeables; (ii) a payment reimbursement agreement, whereby QVC Global agreed to reimburse LINTA for any payments LINTA made on the MSI Exchangeables; and (iii) a promissory note from LINTA to QVC Global, reflecting a face amount of $1.825 billion (the "LINTA Promissory Note"), which approximately matched the "adjusted issue price"—or outstanding amount, as determined for tax purposes—of the MSI Exchangeables at the time of the transaction.[60]

27.     At the time LINTA issued the LINTA Promissory Note in 2020, there was $218 million in principal outstanding on the MSI

---

[57] *Disclosure Statement* at 41–42.

[58] *Disclosure Statement* at 41–42.

[59] *Disclosure Statement* at 41–42. Not to be confused with the deferred tax liability existing with respect to the LINTA Exchangeable Notes (colloquially referred to as the "Deferred Tax Liability" or "DTL").

[60] *Disclosure Statement* at 41–42.

Exchangeables.[61] At the time of the 2020 Restructuring, the MSI Exchangeables had a market value of approximately $397 million.[62] To reduce variability in the obligations due under the MSI Exchangeables, LINTA transferred the related Total Return Swaps to QVC Global[63] which hedged against fluctuations in the underlying reference security. In December 2021, QVC Global retired the MSI Exchangeables, which then had a market value of $573 million.[64] According to the Debtors' management, the net cost for QVC Global to retire the MSI Exchangeables was approximately $315 million, as well as an additional $105 million in tax liabilities.[65]

28. On December 31, 2021, LINTA repaid $85 million of the initial $1.825 billion face amount of the LINTA Promissory Note.[66] There were no additional payments to reduce the principal amount of the note. The LINTA Promissory Note accrues interest at 0.48% annually and LINTA has made the following interest payments: $8.8 million on December 29, 2021; $8.5 million on December 29, 2022; $8.5 million on December 29, 2023; $8.5 million on December 29, 2024; and $8.4 million on January 8, 2026. As of the Petition Date, the balance on the LINTA Promissory Note was $1.74 billion.[67]

---

[61] QVC, Inc. Form 10-K (FY 2020) at I-28, JX-020, ECF No. 341-025.

[62] QVC, Inc. Form 10-K (FY 2020) at II-38, JX-020, ECF No. 341-025.

[63] QRI Memorandum re Qurate MSI Bond Restructure – Common Control Transaction at 3, DX-431, ECF No. 394-004. These variances in the obligations due under the MSI Exchangeables were purportedly caused by fluctuations in the underlying reference security.

[64] *Disclosure Statement* at 53.

[65] 12-6-2021 Qurate Retail, Inc. Board Meeting at 9, DX-430, ECF No. 394-003.

[66] *Disclosure Statement* at 53.

[67] *Disclosure Statement* at 53.

     *(b)    2022   Cash   Management   Plan   and   Subsequent*
          *Intercompany Transfers.*

29.    At the end of 2022, the Debtors executed a series of transactions to optimize cash allocation across their structure and increase balance sheet flexibility (the "2022 Cash Management Plan").[68]

30.    The 2022 Cash Management Plan had two components. First, the Debtors prepared Zulily for sale, which required removing it from the RCF.[69]  On December 14, 2022, the Debtors accomplished this in several steps: (i) CBI drew $300 million under the RCF[70]; (ii) CBI paid that amount to QVCG in exchange for a promissory note for the same amount[71]; (iii) QVCG contributed the $300 million to Zulily[72]; and (iv) Zulily used approximately $277.204 million of that amount to pay down its borrowings, and retained the remaining $22.795 million on its balance sheet.[73]  QVC then drew $300 million from the RCF and paid it to QVCG as a dividend, which in turn used that amount (plus interest) to pay off the CBI promissory note.[74]  CBI then repaid its $300 million borrowing under the RCF (collectively, the "December 14 Transfers").[75]

31.    Second, the Debtors executed a series of transactions from December 21 through December 29, 2022, to allocate cash across the

---

[68] 12-8-22 Qurate Retail Board Meeting Binder at 126–130, DX-363, ECF No. 345-006; Schedule 2A – Cash Management Plan, Dated December 2022, DX-290, ECF No. 343-038; Schedule 2B – 2022 Cash Management Plan, Dated December 2022, DX-301, ECF No. 344-001.

[69] QVC Group, Inc. 10K (FY 2022), JX-016, ECF No. 340-125; *RCF* at Section 9.19; Zulily Purchase Agreement, DX-254, ECF No. 343-002.

[70] CBI Notice of Borrowing, DX-009, ECF No. 340-009; Schedule 2B – 2022 Cash Management Plan, Dated December 2022, DX-301, ECF No. 344-001.

[71] Schedule 2B – 2022 Cash Management Plan, Dated December 2022, DX-301, ECF No. 344-001.

[72] Schedule 2B – 2022 Cash Management Plan, Dated December 2022, DX-301, ECF No. 344-001.

[73] Schedule 2B – 2022 Cash Management Plan, Dated December 2022, DX-301, ECF No. 344-001.

[74] Schedule 2B – 2022 Cash Management Plan, Dated December 2022, DX-301, ECF No. 344-001.

[75] Schedule 2B – 2022 Cash Management Plan, Dated December 2022, DX-301, ECF No. 344-001.

company's structure where it could be needed ahead of potentially tripping certain restrictions under QVC's credit documents.[76] Although the covenants under such credit documents contained carve-outs for distributions for debt service and tax payments, QVCG and LINTA had ongoing cash needs for *inter alia* overhead and anticipated preferred dividends beyond what the carve outs allowed.[77] On December 21, 2022, QVC borrowed an additional $600 million under the RCF, and then paid $800 million to QVCG.[78] After a series of subsequent transactions between QVCG and LINTA over the next 8 days, a bank account at QVCG ultimately held $499 million and a LINTA bank account held $301 million (collectively, the "December 21 Transfers").[79]

32.    On December 19, 2022 (before the December 21 Transfers, but after the December 14 Transfers), Kroll LLC issued a solvency presentation and opinion formulated by Duff & Phelps to the QVCG board (the "2022 Duff & Phelps Solvency Opinion").[80] Duff & Phelps concluded that after QVC's $600 million draw on the RCF, and giving effect to the anticipated dividend of $800 million up to QVCG through the December 21 Transfers: (i) the fair value of QVC's assets would exceed QVC's debt; (ii) QVC should be able to pay its debts as they became due; and (iii) QVC would not have an unreasonably small amount of capital for its businesses.[81] Duff & Phelps  also concluded that after LINTA received the $301 million distribution and QVCG received the $499 million distribution (reflecting the ultimate allocations in the Key Entities' respective bank accounts following the December 21 Transfers): (i) the fair value of LINTA's assets would

---

[76] 12-8-22 Qurate Retail, Inc. Board Meeting Binder at 128, 129, DX-363, ECF No. 345-006

[77] 12-8-22 Qurate Retail, Inc. Board Meeting Binder at 128, 129, DX-363, ECF No. 345-006; *RCF* at § 6.05.

[78] QVC Notice of Borrowing at 1, DX-410, ECF No. 393-003; Schedule 2A – December 2022 Cash Management Plan Transfers to QVCG and LINTA at 1, DX-290, ECF No. 343-038.

[79] Schedule 2A – December 2022 Cash Management Plan Transfers to QVCG and LINTA at 1, DX-290, ECF No. 343-038.

[80] 2022 Duff & Phelps Solvency Opinion, JX-009, ECF No. 340-047.

[81] 2022 Duff & Phelps Solvency Opinion at 5–6, JX-009, ECF No. 340-047.

exceed LINTA's debt; (ii) LINTA should have been able to pay its debts as they became due; (iii) LINTA would not have an unreasonably small amount of capital for its businesses; and (iv) the fair value of LINTA's assets would exceed LINTA's liabilities as calculated pursuant to § 18-607 of the Delaware Limited Liability Company Act.[82]

> ### (c)    Post-2022 Cash Management Plan Intercompany Dividends.

33.    After the 2022 Cash Management Plan, QVC continued to pay dividends to QVCG and LINTA for debt service and tax obligations under that certain Tax Liability Allocation and Indemnification Agreement, dated as of April 26, 2004, by and between LMC and QVC, for and on behalf of itself and each subsidiary of QVCG (the "QVC TSA").[83]    During this period of time the QVC Notes Indenture Credit Group had a Consolidated Leverage Ratio exceeding 3.50x, meaning the restrictive covenants under the QVC Notes Indentures prohibited dividends other than dividends to make debt principal and interest payments or payments under the QVC TSA.[84]    Regardless, between January 2023 and February 2025, QVC paid an aggregate of approximately $586.7 million in dividends (the "Post-2022 QVC Dividends"), comprised of approximately $343.8 million transferred to QVCG and approximately $242.8 million transferred to LINTA.[85]    While the Debtors may have a series of written consents showing QVC paid these dividends to its direct parent QRGI, bank account statements and

---

[82] 2022 Duff & Phelps Solvency Opinion at 6, JX-009, ECF No. 340-047.

[83] Tax Liability Allocation and Indemnification Agreement, JX-002, ECF No. 340-002 [hereinafter the "*QVC TSA*"].   The QVC TSA was originally entered into between QVC, LINTA, and Qurate Retail, Inc.   *QVC TSA* at 1.   Qurate Retail, Inc. would later undergo a name change to QVC Group, Inc., which has been referred to in this decision as QVCG.   *Kearns Testimony*, Day 1:147:13–17.   On June 8, 2023, LINTA assigned, and QVCG assumed, all of LINTA's rights, interests, duties, liabilities and obligations under the QVC TSA, as provided in the Assignment and Assumption Agreement (as referenced below).

[84] *See RCF*; QVC, Inc. 2025 10-K, DX-177, ECF No. 341-051; QVC, Inc. 2024 10-K, DX-155, ECF No. 341-029; QVC, Inc. 2023 10-K, DX-154, ECF No. 341-028; QVC, Inc. 2022 10-K, DX-153, ECF No. 341-027.

[85] Davis Polk & Wardwell LLP ("DPW") and Simpson Thacher & Bartlett LLP ("STB") Excel Sheet of Fund Flows, DX-044, ECF No. 340-044.

other documents provided by the Debtors show QVC transferred funds directly to QVCG's and LINTA's bank accounts, respectively.[86] These records also show QVCG held the amounts it received for one to two days before transferring them to a BNY Mellon corporate trust account associated with the LINTA Exchangeable Notes.[87]

### (d) 2024 Capital Contribution & Exchange.

34. In September 2024, QVC exchanged 89% of its 2027 and 2028 Notes—then worth $959 million—for $605 million of newly issued 2029 Notes and $352 million of cash (the "2024 Capital Contribution and Exchange") in order to facilitate a potential extension under the RCF.[88] The $352 million of cash was comprised of $75 million of cash on hand at QVC and $277 million from a LINTA capital contribution to QVC.[89]

### (e) Payments Under the Intercompany Tax Sharing Agreements.

35. QVCG files consolidated federal income tax returns (and corresponding relevant state and local tax returns) on behalf of itself and certain of its affiliated direct and indirect subsidiaries which are treated as corporations for income tax purposes, such as QVC and CBI (together, the "Q Consolidated Group"). As such, QVC, CBI, and other "members" of the Q Consolidated Group have joint and several liability for the income tax liability of the entire Q Consolidated Group.[90] LINTA

---

[86] QVC, Inc. Payments to QVCG for Debt-Related Dividend Payments From January 2023 through November 2025, DX-292, ECF No. 343-040.

[87] QVC, Inc. Payments to QVCG for Debt-Related Dividend Payments From January 2023 through November 2025, DX-292, ECF No. 343-040; *Plan* at 8 (defining "LINTA Notes Trustee" as "The Bank of New York Mellon Trust Company, N.A. (as successor-in-interest to the Bank of New York Mellon, formerly known as The Bank of New York) as trustee under the LINTA Notes Indenture, including any successors thereto, in its capacity as such under the LINTA Notes Indenture").

[88] *See* QVC, Inc. Offering Memorandum, DX-411, ECF No. 393-4.

[89] *See* QVC, Inc. Offering Memorandum, DX-411, ECF No. 393-4; QVC September 2024 Bond Offering Cap Table, DX-424, ECF No. 393-017.

[90] Treas. Reg. § 1.1502-6(a) ("The common parent corporation and each subsidiary which is a member of the group during any part of the consolidated return year shall be severally liable for the tax for such year"). The nature of joint and several liability under the consolidated tax rules does not appear to be in dispute here. *See*

is treated as a disregarded entity from QVCG for applicable income tax purposes, meaning LINTA is generally not treated as a separate "member" of the Q Consolidated Group and LINTA's activities and tax attributes are reported on QVCG's consolidated tax return as if LINTA did not exist.[91] The Internal Revenue Service ("IRS") has historically taken the position that a disregarded entity such as LINTA is not jointly or severally liable for the taxes of the consolidated income tax group of which its regarded tax owner—QVCG—is a member (absent application of state-law veil piercing or similar arguments).[92]

36. In order to provide for the payment and sharing of tax liabilities among the Q Consolidated Group, its members entered into two different tax sharing agreements. The primary tax sharing agreement—the QVC TSA—allocates liability as between QVCG and LINTA on the one hand, and QVC and its subsidiaries on the other.[93] The QVC TSA generally provides that QVC will pay to QVCG an amount equal to QVC's and its subsidiaries' separately calculated tax liability without regard to any amount of available tax attributes that might be available at the Q Consolidated Group level and generated by entities other than QVC and its subsidiaries.[94] Additionally, the QVC TSA includes reciprocal indemnification obligations for the "QVC Group" (defined as QVC and its subsidiaries) and the "QVCG Group" (defined as all entities owned by QVCG other than the QVC Group).[95]

37. The QVC TSA is generally favorable to QVCG. For example, the QVC TSA generally required that QVC make payments to QVCG that exceeded even QVC's own "standalone" tax liability if that

---

*also* ANDREW J. DUBROFF ET AL., FEDERAL INCOME TAXATION OF CORPORATIONS FILING CONSOLIDATED RETURNS § 14.05 (2d ed. 2026).

[91] *Disclosure Statement* at 53; Treas. Reg. § 301.7701-3(b)(2).

[92] I.R.S. C.A. 201552025 (Aug. 19, 2015).

[93] On June 8, 2023, LINTA assigned, and QVCG assumed, all of LINTA's rights, interests, duties, liabilities and obligations under the QVC TSA in the Assignment and Assumption Agreement, dated June 8, 2023. JX-001, ECF No. 340-001.

[94] *See QVC TSA* Preamble, at 1.

[95] *QVC TSA*, § 10.

"standalone" liability would have been reduced by the use of certain kinds of tax credits that could not be utilized by the Q Consolidated Group in any given year because of QVCG's tax attributes.[96] In the case of this tax credit situation, *QVCG's* liability under the QVC TSA is reduced in future years if the Q Consolidated Group is ultimately able to utilize the relevant tax credits.[97] Contrasting this with QVC's then-current cash tax obligation, if QVC's "standalone" liability exceeds the Q Consolidated Group's tax liability, and in line with the treatment of certain tax credits noted above, if QVC generates taxable income that is offset by *QVC* tax attributes, under the QVC TSA, QVC does *not* receive a cash payment from QVCG.[98] Instead, QVC merely receives a potential future credit against future payments under the QVC TSA.[99] On June 12, 2023, Cornerstone entered into a substantially similar tax sharing agreement with QVCG (the "Cornerstone TSA," and together with the QVC TSA, the "TSAs").[100]

38.     Consistent with these contractual requirements, QVC made substantial payments to QVCG, as applicable, under the QVC TSA.[101] Such amounts were ultimately in excess of that needed to be paid to the IRS, both because QVCG had tax attributes available to reduce the overall amount payable, and because those same attributes precluded, in certain years, the Q Consolidated Group from utilizing certain tax credits QVC could have utilized on a standalone basis.[102]

---

[96] *QVC TSA*, §§ 2, 3.

[97] *QVC TSA*, §§ 2, 3.

[98] *QVC TSA*, §§ 2, 3, 4.

[99] QVC TSA § 4.

[100] *Disclosure Statement* at 55.

[101] Schedule 4 – Tax Sharing Agreement Summary, Dated November 30, 2025, DX-294, ECF No. 343-42.

[102] Schedule 4 – Tax Sharing Agreement Summary, Dated November 30, 2025, DX-294, ECF No. 343-42. The Court hesitates to characterize these excess payments as "overpayments," and recognizes that the potential treatment of those funds is disputed between the Parties. Both Parties agree any excess payments were made pursuant to and consistent with the QVC TSA. The Preferred Shareholders, on the one hand, argue the QVC TSA provides that those funds would be treated as future credits to QVC, and therefore not subject to avoidance action claims. The Debtors take a different view, arguing QVC's solvency during the period it made such excess

Between November 2019 and November 2025, QVC paid QVCG $953.7 million under the QVC TSA.[103]  Over the same period, QVCG paid tax of $440.8 million to tax authorities, retaining the difference of $512.9 million.[104]  CBI also made tax payments up to QVCG between 2020 and 2025, totaling approximately $80.8 million.[105]

39.    The QVC TSA also includes indemnification provisions which protect QVC from bearing tax liability on account of taxable income and tax liabilities generated by members of the Q Consolidated Group other than QVC and its subsidiaries (again, the "QVC Group" compared to the "*QVCG* Group").[106]  In particular, under § 10(a) of the QVC TSA, the members of the "QVCG Group" agreed to indemnify and hold harmless QVC from and against, *inter alia*, "any Taxes for which such member of the [QVCG] Group is required to pay any Governmental Authority (except for Taxes which [QVCG] has a right to reimbursement from QVC) . . . ."[107]  Any tax liability that arises as a result of activities or items arising at QVCG, LINTA, Cornerstone, or any entity not a member of the "QVCG Group" as defined under the QVC TSA would be covered by this indemnity.[108]  This would include any tax liability associated with the prospective discharge of certain LINTA Exchangeable Notes contemplated under the Plan (commonly referred to throughout these chapter 11 Cases as the "Deferred Tax Liability" or "DTL"), as that liability would be Taxes (as defined under the QVC TSA) of the "[QVCG] Group" that are neither Taxes of the *QVC* Group, nor reimbursable by QVC under the QVC TSA.[109]  The DTL, in simple terms,

---

payments is a litigable issue, and the treatment of such excess payments remains unclear.

[103] Schedule 4 – Tax Sharing Agreement Summary, Dated November 30, 2025, DX-294, ECF No. 343-42.

[104] Schedule 4 – Tax Sharing Agreement Summary, Dated November 30, 2025, DX-294, ECF No. 343-42.

[105] Qurate/Cornerstone Tax Sharing Payments, 2020 – 2024, DX-046, ECF No. 340-046.

[106] *QVC TSA*, § 10(a), (b).  These provisions are reciprocal.

[107] *QVC TSA*, § 10(a).

[108] *QVC TSA*, § 10(a).

[109] *See QVC TSA*, § (1)(v), § 10(a); *Plan* Article IV.(H).

arises as a result of the Q Consolidated Group having deducted on their tax return amounts corresponding to a greater interest rate percentage than the interest which was actually paid to bondholders by LINTA.[110]

  *(f)  Payments Under the Intercompany SSA.*

40. In November 2018, QVC, HSN Inc. ("HSN") and Zulily entered into the Affiliate Company Shared Services Agreement, dated November 14, 2018 (as amended by the Joinder and Amendment, dated October 8, 2019, the "Intercompany SSA").[111]  At the time, HSN was a QVCG subsidiary and parent to CBI.[112]  On December 31, 2018, QVCG transferred its ownership interest in HSN, excluding HSN subsidiary CBI, to QVC through a transaction among entities under common control.[113]  As a result, HSN became a subsidiary of QVC while CBI remained a subsidiary of QVCG.[114]  In October 2019, CBI was joined as a party to the Intercompany SSA with QVC, HSN, and Zulily.[115]  On May 24, 2023, the Intercompany SSA terminated as to Zulily upon its divestiture by the Debtors.[116]  Current parties to the Intercompany SSA

---

[110] *Kearns Testimony*, Day 1: 175:15–16; Day 1: 161:22–162:25.  The Q Consolidated Group engaged in this tax maneuver because the LINTA Exchangeable Notes were convertible instruments under the LINTA Notes Indenture, which are treated as contingent payment debt instruments ("CPDI") under the IRS rules because they can be exchanged into stock.  Because of this CPDI characterization, in conjunction with other contingencies, certain IRS rules required the issuer—LINTA— to compute a yield interest rate on the notes.  That interest rate in general on both sets of LINTA Exchangeable Notes (the 3.750% and the 4.000%) is approximately 9%.  But the cash paid to the bondholder by LINTA is only 4%, creating a 5% delta between what the Q Consolidated Group can deduct in their joint tax return, and the interest actually paid.  In essence, the Q Consolidated Group got a tax deduction for the 9%, but only paid interest on the LINTA Exchangeable Notes at 4%.  Since the Q Consolidated Group received those tax deductions year over year, this created a tax savings and accordingly deferred their tax liability.  Hence, the DTL.  *Kearns Testimony*, Day 1: 175:15–16; Day 1: 161:22–162:25.

[111] Intercompany SSA, DX-408, ECF No. 393-001.

[112] QVC, Inc. 2024 10-K at I-3, JX-024, ECF No. 341-029.

[113] QVC, Inc. 2024 10-K at I-3, JX-024, ECF No. 341-029.

[114] QVC, Inc. 2024 10-K at I-3, JX-024, ECF No. 341-029.

[115] Joinder and Amendment to the Intercompany SSA, dated Oct. 8, 2019, DX-409, ECF No. 393-002.

[116] *Disclosure Statement* at 55.

include QVC, HSN, and CBI, and the agreement is automatically set to renew on November 14, 2026.[117]

41.     Under the Intercompany SSA, participating parties may act as a service provider or service recipient of certain business operations and administrative services set forth in the agreement or any other services mutually agreed upon, subject to certain exceptions.[118] The cost of services provided under the Intercompany SSA is determined as the proportionate part of the compensation and benefits paid to service provider personnel, plus an allocation of related overhead costs, and is paid on a monthly basis.[119]  For services provided by third-party vendors, service recipients pay fees and expenses at cost, without markup, which are due within 45 days of the service recipient's receipt of a monthly detailed and itemized invoice from the service provider.[120]

42.     All parties to the Intercompany SSA have historically paid costs incurred in-full on a monthly basis.[121]  Among other services, QVC and CBI (and before its divestiture, Zulily) exchanged invoices for expenses relating to personnel and business advisory services.[122]   In sum, Zulily has paid QVC $2.16 million, $2.69 million, $2.59 million, and $2.79 million for management-related expenses incurred in 2019, 2020, 2021, and 2022, respectively.  CBI has paid to QVC $1.69 million, $1.5 million, $1.29 million, $3.1 million, $3.39 million, $3.53 million, and $2.1 million for management-related expenses incurred in 2019, 2020, 2021, 2022, 2023, 2024, and 2025, respectively.[123]

(g)     *CBI Removal from the RCF.*

43.     On April 1, 2025, QVC notified the RCF Lender Group of its election to remove CBI as a borrower under the RCF.[124]  Pursuant to

---

[117] Intercompany SSA § 9(a), DX-408, ECF No. 393-001.

