# EXHIBIT 20

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

_____

IN RE:

QVC GROUP, INC., ET AL.,

Debtors,

Chapter 11

Case No. 26-90447 (ARP)

_____


HEARING


DATE:    June 8, 2026

TIME:    9:00 a.m.

PLACE:   Federal Courthouse - Houston, Texas

BEFORE:  Melinda Barre

JOB No:  1467

Rosenman firm will be handling the

presentation of Mr. Keglevic.

JUDGE PEREZ:  All right.  Thank

you.

MR. SMITH:  Good morning, Your

Honor.  Robert Smith, Katten Muchin

Rosenman, on behalf of the

disinterested directors of QVC.

Would like to call Mr. Keglevic to

the stand.

PAUL KEGLEVIC,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

QUESTIONS BY MR. SMITH:

Q.   Good morning.  Can you please state

your name and spell it for the record, please.

A.   My name is Paul Keglevic,

K-e-g-l-e-v-i-c.

Q.   Please tell us a little bit about

your education and professional background.

A.   I have a bachelor of science in

accounting from Northern Illinois University.

Upon graduation, I went to work for Arthur

Andersen, where I became a partner in 1987.  I

then became a partner at

PricewaterhouseCoopers from 2002 to 2008.  So 21 years as a partner at both firms combined.

I then went down to Energy Future Holdings, which is the electric utility holding company in Dallas, Texas, where I became the CEO, and ultimately the chief restructuring officer.  And then in my final two years at EFH, I became the chief executive officer.

Since then -- I retired in 2017.  And since then, I have done only disinterested director work.  I've probably been on approximately 20 boards over those 10 years and had one chief restructuring officer engagement during that period of time as well.

Q.   And focusing on those 20-some-odd appointments that you just testified to, when you say disinterested director, were those principally for companies in financial distress?

A.   Yes, probably 80 percent of them were.  But there were others that were not.

Q.   And tell the Court a little bit about your role at QVC.

the time of the dividends?

A.   That's correct.  At QVC, Inc., I'm only aware of the one Kroll in '22 that there was no QVC, Inc. done for subsequent dividends.

Q.   All right.  As you testified, you are aware that Kroll or Duff & Phelps provided a number of solvency opinions for Topco or QVC Group, correct?

A.   Yes, that's right.

Q.   And logically, if QVC Group was solvent at a given time, it would be a valid assumption that QVC, Inc. was also solvent at that time, correct?

A.   Yeah.  That's likely to be true.

Q.   And you understand that the dividend claims would have required a finding of insolvency at the time of the dividends, correct?

A.   Well, in litigation, we could find that at that point in time it's insolvent based on something done now.  It didn't have to be contemporaneous in 2022 to come to that conclusion in the litigation.

Q.   Your understanding is that if a --

Q.   So focusing just on the professional fees piece of that, the net recovery that QVC, Inc. could get at the end of a successful litigation would be reduced both by the professional fees that QVC, Inc. had to expend and the professional fees that QVC Group would have to expend, correct?

A.   Correct.

Q.   As the letter notes, litigation would also have caused delay, correct?

A.   Correct.

Q.   And you testified about your concern about avoiding delay, correct?

A.   I have.

Q.   In fact, you placed a significant value on having what you call a fast and final solution, correct?

A.   I did.

Q.   And you explained to me at your deposition that what you mean by a fast and final solution is a quick restructuring and no overhang, no contingencies, no additional steps that create uncertainty with respect to the go-forward company, correct?

A.   Yes.

Q.    And having to litigate any of these intercompany claims would have prevented a fast and final solution, correct?

A.    That's right.

Q.    In fact, you testified on your direct that it would have been ugly to have to go to litigation, correct?

A.    Correct.

Q.    And, moreover, that litigation would have "hurt the estate" and that "all of that is bad," correct?

A.    Correct.

Q.    In fact, you thought the potential delay caused by litigation would be an even bigger cost for QVC, Inc. than having to pay the substantial professional fees, correct?

A.    If you mean was there cost above the professional fees like disruption costs, time value of not having the settlement amount, yes.

Q.    In your estimation, the impact or downside of the delay exceeded the downside of having to incur the professional fees, correct?

A.    I never quantified the time value

delay or the delays of synergy, I don't think, but they would have been significant. I don't know if they would have been more than the legal fees, but they would have been significant.

Q. You thought that the delay or the time issue was potentially even more expensive than the cost issue, correct?

A. It could have potentially been, yes.

Q. That was your understanding, that it was, correct?

A. Well, I didn't do the calculation, but is there a possibility? Yes, of course.

Q. And you were aware of that possibility at the time and eager to avoid that delay, correct?

A. Yes, correct.

Q. Now, it's also possible that at the end of litigation, QVC, Inc. would lose the litigation and get nothing on the intercompany claims, correct?

A. Yes.

Q. In litigation that precedes to its conclusion, the best case scenario would have been to eventually prevail and recover

ultimately the 350 in this letter.

Q.   They went very quickly from --

A.   That's right.

Q.   Let me just finish the question, although you are anticipating it.

They went very quickly from offering nothing to agreeing to give everything, correct?

A.   Correct.

Q.   You've never been in a negotiation in all your experience before where your counterparty moved from zero to everything so quickly as they did here, correct?

A.   Every negotiation is different, but I don't recall one with the same factors and timeline that this one had.

Q.   And from the discussions you participated in and comments that were made to you, you have no idea why they made such a quick and dramatic concession here, correct?

A.   Well, I think I said in my deposition, as you just pointed out, that they thought our claims were persuasive.

Q.   Your only explanation for why they made such a quick and dramatic move was they