# EXHIBIT 25

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

_____

IN RE:

QVC GROUP, INC., ET AL.,

Debtors,

Chapter 11

Case No. 26-90447 (ARP)

_____

HEARING

DATE:    June 8, 2026

TIME:    9:00 a.m.

PLACE:   Federal Courthouse - Houston, Texas

BEFORE:  Melinda Barre

JOB No:  1467

A.   All of our tools within reason, yes, sir.

Q.   Okay.  And it's your job in a negotiation like the one you've been testifying about today to do everything at your disposal to get the best possible deal for QVC Group, correct?

A.   Again, within the context of what a negotiation looks like, correct.

Q.   Because in this case, sir, by your own testimony, you were faced with claims that could wipe out QVC Group in your own words, correct?

A.   Correct.

Q.   Okay.  We're going to get back to that, but I'd like to start with this.

Isn't it the case that since you've started becoming an independent director for these restructuring transactions, a majority of those mandates have been referred to you by the Kirkland & Ellis firm?

A.   A significant amount of them, yes, sir.

Q.   Okay.  And can you identify the

Kim firm, right?

A.   Correct.

Q.   And those intercompany claims were first identified to you by the Kirkland firm and AlixPartners, correct?

A.   In advance -- when we were first appointed to the board in June of '25, there were broad decks that were provided to the board as a whole that indicated what the potential issues were vis-a-vis a restructuring, yes.

Q.   Okay.  And so you were hired in June; and then you hired the Kobre firm in or around the October 2025 timeframe, correct?

A.   Correct.

Q.   Okay.  And at that time when you first joined the board, Alix was already serving as the financial advisor, correct?

A.   Correct.

Q.   And Evercore was already serving as the company's investment banker, right?

A.   Correct.

Q.   And I think, as you testified in your direct, you never hired an independent financial advisor?

A.    I assume that's a question.  Yes.

Q.    And you never hired any investment banker, correct?

A.    Correct.

Q.    Now, isn't it the case, though, when you first hired Kobre, that no one imposed any budgetary constraints on the professionals that you could hire, right?

A.    Not to my knowledge.

Q.    Right.  So you could have hired an independent financial advisor but you chose not to, correct?

A.    Correct.

Q.    You could have hired an independent investment banker but you chose not to, correct?

A.    Correct.

Q.    And you could have hired an independent solvency expert but you chose not to do that, right?

A.    Correct.

Q.    But you did choose to hire the tax experts that you testified on direct.  I believe that was Mr. Warner's firm, right?

A.    Correct.

So Evercore never performed a solvency analysis on behalf of the Special Committee of QVC Group for QVC, Inc., correct?

A.    Correct.

Q.    And Evercore never performed any valuation analysis of any of QVCG's assets, including the Cornerstone equity, correct?

A.    Well, I'm currently under -- I currently know that Evercore has since provided a valuation of Cornerstone.

Q.    That's a fair clarification.

So as of the time you entered into the intercompany settlement, Evercore had not provided any valuation of Cornerstone for you, correct?

A.    To my knowledge.

Q.    And Evercore never made any presentations specifically to the Special Committee of QVC Group, correct?

A.    Correct.

Q.    And you never asked Evercore any questions about the work they had performed in connection with the intercompany claims analysis, correct?

A.    Correct.

Q.    Now, you did rely on the information that Evercore provided with respect to the trading prices of various QVC debt securities, correct?

A.    Again, I'm not fencing with you. "Reliance" is, I think, a strong word.

Q.    Consider.  How about consider?

A.    We considered and it was a data point, as I've described before.

Q.    At the time you entered into the intercompany settlement, had you reviewed the Evercore engagement letter?

A.    We had seen the Evercore engagement letter.

Q.    And do you know how Evercore was supposed to be compensated?

A.    I mean, we reviewed it at a very high level.  It had been reviewed -- they had entered into that engagement letter way before we were on the board.  It was an existing contractual arrangement.

Did I separately review it at the time we came on the board, no.

Q.    Were you generally aware of

Q.    You can put that down.

      You would agree, I think you testified, that bond trading prices are just one data point, correct, for solvency, right?

A.    For value, solvency.  It's in the eye of the beholder very often.

Q.    Correct.  And the only information ever presented to you by the company's advisors or your adversaries at the QVC, Inc. Special Committee were bond trading prices and the Kroll/Duff & Phelps solvency opinions, right?

A.    As well as, as I testified a minute ago, the Moody's analysis of the various tranches of debt.

Q.    Now, you testified in response to your counsel's questions that you never interviewed Duff & Phelps, correct?

A.    Correct.

Q.    And you never asked to interview Duff & Phelps, correct?

A.    Correct.

Q.    And you never asked for the management operating the company in the 2022

timeframe to be interviewed on the solvency

issue, correct?

