# In the United States Court of Appeals for the Fifth Circuit

## NO. 26-20412

IN RE: QVC GROUP, INC., ET AL.

ADAM GUI, *ET AL.*,
APPELLANTS
V.
QVC GROUP, INC., *ET AL.*,
DEBTORS-APPELLEES,

On Appeal from the United States Bankruptcy Court
for the Southern District of Texas

## APPELLEES' OPPOSITION TO EMERGENCY MOTION FOR STAY PENDING APPEAL

Joshua A. Sussberg
Aparna Yenamandra*
Laila M. Kassis
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022

Chad J. Husnick*
Gabriela Zamfir Hensley*
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654

Rex W. Manning
  *Counsel of Record*
Katherine McMullen*
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 389-5000

*Counsel for Appellees*

July 31, 2026                                    *Admission Pending

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................iii

CITATION KEY ......................................................................................... vi

INTRODUCTION ........................................................................................1

BACKGROUND ...........................................................................................5

      A.    The Debtors ...................................................................5

      B.    The Investigation and Settlement .............................................6

      C.    The Bankruptcy ............................................................7

      D.    Appellants Enter the Fray ..................................................8

      E.    Proceedings Below ..........................................................8

STANDARD OF REVIEW ...........................................................................10

ARGUMENT .............................................................................................10

I.    The Court Lacks Appellate Jurisdiction ...............................................10

II.    Judge Perez Did Not Judicially Usurp Power By Denying A Stay Pending Appeal .........................................................................10

III.    Judge Perez Did Not Abuse His Discretion By Denying A Stay Pending Appeal, Either .............................................................12

      A.    Appellants are unlikely to succeed ..........................................13

            1.    When determining whether to approve the Settlement, Judge Perez correctly applied Bankruptcy Rule 9019 ........................................................13

            2.    The Plan complies with 11 U.S.C. §1123(a)(4) ...................18

            3.    The Plan complies with 11 U.S.C. §1129(a)(10) .................20

      B.    Appellants have not shown irreparable harm. .......................22

C.    A stay would substantially and irreparably harm Debtors and numerous other parties. ......................................22

D.    The public interest disfavors a stay. ........................................24

IV.    A Stay Pending Appeal Would Require A $631 Million Bond. ...........25

V.    An Interim or Administrative Stay Is Inappropriate And, If Ordered, Should Be Conditioned On A Bond Of $1,152,511.42 Per Day ............................................................................................26

CONCLUSION ..................................................................................................27

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
  361 B.R. 337 (S.D.N.Y. 2007) ........................................................................25

*In re Allied Props., LLC*,
  2007 WL 1849017 (Bankr. S.D. Tex. June 25, 2007) ......................................13

*ASARCO LLC v. Americas Mining Corp.*,
  396 B.R. 278 (S.D. Tex. 2008) .........................................................................16

*In re Cajun Elec. Power Co-op., Inc.*,
  119 F.3d 349 (5th Cir. 1997) ............................................................................13

*In re Collier*,
  582 F. App'x 419 (5th Cir. 2014), *as revised* (Sept. 24, 2014) ......................11

*In re Container Store Grp., Inc.*,
  2025 WL 4226766 (Bankr. S.D. Tex. Apr. 7, 2025) .........................................22

*In re Container Store Grp., Inc.*,
  676 B.R. 356 (S.D. Tex. 2026) .........................................................................21

*Cook v. Waldron*,
  2006 WL 1007489 (S.D. Tex. Apr. 18, 2006) ..................................................14

*In re Depuy Orthopaedics, Inc.*,
  870 F.3d 345 (5th Cir. 2017) ............................................................................11

*In re Fin. Oversight and Mgmt. Bd. for Puerto Rico*,
  989 F.3d 123 (1st Cir. 2021) ............................................................................24

*Garcia v. Orta*,
  47 F.4th 343 (5th Cir. 2022)..............................................................................18

*In re Gee*,
  941 F.3d 153 (5th Cir. 2019) (per curiam)..................................................10, 11

iii

*In re Jackson Brewing Co.*,
　　624 F.2d 599 (5th Cir. 1980) ...................................................................13

*In re Nat'l CineMedia, LLC*,
　　2023 WL 5030098 (S.D. Tex. Aug. 4, 2023) ..................................................12

*Plaquemines Parish v. Chevron USA, Inc.*,
　　84 F.4th 362 (5th Cir. 2023) .................................................................22

*Plekowski v. Ralston-Purina Co.*,
　　557 F.2d 1218 (5th Cir. 1977) ...............................................................11

*Poplar Grove Planting & Refin. Co. v. Bache Halsey Stuart Inc.*,
　　600 F.2d 1189 (5th Cir. 1979) ...............................................................26

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
　　390 U.S. 414 (1968) ...........................................................................17