[118] Intercompany SSA § 4, Schedule A, DX-408, ECF No. 393-001.

[119] Intercompany SSA § 4, Schedule A, DX-408, ECF No. 393-001.

[120] *Disclosure Statement* at 55–56.

[121] *Disclosure Statement* at 72.

[122] QVC, Inc. 2025 10-K at II-25, JX-025, ECF No. 341-051.

[123] *Disclosure Statement* at 56.

[124] *Disclosure Statement* at 57.

§ 9.19(a) of the RCF Credit Agreement, QVC elected to remove CBI as a borrower under the RCF (the "CBI Removal").[125] For QVC to elect CBI's removal, CBI was required to pay off all of its outstanding RCF Loans and terminate, or cash collateralize all outstanding letters of credit issued on its account.[126] QVC and CBI were jointly and severally liable for all borrowings under the RCF when QVC elected CBI's removal.[127]

### (h) QVCG Preferred Dividends.

44. The Preferred Shareholders' rights are governed by that certain Certificate of Designations (the "COD") adopted by the board of QVCG on August 20, 2020, in advance of the original QVCG Preferred Equity issuance.[128] Pursuant to the COD, Preferred Shareholders are "entitled to receive, when, and as if declared by the [QVCG] Board of Directors, out of funds legally available therefore, preferential dividends that shall accrue and cumulate" at a rate of 8.0% per annum (unless a triggering event escalates the applicable rate).[129] QVCG's failure to pay results *inter alia* in an increased liquidation price of the QVCG Preferred Equity.[130] Upon liquidation, Preferred Shareholders "receive [the liquidation preference] from the assets of" QVCG "[s]ubject to the prior payment in full of any Debt Instrument and other liabilities owed to the Corporation's creditors" and any senior class of equity.[131] QVCG paid quarterly dividends to the Preferred Shareholders until May 23, 2025 (such dividends, the "QVCG Preferred Dividends"), when it suspended the QVCG Preferred Dividends.[132]

---

[125] Notice of Removal of a Borrower, dated April 1, 2025, JX-003, ECF No. 340-012.

[126] *RCF* § 9.19, DX-005, ECF No. 340-005.

[127] *RCF*, DX-005, ECF No. 340-005.

[128] Certificate of Designations of 8.0% Series of Cumulative Redeemable Preferred Stock of Qurate Retail, Inc., DX-240, ECF No. 341-114 [hereinafter the "*COD*"].

[129] *COD* § 3(a).

[130] *COD* § 3(b), (c).

[131] *COD* § 4.

[132] QVC Group, Inc. 2025 10-K at II-61, JX-016, ECF No. 340-125; QVC Group, Inc. 2023 10-K at II-56, JX-017, ECF No. 340-126 ("During the years ended December 31, 2023, 2022 and 2021, the Company declared and paid four quarterly cash

45.     Between November 2019 and November 2025, QVCG paid approximately $456 million in QVCG Preferred Dividends.[133] Additionally, between November 2019 and May 2025, QVCG paid approximately $1.738 billion in cash dividends to its common shareholders.[134]

46.     Beginning in Q4 2022, QVCG's board obtained a solvency opinion from Duff & Phelps prior to issuing each QVCG Preferred Dividend.[135]  In each opinion, Duff & Phelps  concluded that after each QVCG Preferred Dividend: (i) immediately prior to giving effect to the proposed dividend, the surplus of QVCG exceeded the amount of the proposed dividend and (ii) after giving effect to the consummation of the proposed dividend, (a) the assets of QVCG exceeded its debts, (b) QVCG should be able to pay its debts, and (c) QVCG would not have an unreasonably small capital for the business in which it is engaged.[136]

---

dividends, each for $2.00 per share to stockholders of record of the Preferred Stock."); QVC Group, Inc. 2024 10-K at II-55, JX-018, ECF No. 341-001 ("During the years ended December 31, 2024, 2023, and 2022, the Company declared and paid four quarterly cash dividends, each for $2.00 per share to stockholders of record of the Preferred Stock.  On February 14, 2025, the Company declared a quarterly cash dividend of $2.00 per share, which will be payable in cash on March 17, 2025, to stockholders of record of the Preferred Stock at the close of business on February 28, 2025."); QVC Group, Inc. Q2 2025 10-Q at I-20, DX-148, ECF No. 341-022 ("On May 23, 2025, the Board of Directors announced its decision to suspend payment of the quarterly cash dividend on the Preferred Stock, beginning with the quarterly cash dividend payable on June 16, 2025."); QVC Group, Inc. 8-K at 2, DX-442, ECF No. 405-008 (On May 23, 2025, QVC Group, Inc. [] announced that its [Board] has decided to suspend its quarterly cash dividend [] of $2.00 per share for its 8.0% Series A Cumulative Redeemable Preferred Stock [] beginning with the quarterly dividend payable on June 16, 2025.").

[133] Schedule 5A - Summary of QVCG Outflows to QVCG Preferred Shareholders for the Period November 2019 – November 2025, DX-296, ECF No. 343-044.

[134] Schedule BA - Summary of QVCG Outflows to QVCG Common Stockholders for the Period November 2019 – November 2025, DX-298, ECF No. 343-046.

[135] 11-14-2022 Qurate Retail, Inc. Board Meeting Minutes, DX-366, ECF No. 345-009.

[136] *See e.g.*, 5-17-23 Qurate Retail Inc. Dividend Committee Written Consent, Exhibit A Duff & Phelps Opinion at 5, JX-065, ECF No. 345-011.

### *(2)* *Potential Intercompany Claims.*

*(a)* *Avoidance Claims.*

47. As a result of their investigations into the historical intercompany transactions, the Disinterested Directors determined various avoidance claims and related defenses may exist between certain Key Entities within the company.[137] The Court does not make any conclusive findings as to the merit of these claims. Rather, the Court finds that the Disinterested Directors each conducted and analyzed their due diligence of the company, and each separately and independently formulated an understanding as to the potential existence of such claims, their potential magnitude, potential defenses, and the factual and legal issues underpinning such potential claims which may need to be addressed by a court through litigation.[138]

48. With respect to the 2020 Restructuring, the Court finds each of the Disinterested Directors concluded through their investigation that the issuance of the LINTA Promissory Note as a means of financing the retirement of the MSI Exchangeables may have given rise to actual or constructive fraudulent transfer claims under § 544 of the Bankruptcy Code, assertable by QVC against LINTA, subject to various counter arguments and defenses.[139] The Disinterested Directors believed that either type of avoidance claim could be to the magnitude of the full $1.74 billion outstanding on the LINTA Promissory Note. The Court also finds the Disinterested Directors concluded LINTA having made approximately $85 million in principal and approximately $42.7 million in interest payments on the LINTA Promissory Note could have given rise to actual or fraudulent transfer claims assertable by LINTA against QVC. The Disinterested Directors agreed contingent legal issues would exist as to the extent any

---

[137] JX-027, ECF No. 341-054 at 5–6; JX-029, ECF No. 341-056 at 3–5; JX-032, ECF No. 341-061 at 5–7; JX-031, ECF No. 341-060 at 4–6.

[138] JX-027, ECF No. 341-054 at 5–6; JX-029, ECF No. 341-056 at 3–5; JX-032, ECF No. 341-061 at 5–7; JX-031, ECF No. 341-060 at 4–6.

[139] JX-027, ECF No. 341-054; JX-032, ECF No. 341-061.

badges of fraud could have been proven under the applicable version of the Uniform Fraudulent Transfer Act ("UFTA"). The Disinterested Directors also believed QVC's and LINTA's solvency was a litigable issue with respect to either actual or constructive fraudulent transfer claims.

49.     With respect to the 2022 Cash Management Plan and subsequent December 14 and December 21 Transfers, the Court finds each of the Disinterested Directors concluded QVC having drawn $300 million on the RCF as part of the steps taken to divest Zulily, and QVC having drawn $600 million on the RCF and subsequently sending a collective $800 million up to QVCG to be paid to QVCG and LINTA bank accounts, respectively, may have given rise to actual or constructive fraudulent transfers claims under § 544, assertable by QVC against QVCG, and LINTA as initial or subsequent transferee.[140]     The Disinterested Directors believed various badges of fraud under the applicable version of the UFTA may have existed. They also believed various arguments and counterarguments might exist as to whether QVC received reasonably equivalent value in exchange for the December Transfers. The Court finds each of the Disinterested Directors believed the solvency of QVC before either the December 14 or December 21 Transfers would be a litigable issue in any potential litigation, despite the company's purported reliance on the 2022 Duff & Phelps Solvency Opinion at the time of the transactions.[141]     In light of the complexities

---

[140] JX-027, ECF No. 341-054; JX-032, ECF No. 341-061. While CBI may have been an initial or subsequent transferee as part of the 2022 Cash Management Plan, the QVC Disinterested Director's independent investigation ultimately concluded no viable or valuable causes of action against CBI were worthy of pursuit. JX-027, ECF No. 341-054 at 10 ¶ 36.

[141] *See Keglevic Testimony* Day 3: 37:4–38:11 (QVC Disinterested Director explaining their view as to multiple indicia of insolvency); *Keglevic Testimony* Day 3: 38:25–39:6; 39:11–14; 39:20–40:19 (QVC Disinterested Director explaining issues with Duff & Phelps solvency opinions); *Meltzer Testimony*, Day 3: 157:1–11 (QVCG Disinterested Director expressing opinion that solvency was "clearly litigable," would be a battle of the experts, with a long duration and uncertain outcome); *see also* JX-095, ECF No. 453-002 (FTI insolvency perspective of QVC as of 2022); *Wafford Testimony*, Day 2: 352:18–353:14 (explaining how QVC could upstream to QVCG during 2022 Cash Management Plan despite its own potential insolvency). The Disinterested Directors formulated this view as to solvency, *i.e.*, the nature of it being

involved in such a dispute—such as the fact-intensive nature of solvency—the Disinterested Directors were cognizant that any potential claims precipitated by this prepetition transaction would result in protracted, discovery-heavy and expert-intensive litigation.

50.    With respect to the post-2022 Cash Management Plan intercompany dividends between 2023 and 2025, the Court finds the Disinterested Directors concluded QVC having paid $343.8 million in dividends to QVCG and $242.8 million in dividends to LINTA may have given rise to actual or constructive fraudulent transfer claims under § 544, assertable by QVC against QVCG and LINTA.[142]    The Disinterested Directors again recognized that legal issues may exist as to reasonably equivalent value and the existence of certain badges of fraud under the applicable version of the UFTA.  The Disinterested Directors also recognized that QVC's solvency during the period the dividends were paid would be a litigable issue, and that any potential litigation would require comprehensive, fact-intensive and expert-driven solvency analyses.  Solvency arguments might be further complicated by potential reference to, and disputes regarding, reliance on QVCG-specific solvency opinions as indications of whether QVC, a subsidiary, was solvent during the relevant time periods.

51.    With respect to the 2024 Capital Contribution and Exchange, the Court finds the Disinterested Directors concluded the $277 million capital contribution from LINTA used by QVC to exchange 89% of its 2027 and 2028 Notes may have given rise to actual or constructive fraudulent transfers under § 544, assertable by LINTA

---

a contested issue in any underlying litigation, based on their comparison of the metrics used in the 2022 Duff & Phelps Solvency Opinion (as well as other Duff & Phelps solvency opinions issued both at the QVCG and QVC levels for other transactions), the Evercore insolvency analysis, and the FTI 2022 insolvency analysis.  The Disinterested Directors concluded that the Duff & Phelps solvency opinions historically used by the company may or may not be reliable, given their choice of metrics, but at bottom would be subject to reliability disputes in any litigation.

[142] JX-027, ECF No. 341-054; JX-029, ECF No. 341-056; JX-032, ECF No. 341-061.

against QVC.[143]  As with each other potential avoidance action claim, the Disinterested Directors recognized legal issues might exist as to the extent certain badges of fraud could be proven, as well as to the extent LINTA received reasonably equivalent value in exchange for the contribution.  They also recognized these potential claims might be further complicated by questions as to whether the value of LINTA's potential claim might be reduced by claims QVC might have against LINTA.

52.  <u>With respect to payments under the intercompany TSAs</u>, the Court finds the Disinterested Directors concluded QVC's payments to QVCG for taxes between November 2019 and 2025, totaling approximately $953.7 million, and CBI's payments to QVCG for taxes between 2020 and 2025, totaling approximately $80.8 million, may have given rise to actual or constructive fraudulent transfer claims under § 544, assertable by QVC and CBI, respectively, against QVCG.[144]  The Disinterested Directors had at least four concerns here.  First, they apprehended that QVC was making payments at least from 2018 through 2022 up to QVCG (then referred to as Qurate Retail, Inc.) before LINTA assigned its rights and interests under the QVC TSA to QVCG, potentially creating avoidance issues.  Second, the Disinterested Directors were concerned about how those pre-assignment payments (or overpayments) up to QVCG might be treated under the later-assigned contractual provisions of the QVC TSA.  Similar pre and post-execution timing issues may exist with respect to payments from CBI up to QVCG which predate the CBI TSA.  Third, the Disinterested Directors also understood issues may exist as to how any potential overpayments made from QVC and CBI up to QVCG under the then-operative TSAs would be treated under the contracts' applicable provisions.  Namely, whether those overpayments' characterization is limited to credits which offset QVC's and CBI's future obligations under the respective TSAs, and/or whether the value of those payments could possibly be subject to

---

[143] JX-032, ECF No. 341-061; JX-027, ECF No. 341-054.
[144] JX-027, ECF No. 341-054; JX-031, ECF No. 341-060; JX-029, ECF No. 341-056.

avoidance claims. The Debtors consistently maintained the position that excess tax payments made from QVC up to QVCG were made in compliance with the QVC TSA—but the Disinterested Directors each still believed avoidance issues may exist.[145] Fourth, the Disinterested Directors understood issues may exist as to the extent QVC and CBI received value, if any, under the TSA from QVCG. Separately, the Disinterested Directors concluded potential preference claims under § 547 may exist based on the same payments and overpayments under the respective TSA, assertable by QVC and CBI against QVCG. They recognized legal issues with respect to whether those payments were made in the ordinary course may exist as well.

53. <u>With respect to payments made under the Intercompany SSA</u>, the Court finds the Disinterested Directors concluded various parties' payments for services by counterparties under the Intercompany SSA may have given rise to actual or constructive fraudulent transfer claims.[146] As with the other potential fraudulent transfer claims, the Disinterested Directors again recognized QVC's solvency would be disputed in any litigation, as well as the extent the services QVC received were reasonably equivalent to value paid for them. They recognized potential issues existed as to the extent value was transferred on account of antecedent debts. They recognized the calculations of fees owed would be disputed by any parties to such litigation, and resolution of that issue and the others would be fact intensive. The Disinterested Directors also concluded various parties' payments under the Intercompany SSA may have given rise to potential preference claims, and that potential legal and factual issues may exist as to whether such payments were made in the ordinary course of business.

54. <u>With respect to the CBI Removal</u>, the Court finds the Disinterested Directors concluded QVC's election to remove CBI as

---

[145] *Kearns Testimony*, Day 1: 222:4–20; *Wafford Testimony*, Day 1: 404:12–18.
[146] JX-027, ECF No. 341-054; JX-031, ECF No. 341-060; *see also Disclosure Statement* at 55–56.

borrower under the RCF may have given rise to actual or constructive fraudulent transfer claims, assertable by QVC against QVCG.[147]  The Disinterested Directors believed various badges of fraud may have existed.  They believed issues may exist as to fraudulent intent as well.  And they recognized that fact-intensive issues as to QVC's solvency and a potential lack of reasonably equivalent value received in exchange for the transaction would exist in any such litigation.  They also recognized complicated issues would exist as to how an exchange of value would be conceptualized by a court.

55.     With respect to the QVCG Preferred Dividends, the Court finds the Disinterested Directors concluded QVCG having paid approximately $456 million in QVCG Preferred Dividends to the Preferred Shareholders may have given rise to actual or constructive fraudulent transfer claims, assertable by QVCG against the Preferred Shareholders.[148]  As with each of the other potential actual fraudulent transfer claims, the Disinterested Directors believed certain statutory badges of fraud may exist.  With respect to potential constructive fraudulent transfer claims, the Disinterested Directors recognized issues may exist as to whether each or any of the QVCG Preferred Dividends rendered QVCG insolvent, or whether there was an exchange of reasonably equivalent value.  Indeed, the Disinterested Directors recognized the complicated and fact intensive nature of any potential constructive fraudulent transfer claim, as QVCG's solvency would need to be analyzed at the time each transfer was made.  They believed various arguments and counterarguments may exist as to the reliability of the Duff & Phelps solvency opinions issued for the QVCG board in connection with the QVCG Preferred Dividends.  They also recognized

---

[147] JX-027, ECF No. 341-054; JX-029, ECF No. 341-056.  While this claim would in theory also be assertable against CBI, the QVC Disinterested Directors ultimately concluded that no claims against CBI were worthy of pursuit, particularly given the Reorganized CBI will become a subsidiary of QVC and therefore a release would be, in their view, more appropriate.  JX-027, ECF No. 341-054 at 10 ¶ 36.

[148] JX-027, ECF No. 341-054; JX-029, ECF No. 341-056.

potential legal issues may exist as to the applicability of the safe harbor provision under § 546.

### (b) Illegal Dividends

56. <u>Again, with respect to the QVCG Preferred Dividends</u>, the Court finds the Disinterested Directors concluded QVCG having paid approximately $456 million in QVCG Preferred Dividends to the Preferred Shareholders may have given rise to illegal dividend claims assertable by QVCG's creditors against QVCG and its directors.[149] The Disinterested Directors also believed QVC may be entitled to pursue such illegal dividend claims against the Preferred Shareholders in the event QVCG did not. They recognized that complicated factual issues would exist as to the extent QVCG had surplus[150] at the time of each distribution, and/or the extent QVCG had net profits in the fiscal years—or preceding fiscal years—in which the dividends were declared. They also recognized potential legal issues would exist as to the extent the QVCG directors were acting in compliance with their fiduciary duty of care at the time of declaring each dividend.

### (c) The Deferred Tax Liability.

57. <u>With respect to the Deferred Tax Liability, or DTL</u>, the Court finds the Disinterested Directors concluded there was a risk—albeit a small one—that liability to the IRS may materialize based on the Q Consolidated Group having deducted on their consolidated tax return amounts for interest paid on the LINTA Exchangeable Notes as if those notes' interest rate was 9%, when the cash paid to bondholders by LINTA was only 4%.[151] The Disinterested Directors believed the

---

[149] JX-027, ECF No. 341-054; JX-029, ECF No. 341-056.

[150] Defined under the Delaware General Corporate Law ("DGCL") as "[t]he excess, if any, at any given time, of the net assets of the corporation over the amount so determined to be capital . . . [.]" DEL. CODE ANN. tit. 8, § 154. In a very general sense, a corporation will have surplus as to potentially issue a dividend if the company's net assets (amount by which total assets exceed total liabilities) exceed its capital (the aggregate par value of all issued shares). *Id.* Whether a company has surplus or net profits are factual issues.

[151] JX-027, ECF No. 341-054; JX-029, ECF No. 341-056; *see also* QVC Group, Inc. 2025 10-K, JX-019, ECF No. 341-002 ("Taxing authorities may challenge tax positions we will take with respect to the consequences of the Chapter 11 Cases and

government would look to QVCG as lead taxpayer of the Q Consolidated Group for payment if the DTL materialized. The Disinterested Directors also understood that the members of the Q Consolidated Group may be jointly and severally liable for the DTL, but that QVC may have an indemnity claim against QVCG for its portion pursuant to QVC TSA. The Disinterested Directors understood that the Debtors had obtained a "should"-level tax opinion regarding exposure on the DTL, and that professional tax consultants opined it was "more likely than not" the DTL would not materialize.[152] The Disinterested Directors were also aware the Debtors had obtained a tax insurance policy for the DTL, but that policy only covered a portion of the projected potential liability.[153] The Disinterested Directors understood that even with insurance the potential out-of-pocket exposure on the DTL was anywhere from approximately $550-$800 million.[154] They also understood a confluence of factors potentially affected the total aggregate liability under the DTL, and that each of these risks combined could balloon the Debtors' potential exposure from approximately $550-$800 million to in excess of

---

the transactions contemplated thereby and, in the event such a challenge were successful, it could result in a material current tax liability for Reorganized QVC. It is our position that certain deferred tax liabilities recorded on our financial statements as of December 31, 2025 will not materialize into a current tax liability because of the application of certain tax rules applicable to companies under the protection of a Bankruptcy court.").

[152] JX-072, ECF No. 348-008 (PWC "should" opinion, dated February 20, 2026). *Kearns Testimony*, Day 1: 229:17–230:9; *see also Wafford Testimony*, Day 1: 405:2–8 (stating the company's position was that the DTL would not materialize). The actual percentage of risk associated with "should"-level tax opinion is not clear, even among tax professionals. While a "should" opinion is generally meant to represent a "more likely than not" chance of an event happening/not happening, it is definitively not a "will" opinion, which is meant to convey a greater degree of certainty. *Kearns Testimony*, Day 1: 187:18–188:4; Day 1: 230:7–9.

[153] Moreover, the Disinterested Directors did not know with certainty, nor did the Debtors know, how the premium on the tax insurance policy reflected the market's belief as to a likelihood that the DTL would materialize. Full coverage was potentially available for the DTL, but the next tranche of incremental coverage necessary to achieve full insurance was only obtainable through secondary markets, the premium for which was "incredibly expensive." *Wafford Testimony*, Day 1: 347:7–15; Day 1: 375:19–376:4.

[154] Summary of Calculation of Potential Out-of-Pocket DTL Costs (With Included Assumptions), DX-435, ECF No. 406-001.