    A.   Not to my knowledge.

    Q.   Did you hear Mr. Wafford's testimony

in court?

    A.   I did not.

    Q.   Do you understand that he believed

that the Duff & Phelps solvency opinion was

prepared in good faith?

    A.   Knowing Bill as well as I do, I'm

not surprised to hear that.

    Q.   And Bill is Mr. Wafford, right?

    A.   Correct.  I'm sorry.

    Q.   And you believe that Mr. Wafford is

a credible, competent executive of a company,

correct?

    A.   I certainly do.

    Q.   And as between Mr. Wafford and you,

he's more knowledgeable about the company's

financial position, right?

    A.   By a lot.

    Q.   Okay.

        MR. GLENN:  Now, let's pull up

next PX-151.

A.   It was.  But they're not internally inconsistent.  My views about overall enterprise, evolution and development doesn't change how I exercise my fiduciary duties and business judgment with respect to maximizing whatever was possible to the stakeholders of Topco.

Q.   Okay.  Let's turn to page 8, please. Page 8 has the legend "Professional Fees."  Do you see that?

A.   I do.

Q.   It says in the third bullet point down, "To date, Topco is paid for each box's allocation of the shared professional fees in addition to its own."

Do you see that?

A.   Yeah.

Q.   And then it says, "Topco will likely be refunded for portions of those fees that will be borne by QVC, Inc. and LINTA."

Do you see that?

A.   Yes.

Q.   Okay.  So do you know how much professional fees QVCG has funded for this restructuring process?

A.   To date, I believe they've funded $91 million.

Q.   And how much have they been refunded?

A.   Approximately $15 million.

Q.   So the net is that QVC Group has provided these other Debtors with $75 million in cash from its balance sheet to consummate the restructuring that we're here for today, correct?

A.   In the abstract, that's correct.

Q.   Okay.  Now, if the plan is confirmed, there will be no box at QVCG for any of that cash to be refunded into, correct?

A.   There will be -- well, there will be an agreed allocation and how ultimately -- there will be an agreed allocation of professional fees.  How that ends up being distributed in the event of the evolution of what happens to QVC Group will be determined.

Q.   But you know it's not going to the preferred shareholders, right?

A.   I know it's not going to the preferred shareholders because I know that under no circumstances would Inc. allow it to

Q.   I'll rephrase the question one more time to make this perfectly clear.

This deck prepared by your counsel tells you that the only potential recovery for preferreds before the first negotiation was to get a release, right?

MR. KOBRE:  Objection.  That's not what the document says.

JUDGE PEREZ:  Sustained.

BY MR. GLENN:

Q.   It says, "Potential recovery for preferreds is a release," correct?  That's what this says?

A.   Correct.

Q.   Okay.  And this is before you had any negotiations with any other stakeholders, correct?

A.   The date of this is --

Q.   February 12th.

A.   So if I may for a minute, there were loads of iterative conversations that were going on between the time of the --

THE WITNESS:  Your Honor, if you wouldn't mind, I need to take a bio break if we can do that.

JUDGE PEREZ:  Let's do that.

BY MR. GLENN:

Q.   It's fine.  It's fine.

A.   I don't know where you are in your --

Q.   It's fine.  I'll respect your needs.

A.   But if you need a few minutes to finish whatever section you're in --

JUDGE PEREZ:  Why don't we finish the answer, and then we can take a break.

BY MR. GLENN:

Q.   So my question to you, and I'm going to say it again so it's clear.  This is prepared by your counsel, correct?

A.   Correct.

Q.   And the potential recovery for preferreds is the box there, right?

A.   Correct.

Q.   And it says "preferreds getting releases," correct?

A.   Correct.

Q.   There's no reference here to the preferreds getting one dollar in cash, right?

A.   That is correct.

Q.   So as between you and PwC, the representatives of PwC that delivered that opinion are much more knowledgeable and experienced than you about tax matters, right?

A.   As to the specifics of individual tax positions, for sure.

Q.   Okay.  Now, you were aware of the tax insurance that was procured by the company to deal with the deferred tax liability, correct?

A.   I was aware from early on that that was -- that tax insurance was being sought, yes.

Q.   Okay.  And you testified that the premium for that was around $36 million, correct?

A.   For $925 million of coverage.

Q.   Now, I'd like you to turn to page 14 of this deck, if you would.

So this indicates on the title that, "QVC, Inc. should not bear the cost of tax insurance."  Do you see that?