*In re Robertshaw US Holding Corp.*,
　　662 B.R. 300 (Bankr. S.D. Tex. 2024) .......................................................15

*In re Serta Simmons Bedding, L.L.C.*,
　　125 F.4th 555 (5th Cir. 2024) ...............................................................19

*In re Spirit Airlines, Inc.*,
　　668 B.R. 689 (Bankr. S.D.N.Y. 2025) ........................................................21

*Swanigan v. FCA US LLC*,
　　938 F.3d 779 (6th Cir. 2019) ................................................................18

*Thomas v. Bryant*,
　　919 F.3d 298 (5th Cir. 2019) ................................................................12

*In re Topco, Inc.*,
　　894 F.2d 727 (5th Cir. 1990) ............................................................10, 11

*In re United States*,
　　397 F.3d 274 (5th Cir. 2005) (per curiam) .................................................10

iv

*United States v. Denson*,
   603 F.2d 1143 (5th Cir. 1979) (en banc) ........................................................11

**Statutes**

11 U.S.C. §1123(a)(4) ...................................................................18, 19, 21, 22

11 U.S.C §1124.................................................................................................21

11 U.S.C. §1129(a)(10) ....................................................................................20

28 U.S.C. §1651................................................................................................10

**Rules**

Fed.R.Bankr.P. 8007(c) ...................................................................................25

# CITATION KEY

"BK.Dkt." refers to the docket in the underlying bankruptcy proceeding.

"DC.Dkt." refers to the docket in the underlying district-court appeal.

"Dkt." refers to the docket in this appeal.

To the extent possible, all page numbers provided refer to the page number stamped at the top of the page by CM/ECF.

## INTRODUCTION

The third time is not always the charm. Shortly before and immediately after Debtors declared bankruptcy, several hedge funds bought preferred equity in the parent, QVC Group, Inc. ("QVCG"), for pennies on the dollar. Then they banded together a subset of other preferred-equity holders (together, "Appellants") and attempted to create hold-up leverage by objecting to Debtors' chapter 11 plan of reorganization ("Plan"). It didn't work. So they tried—and failed—twice to manufacture that leverage through emergency stay-pending-appeal motions in the bankruptcy court and district court. Those efforts proved unsuccessful, too. Now, Appellants once again seek to stop Debtors from emerging from bankruptcy. They change standards, change arguments, and continue to repeat a narrative that the record belies. But they are no more deserving of a stay today than they were earlier this week—or last week.

Less so, in fact. To get to this Court, they appealed the district court's stay denial. That is not a final order, though, so this Court lacks appellate jurisdiction. Appellants' only path to review is through the All Writs Act, yet they do not ask for a writ of mandamus, much less show that the bankruptcy court undertook the type of judicial usurpation of power that justifies

mandamus relief. These front-line faults warrant denial of their motion and dismissal of their appeal without even reaching their arguments.

Problems persist past the threshold. Appellants claim that every stay factor weighs in their favor, but they hardly address—and cannot overcome—the record below.

To test their objections to confirmation of Debtors' Plan, Judge Perez held a four-day evidentiary hearing, considered the testimony of eight witnesses, and admitted hundreds of exhibits. He then issued a 103-page opinion explaining his findings in detail.

There was no conspiracy, no collusion, no standing on both sides of a deal. No "purportedly" independent directors. Dkt.13-1 at 18. No one who "ransacked a solvent entity for the benefit of subsidiary creditors." *Id.* at 17. Just dedicated professionals and independent, disinterested fiduciaries working tirelessly—and independently—to investigate potential claims and figure out a path forward.

When Appellants first sought a stay pending appeal, Judge Perez held a second hearing. Debtors presented evidence of the harm they would suffer, which went unrebutted and unchallenged. Appellants presented no evidence. Judge Perez determined that none of the stay factors weighed in

Appellants' favor, and he explained his reasoning in a 25-minute oral ruling. Dkt.15 at 99. To fully develop the record, he also calculated the bond amount that would need to accompany any stay, if one were granted: $631 million — the amount necessary to remedy the harm if Debtors could not emerge from bankruptcy.

On these facts, no factor favors a stay. Appellants are unlikely to succeed on the merits. Their lead argument is that Judge Perez incorrectly assessed whether an intercompany settlement between some of the Debtors was fair and equitable. They say he abdicated his decision-making and never conducted an independent review, but even a glance at his opinion quells any fear that he abandoned his duty, and Appellants' related arguments suffer similar deficiencies. They also assert that Debtors' chapter 11 Plan violates section 1123(a)(4) of the Bankruptcy Code because some Preferred Shareholders value the releases they received more than others do. But Appellants never raised that argument in their prior stay motions, so they have forfeited it. And although they contend that the Plan violated section 1129(a)(10), they ignore a plain-text statutory carveout (and bankruptcy jurisprudence) that means section 1129(a)(10) does not apply.