$1 billion.[155]  These contingent risks included (i) a potential change-in-ownership issue under § 382 of the Internal Revenue Code caused by aggressive investing in the company's preferred equity before and after the Petition Date, which threatened the loss of certain tax attributes, including the ability to offset the DTL through use of accrued interest deduction carryforwards[156]; (ii) the fact that receipt of insurance proceeds on the DTL policy would itself constitute a realization event on which the Debtors would experience gain, necessitating a "tax gross-up"; (iii) the fact that significant interest may accrue on the DTL; (iv) the fact that penalties may be imposed by the IRS; (v) the fact that interest may accrue on those penalties; and (vi) the potential added costs associated with audit and litigation expenses.[157]

### B.    Process    of    Negotiating    the    Intercompany Settlement.

58.    During the course of their investigations into the potential intercompany claims, and with greater intensity between February and April of 2026, the Disinterested Directors underwent negotiations to determine whether a settlement of potential intercompany claims was achievable between the Key Entities.[158]    Such a settlement was eventually reached.  Based on the evidence presented at the Combined Hearing, the Court finds the negotiations were arm's-length, that the Disinterested Directors each acted independently during the course of their respective investigations and subsequent negotiations with one another (whether negotiating directly with other Special Committee members, or negotiating by and through their respective independent counsel).  All Disinterested Directors' testimony as to the negotiation of the Intercompany Settlement was highly credible.  No Disinterested Director or Special Committee member at any Key Entity capitulated

---

[155] Summary of Calculation of Potential Out-of-Pocket DTL Costs (With Included Assumptions), DX-435, ECF No. 406-001.

[156] DX-235, ECF No. 341-109.

[157] Summary of Calculation of Potential Out-of-Pocket DTL Costs (With Included Assumptions), DX-435, ECF No. 406-001.

[158] JX-027, ECF No. 341-054 ¶¶ 20–21; JX-029, ECF No. 341-056 ¶¶ 12–22; JX-032, ECF No. 341-061 ¶¶ 18–31; *Disclosure Statement*, 51–57.

during the negotiations. The Court finds that the terms of the negotiated Intercompany Settlement were not preordained, but rather were reached as part of a thorough, complete, and arm's-length process.

59. On February 6, 2026, the Joint Debtor Advisors circulated a status report to the QVCG Board of Directors and Compensation Committee, outlining recent updates on the ongoing development of their restructuring transaction plan.[159] The February 6 status report outlined four transaction term sheets that had theretofore been exchanged between the company and certain lender constituencies, namely, certain RCF lenders, QVC Notes lenders, and LINTA Notes lenders.[160] The February 6 status report showed the company and its creditor constituencies were in agreement on implementing a restructuring through a pre-packaged chapter 11 plan, but were in disagreement as to various material goalposts, such as: (i) how to pay fees and expenses associated with a chapter 11 case; (ii) recovery for RCF lenders; (iii) recovery for LINTA lenders; (iv) recovery for general unsecured creditors ("GUCs"); (v) funding for CBI; and (vi) recovery for the Preferred Shareholders.[161] Specifically with respect to a recovery for the Preferred Shareholders, the Debtors' October 17, 2025 term sheet proposed that QVCG distribute cash to the Preferred Shareholders upon the company's emergence from bankruptcy, in addition to a 62% stake in the equity of reorganized CBI.[162] On January 26, 2026, certain RCF lenders submitted a counter term sheet, which proposed distributing no cash to the Preferred Shareholders, but contemplated granting up to a 62% stake in the reorganized CBI.[163] Also on January 26, 2026, certain QVC Note lenders submitted their own counter which contemplated

---

[159] Joint Meeting of the Board of Directors and the Compensation Committee of QVCG, JX-080, ECF No. 450-001.

[160] Joint Meeting of the Board of Directors and the Compensation Committee of QVCG at 8, JX-080, ECF No. 450-001.

[161] Joint Meeting of the Board of Directors and the Compensation Committee of QVCG at 8, JX-080, ECF No. 450-001.

[162] DX-437, ECF No. 406-003 at 4.

[163] Joint Meeting of the Board of Directors and the Compensation Committee of QVCG at 8, JX-080, ECF No. 450-001.

distributing to the Preferred Shareholders a to-be-determined "cash tip," or a to-be-determined percentage of equity in the reorganized QVC or CBI.[164]  Eleven days earlier, on January 15, 2026, certain LINTA Note lenders submitted their own counter, but their term sheet did not contemplate a recovery for the Preferred Shareholders.[165]  Accordingly, at the outset of subsequent negotiations which took place throughout the course of February through April 2026, the company and various creditor constituencies were not in agreement as to any recovery the Preferred Shareholders may receive under a potential restructuring, but had contemplated as much as both a cash distribution and equity in the reorganized QVC or CBI, and as little as, potentially, nothing.[166]

60.     On February 12, 2026, Kobre submitted a status update to the QVCG Special Committee on the potential impending restructuring, QVCG's potential exposure on the potential intercompany claims, and an overview of how QVCG's cash position might be affected by the bankruptcy.[167]  In the February 12 status update, Kobre advised the QVCG Special Committee as to their interpretation of the potential intercompany claims between the Key Entities, and advised on the "importance of a consensual resolution" of any potential intercompany claims that may exist.[168]  Kobre advised the QVCG Special Committee of QVCG's limited cash on hand (then determined to be approximately $200 million), the face value of its preferred equity (approximately $136 million), and the low amount of GUC claims against it (less than $15

---

[164] Joint Meeting of the Board of Directors and the Compensation Committee of QVCG at 8, JX-080, ECF No. 450-001.

[165] Joint Meeting of the Board of Directors and the Compensation Committee of QVCG at 8, JX-080, ECF No. 450-001.

[166] Although the substance of the investigation into the intercompany claims and negotiation of the Intercompany Settlement were undergone independently by each respective Disinterested Director group, the Court finds the fact that the company and certain creditor constituencies were not in agreement as to potential distributions to the Preferred Shareholders under a potential restructuring is further indicia that the result eventually reached by the Disinterested Directors was not preordained.

[167] QVCG Special Committee Restructuring Update, JX-081, ECF No. 450-002.

[168] QVCG Special Committee Restructuring Update at 2–4, JX-081, ECF No. 450-002.

million).[169]  Kobre advised that diligence had revealed QVC had upstreamed to QVCG over \$2 billion in the last four-year period, and over \$4 billion in the last six-year period.[170]  Kobre advised as to potential issues regarding both QVC's and QVCG's solvency at the time each paid respective dividends either upstream, or to the Preferred Shareholders, based on a comparison of the relevant Duff & Phelps solvency opinions and recent solvency analyses of the Key Entities for the relevant time periods provided by the Joint Debtor Advisors (Evercore).[171]  Kobre also advised that QVCG was expected to fund its share of Joint Debtor Advisory fees associated with its own "box," based on a to-be-determined allocation.[172]  In light of the foregoing, Kobre advised the QVCG Special Committee as to how QVCG's cash might be distributed under a potential agreement, suggesting "releases" for the Preferred Shareholders from potential claims on the QVCG Preferred Dividends as their "potential recovery."[173]  The Kobre February 12 status update did not contemplate distributing cash or equity to the Preferred Shareholders.[174]  Regardless, the Kobre February 12 status update indicated the QVCG Disinterested Directors had a preliminary understanding of the Key Entities' and Preferred Shareholders' potential exposure under the intercompany claims, and those claims' magnitude.  The February 12 status update also indicated the QVCG Disinterested Directors were aware of how much leverage the QVC Disinterested Directors would have against them in the subsequent negotiations.

---

[169] QVCG Special Committee Restructuring Update at 2, JX-081, ECF No. 450-002.

[170] QVCG Special Committee Restructuring Update at 2, 9, JX-081, ECF No. 450-002.

[171] QVCG Special Committee Restructuring Update at 11–16, JX-081, ECF No. 450-002.

[172] QVCG Special Committee Restructuring Update at 8, JX-081, ECF No. 450-002.

[173] QVCG Special Committee Restructuring Update at 7, JX-081, ECF No. 450-002.

[174] QVCG Special Committee Restructuring Update at 7, JX-081, ECF No. 450-002.

61.    On February 13, 2026, at a counsel-only meeting, counsel for the Special Committees of QVCG (Kobre), QVC (Katten), and LINTA (Milbank) exchanged presentations on their respective positions as to potential intercompany claims and defenses.[175]   As represented by Kobre, the QVCG Special Committee opened with the position that "clawback claims by QVC against QVCG were not likely to be viable," and that each of the contingent legal or factual issues in any avoidance claim (intent to defraud, hinder or delay, certain badges of fraud, reasonably equivalent value, and a showing of QVC's or QVCG's insolvency, *et cetera*) would likely resolve in the favor of QVCG.[176]   The QVCG Special Committee took a similar aggressive position with respect to potential avoidance claims assertable by QVC and LINTA against the Preferred Shareholders.[177]   The QVCG Special Committee also asserted an interpretation that QVC would likely have joint and several liability under the DTL, and that, in essence, QVC had much more to lose than QVCG under the DTL because the parent would not be holding assets after the restructuring.[178]   The Court finds the QVCG Special Committee's representation at the February 13 meeting was an aggressive position at the outset of negotiations—if not the most aggressive position that the QVCG Special Committee could have taken at that stage.   The QVCG Special Committee took this aggressive position (through Kobre) despite likely being aware, (through Kobre's prior advice to the contrary), that QVCG indeed had significant exposure under potential intercompany claims from QVC, that the legal and

---

[175] QVC Group, Inc. Intercompany Settlement Position, JX-008, ECF No. 340-043; Presentation Regarding Potential Valuable and Viable QVC, Inc. Claims and Causes of Action, JX-050, ECF No. 343-018; Board of Managers of Liberty Interactive LLC and Special Committee of the Board of Directors of Qurate Retail Group, Inc. Intercompany Claims Positions, JX-006, ECF No. 340-024.

[176] QVC Group, Inc. Intercompany Settlement Position at 2–6, JX-008, ECF No. 340-043.

[177] QVC Group, Inc. Intercompany Settlement Position at 6, JX-008, ECF No. 340-043.

[178] QVC Group, Inc. Intercompany Settlement Position at 7, JX-008, ECF No. 340-043.

factual issues in any avoidance action were litigable, and that such litigation would be fact-intensive, lengthy, and costly.[179]

62. On February 19, 2026, the QVC and QVCG Disinterested Directors held individual meetings with their respective counsel regarding the developing Intercompany Settlement and upcoming negotiations with the Special Committees.[180]

63. On February 22, 2026, Katten sent initial demand letters, with proposed settlement term sheets attached, to Kobre and Milbank.[181] QVC proposed to LINTA (i) granting QVC a $600 million GUC claim against LINTA and (ii) granting an aggregate $66.7 million in bondholder claims against LINTA, treated as GUC claims.[182] QVC proposed to QVCG (i) payment of third-party GUC claims against QVCG in full, in an amount not to exceed $15 million; (ii) granting QVC at least a $400 million allowed GUC claim against QVCG; (iii) payment of such $400 million GUC claim and other allowed claims by QVC against QVCG with all QVCG's available cash—after payment of QVCG's administrative and third-party GUC claims—and any other assets owned by QVCG, which included the equity in CBI; (iv) that QVC would fund the purchase of tax insurance and payment of any liability on the DTL with proceeds from the treatment of QVC's allowed claim against QVCG; and (v) no recovery for the Preferred Shareholders or common equity holders of QVCG.[183] Both proposals to QVCG and LINTA included mutual releases/customary debtor releases between the Parties (except for the terms of the settlement), subject to completion of the

---

[179] *See* JX-029, ECF No. 341-056 at 5 ¶¶ 13–14.

[180] 02-19-2026 Disinterested Directors of QVC Meeting Minutes, DX-076, ECF No. 340-076; 02-19-2026 Disinterested Directors of QVCG Meeting Minutes, DX-092, ECF No. 340-092.

[181] QVC Settlement Proposal to QVCG, JX-014, ECF No. 340-121; QVC Settlement Proposal to LINTA, DX-120, ECF No. 340-120. The QVC proposal to both QVCG and LINTA provided *inter alia* that allocation of shared advisory fees was still subject to determination.

[182] QVC Settlement Proposal to LINTA at 7, DX-120, ECF No. 340-120.

[183] QVC Settlement Proposal to QVCG at 7, JX-014, ECF No. 340-121; QVC Settlement Proposal to LINTA at 7, DX-120, ECF No. 340-120.

investigation into potential intercompany claims by the Disinterested Directors of QVC.[184]

64.     The Court finds the Disinterested Directors of QVC arrived at the $400 million allowed claim figure as the lowest acceptable amount they felt could be acceptable as fiduciaries for the company, particularly in light of the magnitude of QVC's potential claims against QVCG, which they believed to be in excess of $3 billion in the aggregate, and QVCG's limited cash, which was estimated at around $180-$200 million.[185]  The Court finds the Disinterested Directors of QVC did not include any distribution for the Preferred Shareholders based on their interpretation that QVC had been acting as QVCG's "ATM" for at least the past six years, having upstreamed approximately $4 billion of cash, and that $456 million of that money had already been paid from QVCG to the Preferred Shareholders as dividends.[186]  The Court finds that QVC's Disinterested Directors believed that a mutual release of potential claims had significant value for QVCG and the Preferred Shareholders.[187]

65.     On February 23 and 24, 2026, the Special Committees held virtual and in-person settlement conferences where counterproposals to the initial QVC proposals were made, and the QVCG Disinterested Directors made an ask for a $25 million distribution for the Preferred

---

[184] QVC Settlement Proposal to QVCG at 7, JX-014, ECF No. 340-121.  QVC Settlement Proposal to LINTA at 7, DX-120, ECF No. 340-120.

[185] *Keglevic Testimony*, Day 3: 24:25–24:10.

[186] *Keglevic Testimony*, Day 3: 33:18–34:6; Schedule 2B – 2022 Cash Management Plan, Dated December 2022, DX-301, ECF No. 344-001; QVC Notice of Borrowing at 1, DX-410, ECF No. 393-003; Schedule 2A – December 2022 Cash Management Plan Transfers to QVCG and LINTA at 1, DX-290, ECF No. 343-038; DPW and STB Excel Sheet of Fund Flows, DX-044, ECF No. 340-044; QVC, Inc. Payments to QVCG for Debt-Related Dividend Payments From January 2023 through November 2025, DX-292, ECF No. 343-040; Schedule 4 – Tax Sharing Agreement Summary, Dated November 30, 2025, DX-294, ECF No. 343-42; Schedule 5A - Summary of QVCG Outflows to QVCG Preferred Shareholders for the Period November 2019 – November 2025, DX-296, ECF No. 343-044.

[187] *Keglevic Testimony*, Day 3: 32:4–9.

Shareholders.[188] QVC's Disinterested Directors rejected the $25 million request full stop, as they believed it was a non-starter.[189] QVCG's Disinterested Directors did not insist further on any other amount of cash for the Preferred Shareholders during the February 23 and 24 meetings.[190] The QVCG Disinterested Directors did not bring an independent tax advisor to the meetings, and did not hire their own independent financial advisor or investment banker in preparation for the settlement negotiations.[191]

66.     Regardless of this outcome, the Court finds that QVCG's Disinterested Directors having not insisted further on a distribution for the Preferred Shareholders at the February 23 and 24 meetings was not a capitulation to the QVC Disinterested Directors, and that the negotiations had proceeded in good faith and at arm's-length. All Disinterested Directors recognized that the outcome of the claims was uncertain due to the plethora of legal and factual issues within each claim.[192] Based on the advice of Kobre up until that point, the QVCG Disinterested Directors understood QVCG's potential exposure to QVC and the magnitude of such claims.[193] Indeed, the QVCG Disinterested Directors seemed to recognize that QVC had leverage over QVCG both before and during the February 23 and 24 meetings. And both the QVC and QVCG Disinterested Directors had independently developed— through thorough and complete diligence of the company provided to all Disinterested Directors through the Joint Debtor Advisors—a parallel understanding that QVC had been the ATM of QVCG for at least the past six years.[194] Nonetheless, QVCG was not slated to receive "nothing"

---

[188] *Keglevic Testimony*, Day 3: 32:4–9.

[189] *Keglevic Testimony*, Day 3: 32:4–9.

[190] *Meltzer Testimony*, Day 3: 310: 11–24; 311:13–18.

[191] *Meltzer Testimony*, Day 3: 222:10–21; 303:24–304:1; 304:11–14.

[192] JX-027, ECF No. 341-054 at 5–6; JX-029, ECF No. 341-056 at 3–5; JX-032, ECF No. 341-061 at 5–7; JX-031, ECF No. 341-060 at 4–6; *Disclosure Statement*, at 52–57.

[193] QVCG Special Committee Restructuring Update, JX-081, ECF No. 450-002; JX-027, ECF No. 341-054.

[194] Schedule 2B – 2022 Cash Management Plan, Dated December 2022, DX-301, ECF No. 344-001; QVC Notice of Borrowing at 1, DX-410, ECF No. 393-003;

under the terms of the settlement after the February 23 and 24 meetings—despite its Special Committee eventually agreeing to transfer all QVCG's Distributable Cash plus its interest in CBI to QVC, and granting QVC an allowed $400 million GUC claim.[195] As of the time of the February 23 and 24 meetings, both groups of Disinterested Directors understood QVCG had limited cash on hand, and that regardless of its potential success in litigating or defending the hypothetical intercompany claims from QVC, QVCG would still bear a significant potential liability under the DTL which dwarfed even the avoidance action claims.[196] The QVCG Disinterested Directors never formulated an assessment as to QVCG's potential success on the intercompany claims, but well understood that litigating the claims, particularly with respect to fact-intensive solvency disputes, was guaranteed to be costly and value destructive for both Key Entities.[197] Moreover, it was unclear to both sets of Disinterested Directors how, if at all, QVCG might be able to fund such disputes given its limited cash.[198] Regardless, they understood QVCG's limited cash position placed it at risk of being completely wiped out by the DTL even if it achieved complete victory against QVC on the avoidance claims.[199] They recognized that by getting (i) a release of all QVC's claims against

---

Schedule 2A – December 2022 Cash Management Plan Transfers to QVCG and LINTA at 1, DX-290, ECF No. 343-038; DPW and STB Excel Sheet of Fund Flows, DX-044, ECF No. 340-044; QVC, Inc. Payments to QVCG for Debt-Related Dividend Payments From January 2023 through November 2025, DX-292, ECF No. 343-040; Schedule 4 – Tax Sharing Agreement Summary, Dated November 30, 2025, DX-294, ECF No. 343-42; Schedule 5A - Summary of QVCG Outflows to QVCG Preferred Shareholders for the Period November 2019 – November 2025, DX-296, ECF No. 343-044.

[195] 04-14-2026 Special Committee of the Board of Directors of QVC Group, Inc. Meeting Minutes, DX-096, ECF No. 340-096.

[196] QVCG Special Committee Restructuring Update, JX-081, ECF No. 450-002 (Kobre's views as to QVC's potential claims pre-February 23, 24 meeting); JX-027, ECF No. 341-054; Presentation Regarding Potential Valuable and Viable QVC, Inc. Claims and Causes of Action, JX-050, ECF No. 343-018 (Katten's views as to QVC's potential claims during/post February 23, 24 meeting).

[197] *Meltzer Testimony*, Day 3: 316:18–317:1.

[198] QVCG Special Committee Restructuring Update, JX-081, ECF No. 450-002; JX-027, ECF No. 341-054; Presentation Regarding Potential Valuable and Viable QVC, Inc. Claims and Causes of Action, JX-050, ECF No. 343-018.

[199] *Meltzer Testimony*, Day 3: 186:10–18.

QVCG, and (ii) QVC to assume all QVCG's liability under the DTL, they would succeed in taking all QVCG's risk off the table.[200]

67. The Disinterested Directors of QVC independently believed their initial February 22 term sheet was mutually beneficial, as their primary goal was a fast and final resolution of the claims.[201] They were, however, prepared to litigate to finality all claims against both QVCG and the Preferred Shareholders in order to maximize returns if a settlement was not reached. The Disinterested Directors of QVCG understood this—as of the February 23 and 24 meetings—and were aware that QVC's Disinterested Directors were prepared to unleash their arsenal of claims in the event a resolution was not achieved.[202] Accordingly, QVCG's Disinterested Directors having potentially failed to use QVC's Disinterested Directors' "fast and final" motivation as *their own* leverage point would *not* demonstrate the negotiations were not arm's-length. The litigation alternative, whether done inside or outside of the company's bankruptcy, would be expensive and lengthy.[203] And the Disinterested Directors of QVC understood that they represented the operating company which would likely have sufficient cash—or, at least, more than QVCG had—to fund subsequent litigation.[204]

68. Nor were the Preferred Shareholders collectively slated to receive "nothing" under the settlement after the February 23 and 24 meetings concluded. Despite a distribution now being off the table,

---

[200] *Meltzer Testimony*, Day 3: 194:13–195:2.

[201] *Keglevic Testimony*, Day 3: 99:1–8 (if claims litigated, QVC's recovery would be reduced by its fees and QVCG's fees); *Keglevic Testimony*, Day 3: 99:12–100:4; 102:20–103:5 (litigation would preclude "fast and final" solution QVC Disinterested Directors identified as their objective); *Keglevic Testimony*, Day 3: 101:18–22 (QVC recognized possibility of losing litigation and recovering nothing); *Keglevic Testimony*, Day 3: 103:20–104:1 (QVC Disinterested Director's view that litigation would have been "ugly," would have hurt both estates, and that litigation was "much worse" than settling).

[202] *Keglevic Testimony*, Day 3: 125:11–19.

[203] *Keglevic Testimony*, Day 3: 46:20–47–6; *Meltzer Testimony*, Day 3: 197:4–11; *Wafford Testimony*, Day 2: 379:8–9.

[204] *Keglevic Testimony*, Day 3: 27:6–18.

those Preferred Shareholders who received QVCG Preferred Dividends got to keep the $456 million in aggregate distributions they had previously received—funded with QVC's money—and a release of all claims for those funds.[205]  Not getting a distribution out of the Debtors' reorganization was not a preordained directive from Kirkland, because the company *had* contemplated a distribution as early as October 2025.[206]  Kobre's *suggestion* at the February 12, 2026 status update that the Preferred Shareholders get releases as a "*potential recovery*" also does not indicate that the result of the February 23 and 24 negotiations was preordained or that the QVCG Disinterested Directors capitulated at the meeting.[207]  One day after advising the QVCG Disinterested Directors as to QVC's potential exposure, Kobre represented to QVC's Disinterested Directors' counsel a converse position—despite already understanding they were potentially on thin ice.[208]  That the QVCG Disinterested Directors ultimately did not pursue a distribution, but rather obtained releases, was still a substantial result under the settlement—but was not one guaranteed from the outset.  Indeed, the initial term sheet authorized by the QVC Disinterested Directors did not include releases for the Preferred Shareholders.[209]  It cannot be said the Preferred Shareholders collectively did not receive value under the settlement, nor can it be said the QVCG Disinterested Directors capitulated or that "releases with no distribution" was a preordained result.