A.   I do.

Q.   But you never proposed to QVC, Inc. that, as a settlement mechanic, QVC Group

Q.   Let's focus on the preferred shareholders' recovery.  There weren't that many iterative proposals on the preferred shareholders' recovery, were there?

A.   No.

Q.   There were zero and a hundred on their side, a hundred percent recovery on their side, and then you offered 25 million and then we went back to zero, right?

A.   Correct.

Q.   So do you have a general understanding that we're here to consider the standard approval under bankruptcy Rule 9019 for this intercompany settlement?

Not as an expert, do you have a general understanding?

A.   Yes.

Q.   So let's talk about the probability of success.  Now, before you agreed to the $400 million claim amount, you did not come to a view and the probability that QVC, Inc. would prevail on the intercompany litigation, did you?

A.   I did not come to a view any more than I came to a view as to whether we would

succeed in defending it.

Q.   Okay.

A.   What I did come to a view on was that it was extremely clear that they were bringing these claims.

Q.   Okay.  And you saw earlier that even the QVC, Inc. disinterested directors believed that the evidence of insolvency was mixed, right?

A.   Yes.

Q.   Okay.  Now, in terms of the probability of success, isn't it fair to say that your settlement assigns a zero percent probability of success on defending these intercompany claims?  Isn't that the case?

A.   First of all, I'm not in the business of evaluating percentages of success. They're in the eye of the beholder.

We believed that the 400 million was a reasonable discount over a billion-dollar claim, and it was an important part of the framework for a settlement.

Q.   Okay.  Are you able to tell the Court as you sit here today whether the

Mr. Meltzer, that there's at least a possibility, some possibility that QVC Group would have prevailed in this litigation. Isn't that right?  It's a possibility?

A.    I also agree that there's a possibility that QVC, Inc. would have materially prevailed in the litigation.

Q.    But let's focus on QVC Group.  QVC Group had some possibility of prevailing in this litigation, correct?

A.    Yes.

Q.    This litigation -- strike that.

This settlement that you have proposed to the Court leaves no possibility, recognizes no possibility that QVC Group ultimately would have prevailed, yes or no?

A.    Correct.

Q.    Now, let's talk about the cost of litigation.  I believe you testified about this earlier.  You never got an estimate of the cost of this litigation to litigate for either QVC Group or QVC, Inc., right?

A.    Correct.

Q.    Okay.  And, in fact, the company had

this $200 million war chest, correct?

A.    I think war chest is an overstatement.  They had $200 million of available cash.

Q.    Okay.  Which could have been used for the litigation defense, right?

A.    In part, yes.

Q.    Okay.  And you never used the cost of litigation either to QVC Group or to QVC, Inc. in these negotiations, did you?

A.    No.

Q.    And you never made the argument that if QVC, Inc. ultimately litigated this case, that they would have had to spend money, and their net recovery would have been lower than the intercompany claim that you've agreed to, did you?

A.    As I've said to you before, I did not stand in the head of Mr. Keglevic or Ms. Frizzley as to what their analysis was of what their likely return would be as to the -- as to the continued not only prevailing, but the continued moving forward with any of that litigation.  I did not do that.

Q.    Okay.  Now, you were asked by

preferred shareholders, right?

A. I do.

Q. And you agreed to this transaction in the late February/early March timeframe, correct, the settlement?

A. The settlement?

Q. Yes.

A. Well, it was -- yeah. Again, I'm not fencing with you; but I think it was really ongoing to almost right before the petition date.

Q. That's a fair response. So let's go back to the time you were negotiating the settlement.

So at that time you did not know what of the universe of preferred shareholders existing at that time actually received the dividends that are subject to this release, did you?

A. I did not. But I knew that potentially people who had received dividends and based on -- again, I don't want to in any way blow privilege here. The question of transferee liability was discussed.

Q. Okay. But do you understand that

the people who got the cash, the recipients of the dividends, are the targets of this litigation, right?

A.    Yes, I do.

Q.    And as you sit here today, you have no idea that when you negotiated the settlement, what proportion of the preferred shareholders were in the class that got the dividend versus the ones that bought it after and did not, right?

A.    That is correct.

Q.    So the stakeholders that you represented, the existing stakeholders during these negotiations, you had no idea what percentage of those existing preferred shareholders would, in fact, benefit from this release, right?

A.    All I know was that it was a widely distributed issue of preferred stock in which those preferred holders received $450 million, and that there was a -- I don't want to characterize it, but we believe that the releases had value to protect those holders.

Q.    Okay.  So it made no difference to you whether someone got a preferred dividend