3

The other factors likewise disfavor a stay. Appellants argue they will suffer irreparable harm because consummating the Plan could equitably moot their appeal. Yet the risk of equitable mootness is not a form of irreparable harm. By contrast, a stay would substantially harm Debtors, creditors, and other stakeholders in multiple ways. As Judge Perez found, a stay would risk unwinding the Restructuring Support Agreement, which locks in the creditor votes necessary for the QVC enterprise to restructure. And courts repeatedly hold that the public interest lies in promoting a successful reorganization, which the Debtors are on the cusp of achieving.

A successful reorganization would be something to celebrate. To stay in business rather than liquidate, Debtors hammered out a pre-packaged Plan that eliminates $5 billion in funded debt, resolves complex intercompany claims, pays general unsecured creditors in full, and saves 15,000 jobs. The Plan earned the support of virtually every stakeholder, including the official committee of unsecured creditors and multiple groups of lenders who stand behind the Plan even though they will receive much less than they were owed.

A stay, by contrast, would "wreak havoc" on Debtors' restructuring, Dkt.15 at 117-118 (18:23-19:4), to allow a minority of stakeholders to pursue

4

an appeal when they will be out of the money regardless of whether they win, *id*. at 662-63.

Judge Perez correctly took all this into account and acted well within his discretion when declining to issue a stay pending appeal.

The Court should deny the Motion.

## BACKGROUND

### A.    The Debtors

The QVC business sells products through media and specializes in home shopping. QVCG sits atop the hierarchy. Below it are Liberty Interactive, LLC ("LINTA"); QVC, Inc. ("QVC"); and Cornerstone Brands, Inc. ("Cornerstone"). The full family picture is larger, but QVCG, LINTA, QVC, and Cornerstone are the relevant entities.

Since 2022, QVC has transferred around $2.3 billion to QVCG and LINTA. Dkt.15 at 588-595. QVCG then paid its preferred and common shareholders approximately $2.1 billion in dividends. *Id*. at 598.

More recently, financial distress caused the QVC enterprise to explore restructuring. During that process, QVCG, LINTA, and QVC each appointed Disinterested Directors empowered to investigate potential intercompany claims. *Id*. at 580-581.

**B.     The Investigation and Settlement**

With the help of independent outside counsel, the Disinterested Directors collected, reviewed, and analyzed tens of thousands of documents. BK.Dkt.14 at 67. They interviewed executives. *Id.* at 68. They hired forensic accountants to track the money. *Id.* And they brought in tax experts to assess deferred-tax risks. Dkt.15 at 584. They concluded that QVC had potential claims against QVCG and LINTA totaling over $3 billion. *Id.* at 613.

QVC's potential claims against QVCG took at least three forms. QVC could pursue QVCG for fraudulently transferring significant portions of the billions QVC had sent QVCG. *Id.* at 599-605. QVC could also look to QVCG to indemnify it for possible deferred-tax liabilities, which could have exceeded $1 billion. *Id.* at 605-607. And QVC could pursue QVC's preferred shareholders to claw back the dividends QVCG paid. *Id.* at 605.

QVCG, LINTA, QVC, and others eventually reached a compromise (the "Settlement"). Relevant here, QVCG agreed to a $400 million general unsecured claim to be held by QVC. *Id.* at 622-623; BK.Dkt.14 at 66. In return, QVC released QVCG from all liability and released QVCG's shareholders from claw-back liability. Dkt.15 at 622-624; BK.Dkt.14 at 66. QVC also agreed to pay QVCG's general unsecured creditors in full. Dkt.15 at 624.

6

C.    The Bankruptcy

During settlement negotiations, Debtors also worked with their lenders on a comprehensive financial restructuring. Those discussions culminated in a Restructuring Support Agreement ("RSA"), which secured creditor support for a chapter 11 plan that preserved the business (rather than liquidating it). The Plan also implements the Settlement.

QVCG doesn't have $400 million in cash to pay QVC the full amount of the settlement claim. The Plan also transfers to QVC a 62% interest in Cornerstone that QVCG holds. Dkt.15 at 622-623. That interest still doesn't make QVC whole, but QVC has agreed to accept less than the full settlement amount. BK.Dkt.14 at 66.

The Plan garnered widespread creditor support. Unsecured creditors recover in full. Dkt.15 at 624. The official committee of unsecured creditors supported the Plan. Dkt.15 at 657. So did various groups of lenders who took substantial discounts on the face amount of their debt. *Id*.

As is almost always the case in a financial restructuring, equity holders did not fare as well. QVCG was able to obtain full releases for them, which eliminated the risk that QVC would claw back dividends. Dkt.15 at 617, 618, 622, 624. After paying the Settlement and its other creditors, though, QVCG

7

will be out of money, so equity holders will recover nothing. BK.Dkt.14 at 25. And QVCG, which will be left with no assets, will extinguish all equity interests, wind down, and dissolve. BK.Dkt.14 at 96.