69.    On February 25, 2026, Kobre returned a markup of the QVC/QVCG proposal to Katten, reducing QVC's allowed GUC claim

---

[205] The QVCG Disinterested Directors admittedly did not know at the time of negotiating the settlement what proportion of then-existing Preferred Shareholders were of the subset that received the QVCG Preferred Dividends versus shareholders who bought the stock after those dividends were paid.  *Meltzer Testimony*, Day 3: 333:25–334:11.

[206] DX-437, ECF No. 406-003 at 4.

[207] QVCG Special Committee Restructuring Update at 7, JX-081, ECF No. 450-002.

[208] QVCG Special Committee Restructuring Update, JX-081, ECF No. 450-002; QVC Group, Inc. Intercompany Settlement Position, JX-008, ECF No. 340-043.

[209] *Keglevic Testimony*, Day 3: 32:4–9.

against QVCG to $350 million, and removing the language requiring that QVCG fund all QVC's allowed claims with "100% of any other assets owned by [QVCG]," which theoretically included QVCG's equity in CBI.[210]

70.     On February 26, 2026, Milbank sent Katten a counter to the QVC/LINTA proposal.[211]  Also on February 26, 2026, the QVC and QVCG Disinterested Directors came to an agreement in principle on the $400 million GUC claim amount, subject to overall resolution.[212]  At the time of this agreement, ownership and funding of CBI was still subject to negotiation.[213]     However, QVCG's Special Committee (through statements of counsel), had agreed to no distributions for the Preferred Shareholders as part of the settlement.[214]  Mutual releases were also agreed upon, including a release of QVCG from the DTL (through QVC's assumption of it) and a release for the Preferred Shareholders.[215]

71.     On February 27, 2026, Katten circulated a proposed response, subject to client signoff, to Milbank regarding the QVC/LINTA settlement.[216]

72.     Also on February 27, 2026, counsel from Cleary Gottlieb Steen & Hamilton LLP ("Cleary") contacted Kirkland on behalf of certain Preferred Shareholders regarding conduct in connection with the Debtors' restructuring negotiations.[217]  In the letter from Cleary, counsel advised Kirkland that the Board of QVCG owes fiduciary duties solely to QVCG and its stakeholders—not any of its subsidiaries or their creditors; that significant asset value still existed at QVCG; and that

[210] 02-25-26, 02-26-26 Emails Between Kobre and Katten, DX-037, ECF No. 340-037.
[211] Liberty Interactive, LLC and QVC, Inc. Proposed Settlement Framework, DX-416, ECF No. 393-009.
[212] 02-26-26 Email Between Katten and Kobre, JX-082, ECF No. 450-003.
[213] 02-26-26 Email Between Katten and Kobre, JX-082, ECF No. 450-003.
[214] 02-26-26 Email Between Katten and Kobre, JX-082, ECF No. 450-003.
[215] 02-26-26 Email Between Katten and Kobre, JX-082, ECF No. 450-003.
[216] 02-27-26 Email Between Katten and Milbank, With QVC/LINTA Proposal Markup Attached, DX-417, ECF No. 393-010.
[217] 02-27-26 Letter from Cleary to K&E, JX-041, ECF No. 341-112.

those certain Preferred Shareholders were willing to engage the Board of QVCG in a constructive dialogue regarding these matters and the terms of the potential forthcoming settlement.[218] Despite the letter from Cleary, QVCG's Special Committee never engaged with any Preferred Shareholder prior to the eventual consummation of the Intercompany Settlement.[219] Regardless, a lack of engagement with the Preferred Shareholders does not necessarily demonstrate bad faith, particularly given the fact that the QVC and QVCG Disinterested Directors negotiated releases for the Preferred Shareholders. There is no direct or credible evidence the settlement was agreed upon with any intention of disenfranchising the Preferred Shareholders.

73. On February 28, 2026, the Special Committees at QVC and LINTA arrived at an agreement on the LINTA/QVC Joint Settlement Framework.[220]

74. On March 1, 2026, the Special Committees at QVC and QVCG arrived at an Agreement in Principle on the QVCG/QVC settlement, with the $400 million allowed GUC claim and mutual releases, but subject to a forthcoming CBI funding analysis.

75. On March 10, 2026, Kirkland circulated a draft plan and certain creditor facing materials incorporating the Disinterested Directors' QVCG/QVC settlement framework.[221] The draft plan reflected the Agreement in Principle that as part of the QVCG/QVC

---

[218] 02-27-26 Letter from Cleary to K&E, JX-041, ECF No. 341-112.

[219] *Meltzer Testimony*, Day 3: 325:11–14; 326:4–8; 327:3–8. The QVCG Disinterested Directors understood Cleary purported to represent approximately 1-2% of the Preferred Shareholders. *Melter Testimony*, Day 3: 205:11–14. Around the Fall of 2025, the Debtors received correspondence from Houlihan Lokey ("Houlihan") on behalf of a certain unspecified percentage of QVCG preferred equity holders. *Wafford Testimony*, Day 1: 328:23–329:17. After the Debtors' advisors replied back to Houlihan, the Debtors "really didn't hear anything beyond that." *Wafford Testimony*, Day 1: 328:23–329:17. The correspondence from Cleary on behalf of certain Preferred Shareholders was received months later, at a time when the Disinterested Directors' investigations and negotiations were substantially under way.

[220] 02-26-26 Through 03-01-26 Emails Between Milbank and Katten, DX-419, ECF No. 393-012.

[221] 02-23-26 Emails From Kirkland, DX-242, ECF No. 341-116.

settlement, QVC would receive (i) an allowed GUC claim of $400 million against QVCG; (ii) all of QVCG's Distributable Cash; and (iii) QVCG's interests in CBI.[222]

76. On March 20, 2026, Kirkland circulated a CBI Funding Analysis generated by AlixPartners to the Special Committees' counsel.[223] With respect to the ultimately agreed-on CBI transfer, the Disinterested Directors at QVC and QVCG had a parallel (but independently formulated) understanding that, based on AlixPartners' five-year financial projection and its funding analysis, CBI's horizon for funding itself after the reorganization was dubious, if not bleak.[224] Both sets of Disinterested Directors recognized CBI would have potential synergies with QVC as its parent,[225] namely from (i) being able to participate in QVC's UPS Agreement; (ii) access to new employees; (iii) access to outside professional services; (iv) access to information technology and audit services; and (v) distribution of management fees.[226]

77. On March 30, 2026, the Joint Debtor Advisors circulated a Company Term Sheet reflecting agreements in principle among the Disinterested Directors at the Key Entities.[227]

---

[222] 02-23-26 Emails From Kirkland at 25, DX-242, ECF No. 341-116.

[223] Restructuring Funding Analysis (CBI), DX-265, ECF No. 343-013.

[224] Cornerstone Brands, Inc. 5 Year Financial Projections, Dated December 2025, JX-004, ECF No. 340-013; Restructuring Funding Analysis (CBI), Dated 03-20-2026, DX-265, ECF No. 343-013; *Keyes Testimony*, Day 1: 280:21–281:3.

[225] The expert report at DX-384, ECF No. 345-027, which provides a "football field" valuation of CBI relying on discounted cash flow and comparable companies analyses, was excluded from evidence and therefore the Court shall not consider it. ECF No. 421. Mr. Griffin, however, testified as to his basis for formulating the valuation. The Disinterested Directors also conveyed an understanding that in their view, CBI would be benefitted from being housed under QVC rather than in its own silo under QVCG.

[226] Cornerstone Brands, Inc. Separation Evaluation (Update to V12.18.25), Dated 01-09-2026, DX-255, ECF No. 343-003.

[227] Company Term Sheet, JX-100, ECF No. 499-021.

78.     On April 7, 2026, Katten sent Kobre a revised term sheet regarding the QVCG/QVC settlement.[228]

79.     Between April 8, 2026, and April 15, 2026, conversations between the Special Committees continued regarding CBI.[229]   The Debtors and certain creditors exchanged terms sheets as well as drafts of the plan and RSA incorporating potential settlements.[230]

80.     On April 13, 2026, Katten sent a final markup of the QVCG/QVC Settlement Term Sheet.[231]   Under this version, QVC received 100% of QVCG's CBI interest, all QVCG's Distributable Cash, and its Remaining Assets.  New cash-use covenants and a fiduciary out were also added.  The next day, Kobre sent back a copy of that version with its own comments attached, subject to client review and approval.[232]

81.     On April 14, 2026, the Special Committee of QVCG formally approved the Intercompany Settlement terms.[233]  Also, a final pre-filing term sheet was circulated, containing RSA termination right and cash restriction provisions.

82.     On April 16, 2026, the Governing Bodies granted unanimous written consent to authorize the Debtors' bankruptcy filing

---

[228] Settlement Term Sheet Regarding Intercompany Claims Between QVC Group, Inc. and QVC, Inc., DX-278, ECF No. 343-026.

[229] 02-23-26 Through 04-12-26 Emails Between Kirkland, DPW, and STB, JX-043, ECF No. 341-117; 02-26-26 Through 04-15-26 Emails Between Kirkland and Akin, DX-246, ECF No. 341-120.

[230] 02-23-26 Through 04-12-26 Emails Between Kirkland, DPW, and STB, JX-043, ECF No. 341-117; 02-26-26 Through 04-15-26 Emails Between Kirkland and Akin, DX-246, ECF No. 341-120.

[231] 02-25-26 Through 04-13-26 Emails Between Katten and Kobre, DX-036, ECF No. 340-036.

[232] 02-22-26 Through 04-14-26 Emails Between Katten and Kobre, DX-041, ECF No. 340-041.

[233] 04-14-26 Meeting Minutes of Special Committee of the Board of Directors of QVCG, DX-096, ECF No. 340-096.

and entry into the RSA.[234]  That same day, the Debtors filed voluntary petitions for chapter 11 bankruptcy.[235]

### C.  Overview of the Intercompany Settlement.

83.  Under the final terms of the Intercompany Settlement, QVCG got (i) a full resolution of and releases from all potential claims from QVC, including avoidance claims and tax indemnity claims, which had potential aggregate liability of in excess of $1 billion; (ii) a shift of QVCG's liability under the DTL (under which the aggregate liability could theoretically exceed $ 1 billion) to QVC, with tax insurance being funded by the proceeds of all QVC's allowed claims against QVCG; (iii) no obligation to bear shared post-petition administrative costs or costs associated with the Joint Debtor Advisors; (iv) guaranteed unimpairment of all third-party GUC claims, totaling approximately $15 million; and (v) releases for Preferred Shareholders on potential claims arising from the $456 million QVCG Preferred Dividends.[236]  In exchange, QVCG gave QVC (i) a $400 million allowed GUC claim against it and (ii) all QVCG's Distributable Cash which under the terms of the Plan included QVCG's 62% equity stake in CBI.[237]

84.  Under the Intercompany Settlement, LINTA got (i) a resolution of and release from all potential claims from QVC, including avoidance claims, which had potential aggregate liability in excess of $2.1 billion; (ii) a recovery for Holders of Allowed LINTA Notes Claims in their pro rata share of LINTA Distributable Cash, which would include approximately $88 million of cash LINTA retained prepetition, plus an approximately $23.3 million distribution from QVC as part of settling LINTA's potential intercompany claims, minus certain administrative, allowed secured, and allowed GUC claims; and (iii) no obligation to bear shared post-petition administrative costs or costs

---

[234] 04-16-26 Omnibus Unanimous Written Consent in Lieu of a Special Meeting of the Governing Bodies, DX-375, ECF No. 345-018.

[235] ECF No. 1.

[236] *See generally Plan.*

[237] *See generally Plan.*

associated with the Joint Debtor Advisors.[238]  In exchange, LINTA gave QVC (i) complete disallowance of the LINTA Promissory Note and (ii) a mutual resolution of and release from all potential intercompany claims from LINTA.[239]

85.     Under the Intercompany Settlement, CBI got (i) increased likelihood of going-concern preservation, including the increased ability to continue at least near-term operations, and a favorable set-up for business overhead and administrative costs, by virtue of being transferred to QVC and (ii) unimpairment of all claims.[240]

86.     Under the Intercompany Settlement, QVC got (i) a resolution of and release from all potential intercompany claims from LINTA; (ii) disallowance of the LINTA Promissory Note; (iii) a $400 million GUC claim against QVCG, to be funded by all QVCG's Distributable Cash, comprised of approximately $195 million and QVCG's 62% equity stake in CBI[241]; (iv) a potentially shorter stay in chapter 11, reducing chances of business disruptions as the remaining operating entity under the settlement; and (v) go-forward control over consolidated tax return compliance, including the ability to make certain relevant tax elections otherwise not available under the current Q Consolidated Group scheme.[242]  In exchange, QVC gave (i) LINTA a release of all QVC's potential intercompany claims against it, totaling approximately $1.8-$2.1 billion; (ii) LINTA a distribution of $23.3 million, and permitted LINTA to keep its approximately $88 million in prepetition cash; (iii) QVCG a release of all QVC's potential intercompany claims against it, totaling approximately $1-3 billion (accounting for the DTL indemnity claim and potential prejudgment

---

[238] *See generally Plan.*

[239] *See generally Plan.*

[240] *See generally Plan.*

[241] To be clear, the Plan does not quantify the value of QVCG's equity interest in CBI, but rather contemplates that QVCG will transfer to QVC all QVCG's Distributable Cash, which impliedly includes QVCG's equity in CBI.  *See Plan*, Article III.B.4.; Article IV.B; *see also* ECF No. 212 Ex. C. (Restructuring Steps Plan, providing Debtors method for transferring QVCG's equity in CBI to QVC).

[242] *See generally Plan.*

interest); (iv) QVCG the benefit of assuming all its liability under the DTL; (v) the Preferred Shareholders a release of all potential claims for QVCG Preferred Dividends assertable by QVC on behalf of QVCG, totaling approximately $456 million; and (vi) all Parties the benefit of assuming responsibility for all post-petition Joint Debtor Advisor fees, alleviating the need for "true-ups" from each Key Entity for post-petition administrative fees theretofore accrued but not yet paid.[243]    The Intercompany Settlement also enabled the Debtors to pay all third-party GUC claims in full under the terms of the Second Amended Plan.[244]

## III.    CLASSIFICATION UNDER THE PLAN, THE NOTICING PROCESS, SOLICITATION PROCESS AND VOTING RESULTS.

87.    The Plan establishes four groups of Classes corresponding to each of the four Key Entity Debtors (QVCG,[245] QVC,[246] LINTA,[247] CBI[248]).  In total, there are three voting Classes: two in Class B (RCF

---

[243] *See generally Plan.*

[244] *See generally Plan.*

[245] Class A, which classifies Claims against and Interests in QVCG is comprised of eight subclasses.  Four subclasses of A are unimpaired, are presumed to accept, and therefore not entitled to vote.  One of those subclasses is the "QVC-QVCG Settlement Claim."  Three other subclasses of A are impaired, are deemed to reject, and therefore are not entitled to vote.  The remaining subclass is classified either as unimpaired and presumed to accept, or impaired and deemed to reject, but otherwise is not entitled to vote.

[246] Class B, which classifies Claims against and Interests in QVC is comprised of eight subclasses.  Three subclasses are unimpaired, are deemed to reject, and therefore are not entitled to vote.  One is impaired, deemed to reject, and not entitled to vote.  Two are either unimpaired and presumed to accept, or impaired and deemed to reject; but otherwise not entitled to vote.  The remaining two subclasses—RCF Claims against the QVC Debtors, and QVC Notes Claims against the QVC Debtors—are impaired and entitled to vote.

[247] Class C, which classifies Claims against and Interests in LINTA, is comprised of seven subclasses.  Three are unimpaired, presumed to accept, and not entitled to vote.  One is impaired, deemed to reject, and not entitled to vote.  Two are either unimpaired and presumed to accept, or impaired and deemed to reject, but otherwise are not entitled to vote.  One—LINTA Notes Claims—is impaired and entitled to vote.

[248] Class D, which classifies Claims against and Interests in CBI, is comprised of six subclasses.  Three are unimpaired, presumed to accept, and note entitled to vote.  Two are either unimpaired and presumed to accept, or impaired and deemed to reject,

Claims, and QVC Notes Claims), and one in Class C (LINTA Notes Claims) (collectively, the "Voting Classes").

88. On April 16, 2026, prior to commencing these chapter 11 cases, the Debtors instructed their Soliciting Agent, Kroll, to distribute, via electronic mail or mail, as applicable, Solicitation Packages containing the Disclosure Statement (including all exhibits attached thereto), the Plan, and the applicable Ballot to each member of the Voting Classes entitled to vote on the Plan as of April 13, 2026 (the "Voting Record Date").[249] Each holder of a Claim to whom a Solicitation Package was transmitted was directed in the Disclosure Statement and applicable Ballot to follow the instructions contained in the Ballot (as described in the Disclosure Statement) to complete and submit its respective Ballot to cast a vote to accept or reject the Plan.[250] Each holder of a Claim was informed in the Disclosure Statement and applicable Ballot that such holder needed to submit its Ballot such that it was actually received by Kroll by May 19, 2026, at 11:59 p.m. CT (the "Voting Deadline").[251]

89. On the Petition Date, each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.[252] On or around the same day, the Debtors also filed the Plan, Disclosure Statement, and Scheduling Motion, pursuant to which the Debtors sought to schedule a Combined Hearing on approval of the Disclosure Statement and Confirmation of the Plan and related objection deadlines.[253] On April 17, 2026, this Court entered the Order (I) Scheduling a Combined Disclosure Statement and Plan Confirmation Hearing, (II) Approving the Solicitation Procedures, (III) Approving the Deadlines and Notices Related Thereto, (IV) Waiving Certain Requirements in Connection

---

but otherwise are not entitled to vote. The remaining is impaired, deemed to reject, and not entitled to vote.

[249] *See* ECF No. 364 ¶ 7 [hereinafter "*Voting Report*"].
[250] *Voting Report* ¶ 8.
[251] *Voting Report* ¶ 11.
[252] ECF No. 1.
[253] ECF Nos. 15, 14, 41.

Therewith, and (V) Granting Related Relief (the "Scheduling Order"), which (i) established May 19, 2026, at 11:59 p.m. CT as the deadline to object to the adequacy of the Disclosure Statement and confirmation of the Plan (the "Objection Deadline") and (ii) approved the form and manner of the Combined Hearing Notice and the Publication Notice.[254]

90.     Starting on April 17, 2026, the Debtors mailed, or caused to be delivered, the Combined Hearing Notice.[255]  The Combined Hearing Notice informed recipients of: (i) the commencement of these Chapter 11 Cases on April 16, 2026; (ii) the scheduling of the Combined Hearing to consider approval of the Disclosure Statement and Confirmation of the Plan on May 26, 2026, at 9:00 a.m. CT[256]; (iii) the key terms of the Plan, including classification and treatment of Claims and Interests; (iv) key dates and information regarding approval of the Disclosure Statement, Confirmation of the Plan, and the Objection Deadline; (v) the methods by which parties may request copies of the Plan and Disclosure Statement; and (vi) the full text of the release, exculpation, and injunction provisions set forth in the Plan.[257]  In addition, the Debtors caused the Publication Notice to be published in the *New York Times* (national edition) on April 23, 2026,[258] and in the *New York Times* (international edition) on April 27, 2026.[259]  The Combined Hearing Notice was also made available at no charge on the public website maintained by Kroll at: https://restructuring.ra.kroll.com/QVC.

91.     Certain Holders of Claims and Interests were not solicited because such Holders are (i) unimpaired under the Plan and therefore conclusively presumed to have accepted the Plan pursuant to § 1126(f), or (ii) impaired and not entitled to receive a distribution under the Plan,

---

[254] ECF No. 70.

[255] ECF No. 70 Ex. 1 (Combined Hearing Notice).

[256] The Combined Hearing was ultimately continued by stipulation until June 4, 2026, at 1:00 p.m. CT.  ECF No. 327.

[257] *See* ECF No. 80.

[258] *See* ECF No. 127.

[259] *See* ECF No. 146 (actual date of publication on April 29, 2026).

and therefore conclusively deemed to reject the Plan pursuant to § 1126(g) (collectively, the "Non-Voting Classes").[260] Instead, shortly after the Petition Date, the Debtors mailed, or caused to be delivered, to all Holders or potential Holders of Claims and Interests in the Non-Voting Classes the Notice of Non-Voting Status, which informed recipients of their status as ineligible to vote (either as presumed to accept the Plan or deemed to reject it) and, as applicable, gave the Non-Voting Classes that were presumed to accept the Plan an opportunity to opt out of the Third-Party Releases in the Plan, or gave the Non-Voting Classes deemed to reject the Plan an opportunity to opt in.[261]

92. On May 12, 2026, the Debtors filed and served the Notice of Filing of Plan Supplement, which included then-current drafts of the following exhibits: (i) the Schedule of Retained Causes of Action; (ii) the Rejected Executory Contracts and Unexpired Lease List (reflecting no rejections); and (iii) the Restructuring Steps Plan.[262] On May 19, 2026, the Debtors filed and served the Second Notice of Filing of Plan Supplement, which included certain of the ABL Facility Documents (including the executed commitment letter).[263] On May 19, 2026 the Debtors filed their First Amended Chapter 11 Plan, and on June 2, 2026, filed their Second Amended Chapter 11 Plan.[264] On June 12, 2026, the Debtors filed and served the Third Notice of Filing of Plan Supplement, which included certain ABL Facility Fee Letters filed under seal.[265]

93. The Debtors completed their solicitation on the Voting Deadline.[266] The Debtors completed their tabulation of the Ballots shortly thereafter, following a complete review and audit of all received

---

[260] *See Voting Report* ¶ 7; *Disclosure Statement*.

[261] *Voting Report* ¶ 7. The Debtors did not mail Notices of Non-Voting Status to classes of intercompany claims, *i.e.*, Classes A4, A5, B6, B7, C5, C6, D4 and D5.

[262] ECF No. 212.