### D.   Appellants Enter the Fray

Shortly after Debtors entered bankruptcy and announced their plans, several hedge funds purchased preferred shares for pennies on the dollar. BK.Dkt.341-109. They gathered support from a few individuals who also held preferred shares. The coalition behind this appeal holds roughly 22.5% of QVCG's preferred stock. BK.Dkt.315.

### E.   Proceedings Below

Appellants objected to confirmation of the Plan and challenged the Settlement. BK.Dkt.318. The bankruptcy court conducted a four-day evidentiary hearing. Judge Perez heard testimony from "eight highly credible Debtor-witnesses." Dkt.15 at 575. He admitted "hundreds of exhibits." *Id*. He then issued a 103-page opinion overruling the objections and confirming the Plan. *Id.* at 574. And he entered an order confirming the Plan ("Confirmation Order") on July 20, 2026. *Id.* at 475.

Appellants appealed the Confirmation Order to the district court. BK.Dkt.714; BK.Dkt.726. In the bankruptcy court, they moved for an

8

emergency stay pending appeal. Dkt.15 at 122. Judge Perez held an evidentiary hearing on the stay motion. BK.Dkt.745. Debtors presented the testimony of Jason Keyes, a restructuring advisor who established the harm Debtors and others would suffer from a stay. Dkt.15 at 466. Appellants presented no competing evidence and chose not to question Mr. Keyes.

The next day, in a 25-minute oral ruling, Judge Perez denied the motion. He found that Appellants "failed to carry their burden on the four elements" of the stay standard. Dkt.15 at 117 (18:17-20). To fully develop the record, he calculated the bond amount that would be required were a stay later granted: $631 million. Bk.Dkt.15 at 118 (19:20-21). The $631 million quantifies the harm that the estate would suffer if the Plan could not go into effect until after the appellate process runs its course.

Appellants filed a separate stay motion with the district court. DC.Dkt.3; *see also* Dkt.15 at 8 (amended motion). Judge Hanks, sitting in review of Judge Perez's stay decision, reached the same conclusion Judge Perez reached: Appellants "failed to carry their burden." Dkt.15 at 6.

Appellants appealed Judge Hanks's order denying their stay motion. DC.Dkt.44. They now seek a stay from this Court. Dkt.13-1. Debtors have

separately moved to dismiss this appeal for lack of jurisdiction. Dkt.14. Debtors now respond to oppose a stay.

## STANDARD OF REVIEW

When "the district court denies a stay pending appeal of a bankruptcy court's order," a dissatisfied party "may seek only a writ of mandamus under the All Writs Statute." *In re Topco, Inc.*, 894 F.2d 727, 735 n.12 (5th Cir. 1990) (citing 28 U.S.C. §1651). Mandamus is an "extraordinary remedy." *In re United States*, 397 F.3d 274, 282 (5th Cir. 2005) (per curiam). And when the issue on which mandamus is sought "is one committed to the discretion of the trial court," a petitioner may secure relief only by showing that the challenged ruling "amounts to a judicial usurpation of power." *In re Gee*, 941 F.3d 153, 158-59 (5th Cir. 2019) (per curiam) (citation omitted).

## ARGUMENT

### I.    The Court Lacks Appellate Jurisdiction

As Debtors explained in their emergency motion to dismiss, this Court lacks appellate jurisdiction. Dkt.14.

### II.   Judge Perez Did Not Judicially Usurp Power By Denying A Stay Pending Appeal

Although Appellants suggest that this Court has jurisdiction under 28 U.S.C. §1651(a), Dkt.13-1 at 20, that is all they have to say on the All Writs

10

Act and their sole path to review of the stay-pending-appeal denial. *See Topco, Inc.*, 894 F.2d at 735 n.12. Nowhere do they request a writ of mandamus, and nowhere do they contend that Judge Perez's exercise of his discretion "amount[ed] to a judicial usurpation of power." *Gee*, 941 F.3d at 159. That is reason enough to deny the motion.

In any case, Appellants are not entitled to mandamus relief. Because "[a] writ of mandamus is a drastic and extraordinary remedy reserved for really extraordinary causes," *In re Depuy Orthopaedics, Inc.*, 870 F.3d 345, 350 (5th Cir. 2017), it takes a flagrant abuse of judicial authority to justify one. Ordering relief that the law categorically forbids is enough. *See United States v. Denson*, 603 F.2d 1143, 1145 (5th Cir. 1979) (en banc). So is imposing a criminal punishment without warning—and without due process. *See In re Collier*, 582 F. App'x 419, 423 (5th Cir. 2014), *as revised* (Sept. 24, 2014).