[263] ECF No. 293.

[264] ECF Nos. 289, 389.

[265] ECF No. 503. This filing was made after the Court closed the evidentiary record of the Combined Hearing.

[266] *Voting Report* ¶¶ 11, 13–14.

Ballots.[267] Each of the Voting Classes voted to accept the Plan, as follows:

| Classes | Accept | | Reject | |
|---|---|---|---|---|
| | Number (% of Number Voting) | Amount (% of Amount Voting) | Number (% of Number Voting) | Amount (% of Amount Voting) |
| **Class B3** RCF Claims against the QVC Debtors | 17 (100%) | $3,034,444,444.40 (100%) | 0 (0%) | $0.00 (0%) |
| **Class B4** QVC Notes Claims against the QVC Debtors | 1,096 (85.56%) | $1,111,733,174.46 (99.88%) | 185 (14.44%) | $1,359,558.42 (0.12%) |
| **Class C3** LINTA Notes Claims against the LINTA Debtors | 865 (81.91%) | $904,963,513.00 (98.95%) | 191 (18.09%) | $9,971,200.00 (1.05%) |

## V. THE PREFERRED SHAREHOLDERS' MOTION TO TERMINATE EXCLUSIVITY AND OBJECTIONS TO CONFIRMATION.

94.     Leading up to the Combined Hearing, the Debtors received six formal objections, one reservation of rights, and certain informal objections to the Disclosure Statement and Plan.[268] Prior to the Combined Hearing, the Debtors resolved drafting issues raised by certain arbitration claimants,[269] as well as all informal objections through modifications to the Plan and agreed language for a potentially forthcoming proposed Confirmation Order. To date, five outstanding

---

[267] *See Voting Report* ¶ 15.

[268] ECF No. 291; ECF No. 318; ECF No. 295; ECF No. 299; ECF No. 300; ECF No. 338; ECF No. 322.

[269] ECF No. 322.

objections remain, as well as the Preferred Shareholders Motion to Terminate Exclusivity, further described below.

95.    On May 8, 2025, the Preferred Shareholders filed their Emergency Motion to Terminate Exclusivity Under 11 U.S.C. § 1121(d).[270]    In the Motion to Terminate Exclusivity, the Preferred Shareholders argue *inter alia* there is no basis to approve the Intercompany Settlement under Bankruptcy Rule 9019, and that the Debtors' proposed Plan—built on the RSA and Intercompany Settlement—is unconfirmable.[271]    The Preferred Shareholders argue against the procedural and economic fairness of the Intercompany Settlement, as well as the proposed treatment of Preferred Equity as a Class under the terms of the Plan.[272]    The Preferred Shareholders request the Court terminate the Debtors' Exclusive Periods, and have the Preferred Shareholders' proposed plan for QVCG considered in tandem with the Plan proposed by the Debtors.[273]

96.    On May 25, 2026, the Preferred Shareholders filed their Objection to Confirmation of the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization.[274]    The Preferred Shareholders in their objection reiterate their position laid out in the Motion to Terminate Exclusivity, that there is no basis to approve the Intercompany Settlement under Rule 9019, and that the Debtors' proposed Plan is unconfirmable based on a failure to comport with various provisions of § 1129 of the Bankruptcy Code.[275]

97.    On May 19, 2026, the United States Trustee (the "U.S. Trustee") filed its Objection to Confirmation of the First Amended Joint

---

[270] ECF No. 205.  As noted *supra*, prior to filing their Motion to Terminate Exclusivity, certain Preferred Shareholders had filed an Emergency Motion for Entry of an Order Directing the Appointment of an Official Committee of Preferred Equity Security Holders.  ECF No. 133.  These Preferred Shareholders later withdrew their motion voluntarily.

[271] ECF No. 207.

[272] ECF No. 207.

[273] ECF No. 207.

[274] ECF No. 318.

[275] ECF No. 316.

Prepackaged Plan of Reorganization of QVC Group, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code.[276] The U.S. Trustee initially objected to the Plan on grounds that (i) the Bankruptcy Code does not authorize the nonconsensual release of non-debtor third parties by other non-debtor third parties; (ii) the Debtors' proposed opt out provisions in the Ballots and the Non-Voting Notices are ineffective to confer affirmative consent to the Third-Party Releases in the Plan; (iii) the Plan includes a permanent injunction provision that violates Fifth Circuit precedent set forth in *Highland Capital II*[277] and the Bankruptcy Code; (iv) the Plan should expressly state that it does not release claims asserted by governmental entities acting under the police and regulatory authority; and (v) the Plan seeks a waiver of the 14-day stay required under Rule 3020(e) without a legal or factual basis to substantiate such waiver.[278] As of the conclusion of the Combined Hearing, the Debtors worked with the U.S. Trustee to resolve objections (iii)-(v). The U.S. Trustee continues to stand on its arguments with respect to the Plan's proposed use of Third-Party Releases, and the opt out mechanism as a means of conferring affirmative consent.

98. On May 19, 2025, interested party Guowei Zhang filed his Objection to Confirmation of the Debtors' Chapter 11 Plan and Request for Continuance, Additional Disclosure, and Preservation of Rights.[279] In his objection, Mr. Zhang requests the Court not confirm the Debtors' proposed Plan prior to the IRS, equity holders, and other interests parties having a chance to examine the nature of the Debtors' exposure under the DTL and proposed treatment of the LINTA Exchangeable Notes, as well as the intercompany account history and valuation

---

[276] ECF No. 291.

[277] *Highland Cap. Mgmt. Fund Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 132 F.4th 353 (5th Cir. 2025) [hereinafter "*Highland II*"].

[278] ECF No. 291, at 2 ¶ 1.

[279] ECF No. 295.

analyses which serve as a basis for the Intercompany Settlement and $400 million GUC claim amount.[280]

99.     On May 18, 2026, interested party Salil Rajadhyaksha, acting individually and as "attorney-in-fact" for certain Class A7 (QVCG Common Equity Interests) and Class A6 (QVCG Preferred Equity Interests) Holders, filed his Objection to Confirmation of the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization.[281]  On May 20, 2026, Mr. Rajadhyaksha filed a supplemental objection.[282]  In his objections, Mr. Rajadhyaksha asserts a variety of arguments as to why the Plan does not meet various requirements of § 1129, why the Disclosure Statement does not provide adequate information as required by § 1125(a)(1), and why the Plan's proposed debtor release under § 1123(b)(3)(A) is not appropriate.[283]

100.     On May 28, 2026, interested party Bhavin Shah filed his Objection to Confirmation of the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization.[284]  In his objection Mr. Shah argues *inter alia* the Plan was not proposed in good faith, the Disclosure Statement lacks adequate information, and the terms of the Intercompany Settlement are questionable, unfair to common equity holders, and deserve greater scrutiny.[285]

101.     On June 4, 2026, the Court held the first day of the four-day long Combined Hearing, where it considered the Second Amended Plan,[286] Disclosure Statement,[287] and Motion to Terminate Exclusivity.[288]  Testimony was adduced from the Debtors' witnesses Ted Stafford (partner at AlixPartners in the investigations, disputes, and

---

[280] ECF No. 295.
[281] ECF No. 299.
[282] ECF No. 300.
[283] ECF Nos. 299, 300.
[284] ECF No. 338.
[285] ECF No. 338.
[286] ECF No. 389.
[287] *Disclosure Statement.*
[288] ECF No. 421.

risk group), Paul Kearns (the Debtors' vice president of tax), Jason Keyes (partner and managing director at AlixPartners in the turnaround and restructuring group), Bill Wafford (the Debtors' Chief Financial Officer), Patrick Griffin (vice president at Evercore in the restructuring liability management group), Thomas Walper (Disinterested Director at LINTA), Paul Keglevic (Disinterested Director at QVC) and Roger Meltzer (Disinterested Director at QVCG).[289] The Court finds each of the Debtors' witnesses were highly credible based on their years of experience in the legal or business fields, as well as their personal knowledge about the Debtors. While the Preferred Shareholders sought admission of various exhibits throughout the course of the Combined Hearing, they chose not to put up their own witnesses after the Debtors rested.[290] On June 10, 2026, the Court heard closing arguments on the Second Amended Plan, Disclosure Statement, and Motion to Terminate Exclusivity, and at the conclusion of the Combined Hearing took all matters under advisement.[291]

## CONCLUSIONS OF LAW

### I. JURISDICTION & VENUE.

28 U.S.C. § 1334(a) provides district courts with jurisdiction over this proceeding. 28 U.S.C. § 157(b)(1) states that "[b]ankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title." This proceeding has been referred to this Court under General Order 2012-6 (May 24, 2012). This Court has jurisdiction in this proceeding as it is a core proceeding which the Court can consider under 28 U.S.C. § 157(b)(2)(A), (B), and (L). The Court has constitutional authority to

---

[289] ECF Nos. 421, 443, 461.

[290] ECF No. 461.

[291] ECF No. 486. The Court also took under advisement the Debtors' recently filed Emergency Motion Pursuant to Section 345(b) of the Bankruptcy Code Seeking an Extension to Comply with Section 345 of the Bankruptcy Code on an Interim Basis. ECF No. 362.

enter final orders and judgments. *Stern v. Marshall*, 564 U.S. 462, 486–87 (2011). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

## I.   WHETHER THE INTERCOMPANY SETTLEMENT SATISFIES BANKRUPTCY RULE 9019.

Under § 1123(b)(3)(A) of the Bankruptcy Code, a plan may provide for the settlement of any claim or interest belonging to the debtor or the estate.   11 U.S.C. § 1123(b)(3)(A).   In considering settlements under § 1123(b)(3)(A), bankruptcy courts apply the same legal test used to approve settlements under Bankruptcy Rule 9019— that is, whether the settlement is fair and equitable and in the best interest of the estate. *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980) (citing *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc.*, 390 U.S. 414, 424–25 (1968)). In considering whether a settlement is fair and equitable, courts in the Fifth Circuit apply a three-part test:

> (i) the probability of success in the litigation, with due consideration for the uncertainty in fact and law;
>
> (ii) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay; and
>
> (iii) all other factors bearing on the wisdom of the compromise.

*Id.* The "other factors" under prong three, also referred to as the *Foster Mortgage* factors, include: (i) "the best interests of the creditors, 'with proper deference to their reasonable views'"; and (ii) "'the extent to which the settlement is truly the product of arm's-length bargaining, and not of fraud or collusion.'" *Off. Comm. of Unsecured Creditors v. Moeller (In re Age Ref. Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015) (quoting *In re Foster Mortg. Corp.*, 68 F.3d 914, 917–18 (5th Cir. 1995)). The Debtors, as proponents of the Intercompany Settlement, have the burden of establishing that a balance of the above factors leads to a fair and equitable compromise. *In re Allied Props., LLC*, No. 06-33754, 2007 WL 1849017, at *4 (Bankr. S.D. Tex. June 25, 2007). The burden under

Rule 9019 is not a high one. The Debtors need only show that the settlement falls within the "range of reasonable litigation alternatives." *Id.*

### A. Whether the Intercompany Settlement Warrants Business Judgment Deference.

In general, when considering whether to approve a settlement, the Court gives "[g]reat judicial deference . . . to the [debtors'] exercise of business judgment." *See In re Robertshaw US Holding Corp.*, 662 B.R. 300, 314 (Bankr. S.D. Tex. 2024). The Preferred Shareholders argue that because the proposed Intercompany Settlement is between Debtor-insiders, it should be subject to the heightened "entire fairness" standard of review. The Preferred Shareholders argue the QVCG Disinterested Directors were not adequately informed of the settlement due to a fundamentally flawed process, and that they effectively deferred to the other Key Entity Disinterested Directors and the Joint Debtor Advisors throughout the negotiation. Accordingly, the Preferred Shareholders argue entire fairness applies, and the Court should consider both the fairness of the parties' dealing (the process) and the fairness of the price (the substance) in evaluating whether to approve the Intercompany Settlement.

Notably, the Fifth Circuit has not adopted a categorical rule requiring application of entire fairness to a 9019 merely because the settlement involved debtor-affiliates. Entire fairness review as a concept derives from state-level corporate law principles. *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983). Courts apply entire fairness when the facts of the case demonstrate one party stands on both sides of the transaction. *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 405 (S.D. Tex. 2008) (citing *Weinberger*, 457 A.2d at 710). The Preferred Shareholders cite numerous cases where courts expressly incorporate entire fairness review when evaluating certain transactions in the bankruptcy context, including settlements of estate causes of action.[292]

---

[292] *See e.g.*, *In re Vanderbilt Minerals, LLC*, No. 26-60110 (WAK), 2026 WL 1138767, at *6 (Bankr. S.D.N.Y. Apr. 27, 2026) (applying entire fairness to proposed

61 / 103

Those courts, however, applied heightened scrutiny only after finding the underlying transactions were conflicted.[293]

Despite the Key Entities indisputably being statutory "insiders" under the Bankruptcy Code, 11 U.S.C. § 101(31)(E), 101(2)(A), [Findings of Fact 2], the Key Entities appointed Disinterested Directors at each silo to investigate the historical intercompany transactions, and to negotiate on behalf of themselves and their respective stakeholders. [Findings of Fact 13–14]. Each Disinterested Director was in turn represented by their own respective conflicts counsel. [Findings of Fact 13–16]. No direct evidence was introduced to demonstrate (i) the siloed structure of the Disinterested Directors and Special Committees at each Key Entity was deficient to resolve potential conflicts; (ii) that the Disinterested Directors themselves were conflicted; or (iii) that conflicts counsel was conflicted/created a conflict. The Disinterested Directors stood to receive releases under the Plan, and were compensated in association with their having rendered services for each respective Debtor-entity during the course of the investigation, negotiation, and reorganization. Debtor-releases and professional compensation of this kind are standard practices and are not at all out of the ordinary. That the Intercompany Settlement resolved potential avoidance and illegal dividend claims for QVC dividends to QVCG, and QVCG Preferred Dividends to Preferred Shareholders did not create a conflict, because the recently-appointed Disinterested Directors were the ones

---

settlement of estate claims); *In re Latam Airlines Group, S.A.*, 620 B.R. 722, 769–70 (Bankr. S.D.N.Y. 2020) (applying entire fairness to proposed DIP financing transaction); *In re Soundview Elite Ltd.*, 594 B.R. 108, 129 (Bankr. S.D.N.Y. 2018) (applying entire fairness to equity sale transaction).

[293] *In re Vanderbilt Minerals, LLC*, 2026 WL 1138767, at *6 (applying entire fairness after parties agreed at hearing that was the standard to be employed, "given the insider transactions at issue"); *In re Latam Airlines Group, S.A.*, 620 B.R. at 769–70 (applying entire fairness after finding parties to certain tranche of DIP financing transaction were present on both sides of the transaction due to shared equity ownership); *In re Soundview Elite Ltd.*, 594 B.R. 108, 129 (Bankr. S.D.N.Y. 2018) (applying entire fairness where sign-off board members sat as directors for entities on both sides of transaction, transaction lacked independence, and transaction was facilitated using insider affiliates).

investigating, negotiating, and proposing to release these claims—not the directors who authorized the dividends to begin with.

The Joint Debtor Advisors facilitated information flow between the company and each Disinterested Director group, providing diligence, fund flow analyses, financial projections, solvency analysis, and valuation analysis of various Debtor entities to equally and adequately inform them of the intercompany transactions and potential intercompany claims. [Findings of Fact 18–24, 59–82]. The Joint Debtor Advisors did not, however, tell the Disinterested Directors what opinions to formulate, or what conclusions to arrive at with respect to the investigation and negotiation. They each made their own independent determinations, through the advice of counsel, as to the existence and magnitude of potential claims, and the legal or factual issues that may exist within them. [Findings of Fact 18–24, 47–57].

The Preferred Shareholders argue the $400 million GUC claim was manufactured to support the other Debtors' restructuring and evidences a conflict to justify entire fairness review. But they misconstrue the timeline and process of the negotiation. Kobre represented at the February 13, 2026, meeting that QVC's potential claims against QVCG were "without merit" and that QVC was solvent during the relevant time periods according to the Duff & Phelps solvency opinions. [Findings of Fact 61]. The Court has already found this was the most aggressive position Kobre could have taken at the outset of negotiations—posturing, to advance the interests of their client. [*Id.*].

One day before this counsel-only meeting, Kobre advised the QVCG Disinterested Directors of QVCG's potential exposure and precarious position. [Findings of Fact 60, 66]. It therefore comes as no surprise that Kobre/the QVCG Disinterested Directors would ultimately walk back Kobre's initial posturing at the February 13 meeting, once it became apparent the QVC Disinterested Directors also understood they had the leverage in the negotiations. [*Id.*; Findings of Fact 65–73].

63 / 103

This entire process of posturing and walking back is only indicative that the process was robust and at arm's-length, and not a preordained result. The $400 million GUC claim appearing "as early" as February 26, 2026, is a mischaracterization of this robust process. The Disinterested Directors had been engaged in months-long investigations, and had been negotiating at that point for nearly two weeks with increasing intensity. [Findings of Fact 18–25, 59–68]. Kobre even sent a counter to the $400 million at $350 million the day before February 26. [Findings of Fact 69]. The Court concludes the $400 million GUC figure does not evidence a conflicted transaction.

With respect to the Preferred Shareholders' argument that QVCG's Disinterested Directors' reliance on Evercore, a "conflicted financial advisor," evidences a conflict, the Court disagrees as well. Evercore as a Joint Debtor Advisor helped to inform both sides of the transaction, true, but Evercore's analysis was not substantively relied on for the purposes of assessing the merits of claims. [Findings of Fact 48, 49, 50, 61, 66]. The QVC and QVCG Disinterested Directors emphasized time and time again their belief that solvency is litigable— not that they believed, one way or the other, that the Duff & Phelps solvency opinions or Evercore's analyses were the correct ones— although they each independently recognized the Duff & Phelps solvency opinion would be subject to reliability disputes. [*Id.*]. Both sides of the transaction took Evercore's analyses on insolvency as a data point, much like how they took Kirkland's diligence productions and AlixPartners' fund-flow analyses as data points to inform their understanding of the historical transactions and general state of the company. [*Id.*]. Indeed, Evercore used different insolvency metrics than Duff & Phelps , which the Disinterested Directors evidently interpreted not necessarily for the truth of the analysis, but for the fact that if either side chose to pursue the claims, disputed financial analyses—for either side's respective position—would be litigated at the forefront. [*Id.*]. This supposed "reliance" on Evercore as a data point did not serve to conflict the QVCG Disinterested Directors.

64 / 103

With respect to the Preferred Shareholders' argument that the substantive analysis underpinning the terms of the Intercompany Settlement remained entirely opaque prior to the Combined Hearing, this argument is largely an attack on a straw man. The historical intercompany transactions, albeit highly complicated, were clearly laid out in the Disclosure Statement, along with the Disinterested Directors assumptions as to the legal and factual issues existing with respect to all potential claims. [*See Disclosure Statement*]. It was clear from the evidence that QVC had the leverage in the settlement, and the Disinterested Directors knew this. [Findings of Fact 60–82]. If the ultimate terms provide QVC with a higher proportion of "gets" than "gives," that does not indicate a conflict—it demonstrates the result of the Disinterested Directors' interpretation of the data. The valuation of the $400 million GUC claim was explained as the QVC Disinterested Directors' lowest acceptable figure they could possibly make as fiduciaries of the company. [Findings of Fact 64]. They did not explain it as a supposed enterprise valuation of QVCG, nor was there any requirement that their valuation of QVCG would have to correspond to that ultimate allowed claim amount.[294]

The Preferred Shareholders' point that the RSA locked the Parties in before adversarial testing is an argument out of sequence. The terms of the RSA were contingent on the result of the Intercompany Settlement, as evidenced by the negotiation timeline. [Findings of Fact 58–82]. The Boards authorized entry into the RSA only after the terms of the Intercompany Settlement were finalized. [*Id.*]. The Debtors had incentive from the beginning to undergo a rigorous analysis of the claims, because the gives and gets at the QVC and QVCG levels were still uncertain, particularly at the early stages in the negotiation (*e.g.*, the ultimate value of QVC's allowed claim against QVCG, whether to

---

[294] If the $400 million GUC claim was instead $0, would that imply QVCG had an enterprise valuation of $0? Certainly not—it would be interpreted as a strong "get" for QVCG as part of the settlement. This point by the Preferred Shareholders is hard to understand.

make a distribution to the Preferred Shareholders and LINTA stakeholders, and if so, in what amount, *et cetera*). [Findings of Fact 59].

The Preferred Shareholders argument that "all other" stakeholders having participated in the Intercompany Settlement, represented separately by their respective counsel, does not stand to create a conflict in the Intercompany Settlement. Cleary notably did not specify which Preferred Shareholders they represented, or in what amount. The QVCG Disinterested Directors' understanding at the time was Cleary represented 1-2% of the entire Preferred Shareholder body. [Findings of Fact 72]. Moreover, the QVCG Preferred Equity was disparately held, having originated as a distribution on the common. [Findings of Fact 3]. It therefore becomes apparent why the QVCG Disinterested Directors declined to engage with Cleary. The Preferred Shareholders as equity were set to be extinguished under the Plan. Even if an Intercompany Settlement was not negotiated and the claims remained in-tact, extinguishing the QVCG Preferred Equity may have been the result of the reorganization anyways. Certain LINTA Noteholders having been represented by Akin Gump Strauss Hauer & Feld LLP is a false dichotomy. This was a creditor constituency, not equity. Moreover, LINTA had categorically more leverage than QVCG in the negotiations, based on the Disinterested Directors' investigation of the intercompany transactions. [Findings of Fact 48, 51, 84]. LINTA being in a more favorable position than QVCG does not mean a conflict existed.

In sum, the Court concludes the investigation and negotiation of the Intercompany Settlement was not subject to a conflict. Adversarial testing is not a requirement before a settlement can be conflict free.

While this Court does not disagree with the holding of those cases the Preferred Shareholders cited to support the entire fairness inquiry, none are dispositive here because the current facts do not demonstrate

a conflict existed.[295]  Nor does the holding in *Foster Mortgage* warrant application of heightened scrutiny, because there the Fifth Circuit was concerned not just about the proposed settlement of claims having been between insiders, but that an overwhelming majority of creditors in interest opposed such settlement of claims.  68 F.3d at 919.  Here, the only objectors are holders of Preferred Equity Interests and a handful of other *pro se* equity holders.  [Findings of Fact 94–101].  These objectors are not creditors, as was the case in *Foster Mortgage*, but equity.  68 F.3d at 919.  Here, there are no creditors objecting to the proposed Intercompany Settlement and Plan.  [Findings of Fact 94–101].