But the discretionary application of well-established factors to a just-as-well-developed record falls short. *See, e.g.*, *Plekowski v. Ralston-Purina Co.*, 557 F.2d 1218, 1219-20 (5th Cir. 1977) (refusing to "review…discretionary matters via petition for writ of mandamus," including denials of motions for class certification, to compel interrogatory responses, and to certify immediate appeal). After all, a writ of mandamus "is not a substitute for an

appeal." *In re Depuy Orthopaedics, Inc.*, 870 F.3d at 350. Judge Perez's careful and considered stay denial looks nothing like the extreme departures from acceptable judging that prompt mandamus relief.

### III.   Judge Perez Did Not Abuse His Discretion By Denying A Stay Pending Appeal, Either

Also missing from Appellants' motion is any discussion of the standard of review that applies when an appellate court has jurisdiction to consider a bankruptcy court's denial of a stay pending appeal. The decision receives "abuse of discretion" review. *In re Nat'l CineMedia, LLC*, 2023 WL 5030098, at *2 (S.D. Tex. Aug. 4, 2023). Legal conclusions are reviewed de novo; fact findings for clear error. *Id.*

Even under this standard, Appellants miss the mark. Four factors governed Judge Perez's analysis: (1) likelihood of success on the merits; (2) irreparable harm to the movant absent a stay; (3) substantial injury to other interested parties with a stay; and (4) the public interest. *Thomas v. Bryant*, 919 F.3d 298, 303 (5th Cir. 2019). As he correctly determined, all four factors weighed against a stay.

### A.    Appellants are unlikely to succeed

####    1.    When determining whether to approve the Settlement, Judge Perez correctly applied Bankruptcy Rule 9019

Appellants first challenge Judge Perez's Rule 9019 analysis, which tested whether the Settlement was fair and equitable by examining several factors. Among them were the chances that QVCG could prevail in litigation against QVC; whether negotiations were arm's length; and what was best for creditors. Dkt.15 at 643-46. In Appellants' view, Judge Perez weighed every one of those factors incorrectly. Dkt.13-1 at 25-39.

To surpass the Rule 9019 threshold, a settlement need only be "fair and equitable and in the best interest of the estate," *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980), and fall "within the range of reasonable litigation alternatives," *In re Allied Props., LLC*, 2007 WL 1849017, at *4 (Bankr. S.D. Tex. June 25, 2007). To make that call, a bankruptcy court need not conduct a "mini-trial." *In re Cajun Elec. Power Co-op., Inc.*, 119 F.3d 349, 356 (5th Cir. 1997). All that is required is that the bankruptcy judge "be informed of all the relevant facts and information" and "make an independent judgment as to whether the settlement is fair and reasonable

13

under the circumstances." *Cook v. Waldron*, 2006 WL 1007489, at *4 (S.D. Tex. Apr. 18, 2006).

Here, Judge Perez outlined his independent judgment at great length. He issued a 103-page opinion, with 57 pages of fact findings and another 14 pages of Rule-9019 analysis. Dkt.15 at 575-632 (findings of fact), 633-647 (Rule 9019). Although Appellants disagree with his findings and conclusions seemingly from start to finish, they have never suggested that he was uninformed of the relevant facts.

Nor can Appellants show that the Settlement fell outside the range of reasonable litigation alternatives. QVCG had billions of dollars of exposure and no way to make money. *See* Dkt.15 at 614-616, 622-624. It faced multiple, independent claims that, if successful, would have wiped it out. *Id.* at 615, 663. The company could not have resolved the tax claims through litigation, either. *Id.* at 606-607. And shareholders faced claw-back suits from QVC. *Id.* at 604-605. Judge Perez correctly recognized all this and concluded that the settlement was "fair and equitable and in the best interest of the estates and their creditors." *Id.* at 647.

Appellants' factor-specific criticisms fare no better. For starters, many of their arguments distort the record. They accuse Judge Perez of

14

"abdicat[ing] his decision-making to the QVCG directors" and claim that an "independent review…was not conducted." Dkt.13-1 at 26-27. But Judge Perez exhaustively cataloged his independent assessment. Dkt.15 at 586-607, 640-41. They also call the settled claims "exceptionally weak," "dubious," "insubstantial," and "insufficiently weighty," and they suggest that the claims were immaterial. Dkt.13-1 at 17-18, 27-29. Yet Judge Perez found that the Disinterested Directors believed the opposite. Dkt.15 at 599-607.

Appellants question whether settlement negotiations were really arm's length as well. Dkt.13-1 at 28-29. The four-day evidentiary hearing, though, established that the Settlement was "achieved through a fair, arm's-length process devoid of fraud and collusion" and that the negotiation unfolded as a "robust process" of posturing, counterproposals, and give-and-take. Dkt.15 at 636-37, 645-46.