Accordingly, the Court shall review whether the Intercompany Settlement is fair and equitable and in the best interest of creditors under the more deferential business judgment standard of review.  *In re Robertshaw US Holding Corp.*, 662 B.R. at 314.

### B.  Whether the Intercompany Settlement is Fair, Equitable, and In the Best Interest of Creditors.

### (1)  The Probability of Success in the Litigation, With Due Consideration for the Uncertainty in Fact and Law.

Turning to the first factor, bankruptcy courts need not "conduct a mini-trial to determine the probable outcome of any claims" resolved in the proposed settlement.  *In re Cajun Elec. Power Co-op., Inc.*, 119 F.3d 349, 356 (5th Cir. 1997).  A court need only "appraise [itself] of the relevant facts and law so that [it] can make an informed and intelligent decision[.]"  *In re Age Refining Co.*, 801 F.3d 530, 541 (5th Cir. 2015).  The Court has familiarized itself extensively with the historical intercompany transactions potentially giving rise to avoidance,

---

[295] Moreover, bankruptcy courts in the Second Circuit have noted the issue of whether business judgment was exercised is just one factor to evaluate in reviewing whether a 9019 is fair and equitable, and that the Court must also conduct its own review.  *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 641 (Bankr. S.D.N.Y. 2012); *In re GOL Linhas Aéreas Inteligentes S.A.*, 659 B.R. 641, 651 (Bankr. S.D.N.Y. 2024).

dividend, and tax liability claims. So did the Disinterested Directors, in sufficient manner. [Findings of Fact 18–46].

That the QVCG Disinterested Directors did not formulate a determination on the likelihood of success in prosecuting—or defending—against the claims does not defeat satisfaction of prong one of the 9019 standard. Here, through the course of their investigation and negotiation, the Disinterested Directors believed, and this Court concludes, that the outcome of all potential intercompany claims was highly uncertain. [Findings of Fact 66]. That uncertainty was their understanding going into the settlement, and that was their justification for entering into it. [Findings of Fact 60–68]. The alternative outcome—litigation—was an unpredictable result, and therefore an uncertain return for each Key Entity; but a value destructive process for all Debtors regardless. [Findings of Fact 66]. Through exercise of their fiduciary obligations as directors of their respective Key Entity, they each independently formulated the determination that settling under the terms of the Intercompany Settlement was in the best interest of the Debtors' estate, as well as the Debtors-entities' stakeholders. Under business judgment deference, it is not the province of the Court to second guess those determinations.

True, the Debtors uniformly maintained the position that the DTL would not materialize, which speaks to supposed "certainty" of litigation (or lack thereof) from the IRS and QVC's corresponding indemnity claim. [Findings of Fact 57]. But the magnitude of liability was, in their view, too great not to consider it a highly motivating factor for QVCG to settle QVC's potential claims against it. [Findings of Fact 57, 66]. Moreover, other factors, like QVCG's limited cash on hand, it not having full tax insurance coverage, and the potential change in ownership issue highlight the fact that even though the DTL had a low likelihood of materializing, a mere single digit risk of loss percentage on the DTL threatened to completely wipe QVCG out. [Findings of Fact 57, 66].

True, many of the avoidance claims hinge on certain Key Entities' insolvency, but that issue was, in each of the Disinterested Directors view, litigable both at the QVC and QVCG level. [Findings of Fact 48–50, 61]. Regardless of this uncertainty over proving insolvency of any Key Entities, the Disinterested Directors of QVC were ready to pursue their arsenal of claims if a fast and final resolution was not reached during the negotiation. [Findings of Fact 67]. All Disinterested Directors agreed, however, litigating the avoidance claims was guaranteed to be highly expensive—a potential drawback, if not a negative outcome in any lawsuit pursued. [Findings of Fact 48–50, 61, 66]. The Disinterested Directors at QVCG were therefore presented with the option of either arriving at speedy resolution which, in their view, was value maximizing, or litigating against an entity that has leverage on them, all while relying on a limited asset pool. [Findings of Fact 66]. Again, the 9019 inquiry is focused on whether the settlement was fair, equitable, and in the best interest of *creditors*. Diminishing potential recovery out of estate assets through administrative fee burn for expensive professionals in extensive litigation over complicated intercompany financial transactions is unlikely to promote creditors' interest. The facts here demonstrate that the Disinterested Directors believed settling, rather than litigating, claims, would be more beneficial to creditors generally. The same reasoning applies to the potential illegal dividend claims. Those claims have various legal and factual contingencies that would need to be determined or proved up in litigation. The ultimate result of such a suit is uncertain, but guaranteed to be expensive, much like the avoidance claims. [Findings of Fact 56].

The Preferred Shareholders seem to argue that the Disinterested Directors should be expected to marshal all resources available at QVCG to get something for their constituency. The Court rejects the notion that in order to comply with the standard for Rule 9019, the Disinterested Directors had to expend all resources or exhaust all conceivable settlement options. Instead, the Disinterested Directors achieved a settlement that paid all GUC claims in full, including all

outstanding trade vendor claims at the QVCG level, resolved all potential intercompany claims, took all QVCG's tax risks off the table, and secured a release for the Preferred Shareholders for liability on the QVCG Preferred Dividends.

The Debtors and Preferred Shareholders each hold divergent views on how the landscape of caselaw regarding these potential claims support or detract from their positions.[296] Although argument in briefing does not elucidate what was going through the mind of the Disinterested Directors, particularly given they were represented by separate conflicts counsel during the investigation and negotiation, it speaks to the nature of how complicated, lengthy, costly, and *uncertain* litigating the claims would be.

Based on this uncertainty of result, as well as various negative effects litigating the claims may have had, the Court concludes prong one of the 9019 analysis weighs in favor of concluding the Intercompany Settlement was fair and equitable and in the best interest of creditors.

### (2) *The Complexity and Likely Duration of the Litigation and any Attendant Expense, Inconvenience and Delay.*

Next, the Court will consider the "complexity and likely duration of the litigation and any attendant expense, inconvenience and delay" and the difficulty, if any, to be encountered in collecting a judgment. *In re Jackson Brewing Co.*, 624 F.2d 599, 600.

Each type of potential intercompany claim (avoidance, DTL, illegal dividend) individually would implicate manifold legal issues—both under bankruptcy and applicable non-bankruptcy law—as well as extensive and complicated factual issues, particularly as it related to certain Key Entities' solvency and the reliability of the Duff & Phelps and Evercore insolvency analyses, as well as the extent to which certain Key Entities' had surplus or net profits at relevant time periods. [Findings of Fact 47–57]. The Disinterested Directors understood

---

[296] ECF No. 359; ECF No. 316.

litigating these claims would be a lengthy process, particularly with respect to the avoidance claims given the necessity for extensive expert testimony from financial analysts and/or investment bankers to prove or disprove insolvency at various company levels.  [Findings of Fact 49, 50].  Hiring these experts would be expensive, too.  Again, QVCG would have limited cash available to fund the professionals involved in such a lawsuit, or to pay the experts.  [Findings of Fact 60, 64, 66].  The Disinterested Directors at QVC preferred a quick path to global peace, but were prepared to draw out the process and litigate all claims in its arsenal to maximize returns if an amicable resolution could not be reached.  [Findings of Fact 67].

From a different point of view, the Disinterested Directors also understood that a fast and final resolution of the claims was preferable to the company filing bankruptcy and litigating the claims through separate adversary proceedings between Debtor entities.  [Findings of Fact 67].  The Intercompany Settlement was also more preferrable to them than pursuing confirmation for all Debtors besides QVCG, and leaving that Debtor "on the operating table" with a limited asset pool to litigate (or defend against) the avoidance claims and dividend claims on their merits.  [*Id.*; Findings of Fact 60, 64, 66].  The Court concludes factor two weighs in favor of approving the Intercompany Settlement.

### (3)   *All Other Factors Bearing on the Wisdom of the Compromise.*

With respect to factor three, the *Foster Mortgage* factors ask the Court to consider (i) whether the settlement is in "the best interests of the creditors, 'with proper deference to their reasonable views,'" and (ii) "the extent to which the settlement is truly the product of arm's-length bargaining, and not of fraud or collusion."  68 F.3d at 917–18.

In considering the best interest of creditors, bankruptcy courts should consider the "amount of creditor support for a compromise settlement." *Id.* at 914. The Fifth Circuit was careful to note, however, that it was not creating a categorical rule allowing a majority of creditors to veto a settlement.  Instead, it emphasized that while the desires of

71 / 103

creditors are not binding, a court should consider them when their wishes represent the views of a majority of creditors.

Here, the Court concludes the Intercompany Settlement is in the best interest of creditors within the meaning of *Foster Mortgage* factor one. The Intercompany Settlement functions as the keystone to the RSA and the Plan. Without the settlement, the Debtors face an uncertain future, both in terms of the dark waters of litigating the intercompany claims, as well as funding their go-forward operations absent the proposed reorganization, particularly at the CBI level.

Moreover, no creditor has lobbied an objection to the Intercompany Settlement or the Plan. The only objectors are equity and the U.S. Trustee. The Intercompany Settlement and Plan both have overwhelming creditor support. While typical third-party creditors were not parties to the settlement investigation and negotiation, the Key Entities as creditors of one another each agreed to the compromise, through the representation of the Disinterested Directors.

The Plan, in turn, was accepted by a wide majority of each creditor-voting class. These three Voting Classes were significant both in members and dollar value. [Findings of Fact 93]. For example, the LINTA Noteholders took an approximately 92.5% haircut on their claims; despite this significant reduction, they still voted to accept by a wide majority. On the other hand, QVCG was able to pay all its GUC claims in full, including outstanding trade vendor claims, as a result of the Intercompany Settlement. Under *Foster Mortgage* factor one, the Court is required to defer to creditors' viewpoint that approval of the Intercompany Settlement is appropriate. [297] 68 F.3d at 917–18.

The Preferred Shareholders seek to unwind this compromise between the Debtors and various creditor constituencies—despite the amicable and productive result—for their own potential upside. Their

---

[297] ECF No. 392 (Statement of the Official Committee of Unsecured Creditors in (I) Support of Confirmation of the Plan and (II) Response to the Preferred Shareholder Ad Hoc Group's Objection).

arguments fail to demonstrate the Intercompany Settlement is not in the best interest of creditors, with reasonable deference to their views. *Foster Mortgage* sub-prong one weighs in favor of concluding the Intercompany Settlement was in the best interest of creditors.

Regarding *Foster Mortgage* factor two, the extent to which the settlement is truly the product of arm's-length bargaining, the Court concludes the facts demonstrate the settlement was achieved through a fair, arm's-length process devoid of fraud and collusion. [*See* Findings of Fact 18–82 (detailing both investigation and negotiation)]. The Key Entities were each represented by Disinterested Directors who obtained independent conflicts counsel to represent and advise them throughout their investigation and negotiation. [Findings of Fact 14–16]. The nature of using the Joint Debtor Advisors to facilitate information flow and inform the Disinterested Directors about the company and historical intercompany transactions does not demonstrate the process was not arm's-length.

Nor was the result preordained as the Preferred Shareholders suggest. The company initially proposed different terms for the restructuring than that which were agreed upon by virtue of the Intercompany Settlement. [Findings of Fact 59]. That Kobre proposed releases as the Preferred Shareholders "potential recovery" at the February 12, 2026, status update does not demonstrate them ultimately receiving solely releases under the Intercompany Settlement was a preordained result. [Findings of Fact 60, 68]. Kobre and the QVCG Disinterested Directors negotiated as best they could for a better result both for QVCG and the Preferred Shareholders, as all disinterested fiduciaries are expected. [Findings of Fact 60–68]. The $400 million GUC claim was not arrived at to manufacture Plan confirmation. The QVC Disinterested Directors explained that it was the lowest figure they could accept as fiduciaries. [Findings of Fact 64].

The fact that the QVCG Disinterested Directors did not engage with the Preferred Shareholders or QVCG Preferred Equity Holders during the negotiation process does not demonstrate their ultimate

treatment under the settlement was the product of fraud or collusion by the company or Kirkland. Equity was slated to get wiped out under the Plan, which may have been the case absent the Intercompany Settlement. Under the Intercompany Settlement, those Preferred Shareholders who received the $456 million in aggregate dividends got to keep with their cash, but a release of those claims was not a guaranteed result. Indeed, the initial term sheet authorized by the QVC Disinterested Directors *did not* include releases for the Preferred Shareholders. [Findings of Fact 68]. Accordingly, after considering both *Foster Mortgage* factors, the Court concludes all factors bearing on the wisdom of the compromise supports approval of the Intercompany Settlement.

Based on the extensive evidentiary record before it, the Court finds the settlement is fair and equitable and in the best interest of the estates and their creditors. All factors weigh in favor of an approval of the Intercompany Settlement, and the Court finds it reflects a sound exercise of the Debtors' business judgment. Therefore, the Court approves the Intercompany Settlement.

## III. WHETHER THE PLAN COMPLIES WITH THE REQUIREMENTS OF § 1129.

The Debtors, as the proponents of the Second Amended Plan, have the burden of proving all elements of 11 U.S.C. § 1129(a) by a preponderance of the evidence. *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters.)*, 994 F.2d 1160, 1165 (5th Cir. 1993). The Court concludes that the Debtors have met their burden of proof and that all applicable elements of 11 U.S.C. § 1129 are satisfied. Accordingly, the Court shall confirm the Second Amended Plan.

### (A) Section 1129(a)(1): The Second Amended Plan Complies With the Applicable Provisions of Title 11.

Section 1129(a)(1) provides that a plan must comply with all the applicable provisions of Title 11. This includes the mandatory requirements of §§ 1122 and 1123.

74 / 103

Section 1122(a) provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." Here, the Second Amended Plan properly classifies claims and interests in accordance with 11 U.S.C. § 1122(a). The claims and interests placed in each class are "substantially similar to the other claims or interests" of each such class.[298] Valid business, factual, and legal reasons exist for separately classifying the various classes of claims and interests created under the Plan. The Plan's classification scheme generally follows the Debtors' capital structure, classifying claims and interests into four main categories: Class A for QVCG, Class B for QVC, Class C for LINTA, and Class D for CBI Debtors. Within each main category there are subcategories classifying each claim based on priority, secured status, holder status, type, or other unique factors including prepetition legal rights or legal rights under the Bankruptcy Code.[299]

Section 1123(a)(4) requires that all creditors within a class be treated the same, unless the holder of a particular claim or interests agrees to less favorable treatment. Here, all Class A6 members are set to receive no distribution under the Second Amended Plan and their QVCG Preferred Equity Interests are set to be extinguished.[300] By definition, their treatment under the Second Amended Plan is equal.

The Preferred Shareholders argue that the Second Amended Plan violates § 1123(a)(4) because the Debtor releases available to Class A6 (QVCG Preferred Equity Interest, *i.e.*, the Preferred Shareholders) only benefit those current QVCG Preferred Equity Interest Holders who received QVCG Preferred Dividends. In the Preferred Shareholders view, a release of claims from the Debtors provides no value to current Holders that did not receive any dividends.[301] Citing to the Fifth

---

[298] ECF No. 389, Art. III.

[299] ECF No. 389.

[300] ECF No. 389, Art. III.B.6.

[301] The Preferred Shareholders' original position throughout the Combined Hearing is that the intercompany claims are without merit—including those potential claims against themselves for the QVCG Preferred Dividends. Counterintuitively,

Circuit's decision in *In re Serta Simmons Bedding, L.L.C.*, the Preferred Shareholders argue the court must "'look below the surface' to determine whether plan treatment is 'in fact equal in value,' and not merely identical in form."

In *Serta*, the Fifth Circuit on independent grounds reversed the court's prior approval of a reorganization plan which treated intra class creditors unequally. 125 F.4th 555, 591–93 (5th Cir. 2024). In *Serta* there were two classes in question: one, creditors who participated in the "2020 Uptier" and continued to hold super-priority debt from the uptier transaction ("Class 3"); the other, creditors who did not participate in the 2020 Uptier, but later purchased the super-priority debt on secondary markets ("Class 4"). *Id.* at 571. The reorganization plan ultimately contemplated by the court provided both Classes 3 and 4 with an indemnity whereby the company agreed to indemnify recipients for any losses, claims, damages and liabilities which they might incur in connection with their participation in the 2020 Uptier. *Id.* The Fifth Circuit took many issues with the reorganization plan, *inter alia*, but specifically with respect to § 1123(a)(4) held that because all members of Classes 3 and 4 stood to receive dramatically varying value under the indemnity, depending on whether the members had participated in the 2020 Uptier, the plan subjected them to unequal treatment. *Id.* at 591.

> To [certain class members], the indemnity was potentially worth millions or even tens of millions of dollars. But to other class members [] that had no involvement with the uptier, the indemnity was worth little or even nothing. Thus, some class members received settlements with higher effective values than their co-class members. [] Given this differential, the Plan indemnity constituted impermissible unequal treatment.

*Id.* at 591–92 (citations omitted).

---

they now decry that a release of liability for those claims would be incredibly valuable to only some members of Class A6.

The Second Amended Plan here is different than the one in *Serta*. It is like comparing apples to oranges. Here, as noted above, the Second Amended Plan proposes no distribution for the Preferred Shareholders in Class A6 while those in *Serta* stood to receive the indemnity.[302] The Preferred Shareholders do, however, receive broad Debtor releases (as defined under the Plan) of any and all potential claims or Causes of Action assertable against them in connection with them having received the QVCG Preferred Dividends.[303]

While the Fifth Circuit declined to articulate the scope of what equal treatment means under § 1123(a)(4), its review of caselaw focused on the *payment* of value and the *tendering* of consideration in exchange for that value as part of a settlement. *See id.* (citing *AOV Indus., Inc.*, 792 F.2d 1140, 1152 (D.C. Cir. 1986)) ("For its part, the D.C. Circuit has held that equal treatment prohibits disparate treatment with respect to value, thus prohibiting the payment of different settlements to co-class members or a requirement that some class members tender more valuable consideration for the same settlement."); *In re Quigley Co., Inc.*, 437 B.R. 102, 146 (Bankr. S.D.N.Y. 2010) ("Equality of treatment involves two facets: (1) all class members must receive equal value, and (2) each class member must pay the same consideration in exchange for its distribution.").

---

[302] ECF No. 389, Art. III.B.6.
[303] *See* ECF No. 389, Art. I.16, 172(b), 173(m); Art. VIII.C. Under Article I.172(b), the Preferred Shareholders are included in the definition of "Related Parties" of the Debtors. ECF No. 389. Under Article I.173(m), Related Parties of the Debtors are included in the definition of "Released Parties." ECF No. 389. Under Article VIII.C, the Second Amended Plan provides a broad Debtor release to all Released Parties from *inter alia*, "any and all claims and Causes of Action whatsoever, including any Avoidance Actions and any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, and their Estates, whether liquidated or unliquidated, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or assertable, accrued or unaccrued, existing or hereafter existing, contingent or noncontingent . . . ." ECF No. 389. The Second Amended Plan's definition of Avoidance Actions canvases the array of avoidance actions generally available under the Bankruptcy Code—which would include potential claims to recover amounts for the QVCG Preferred Dividends. ECF No. 389, Art. I.16. This was the "release" the QVCG Disinterested Directors negotiated for.

With respect to the supposed payment of value from the Debtors under the settlement here, an indemnity has "make-whole" characteristics which confer qualitatively different forms of value on recipients than a release. Whereas an indemnity creates an affirmative right to payment in the event of litigation, a release does not create any such affirmative right to payment (*i.e.*, "value") for the Preferred Shareholders in the same way. From this viewpoint, it becomes clear that current Preferred Shareholders who received QVCG Preferred Dividends do not receive different "payments of value" under the Intercompany Settlement than those current Holders who did not receive any such dividends.[304] This interpretation is consistent with the "equal opportunity, equal result" principle the *Serta* court clarified from the Third Circuit's holding in *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013).[305]

---

[304] Mr. Meltzer, Disinterested Director of QVCG, when questioned about whether he was aware of the universe of Preferred Shareholders existing at the time the QVCG Preferred Dividends were paid, stated "*the question of transferee liability [for the QVCG Preferred Dividends] was discussed*" by the QVCG Disinterested Directors and their counsel during the course of negotiating the Intercompany Settlement. *Meltzer Testimony*, Day 3:333:20–24 (emphasis added). Mr. Meltzer disagreed with the belief that not all Preferred Shareholders received value from the releases. When asked why, he stated "[f]or a number of reasons. The existing group of Preferred – objecting Preferred Shareholders only represent about a third of the Preferred class. The Preferred class was widely-held and fully-distributed Preferred [*sic*] class that came as a result of a dividend on the common. Those were essentially the people that received the dividends, the $456 million in dividends. The Preferred holders that are objecting holders acquired their positions, I believe, after the petition date . . . So, releases to them, when they have no economic interest other than their having purchased the shares post-petition, has nothing to do with the potential claims that could be brought against, honestly, retail holders that have purchased or were subsequent transferees of people who had received the dividends." *Meltzer Testimony*, Day 3: 209:7–25; 210:1–4. He later stated "lawyers can differ on this subject" but "I do not, as a Disinterested Director right now, have a firm understanding or a firm belief as to what the likely – what transferee liability may be directed at those people who [] maybe [did] not [get] dividends but bought [the stock] from people who got dividends." *Meltzer Testimony*, Day 3:335:20–25; 336:1–2.

[305] *In re W.R. Grace & Co.* was an asbestos case, wherein the Third Circuit held that equal treatment under § 1123(a)(4) for certain tort claimants necessitated equal opportunity to recover on account of their claims; not that the claimants recover the same amount. 729 F.3d at 237. The Fifth Circuit distinguished such asbestos cases

Conversely, with respect to the supposed tendering of value under the settlement, none of the Preferred Shareholders gave any consideration in exchange for their treatment. They do not "give up" their interests in the QVCG Preferred Equity as part of the Intercompany Settlement. Their equity interests were to be extinguished under the terms of the Second Amended Plan; a release of claims for the dividends was not a contingency of that. The QVCG Disinterested Directors negotiated the terms of the settlement on their behalf as fiduciaries; the QVCG Preferred Shareholders consent was not required to arrive at an agreement. In the same vein, the QVCG Disinterested Directors determined they could not get a cash distribution for the Preferred Shareholders as an additional get under the settlement. That was a product of the leverages the Key Entities' had on one another. The Preferred Shareholders did not "give up" the right to receive additional cash from their ATM to-date (QVC) under the settlement.