Appellants try to inject error into Judge Perez's findings by suggesting that Debtors treated the Disinterested Directors' titles as "talismans," second-guessing their judgment, and seeking to reconfigure their allegiances after the fact. Dkt.13-1 at 13-14. But Judge Perez dispelled any notion that the Disinterested Directors were conflicted. Dkt.15 580-583, 599, 607-622. Debtors' business judgment warrants great deference. *In re Robertshaw US*

15

*Holding Corp.*, 662 B.R. 300, 314–15 (Bankr. S.D. Tex. 2024). And the QVCG Disinterested Directors owed fiduciary duties to QVCG and, upon its entry into chapter 11, all its stakeholders, not just Appellants, who would have been out of the money in any scenario. *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 415 (S.D. Tex. 2008) ("Directors always owe fiduciary duties to the corporation. When the corporation is solvent, the beneficiaries of the duty are the shareholders of the corporation; however, if the corporation becomes insolvent, the creditors become beneficiaries of these same duties."); Dkt.15 at 662-63.

Appellants also misunderstand the Settlement. They argue that QVCG was sure to win the tax-indemnity claims because §502(e)(1)(B) of the Bankruptcy Code "foreclosed" them "as a matter of law." Dkt.13-1 at 27. But they ignore that QVCG has been both released from its tax obligation and indemnified and is therefore able to be dissolved. *See* BK.Dkt.359 ¶¶100-101. They repeatedly emphasize that Debtors did not disclose the settled claims in their SEC filings. Yet Debtors file consolidated disclosures, and any outward-facing liability was too speculative to disclose. *See id.* at ¶141 n.225.

Appellants also argue that the Plan's releases render the Settlement unfair and inequitable, but as Judge Perez correctly found, the releases the

16

Disinterested Directors received are "standard practice[]" and "not at all out of the ordinary." Dkt.15 at 635. The Disinterested Directors engaged in a months-long, "robust and at arm's-length" investigation and negotiation process, and "[n]o direct evidence was introduced to demonstrate (i) the siloed structure of the Disinterested Directors and Special Committees at each Key Entity was deficient to resolve potential conflicts; (ii) that the Disinterested Directors themselves were conflicted; or (iii) that conflicts counsel was conflicted/created a conflict." *Id.* at 635, 637. Appellants' argument misconstrues reality.

Appellants also contend that Judge Perez failed to independently assess the likelihood that the intercompany claims would succeed. Dkt.13-1 at 11. They cite *TMT*, but that case does not help them: the court there "accepted the bald conclusions of the trustee" and provided "no explanation of how the strengths and weaknesses" of the claims were evaluated. *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 433-34 (1968). Judge Perez did the opposite: based on his own analysis of the evidence, he examined the claims' "potential magnitude," the "potential defenses," and the "factual and legal issues" litigation would

17

present and expressly concluded that "the outcome of all potential intercompany claims was highly uncertain." Dkt.15 at 599-607, 640-641.

And rather than acknowledge the overwhelming creditor support for QVCG's Plan, they try to expand the inquiry to their equity interests. But the case they cite, *In re RNI Wind Down Corporation*, involved equity interests that were realistically "in the money," 348 B.R. 286, 298 (Bankr. D. Del. 2006), whereas here, Judge Perez found that under any alternative, "equity would still receive no recovery." Dkt.15 at 663.

### 2.    The Plan complies with 11 U.S.C. §1123(a)(4)

Appellants next contend that the Plan "independently violates §1123(a)(4) of the Bankruptcy Code" because even though all Preferred Shareholders receive the same treatment, some value that treatment more than others. Dkt.13-1 at 31-32. They never raised that argument when seeking a stay below, however, so they have forfeited it. *Garcia v. Orta*, 47 F.4th 343, 349 (5th Cir. 2022). And because judges "depend on the arguments presented by the parties in making decisions," *id.*, this Court should "refuse to grade" Judge Perez "on a test [he] never took." *Swanigan v. FCA US LLC*, 938 F.3d 779, 789 (6th Cir. 2019).

18

In any event, the Plan did not violate §1123(a)(4). That provision requires "the same treatment for each claim or interest of a particular class." 11 U.S.C. §1123(a)(4). All the preferred shareholders sit in a single class, and the Plan treats each of them exactly alike. Every share of preferred stock is cancelled, no holder receives any distribution or payment, and every holder receives the identical release of any claims to claw back the dividends QVCG paid on the preferred stock. No holder gets a dollar, a share, or a right that another holder does not. Judge Perez so found. Dkt.15 at 653 ("the Preferred Shareholders received equal, rather than unequal treatment…within the meaning of §1123(a)(4)").