The Second Amended Plan treats all Preferred Shareholders the same. The Debtor releases they receive are not contingent on such treatment. Courts have previously held exculpation and release provisions have no bearing on a plan's treatment of claims or interests. *In re Adelphia Comm. Corp.*, 368 B.R. 140, 250–51 (Bankr. S.D.N.Y. 2007). Nor do the Debtor releases here have any bearing on the treatment of the Preferred Shareholders' interest.

---

not on their interpretation of the law, but on their facts, concluding that Class 3 and 4 members had not all similarly participated in the 2020 Uptier in an analogous manner to how all tort-claimant class members had suffered injuries as a result of exposure to asbestos. The Fifth Circuit stated "[a] better analogy would be a plan distribution by which all class members were given the opportunity to litigate their asbestos injuries, but only half had such injuries. We do not think our sister circuits would find such arrangement compliant with § 1123(a)(4)." *In re Serta Simmons Bedding,* 125 F.4th at 592. This highlights the underlying distinction between the Second Amended Plan, *Serta*, and the asbestos cases: a release does not convey on the QVCG Preferred Shareholders the right to receive *value* from the Debtors, but rather grants all a release for *liability* from the Debtors only some may have experienced. This Court's interpretation of § 1123(a)(4) is therefore consistent with Fifth and Third Circuit jurisprudence in this area.

Accordingly, this Court concludes the Preferred Shareholders received equal, rather than unequal treatment under the Second Amended Plan within the meaning of § 1123(a)(4) and *Serta*. Moreover, the Court has concluded all remaining Classes receive equal treatment under the Plan within the meaning of § 1123(a)(4). As such, that provision does not stand in the way of this Court's conclusion as to whether § 1129(a)(1) is satisfied.

**(B)   Section 1129(a)(2): The Proponent of the Second Amended Plan has Complied with the Applicable Provisions of Title 11.**

Section 1129(a)(2) of the Bankruptcy Code requires that "the proponent of the plan compl[y] with the applicable provisions of [Title 11]." 11 U.S.C. § 1129(a)(2). Though this language is broad, bankruptcy courts have mostly limited their inquiry of § 1129(a)(2) to ensuring the plan proponent has complied with the requirements of 11 U.S.C. §§ 1125 and 1126. *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 423–24 (Bankr. S.D. Tex. 2009); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984).

Section 1125 of the Bankruptcy Code provides plan solicitation and disclosure requirements. *See* 11 U.S.C. § 1125. A disclosure statement must contain "adequate information" which means "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records" that would enable "a hypothetical investor of the relevant class to make an informed judgment about the plan." *See* 11 U.S.C. § 1125(a)(1). Further, "in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information." 11 U.S.C. § 1125(a)(1). Courts determine what constitutes "adequate information" on a case-by-case basis under the facts and circumstances presented. *See Mabey v. SW. Elec. Power Co. (In re Cajun Elec. Power Coop.)*, 150 F.3d

503, 518 (5th Cir. 1998). The adequacy of a disclosure statement is a determination largely within the bankruptcy court's discretion. *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion)*, 844 F.2d 1142, 1157 (5th Cir. 1988).

Here, the disclosure statement includes, among other information: a summary of the events leading to the Chapter 11 cases, including prepetition challenges and initiatives; an overview of the Intercompany Settlement; the key terms of the Debtors' Plan; risk factors affecting the Plan; information on federal income tax consequences; and it attached the RSA, the Plan of Reorganization, financial projections, and liquidation and valuation analyses.[306] The Court concludes that the Disclosure Statement contains adequate information for parties-in-interest to make an informed judgment of the Plan. As such, it approves the Disclosure Statement on a final basis.

The objecting Preferred Shareholders argue that the Disclosure Statement fails to provide adequate information regarding the Intercompany Settlement.[307] They argue that the Debtors' disclosures of the QVC-QVCG Settlement are inadequate because it "assigns no value or estimated range to any individual Potential Claim, provides no analysis of the relative strengths and weaknesses of those claims, and offers no explanation of how the identified claims were aggregated or discounted to arrive at the $400 million figure."[308]

The Court disagrees and concludes the Disclosure Statement contains sufficient information concerning the Intercompany Settlement to warrant approval. The Disclosure Statement contains a multi-page overview of the Intercompany Settlement including information regarding the Disinterested Directors' Investigations, their process, and a summary of potential claims.[309] The information contained in the Disclosure Statement is sufficient to convey the

---

[306] *See generally Disclosure Statement*.
[307] *See* ECF No. 316 at 41–42.
[308] ECF No. 316 at 42.
[309] *See Disclosure Statement* at 46–57.

Disinterested Directors' understanding and the basis for their understanding—including the nature of the historical intercompany transactions and the potential legal and factual issues that may exist in any intercompany claims. The fact that it did not contain the substantive diligence, fund-flow, or solvency reports the Preferred Shareholders are critical of the Disinterested Directors having used to arrive at the Intercompany Settlement does not mean creditors did not have enough information on whether to accept the Second Amended Plan or not. Indeed, the information revealed about the investigation and negotiation demonstrated that the basis of the Intercompany Settlement was, in large part, due to the uncertainty around the potential success and outcome of the intercompany claims. The Disclosure Statement is sufficient in conveying that the claims may exist, based on its detailing of the historical intercompany transactions. Accordingly, the Court finds the Debtors' detailed disclosure of the Intercompany Settlement provided enough information for creditors to decide whether or not to accept the Second Amended Plan within the meaning of § 1125.

Further, § 1126 provides the requirements for acceptance of a plan. *See* 11 U.S.C. § 1126. Under § 1126, only holders of allowed claims and allowed interests in impaired classes that will receive or retain property under a plan, on account of such claims or interests, may vote to accept or reject the plan. *See* 11 U.S.C. § 1126. Here, Debtors solicited votes from Classes B3, B4, and C3—all impaired classes of claims that will recover under the plan.[310] The Voting Report reflects that these classes accepted the Second Amended Plan according to 11 U.S.C. §§ 1126(c) and (d).[311] Debtors did not solicit votes from other claim or interest holding classes because they were either unimpaired and presumed to accept the plan under 11 U.S.C. § 1126(f) or impaired and deemed to reject the plan under 11 U.S.C. § 1126(g).

---

[310] *See* ECF No. 364 at 2.
[311] *See* ECF No. 364, Ex. A.

Because the Debtors have complied with the post-petition disclosure and solicitation requirements of § 1125, and the plan acceptance requirements of § 1126, the requirements of § 1129(a)(2) are satisfied.

### (C) Section 1129(a)(3): The Second Amended Plan was Proposed in Good Faith and Not by any Means Prohibited by Law.

Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). "Good faith should be evaluated 'in light of the totality of the circumstances surrounding establishment of [the] plan,' mindful of the purposes underlying the Bankruptcy Code." *In re Vill. at Camp Bowie I, L.P.*, 710 F.3d 239, 247 (5th Cir. 2013). The Fifth Circuit has held that the plan must be proposed with a legitimate and honest purpose of reorganizing and with a reasonable hope of success. *In re Sun Country*, 764 F.2d 406, 408 (5th Cir. 1985). Additionally, "[t]o be proposed in good faith, a plan must fairly achieve a result consistent with the [Bankruptcy Code]." *In re Block Shim Dev. Co.-Irving*, 939 F.2d 289, 292 (5th Cir. 1991).

To begin, the Court notes that the Intercompany Settlement and the Second Amended Plan are good results for the Debtors and their creditors, generally. The Debtors were able to right-size their balance sheet, improve liquidity, and position their go-forward operating entity QVC for long-term success. The Debtors also rescued CBI from its silo and brought it under QVC's umbrella, enabling synergies that might otherwise save an entity which the Disinterested Directors believed had an uncertain future. [Findings of Fact 76]. The Debtors were also able to pay all third-party GUC claims in full. [Findings of Fact 86]. Under *Sun Country*, these considerations weigh in favor of a conclusion that the Second Amended Plan was proposed with a legitimate and honest purpose of reorganizing the business, and that the plan has a reasonable hope of success. 764 F.2d at 408. These considerations are also consistent with the Bankruptcy Code's underlying purpose of preserving

the company as a going-concern, and maximizing asset value for creditors. *See In re Vill. at Camp Bowie I, L.P.*, 710 F.3d at 247.

The Second Amended Plan has been met with overwhelming creditor support, evidenced by *inter alia* all Voting Classes accepting by large margins, and the Unsecured Creditors' Committee expressing its support. [Findings of Fact 93; ECF No. 392]. The Second Amended Plan, along with the RSA, Intercompany Settlement, and related documents were products of negotiations between the Debtors and the Consenting Stakeholders held at arm's-length and in good faith. [Findings of Fact 58–82]. The Second Amended Plan does not improperly benefit any single constituency, but represents a robust compromise where many, if not all stakeholders made concessions to achieve the result. Under *Village at Camp Bowie*, all of these factors weigh in favor of concluding the Second Amended Plan was proposed in good faith. 710 F.3d at 247.

The Preferred Shareholders, Mr. Rajadhyaksha and Mr. Shah each object to confirmation on grounds that the Debtors' Second Amended Plan was not proposed in good faith. With respect to the Preferred Shareholders, their argument centers around the process of negotiating the Intercompany Settlement. The Court has dispelled concerns the Intercompany Settlement was the product of a capitulation or that it was preordained. [Findings of Fact 68]. Rather, the agreement was the product of a robust and arm's-length process between disinterested fiduciaries of each box at the company. [Findings of Fact 58–82]. The process was not, however, result-oriented, and no direct evidence indicates otherwise. Moreover, the QVCG Disinterested Directors (or Debtors, generally) not having engaged the Preferred Shareholders as part of the negotiation does not indicate a fraud. They held the belief that the QVCG Preferred Equity was disparately held, and that Cleary only represented 1-2% of the entire holder base. [Findings of Fact 72]. Moreover, the Cleary letter was sent at time when the Disinterested Directors were months into the process. [*Id.*]. Nonetheless, the QVCG Disinterested Directors took the Preferred

84 / 103

Shareholders interests into account during the negotiation by securing them a release which was not included in the term sheet initially authorized by the QVC Disinterested Directors. [Findings of Fact 68]. The Court will not second guess the Disinterested Directors' business judgment that releases with no distribution for the Preferred Shareholders was appropriate, particularly given their understanding as to QVCG's exposure to QVC, and its exposure under the DTL.[312]

With respect to Mr. Rajadhyaksha's and Mr. Shah's arguments regarding the fact that the company did not disclose its contemplated restructuring, there is no such requirement under the Bankruptcy Code. Nor does a lack of disclosure as to highly sensitive bankruptcy considerations at the upper levels of management demonstrate the Second Amended Plan was not proposed with a legitimate hope of a successful reorganization. *See Sun Country*, 764 F.2d at 408. Mr. Rajadhyaska's other allegations regarding prepetition public communications, executive compensation, solvency and other governance issues similarly miss the mark. The Court concludes none of these considerations weigh in favor of a conclusion that the Second Amended Plan was not proposed in good faith under § 1129(a)(3). Nor are the Debtors expressly required to preserve historical allocations of risk, value, or tax attributes among affiliated entities, or maintain the corporate structure favored by prior management. Rather, all of these business elements are subject to change in preparation for and during a bankruptcy proceeding, generally for the purpose of setting a debtor up for a successful reorganization. The Court has duly considered them in evaluating the Second Amended Plan, and has concluded it was

---

[312] It also bears worth noting the Preferred Shareholders initially sought to form an official equity committee, but later voluntarily abandoned their motion in favor of pursuing their Motion to Terminate Exclusivity and their plan Objection. ECF No. 133 (withdrawn). Equity committees in bankruptcy are restricted from trading in securities of the company after their formation under fiduciary duty and securities laws. After the Preferred Shareholders abandoned their attempt to form an equity committee, the Debtors produced various documents from the company as well as documents from the Disinterested Directors, refuting the argument the Debtors sought to prevent the Preferred Shareholders from investigating the substantive basis the Disinterested Directors had for formulating opinions as to the intercompany claims.

proposed for a legitimate bankruptcy purpose, with a reasonable hope of success.

Accordingly, the Court concludes the Second Amended Plan satisfies § 1129(a)(3).

### (D) Section 1129(a)(4): All Payments for Services or Costs in Connection with the Debtors' Chapter 11 Case are Subject to Court Approval.

Section 1129(a)(4) requires:

> Any payment made or to be made by the proponent, by the debtor . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4). This provision by its terms requires court approval for any payment made or to be made for services, costs, or expenses made in connection with the case. *In re Cajun Elec. Power Coop.*, 150 F.3d at 513.

Here, Article I of the Second Amended Plan provides that professionals are compensated for services pursuant to §§ 328 and 330 of the Bankruptcy Code—which require fees to be examined by the Court.[313] Article II.C.1 of the Second Amended Plan provides that all requests for payment of Professional Fee Claims for services rendered and expenses incurred prior to the Confirmation Date must be filed no later than forty-five (45) days after the Effective Date, and that the Bankruptcy Court will determine allowed amounts.[314] Lastly, Article II.C.2 of the Second Amended Plan provides for an escrow of funds for professional fees, and that such fees will be paid from the escrow account following this Court's approval.[315] Thus, under these provisions, the Court concludes that 11 U.S.C. § 1129(a)(4) is satisfied.

---

[313] *See* ECF No. 389 at 10 ¶ 122.
[314] *See* ECF No. 389 at 20.
[315] See ECF No. 389 at 20.

**(E)    Section 1129(a)(5): The Second Amended Plan Makes the Proper Governance Disclosures.**

Section 1129(a)(5)(A)(i) of the Bankruptcy Code requires that a plan proponent disclose the identity and affiliations of any individual proposed to serve, post-confirmation, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or successor of the debtor under the plan. 11 U.S.C. § 1129(a)(5)(A)(i). Here, Article IV.K of the Second Amended Plan discloses that after the effective date the terms of the current members of the board of directors or other Governing Body[316] of each Debtor will expire, and such current directors shall be deemed to have resigned.[317] A New Board[318] will then be established at each of the Reorganized Debtors for an initial term. The Second Amended Plan further details that the New Board will be identified in a Plan Supplement, to the extent known and determined at the time of filing.[319] This New Board will serve from and after the Effective Date and will be appointed according to the Governance Term Sheet and the applicable New Organizational Documents of such Reorganized Debtor.[320]

Courts find that a debtor's inability to specifically identify future board members does not mean the debtor has not met the requirements of § 1129(a)(5)(A)(i). *See In re Am. Solar King Corp.*, 90 B.R. 808, 815 (Bankr. W.D. Tex. 1988) ("The subsection does not (and cannot) compel the debtor to do the impossible, however. If there is no proposed slate of directors as yet, there is simply nothing further for the debtor to disclose under subsection (a)(5)(A)(i)."). Thus, the Court concludes that the

---

[316] *See* ECF No. 389 Article I.80. ("'*Governing Body*' means . . . a board of directors, board of managers, manager, managing member, general partner, special committee, or any other similar governing body of any of the Debtors.").

[317] *See* ECF No. 389 at 45.

[318] *See* ECF No. 389 Article I.109. ("'*New Board*' means the board of directors or similar governing body of Reorganized QVC that shall be appointed in accordance with the terms of the Governance Term Sheet.").

[319] *See* ECF No. 389 at 45.

[320] *See* ECF No. 389 at 45.

Second Amended Plan satisfies the requirements of 11 U.S.C. § 1129(a)(5).

### (F)    Section 1129(a)(6): § 1129(a)(6) is Inapplicable.

Section 1129(a)(6) of the Bankruptcy Code requires that any governmental regulatory commission with jurisdiction, post-confirmation, over the rates of the debtor has approved any rate change provided in the plan. 11 U.S.C. § 1129(a)(6). The Second Amended Plan does not provide for any rate changes, therefore, § 1129(a)(6) is inapplicable.

### (G)    Section 1129(a)(7): The Second Amended Plan Satisfies the "Best Interests" Test.

A plan satisfies 11 U.S.C. § 1129(a)(7) when all holders of claims or interests in impaired classes either vote to accept the plan or receive the same amount or more under the plan than they would in a chapter 7 liquidation.[321] This statutory provision, otherwise known as the "best interests" test ensures that reorganization is in the best interest of impaired claimholders who have voted against the plan. *See In re Cypresswood Land Partners, I*, 409 B.R. at 428. The "best interests" test applies to individual claim or interest holders impaired under a plan, even if the class as a whole has voted to accept the plan. *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. Lasalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999).

Here, the Debtors prepared a Liquidation Analysis to reflect estimated recoveries under a hypothetical chapter 7 liquidation.[322] The Liquidation Analysis assumes the Court denies confirmation and that the Debtors seek and are granted court approval of the Intercompany

---

[321] Section 1129(a)(7)(A) of the Bankruptcy Code provides: "With respect to each impaired class of claims or interests—(A) each holder of a claim or interest of such class—(B) **(i)** has accepted the plan; or **(ii)** will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [Title 11] . . . [.]"

[322] *See Disclosure Statement* Ex. D.

Settlement.[323] In each Debtors' liquidation analyses, the projected recoveries under the Plan are either equal to or in excess of the recoveries estimated in a chapter 7 liquidation.[324] Therefore, the Second Amended Plan meets the requirements of 11 U.S.C. § 1129(a)(7).

The objecting parties argue that the plan does not meet the "best interests test" as to the QVCG Debtor.[325] They contend that under the Plan they receive nothing, but under a chapter 7 liquidation they would likely receive a recovery.[326] The Preferred Shareholders assert that the intercompany claims lack merit and that a chapter 7 trustee would litigate the claims and either reduce the claims or eliminate them completely.[327] At which point, they allege, Preferred Shareholders would potentially realize a significant recovery.[328] Further, they assert that even if the settlement was adopted by a chapter 7 trustee there would be a residual value to pay preferred shareholders.[329]

First, in a hypothetical liquidation, the trustee may choose to adopt the Intercompany Settlement. In such a case, the Debtors'

---

[323] *See Disclosure Statement*, Exhibit D. The Debtors Liquidation Analysis reasonably assumes approval of the Intercompany Settlement. This assumption recognizes the variety of issues resolved by the Intercompany Settlement which would remain pending and require resolution in a chapter 7 liquidation. *In re Enron Corp.*, 2004 Bankr. LEXIS 2549, at *118–*119 (Bankr. S.D.N.Y. 2004) (recognizing the need for an "apples to apples" comparison so that creditors have a clear understanding of the differences between recoveries under the plan compared to a potential chapter 7). A hypothetical chapter 7 liquidation analysis is "inherently speculative" and "is often replete with assumptions and judgments." *ACC Bondholder Group v. Adelphia Communs. Corp. (In re Adelphia Communs. Corp.),* 361 B.R. 337, 367 (S.D.N.Y. 2007). As discussed *supra*, the Disinterested Directors' investigation resulted in their conclusion that there were many possible intercompany claims that were best resolved by the Intercompany Settlement. Thus, the Debtors' evidence-based assumptions appropriately reflect the magnitude of intercompany claims and their clear effect on any chapter 7 liquidation—by requiring that a chapter 7 trustee either settle the claims or pursue litigation. *See In re Abeinsa Holding, Inc.*, 562 B.R. 265, 275 (Bankr. D. Del. 2016).

[324] *See Disclosure Statement*, Exhibit D; ECF No. 389 at 23–36.

[325] ECF No. 316 at 38–39.

[326] ECF No. 316 at 38–39.

[327] ECF No. 316 ¶ 72.

[328] ECF No. 316 ¶ 72.

[329] ECF No. 316 ¶ 73.

Liquidation Analysis demonstrates that the Preferred Equity holders would receive the same under the Second Amended Plan as they would under a chapter 7 liquidation, which is no recovery. For value to flow to the Preferred Shareholders, QVCG's cash and equity interests in CBI would have to amount to more than QVC's $400 million claim. Evercore's enterprise valuation of CBI (which was the only evidence presented) showed a maximum value of $135 million under a comparable companies analysis assuming a 4.5 EBITDA multiple (which would equate to $82.3 million for QVCG's 62% equity interest).[330] [Finding of Fact 78]. The CBI equity interest value combined with the QVCG cash would fall short of QVC's $400 million claim. Thus, in a liquidation, if a trustee were to adopt the Intercompany Settlement, equity would still receive no recovery, and QVCG's General Unsecured Creditors would only receive an approximate 43.9% recovery as opposed to the 100% recovery they are receiving under the Second Amended Plan.[331]

Second, as discussed *supra*, the Intercompany Claims are highly uncertain, complex, and would likely result in prolonged and costly litigation. If a chapter 7 trustee were to choose to litigate the Intercompany Claims, the evidence supports that litigation would likely be value destructive and all QVCG stakeholders would be worse off. [Finding of Fact 68]. The chapter 7 trustee would need to win on all claims for there to be a recovery to Preferred Equity. However, if the trustee were to lose on even a fraction of potential claims, it is possible that the QVCG cash would be wiped out—both by the claim itself and the cost to litigate—and stakeholder recovery would be diminished. The result would be that equity would still receive no recovery under this scenario, which is what they receive under the Second Amended Plan.

---

[330] The Court does consider this valuation for the truth of its matter, nor was Evercore's expert report admitted into evidence. Mr. Griffin did, however, testify as to his formulation of the valuation of CBI.

[331] *See Disclosure Statement*, Ex. D.

Because the Second Amended Plan is in the best interest of creditors, the Court concludes it satisfies 11 U.S.C. § 1129(a)(7).

**(H)    Section    1129(a)(8):    The    Plan    is    Confirmable Notwithstanding Its Failure to Satisfy § 1129(a)(8).**

Section 1129(a)(8) of the Bankruptcy Code is satisfied when each class of claims or interests either accepts a proposed plan or is not impaired under the proposed plan. 11 U.S.C. § 1129(a)(8). Here, Classes A6, A7, A8, B8, C7, and D6 are impaired and deemed to reject the plan.[332] Additionally, Classes A5, B6, B7, C5, C6, D4, and D5 are unimpaired or impaired and presumed to accept or deemed to reject the plan.[333] Therefore, the Second Amended Plan does not satisfy the requirements of 11 U.S.C. § 1129(a)(8).  However, as discussed *infra*, this provision does not prevent the Court from confirming the Debtors' Second Amended Plan because it satisfies the "cram down" requirements of § 1129(b).