Appellants' reliance on *In re Serta Simmons Bedding, L.L.C.*, 125 F.4th 555 (5th Cir. 2024), is misplaced. There, the plan gave every lender an indemnity worth "millions or even tens of millions of dollars" to the lenders who had taken part in the transaction and faced exposure, and "little or even nothing" to the lenders who had not. *Id.* at 591-92. This Court held that giving the class the same indemnity on paper was not equal treatment when its *monetary* value was so lopsided. *Id.*

A release is fundamentally different. An indemnity puts money in a claimant's pocket: it "has 'make-whole' characteristics" and "creates an

19

affirmative right to payment." Dkt.15 at 651. A release does the opposite. It pays nothing and "does not create any such affirmative right to payment (i.e., 'value')." *Id.* It promises only that the estate will not sue. No money changes hands, and every preferred shareholder lands in exactly the same position—receiving nothing and returning nothing. That is the definition of equal treatment.

### 3.    The Plan complies with 11 U.S.C. §1129(a)(10)

Finally, Appellants argue that the Plan violates 11 U.S.C. §1129(a)(10). Dkt.13-1 at 17-20. *If* a chapter 11 plan impairs any class of claims—meaning creditors recover less than full value—section 1129(a)(10) requires at least one impaired class to accept the plan. Judge Perez held that section 1129(a)(10) does not apply because no classes of claims against QVCG are impaired. Dkt.15 at 668.

Appellants contest that ruling. They argue that the class containing QVC's claim against QVCG was impaired. Dkt.13-1 at 34. QVC agreed to settle that claim for $400 million and accept less than a full recovery. *Id.* Because QVC will recover less than $400 million, Appellants argue that QVC's claim is impaired. *Id.*

Appellants misunderstand the law. Section 1124 of the Bankruptcy Code defines impairment but carves out the circumstances listed in section 1123(a)(4). *See* 11 U.S.C. §1124 ("except as provided in section 1123(a)(4)"). Section 1123(a)(4), in turn, permits a claim holder to "agree[] to a less favorable treatment." 11 U.S.C. §1123(a)(4). In other words, when a creditor "consent[s] to specific treatment that is less than the creditor's full legal and equitable rights," its claim is no longer considered impaired. *In re Spirit Airlines, Inc.*, 668 B.R. 689, 702 (Bankr. S.D.N.Y. 2025); *see also In re Container Store Grp., Inc.*, 676 B.R. 356, 377 (S.D. Tex. 2026).

That is what happened here. By agreeing to accept what QVCG could pay, QVC consented to less favorable treatment. Under section 1123(a)(4), QVC's consent makes its claim unimpaired. *See* Dkt.15 at 434-435 (collecting cases). QVC's claim is the only claim in Class A4, so the class is also unimpaired, and section 1129(a)(10)'s requirements do not trigger.

Appellants' contrary arguments miss the mark. For all they have to say on the difference between acceptance and impairment, section 1124's reference to the alteration of rights, and supposedly unjustified differences in classification, *see* Dkt.13-1 at 31-35, they never address section 1124's express carveout of the circumstances in section 1123(a)(4). When a creditor

"agrees to a less favorable treatment," 11 U.S.C. §1123(a)(4), its claim falls outside section 1124—and therefore is not impaired, Dkt.15 at 668.

### B.   Appellants have not shown irreparable harm.

Appellants argue that once the Plan goes into effect, their appeal could become equitably moot. Dkt.13-1 at 35-36. But that is not enough. As "many courts in the Fifth Circuit have held[,] the possibility of the application of equitable mootness does not demonstrate irreparable injury." *In re Container Store Grp., Inc.*, 2025 WL 4226766, at *9 (Bankr. S.D. Tex. Apr. 7, 2025); *see also Plaquemines Parish v. Chevron USA, Inc.*, 84 F.4th 362, 376 (5th Cir. 2023) (mere "possibility of irreparable injury fails to satisfy" irreparable-harm inquiry).

### C.   A stay would substantially and irreparably harm Debtors and numerous other parties.

On "very credible and uncontradicted evidence," Judge Perez found that a stay would "wreak havoc" on Debtors' restructuring and pose "real risk as well as unrecoverable harm" to Debtors, their employees, lenders, creditors, and vendors. Dkt.15 at 117-118 (18:23-19:4), 114 (15:17-16:9), 115 (16:10-24). Appellants do not contest Judge Perez's findings. Even though they ask this Court to "enter an order staying the effectiveness of the Confirmation Order" in its entirety, they argue that Debtors and others will

suffer no harm because "the Court can tailor relief to the QVCG-specific provisions…," Dkt.13-1 at 38-39, 36. Their refusal to address the harm emanating from a full stay reflects their tacit admission that such harm would occur.

A "tailored" stay would not prevent that harm. QVCG cannot be isolated from the rest of the enterprise. The Settlement and RSA are interlocking, part of a holistic resolution. A QVCG-specific stay would "hold up" the Settlement, which "functions as the keystone to the RSA and the Plan." Dkt.15 at 115 (16:25-17:4). The delay would "necessarily have irreparable downstream effects on the terms of the RSA" and those parties have "no…obligation to recommit to…after August 17." *Id.* at 116 (17:5-11). Without the RSA to keep the parties aligned, Debtors' chapter 11 cases could unravel. And if that came to pass, Debtors' "employees, lenders, creditors, vendors, and other unsecured parties" would all suffer "unrecoverable harm." *Id.* at 115 (16:15-17).