**(I)    Section    1129(a)(9):    The    Second    Amended    Plan Provides for Payment of all Allowed Priority Claims.**

Section 1129(a)(9)(A) of the Bankruptcy Code requires that, unless otherwise agreed to, a plan provide holders of claims of a kind specified in § 507(a)(2)—administrative claims under § 503(b)— payment in full by the effective date of the plan. Here, Article II.A of the Second Amended Plan provides that "each Holder of an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim" on the Effective Date, as soon as reasonably practicable thereafter, or at some other time as defined in Article II.A.[334] Thus, the Second Amended Plan complies with § 1129(a)(9)(A).

---

[332] *See* ECF No. 389 at 23–25.
[333] *See* ECF No. 389 at 23–25.
[334] ECF No. 389 at 19.

Section 1129(a)(9)(B) requires that claimholders of the kind specified in §§ 507(a)(1) or 507(a)(4) through (7) of the Bankruptcy Code must receive

> (i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

> (ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim[.]

11 U.S.C. § 1129(a)(9)(B). Here, no holders of the types of claims specified in § 1129(a)(9)(B) are impaired. Thus, the Second Amended Plan complies with § 1129(a)(9)(B).

Additionally, § 1129(a)(9)(C) of the Bankruptcy Code specifies the payment of claims under § 507(a)(8)—priority tax claims. Here, the Second Amended Plan specifies that each holder of an allowed priority tax claim shall be treated in accordance with the terms of § 1129(a)(9)(C).[335] Thus, the Second Amended Plan satisfies § 1129(a)(9)(C).

The Second Amended Plan satisfies each of the requirements set forth in § 1129(a)(9).

**(J)    Section 1129(a)(10): At Least One Class of Impaired Creditors Accepted the Second Amended Plan as to the QVC and LINTA Debtors, and § 1129(a)(10) Does Not Apply to QVCG or the CBI Debtors Because They Do Not Have Any Impaired Classes.**

Section 1129(a)(10) requires that, where there is an impaired class of claims, at least one impaired class of claims accept the plan. 11 U.S.C. § 1129(a)(10).

Here, as to the QVC Debtor, Classes B3 and B4 are impaired under the Second Amended Plan and have voted to accept, independent

---

[335] ECF No. 389 at 20.

of any insider votes.[336] As to the LINTA Debtor, Class C3 is an impaired class and has voted to accept the plan.[337] Therefore, § 1129(a)(10) is satisfied as to the QVC and LINTA Debtors. CBI and QVCG do not have an impaired class of claims, so § 1129(a)(10) does not apply as to those Debtors.[338]

The objecting Preferred Shareholders argue that § 1129(a)(10) is not satisfied as to the QVCG Debtor.[339] They allege that under the Second Amended Plan, no classes of claims or interests against QVCG have voted to accept the Plan.[340] They assert that the only classes of claims that are designated as impaired—Classes A6 (QVCG Preferred Equity Interests), A7 (QVCG Common Equity Interests), and A8 (§ 510(b) claims against QVCG) are all deemed to reject the plan.[341]

However, the Bankruptcy Code is clear that § 1129(a)(10) applies to classes of "claims" that are impaired under the plan. See 11 U.S.C. § 1129(a)(10). "Claims"[342] are distinct from an interest in an equity security. *Adler v. Lehman Bros. Holdings (In re Lehman Bros. Holdings)*, 855 F.3d 459, 469 (2d Cir. 2017) ("[A]n interest in an equity security is distinct from a claim to a right to payment or an equitable remedy"). Here, as defined by the Bankruptcy Code, the QVCG Debtor only has unimpaired classes of "claims" under the Second Amended Plan. Because § 1129(a)(10) applies when there is an impaired class of claims, this statutory provision does not apply to QVCG who does not have an impaired class of claims.

---

[336] *See* ECF No. 364, Exhibit A.

[337] *See* ECF No. 364, Exhibit A.

[338] *See* ECF No. 389 at 23–24, 25.

[339] *See* ECF No. 316 at 33–37. In their objection to plan confirmation, the objecting Preferred Shareholders argue that the §1129(a)(10) applies on a "per debtor" basis because QVCG is not substantively consolidated with QVC. In closing arguments, the Debtors clarified that they are seeking approval of the Second Amended Plan on a "per debtor" basis. Thus, the Court will consider § 1129(a)(10) on a "per debtor" basis.

[340] *See* ECF No. 316 at 33–34.

[341] *See* ECF No. 316 at 34.

[342] *See* 11 U.S.C. § 101(5) (defining the term "claim").

The objecting Preferred Shareholders further argue that the QVC-QVCG Settlement Claim is not unimpaired, as suggested under the Second Amended Plan.[343] They argue that because the Second Amended Plan contemplates QVC receiving less than their alleged claim, their claim is impaired.[344] They argue that the Debtors artificially eliminated any "impaired class," and that accepting the Debtors position would render §§ 1124 and 1129 meaningless because "any plan proponent could evade the impaired-accepting-class requirement by drafting a settlement entitling a creditor to 'whatever is left over.'"[345]

The Court disagrees with the Preferred Shareholders' argument. Section 1124 defines "impairment" under the Bankruptcy Code by providing, in relevant part:

> *Except as provided in section 1123(a)(4) of this title* [Title 11], a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—
>
> **(1)** leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest . . .

11 U.S.C. § 1124(1) (emphasis added). As provided above, under § 1123(a)(4), a plan must provide the same treatment for each claim or interest in a class, *unless* the holder of that claim or interest agrees to a less favorable treatment. *See* 11 U.S.C. § 1123(a)(4). Courts have interpreted this provision to mean that creditors can agree to treatment that is less than their full and equitable rights—by settlement, stipulation, or some form of agreement—and be considered unimpaired under § 1124. *In re Container Store Grp., Inc.*, 676 B.R. 356, 377 (S.D. Tex. 2026) ("Parties who agree to a settlement under this provision are considered unimpaired"); *In re Spirit Airlines, Inc.*, 668 B.R. 689, 701 (Bankr. S.D.N.Y. 2025) ("It is well established that consenting to a less

---

[343] *See* ECF No. 316 at 35–37.
[344] *See* ECF No. 316 at 35–37.
[345] *See* ECF No. 316 ¶ 69.

favorable treatment under Section 1123(a)(4) of the Bankruptcy Code does not make that party 'impaired' under Section 1124(1) of the Code"); *In re K Lunde, LLC*, 513 B.R. 587, 595 n. 5 (Bankr. D. Colo. 2014) ("An agreement or consent to a particular treatment removes the claim from the presumption of impairment").

Here, the QVC-QVCG Settlement Claim is based on the Intercompany Settlement discussed *supra* and memorialized in the RSA. In it, QVC has consented to a less favorable treatment—accepting a $400 million claim and receiving in full satisfaction of that claim the QVCG distributable cash and 62% equity interest in CBI. Because QVC has agreed to settle its claim, it is considered unimpaired under the Second Amended Plan.

Further, the objecting Preferred Shareholders' argument that plan proponents could create settlements to get around the provisions of § 1129(a)(10) is unpersuasive.[346] First, settlements require two consenting parties, so a settling party would need to agree to recover less than what they are legally entitled to. Further, § 1129(a)(10) would still apply if the Debtor had an impaired class of claims.

The Court concludes that QVCG does not have an impaired class of claims, so § 1129(a)(10) does not apply to that Debtor. Therefore, the Court further concludes that all Debtors have met the requirements of § 1129(a)(10).

**(K) Section 1129(a)(11): Confirmation of the Second Amended Plan is Not Likely to be Followed by the Liquidation, or the Need for Further Financial Reorganization, of the Debtor.**

A plan must be feasible. Section 1129(a)(11) of the Bankruptcy Code requires that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor

---

[346] *See* ECF No. 316 ¶ 69.

> under the plan, unless such liquidation or reorganization
> is proposed in the plan.

11 U.S.C. § 1129(a)(11). Under this provision, bankruptcy courts "need not require a guarantee of success . . . [o]nly a reasonable assurance of commercial viability is required." *In re Briscoe Enters.*, 994 F.2d at 1165–66. The court must find there is "a reasonable probability of success." *In re Cypresswood Land Partners, I*, 409 B.R. at 433.

Courts consider a list of factors for feasibility of a reorganization plan. This list typically includes:

> (1) the adequacy of the debtor's capital structure;
>
> (2) the earning power of the debtor's business;
>
> (3) economic conditions;
>
> (4) the ability of the debtor's management;
>
> (5) the probability of the continuation of the same management; [ ]
>
> (6) and [sic] any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*Save Our Springs Alliance, Inc. v. WSI (II)-COS, L.L.C.*, 632 F.3d 168, 173 n.6 (5th Cir. 2011). The Court is not required, however, to consider all six factors. *Id.* at 173.

The Court concludes that the Second Amended Plan is feasible. The Debtors have prepared financial projections forecasting the Reorganized Debtors financial performance for the annual periods ending December 31, 2026 through to December 31, 2029.[347] These projections support Debtors' assertion that the Reorganized Debtor will be able to meet their obligations under the Plan as they come due.[348] Furthermore, the Second Amended Plan contemplates reducing billions

---

[347] *See Disclosure Statement*, Exhibit C.

[348] JX-079, ECF No. 405-011.

in funded debt and strengthening the business as a going-concern.[349] Thus, the Court concludes that § 1129(a)(11) is satisfied.

**(L)     Section 1129(a)(12): All Fees Payable Under 28 U.S.C. § 1930 Have Been Paid Or Will be Paid on the Effective Date.**

Section 1129(a)(12) of the Bankruptcy Code requires that "[a]ll fees payable under [28 U.S.C. § 1930], as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan." Article XII.C of the Second Amended Plan provides that all fees due and payable pursuant to 28 U.S.C. § 1930(a) that have not been paid, will be paid on the Effective Date or when due.[350] Therefore, 11 U.S.C. § 1129(a)(12) is satisfied.

**(M)     Section 1129(a)(13): The Second Amended Plan Provides for Continuation of Retiree Benefits Post-Effective Date.**

Section 1129(a)(13) of the Bankruptcy Code requires that a plan provide for the continued payment of all retiree benefits post-effective date at the level established by 11 U.S.C. 1114(e)(1)(B) or (g). Article IV.O.1 of the Plan provides that "pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable Law."[351] Therefore, the Court finds that the Second Amended Plan satisfies 11 U.S.C. 1129(a)(13).

**(N)     Sections 1129(a)(14) Through (16) Are Inapplicable.**

Section 1129(a)(14) does not apply because the Debtors are not subject to any domestic support obligations. *See* 11 U.S.C. § 1129(a)(14).

---

[349] *See Disclosure Statement* at 3.
[350] *See* ECF No. 389 at 72.
[351] *See* ECF No. 389 at 47.

Section 1129(a)(15) does not apply because none of the Debtors are individuals. *See* 11 U.S.C. § 1129(a)(15).

Section 1129(a)(16) does not apply because the Debtors are moneyed, business, or commercial corporations. *See* 11 U.S.C. § 1129(a)(16).

### (O)    The Second Amended Plan Complies With § 1129(b) of the Bankruptcy Code.

Section 1129(b)(1) provides, in relevant part:

> [I]f all of the applicable requirements of subsection (a) of this section other than paragraph (8) [11 U.S.C. 1129(a)(8)] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1). This provision allows a debtor to "cram down" its plan over the objection of a creditor. *In re D & F Constr., Inc.*, 865 F. 2d 673, 675 (5th Cir. 1989).

### *(1)    The Plan is "Fair and Equitable."*

With respect to a class of impaired unsecured claims, § 1129(b)(2)(B)(i) provides that a plan is "fair and equitable" if each claimholder is paid in full. 11 U.S.C. § 1129(b)(2)(B)(i). Alternatively, § 1129(b)(2)(B)(ii) provides that a plan can be determined to be "fair and equitable" if "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C. § 1129(b)(2)(B)(ii). The latter condition is known as the "absolute priority rule." *Bank of Am. Nat'l Trust & Sav. Ass'n*, 526 U.S. at 442. Under the absolute priority rule, dissenting classes of creditors must be fully satisfied before any junior creditor receives any recovery for its

98 / 103

claim. *Cantu v. Schmidt (In re Cantu)*, 784 F.3d 253, 256 n. 2 (5th Cir. 2015).

Under the Debtors' Second Amended Plan, no class junior to the impaired and deemed rejecting classes—classes A6, A7, A8, B8, C7, and D6— is receiving anything under the Plan. As for the classes which are for certain Intercompany Claims and Interests—A5, B6, B7, C5, C6, D4, and D5—which may be reinstated, and thus have unimpaired status, the Debtors contend that the treatment of these would be for the "purposes of preserving the Debtors' corporate structure and will have no economic substance."[352] Under these circumstances, the Plan satisfies § 1129(b)'s absolute priority rule.

"The corollary of the absolute priority rule is that senior classes cannot receive more than one hundred percent (100%) recovery for their claims." *In re Idearc, Inc.*, 423 B.R. 138, 170 (Bankr. N.D. Tex. 2009). A senior class of creditors cannot receive more than the full amount of their claim, and any excess must flow to junior classes. *In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007).

Objecting parties argue that the Plan violates the corollary to the absolute priority rule because QVC is receiving more than 100% of its $400 million claim.[353] The evidence does not support this argument. As discussed *supra*, the evidence supports the proposition that QVC is not receiving more than a 100% recovery. [Finding of Fact 88]. The sum of 62% of the high end of Evercore's valuation of Cornerstone and the QVCG Distributable Cash is less than QVC's $ 400 million GUC claim. The Second Amended Plan satisfies the corollary to the absolute priority rule because no senior class is receiving more than 100% recovery for their claims. Therefore, the Court concludes that the Second Amended Plan is "fair and equitable" under 11 U.S.C. § 1129(b)(1).

---

[352] *See* ECF No. 359 ¶ 240.
[353] ECF No. 316 at 39–40.

### *(2)* *The Plan Does Not Discriminate Unfairly in Violation of § 1129(b)(1).*

Under § 1129(b)(1) of the Bankruptcy Code, a plan must not unfairly discriminate against an impaired non-accepting class. 11 U.S.C. § 1129(b)(1). The Bankruptcy Code does not define what it means to "discriminate unfairly," but "[c]ourts generally assess unfair discrimination based on the facts and circumstances presented in the case."[354] *In re Robertshaw US Holding Corp.*, 662 B.R. 300, 319 (Bankr. S.D. Tex. 2024). "The Code does not prohibit unequal treatment of claims that are properly classified in different classes so long as the discrimination is not unfair." *In re Cypresswood Land Partners, I*, 409 B.R. at 434. Thus, Debtors must state a basis for discriminating between two classes and show by a preponderance of the evidence that such discrimination is not unfair to impaired rejecting classes. *In re Robertshaw US Holding Corp.*, 662 B.R. at 320.

Here, the Second Amended Plan does not unfairly discriminate between similar classes of claims and interests. The Second Amended Plan classifies claims in a permissible manner based on legally acceptable rationale. QVCG equity interests—Classes A6 and A7—sit at the bottom of the priority scheme, and no junior classes will receive a recovery.[355] Similarly, § 510(b) claims, which are "subordinated to all claims or interests that are senior to or equal [to] the claim or interest represented by such security," are receiving similar treatment. *See* 11 U.S.C. § 510(b).

Further, with respect to the potentially impaired classes of Intercompany Claims and Interests—Classes A5, B6, B7, C5, C6, D4,

---

[354] In *In re Robertshaw*, this Court explained: "Some courts have utilized multi-factor tests or rebuttable presumption tests as an analytical framework to assess unfair discrimination. They are helpful considerations, but could be construed to either create additional burdens on the debtor to satisfy this prong or appear to repeat standards already required in other parts of § 1129 required for confirmation. The text requires a plan not to unfairly discriminate against an impaired non-accepting class." *In re Robertshaw US Holding Corp.*, 662 B.R. at 319–20.

[355] *See* ECF No. 389 at 24.

and D5—the Second Amended Plan can be confirmed despite their potential impairment/rejection because it does not discriminate unfairly with respect to those classes. These classes of Intercompany Claims and Interests are distinct from other classes based on their business purpose—which, as the Debtors contend, is to support the Debtors' corporate structure, and if reinstated, would "advance an efficient reorganization by avoiding the need to unwind and recreate the corporate economic substance of the Plan for the Debtors' stakeholders."[356]

Therefore, the Court finds that the Second Amended Plan properly classifies claims and interests according to priority and character, and it does not unfairly discriminate impaired rejecting classes.

### (P) Section 1129(c): The Second Amended Plan Satisfies § 1129(c) of the Bankruptcy Code.

Section 1129(c) of the Bankruptcy Code prohibits confirmation of multiple plans. The Second Amended Plan satisfies this provision because there is only one proposed plan.

The Debtors have met all requirements of 11 U.S.C. § 1129, therefore, the Second Amended Plan is confirmed.

## IV. THE SECOND AMENDED PLAN'S THIRD-PARTY RELEASES ARE CONSENSUAL.

The U.S. Trustee objects to the Second Amended Plan's opt out third-party releases and contends that they are nonconsensual and, therefore, prohibited under the United States Supreme Court's decision in *Harrington v. Purdue Pharma L.P.*[357] 603 U.S. 204 (2024). However, well-established precedent in this district, as well as the district court's decision in *Container Store*, acknowledge that under the appropriate circumstances the failure to opt-out *can* constitute consent to a third-

---

[356] *See* ECF No. 359 ¶ 240.
[357] *See* ECF No. 291 at 9–11.

party release. *See* 676 B.R. at 388 (finding that "[f]or these reasons, consistent with its longstanding precedent, the court holds that the failure to opt-out constitutes consent to a third-party release under the appropriate circumstances"). In *Container Store*, the district court found that the third party releases in the reorganization plan were consensual—with the exception of two classes who received no recovery under the plan and were deemed to reject. *See In re Container Store Grp., Inc.*, 676 B.R. at 390–91. Here, the Plan excludes from the definition of "Releasing Parties" all classes of claims or interests deemed to reject the Plan—unless they affirmatively elect to do so by opting-in to the releases.[358] Only classes that will receive a recovery under the Plan are required to opt-out to avoid consenting to the third-party release.

The Court finds that the third-party releases satisfy the applicable law. Interested parties were provided sufficient notice, an opportunity to opt-out, and the disclosure statement contained a detailed description of the opt-out and third-party releases. *See In re Container Store Grp., Inc.*, 676 B.R. at 384 (listing factors courts consider "in determining whether the procedures around the opt-outs were sufficient to find consent"). Therefore, the Court finds that the Plan complies with *Container Store*, and the U.S. Trustee's objection is overruled.

## V. PREFERRED SHAREHOLDERS' MOTION TO TERMINATE EXCLUSIVITY

The objecting Preferred Shareholders filed an Emergency Motion to Terminate Exclusivity Under 11 U.S.C. § 1121(d).[359] For the reasons discussed *supra*, the Court confirms the Debtors' Second Amended Plan. As such, the Court concludes that the Motion to Terminate Exclusivity is moot at this time. In the event the Second Amended Plan does not go effective, the Court reserves judgment on this matter.

---

[358] *See* ECF No. 389 at 14 ¶ 174.
[359] ECF No. 205.

# CONCLUSION

Based on the foregoing reasons, the Court hereby **OVERRULES** all objections; **APPROVES** the Disclosure Statement; **CONFIRMS** the Second Amended Plan; and **RESERVES JUDGMENT** on the Motion to Terminate Exclusivity.

The Debtors are requested to submit a confirmation order consistent with this Memorandum Decision's Findings of Fact and Conclusions of Law within (7) days.[360]

SIGNED 07/15/2026

Alfredo R Pérez
United States Bankruptcy Judge

---

[360] Such confirmation order shall be supplemental to these Findings of Fact and Conclusions of Law, and shall address matters not addressed in these Findings of Fact and Conclusions of Law, or agreements with other parties that would address issues with such parties that are not addressed herein.

# Exhibit J

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

July 22, 2026
Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| QVC GROUP, INC., *et al.*,[1] | ) | Case No. 26-90447 (ARP) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**ORDER DENYING PREFERRED SHAREHOLDERS'
EMERGENCY MOTION FOR STAY PENDING APPEAL OF CONFIRMATION
ORDER UNDER BANKRUPTCY RULE 8007(A), OR, IN THE ALTERNATIVE, FOR
LIMITED STAY AND INTERIM STAY PENDING HEARING [DOCKET NO. 716]**

Upon the emergency motion (the "Motion") of Preferred Shareholders (the "Preferred Shareholders")[2] of QVC Group, Inc. ("QVCG" and, together with its subsidiaries and affiliates in the above-captioned Chapter 11 Cases, the "Debtors"), for entry of an order staying, pending appeal, the *Order (I) Approving the Debtors' Disclosure Statement for the Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, (II) Confirming the Second Amended Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, and (III) Granting Related Relief* [Docket No. 722] (the "Confirmation Order"),[3] under Rule 8007 of the Federal Rules of Bankruptcy Procedure; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Order of Reference to Bankruptcy Judges* from the United

---

[1]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/QVC.  The location of Debtor QVC Group, Inc.'s corporate headquarters and the Debtors' service address in these chapter 11 cases is 1200 Wilson Drive, West Chester, Pennsylvania 19380.

[2]  The Preferred Shareholders are certain institutional and individual holders of the 8.000% Series A Cumulative Redeemable Preferred Stock issued by QVCG as identified in the *Amended Notice of Appeal* [Docket No. 726].

[3]  Terms capitalized but not defined herein shall have the meanings ascribed to such terms in the Confirmation Order.

States District Court for the Southern District of Texas, entered May 24, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b); and the Court having found that the Court may enter a final order with respect to the Motion consistent with Article III of the United States Constitution; and the Court having found that venue of the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Preferred Shareholders' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion, the *Debtors' Objection to Preferred Shareholders' Emergency Motion for Stay Pending Appeal* [Docket No. 730], and the *Declaration of Jason Keyes in Support of Debtors' Opposition to the Preferred Shareholders' Emergency Motion for Stay Pending Appeal of Confirmation Order Under Bankruptcy Rule 8007(A), or, in the Alternative, for Limited Stay and Interim Stay Pending Hearing* [Docket No. 729] and having conducted an evidentiary hearing on July 21, 2026; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT**:

1. The Motion is denied for the reasons stated on the record during the Bankruptcy Court's oral bench ruling on July 22, 2026.

2. To the extent a stay of the Confirmation Order were to be ordered, I find that based on the evidence presented, the appropriate measure of the harm from a stay would require setting a bond of no less than $631,000,000.00.

Signed: July 22, 2026

_____
Alfredo R Pérez
United States Bankruptcy Judge

2