Whether full or tailored, a stay pending appeal would impose orders of magnitude more harm than allowing the Confirmation Order to take effect. Courts often deny stay motions when the harm from a stay would

greatly outweigh the harm absent one. *See* Dkt.15 at 455 ¶87 (collecting cases). The same result should follow here.

### D.    The public interest disfavors a stay.

The public interest favors successful reorganizations and finality in bankruptcy. *See In re Fin. Oversight and Mgmt. Bd. for Puerto Rico*, 989 F.3d 123, 134 (1st Cir. 2021) ("we have long affirmed the important public policy favoring orderly reorganization and settlement of debtor estates by affording finality to the judgments of the bankruptcy court" (internal quotation marks omitted)). Here, the Confirmation Order allows Reorganized QVC to emerge from bankruptcy better positioned for long-term growth, benefiting employees, vendors, commercial counterparties, and creditors relying on the Confirmation Order's finality. Dkt.15 at 469 ¶8; *id.* at 422 ¶7.

Appellants respond that the public interest favors preventing the will of the majority from going unchecked by appellate review. Dkt.13-1 at 38. That is just their irreparable-harm argument repackaged as the public interest. They also claim the public interest supports "ensuring proper scrutiny of an insider-driven settlement and the disclosure of material litigation risks to the public securities markets." *Id.* But that argument rests

24

on a retelling of their conspiracy theory, which Judge Perez's extensive fact findings debunked, and a misunderstanding of accounting principles and securities law. There was no "gambit" or "maneuver," *id.*, and Debtors concealed nothing, *supra*, pp. 15-16.

## IV.   A Stay Pending Appeal Would Require A $631 Million Bond.

Under Bankruptcy Rule 8007(c), a court "may condition relief on filing a bond or other security." Fed.R.Bankr.P. 8007(c). The amount is typically set "at or near the full amount of the potential harm" to the parties who do not seek a stay. *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 368 (S.D.N.Y. 2007). In large bankruptcies, courts have set bond amounts in the hundreds-of-millions or billions of dollars. *See, e.g.*, *id.* ($1.3 billion); *id.* at n.166 (collecting cases); *see also* Dkt.15 at 458.

Here, after considering the "very credible and uncontradicted evidence" that Debtors presented at the stay hearing, Judge Perez determined "the minimum bond requirement would be no less than $631 million." *Id.* at 117-118 (18:23-19:2, 19:20-21).

Appellants take issue with his ruling, but they have not shown an abuse of discretion. They first argue that a bond would be inappropriate because "the assets affected by the stay…will remain intact" if they lose on

appeal. Dkt.13-1 at 37. Appellants are wrong. Professional fees—which so far have averaged $17 million per month—will continue to drain the bankruptcy estate. Dkt.15 at 472. And the risk to those assets is not the only harm a stay will cause. Even the short period Debtors have been in bankruptcy has been associated with decreased revenue, lost business opportunities, and added supplier and employee expenses. *Id.*

Appellants also suggest that "alternate security" could take a bond's place. Dkt.13-1 at 37-38. They say QVCG could deposit the "disputed funds" in "an interest-bearing account." *Id.* That would solve nothing. QVCG *won* below; it does not need to secure itself. If Appellants want the stay, they must post the bond. *Poplar Grove Planting & Refin. Co. v. Bache Halsey Stuart Inc.*, 600 F.2d 1189, 1191 (5th Cir. 1979).

## V. An Interim or Administrative Stay Is Inappropriate And, If Ordered, Should Be Conditioned On A Bond Of $1,152,511.42 Per Day

Appellants also request an "interim" or "administrative" stay. Dkt.13-1 at 16, 38. Should the Court order a stay beyond August 3, consistent with Judge Perez's bond calculation—which has not been appealed, stayed, or reversed—the Court should require Appellants to post a bond of $1,152,511.42 per day. *Id.*

## CONCLUSION

The Court should deny the Motion.

July 31, 2026

Joshua A. Sussberg
Aparna Yenamandra*
Laila M. Kassis
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022

Chad J. Husnick*
Gabriela Zamfir Hensley*
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654

Respectfully submitted,

s/ Rex W. Manning
Rex W. Manning
  *Counsel of Record*
Katherine McMullen*
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 389-5000

*Admission Pending*

27

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above response brief was filed electronically on July 31, 2026, and will therefore be served electronically upon all counsel.

*s/ Rex W. Manning*

Rex W. Manning

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this response complies with the word limit of Fed. R. App. P. 27(d)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 5,190 words. The response also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced, roman-style typeface of 14 points or more.

*s/ Rex W. Manning*
Rex W. Manning